Case No. 25-3138

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

**VOTEAMERICA and VOTER PARTICIPATION CENTER,**

*Plaintiffs-Appellees*

v.

**SCOTT SCHWAB, in his official capacity as Kansas Secretary of State; KRIS KOBACH, in his official capacity as Kansas Attorney General; and STEPHEN M. HOWE, in his official capacity as District Attorney of Johnson County**

*Defendants-Appellants*

## APPELLANTS' OPENING BRIEF

Appeal from the U.S. District Court for the District of Kansas
Honorable Kathryn H. Vratil, District Judge
District Court Case No. 2:21-CV-02253-KHV-GEB

Kris Kobach
  Attorney General
Anthony J. Powell
  Solicitor General
**Kansas Attorney General's Office**
120 SW 10th Ave., Room 200
Topeka, KS 66612-1597
Tel.: (785) 296-2215
Fax: (785) 291-3767
Email: anthony.powell@ag.ks.gov
Email: kris.kobach@ag.ks.gov

Bradley J. Schlozman
Scott R. Schillings
Garrett R. Roe
**HINKLE LAW FIRM LLC**
1617 N. Waterfront Parkway, Ste. 400
Wichita, KS 67206
Tel: (316) 267-2000
Fax: (316) 264-1518
Email: bschlozman@hinklaw.com
Email: sschillings@hinklaw.com
Email: groe@hinklaw.com

***ORAL ARGUMENT REQUESTED***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

STATEMENT OF PRIOR OR RELATED APPEALS ..................................... v

JURISDICTIONAL STATEMENT ................................................................. 1

STATEMENT OF THE ISSUES ...................................................................... 1

STATEMENT OF THE CASE .......................................................................... 1

SUMMARY OF THE ARGUMENT .............................................................. 13

ARGUMENT .................................................................................................. 17

    I.      De Novo Standard of Review Must Be Applied ................................. 17

    II.    District Court Erred in Subjecting Prohibition to Strict Scrutiny .... 18

    III.   The Prohibition Satisfies Intermediate Scrutiny ............................... 27

          A.   *The Prohibition's Restrictions on Speech Occur in a Non-Public Forum Where Regulatory Latitude is Much Greater* ........................ 28

          B.   *Defendants Did Not Waive Their Non-Public Forum Argument* ..... 34

               1.   Mandate in *VoteAmerica I* Did Not Foreclose Argument About Non-Public Forum ........................................................ 34

               2.   Appellate Court's Modification of Governing Legal Standard Warrants Consideration of All Legal Theories Underlying that Standard on Remand ........................................................ 37

          C.   *The Prohibition Would Survive Intermediate Scrutiny Even if an Advance Ballot Application is Considered a Public Forum* ............ 39

    IV.   The State's Demonstrated Interests Amply Justify the Prohibition ......................................................................................... 40

    A.   *The Court Imposed a Legally Erroneous Evidentiary Burden*.........41

    B.   *The Stipulated Facts Justify the Prohibition* ....................................45

        1.   Minimizes Voter Confusion........................................................45

        2.   Facilitates Orderly and Efficient Election Administration .......49

        3.   Promotes Public Confidence in Integrity of Electoral System and Deters Voter Fraud................................................51

        4.   Provides Ample Alternative Channels for Communication.....53

**CONCLUSION**.................................................................................................54

**STATEMENT IN SUPPORT OF ORAL ARGUMENT** .................................56

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)**..............56

**CERTIFICATE OF DIGITAL SUBMISSION**................................................57

**CERTIFICATE OF SERVICE** ........................................................................57

**INDEX OF ATTACHMENTS**...........................................................................58

    **Attachment 1: Memorandum & Order (July 3, 2025)**...................Attach. 1

    **Attachment 2: Judgment of the Court (July 16, 2025)** .................Attach. 2

# TABLE OF AUTHORITIES

Cases                                                                                        Page(s)

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ........................... 33
*Brewer v. City of Albuquerque*, 18 F.4th 1205 (10th Cir. 2021) ..................... 29, 39
*Brnovich v. DNC*, 594 U.S. 647 (2021) ........................................................... 40, 53
*Burdick v. Takushi*, 504 U.S. 428 (1992) .............................................................. 31
*Burson v. Freeman*, 504 U.S. 191 (1992) .................................... 32, 40, 42, 43, 44
*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022) ...... 9, 11
*Colorado v. U.S. EPA*, 989 F.3d 874 (10th Cir. 2021) ........................................... 23
*Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015) ............................. 36
*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788 (1985) ....... 28, 29, 30
*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ............................. 52
*Cressman v. Thompson*, 798 F.3d 938 (10th Cir. 2015) ....................................... 17
*Daunt v. Benson*, 999 F.3d 299 (6th Cir. 2021) .................................................. 50
*Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177 (2007) ........................................ 32
*Dish Network Corp. v. Arrowood Indem., Co.*, 772 F.3d 856 (10th Cir. 2014) ..... 34
*Doe v. Reed*, 561 U.S. 186 (2010) .................................................................. 31, 40
*DSCC v. Pate*, 950 N.W.2d 1 (Iowa 2020) ........................................................... 40
*Evans v. Sandy City*, 944 F.3d 847 (10th Cir. 2019) ....................................... 28, 39
*Frank v. Lee*, 84 F.4th 1119 (10th Cir. 2023) ...................................................... 42
*Free Speech Coal. v. Paxton*, 606 U.S. 461 (2025) ......................................... 27, 28
*Greenlaw v. United States*, 554 U.S. 237 (2008) .................................................. 23
*Hill v. Colorado*, 530 U.S. 703 (2000) ................................................................ 24
*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .................................... 33
*Huffman v. Saul Holdings Ltd. P'ship*, 262 F.3d 1128 (10th Cir. 2001) ............... 37
*Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) ...................................... 30
*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................. 19, 20, 29, 39, 53
*Meyer v. Grant*, 486 U.S. 414 (1988) .................................................................. 53
*Mills v. Alabama*, 384 U.S. 214 (1966) ........................................................ 43, 44
*Minn. Voters All. v. Mansky*, 585 U.S. 1 (2018) ............................................ 32, 42
*Minority Television Project, Inc. v. FCC*, 736 F.3d 1192 (9th Cir. 2013) ............. 45
*Munro v. Socialist Workers Party*, 479 U.S. 189 (1986) ................................. 41, 42
*NLRB v. Noel Canning*, 573 U.S. 513 (2014) ...................................................... 20
*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ............. 29
*Pioneer Centres Holding Co. ESOP & Trust v. Alerus Fin., N.A.*,
   858 F.3d 1324 (10th Cir. 2017) ........................................................................ 22

*Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*,
  64 F.4th 287 (5th Cir. 2023) ................................................................ 38
*Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463 (1979) ................ 25
*Storer v. Brown*, 415 U.S. 724 (1974) .................................................. 31
*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ........................... 41
*Travelers Ins. Co. v. Rowand*, 197 F.2d 283 (5th Cir. 1952) .......................... 23
*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ....................... 20, 27, 29
*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ................................ 27
*United States v. Amador-Bonilla*, 102 F.4th 1110 (10th Cir. 2024) .................... 18
*United States v. Delgado-Lopez*, 974 F.3d 1188 (10th Cir. 2020) ...................... 23
*United States v. Dutch*, 978 F.3d 1341 (10th Cir. 2020) ........................... 34, 37
*United States v. Kokinda*, 497 U.S. 720 (1990) ...................................... 28
*United States v. O'Brien*, 391 U.S. 367 (1968) ...................................... 21
*United States v. Walker*, 918 F.3d 1134 (10th Cir. 2019) ............................ 34
*Utah Educ. Ass'n v. Shurtleff*, 565 F.3d 1226 (10th Cir. 2009) ...................... 17
*Verlo v. Martinez*, 820 F.3d 1113 (10th Cir. 2016) .................................. 37
*Vidal v. Elster*, 602 U.S. 286 (2024) ........................................... 31, 32
*VoteAmerica v. Raffensperger*, Case No. 21-CV-1390, 2025 WL 2607827
  (N.D. Ga., Sept. 8, 2025) ............................................................ 7
*VoteAmerica v. Schwab*, 671 F. Supp. 3d 1230 (D. Kan. 2023) .......................... 9
*VoteAmerica v. Schwab*, 121 F.4th 822 (10th Cir. 2024) ................................
................................ 9, 13, 18, 26, 27, 28, 30, 31, 32, 34, 35, 36, 45, 50, 53, 54
*Walden v. Kosinski*, 153 F.4th 118 (2d Cir. 2025) ................................... 28
*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ..................... 20, 24, 27, 28, 39
*Wheeler v. John Deere Co.*, 935 F.2d 1090 (10th Cir. 1991) ........................... 17
*Youngberg v. Romeo*, 457 U.S. 307 (1982) ............................................ 25

Statutes

28 U.S.C. § 1291 ...................................................................... 1
28 U.S.C. § 1331 ...................................................................... 1
Ga. Code Ann. § 21-2-381(a)(1)(C)(ii) ................................................. 7
K.S.A. 25-1122(*l*)(1) ............................................................. 7, 21
K.S.A. 25-1122(k)(1)(D) .............................................................. 46
K.S.A. 25-1122(k)(1)(C) .............................................................. 46
Kan. Stat. Ann. ("K.S.A.") 25-1122(k)(2) ............................................. 7
U.S. Const. Art. 1 ................................................................... 32

Other Authorities

Kan. H.B. 2332 ................................................................................ 11, 22
Kan. H.B. 2016 ...................................................................................... 8
Kan. H.B. 2332 ................................................................ 10, 11, 19, 22, 24

## STATEMENT OF PRIOR AND RELATED APPEALS

This is the second appeal in this case. The Tenth Circuit previously reversed and remanded the district court's judgment. *See VoteAmerica v. Schwab*, 121 F.4th 822 (10th Cir. 2024).

# JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331. The court issued a Memorandum and Order on July 3, 2025, and a separate Judgment disposing of all remaining claims on July 16, 2025. App.IV 775-817.[1] Defendants-Appellants filed a timely notice of appeal on August 13, 2025. App.IV 818. This Court now has jurisdiction pursuant to 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

(I)   Did the district court commit legal error in concluding, based on the parties' stipulated facts and the court's own judicial notice of unrelated lawsuits and certain statements by President Donald Trump following the November 2020 General Election, that the Kansas legislature acted with an "improper purpose or justification" in enacting the Pre-Filled Application Prohibition such that the law must be subjected to strict scrutiny in connection with Plaintiffs' First Amendment free speech claim?

(II)  Did the district court commit legal error in concluding that Kansas' Pre-Filled Application Prohibition does not survive intermediate scrutiny?

# STATEMENT OF THE CASE

This case returns to the Tenth Circuit following a prior remand to the district court. The case revolves around the process for advance voting by mail in Kansas, the complications that can and have arisen when third parties mail unsolicited, pre-filled advance ballot applications to voters, and the State's constitutional authority to mitigate those harms through appropriate legislation.

---

[1] References to the Appendix include the volume number (e.g., App.IV) followed by specific page number(s).

The facts were submitted by the parties, and decided by the district court, exclusively on written stipulations. App.III 594-627. Other than a pre-discovery preliminary injunction hearing, there was neither oral argument nor any evidentiary hearings during the district court proceedings.

To vote by mail under Kansas' no-excuse advance voting rules, a registered voter must timely submit a properly completed advance ballot application to the county election office in which the individual is registered. App.III 599-¶28. With the exception of clearly inadvertent mismatches (e.g., minor misspellings of street names or signing "Jim" despite being registered as "James"), all information on the application must precisely match the data in the statewide voter registration database ("ELVIS") for the applicant to be issued an advance ballot. App.III 599-¶24, 600-¶37. If information does not match or is missing, county election officials must undertake a highly time-consuming process to contact and afford the voter a chance to cure the deficiencies. App.III 600-¶¶33-35. If the voter cannot be reached or it would be impracticable to do so given the proximity of the election, a more labor-intensive provisional ballot may be issued, depending on the defect. App.III 600-¶36, 601-¶43.

This cure process can be protracted and time consuming. Although it takes an experienced election official, on average, roughly three to five minutes to process an accurate advance ballot application, App.III 615-¶153, an average of fifteen minutes

of staff time is typically necessary if the cure process must be utilized. App.III 615-¶¶154-155. If a voter cannot be contacted and must instead be sent a provisional ballot, the process ordinarily consumes thirty minutes or more of staff time. App.III 615-¶156. Review of inaccurate or duplicate applications, meanwhile, generally takes seven to ten minutes of staff time to process if the voter does not need to be contacted, but can take fifteen to thirty minutes or more if officials must communicate directly with the voter. App.III 619-¶¶176-177.

*VPC's Advance Ballot Application Activities in Kansas*

Plaintiff Voter Participation Center ("VPC") is a 501(c)(3) entity which, along with its 501(c)(4) sister organization, Center for Voter Information ("CVI"), mails partially pre-filled advance ballot applications – in which the voter's name, address, and county are pre-populated – to targeted registrants meeting certain demographics. App.III 597-¶6, 598-¶14, 602-¶48. The pre-filled applications are accompanied by a cover letter in which VPC touts the benefits of voting by mail, and a pre-addressed, pre-paid envelope for the recipient to use in returning the completed application to the election office. App.III 602-¶48; App.IV 821-825. In 2020, VPC relied on a vendor (Catalist) to provide the data that it used to pre-populate its applications. App.III 602-¶52. Although the information Catalist sent to VPC was based upon publicly available information in ELVIS, Catalist also merged commercial data into the mix, meaning the information VPC received did not always track ELVIS data.

App.III 604-¶63. Because of the significant lag time between data gathering and the printing and mailing of the pre-filled applications, the information used to pre-populate the forms was also often stale. App.III 603-¶53, 605-¶68. This resulted in substantial quality control issues with VPC's mailings.

Prior to the November 2020 election, VPC and CVI mailed between one and five advance ballot application packets to nearly 508,000 Kansas voters. App.III 602-¶47, 617-¶165. This occurred over five "waves" of mailings. App.III 604-¶60. Many of these pre-filled applications contained erroneous information. VPC's internal data revealed that nationally, approximately 5% of its pre-filled applications contained an erroneous middle name or initial and about 3% had a mismatched suffix. App.III 604-¶64.[2] That would translate to more than *40,600* inaccurate applications in Kansas, assuming a similar error rate. Although VPC did not know whether Kansas' error rates exactly tracked its national error rate, it never argued that the rates did not track. And VPC was sufficiently concerned about the accuracy of the data it received from Catalist that it stopped pre-filling applications and instead sent blank applications in the third and fourth Kansas waves. App.III 604-¶¶ 61-62, 65.

In discovery, VPC provided only a subset of its Kansas mailing list (just under 313,000 of the voters to whom it sent at least one advance ballot application). But

---

[2] VPC undertook similar activity in seventeen other states. App.IV 820.

Defendants' expert, Ken Block, identified an array of errors in the names and addresses VPC used to pre-fill the applications, and he highlighted almost 400 VPC mailings to voters whose registrations had been cancelled. App.III 605-606-¶¶67-74. He also discovered that, *at best*, VPC used a Kansas voter file from April 2020 to pre-fill the applications it sent to voters for the November 2020 Election. App.III 603-¶53; 605-¶68. Given that ELVIS is a dynamic system and updated in real time, App.III 603-¶58, it was thus clear that VPC often used stale / inaccurate information.

Even Plaintiffs' expert, Dr. Eitan Hersh, acknowledged that at least 3% of VPC's Kansas voter database was inaccurate, suggesting that VPC and CVI sent more than *15,000 erroneous applications* to Kansas voters in connection with the 2020 General Election. App.III 607-¶88. Dr. Hersh observed that VPC could have achieved greater accuracy, but that VPC's cost-benefit assessment led it to refrain from taking such measures. App.III 608-¶90. In fact, he said that a 3% error rate fit "quite in line with his expectations." App.III 607-¶88.

VPC further plagued voters with a rash of duplicate applications. Shawnee County Election Commissioner Andrew Howell described receiving a substantial number of pre-filled applications containing information that did not match applicants' data in ELVIS (e.g., wrong address, last name, middle initial, or suffix). App.III 613-¶139. He also noted the county received 4,217 duplicate applications, a staggering figure representing more than 15.4% of the total advance applications

received. App.III 617-618-¶¶168-169. Ford County Clerk Debbie Cox testified similarly. Her office received 274 duplicates, nearly 9% of the 3,040 total applications. App.III 618-¶172. These figures bore no resemblance to the 2020 proportional increase in mail voting, considering that Shawnee County had never received more than a *dozen* duplicates in any prior election, and Ford County had never received more than *five*. App.III 618-¶¶169-170; 173. Election Director Bryan Caskey testified that other county election officials throughout the State shared their own similar experiences with him. App.III 616-¶¶161-162.

Howell recounted that these inaccurate and duplicate applications resulted in calls, letters, e-mails, and in-office visits from voters expressing anger, confusion, and frustration at what they had received. App.III 614-¶¶142-144. Howell and Cox both also noted that many voters explained that they had only submitted duplicate applications because they *believed they were obligated to mail any and all pre-filled applications back to the county election office*, even if they had previously submitted one, and even if they had no desire to vote by mail. App.III 614-¶143; 618-¶171; 619-620-¶179.

These inaccurate and duplicate applications had a deleterious impact on efficient election administration. Election officials described the extra time they had to spend processing every application and going through the elaborate curative process for voters submitting erroneous and duplicate applications. App.III 615-616-

¶¶153-157; 619-¶¶176-178. Cox recalled the situation got so bad in Ford County that she took out an ad in the local paper to inform voters she had nothing to do with VPC's mailings. App.III 615-¶¶150-151; App.IV 826. VPC itself received enough complaints about its pre-filled applications that it created an FAQ for staff to use in responding to voters in which voters were told that VPC was "aware" that it was mailing forms with "Someone else's information" and that voters should use the Secretary of State's website to obtain a *blank application* instead. App.III 616-¶158. Officials in other states complained to VPC about its inaccuracies as well. App.III 616-¶159.[3]

*Legislative Reaction to 2020 Election and Ensuing Litigation*

In response to the events of the 2020 election, the Kansas legislature in its 2021 session adopted the Pre-Filled Application Prohibition (hereinafter, "the Prohibition"), codified at Kan. Stat. Ann. ("K.S.A.") 25-1122(k)(2).[4] The statute makes

---

[3] Georgia passed a law similar to Kansas' Prohibition in March 2021, *see* Ga. Code Ann. § 21-2-381(a)(1)(C)(ii), also in response to significant complaints about inaccurately pre-filled absentee vote applications from VPC. These same plaintiffs asserted identical claims against Georgia's statute. A district court recently rejected those claims following trial. *VoteAmerica v. Raffensperger*, Case No. 21-CV-1390, 2025 WL 2607827 (N.D. Ga., Sept. 8, 2025).

[4] The Legislature separately prohibited any person not residing or domiciled in Kansas from sending an advance ballot application to a Kansas voter. K.S.A. 25-1122(*l*)(1). After the district court preliminarily enjoined that statute's enforcement, Defendants agreed to a permanent injunction, and Plaintiffs dismissed Count IV of their Complaint. App.I 123-126; App.III 620-¶187. Those claims are not part of this litigation.

it a misdemeanor for any person to solicit, by mail, a registered voter to file an advance ballot application if the mailing includes an application that has been partially or fully completed prior to the mailing.[5]

*Proceedings Below*

Plaintiffs VoteAmerica and VPC commenced this lawsuit, alleging that the Prohibition contravened their First Amendment freedoms of speech and association and was unconstitutionally overbroad. App.I 28. Plaintiffs moved for a preliminary injunction, which the district court granted.[6] App.II 77. Following discovery, the parties filed cross-motions for summary judgment. App.I 150 – App.III 592. The district court initially declined to rule on the motions and instead directed the parties to stipulate to the facts. App.III 461. The court also invited the parties to submit the case for trial on the written record generated by the summary judgment motions. App.III 462. After the parties accepted this invitation, the court denied the summary judgment motions in a minute order but stated that the motions would be considered as trial briefs. App.III 593. The parties subsequently filed stipulated facts, App.III 594-627, and the case was submitted without oral argument or evidentiary hearings. App.III 628.

---

[5] In a 2025 amendment, the legislature modified the statute to allow the date of the election to be pre-filled. *See* HB 2016, § 2(k)(2) (2025).

[6] The parties stipulated that the activities of VoteAmerica, which operates an interactive website whereby voters can request that a pre-filled application be mailed to them, do not violate the challenged statute. App.III 621-¶188.

The district court issued a Memorandum and Order declaring the Prohibition violative of VPC's First Amendment rights to free speech and association, and unconstitutionally overbroad. *VoteAmerica v. Schwab*, 671 F. Supp. 3d 1230 (D. Kan. 2023). Defendants appealed, and the Tenth Circuit reversed and remanded. *VoteAmerica v. Schwab*, 121 F.4th 822 (10th Cir. 2024) ("*VoteAmerica I*").

In *VoteAmerica I*, this Court ordered the dismissal of Plaintiffs' freedom of association and overbreadth claims. *Id.* at 851-54. This Court further reversed the district court's judgment on the freedom of speech claim – to which the district court had applied strict scrutiny – and held that, "absent evidence of an improper purpose or justification for the statutory provision, the proper level of scrutiny to apply to the Prohibition under the Free Speech Clause of the First Amendment is intermediate scrutiny." *Id.* at 851 (cleaned up). The Court noted that intermediate scrutiny "requires that the 'restriction on speech or expression [must] be narrowly tailored to serve a significant governmental interest.'" *Id.* at 851 (quoting *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022)).

On remand, the parties engaged in no additional discovery and introduced no additional evidence. App.III 672, 677. Instead, the parties merely briefed how the newly articulated standard adopted by the Tenth Circuit in *VoteAmerica I* should be applied to the previously stipulated facts. App.III 679 – App.IV 774.

Post-briefing, the district court again invalidated the Prohibition. The court first held that the Kansas legislature had adopted the Prohibition for an improper purpose, thereby triggering strict scrutiny. App.IV 792-800. Specifically, the court found "the evidence raises a reasonable inference that the legislature enacted the … Prohibition because of disagreement with speech which advocates voting by mail." App.IV 796. To support this "evidentiary" finding, the court relied on a theory that VPC had not even advanced: the court took judicial notice that the Trump re-election campaign, along with other "state election groups and individual voters [had] filed numerous lawsuits [across the country] regarding state election processes, including challenges to mail ballots" in the months prior to the 2020 election. App.IV 796-797. Some of those suits, the court noted, "failed to prove fraud or illegal conduct" and were dismissed. App.IV 797. Additionally, the court observed, "[o]n January 6, 2021, the day Congress was to certify the 2020 election results, President Trump" made a series of statements at the Capitol (as part of a much longer speech touching on an array of divergent issues) in which he criticized mail voting and suggested that some ballots in various states had been fraudulently counted and/or illegally voted by non-citizens. App.IV 798.

Based on the unsuccessful lawsuits with no nexus to Kansas, and the snippets of President Trump's comments at the Capitol, the court concluded: "Defendants' stated reasons for HB 2332 as a whole are not implausible, but as applied to the . . .

Prohibition, they are not more credible than plaintiff's position that the legislature enacted the . . . Prohibition for an improper purpose," namely, "to suppress speech which favors voting by mail." App.IV 799-800. Although acknowledging that VPC bears the burden of proof, the court speculated that "it is more probably true than not true that the Kansas Legislature" acted with this unconstitutional justification based on "the temporal proximity, the passion which the 2020 election inspired even before January 6, 2021, the widespread claims of election fraud and litigation related thereto, the culminating events of January 6, 2021, and the fact that the State has offered no rationale which explicitly links prefilled ballot applications to the stated reasons for the . . . Prohibition." App.IV 800.[7] The court added that, in the absence of evidence of "widespread, systematic issues of voter fraud, intimidation, irregularities or voting problems" in Kansas in the 2020 general election, the court could infer an improper legislative purpose in the passage of the Prohibition. *Id.*

Applying strict scrutiny, the court then analyzed the State's asserted interests in the Prohibition. App.IV 800-807. The court held that, although the State has compelling interests in minimizing voter confusion, facilitating efficient election administration, and promoting public confidence in the integrity of the electoral

---

[7] HB 2332 was initially introduced in the House on Feb. 10, 2021, and was passed via gubernatorial veto override nearly three months later on May 3, 2021. *See* https://www.kslegislature.gov/li_2022/b2021_22/measures/hb2332/.

process, the State failed to show the Prohibition is narrowly tailored to serve any of those interests and, therefore, cannot survive strict scrutiny review. App.IV 807.[8]

The court next held that the Prohibition also could not withstand intermediate scrutiny. App.IV 807-814. The court reasoned that, while the Prohibition left ample alternative channels for VPC to communicate its message, App.IV 813-814, the challenged law was not narrowly tailored because the State purportedly provided insufficient evidence that the law furthered any of its interests. In reaching this conclusion, the court largely reiterated the same analysis of the evidence it had used in its strict scrutiny evaluation. In so doing, the court held that the electoral context of the statute entitled the State to no deference, and that "specific findings" of harm were necessary to justify the Prohibition's enactment. App.IV 808-809 n.28. The court added that, although the Tenth Circuit had remanded the case for application of a new jurisprudential theory and an entirely different level of scrutiny than had been applied in the initial proceedings, Defendants were foreclosed from arguing that the degree of narrow tailoring was affected by the fact that an advance mail ballot application is a quintessential non-public forum over which the State has substantial latitude as part of time, place, and manner regulatory authority. App.IV 808 n.27.

---

[8] The district court conceded that, "[w]ithout reference to the facts of which the Court takes judicial notice, plaintiff's case for strict scrutiny is much closer." App.IV 807 n.26.

## SUMMARY OF THE ARGUMENT

The Kansas Legislature is vested with constitutional authority to preserve the accuracy, efficiency, and integrity of its election process by prohibiting third parties from mailing unsolicited pre-filled advance ballot applications to voters. Although the Tenth Circuit previously held that the Prohibition implicates speech, it also held that any burden on speech from this viewpoint-neutral law is minimal and there are ample alternative ways for regulated parties to communicate any message they want to convey. As the Court noted, "the history of regulations (instructions) governing the filling out of noncontroversial information on government forms provides substantial comfort that such regulation is fully compatible with a lively market in controversial ideas." *VoteAmerica I*, 121 F.4th at 851.

That reasoning eluded the district court, and its decision to subject the law to strict scrutiny was legal error. Nothing in the record supports the district court's conclusion that the legislature acted with an "improper purpose." The court's finding of discriminatory intent rested not on evidence from the Kansas legislative process, but on rank speculation drawn from completely unrelated national litigation and political rhetoric following the 2020 election. Such conjecture cannot substitute for proof. Indeed, the record is devoid of any statement, document, or testimony suggesting Kansas lawmakers enacted the Prohibition to suppress advocacy in favor of mail voting. The district court's reliance on judicial notice of lawsuits and public

13

comments by President Trump to infer state legislative intent defies both logic and precedent.

When examined under the correct standard, the Prohibition comfortably survives intermediate scrutiny. It advances multiple governmental interests – avoiding voter confusion, facilitating efficient election administration, bolstering public confidence in electoral integrity, and deterring potential fraud – and it does so in a narrowly tailored manner that minimally affects speech.

The State's interests are well supported by the record. During the 2020 election cycle, VPC and CVI mailed hundreds of thousands of pre-filled advance ballot applications to Kansas voters using data that was often inaccurate or stale. The result was widespread voter confusion and frustration. Many voters, mistakenly believing they had to submit every pre-filled application they received, also mailed in multiple forms, triggering administrative disruption – by necessitating extensive cure procedures and staff time to address mismatches and duplicates – and straining county resources. This was documented through stipulated evidence from election administrators across the State.

Given those circumstances, the legislature's decision to prohibit third parties from pre-filling government forms was both reasonable and restrained. The Prohibition directly targets the source of documented problems while leaving ample avenues open for voter-outreach organizations to convey their messages. VPC and

14

similar entities remain free to advocate for mail voting, to send blank applications with personalized instructions, to assist voters individually in completing their applications, and to communicate by every other medium imaginable.

Moreover, the advance ballot application is not a public forum for speech. It is a state-created, state-controlled instrument used to initiate the voting process. As this Court recognized, government forms necessarily impose content limitations to ensure uniformity and accuracy. Restrictions governing how those forms may be completed fall at the far end of the spectrum of permissible state regulation. At most, such forms constitute a nonpublic forum, where the State may impose reasonable, viewpoint-neutral restrictions consistent with the purpose of the forum. The Prohibition easily satisfies that standard.

Even if viewed through the lens of intermediate scrutiny applicable to public fora, the statute remains valid. Kansas' interests are substantial, and the regulation does not burden substantially more speech than necessary. The law does not silence political viewpoints or eliminate a channel of discourse; it merely eliminates one *method* of transmitting voter data that proved both highly disruptive in the 2020 General Election. Courts have repeatedly upheld reasonable, politically neutral election regulations that modestly affect expressive activity in order to protect the integrity and reliability of the voting process.

The district court compounded its error by demanding that the State produce empirical proof of actual voter confusion or fraud before enacting prophylactic election measures. That is not the law. The Supreme Court has long recognized that states may act preemptively to preserve orderly elections and need not await demonstrable harm before legislating. The Constitution allows (indeed, *expects*) states to legislate with foresight in election administration, particularly where the risks of confusion and diminished confidence are real and documented.

Finally, even under the district court's framing, the burdens imposed by the Prohibition are minimal when compared to the State's compelling interests. Kansas has not banned mail voting or restricted advocacy; it has merely required that voters themselves complete their unsolicited advance mail ballot applications. The district court also failed to grasp that an advance ballot application is not separate from voting; it is the first step of voting. Without an application, there is no ballot, and without a ballot, there is no vote. Just as States may regulate ballot-access rules that determine who may appear on the ballot, so too may they regulate the ballot application process that determines who may cast one. The First Amendment does not prevent states from ensuring that the first step in voting remains accurate, uncoerced, and secure. The Constitution leaves broad room for state regulation at this administrative threshold, and the Prohibition easily satisfies this standard.

16

**ARGUMENT**

The Pre-Filled Application Prohibition does not unconstitutionally infringe on VPC's free speech rights. There is no legitimate basis for subjecting the law to strict scrutiny. And the district court's intermediate scrutiny analysis not only imposed legally unwarranted evidentiary burdens on the State, but it ignored the *stipulated facts* that undermined its decision. The State presented ample evidence to support its interests in the Prohibition.

## I. – *De Novo* Standard of Review Must Be Applied

In appeals involving claims predicated on First Amendment rights, this Court reviews the district court's decision *de novo*. *Cressman v. Thompson*, 798 F.3d 938, 946 (10th Cir. 2015). "The factual findings, as well as the conclusions of law, are reviewed without deference to the trial court." *Id.* This is particularly true where, as is the case here, "the district court relied entirely on the parties' stipulated facts in [issuing its] ruling." *Utah Educ. Ass'n v. Shurtleff*, 565 F.3d 1226, 1229-30 (10th Cir. 2009). The Court is likewise able to draw upon any of the parties' stipulated facts in resolving these First Amendment issues. *See Wheeler v. John Deere Co.*, 935 F.2d 1090, 1097 (10th Cir. 1991) ("A stipulation is an admission which cannot be disregarded or set aside at will.") (citation omitted).

## II. – District Court Erred in Subjecting Prohibition to Strict Scrutiny

In *VoteAmerica I*, the Tenth Circuit held that, "absent evidence of an improper purpose or justification for the statutory provision, the proper level of scrutiny to apply to the Prohibition is intermediate scrutiny." 121 F.4th at 851 (cleaned up). The record is bereft of any competent evidence supporting strict scrutiny, and the district court's holding to the contrary is rooted in a misapplication of the law.

The district court correctly held that VPC has the burden of proof in establishing that strict scrutiny must be applied. App.IV 793-794.[9] Unfortunately, that is where the validity of the court's analysis on this issue ends.

Invoking a series of cases that probe whether content neutral regulations may nevertheless be treated as content based, and whether statutes should be classified as discriminatory based on viewpoint, App.IV 792-793 – curious citations given that the Tenth Circuit already held the Prohibition is viewpoint neutral and a type of content-based restriction that does not trigger heightened scrutiny, *VoteAmerica I*, 121 F.4th at 846-51 – the district court suggested the relevant inquiry is whether the challenged law can be "justified without reference to the content of the regulated

---

[9] The Tenth Circuit has not directly ruled on whether a plaintiff has the burden to show the government enacted a law for an improper purpose or justification. But this Court has held that the plaintiff bears the burden of overcoming the presumption that the legislature acted in good faith and showing that the legislature passed the law with an improper purpose – discriminatory intent – in determining whether a heightened level of scrutiny applies to Equal Protection claims. *United States v. Amador-Bonilla*, 102 F.4th 1110, 1116-17 (10th Cir. 2024).

speech" and/or whether such law "was adopted by the government because of a disagreement with the message the speech conveys." App.IV 792-793.

VPC offered no substantive evidence that the Kansas legislature adopted the Prohibition for an improper purpose or justification. Nothing in the record shows the law was rooted in an intent to suppress free expression or effectuate a hostility to protected speech. The district court acknowledged that neither the text of the statute, nor the State's asserted rationale for its passage, "reference the content of ballot application forms or reflect disagreement with the message that [VPC] conveys by personalizing the forms with voter information." App.IV 794-795. The court also conceded that a "regulation does not have an underlying improper purpose or justification . . . merely because 'it may disproportionately affect speech on certain topics' or . . . 'has an incidental effect on some speakers or messages but not others.'" App.IV 793 (quoting *McCullen v. Coakley*, 573 U.S. 464, 480 (2014)).

Yet the district court *flipped the burden of proof* by holding that, because the State's claimed rationale for the Prohibition was purportedly not a sufficient fit, the legislature necessarily must have been motivated by unconstitutional purposes. App.IV 796 ("Viewing HB 2332 as a whole, the legislature could have enacted it to generally minimize voter confusion, mitigate workload issues for local election offices and protect the integrity of the electoral process with regard to advance ballot applications. But defendants' stated justifications do not explicitly address the logic

19

behind the Personal Application Prohibition. On this record, the evidence raises a reasonable inference that the legislature enacted the Personalized Application Prohibition because of disagreement with speech which advocates voting by mail.")

This reasoning – a "fallacy of the inverse" theory, *see NLRB v. Noel Canning*, 573 U.S. 513, 589 (2014) (Scalia, J. concurring) – is fundamentally flawed.[10] While the court's attack on Kansas' legitimate interests lacks merit, ignores stipulated facts, and fails to afford the State the level of deference to which it is entitled in an electoral context, *see* Part IV, *infra*, there is a more basic problem with its analytical path. Specifically, the court conflated the threshold question of "purpose or justification" with the narrow tailoring inquiry. That puts the cart before the horse.

The correct analytical framework – i.e., determining the level of scrutiny by looking at the nature of the restriction and the category of speech, *not* the adequacy of the government's evidentiary support for its state interests – is well established. *See, e.g.*, *McCullen*, 573 U.S. at 479-85; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-62 (1994); *Ward v. Rock Against Racism*, 491 U.S. 781, 790-96 (1989). Narrow tailoring and evidentiary sufficiency are *second-step* inquiries. Absent evidence that the Prohibition was enacted with an improper purpose, strict scrutiny is not even triggered.

---

[10] Defendants raised this issue at App.III 733.

The district court's focus on the State's asserted interests in the Prohibition – minimizing voter confusion, facilitating efficiency in election administration, and fostering confidence in and protecting the integrity of the electoral process – is more unusual still because the court recognized that each justification is legitimate in the main. App.IV 796. And none of those interests relate to or potentially deter any message that pre-filled advance mail ballot applications may convey.

The district court also emphasized that the legislature passed the Prohibition in the same omnibus election bill used to restrict non-Kansas residents from mailing advance ballot applications to Kansas voters. *See* K.S.A. 25-1122(*l*)(1)). But that statute has been permanently enjoined by stipulation and is no longer at issue in the case. A court cannot analyze the constitutionality of separate provisions under a "one bad apple spoils the whole barrel" methodology. Each statute must be assessed on its own merits, even if enacted alongside other allegedly unconstitutional provisions. *See United States v. O'Brien*, 391 U.S. 367, 383 (1968) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."). As anyone familiar with the legislative process knows, different provisions in a single bill are frequently proposed, amended, and adopted by a divergent cast of legislators and committees. Legislative text is added and deleted in committee and on the floor. The notion that every line in a bill reflects a universal consensus or motivation of each member

voting in favor of final passage is nonsense. The arduous path that HB 2332 took to passage shows this bill is no exception.[11]

Because VPC offered no evidence of an improper purpose or justification, the district court attempted to fashion its own factual foundation. Taking judicial notice of (i) a series of unsuccessful lawsuits outside the State of Kansas in 2020 involving mail ballots (none of which had more than the most tangential connection to the issues in this case), and (ii) excerpts from a speech at the Capitol by President Trump on January 6, 2021, in which he criticized the role that mail-in voting played in the 2020 General Election, the court held:

> Defendants' stated reasons for HB 2332 as a whole are not implausible, but as applied to the Personalized Application Prohibition, they are not more credible than plaintiff's position that the legislature enacted the Personalized Application Prohibition for an improper purpose. Plaintiff bears the burden of proof, and the Court finds that it is more probably true than not true that the Kansas Legislature enacted the Personal Application Prohibition to suppress speech which favors voting by mail. App.IV 799.

This conclusion is predicated on rank speculation and is legally unsupportable. *See Pioneer Centres Holding Co. ESOP & Trust v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) ("an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility") (quotation omitted). Plus, the court's invocation of "credibility" is not only

---

[11] *See* https://kslegislature.gov/li_2022/b2021_22/measures/hb2332/.

odd, but unwarranted, given that the case was submitted on written, stipulated facts.

The court invited Defendants to file a motion objecting to the facts about which it took judicial notice, App.IV 807 n.26, but they declined because it would have been pointless. The problem was not that the court took judicial notice of unrelated lawsuits during the 2020 campaign or snippets of President Trump's speech. Both were widely known and undisputed, and Defendants take no issue with them.[12] The problem is that those events are irrelevant to the underlying purposes behind the passage of the Prohibition. Any suggestion that Kansas legislators were aware of those cases and comments is pure conjecture. More importantly, the notion that State legislators adopted the law in response to President Trump's rhetoric is total speculation.[13] *See United States v. Delgado-Lopez*, 974 F.3d 1188, 1193 n.2 (10th Cir. 2020) (court cannot use judicially noticed facts to speculate about causation); *Travelers Ins. Co. v. Rowand*, 197 F.2d 283, 284 (5th Cir. 1952) (same).

---

[12] The district court's decision to develop its own factual theory in support of VPC's legal claim is, however, in tension with the principle of party presentation. *See Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("We rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."); *Colorado v. U.S. EPA*, 989 F.3d 874, 885 (10th Cir. 2021) ("[C]ourts do not sit as self-directed boards of legal inquiry and research.") (quotations omitted).

[13] The court acknowledged that the record is devoid of any statements by legislators that might support this theory. App.IV 793 n.17.

Moreover, even if one disregards the stipulated record here and assumes that legislators adopted the Prohibition in response to President Trump's speech,[14] the district court's holding effectively amounts to viewpoint discrimination *against the State*. If legislators act on a hotly contested public policy issue based on what they have heard from the President (or the media, or a constituent, or whomever), the court suggests heightened scrutiny is in order. But that conflates legislators being influenced by public discourse (normal in democracy) with legislators adopting laws *because* they want to suppress one side's speech. *Cf. Hill v. Colorado*, 530 U.S. 703, 724 (2000) ("[T]he contention that a statute is 'viewpoint based' simply because its enactment was motivated by the conduct of the partisans on one side of a debate is without support."); *Ward*, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). If influence alone sufficed, then every debated policy could be struck down as viewpoint discrimination simply

---

[14] In addition to indulging total speculation, this assumption would necessitate ignoring, *inter alia*, legislative testimony on HB 2332 from the Secretary of State's Office regarding the substantial workload increase that state and county election officials experienced leading up to the 2020 general election fielding questions and complaints from confused voters who had received unsolicited advance ballot applications from third parties, and processing thousands of duplicate forms. App.III 616-617-¶163. It also would require disregarding the *stipulated fact* that many voters believed they were obligated to mail any pre-filled application back to the county election office in order to receive an advance ballot, even if they had previously submitted one. App.III 618-¶171.

because some legislator "reacted" to someone's speech. That would risk turning the inquiry into a generalized viewpoint analysis, paradoxically penalizing legislatures *for listening to public debate. See Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 464 (1979) ("The government is prohibited from . . . imposing sanctions for the expression of particular views it opposes.").

The district court's *sua sponte* theory also defies logic and precedent. If Kansas legislators wanted to heed a rhetorical call to ban the practice of unsolicited mail-in voting, they could have done so. Yet they did nothing of the sort. Employing a scalpel rather than a sledgehammer, the Prohibition targets a discrete issue over which there had been a cacophony of complaints in Kansas (and elsewhere), i.e., the pre-filling of advance ballot applications. The fact that Kansas also had substantial problems with duplicate applications, yet did not restrict that practice, does not diminish the importance of the Prohibition. States are not required to "choose between attacking every aspect of a problem or not attacking the problem at all." *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) (quotation omitted).

VPC also claimed below that the Prohibition was animated by an improper justification because it constrains only views that advocate in favor of mail voting. But there is no conceivable counterpoint to be written on this government form. The application contains only discrete data fields. There is nothing else that *could* be written on it. As this Court noted, "the use of forms by the government inherently

requires some content restrictions. One would be hard-pressed to name an official form that is not accompanied by a set of instructions on how to complete it – instructions which not uncommonly exceed the length of the form itself." *VoteAmerica I,* 121 F.4th at 850-51. "In particular, instructions governing the time, place, and manner in which someone can fill out for another person a government form seeking noncontroversial information do not on their face suggest hostility to any idea or point of view." *Id.* at 851.

Finally, the district court suggested that the State's justifications for the law are suspect because Secretary Schwab "publicly declared that the 2020 election in Kansas was successful, without widespread systematic issues of voter fraud, intimidation, irregularities or voting problems." App.IV 800. This is non-sequitur. That the Secretary, in an effort to ensure the public's confidence in the election's outcome, highlighted the absence of systemic fraud or widespread voting irregularities, in no way undermines the fact that there was major consternation among voters, and serious challenges behind the scenes for election administrators, arising out of the proliferation of pre-filled advance mail ballot applications. Plucking excerpts from the Secretary's press release – at the highest level of generality – does not suggest he was unsupportive of the Prohibition. Besides, his views on the law are immaterial. One cannot ascribe a nefarious purpose to the *legislature* based on 40,000-foot level statements by a member of a *coordinate branch*.

In sum, there is no legal (or factual) basis for applying strict scrutiny to the Prohibition. The district court's holding to the contrary is tethered to nothing but speculation. It must be reversed.

### III. – The Prohibition Satisfies Intermediate Scrutiny

The district court also committed legal error in concluding that the Prohibition cannot withstand intermediate scrutiny. This level of scrutiny is employed where, as is true of the Prohibition, *VoteAmerica I*, 121 F.4th at 848-51, the challenged law "pose[s] a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner*, 512 U.S. at 642. A narrow tailoring test is applied with intermediate scrutiny, but it is far more relaxed than with strict scrutiny. A statute survives intermediate scrutiny review as long as "it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Free Speech Coal. v. Paxton*, 606 U.S. 461, 471 (2025) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)). In other words, "narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. Nor does the law's validity "turn on the court's agreement with the legislature concerning the most appropriate method for promoting significant government interests or the degree to which those

interests should be promoted." *Free Speech Coal.*, 606 U.S. at 496 (cleaned up) (quoting *Ward*, 491 U.S. at 800).

### A. The Prohibition's Restrictions on Speech Occur in a Non-Public Forum Where Regulatory Latitude is Much Greater

The nature of the forum is a critical component of this narrow tailoring test.[15] *Evans v. Sandy City*, 944 F.3d 847, 853 (10th Cir. 2019) ("Under First Amendment jurisprudence, 'the extent to which the Government can control access [to Government property] depends on the nature of the relevant forum.'") (alteration in original) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985)). Indeed, the Supreme Court has made clear in the intermediate scrutiny context that content-based restrictions in a non-public forum are permissible if reasonable and viewpoint-neutral. *Cornelius*, 473 U.S. at 799-800; *accord United States v. Kokinda*, 497 U.S. 720, 727 (1990) (postal sidewalk is a non-public forum and can be reasonably regulated by government); *Walden v. Kosinski*, 153 F.4th 118, 138 (2d Cir. 2025) (nominating petition and ballot are both non-public fora, thus conferring substantial latitude on the State to regulate their content).

In a case where this Court expressly held the Prohibition represents "a good fit for . . . less-demanding scrutiny," *VoteAmerica I*, 121 F.4th at 848, the district court made no effort to distinguish the non-public forum nature of an advance ballot

---

[15] Defendants advanced this argument at App.III 734-738.

application from the public fora at the heart of the intermediate scrutiny cases cited

in its opinion and relied upon by VPC. Indeed, in emphasizing a "close fit" necessity

for narrow tailoring, the court focused on *traditional public fora*. App.IV 808-810;

*see McCullen*, 573 U.S. at 476-77 (2014) (street and sidewalk outside an abortion

clinic); *Turner*, 512 U.S. at 643-44 (must-carry public airwaves); *Brewer v. City of

Albuquerque*, 18 F.4th 1205, 1219-20 (10th Cir. 2021) (ground surrounding highway

entrance). The speech barriers in those cases were problematic because traditional

public fora "occupy a special position in terms of First Amendment protection, have

immemorially been held in trust for the use of the public and, time out of mind, have

been used for purposes of assembly, communicating thoughts between citizens, and

discussing public questions." *Brewer*, 18 F.4th at 1219 (quotations omitted). That is

why, with "traditional public fora, the government's right to limit expressive activity

is sharply circumscribed." *Id.* at 1220 (quotations omitted).

By contrast, in a *non-public forum*, the government has much greater latitude

to impose restrictions "based on subject matter and speaker identity so long as the

distinctions drawn are reasonable in light of the purpose served by the forum and are

viewpoint neutral." *Cornelius*, 473 U.S. at 806 (citing *Perry Educ. Ass'n v. Perry

Local Educators' Ass'n*, 460 U.S. 37, 49 (1983)). "The Government's decision to

restrict access to a nonpublic forum need only be *reasonable;* it need not be the most

reasonable or the only reasonable limitation. In contrast to a public forum, a finding

of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Id.* at 808.

Moreover, "[n]ot every instrumentality used for communication . . . is a traditional public forum or a public forum by designation." *Id.* at 803. For example, the Supreme Court characterized advertising space on city buses as a non-public forum and upheld restrictions therein. *Id.* at 803-04 (citing *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974)). Similarly, the Supreme Court in *Cornelius* rejected a First Amendment challenge to the government's restrictions on which entities could participate in the annual Combined Federal Campaign charity drive. *Id.* at 811-12. The Court reasoned that the government did not intend to create an arena for open-ended expression, and it was thus appropriately labeled a non-public forum. *Id.* at 804-06. The underlying rationale is that the scope of the First Amendment typically turns on "the nature of the property" and the "disruption that might be caused by the speaker's activities." *Id.* at 799-800.

An official government form like Kansas' advance ballot application that is used as part of the voting process is *not* properly characterized as a traditional public forum. There may be information communicated meriting First Amendment protection, *VoteAmerica I*, 121 F.4th at 838, but the form itself is, *at most*, a non-public forum. *See id.* at 850-51 (describing how such a form inherently needs content

restrictions). Indeed, as this Court previously held, "the likelihood that the Prohibition's restrictions on what can be done with a government form would impair the free marketplace of ideas is *even less* than the potential impairment from the somewhat analogous context of content restrictions on the use of government property constituting a *nonpublic forum*." *Id.* at 851 (emphasis added); *cf. Doe v. Reed*, 561 U.S. 186, 196 (2010) (exacting scrutiny test used for determining if disclosure mandate unreasonably burdened speech requires that the "strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights"). To subject any regulations/instructions imposed by Kansas in the Prohibition to the same level of scrutiny applied in connection with a public gathering space or other traditional public forum, as the district court did here, is illogical.

This analysis is fully consistent with, and even compelled by, *Vidal v. Elster*, 602 U.S. 286 (2024), which this Court relied upon in rejecting a strict scrutiny standard. *See VoteAmerica I*, 121 F.4th at 848-49. Just as is the case with viewpoint-neutral trademark restrictions, there is a long history of federal courts deferring to states' electoral regulations. The judiciary has consistently recognized that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)); *id.* at 438 ("[W]e have repeatedly upheld reasonable, politically

neutral regulations that have the effect of channeling expressive activity at the polls."). *Vidal* instructs courts to look at that history when evaluating the scope and impact of the First Amendment on the regulation at issue.[16] *Vidal*, 602 U.S. at 300.

Despite acknowledging that the trademark dispute involved a content-based, viewpoint neutral speech restriction, *Vidal* held that the absence of a public forum, combined with the lack of a governmental intent to create a designated forum for speech simply by providing for the federal registration of trademarks, counseled in favor of subjecting the law to the type of scrutiny used for a non-public forum. *Id.* at 309; *see also Minn. Voters All. v. Mansky*, 585 U.S. 1, 11-12 (2018) (polling place is non-public forum and thus subject to less rigorous scrutiny); *Burson v. Freeman*, 504 U.S. 191, 214-16 (1992) (Scalia, J. concurring) (content-based, viewpoint-neutral restrictions on speech around polling place are not subject to any heightened scrutiny because they regulate a non-public forum).

The same is true of advanced mail ballot applications. Far from intending to establish any designated forum for speech, the official application form – accompanied by detailed instructions and governed by Kansas' comprehensive election code – functions as a component of the voting process. In fact, exercising their broad

---

[16] As this Court noted, however, *Vidal* also indicated that a historical practice of regulation is not required for a viewpoint-neutral regulation to pass constitutional muster under the First Amendment, a point reinforced by *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177 (2007). *VoteAmerica I*, 121 F.4th at 849-51.

authority to regulate elections under U.S. Const. Art. 1, § 4, states have created a plethora of laws governing voter registration and ballot casting, which rely on a variety of government forms. *See, e.g., Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) (collecting cases regarding laws subject to the Elections Clause). These forms, which necessarily restrict speech under the Tenth Circuit's interpretation, have long co-existed with the First Amendment, and the Prohibition should be viewed in a similar light.

In the district court, VPC countered this argument by suggesting that *the mail* is the relevant forum. This frames the issue at far too high a level of generality. The Supreme Court has repeatedly cautioned against defining a forum in such sweeping terms, recognizing instead that the requisite analysis must be tailored to the specific governmental program or channel at issue. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 25 (2010) (speech cannot be defined at the highest level of generality in assessing constitutionality of government regulation). The forum here is not the general system of postal communication, but the advance ballot application itself – a government-controlled instrument created for the narrow purpose of facilitating election administration. VPC's theory would erase the distinction between a public and non-public forum by treating every government form or instrument sent by mail as part of the "public forum" of the postal system.

In sum, the State enjoys substantial flexibility to regulate this area. Whether an advance ballot application is branded a non-public forum or simply a directive at the far end of the continuum where government regulation of speech is at its peak (i.e., the immediate proximity of a non-public forum), the limits on state authority applicable to traditional public fora that the district court held apply have no place here.

### B. Defendants Did Not Waive Their Non-Public Forum Argument

The district court refused to consider Defendants' non-public forum argument, holding that it was inconsistent with the mandate in *VoteAmerica I* and that Defendants waived the issue by raising it for the first time on remand. App.IV 808 n.27. Neither rationale is true.

#### 1. Mandate in *VoteAmerica I* Did Not Foreclose Non-Public Forum Argument

This Court reviews the interpretation and scope of its earlier mandate *de novo*. *Dish Network Corp. v. Arrowood Indem., Co.*, 772 F.3d 856, 864 (10th Cir. 2014). "The mandate rule follows from the law of the case doctrine." *United States v. Dutch*, 978 F.3d 1341, 1345 (10th Cir. 2020). "The mandate consists of [this Court's] instructions to the district court at the conclusion of the opinion, and the entire opinion that preceded those instructions." *United States v. Walker*, 918 F.3d 1134, 1144 (10th Cir. 2019) (quotation omitted).

Nothing about the mandate in *VoteAmerica I* precluded the consideration on remand of Defendants' argument regarding the non-public forum nature of advance ballot applications. This Court's mandate directed the district court to apply intermediate scrutiny to the Prohibition in the first instance on remand – a level of review the district court had not evaluated in the original proceedings. *VoteAmerica I*, 121 F.4th at 852. More importantly, this Court essentially announced a new legal standard (or at least significantly clarified the existing legal standard) for First Amendment challenges involving content based, viewpoint neutral regulations where the threat to speech is minimal. *VoteAmerica I*, 121 F.4th at 848-51. In so doing, this Court rejected each of the parties' alternative theories in favor of its own. *See id.* at 836-38 (rejecting Defendants' argument that prefilled applications do not represent speech); *id.* at 838-43 (rejecting Defendants' argument that *Anderson-Burdick* balancing test applies); *id. at* 843-86 (rejecting VPC's theory that *Meyer-Buckley* strict scrutiny applies); *Id. at* 846-48 (rejecting VPC's appeal for strict scrutiny based on speaker distinctions in statute); *id.* at 848-50 (rejecting VPC's contention that strict scrutiny is applicable merely because Prohibition is content-based restriction).

Defendants' arguments on remand were both appropriate and well within the scope of the mandate, which had ordered the district court to examine the Prohibition under intermediate scrutiny "with the benefit of more full and focused briefing by

the parties." *VoteAmerica I*, 121 F.4th and 852. Given that a forum analysis is a key part of applying that standard, Defendants should not have been foreclosed from advancing this argument on remand.

Misconstruing the argument, the district court suggested that Defendants were attempting to repudiate intermediate scrutiny in favor of a "reasonableness" theory. App.IV 808 n.27. Not true. Defendants discussed reasonableness only in the context of the intermediate scrutiny standard enumerated by this Court. App.III 734-738. The point was that the narrow tailoring inquiry in intermediate scrutiny turns in large part on the nature of the forum being regulated. And where, as here, the challenged law targets a quintessentially non-public forum, the government enjoys far more latitude in its regulations. *See supra*.

The district court's reliance on *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015), was also improper. *Cook* reasoned that where a prior panel held the defendants failed to develop a field preemption argument, the argument was forfeited on remand under the law of the case doctrine. That is because "parties and trial courts aren't usually free to revisit issues an appellate court has resolved." *Id.* at 1093.

Here, the district court found that Defendants' forum analysis argument was waived because it was not included in the pretrial order. But the pretrial order included Defendants' First Amendment defenses before this Court articulated a new

standard and ordered "more full and focused briefing" on the issue. *VoteAmerica I*, 121 F. 4th at 852. In the wake of that appellate directive, it would be inappropriate (and unfair) to deprive Defendants of their opportunity to advance this theory.[17]

### 2. Appellate Court's Modification of Governing Legal Standard Warrants Consideration of All Legal Theories Underlying that Standard on Remand

In any event, the mandate rule is not jurisdictional. "[T]his court has carved out several exceptions to the mandate rule when the district court is faced with exceptional circumstances." *United States v. Dutch*, 978 F.3d 1341, 1345 (10th Cir. 2020). Those include: "(1) a dramatic change in controlling legal authority; (2) significant new evidence that was not earlier obtainable through due diligence but has since come to light; or (3) if blatant error from the prior . . . decision would result

---

[17] In support of its wavier theory on remand, VPC cited *Verlo v. Martinez*, 820 F.3d 1113 (10th Cir. 2016), a case in which this Court ironically underscored the importance of a forum analysis in conducting intermediate scrutiny analysis. *See id.* at 1128-29. But the waiver discussion in that decision is wholly distinguishable from this suit. First, there was no new legal standard imposed as there was here. Second, one of the defendants (the City and County of Denver) *stipulated* in the district court that a traditional public forum was at issue, *id.* at 1122, while the other defendant (the Judicial District) expressly took the "position that resolving the forum status was not necessary because the [challenged administrative] Order would satisfy even the strictest test." *Id.* at 1123. So the district court evaluated the Order under a public forum analysis. *Id.* Under those circumstances, it made sense to hold that the Judicial District had waived its right to switch positions and challenge the Order on appeal as targeting a non-public forum. *Id.* at 1128-29. By contrast, Defendants here emphasized the non-public forum only after this Court had articulated a new legal standard on appeal and directed the parties to brief that issue on remand. The district court's decision to blind itself to Defendants' theory, which was a critical component of the remand briefing ordered by this Court, amounts to a manifest injustice.

in serious injustice if uncorrected." *Huffman v. Saul Holdings Ltd. P'ship,* 262 F.3d 1128, 1133 (10th Cir. 2001) (quotation omitted).

As the Fifth Circuit recently noted in rejecting a waiver argument on remand from the very case that formed part of the predicate for this Court's newly articulated standard in *VoteAmerica I,* a remand from a higher court altering the existing legal standard "surely qualifies" as an exceptional circumstance allowing a party to raise a new issue on remand.[18] *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin,* 64 F.4th 287, 291 (5th Cir. 2023). The court there noted that "[r]egardless of whether the Supreme Court revised or merely clarified the existing test for content-based restrictions, the new state of the law allows a party to address the current reality with appropriate arguments." *Id.* at 292.

Similarly here, this Court announced a new legal standard and sent the case back to the district court to consider that standard in the first instance. The issue is entirely legal in nature, entails applying the standard to *stipulated facts*, and would result in a miscarriage of justice if not permitted. Moreover, the district court was in no better position than this Court to apply the new standard with the benefit of the parties' supplemental briefing below and in this appeal.

---

[18] Incidentally, Defendants did raise this issue in their Opening Brief (at pages 37-38) of the first appeal in *VoteAmerica I.*

*C.     The Prohibition Would Survive Intermediate Scrutiny Even if an
Advance Ballot Application Is Considered a Public Forum*

To be clear, the Prohibition would withstand intermediate scrutiny even if an advance ballot application was considered a traditional public forum. With public fora, the narrow tailoring component of intermediate scrutiny requires the court to "look to the amount of the speech covered by the [regulation] and whether there is an appropriate balance between the affected speech and the governmental interests that the [regulation] purports to serve." *Brewer*, 18 F.4th at 1224 (quoting *Evans v. Sandy City*, 944 F.3d at 856). The fit need not be perfect. There is no mandate that the challenged regulation "be the least restrictive or least intrusive means of serving the government's interests." *Id.* (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)); *accord Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). "Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation without burdening *substantially more* speech than is necessary to further the government's legitimate interests." *Brewer*, 18 F.4th at 1225 (citations and internal alterations omitted). "In other words, restrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Id.* And the State's interests outlined in Part IV are more than sufficient to overcome the minimal limits on VPC's speech posed by the challenged law.

**IV. – The State's Demonstrated Interests Amply Justify the Prohibition**

Defendants advanced compelling reasons that support the Prohibition, including avoidance of voter confusion, facilitation of orderly and efficient election administration, enhancement of public confidence in the integrity of electoral processes, and deterrence of voter fraud.[19] All are indisputably legitimate. *See Brnovich v. DNC*, 594 U.S. 647, 672 (2021) (combatting fraud is a "strong and entirely legitimate" reason for enacting voting laws); *Doe v. Reed*, 561 U.S. 186, 197-98 (2010) ("State's interest in preserving the integrity of the electoral process is undoubtedly important."); *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality) (State has "compelling interest in protecting voters from confusion and undue influence."); *DSCC v. Pate*, 950 N.W.2d 1, 5-7 (Iowa 2020) (rejecting constitutional challenge to statute that prohibited third-parties from pre-populating voters' absentee ballots).

The district court conceded the general validity of these interests but held the State had not provided sufficient evidence of the harm it endured from pre-filled advance ballot applications to justify the Prohibition. App.IV 808-809 n.28. In doing so, the court not only misapplied the law in terms of the State's requisite evidentiary burden, but it disregarded stipulated facts providing ample foundation for the law.

---

[19] Defendants advanced this argument at App.III 739-741.

*A.      The Court Imposed a Legally Erroneous Evidentiary Burden*

The Supreme Court has repeatedly held that, in the election context, states may rely on reasonable predictive judgments about the risks of confusion, fraud, or undue influence, even without empirical proof of actual harm. In *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986), for example, the Court explained that forcing states to prove actual voter confusion "as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by a State to prove the predicate." Because "[s]uch a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action," states must "be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." *Id.* at 195-96. *Accord Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363-64 (1997) (Court does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications"). These cases reflect a broadly applicable principle in election law: prophylactic regulation is constitutionally permissible without a demonstrable record of abuse.

Although it ultimately did so, Kansas was under no obligation to create a comprehensive record of all its rationale for adopting the Prohibition. "[B]ecause a

government has such a compelling interest in securing the right to vote freely and effectively, [the Supreme] Court never has held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question." *Burson*, 504 U.S. at 208-09 (quoting *Munro*, 479 U.S. at 195).

The district court nevertheless refused to afford the State any deference, relying on a *Burson* footnote describing heightened evidentiary obligations in more traditional First Amendment free speech cases where the connection to elections is, at most, tangential. App.IV 808-809 n.28 (citing *Burson*, 504 U.S. at 209 n.11, and *Frank v. Lee*, 84 F.4th 1119, 1141 (10th Cir. 2023)). The district court misconstrued *Burson* in the process.

*Burson* and *Frank* each involved free speech challenges to electioneering restrictions outside polling places. The *Burson* plurality characterized this area as a traditional public forum, implicating strict scrutiny. 504 U.S. at 198.[20] In applying the narrow tailoring test, however, the Court applied a relaxed burden of proof given the electoral context and the State's strong interest in safeguarding those processes. *Id.* at 208-09 & n.12; *see also id.* at 209 ("Elections vary from year to year, and place to place. It is therefore difficult to make specific findings about the effects of a voting

---

[20] The Court later clarified that the *interior* of the polling place is a nonpublic forum. *Mansky*, 585 U.S. at 12.

regulation.”).

True, the breadth of this modified evidentiary burden is not unlimited. As the Supreme Court explained in *Burson*:

> [It] does not apply to all cases in which there is a conflict between First Amendment rights and a State's election process – instead, it applies only when the First Amendment right threatens to interfere with the act of voting itself, *i.e.,* cases involving voter confusion from overcrowded ballots, like *Munro,* or cases such as this one, in which the challenged activity physically interferes with electors attempting to cast their ballots. Thus, for example, States must come forward with more specific findings to support regulations directed at intangible "influence," such as the ban on election-day editorials struck down in *Mills v. Alabama,* 384 U.S. 214 (1966).

*Id.* at 209 n.11.

The district court here, isolating on the "interfere[nce] with the act of voting itself" language, insisted that the Prohibition "involves nothing of the sort." App.IV 808-809 n.28. "Prefilled applications are not the same as casting a ballot," the court reasoned, so a heightened burden of proof must be imposed. *Id.* This analysis misses the mark.

Applying for an advance mail ballot is *not* an ancillary activity detached from voting. It is an integral component of the voting process. Kansas' interest in regulating the way applications are completed falls squarely within the same domain of cases like *Burson* and *Munro* where the Supreme Court has afforded deference to State judgments about safeguarding elections. Indeed, *Burson's* reliance on *Munro* is critical. *Munro* did not involve the physical act of marking or depositing a ballot;

it concerned ballot access restrictions, which are antecedent steps that structure how citizens can exercise the franchise.

By including *Munro* in the same breath as the regulation at issue in *Burson*, the Supreme Court signaled that deference extends beyond the moment of casting a vote to those administrative and procedural gateways without which voting cannot occur. Applying for an advance ballot is one such gateway. Like ballot access rules, it is inseparable from the act of voting because it determines whether and how a citizen may cast a lawful ballot. *Burson*'s footnote, properly understood, *supports* the State's position: prophylactic regulation of critical voting-related steps merits deference. The mere fact that speech is involved – just as it was in *Burson* – does not negate the appropriateness or necessity of the modified evidentiary burden.

Moreover, *Mills* is not remotely similar to this case. *Mills* involved a criminal prohibition on *any* Election Day electioneering, including publishing editorials in a newspaper in support or opposition of candidates or propositions. 384 U.S. at 216. In striking down the law as a blatant First Amendment violation, the Court held that "[s]uppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change, which is all that this editorial did, muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.* at 219. By contrast, this Court has already held that the threat to free speech posed by the Prohibition is

"small" and that it is highly unlikely the law will "impair the free marketplace of ideas." *VoteAmerica I*, 121 F.4th at 850-51. The Prohibition merely ensures public confidence in the integrity of advance voting without imposing significant burdens on expressive activity.

## B. The Stipulated Facts Justify the Prohibition

Even without a relaxed evidentiary burden that should be applied here, the Prohibition still withstands intermediate scrutiny under the stipulated facts. *Cf. Minority Television Project, Inc. v. FCC*, 736 F.3d 1192, 1198-99 (9th Cir. 2013) (in conducting intermediate scrutiny review as part of First Amendment free speech challenge, court looks to evidence developed in the litigation and is not restricted to legislative history).

### 1. Minimizes Voter Confusion[21]

The parties *stipulated* that election officials were inundated with calls from confused and angry voters who had received inaccurately pre-filled applications. App.III 614-¶¶142-144; 616-¶¶161-162. Shawnee County Election Commissioner Howell described voters venting frustration at having received applications that contained their wrong name and address, particularly when they had previously communicated changes to the election office. App.III 614-¶143. Ford County alone (barely 1/5 the size of Shawnee County) received 20-30 phone calls *per day* and

---

[21] Defendants advanced this argument at App.III 741-747.

placed newspaper ads to alert voters that the county had not mailed out any pre-filled applications. App.III 615-¶150. The parties also *stipulated* that, as attested by election officials, many voters were confused by the pre-filled applications and believed they were required to complete and mail back any pre-filled application even if they had already submitted one. App.III 618-¶171; 619-620-¶179. This led to an explosion of duplicate applications, which imposed significant burdens on election officials. App.III 614-¶152; 617-618-¶¶168-170, 172-174. Disregarding these stipulated facts, the district court found (as part of its strict scrutiny analysis) that Howell did not believe voters were confused or angry due to ballots being pre-filled, but only because they had received duplicates. App.IV 801-802. This mischaracterizes the record. Howell simply testified that he did not "think that the pre-filled information, *in and of itself*, was what *all of the concern was*." App.III 614-¶ 141 (emphasis added). All he meant was that it was both the *errors on the pre-filled applications* and the duplicate mailings that triggered such negative reactions from voters.

The district court further highlighted (in its strict scrutiny analysis) that K.S.A. 25-1122(k)(1)(D) (now codified at K.S.A. 25-1122(k)(1)(C)) requires private actors to disclose that any advance ballot application they send to voters "is not a government mailing" and "is from a private individual or organization." App.IV 802. But in 2020, this disclosure was as ineffective as VPC's disclaimer that voters need

46

not submit another application if they had already done so. Indeed, just as there was a torrent of duplicate applications notwithstanding the disclaimer, there was a rash of confused and angry voters who received erroneously pre-filled applications and who, despite a small disclosure at the bottom of the VPC cover letter accompanying their application,[22] were clearly not assuaged (assuming the voters even read and understood it). Any suggestion, therefore, that the statute's mandatory disclosure adequately addresses Defendants' concerns is flatly contradicted by the record.

The district court found that Defendants did not establish the Prohibition would prevent voter confusion because some county election officials support pre-filling applications. App.IV 802. This makes no sense. The legislature does not require universal agreement before it can act. As with many issues, opinions diverge on whether pre-filled advance ballot applications are a benefit or burden to the electoral ecosystem. Rarely is everyone happy with decisions made in the election law space (or, for that matter, in the legislative process generally).

But the havoc flowing from VPC's pre-filled ballot application activities – both in Kansas and elsewhere – amply justified the Prohibition's adoption. Indeed, the stipulated record includes written complaints that VPC received from officials across the nation regarding inaccurate applications. App.III 616-¶159. The media widely covered these problems, highlighting the bipartisan frustration with VPC and

---

[22] *See* App.IV 822 (sample copy of the cover letter).

CVI, and describing how the organizations' mailers "contained mistakes and confused voters at a time when states are racing to expand vote by mail." Joshua Eaton et al., "*A Nonprofit with Ties to Democrats Is Sending Out Millions of Ballot Applications. Election Officials Wish It Would Stop*," Pro Publica, Oct. 23, 2020.[23] Kansas had every right to take those other states' concerns into consideration.

Nor was Kansas required to select the least restrictive means to rectify its concerns. The legislature endeavored to maintain its solicitude of mail voting and limit the intrusion on any speech rights while still addressing a problem that had occurred in 2020. Precluding entities from sending more than one pre-filled application to any single voter, for example, would be ineffective given that multiple organizations and parties engage in this activity. Mandating that all applications be pre-filled exclusively with data directly from ELVIS would likewise have little utility. Not only would such a mandate be impossible to police, but ELVIS is a dynamic database that updates in real time. App.III 603-¶¶58-59. When data is downloaded, it reflects a snapshot of the system at the time of download. App.III 602-¶50. As a result, the registration list can become outdated almost immediately after it is downloaded. A long delay between the download and the printing of a pre-

---

[23] https://www.propublica.org/article/a-nonprofit-with-ties-to-democrats-is-sending-out-millions-of-ballot-applications-election-officials-wish-it-would-stop; Ryan McCarthy, "*Pro Publica Responds to the Center for Voter Information*," Pro Publica, Oct. 30, 2020, available at https://www.propublica.org/article/propublica-responds-to-the-center-for-voter-information.

filled application – as there was with VPC – means the likelihood of a mismatch grows substantially. App.III 603-604-¶59. Plus, the notion that the State could enforce a time limit by third parties on the printing/mailing lag time is folly.

Notably, the volume of ELVIS data updates hits a peak as the Election Day registration deadline looms because that is when most individuals focus on their registration information and ensure that any changes to their profile (e.g., address and name) are current. Because this is also the time when most pre-filled applications are sent to voters, restricting the source of pre-filled data would have minimal impact.

### 2. Facilitates Orderly and Efficient Election Administration[24]

The Prohibition is also justified by Kansas' interest in promoting orderly and efficient election administration. Just focusing on the partial subset of Kansas recipients of VPC/CVI pre-filled applications produced in discovery, the analyses of both parties' expert witnesses indicated that there were at least 15,000 (and likely more than 40,600) voters who received erroneously pre-filled applications. Defendants offered abundant (stipulated) evidence of the extensive amount of extra time it took county election officials to process the inaccurate and duplicate applications, and the elaborate and highly time-consuming cure process such officials had to undertake each time they confronted a non-compliant application. App.III 600-¶¶ 33-36; 610-

---

[24] Defendants advanced this argument at App.III 747-749.

¶111; 613-614-¶¶139-144; 615-616-¶¶150-157; 616-¶161; 616-617-¶163; 619-620-¶¶175-180. This Court specifically referenced these facts. *See VoteAmerica I*, 121 F.4th at 827-31.

In discounting this state interest, the district court largely trotted out the same points it made in criticizing the avoidance of voter confusion rationale. App.IV 803-804, 811-812. The analysis fares no better here. The court suggested, for example, that the "real issue" in Kansas was merely duplicate applications, not pre-filled ones. App.IV 803. The court added that Defendants "have not established that in the context of an unprecedented election during a global pandemic, any 'surge' of inaccurate and duplicate applications was fairly attributable to activity which the" Prohibition seeks to target. *Id.* As Defendants already explained, however, *stipulated facts* in the record show that the Prohibition addresses problems arising out of the pre-filled applications as well as duplicates. Moreover, as noted above, the fact that some county election officials may believe that pre-filling applications can be beneficial in no way means that they (or the district court) are entitled to substitute their own judgment for that of the Kansas Legislature. *See Daunt v. Benson*, 999 F.3d 299, 329-31 (6th Cir. 2021) (Readler, J., concurring) (describing separation of powers concerns when election regulations are stricken).[25]

---

[25] To the extent the district court is suggesting that the State has less authority (or a greater evidentiary burden) to regulate election administration problems arising out of the 2020 surge in mail voting because it occurred in the context of a pandemic,

No doubt, not all erroneously pre-filled applications mailed to voters were submitted to county election offices. But the ones that *were* – and the record reflects there were many – heavily taxed the time and resources of election officials. Any suggestion, therefore, that the Prohibition will not facilitate more efficient election administration in the processing of mail votes blinks at reality.

3. Promotes Public Confidence in Integrity of Electoral System and Deters Voter Fraud

The Prohibition is similarly supported by Kansas' interest in preserving public confidence in the integrity of the electoral process and deterring voter fraud.[26] The turmoil and distrust stemming from thousands of inaccurate applications circulating statewide – evidenced by the flood of calls and letters received by county election officials from agitated voters – made clear the urgent need for legislative action. The State had every right to adopt measures to shore up the public's faith that mail voting is free and fair.

Yet the district court found this interest insufficient to justify the Prohibition. App.IV 804-807, 812-813. The court did not address the public confidence point *per se*. Instead, it criticized Defendants for not offering evidence of any actual fraud or

the *opposite* would be true. That voters might have utilized mail-in voting in 2020 in greater numbers hardly undermines the State's right to adopt preventive measures like the Prohibition that are designed to minimize the harms from activities of third parties like VPC.

[26] Defendants raised this argument at App.III 747-750.

mistakes leading to improperly issued ballots in Kansas in the 2020 election. The court's focus was far too narrow.

Even if one assumes there were no documented cases of fraud tied to pre-filled advance ballot applications in Kansas, that does not undercut the State's interest in regulating this practice. In light of the problems such applications caused in 2020, the State was well within its rights to attempt to avoid a recurrence of those issues. The objective of safeguarding public confidence in the electoral process is not merely an ancillary gloss on anti-fraud enforcement; it is a discrete, constitutionally cognizable interest. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (State's interest in protecting "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process.").

And the State need not wait for the raindrop before building the roof. It may adopt prophylactic measures to forestall plausible pathways to abuse. If the State were required to show actual fraud before enacting every protective rule, it would be foreclosed from adopting any preventive regulation until after harm has occurred, an untenable rule in a field where the mere perception of vulnerability can corrode legitimacy and public confidence.

Moreover, focusing myopically on confirmed cases of fraud that have been both detected and successfully prosecuted undervalues the preventative effect that

election integrity laws serve. Voter fraud is extremely hard to detect, prosecutors have broad discretion as to what cases to charge, and election fraud cases historically have not been prioritized.

It is undisputed, however, that mail-in voting creates more links in the chain between a ballot being created and a ballot being cast, received, adjudicated, and tabulated. This creates more opportunities for mistakes and political chicanery. It also creates opportunities for fraud. *See Brnovich v. DNC*, 594 U.S. 647, 686 (2021) ("Fraud is a real risk that accompanies mail-in voting," which "has had serious consequences in [the] States.").

4. Provides Ample Alternative Channels for Communication

Having established that the Prohibition is narrowly tailored, the remaining question is whether it leaves open ample channels for communication.[27] Clearly, it does, as this Court expressly underscored in *VoteAmerica I*, 121 F.4th at 845, and as the district court agreed on remand. App.IV 813-814. As this Court noted:

> The Kansas Prohibition is a far cry from "restrict[ing] access to" an entire "fundamental ... avenue of political discourse," as in *Meyer [v. Grant]*, 486 U.S. [414,] 424 [1988]. VPC may continue using the mails to send unsolicited letters to Kansas voters advocating for mail voting and may even include a separate sheet with all the information VPC previously placed on prefilled applications along with a blank application and instructions for using it. The mailing of prefilled applications is hardly a "fundamental" method of communication or one that "is the essence of First Amendment expression," like the distribution of political leaflets or the one-on-one discussions

_____

[27] Defendants raised this argument at App.III 751.

> accompanying the circulation of petitions. *McCullen*, 573 U.S. at 488–89 (internal quotation marks omitted). In short, despite the Prohibition, VPC remains free to choose what avenue of communication it will use to advocate for mail voting, including the use of unsolicited mailers.

*VoteAmerica I*, 121 F.4th at 845. Third parties are free to communicate any message they want with an advance ballot application and are fully permitted to express such views through any medium outside of mailing a pre-filled, unsolicited application. There is no credible argument that the Prohibition fails to leave ample channels open for VPC to communicate its ideas.

## CONCLUSION

The Prohibition was carefully crafted to address specific harms experienced from unsolicited, pre-filled advance ballot applications. The statute is narrowly tailored, leaves sufficient avenues for groups to communicate their chosen messages, and satisfies intermediate scrutiny. Accordingly, Defendants request this Court reverse the district court's judgment and remand with instructions to grant judgment in favor of Defendants.

Respectfully submitted,

Kris Kobach
   Attorney General
Anthony J. Powell
   Solicitor General
**Office of the KS Attorney General**
120 SW 10th Ave., Room 200
Topeka, KS 66612-1597
Tel.: (785) 296-2215
Fax: (785) 291-3767
Email: anthony.powell@ag.ks.gov
Email: kris.kobach@ag.ks.gov

/s/ Bradley J. Schlozman
Bradley J. Schlozman
Scott R. Schillings
Garrett R. Roe
**HINKLE LAW FIRM LLC**
1617 N. Waterfront Parkway, Ste. 400
Wichita, KS 67206
Tel: (316) 267-2000
Fax: (316) 264-1518
Email: bschlozman@hinklaw.com
Email: sschillings@hinklaw.com
Email: groe@hinklaw.com

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Defendants request oral argument because of the important state interests at issue, most notably, a federal court striking down a state law as allegedly violative of the U.S. Constitution.  Defendants believe that oral argument will materially assist this Court in resolving the complex constitutional questions at issue here.

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(b).  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Bradley J. Schlozman*
Bradley J. Schlozman

**CERTIFICATE OF DIGITAL SUBMISSION**

I certify that all required privacy redactions have been made pursuant to Fed. R. App. P. 25(a)(5) and 10th Cir. R. 25.5.  The document is a native PDF document. The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, SentinelOne (version 24.1.5.277), which was last updated May 8, 2025.  According to the program, the document is virus free.

/s/ *Bradley J. Schlozman*
Bradley J. Schlozman

**CERTIFICATE OF SERVICE**

I certify pursuant to Fed. R. App. P. 25 and 10th Cir. R. 25.4 that on this 7th day of November, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which in turn caused electronic notifications of such filing to be sent to all counsel of record.

/s/ *Bradley J. Schlozman*
Bradley J. Schlozman

# INDEX OF ATTACHMENTS

**Memorandum and Order (July 3, 2025)**..............................................Attachment 1

**Judgment of the District Court (July 16, 2025)**................................Attachment 2

# ATTACHMENT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; KRIS KOBACH, in his official capacity as Attorney General of the State of Kansas; and STEPHEN M. HOWE in his official capacity as District Attorney of Johnson County,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br><br>No. 21-2253-KHV |

## MEMORANDUM AND ORDER

VoteAmerica and Voter Participation Center ("VPC") bring suit for declaratory and injunctive relief against Scott Schwab in his official capacity as Kansas Secretary of State, Kris Kobach in his official capacity as Kansas Attorney General and Stephen M. Howe in his official capacity as District Attorney of Johnson County. VPC alleges that by preventing third parties from mailing prefilled mail ballot applications, Section 3(k)(2) of HB 2332 (codified as K.S.A. § 25-1122(k)(2)) violates its freedom of speech under the First Amendment, U.S. Const. amend. I. Pretrial Order (Doc. #140) filed September 30, 2022 at 15.

This matter is before the Court on Plaintiffs' Opening Brief (Doc. #200) filed January 21, 2025, Defendants' Response To Plaintiff VPC's Brief Following Remand (Doc. #202) filed March 14, 2025 and Plaintiffs' Reply To Defendants' Response Following Remand (Doc. #204) filed April 4, 2025. After careful consideration, the Court makes the following findings of fact and conclusions of law, as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure.

For reasons set forth below, the Court finds in favor of plaintiff.[1]

## Findings Of Fact

Many of the Court's findings of fact are set forth in its Memorandum And Order (Doc. #183) filed May 4, 2023 ("VoteAmerica I"). The Tenth Circuit did not alter those findings on appeal, and on remand, the parties agreed that no further discovery or fact finding was necessary. The Court repeats its original findings of fact but supplements them to address issued raised on appeal to the Tenth Circuit.

## I.    Personalized Application Prohibition

On February 10, 2021, the Kansas Legislature introduced HB 2332, which included restrictions on the distribution of advance mail ballot applications to potential Kansas voters.[2] On May 3, 2021, over the veto of Governor Laura Kelly, the legislature enacted HB 2332. In part, HB 2332 sought to regulate third parties who use direct mailings to Kansas voters to

---

[1]    VoteAmerica has resolved all claims against defendants pursuant to a joint stipulation by the parties. See Stipulated Order For Permanent Injunction And Declaratory Relief (Doc. #73) filed February 25, 2022. Because VoteAmerica's claims have been fully resolved, the Court's reference to plaintiff is to VPC.

[2]    The legislation included several changes to Kansas election law. Relevant to this lawsuit, HB 2332 contained the Personalized Application Prohibition and the Out-of-State Distributor Ban. The Out-of-State Distributor Ban stated that "No person shall mail or cause to be mailed an application for an advance voting ballot, unless such person is a resident of this state or is otherwise domiciled in this state." HB 2332, Session of 2021 (Kan.), § 3(l)(1). The legislation also (1) prohibited the Kansas Governor, Secretary of State or Judicial Branch from modifying state election laws, id. at § 1(a)–(b), (2) required each county election officer to maintain a residential address and mailing address for each registered voter if the mailing address differed from the residential address, id. at § 2, (3) required organizations to include certain information and disclosures (such as the name and address of the mailing organization) on the mail ballot application, id. at § 3(k)(1), and (4) expanded the crime of election tampering to include changing, attempting to change, altering, destroying, concealing or manipulating any vote or voting mechanism and knowingly producing false vote totals, id. at § 4.

encourage them to vote by mail. As to direct mailings which include an application for an advance voting ballot, the statute stated as follows:

> The application for an advance voting ballot included in such mailing shall be the official application for advance ballot by mail provided by the secretary of state. *No portion of such application shall be completed prior to mailing such application to the registered voter.*

K.S.A. § 25-1122(k)(2) (italics added) ("the Personalized Application Prohibition").[3]

The Personalized Application Prohibition applies to any person or organization who solicits a registered voter by mail. It prohibits mailing to a registered Kansas voter an advance mail ballot application that is personalized, i.e. prefilled with any personalized information such as the voter's name or address. Id. A violation is a class C nonperson misdemeanor, which is punishable by up to one month in jail and/or fines.[4]

The State argues that the Personalized Application Prohibition is necessary to (1) minimize voter confusion and disenfranchisement, (2) preserve and enhance voter confidence

---

[3]    On April 9, 2025, defendants notified the Court that Governor Laura Kelly has signed into law HB 2016, which amended K.S.A. § 25-1122(k)(2) in part. See Defendants' Notice Of Statutory Amendments To K.S.A. § 25-1122(k)'s Pre-Filled Application Prohibition (Doc. #205). Effective July 1, 2025, the amended provision states as follows:

> The application for an advance voting ballot included in such mailing shall be the official application for advance ballot by mail provided by the secretary of state **or the appropriate county election office.** No portion of such application shall be completed prior to mailing such application to the registered voter, **except that the date of the election may be printed on the application.**

HB 2016, Session of 2025 (Kan.), § 2(k)(2) (changes in bold). The parties have not filed supplemental briefing or sought leave to file supplemental briefing on the amendment. The parties agree that the amendment does not alter the First Amendment issue in this case.

[4]    The statute carves out exceptions by permitting a subset of state and county election officials to mail prefilled advance mail ballot applications.

and (3) reduce potential voter fraud by reducing inaccurate applications and inefficiencies in election administration. Exhibit 34 (Doc. #145-37) filed October 14, 2022 at 3–4. These rationales are not a part of the Legislative Record for HB 2332, and the State does not explain how the Personalized Application Prohibition advances these objectives.

In February of 2021, the Office of the Kansas Secretary of State submitted written testimony regarding the State's 2020 general election to both the House and Senate Committees on Federal and State Affairs. Among other things, the testimony advised the legislature on problems which state and local election officials encountered in that election. It specifically stated as follows:

> Leading up to the 2020 general election, state and county election officials were inundated with calls from confused voters who submitted an advance by mail ballot application but continued to receive unsolicited advance ballot applications from third parties. This created a substantial workload increase for local election offices who had to process thousands of duplicate forms at a time when county election officials were preparing for a high turnout, statewide election, in the middle of a pandemic.

Exhibit Z (Doc. #151-26) filed October 28, 2022. On March 17, 2021, the Kansas Secretary of State submitted written testimony on HB 2332 which did not discuss prefilled applications but mentioned "incomplete mail ballot applications." Exhibit 32 (Doc. #145-31) at 3.

## II.    Voting In Kansas

Schwab is the Chief Election Officer for Kansas. As such, he oversees all Kansas elections and administers the State's election laws and regulations. Schwab also gives guidance and instruction on election procedures and requirements to county election officers. Kansas law permits Schwab to adopt rules and regulations related to advance voting, including the general form of advance voting ballots and applications for advance mail voting. K.S.A. §§ 25-1131, 25-

1121(a)–(b), 25-1122d(c); see also HB 2332, Session of 2021 (Kan.), §§ 3(k)(2), (m).

The Kansas state voter registration database is known as the Election Voter Information System ("ELVIS"). Schwab is responsible for maintaining the online voter registration database. 52 U.S.C. § 21083(a)(1)(A). In all 105 counties in Kansas, county election officials perform all additions, deletions and modifications of records in the database, and ELVIS reflects the voter data maintained by those county officials. When a county election office receives a voter registration application, an election official puts that voter's registration information into the State's central database and thereby creates a voter record in ELVIS. ELVIS reflects real-time changes that officials make to individual voter files.

To vote by mail in Kansas, a voter generally must complete an advance ballot application and return it to the county election office where the voter is registered.[5] The advance mail voting process includes multiple safeguards against fraud, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. See, e.g., K.S.A. § 25-2431.

If a voter timely submits an advance voting ballot application, a county election official processes the application and, if the county accepts the application, mails the voter an advance ballot packet.[6] If a voter submits an inaccurate or incomplete application, a county election

---

[5]    To vote by mail, voters on the permanent advance voting list and voters who vote by mail pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 et seq., need not file advance ballot applications.

[6]    Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the general election and the Tuesday of the week preceding the general election. K.S.A. § 25-1122(f)(2). Except for voters who are entitled to receive ballots under the Uniformed and Overseas Citizens Absentee Voting Act, counties cannot transmit advance ballots to voters before the 20th day before the election for which an application has been received. K.S.A. §§ 25-1123(a), 25-1220. For advance voting ballot applications received

(continued . . .)

-5-

official must contact the voter and "cure" the application. If the official cannot contact the voter, the office will mail the voter a provisional ballot.

An advance voting ballot application must precisely match the information in ELVIS; otherwise, the county election office must contact the voter to cure the mismatch or discrepancy. Officials may only overlook mismatches that are clearly inadvertent (e.g., minor misspelling of a street name such as omitting the letter "e" or signing as "Jim" despite being registered as "James"). Once the county election office processes an advance ballot application, it documents in ELVIS the date that it processed the application and transmitted the regular or provisional ballot to the voter. In ELVIS, county election offices also document whether (and when) a voter has returned an advance ballot.

## III.    Voter Participation Center

Plaintiff's core mission is to promote voting among traditionally underserved groups—including young voters, voters of color and unmarried women—at rates commensurate with voters in other groups.[7] Plaintiff believes that when more eligible voters participate in elections, it benefits democracy in the United States and that encouraging and assisting voters to participate in elections through mail voting ensures a robust democracy. Plaintiff believes that mail voting expands participation opportunities among its target voters—some of whom may not have the ability to vote in person or the resources to navigate the mail voting application process.

---

[6] (. . .continued)
on or after the 20th day before the election, the county generally must process them within two business days of receipt. K.S.A. § 25-1123(a).

[7]    The record contains no information about whether other organizations are dedicated to promoting voting, or what demographic sectors they might target.

Plaintiff primarily uses direct mailings to encourage these voters to register and participate in the electoral process. VPC President and Chief Executive Officer Thomas Lopach testified that plaintiff believes sending personalized advance mail ballot applications "increases voter engagement," which Lopach defines as a broad associational base of potential voters in Kansas. Exhibit 7 (Doc. #147-5) filed October 15, 2022 at 167:22–168:15.[8] Plaintiff believes that providing underserved groups the necessary personalized advance mail voting applications is key to effectively advocating its message.

Plaintiff encourages registered Kansans to participate in this manner by mailing voters a communication package that advocates voting by mail and provides a personalized advance mail ballot application. Through these communications, plaintiff communicates its message that advance mail voting is safe, secure, accessible and beneficial. Providing personalized applications to young voters, voters of color and unmarried women provides them simple access to advance mail ballot applications. Plaintiff tracks recipient responses to its communications and conducts randomized control trials to evaluate the effectiveness of its mailings.

Lopach and VPC Executive Vice President Lionel Dripps testified that plaintiff engages voting behavior and quantitative research professionals, including but not limited to Christopher B. Mann, associate professor of political science at Skidmore College, to analyze the efficacy of its direct mail programs. Plaintiff believes that personalized applications are the most effective

---

[8] To support its belief that sending personalized applications increases voter engagement, plaintiff relies on a 2006 election cycle study which, among other things, evaluated the effectiveness of personalizing advance mail ballot applications. Defendants argue that the study is inadmissible hearsay if offered to prove the effectiveness of the personalized applications. This argument does not address plaintiff's *belief* that personalizing the applications increases engagement.

means of conveying its pro-mail voting message and that if the prohibition stands, plaintiff must reconsider its communications with Kansas voters.

## IV.    2020 Elections In Kansas

For the 2020 General Election, plaintiff and its 501(c)(4) sister organization, the Center for Voter Information ("CVI"), sent advance mail ballot application packets to approximately 507,864 Kansas voters.  Plaintiff's communications included a letter that (1) encouraged each voter to request and cast an advance ballot, (2) provided instructions on how to do so, (3) detailed how to opt out of future VPC communications and (4) provided a step-by-step guide on how to submit the included application.  The packet also included a postage-paid envelope addressed to the voter's county election office.  The letter's opening paragraph specifically referred to "the enclosed advance voting application already filled out with [the voter's] name and address" and mentioned the personalization in the closing "P.S." message: "We have already filled in your name and address on the enclosed form.  Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope." Exhibit A (Doc. #145-34) at 3.  On the reverse side of the enclosed personalized advance ballot application, plaintiff also printed a step-by-step guide.

To personalize the applications, plaintiff uses statewide voter registration files obtained from data vendors and completes parts of the advance mail ballot application forms with the voter's name and address.  Plaintiff has relied on a vendor, Catalist, LLC, to provide the voter registration data for the Kansas voters whom plaintiff targeted with advance voting ballot application packets.  For $200, the Secretary of State's office will provide a list of all registered voters in Kansas.  That list comes from ELVIS and is a snapshot of the State's voter file as it

appears on the date when the office generates the registration list. Plaintiff's CEO Lopach does not know how often Catalist requests updated voter files from the Secretary of State's office, but on January 31, April 10 and September 15, 2020, Catalist sent Kansas active voter registration lists to plaintiff.

Plaintiff attempts to cull its lists to ensure efficiency and accuracy. If a third party relies on voter registration information obtained from ELVIS, because ELVIS is a dynamic system, some information on a prefilled application may not match the State's voter file database when the voter receives it. This happens when an official has updated ELVIS (e.g., noting a change of name, change of address, death or ineligibility due to criminal conviction) after the Secretary of State's office generates the voter file which the third party has requested.

VPC Executive Vice President Dripps testified that *nationally*, plaintiff detected that roughly five per cent of the data vendor records had an incorrect middle name or initial and roughly three per cent had a suffix that did not match the voter file. Dripps testified that he did not know whether the errors in Kansas data matched the national numbers.

Defendants' expert witness, Ken Block, analyzed a subset of the advance ballot applications that plaintiff sent to Kansas voters in the 2020 general election. This subset contained 312,918 of the approximately 507,864 applications that plaintiff sent. Block identified errors in the information that plaintiff used to pre-populate the applications. Block attested that during the 2020 General Election, plaintiff's data contained information on 385 Kansas voters

whose registrations had been cancelled.[9]  Block also identified 23 pairs of matched records in which two different voters showed the same voter registration number, even though Kansas voter files properly separated these individuals.[10]  Block did not purport to demonstrate that any erroneously prefilled application came to the attention of election officials, however, or conclude that they negatively impacted the 2020 election process.  Block attested that plaintiff's use of stale voter registration data to prefill the advance mail ballot applications imposed an extra burden on county election officials, but he did not explain how it did so.

Dr. Eitan Hersh, who analyzed Block's reports, testified that actually "it seems likely that the [plaintiff's] methods *reduced* the burden on election officials." Exhibit 5 (Doc. #156-6) filed November 4, 2022, ¶ 41 (emphasis in original).  During his deposition, Dr. Hersh stated, "all voter registration data, whether it's sourced from the state or whether it's sourced from a third party, contain obsolete records essentially the day that it is downloaded." Exhibit 1 (Doc. #167-1) filed December 8, 2022 at 104:22–25.  Connie Schmidt, Johnson County Elections Director, testified that she is "sure there are always data entry errors" in ELVIS. Exhibit 2 (Doc. #167-2) at 107:19–24.

In his report, Dr. Hersh attested that any errors which Block identified "are nothing out of the ordinary, given population churn and the logistics of sending large mailers out to voters." Exhibit 5 (Doc. #156-6), ¶ 16.  Dr. Hersh further attested that attempts to eliminate routine error

---

[9]    Of those 385 Kansans, plaintiff sent (1) five separate mailings to 176 of the Kansans; (2) four separate mailings to 99 of the Kansans; (3) three separate mailings to 39 of the Kansans; and (4) two separate mailings to 11 of the Kansans. Exhibit N (Doc. #151-14) at 3–4.

[10]    This mismatch suggests that plaintiff had sent prefilled applications for Voter #1 to Voter #2.  Block did not address whether recipients actually returned these erroneous advance mail ballot applications.

in mailing lists would be "extreme," "costly and labor intensive" and "would delay the eventual sending of the mailing." Id., ¶ 20. Dr. Hersh concluded that Block's concerns relate to just under three per cent of the records in plaintiff's database and "[e]ven if one were to stipulate that all the issues raised by" Block existed, "the total number of problems identified by [him] is quite in line with [Dr. Hersch's] expectations." Id., ¶ 27.

To ensure it has the most accurate data when creating mailing lists, plaintiff now contracts with two data vendors. Each year, plaintiff notifies the Kansas Director of Elections of its upcoming advance mail voting program and seeks feedback on the forms and instructions that it plans to distribute. In the 2020 general election, an estimated 112,000 Kansas voters used a VPC-provided or CVI-provided pre-paid/pre-addressed envelope to mail an advance ballot application to their county election offices. An estimated 69,000 of such Kansas voters mailed an advance voting ballot application provided by plaintiff. In 2020, county election offices received approximately 14,739 duplicate applications from Kansas voters using VPC-provided or CVI-provided envelopes.[11]

The 2020 general election in Kansas was one of a kind. It had record turnout (1,375,125 votes cast, a 70.9 per cent turnout rate) and a steep increase in advance mail voting (459,229 mail ballots, 3.3 per cent of total votes). This compared to 1,039,085 total votes cast in the 2018 general election, which represented a 56.4 per cent turnout rate with 152,267 votes cast by mail (1.5 per cent), and 1,225,667 total votes cast in the 2016 general election, which was a 67.4 per

---

[11]    It is not clear whether Kansas voters submitted duplicate VPC-provided or CVI-provided applications before the 2020 general election or if so, how many. The parties agree that the 2020 election was unique, however, so references to prior elections are not particularly instructive.

cent turnout rate with 173,457 votes cast by mail (1.4 per cent).

Conducting a high-turnout presidential election race in the middle of a worldwide pandemic introduced many challenges for election administrators. COVID-19 also presented new hurdles for some voters. In the 2020 primary and general elections, many organizations, campaigns and elections offices, including plaintiff and Kansas election officials, encouraged voters to vote by mail. Several Kansas counties directly sent communications to registered voters regarding the advance mail voting process, including advance mail ballot applications.

Many voters had concerns about lost applications or mail delays and called their election offices to inquire about the status of their applications. Some voters re-submitted their applications. Election Commissioner Andrew Howell attested that in Shawnee County, duplicate and inaccurately prefilled advance mail ballot applications resulted in telephone calls, letters, e-mails and in-office visits from voters. Howell believed that voters were confused and frustrated, but not necessarily because they received prefilled applications. He believed that voters erroneously assumed that the county had mailed multiple prefilled ballot applications and were frustrated at the purported incompetency of his election office. The Shawnee County Election Office received 4,217 duplicate applications in 2020, as compared to the dozen or fewer that it received in the 2016 and 2018 general elections.

Ford County Election Clerk Deborah Cox testified that in the lead-up to the 2020 election, she heard from 20 to 30 voters a day about advance ballot applications. She had to send an ad to three Ford County newspapers to remind voters that most prefilled applications had not come from the county election office. Howell and Cox attested that these voters told election officials in Shawnee and Ford Counties that they thought they were required to complete and

-12-

return the prefilled applications even if they had already submitted applications. Howell and Cox attested that after receiving a duplicate application, their election offices could not assume that the initially submitted application was correct. Depending on the situation, the offices might need to send the voter a provisional ballot. For this reason, reviewing a duplicate application usually took staff more time than reviewing the initial application. If the office did not need to contact the voter, it could review the duplicate application in about seven to 10 minutes. If the office had to contact the voter, it could review the duplicate application in about 15 to 30 minutes (occasionally longer).

Though Howell and Cox believe that VPC had prefilled most of the duplicate applications which they received, Kansas election officials did not attempt to quantify how many duplicate applications in the 2020 general election involved VPC-prefilled applications. When they received an incomplete or inaccurate application, officials did not determine whether it was prefilled or track how many of them were prefilled. County election officials helped voters cure their applications regardless whether the voter had used a blank form or a prefilled form.

Cox testified that she would normally agree that at least in some ways, "pre-filled information increased the likelihood and the ease that [her] office can match information between the voter file and application." Exhibit 2 (Doc. #145-3) at 150:9–14. Douglas County Elections Director Jamie Shew testified that if not for budgetary constraints, his office would actually prefer to prefill the applications sent to voters. In 2020, for the primary and general elections, Johnson County mailed applications to all voters, and it spent additional resources to personalize the applications. The Johnson County Election Office chose to prefill as much of the voter's information as possible, and it actually prefilled more information than plaintiff did.

Exhibit 12 (Doc. #145-11) at 4. It reasoned that doing so "makes it easier for the voter and reduces mistakes that [officials] then have to work harder to fix on the backend." Exhibit 9 (Doc. #145-8) at 2.

Bryan Caskey, Kansas Secretary of State Elections Director, testified that the 2020 post-election audits revealed that every cast ballot was accounted for and counted properly either by hand or by machine. When asked whether the audits revealed "any systemic fraud in Kansas elections in 2020," Caskey responded, "They did not." Exhibit 17 (Doc. #146-16) filed October 15, 2022 at 282:25–283:13.

## Procedural Background

On June 2, 2021, VoteAmerica and VPC filed suit for declaratory and injunctive relief against Scott Schwab in his official capacity as Kansas Secretary of State, Kris Kobach in his official capacity as Kansas Attorney General and Stephen M. Howe in his official capacity as District Attorney of Johnson County. See Complaint For Declaratory And Injunctive Relief (Doc. #1). VoteAmerica and VPC alleged that the Personalized Application Prohibition and Out-of-State Distributor Ban in HB 2332 violated their First Amendment rights to freedom of speech and freedom of association and were unconstitutionally overbroad.[12] Id. at 22–30 (Counts I–III). VoteAmerica and VPC also alleged that the Out-of-State Distributor Ban violated the Dormant Commerce Clause, U.S. Const. art. I, § 8, cl. 3. Id. at 30–33 (Count IV).

After an evidentiary hearing on September 8, 2021, the Court preliminarily enjoined defendants from enforcing both provisions of HB 2332. Memorandum And Order (Doc. #50)

---

[12] As noted, the Out-of-State Distributor Ban prohibited any person or entity who was not a resident of Kansas or otherwise domiciled in Kansas from mailing an advance mail ballot application to a Kansas voter. HB 2332, Session of 2021 (Kan.), § 3(l)(1).

filed November 19, 2021.  VoteAmerica and VPC stipulated to a permanent injunction against enforcement of the Out-of-State Distributor Ban as violating plaintiffs' First and Fourteenth Amendment rights.  See Stipulated Order For Permanent Injunction And Declaratory Relief (Doc. #73) filed February 25, 2022.  The claims remaining pertained to the Personalized Application Prohibition—Counts I, II and III.[13]

On October 14, 2022, the parties filed cross-motions for summary judgment.  See Defendants' Motion For Summary Judgment Regarding Counts I–III (Doc. #141); Plaintiff's Motion For Summary Judgment (Doc. #144).  The parties agreed to submit the case by written submissions, with their summary judgment briefs serving as trial briefs.  On May 4, 2023, based largely on stipulated facts, the Court held that the Personalized Application Prohibition violated the First Amendment.  VoteAmerica v. Schwab, 671 F. Supp. 3d 1230, 1254 (D. Kan. 2023) ("VoteAmerica I").  Specifically, the Court held that (1) mailing personalized voting applications is inherently expressive conduct which the First Amendment protects, id. at 1244; (2) the Personalized Application Prohibition implicates plaintiff's First Amendment right to freedom of association, id. at 1246; (3) because the Personalized Application Prohibition restricts the overall quantum of speech available to the election or voting process, it is subject to strict scrutiny, id. at 1250; (4) the Personalized Application Prohibition was not narrowly tailored to achieve the State's compelling interest in preventing voter fraud and voter confusion, protecting election integrity or facilitating the orderly and efficient administration of elections, id. at 1253–54; and

---

[13]      As noted, the parties stipulated that the Personalized Application Prohibition does not apply to VoteAmerica's conduct.  See Stipulated Order For Permanent Injunction And Declaratory Relief (Doc. #73); see also Pretrial Order (Doc. #140) at 4–5.  The Court therefore considers only VPC's claims.

(5) facially, the Personalized Application Prohibition is unconstitutionally overbroad, id. at 1256. That same day, May 4, 2023, the Court entered judgment on all counts in favor of plaintiffs. See Judgment In A Civil Case (Doc. #184). Defendants appealed. See Notice of Appeal (Doc. #187) filed June 1, 2023.

On November 12, 2024, the Tenth Circuit reversed the Court's judgment and remanded for further proceedings. VoteAmerica v. Schwab, 121 F.4th 822, 827 (10th Cir. 2024) ("VoteAmerica II"). As relevant here, the Tenth Circuit reversed the Court's application of strict scrutiny to plaintiff's freedom of speech claim, holding that absent an improper purpose or justification for the statutory prohibition, intermediate scrutiny applies.[14] Id. at 834. The Tenth Circuit left to this Court the task of deciding what degree of scrutiny to apply, and applying it with the benefit of focused briefing on the remaining issues. Id.

## Conclusions Of Law

Plaintiff alleges that the Personalized Application Prohibition is an unconstitutional infringement on plaintiff's First Amendment right to freedom of speech. The First Amendment, made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "Content-based laws— those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve

---

[14]    The Tenth Circuit also reversed the Court's judgment on plaintiff's freedom of association and overbreadth claims, instructing the Court on remand to enter judgment for defendants. Id. at 852, 854.

-16-

compelling state interests."[15] <u>Reed v. Town of Gilbert, Ariz.</u>, 576 U.S. 155, 163 (2015).   The

rationale behind this general prohibition is that "content discrimination raises the specter that the

Government may effectively drive certain ideas or viewpoints from the marketplace."

<u>Davenport v. Wash. Educ. Ass'n</u>, 551 U.S. 177, 188 (2007) (quotations omitted).   Under the

umbrella of content-based laws, viewpoint discrimination is a "particularly egregious form of

content discrimination."  <u>Vidal v. Elster</u>, 602 U.S. 286, 293 (2024) (quotations omitted).  "A

viewpoint-based regulation targets not merely a subject matter, but particular views taken by

speakers on a subject," and is generally subject to heightened scrutiny. <u>Id.</u> (quotations omitted).

Courts use a two-step inquiry to determine whether a regulation is content-based and

subject to strict scrutiny.  First, the Court considers whether—on its face—the law is content-

based.  <u>Reed</u>, 576 U.S. at 165.  If it is, strict scrutiny applies "regardless of the government's

benign motive, content-neutral justification, or lack of animus toward the ideas contained in the

regulated speech."  <u>Id.</u>  Nevertheless, some facially content-based restrictions pose only a slight

threat to free speech, so adequate protection is afforded by lesser constitutional scrutiny.[16]

<u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 382–83 (1992).  Second, if the law is facially content-

neutral, the Court considers whether the government adopted the regulation for an improper

purpose or justification, <u>i.e.</u> the suppression of free expression.  <u>Id.</u> at 166; <u>United States v.</u>

<u>Eichman</u>, 496 U.S. 310, 315 (1990) ("Although the [statute] contains no explicit content-based

---

[15]     By contrast, content-neutral laws—those justified without reference to the content of the regulated speech—may be justified only if the government proves that they are narrowly tailored to serve a significant governmental interest.  <u>Brewer v. City of Albuquerque</u>, 18 F.4th 1205, 1220 (10th Cir. 2021).

[16]     Obscenity, defamation and "fighting words" are categories of content-based speech that receive lesser constitutional protection. <u>R.A.V.</u>, 505 U.S. at 383.

limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted interest is related to the suppression of free expression." (quotations omitted)). If an improper purpose or justification underpins an otherwise facially content-neutral law, the law is considered content-based and subject to strict scrutiny. City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC, 596 U.S. 61, 76 (2022).

Here, the Tenth Circuit has held that the Personalized Application provision prohibits certain content on its face: the information necessary to complete any portion of an advance mail ballot application. VoteAmerica II, 121 F.4th at 850. It also held that because the Personalized Application Prohibition is viewpoint neutral, "the threat to free speech posed by the Prohibition is sufficiently small that (absent evidence that it was enacted for an improper purpose or justification) adequate protection is provided by intermediate scrutiny." Id. The Court therefore first examines whether defendants enacted the Personalized Application Prohibition for an improper purpose or justification.

## I.     Whether Defendants Enacted The Personalized Application Prohibition For An Improper Purpose Or Justification

As noted, strict scrutiny applies if the State enacted the Personalized Application Prohibition for an improper purpose or justification. City of Austin, 596 U.S. at 76. In making this assessment, the Court considers whether the prohibition "cannot be justified without reference to the content of the regulated speech" or whether it "was adopted by the government because of disagreement with the message the speech conveys." TikTok Inc. v. Garland, 145 S. Ct. 57, 67 (2025). A purpose or justification is improper if it is "related to the suppression of free expression." Eichman, 496 U.S. at 315; see also Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984) (considering whether "ordinance was

-18-

designed to suppress certain ideas that the City finds distasteful" and if "bias or censorship" underpin enactment). Simply put, the government may not legislate "based on hostility—or favoritism—towards the underlying message expressed." R.A.V., 505 U.S. at 382. A regulation does not have an underlying improper purpose or justification, however, merely because "it may disproportionately affect speech on certain topics" or "it has an incidental effect on some speakers or messages but not others." McCullen v. Coakley, 573 U.S. 464, 480 (2014).

The key question in determining whether a regulation is neutral is whether the law is "justified without reference to the content of the regulated speech." Id. To determine this, the Court considers the statute's stated purposes, the purposes of the statute as advanced by the government in litigation and legislative purposes which the Court can infer when a statute singles out a particular topic.[17] Id. at 480–82.

To show that a facially content-neutral regulation is subject to strict scrutiny, plaintiff bears the burden of showing by a preponderance of the evidence that defendants adopted the regulation because of disagreement with the message it conveys. See Signs for Jesus v. Town of Pembroke, N.H., 977 F.3d 93, 101 (1st Cir. 2020) ("To show that a facially content-neutral regulation is subject to strict scrutiny, the plaintiff must show not only that the restriction distinguishes between speakers, but also that it 'reflects a content preference.'" (quoting Reed, 576 U.S. at 170)); Free Speech Coal., Inc. v. Att'y Gen. of U.S., 677 F.3d 519, 534 (3d Cir.

---

[17] The Court may also rely on statements by legislators and concerned citizens about the passage of the regulation. Harmon v. City of Norman, Okla., 61 F.4th 779, 790 (10th Cir. 2023). The record here contains no such statements, and in any event, the Supreme Court has warned that it is a "hazardous matter" to inquire into congressional purpose or motive because what motivates one legislator does not necessarily reflect the intent of the legislature as a whole. United States v. O'Brien, 391 U.S. 367, 383–84 (1968).

2012) ("To demonstrate that a restriction is content based and thus subject to strict scrutiny, Plaintiffs must show that the Statutes single out speech for special treatment because of the effect that speech will have on its audience."); McCoy v. Town of Pittsfield, N.H., 59 F.4th 497, 506 (1st Cir. 2023) (plaintiff produced no evidence that ordinance could not be justified without reference to speech, so ordinance subject to intermediate scrutiny).[18]  Once plaintiff makes this showing, the burden shifts to defendants to justify the regulation.  See Brewer, 18 F.4th at 1220.

Here, as noted, HB 2332 does not explicitly set forth its purpose.[19]  Retroactively, defendants offer three justifications for it: to (1) minimize voter confusion; (2) facilitate efficiency in election administration; and (3) foster confidence in and protect the integrity of the electoral process.  HB 2332 addresses many issues in addition to the Personalized Application Prohibition, however, and defendants do not explain how that prohibition is designed to minimize voter confusion, facilitate efficiency in election administration, promote confidence in and protect the integrity of the electoral process or make mail ballots more secure.

Facially, defendants' three justifications do not reference the content of ballot application forms or reflect disagreement with the message that plaintiff conveys by personalizing the forms

---

[18]    The Tenth Circuit has not explicitly held that plaintiff bears the burden of showing that the legislature enacted a regulation because of disagreement with the message it conveys.  In Pahls v. Thomas, 718 F.3d 1210 (10th Cir. 2013), however, it did state that to establish viewpoint discrimination, *plaintiff* must show that a government official acted with discriminatory purpose.  718 F.3d at 1236.

[19]    As noted, HB 2332 addressed various election matters in addition to the Personalized Application Prohibition.  It also restricted the distribution of ballots by non-Kansas residents (the Out-of-State Distributor Ban), set address requirements for mail ballots, enacted standards for disclosures on advance ballot applications, restricted the authority of state executives and the judicial branch to modify election laws and expanded the crime of election tampering.  See supra note 2.

with voter information. See TikTok, 145 S. Ct. at 68 ("preventing China from collecting vast amounts of sensitive data" is content-neutral justification); Harmon, 61 F.4th at 790 (noise control is content-neutral justification). As to legislative history, on February 18, 2021, the Office of the Kansas Secretary of State submitted written testimony regarding the State's 2020 general election to the House and Senate Committees on Federal and State Affairs. The testimony advised the legislature as follows:

> Leading up to the 2020 general election, state and county election officials were inundated with calls from confused voters who submitted an advance by mail ballot application but continued to receive unsolicited advance ballot applications from third parties. This created a substantial workload increase for local election offices who had to process thousands of duplicate forms at a time when county election officials were preparing for a high turnout, statewide election, in the middle of a pandemic.

Exhibit Z (Doc. #151-26). On March 17, 2021, the Kansas Secretary of State submitted written testimony on HB 2332 which mentioned "incomplete mail ballot applications."[20] Exhibit 32 (Doc. #145-31) at 3.

Approximately three months after the 2020 presidential election, on February 10, 2021, the legislature introduced HB 2332, which contained the Personalized Application Prohibition, Out-of-State Distributor Ban and other regulations of advance voting by mail.[21] At a high level of generality, the timing of HB 2332 could support defendants' proffered justifications for the legislation as a whole. In Evans v. Sandy City, the city prosecutor had received notice of safety problems and accidents related to panhandling. 944 F.3d 847, 854 (10th Cir. 2019). To remedy

---

[20]    It did not specifically discuss prefilled applications, which would seem to prevent incomplete mail ballot applications, rather than facilitate them.

[21]    See supra notes 2 and 19.

the safety hazards, the prosecutor drafted an ordinance which prohibited individuals from sitting or standing on medians that were unpaved or less than 36 inches wide. Id. at 852, 854. The Tenth Circuit found that the process and timeline of the ordinance's enactment confirmed defendant's public safety justification for it. Id. at 854. Here, viewing HB 2332 as a whole, the legislature could have enacted it to generally minimize voter confusion, mitigate workload issues for local election offices and protect the integrity of the electoral process with regard to advance ballot applications. But defendants' stated justifications do not explicitly address the logic behind the Personal Application Prohibition. On this record, the evidence raises a reasonable inference that the legislature enacted the Personalized Application Prohibition because of disagreement with speech which advocates voting by mail. This is particularly true when the Personalized Application Prohibition is read alongside the Out-of-State Distributor Ban, which is also part of HB 2332, and viewed in historical context.

As noted, the 2020 election was one of a kind—election officials in each state had to conduct a high-turnout presidential election race in the midst of a worldwide pandemic. The 2020 election also stood out for another reason: widespread claims that the U.S. presidential election was fraudulent and that mail ballots in particular were partly to blame. Before the election, President Donald Trump, state election groups and individual voters filed numerous lawsuits regarding state election processes, including challenges to mail ballots. See O'Rourke v. Dominion Voting Sys. Inc., 552 F. Supp. 3d 1168, 1190–92 (D. Colo. 2021) (compiling 2020 election lawsuits). For example, in Donald J. Trump for President, Inc. v. Boockvar, 493 F. Supp. 3d 331 (W.D. Pa. 2020), plaintiffs challenged a number of Pennsylvania's procedures for voting by mail, including the (1) use of drop boxes and other satellite ballot-collection sites;

-22-

(2) procedures for verifying the qualifications of voters applying in person for mail-in or absentee ballots; and (3) rules for counting non-compliant ballots.[22] 493 F. Supp. 3d at 344. In Donald J. Trump for President, Inc. v. Way, 492 F. Supp. 3d 354 (D.N.J. 2020), plaintiffs challenged New Jersey legislation which allowed "election officials to canvass mail-in ballots ten days before Election Day and to canvass mail-in ballots received within two days of Election Day even if those ballots lack[ed] a postmark from the United States Postal Service." 492 F. Supp. 3d at 358. In Martel v. Condos, 487 F. Supp. 3d 247 (D. Vt. 2020), plaintiffs challenged the Vermont Legislature's decision "to authorize the Secretary of State to require local election officials to send ballots by mail to all registered voters." 487 F. Supp. 3d at 248. In Gallagher v. N.Y. State Bd. of Elections, 496 F. Supp. 3d 842 (S.D.N.Y. 2020), plaintiffs challenged New York law which required that mail-in absentee ballots be postmarked by election day to be counted. 496 F. Supp. 3d at 847.

The lawsuits continued after election day. For example, in King v. Whitmer, 505 F. Supp. 3d 720 (E.D. Mich. 2020), plaintiffs sought a declaratory judgment "that mail-in and absentee ballot fraud must be remedied with a manual recount or statistically valid sampling." 505 F. Supp. 3d at 730. Across the country, courts dismissed suits which challenged election processes and election results because plaintiffs failed to prove fraud or illegal conduct. See e.g., Donald J. Trump for President, Inc. v. Sec'y of Pa., 830 F. App'x 377, 381 (3rd. Cir. 2020) ("Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But

---

[22] The Court does not cite these lawsuits for the truth of the evidence established therein, but takes judicial notice to show widespread partisan disagreement, and litigation over mail-in ballot procedures and whether they were responsible for the "stealing" of the 2020 election. See Gilchrist v. Citty, 71 Fed. App'x 1, 3 (10th Cir. 2003). These cases evidence the fact that voting by mail became a topic of partisan political debate and widespread litigation.

calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here."). On January 6, 2021, the day Congress was to certify the 2020 election results, President Trump made the following statements:

- [T]his year, using the pretext of the China virus and the scam of mail-in ballots, Democrats attempted the most brazen and outrageous election theft and there's never been anything like this. So pure theft in American history. Everybody knows it.

- More than 10,000 votes in Pennsylvania were illegally counted, even though they were received after Election Day. In other words, they were received after Election Day. Let's count them anyway.

- And what they did in many cases is, they did fraud. They took the date and they moved it back so that it no longer is after Election Day. And more than 60,000 ballots in Pennsylvania were reported received back. They got back before they were ever supposedly mailed out. In other words, you got the ballot back before you mailed it, which is also logically and logistically impossible, right?

- In the state of Arizona, over 36,000 ballots were illegally cast by non-citizens. Two thousand ballots were returned with no address. More than 22,000 ballots were returned before they were ever supposedly mailed out. They returned, but we haven't mailed them yet.

- In Michigan, quickly, the secretary of state, a real great one, flooded the state with unsolicited mail-in ballot applications sent to every person on the rolls in direct violation of state law.

- We will ban ballot harvesting and prohibit the use of unsecured drop boxes to commit rampant fraud. These drop boxes are fraudulent. Therefore, they get disapp — they disappear, and then all of a sudden they show up. It's fraudulent.

- We will stop the practice of universal unsolicited mail-in balloting.

Transcript of Trump's speech at rally before US Capitol riot, Associated Press (Jan. 13, 2021) available at https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-

media-e79eb5164613d6718e9f4502eb471f27 (last visited June 23, 2025).[23]   President Trump further stated, "Now, it is up to Congress to confront this egregious assault on our democracy. And after this, . . . we're going to walk down to the Capitol . . . [b]ecause you'll never take back our country with weakness." Id.  Around one hour later, the United States Capitol building was breached.  Lisa Mascaro et al., Pro-Trump mob storms US Capitol in bid to overturn election, Associated Press (Jan. 5, 2021) available at https://apnews.com/article/congress-confirm-joe-biden-78104aea082995bbd7412a6e6cd13818 (last visited June 23, 2025).

The Kansas Legislature convened on January 11, 2021, two months after the 2020 general election and five days after January 6, 2021.[24]   One month later, on February 10, 2021, the legislature introduced HB 2332, which contained the Personalized Application Prohibition.  Aside from the language of the Personalized Application Prohibition, the Court finds no direct contemporaneous evidence of legislative intent for this provision.  Defendants' stated reasons for HB 2332 as a whole are not implausible, but as applied to the Personalized Application Prohibition, they are not more credible than plaintiff's position that the legislature enacted the Personalized Application Prohibition for an improper purpose.  Plaintiff bears the burden of proof, and the Court finds that it is more probably true than not true that the Kansas Legislature enacted the Personal Application Prohibition to suppress speech which favors voting

---

[23]   Again, the Court takes judicial notice of news articles for proof that a matter is publicly known or believed, not for the truth of the matter asserted. Est. of Lockett by & through Lockett v. Fallin, 841 F.3d 1098, 1111 (10th Cir. 2016).

[24]   As set forth in the Kansas Constitution, the legislature convenes on the second Monday in January.  Kan. Const. art. 2, § 8.  In 2021, the second Monday of January was January 11.  See Plotner v. AT & T Corp., 224 F.3d 1161, 1167 n.1 (10th Cir. 2000) (court can take judicial notice of calendar and days of week on which certain dates fall).

by mail.[25] In so holding, the Court considers the temporal proximity, the passion which the 2020 election inspired even before January 6, 2021, the widespread claims of election fraud and litigation related thereto, the culminating events of January 6, 2021, and the fact that the State has offered no rationale which explicitly links prefilled ballot applications to the stated reasons for the Personalized Application Prohibition. As noted, before and after the 2020 election, mail-in voting had become one of several scapegoats for the alleged "stealing" of the 2020 presidential election. In Kansas however, one week after the election, on November 10, 2020, Schwab had publicly declared that the 2020 election in Kansas was successful, without widespread, systematic issues of voter fraud, intimidation, irregularities or voting problems—an undisputed fact which calls into question any purported legislative intent to root out fraud, promote efficiency or avoid voter confusion in Kansas elections. See McCullen, 573 U.S. at 481–82 (court can infer legislative purpose when statute singles out particular topic).

As noted, plaintiff bears the burden of showing that defendants enacted the prohibition because of disagreement with speech which advocates voting by mail. Plaintiff has made this showing. The Court finds that following the 2020 election, defendants enacted the Personalized Prohibition to suppress speech which advocates voting by mail. It therefore merits strict scrutiny.

## II.    Whether The Personalized Application Prohibition Survives Strict Scrutiny

In VoteAmerica I, the Court held that the Personalized Application Prohibition could not withstand strict scrutiny and that it was therefore an unconstitutional infringement on plaintiff's

---

[25]     Through the Out-of-State Distributor Ban, the State also sought to silence speakers like VoteAmerica who advocated voting by mail but were not residents of Kansas.

First Amendment rights to speech. <u>VoteAmerica I</u>, 671 F. Supp. 3d at 1251–54. The Court reaffirms its conclusions of law here.

A.    <u>Whether The Personalized Application Prohibition Is Narrowly Tailored To The Government's Interests</u>

To survive strict scrutiny, defendants must show that the Personalized Application Prohibition is narrowly tailored to serve a compelling state interest. <u>See Yes On Term Limits, Inc. v. Savage</u>, 550 F.3d 1023, 1028 (10th Cir. 2008) (citing <u>Republican Party of Minn. v. White</u>, 536 U.S. 765, 774–75 (2002)). As noted, defendants assert the following justifications for the prohibition: to (1) minimize voter confusion; (2) facilitate efficiency in election administration; and (3) foster confidence in and protect the integrity of the electoral process.

1.    **Voter Confusion**

Defendants argue that the Personalized Application Prohibition prevents voter confusion because it eliminates the opportunity for mistakes in prefilled applications and reduces any mistaken belief that the applications originated from election officials. Specifically, defendants assert that some voters were confused about inaccurately prefilled and duplicate applications, and that this confusion caused disorder, which endangered the integrity of the election. The State's interest in minimizing voter confusion is connected to its broader legitimate interest in protecting election integrity. <u>Fish v. Kobach</u>, 189 F. Supp. 3d 1107, 1148 (D. Kan. 2016); <u>see also Burson v. Freeman</u>, 504 U.S. 191, 199 (1992) (state has "compelling interest in protecting voters from confusion and undue influence").

Although protecting voters from confusion is a compelling interest, the Personalized Application Prohibition is not narrowly tailored to serve that interest. Howell attested that duplicate and inaccurately prefilled advance mail ballot applications resulted in telephone calls,

-27-

letters, e-mails and in-office visits from voters. But Howell did not believe that voters were confused or frustrated because the applications which they received were prefilled; he believed that voters erroneously assumed that the county had mailed the duplicate ballot applications and were frustrated by the purported incompetency of his election office. Moreover, HB 2332 requires the following disclosure on a mail ballot application: "Disclosure: This is not a government mailing. It is from a private individual or organization." HB 2332, Session of 2021 (Kan.), § 3(k)(1)(d). This provision addresses defendants' concern that voters were confused about the source of the prefilled applications.

Even assuming that receiving duplicate advance ballot applications confused some voters, defendants presented no evidence on how criminalizing the mailing of personalized mail ballot applications would prevent confusion as to the source of the prefilled advance mail ballot. Furthermore, it is not clear that the State has a compelling interest in protecting the reputations for administrative efficiency of county election officials. Even so, defendants have not established that the Personalized Application Prohibition is narrowly tailored to protect their reputational interests. Johnson County officials distributed prefilled ballot applications because they believed that doing so "makes it easier for the voter and reduces mistakes that [officials] then have to work harder to fix on the backend." Exhibit 9 (Doc. #145-8) at 2. It therefore appears that the real problem is not prefilled applications but duplicate applications—which the Personalized Application Prohibition does not attempt to regulate.

In short, defendants have presented minimal evidence of voter confusion and frustration and have not established that the prefilled applications caused the alleged confusion. On this record, defendants have not established that the Personalized Application Prohibition is narrowly

tailored to achieve its interest in preventing voter confusion regarding the source of unsolicited prefilled applications, or any other electoral issues.

### 2.    Efficient Election Administration

Defendants argue that the Personalized Application Prohibition is necessary to facilitate orderly and efficient administration of elections.    Preserving the integrity and administration of the electoral process is a compelling state interest. Fish, 957 F.3d at 1133.

Defendants submitted evidence that if a voter submits an inaccurate or incomplete application, county election officials must contact the voter and "cure" the application.    If officials cannot contact the voter, the office will mail a provisional ballot to the voter.    Howell and Cox attested that reviewing a duplicate application usually takes more staff time than reviewing the initial application.    Again, the real issue here seems to be duplicate applications, which the Personalized Application Prohibition does not address.    Moreover, even if duplicates hinder efficient election administration, defendants have not established that in the context of an unprecedented election during a global pandemic, any "surge" of inaccurate and duplicate applications was fairly attributable to activity which the Personalized Application Prohibition seeks to prohibit.

In fact, the record suggests that on balance, personalizing advance mail ballot applications actually facilitates orderly and efficient election administration.    Cox testified that normally she agrees that at least in some ways, prefilled information increases the likelihood and the ease with which her office can match information between voter files and applications.    Shew testified that if not for budgetary constraints, his office would prefer to personalize applications sent to voters with prefilled information.    Even more, in the 2020 primary and general elections,

Johnson County mailed applications to all voters—expending additional resources to personalize applications and actually prefilling more information than plaintiff did. It chose to prefill as much of the voter's information as possible because doing so makes it easier for voters and reduces mistakes that officials have to fix on the back end.

On this record, defendants' contention that the Personalized Application Prohibition is narrowly tailored to facilitate orderly and efficient election administration is not persuasive. The prohibition does nothing to address duplicate application concerns, and defendants have not established that prefilling advance mail ballot applications hinders election administration. Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve the State's alleged interests in the enhancement of public confidence in the integrity of the electoral process, avoiding fraud and voter confusion or facilitating orderly and efficient election administration.

### 3.    Public Confidence And Election Integrity

Defendants argue that the Personalized Application Prohibition is narrowly tailored to achieve its interest in avoiding potential fraud. Preventing voter fraud and preserving election integrity are important state interests. See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials."). The Supreme Court has observed that courts do not "require elaborate, empirical verification of the weightiness" of the State's asserted justifications. Id. "Indeed, the Supreme Court has upheld what is likely a more burdensome regulation, requiring photo identification issued by the government in order to vote in person, even in the face of a record devoid of any evidence of

voter fraud occurring in Indiana in its history." Democracy N.C. v. N.C. State Bd. of Elections, 476 F. Supp. 3d 158, 207 (M.D. N.C. 2020).

To start, although preventing voter fraud is a compelling state interest, defendants have presented no evidence of voter fraud effectuated through advance mail voting, prefilled ballot applications or otherwise. Defendants have presented no evidence of a single instance in which a specific voter received duplicate mail ballots, and they have presented evidence that every cast ballot was accounted for. Kansas officials publicly declared that the 2020 election was successful, without widespread, systematic issues of voter fraud, intimidation, irregularities or voting problems.

As the Court noted in its order granting plaintiff's motion for preliminary injunction, defendants' argument has superficial appeal but boils down to an issue of administrative efficiency. The real issue seems to be that the process of preventing duplicate ballots takes more time than the process of dealing with requests for initial ballots. See Defendants' Memorandum In Support Of Motion For Summary Judgment Regarding Counts I–III (Doc. #151) filed October 28, 2022 at 50 ("While Kansas appears to have avoided any systemic fraud in its recent elections, the surge of inaccurate and duplicate prefilled advance voting ballot applications in 2020 taxed the ability of overburdened county election offices to timely and efficiently process such applications, which also necessarily increased the opportunity for mistakes to be made both in connection with advance voting ballot applications and election administration in general.").

Even if Kansas had a problem with election fraud, the Personalized Application Prohibition is not narrowly tailored to prevent such fraud. Defendants argue that a surge of "inaccurate and duplicate" advance mail ballot applications decreased the efficiency of county

election officials, which in turn increased the "opportunity" for mistakes. Yet even in a historically unprecedented election, they cite no evidence of a single mistake. Id. Given the overall surge in advance mail ballot applications, the Court does not doubt that some county election offices felt put upon or overburdened. In the 2020 elections, in part due to the pandemic, many organizations, campaigns, election offices and even Kansas election officials were encouraging voters to vote by mail. Kansas voters got the message: compared to 2018, three times as many of them voted by mail. Because of the highly contested nature of the election, in addition to the pandemic, many voters were concerned that their mail ballots would not be received and counted—so they requested duplicate ballots for peace of mind. Defendants have not demonstrated that in this context, any "surge" of "inaccurate and duplicate" advance mail ballot requests was fairly attributable to activity which the Personalized Application Prohibition seeks to prohibit. In fact, the record suggests that such activity is more helpful than harmful to overburdened election officials.

Again, defendants have not presented any evidence of voter fraud effectuated on account of personalized advance ballot applications or any other reason, or even a single instance in which a voter received or cast duplicate mail ballots. The advance mail voting process includes multiple safeguards against fraud, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. See, e.g., K.S.A. § 25-2431. These safeguards are extremely effective in preventing fraud in Kansas. Plaintiff persuasively observes that following defendants' logic, "any activity that takes up an election official's time and attention can be criminalized on the basis of potential fraud." Plaintiff Voter Participating Center's Opposition To Defendants' Motion For Summary Judgment (Doc. #156) filed November 4, 2022 at 114.

Even if prefilled or duplicate applications raised fraud concerns in Kansas, the Personalized Application Prohibition does nothing to address the alleged concern. It does not limit the number of advance mail ballot applications a third party may send to a voter or the number of ballot applications a voter may submit. Moreover, even accepting Block's identification of "hundreds" of purported errors in plaintiff's mailing list, these errors relate to under *three per cent* of plaintiff's records in a general election year that was sui generis, and the record contains no evidence that these errors had any impact on election processes. Block could not connect the alleged errors in plaintiff's mailing list to errors in applications received by election officials.

Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve any alleged interest in preventing voter fraud. The Personalized Application Prohibition therefore cannot withstand strict scrutiny on this ground.

## III. Whether The Personalized Application Prohibition Survives Intermediate Scrutiny

If the State had not enacted the Personalized Application Prohibition because of disagreement with speech which advocates voting by mail, the Court would apply intermediate scrutiny to that provision.[26] Under intermediate scrutiny, the government has the burden of showing that the regulation is "narrowly tailored to achieving significant government interests"

---

[26]    Without reference to the facts of which the Court takes judicial notice, plaintiff's case for strict scrutiny is much closer. In advance of this order, the Court did not inform the parties of the facts of which it now takes judicial notice. See Fed. R. Evid. 201(e). Accordingly, if any parties want to be heard on the issue of judicial notice, on or before July 14, 2025 at 5:00 PM, they may file an appropriate motion.

and "leaves open ample alternative channels of communication."[27] Brewer, 18 F.4th at 1220.

Plaintiff does not disagree that the State has important interests in minimizing voter confusion, facilitating efficiency in election administration and fostering confidence in and protecting the integrity of the electoral process. Rather, plaintiff argues that the Personalized Application Prohibition is not narrowly tailored to serve these interests.

A.     Whether The Personalized Application Prohibition Is Narrowly Tailored To The Government's Interests

The narrow tailoring requirement demands a "close fit between ends and means." McCullen, 573 U.S. at 486. Defendants "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 664 (1994); see Brewer, 18 F.4th at 1226 (defendants must show real, non-speculative harms ameliorated by statute).[28] "So

---

[27]     Defendants argue that the advance mail ballot application is a non-public forum and therefore the proper test is reasonableness, not intermediate scrutiny. Specifically, defendants assert that the Court should consider whether the government's decision to restrict the distribution of advance mail ballot applications to potential Kansas voters was reasonable. The Court rejects this argument for two main reasons. First, defendants raise this argument for the first time on remand. Defendants never raised a forum analysis challenge before this Court or before the Tenth Circuit, and the argument is glaringly absent from the pretrial order. For this reason, the Court does not consider the argument. See Cook v. Rockwell Int'l Corp., 790 F.3d 1088, 1093 (10th Cir. 2015) (non-jurisdictional argument not raised on appeal is waived on remand); Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002) (party waives claims, issues or defenses not included in pretrial order). Second, the Tenth Circuit conducted a robust analysis on the proper standard of review and directed the Court on remand to apply intermediate scrutiny—not reasonableness—unless defendants enacted the prohibition for an improper purpose or justification. VoteAmerica II, 121 F.4th at 851.

[28]     Defendants claim that to determine whether a restriction is narrowly tailored in the context of election restrictions, they have a relaxed burden of proof and are "not required to prove with empirical evidence, that an election regulation is perfectly tailored." Frank v. Lee, 84 F.4th 1119, 1140 (10th Cir. 2023) (brackets and quotations omitted), cert. denied, 144 S. Ct.

(continued . . .)

long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." TikTok, 145 S. Ct. at 71 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 800 (1989)). The Court cannot displace the legislature's judgment respecting content-neutral regulations with its own, so long as the legislature's policy is "grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination." Id. (quoting Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 224 (1997)).

To some extent, the Court's analysis whether the statute is narrowly tailored to defendants' significant interests overlaps with its prior order and the above analysis, which considers whether the Personalized Application Prohibition is narrowly tailored to defendants' compelling interests. See VoteAmerica I, 671 F. Supp. 3d at 1251–1254. That said, strict and intermediate scrutiny differ in terms of the degree of precision required and the necessity of

---

[28] (. . .continued)
1349 (2024). Defendants reason that the law does not require them to wait for concrete harm to befall the State before the legislature can enact prophylactic election integrity laws. The Supreme Court has explained, however, that this "modified burden of proof" does not apply to all cases in which an election regulation conflicts with the First Amendment. Burson v. Freeman, 504 U.S. 191, 209 n.11 (1992). Rather, "the Supreme Court has relaxed the demands of the narrow-tailoring inquiry when a state's electioneering regulations are designed to protect voters engaged in the act of voting," i.e. cases involving overcrowded ballots or boundary lines at a polling location. Frank, 84 F.4th at 1141; see also Burson, 504 U.S. 191, 209 n.11 (relaxed burden when "challenged activity physically interferes with electors attempting to cast their ballots"). This case involves nothing of the sort. Prefilled applications are not the same as casting a ballot. The Court cannot say that defendants' restriction physically interferes with voters engaged in the act of voting such that a relaxed burden of proof applies. Defendants must show that the restriction is aimed at alleviating real, non-speculative harm and they must "come forward with more specific findings to support the regulation." Frank, 84 F.4th at 1141 (brackets omitted).

using the least restrictive means. Strict scrutiny is an exacting standard which requires that the statute be "the least restrictive means of achieving a compelling state interest." McCullen, 573 U.S. at 478. By contrast, with intermediate scrutiny, the statute "need not be the least restrictive or least intrusive means of serving the government's interests." Id. at 486 (quotations omitted). Rather, "[i]n this context, narrow tailoring requires that the chosen means do not burden substantially more speech than is necessary to further the government's legitimate interests." StreetMediaGroup, LLC v. Stockinger, 79 F.4th 1243, 1252 (10th Cir. 2023).

As noted, defendants assert the following justifications for the Personalized Application Prohibition: to (1) minimize voter confusion; (2) facilitate efficiency in election administration; and (3) foster confidence in and protect the integrity of the electoral process.

### 1.    Voter Confusion

Largely relying on the foregoing testimony of Howell and Cox, defendants argue that the prohibition minimizes voter confusion. While defendants may have shown that voter confusion was a real harm, for the reasons already explained, they have not shown how the prohibition will alleviate that harm in a direct and material way. The evidence is that voter confusion in the lead-up to the 2020 election related to the source of the advance ballot applications and whether voters had to complete applications even if they had already done so.

Defendants have not met their burden of showing that voters were confused because the applications were prefilled. As noted, Cox testified that she would normally agree that at least in some ways, "pre-filled information increased the likelihood and the ease that [her] office can match information between the voter file and application." Exhibit 2 (Doc. #145-3) at 150:9–14. Shew testified that if not for budgetary constraints, his office would actually prefer to prefill the

-36-

applications sent to voters, as doing so "makes it easier for the voter and reduces mistakes that [officials] then have to work harder to fix on the backend." Exhibit 9 (Doc. #145-8) at 2.

Absent evidence that voter confusion existed because the applications were prefilled, defendants' means are unrelated to the ends. Under intermediate scrutiny, defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve any interest in preventing voter confusion.

### 2.    Efficient Election Administration

Again relying on Howell and Cox, defendants argue that the prohibition facilitates efficiency in election administration because prefilled applications lead to incomplete or duplicate applications which require extra time and attention by election officials.

As previously noted, however, defendants have provided no evidence of how many duplicate, incomplete or inaccurate prefilled applications were submitted to county offices. It is not clear how many Kansas voters, if any, submitted duplicate VPC-provided or CVI-provided applications before the 2020 general election. For the 2020 general election, Kansas election officials did not attempt to quantify how many duplicate advance voting ballot applications involved VPC-prefilled applications. When officials received an incomplete or inaccurate application, they did not determine whether it was prefilled, or track how many were prefilled. County election officials helped voters cure their applications regardless whether the voters had used blank forms or prefilled forms. Though Howell and Cox believed that most duplicate applications were prefilled by VPC, such speculation does not satisfy defendants' burden of showing that the prohibition is narrowly tailored. See Brewer, 18 F.4th at 1226 (defendants must show real, non-speculative harms). For these reasons, defendants have not demonstrated that the

-37-

recited harms are real.

Even if defendants had demonstrated real harm, the statute is not designed to alleviate these harms. On this record, for the reasons stated above, defendants have not shown a close fit between prohibiting the distribution of prefilled ballot applications and facilitating efficient election administration.

### 3.    Public Confidence And Election Integrity

Defendants argue that the prohibition fosters confidence in and protects the integrity of the electoral process. Defendants have presented no evidence of (1) voter fraud effectuated through advance mail voting or otherwise or (2) a single instance in which a voter received or cast duplicate mail ballots. On the other hand, defendants have presented evidence that every cast ballot was accounted for. Indeed, Kansas officials publicly declared that the 2020 election was successful, without widespread, systematic issues of voter fraud, intimidation, irregularities or voting problems. As noted, the advance mail voting process includes multiple safeguards against fraud, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. See, e.g., K.S.A. § 25-2431. These safeguards have been extremely effective in preventing election fraud in Kansas. For these reasons, defendants have not demonstrated that the recited harms of prefilled ballot applications are real.

Even if the harms were real, the Personalized Application Prohibition does nothing to alleviate election integrity concerns. The prohibition does not limit the number of advance mail ballot applications a third party may send to a voter or the number of ballot applications a voter may submit. Moreover, even accepting Block's identification of "hundreds" of purported errors in plaintiff's mailing list, the record contains no evidence that these errors had any impact on

election processes. Accordingly, the prohibition will not alleviate defendants' harms in a direct and material way.

On this record, defendants have not shown that the prohibition is narrowly tailored to their stated interest in fostering confidence in and protecting the integrity of the electoral process. The Court concludes that the Personalized Application Prohibition is not narrowly tailored to achieving defendants' significant interests.

B.    Whether The Prohibition Leaves Open Ample Alternative Channels Of Communication

As noted, under intermediate scrutiny, the government has the burden of showing that the regulation is "narrowly tailored to achieving significant government interests" and "leaves open ample alternative channels of communication." Brewer, 18 F.4th at 1220. "While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 812 (1984) (citations omitted). To determine whether alternative channels are adequate, the Court assesses the speaker's ability to reach its target audience. Ward, 491 U.S. at 802.

Defendants argue that the Personalized Application Prohibition leaves open ample alternative channels of communication because its reach only precludes mailing unsolicited prefilled applications. In VoteAmerica II, the Tenth Circuit noted that despite the prohibition, plaintiff "may continue using the mails to send unsolicited letters to Kansas voters advocating for mail voting and may even include a separate sheet with all the information VPC previously

placed on prefilled applications along with a blank application and instructions for using it."[29] 121 F.4th at 845. While plaintiff's ideal method of communication may be restricted, it still has ample ability to reach its target audience. Indeed, plaintiff "remains free to choose what avenue of communication it will use to advocate for mail voting, including the use of unsolicited mailers." Id. Accordingly, the Personalized Application Prohibition leaves open ample alternative channels of communication.

To satisfy intermediate scrutiny, however, defendants must show that the Personalized Application is narrowly tailored *and* leaves open ample channels of communication. See Brewer, 18 F.4th at 1220. Because defendants cannot establish the former, the latter does not render the statute constitutional. Accordingly, the Personalized Application Prohibition cannot withstand intermediate scrutiny because it is not narrowly tailored to achieving defendants' significant interests.

The Court holds that under both strict and intermediate scrutiny, the Personalized Application Prohibition is an unconstitutional infringement on plaintiff's First Amendment rights to speech.

**IT IS THEREFORE ORDERED that the second sentence of K.S.A. § 25-1122(k)(2) is an unconstitutional infringement on plaintiff's First Amendment right to freedom of speech. The Court therefore enjoins defendants from enforcing the second sentence of K.S.A. § 25-1122(k)(2). If any parties want to be heard on the issue of judicial notice, they**

---

[29] The Tenth Circuit made this observation in considering whether Meyer-Buckley strict scrutiny applied to plaintiff's First Amendment claim. See Meyer v. Grant, 486 U.S. 414 (1988); Buckley v. Am. Const. Law Found., Inc., 525 U.S. 182 (1999). Even so, the fact remains undisputed that plaintiff has this alternative method of communication.

**may file a motion with the Court on or before July 14, 2025 at 5:00 PM.**

Dated this 3rd day of July, 2025 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge

# ATTACHMENT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VOTE AMERICA, and
VOTER PARTICIPATION CENTER,

      Plaintiffs,

v.                                                    Case No. 2:21-cv-02253-KHV

SCOTT SCHWAB,
*in his official capacity as Secretary of State*
*for the State of Kansas,*
KRIS KOBACH,
*in his official capacity as Attorney General*
*for the State of Kansas,* **and**
STEPHEN M. HOWE,
*in his official capacity as District Attorney*
*for Johnson County,*

      Defendants.

## JUDGMENT IN A CIVIL CASE

☒    **DECISION BY THE COURT.** This action came before the Court. The issues have been considered and a decision has been rendered.

**Consistent with the <u>MEMORANDUM AND ORDER</u> [Doc. 206] filed on July 3, 2025, judgment is entered in favor of plaintiff VOTER PARTICIPATION CENTER on Count I. The second sentence of K.S.A. § 25-1122(k)(2) is an unconstitutional infringement on plaintiff's First Amendment right to freedom of speech. The Court therefore enjoins defendants from enforcing the second sentence of K.S.A. § 25-1122(k)(2).**

**By order of the <u>TENTH CIRCUIT MANDATE</u> [Doc. 194] filed on December 4, 2024, judgment is entered in favor of defendants SCOTT SCHWAB, KRIS KOBACH, and STEPHEN M. HOWE on Counts II and III.**

ENTERED this 16th day of JULY 2025 at Kansas City, Kansas.

SKYLER B. O'HARA,
CLERK OF THE DISTRICT COURT

by:

/s/ Jeffrey S. Hokanson
Deputy Clerk