Case No. 25-3138

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

## VOTEAMERICA and VOTER PARTICIPATION CENTER,

*Plaintiffs-Appellees*

v.

## SCOTT SCHWAB, in his official capacity as Kansas Secretary of State; KRIS KOBACH, in his official capacity as Kansas Attorney General; and STEPHEN M. HOWE, in his official capacity as District Attorney of Johnson County

*Defendants-Appellants*

## APPELLANTS' APPENDIX – VOLUME I

Appeal from the U.S. District Court for the District of Kansas
Honorable Kathryn H. Vratil, District Judge
District Court Case No. 2:21-CV-02253-KHV-GEB

Kris Kobach
  Attorney General
Anthony J. Powell
  Solicitor General
**Kansas Attorney General's Office**
120 SW 10th Ave., Room 200
Topeka, KS 66612-1597
Tel.: (785) 296-2215
Fax: (785) 291-3767
Email: anthony.powell@ag.ks.gov
Email: kris.kobach@ag.ks.gov

Bradley J. Schlozman
Scott R. Schillings
Garrett R. Roe
**HINKLE LAW FIRM LLC**
1617 N. Waterfront Parkway, Ste. 400
Wichita, KS 67206
Tel: (316) 267-2000
Fax: (316) 264-1518
Email: bschlozman@hinklaw.com
Email: sschillings@hinklaw.com
Email: groe@hinklaw.com

## **TABLE OF CONTENTS – VOLUME I**

Document — Page(s)

District Court Docket Sheet ............................................................................... 1

Complaint.............................................................................................................. 28

Defendant's Answer to Complaint...................................................................... 65

Memorandum & Order Nunc Pro Tunc Granting Plaintiff's Motion for
Preliminary Injunction ........................................................................................ 77

Stipulated Order for Permanent Injunction re Out-of-State Distribution Ban........... 123

Pretrial Order....................................................................................................... 128

Defendants' Memorandum in Support of Motion for Summary Judgment
Regarding Counts I-III ........................................................................................ 150

Appellate Case: 25-3138   Document: 24-1   Date Filed: 11/07/2025   Page: 3
CLOSED,APPEAL,ETT-5D,MEDIATION,PROTO

# U.S. District Court
## DISTRICT OF KANSAS (Kansas City)
## CIVIL DOCKET FOR CASE #: 2:21-cv-02253-KHV

VoteAmerica v. Schwab et al
Assigned to: District Judge Kathryn H. Vratil
Case in other court:  10CCA, 23-03100
                   10 CCA, 25-03138
Cause: 42:1983 Civil Rights Act

Date Filed: 06/02/2021
Date Terminated: 07/16/2025
Jury Demand: None
Nature of Suit: 441 Civil Rights: Voting
Jurisdiction: Federal Question

**Plaintiff**

**VoteAmerica**

represented by **Alice Huling**
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
202-736-2200
Fax: 202-736-2222
Email: ahuling@campaignlegalcenter.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aseem Mulji**
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
202-736-2200
Fax: 202-736-2222
Email: amulji@campaignlegalcenter.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Jarrett**
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
212-455-2000
Fax: 212-455-2502
Email: bonnie.jarrett@stblaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle M. Lang**
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
202-736-2200
Fax: 202-736-2222

Email: dlang@campaignlegalcenter.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan K. Youngwood**
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
212-455-2000
Fax: 212-455-2502
Email: jyoungwood@stblaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katherine Hamilton**
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
202-736-2200
Fax: 202-736-2222
Email: khamilton@campaignlegalcenter.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark P. Johnson**
Dentons US, LLP - KC
4520 Main Street, Suite 1100
Kansas City, MO 64111-7700
816-460-2400
Fax: 816-531-7545
Email: mark.johnson@dentons.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meredith D. Karp**
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
212-455-2000
Fax: 212-455-2502
Email: meredith.karp@stblaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicole A. Palmadesso**
Simpson Thacher & Bartlett LLP
900 G Street, NW
Washington, DC 20001
202-636-5500
Fax: 202-636-5502

Email: nicole.palmadesso@stblaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Allison Walter**
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 22036
202-847-4239
Fax: 202-847-4005
Email: awalter@wilkinsonstekloff.com
*TERMINATED: 08/24/2023*

**Christopher Lapinig**
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
202-736-2200
Fax: 202-736-2222
Email: clapinig@campaignlegalcenter.org
*TERMINATED: 03/17/2025*
*PRO HAC VICE*

**Dana Paikowsky**
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
202-650-5171
Fax: 202-736-2222
Email:
dpaikowsky@campaignlegalcenter.org
*TERMINATED: 10/07/2021*
*PRO HAC VICE*

**Hayden Johnson**
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
202-736-2200
Fax: 202-736-2222
Email: hjohnson@campaignlegalcenter.org
*TERMINATED: 02/15/2024*
*PRO HAC VICE*

**Jade Ford**
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
202-736-2200
Fax: 202-736-2222
Email: jford@campaignlegalcenter.org
*TERMINATED: 08/19/2021*
*PRO HAC VICE*

**Reid Day**
Lathrop GPM, LLP - Kansas City
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108-2618
816-513-1313
Email: reid.day@gmail.com
*TERMINATED: 07/07/2021*

**Robert N. Weiner**
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
202-736-2200
Fax: 202-736-2222
Email: rweiner@campaignlegalcenter.org
*TERMINATED: 03/23/2022*
*PRO HAC VICE*

**Tedrick A. Housh , III**
Lathrop GPM, LLP - Kansas City
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108-2618
816-292-2000
Fax: 816-292-2001
Email: tedrick.housh@lathropgpm.com
*TERMINATED: 07/07/2021*

**Wade P. K. Carr**
Save Haven Security Services, LLC
520 E. 19th Avenue
North Kansas City, MO 64116
816-601-1935
Email: wade.carr@mysafehaven.com
*TERMINATED: 05/12/2022*

**Plaintiff**

**Voter Participation Center**                    represented by **Alice Huling**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aseem Mulji**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Jarrett**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Appellants' Appendix - Vol. I - 004

**Danielle M. Lang**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan K. Youngwood**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katherine Hamilton**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark P. Johnson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meredith D. Karp**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicole A. Palmadesso**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Allison Walter**
(See above for address)
*TERMINATED: 08/24/2023*

**Christopher Lapinig**
(See above for address)
*TERMINATED: 03/17/2025*
*PRO HAC VICE*

**Dana Paikowsky**
(See above for address)
*TERMINATED: 10/07/2021*
*PRO HAC VICE*

**Hayden Johnson**
(See above for address)
*TERMINATED: 02/15/2024*
*PRO HAC VICE*

**Jade Ford**
(See above for address)
*TERMINATED: 08/19/2021*
*PRO HAC VICE*

**Reid Day**
(See above for address)
*TERMINATED: 07/07/2021*

**Robert N. Weiner**
(See above for address)
*TERMINATED: 03/23/2022*
*PRO HAC VICE*

**Tedrick A. Housh , III**
(See above for address)
*TERMINATED: 07/07/2021*

**Wade P. K. Carr**
(See above for address)
*TERMINATED: 05/12/2022*

V.

**Defendant**

**Scott Schwab**
*in his official capacity as Secretary of State*
*of the State of Kansas*

represented by **Bradley Joseph Schlozman**
Hinkle Law Firm LLC
1617 N. Waterfront Parkway, Suite 400
Wichita, KS 67206-6639
316-660-6296
Fax: 316-264-1518
Email: bschlozman@hinklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott R. Schillings**
Hinkle Law Firm LLC
1617 N. Waterfront Parkway, Suite 400
Wichita, KS 67206-6639
316-267-2000
Fax: 316-630-8466
Email: sschillings@hinklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Krystle M. S. Dalke**
Hinkle Law Firm LLC
1617 N. Waterfront Parkway, Suite 400
Wichita, KS 67206-6639
316-267-2000
Fax: 316-630-8466

Email: kdalke@hinklaw.com
*TERMINATED: 05/13/2022*

**Defendant**

**Derek Schmidt**
*in his official capacity as Attorney General*
*of the State of Kansas*
*TERMINATED: 04/03/2023*

represented by **Bradley Joseph Schlozman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott R. Schillings**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Krystle M. S. Dalke**
(See above for address)
*TERMINATED: 05/13/2022*

**Defendant**

**Stephen M. Howe**
*in his official capacity as District Attorney*
*of Johnson County*

represented by **Bradley Joseph Schlozman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott R. Schillings**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Krystle M. S. Dalke**
(See above for address)
*TERMINATED: 05/13/2022*

**Defendant**

**Kris Kobach**
*in his official capacity as Attorney General*
*of the State of Kansas*

represented by **Bradley Joseph Schlozman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott R. Schillings**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/02/2021 | 1 | COMPLAINT with trial location of Kansas City (Filing fee $402, Internet Payment Receipt Number AKSDC-5502563.), filed by VoteAmerica, Voter Participation Center. (Attachments: # 1 Exhibit Designation of Place of Trial, # 2 Civil Cover Sheet) (Housh, Tedrick) (Entered: 06/02/2021) |
| 06/02/2021 |  | NOTICE OF JUDGE ASSIGNMENT: Case assigned to District Judge Kathryn H. Vratil and Magistrate Judge Gwynne E. Birzer for all proceedings. (This is a TEXT ENTRY |

| | | |
|---|---|---|
| | | ONLY. There is no.pdf document associated with this entry.) (kas) (Entered: 06/02/2021) |
| 06/02/2021 | 2 | CIVIL COVER SHEET by Plaintiffs VoteAmerica, Voter Participation Center. (Housh, Tedrick) (Entered: 06/02/2021) |
| 06/02/2021 | 3 | CORPORATE DISCLOSURE STATEMENT by VoteAmerica, Voter Participation Center identifying None as corporate parent. (Housh, Tedrick) (Entered: 06/02/2021) |
| 06/02/2021 | | SUMMONS ISSUED as to Stephen M. Howe, Derek Schmidt, Scott Schwab. (issued to Attorney for service) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry) (kas) (Entered: 06/02/2021) |
| 06/09/2021 | 4 | MOTION for attorney Jade Ford to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5508160.) by Plaintiffs VoteAmerica, Voter Participation Center. (Motion referred to Magistrate Judge Gwynne E. Birzer.) (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Housh, Tedrick) (Entered: 06/09/2021) |
| 06/09/2021 | 5 | MOTION for attorney Aseem Mulji to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5508232.) by Plaintiffs VoteAmerica, Voter Participation Center. (Motion referred to Magistrate Judge Gwynne E. Birzer,) (Attachments: # 1 Affidavit, # 2 ECF Registration Form) (Housh, Tedrick) (Entered: 06/09/2021) |
| 06/09/2021 | 6 | MOTION for attorney Rob Weiner to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5508254.) by Plaintiffs VoteAmerica, Voter Participation Center. (Motion referred to Magistrate Judge Gwynne E. Birzer.) (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Housh, Tedrick) (Entered: 06/09/2021) |
| 06/09/2021 | 7 | MOTION for attorney Meredith D. Karp to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5508292.) by Plaintiffs VoteAmerica, Voter Participation Center. (Motion referred to Magistrate Judge Gwynne E. Birzer.) (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Housh, Tedrick) (Entered: 06/09/2021) |
| 06/09/2021 | 8 | MOTION for attorney Hayden Johnson to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5508327.) by Plaintiffs VoteAmerica, Voter Participation Center. (Motion referred to Magistrate Judge Gwynne E. Birzer.) (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Housh, Tedrick) (Entered: 06/09/2021) |
| 06/10/2021 | 9 | ORDER granting 4 5 6 7 8 Motions to Appear Pro Hac Vice of Jade Ford, Aseem Mulji, Robert N. Weiner, Meredith D. Karp, and Hayden Johnson for VoteAmerica and Voter Participation Center pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Gwynne E. Birzer on 6/10/21. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ala) (Entered: 06/10/2021) |
| 06/11/2021 | 10 | MOTION for attorney Jonathan K. Youngwood to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5510640.) by Plaintiffs VoteAmerica, Voter Participation Center. (Motion referred to Magistrate Judge Gwynne E. Birzer.) (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Housh, Tedrick) (Entered: 06/11/2021) |
| 06/11/2021 | 11 | ORDER granting 10 Motion to Appear Pro Hac Vice of Jonathan K. Youngwood for VoteAmerica and Voter Participation Center pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Gwynne E. Birzer on 6/11/21. (This is a |

Appellate Case: 25-3138    Document: 24-1    Date Filed: 11/07/2025    Page: 11

| | | |
|---|---|---|
| | | TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ala) (Entered: 06/11/2021) |
| 06/16/2021 | 12 | MOTION for attorney Dana Paikowsky to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5515115.) by Plaintiffs VoteAmerica, Voter Participation Center. (referred to Magistrate Judge Gwynne E. Birzer.) (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Housh, Tedrick) (Entered: 06/16/2021) |
| 06/16/2021 | 13 | MOTION for attorney Alice Huling to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5515120.) by Plaintiffs VoteAmerica, Voter Participation Center. (Motion referred to Magistrate Judge Gwynne E. Birzer.) (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Housh, Tedrick) (Entered: 06/16/2021) |
| 06/17/2021 | 14 | ORDER granting 12 and 13 Motions to Appear Pro Hac Vice of Dana Paikowsky and Alice Huling for VoteAmerica and Voter Participation Center pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Gwynne E. Birzer on 6/17/21. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ala) (Entered: 06/17/2021) |
| 06/22/2021 | 15 | ENTRY OF APPEARANCE by Krystle M. S. Dalke on behalf of Derek Schmidt, Scott Schwab. (Dalke, Krystle) (Entered: 06/22/2021) |
| 06/22/2021 | 16 | ENTRY OF APPEARANCE by Scott R. Schillings on behalf of Derek Schmidt, Scott Schwab. (Schillings, Scott) (Entered: 06/22/2021) |
| 06/22/2021 | 17 | ENTRY OF APPEARANCE by Bradley Joseph Schlozman on behalf of Derek Schmidt, Scott Schwab. (Schlozman, Bradley) (Entered: 06/22/2021) |
| 06/22/2021 | 18 | ENTRY OF APPEARANCE by Krystle M. S. Dalke on behalf of Stephen M. Howe. (Dalke, Krystle) (Entered: 06/22/2021) |
| 06/22/2021 | 19 | ENTRY OF APPEARANCE by Scott R. Schillings on behalf of Stephen M. Howe. (Schillings, Scott) (Entered: 06/22/2021) |
| 06/22/2021 | 20 | ENTRY OF APPEARANCE by Bradley Joseph Schlozman on behalf of Stephen M. Howe. (Schlozman, Bradley) (Entered: 06/22/2021) |
| 06/23/2021 | 21 | CLERKS ORDER EXTENDING TIME until 7/9/2021 for Defendants Derek Schmidt, Scott Schwab, Stephen M. Howe to answer or otherwise plead. Signed by deputy clerk on 6/23/2021. (lb) (Entered: 06/23/2021) |
| 07/07/2021 | 22 | ENTRY OF APPEARANCE by Mark P. Johnson on behalf of VoteAmerica, Voter Participation Center. (Johnson, Mark) (Entered: 07/07/2021) |
| 07/07/2021 | 23 | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Tedrick Housh and Reid Day as to All Plaintiffs. (Housh, Tedrick) (Entered: 07/07/2021) |
| 07/08/2021 | 24 | MOTION for Preliminary Injunction by Plaintiffs VoteAmerica, Voter Participation Center. (Johnson, Mark) (Entered: 07/08/2021) |
| 07/08/2021 | 25 | MEMORANDUM IN SUPPORT of 24 Motion For Preliminary Injunction by Plaintiffs VoteAmerica, Voter Participation Center. (Attachments: # 1 Exhibit 1, # 2 Exhibit 1.A, # 3 Exhibit 2, # 4 Exhibit 2.A)(Johnson, Mark) (Entered: 07/08/2021) |
| 07/09/2021 | 26 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction ( Response deadline 7/30/2021) by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab (Schlozman, Bradley) (Entered: 07/09/2021) |

| 07/09/2021 | 27 | MEMORANDUM IN SUPPORT of 26 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab (Attachments: # 1 Exhibit Shawnee County Case Petition, # 2 Exhibit Testimony of Deputy Ass't Secretary of State Katie Koupal) (Schlozman, Bradley) (Entered: 07/09/2021) |
|---|---|---|
| 07/09/2021 | 28 | EXHIBIT(S) IN SUPPORT of 26 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab (Schlozman, Bradley) (Entered: 07/09/2021) |
| 07/22/2021 | 29 | RESPONSE by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab re 24 Motion for Preliminary Injunction (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Schlozman, Bradley) (Entered: 07/22/2021) |
| 07/27/2021 | 30 | ORDER: The undersigned Magistrate Judge communicated to counsel, via letter dated July 12, 2021, regarding deferred scheduling of this case. Having received no response, the initial order and scheduling in this case shall be deferred pending ruling on the Motion to Dismiss (ECF No. 26). IT IS SO ORDERED. Signed by Magistrate Judge Gwynne E. Birzer on 7/27/21. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(adc) (Entered: 07/27/2021) |
| 07/30/2021 | 31 | MEMORANDUM IN OPPOSITION by Plaintiffs VoteAmerica, Voter Participation Center re 26 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction *(Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss)* (Johnson, Mark) (Entered: 07/30/2021) |
| 08/05/2021 | 32 | MOTION for attorney Brooke Jarrett to appear pro hac vice ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5553921.) by Plaintiffs VoteAmerica, Voter Participation Center (referred to Magistrate Judge Gwynne E. Birzer) (Attachments: # 1 Affidavit in Support of Motion for Leave to Appear Pro Hac Vice, # 2 Brook Jarrett Pro Hac Vice Electronic Filing Registration Form)(Carr, Wade) (Entered: 08/05/2021) |
| 08/05/2021 | 33 | REPLY TO RESPONSE TO MOTION by Plaintiffs VoteAmerica, Voter Participation Center re: 24 Motion for Preliminary Injunction (Johnson, Mark) (Entered: 08/05/2021) |
| 08/06/2021 | 34 | ORDER granting 32 Motion to Appear Pro Hac Vice of Brooke Jarrett for VoteAmerica and Voter Participation Center pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Gwynne E. Birzer on 8/6/21. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ala) (Entered: 08/06/2021) |
| 08/09/2021 | 35 | Unopposed MOTION for Extension of Time to File Reply as to 26 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab. (Schlozman, Bradley) (Entered: 08/09/2021) |
| 08/09/2021 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 35 Unopposed MOTION for Extension of Time to File Reply as to 26 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction . The motion will be resolved by the District Judge.(adc)** (Entered: 08/09/2021) |
| 08/09/2021 | 36 | ORDER **sustaining**, for substantially the reasons stated in the motion, 35 Defendant's Unopposed Motion For Extension Of Time To File Reply Brief In Support Of Motion To Dismiss. New reply deadline: 8/20/2021. Signed by District Judge Kathryn H. Vratil on 8/9/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (as) (Entered: 08/09/2021) |
| 08/10/2021 | 37 | NOTICE of Hearing on Motion. THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Oral Argument on 24 Plaintiffs' Motion For Preliminary Injunction set for |

Appellate Case: 25-3138     Document: 24-1     Date Filed: 11/07/2025     Page: 13

| | | |
|---|---|---|
| | | 9/8/2021 at 01:30 PM in KC Courtroom 440 (JWL/KHV) before District Judge Kathryn H. Vratil. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (as) (Entered: 08/10/2021) |
| 08/11/2021 | | **Per 36 ORDER, Reset reply deadline as to 26 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction . Reply deadline 8/20/2021. (jsh)** (Entered: 08/11/2021) |
| 08/11/2021 | 38 | NOTICE of Rule 7.1(f) Letter by VoteAmerica, Voter Participation Center (Attachments: # 1 Attachment)(Johnson, Mark) (Entered: 08/11/2021) |
| 08/12/2021 | 39 | RESPONSE to 38 NOTICE of Rule 7.1(f) Letter by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Schlozman, Bradley) (Entered: 08/12/2021) |
| 08/19/2021 | 40 | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Jade Ford as to VoteAmerica, Voter Participation Center (Johnson, Mark) (Entered: 08/19/2021) |
| 08/20/2021 | 41 | REPLY TO RESPONSE TO MOTION by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab re: 26 Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction (Schlozman, Bradley) (Entered: 08/20/2021) |
| 08/27/2021 | 42 | ORDER. Defendant's Motion to Dismiss Plaintiffs' Complaint (Doc. # 26 ) filed July 9, 2021 is hereby **OVERRULED IN PART** for substantially the reasons stated on pages 1-13 of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Doc. # 31 ) filed July 30, 2021. More specifically, the Court finds that plaintiffs' complaint is not subject to dismissal for lack of subject matter jurisdiction. In this ruling, the Court disregards the many arguments which defendants raise for the first time in their reply brief. Defendants' arguments with regard to jurisdiction are without merit under well established, long-standing principles of law and no purpose is served by addressing them at greater length at this time. Defendants' arguments with regard to failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., remain **under advisement**. In evaluating Plaintiffs' Motion For Preliminary Injunction (Doc. # 24 ) filed July 8, 2021, the Court will address plaintiffs' likelihood of success on the merits. In that context, the Court will address the sufficiency of the allegations of plaintiffs' complaint. In regard to the latter motion, the Court expects that on September 8, 2021, in addition to oral argument, the parties will present evidence in support of their respective positions. Without limitation, that evidence should address the extent of any burden which the challenged statutes impose on federally protected rights, and the substance of any legitimate interests which the State of Kansas seeks to advance. Signed by District Judge Kathryn H. Vratil on 8/27/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (as) (Entered: 08/27/2021) |
| 09/08/2021 | 43 | MINUTE ENTRY for proceedings held before District Judge Kathryn H. Vratil: MOTION HEARING held on 9/8/2021 re 24 Plaintiffs' Motion For Preliminary Injunction. Evidentiary hearing concluded; Oral Argument still to come. (Court Reporter Nancy Wiss.) (Attachments: # 1 Witness Sheet, # 2 Plaintiffs' Exhibit List, # 3 Defendants' Exhibit List) (as) (Entered: 09/09/2021) |
| 09/09/2021 | 44 | NOTICE of Hearing. THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Oral Argument on 24 MOTION for Preliminary Injunction is set for 10/8/2021 at 01:00 PM in KC Courtroom 440 (JWL/KHV) before District Judge Kathryn H. Vratil. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (as) (Entered: 09/09/2021) |
| 09/14/2021 | 45 | TRANSCRIPT of Preliminary Injunction Motion Hearing held 9/8/2021 before Judge Kathryn H Vratil, Court Reporter Nancy Wiss, 913-735-2354, nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Bradley Schlozman. |

Appellate Case: 25-3138     Document: 24-1     Date Filed: 11/07/2025     Page: 14

**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 12/13/2021. (nw) (Entered: 09/14/2021)

| | | |
|---|---|---|
| 10/07/2021 | 46 | MOTION for attorney Danielle Lang to appear pro hac vice *(Motion For Leave to Appear Pro Hac Vice)* ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5605896.) by Plaintiffs VoteAmerica, Voter Participation Center (referred to Magistrate Judge Gwynne E. Birzer) (Attachments: # 1 Affidavit Affidavit in Support of Motion For Leave to Appear Pro Hac Vice, # 2 ECF Registration Form)(Johnson, Mark) (Entered: 10/07/2021) |
| 10/07/2021 | 47 | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Dana Paikowsky as to VoteAmerica, Voter Participation Center (Johnson, Mark) (Entered: 10/07/2021) |
| 10/08/2021 | 48 | MINUTE ENTRY for proceedings held before District Judge Kathryn H. Vratil: MOTION HEARING held on 10/8/2021. Plaintiffs' Motion For Preliminary Injunction (Doc. # 24 ) is **taken under advisement**. (Court Reporter Nancy Wiss.) (as) (Entered: 10/08/2021) |
| 10/15/2021 | 49 | ORDER granting 46 Motion to Appear Pro Hac Vice of Danielle M. Lang for VoteAmerica and Voter Participation Center pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Gwynne E. Birzer on 10/15/21. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ala) (Entered: 10/15/2021) |
| 11/19/2021 | 50 | MEMORANDUM AND ORDER overruling 26 Motion to Dismiss for Failure to State a Claim, Motion to Dismiss for Lack of Jurisdiction; and sustaining 24 Motion for Preliminary Injunction. The Court hereby enjoins enforcement of HB 2332. Pending further order of the Court, this Order shall remain effective until the conclusion of the case. Signed by District Judge Kathryn H. Vratil on 11/19/2021. (kas) (Entered: 11/19/2021) |
| 11/24/2021 | 51 | INITIAL ORDER REGARDING PLANNING AND SCHEDULING: Scheduling Conference set for 12/16/2021 at 11:00 AM by telephone before Magistrate Judge Gwynne E. Birzer. Report of Parties Planning Conference and Rule 26 Initial Disclosures due 12/9/2021. Signed by Magistrate Judge Gwynne E. Birzer on 11/24/21. (ala) (Entered: 11/24/2021) |
| 12/03/2021 | 52 | Unopposed MOTION for Order *Holding in Abeyance Proceedings Regarding Attorneys' Fees and Expenses* by Plaintiffs VoteAmerica, Voter Participation Center. (Johnson, Mark) (Entered: 12/03/2021) |
| 12/03/2021 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 52 Unopposed MOTION for Order *Holding in Abeyance Proceedings Regarding Attorneys' Fees and Expenses*. The motion will be resolved by the District Judge.(adc)** (Entered: 12/03/2021) |

Appellate Case: 25-3138     Document: 24-1     Date Filed: 11/07/2025     Page: 15

| | | |
|---|---|---|
| 12/09/2021 | 53 | Unopposed MOTION FOR LEAVE to File Answer Out of Time by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab (referred to Magistrate Judge Gwynne E. Birzer) (Attachments: # 1 Exhibit A)(Schlozman, Bradley) (Entered: 12/09/2021) |
| 12/09/2021 | 54 | ORDER granting 53 as Unopposed Defendants' Motion For Leave To File Out of Time their Answer and Affirmative Defenses. Defendants are to file their Answer forthwith. Signed by Magistrate Judge Gwynne E. Birzer on 12/9/21. (adc) (Entered: 12/09/2021) |
| 12/09/2021 | 55 | ANSWER to Complaint by Stephen M. Howe, Derek Schmidt, Scott Schwab. (Schlozman, Bradley) (Entered: 12/09/2021) |
| 12/09/2021 | 56 | CERTIFICATE OF SERVICE of Report of the Parties' Planning Conference and Plaintiffs' Rule 26(a) Initial Disclosures by VoteAmerica, Voter Participation Center. (Johnson, Mark) (Entered: 12/09/2021) |
| 12/09/2021 | 57 | NOTICE of Certificate of Service of Defendants' Rule 26 Initial Disclosures by Stephen M. Howe, Derek Schmidt, Scott Schwab (Schillings, Scott) (Entered: 12/09/2021) |
| 12/13/2021 | 58 | Unopposed MOTION to Clarify *the Court's Memorandum & Order Granting Plaintiffs' Motion for a Preliminary Injunction* by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab (Schlozman, Bradley) (Entered: 12/13/2021) |
| 12/14/2021 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 58 Unopposed MOTION to Clarify *the Court's Memorandum & Order Granting Plaintiffs' Motion for a Preliminary Injunction*. The motion will be resolved by the District Judge.(adc)** (Entered: 12/14/2021) |
| 12/14/2021 | 59 | ORDER sustaining 52 Unopposed MOTION for Order Holding in Abeyance Proceedings Regarding Attorneys' Fees and Expenses. Signed by District Judge Kathryn H. Vratil on 12/14/2021. (kas) (Entered: 12/14/2021) |
| 12/15/2021 | 60 | ORDER granting 58 Unopposed MOTION to Clarify the Court's Memorandum & Order Granting Plaintiffs' Motion for a Preliminary Injunction. Signed by District Judge Kathryn H. Vratil on 12/15/2021. See Order for details. (kas) (Entered: 12/15/2021) |
| 12/15/2021 | 61 | MEMORANDUM AND ORDER NUNC PRO TUNC. Signed by District Judge Kathryn H. Vratil on 11/19/2021. (ca) (Entered: 12/15/2021) |
| 12/16/2021 | 62 | MINUTE ENTRY for proceedings held before Magistrate Judge Gwynne E. Birzer: SCHEDULING CONFERENCE held on 12/16/2021. (AT&T recording.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (adc) (Entered: 12/16/2021) |
| 12/16/2021 | 63 | SCHEDULING ORDER: Mediation Notice or Confidential Settlement Report Due to Magistrate Judge on 3/31/2022. Mediation deadline 5/27/2022. Discovery deadline 8/31/2022. Proposed Pretrial Order due by 9/6/2022. Final Pretrial Conference set for 9/13/2022 at 10:00 AM by Telephone before Magistrate Judge Gwynne E. Birzer. Participants must call the CONFERENCE LINE at 1-888-363-4749 using ACCESS CODE 9686294. Dispositive motion deadline 9/30/2022. Court Trial set for 5/1/2023 at 09:00 AM in KC Courtroom 440 before District Judge Kathryn H. Vratil. Estimated trial time 5 days. Signed by Magistrate Judge Gwynne E. Birzer on 12/16/21. (adc) (Entered: 12/16/2021) |
| 01/07/2022 | 64 | NOTICE OF SERVICE by Stephen M. Howe, Derek Schmidt, Scott Schwab of Rule 26(a)(1) Initial Disclosures (Schlozman, Bradley) (Entered: 01/07/2022) |
| 01/18/2022 | 65 | AGREED PROTECTIVE ORDER. Signed by Magistrate Judge Gwynne E. Birzer on 1/18/22. (adc) (Entered: 01/18/2022) |

| 01/25/2022 | 66 | NOTICE OF SERVICE by Scott Schwab of First Set of Interrogatories *on Plaintiff VoteAmerica and Plaintiff Voter Participation Center* (Schlozman, Bradley) (Entered: 01/25/2022) |
|---|---|---|
| 01/25/2022 | 67 | NOTICE OF SERVICE by Scott Schwab of First Set of Request for Production of Documents *on Plaintiff VoteAmerica and Plaintiff Voter Participation Center* (Schlozman, Bradley) (Entered: 01/25/2022) |
| 01/25/2022 | 68 | NOTICE OF SERVICE by Scott Schwab of First Request for Admissions *on Plaintiff VoteAmerica and Plaintiff Voter Participation Center* (Schlozman, Bradley) (Entered: 01/25/2022) |
| 02/07/2022 | 69 | NOTICE OF SERVICE by Scott Schwab of Second Request for Production of Documents on Plaintiff Voter Participation Center (Schlozman, Bradley) (Entered: 02/07/2022) |
| 02/24/2022 | 70 | CERTIFICATE OF SERVICE of Responses and Objections to Defendant Scott Schwab's First Requests for Admission by Voter Participation Center. (Johnson, Mark) (Entered: 02/24/2022) |
| 02/24/2022 | 71 | CERTIFICATE OF SERVICE of Objections and Responses to Defendant Scott Schwab's First Request for Production of Documents by Voter Participation Center. (Johnson, Mark) (Entered: 02/24/2022) |
| 02/24/2022 | 72 | CERTIFICATE OF SERVICE of Responses and Objections to Defendant Scott Schwab's First Set of Interrgatories by Voter Participation Center. (Johnson, Mark) (Entered: 02/24/2022) |
| 02/25/2022 | 73 | STIPULATED ORDER FOR PERMANENT INJUNCTION AND DECLARATORY JUDGMENT. See Order for full details. Signed by District Judge Kathryn H. Vratil on 2/25/2022. (ca) (Entered: 02/25/2022) |
| 03/10/2022 | 74 | CERTIFICATE OF SERVICE of Objections and Responses to Defendant Scott Schwab's Second Request for Production of Documents by Voter Participation Center. (Johnson, Mark) (Entered: 03/10/2022) |
| 03/14/2022 | 75 | CERTIFICATE OF SERVICE of First Requests for Production and Interrogatories to Defendant Howe by Voter Participation Center. (Johnson, Mark) (Entered: 03/14/2022) |
| 03/14/2022 | 76 | CERTIFICATE OF SERVICE of First Requests for Production and Interrogatories to Defendant Schmidt by Voter Participation Center. (Johnson, Mark) (Entered: 03/14/2022) |
| 03/14/2022 | 77 | CERTIFICATE OF SERVICE of First Requests for Production and Interrogatories to Defendant Schwab by Voter Participation Center. (Johnson, Mark) (Entered: 03/14/2022) |
| 03/21/2022 | 78 | NOTICE OF SERVICE by Scott Schwab of Defendant Schwab's Third Request for Production of Documents to Plaintiff Voter Participation Center (Schlozman, Bradley) (Entered: 03/21/2022) |
| 03/21/2022 | 79 | NOTICE OF SERVICE by Scott Schwab of Defendant Schwab's Second Set of Interrogatories to Plaintiff Voter Participation Center (Schlozman, Bradley) (Entered: 03/21/2022) |
| 03/23/2022 | 80 | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Robert N. Weiner as to VoteAmerica, Voter Participation Center (Johnson, Mark) (Entered: 03/23/2022) |
| 04/01/2022 | 81 | ORDER. Upon review of the parties' confidential settlement reports, the mediation deadline previously set for 5/27/2022 in the 63 Scheduling Order is cancelled pending further discussion at the pretrial conference. IT IS SO ORDERED. Signed by Magistrate |

Appellate Case: 25-3138    Document: 24-1    Date Filed: 11/07/2025    Page: 17

| | | Judge Gwynne E. Birzer on 4/1/22. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(adc) (Entered: 04/01/2022) |
|---|---|---|
| 04/11/2022 | 82 | MOTION for extension of time *to File Request for Attorney's Fees* by Plaintiffs VoteAmerica, Voter Participation Center. (Johnson, Mark) (Entered: 04/11/2022) |
| 04/11/2022 | 83 | NOTICE OF SERVICE by Stephen M. Howe of Responses and Objections to Voter Participation Center's First Requests for Production of Documents (Schlozman, Bradley) (Entered: 04/11/2022) |
| 04/11/2022 | 84 | NOTICE OF SERVICE by Stephen M. Howe of Responses and Objections to Voter Participation Center's First Interrogatories (Schlozman, Bradley) (Entered: 04/11/2022) |
| 04/11/2022 | 85 | NOTICE OF SERVICE by Derek Schmidt of Responses and Objections to Voter Participation Center's First Interrogatories (Schlozman, Bradley) (Entered: 04/11/2022) |
| 04/11/2022 | 86 | NOTICE OF SERVICE by Derek Schmidt of Responses and Objections to Voter Participation Center's First Requests for Production of Documents (Schlozman, Bradley) (Entered: 04/11/2022) |
| 04/11/2022 | 87 | NOTICE OF SERVICE by Scott Schwab of Responses and Objections to Voter Participation Center's First Interrogatories (Schlozman, Bradley) (Entered: 04/11/2022) |
| 04/11/2022 | 88 | NOTICE OF SERVICE by Scott Schwab of Responses and Objections to Voter Participation Center's First Requests for Production of Documents (Schlozman, Bradley) (Entered: 04/11/2022) |
| 04/11/2022 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 82 MOTION for extension of time *to File Request for Attorney's Fees*. The motion will be resolved by the District Judge. (kf)** (Entered: 04/11/2022) |
| 04/13/2022 | 89 | ORDER **sustaining**, for substantially the reasons stated in the motion, 82 Motion For Extension Of Time To File Request For Attorney's Fees. Plaintiffs have until May 11, 2022 to file their request for attorney's fees arising out of the Court's decision on summary judgment. Signed by District Judge Kathryn H. Vratil on 4/13/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (as) (Entered: 04/13/2022) |
| 04/14/2022 | 90 | MOTION to Compel *Production of Documents* by Defendant Scott Schwab (referred to Magistrate Judge Gwynne E. Birzer) (Schlozman, Bradley) (Entered: 04/14/2022) |
| 04/14/2022 | 91 | MEMORANDUM IN SUPPORT of 90 MOTION to Compel *Production of Documents* by Defendant Scott Schwab (Attachments: # 1 Attachment A - Certification of Good Faith Negotiation, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7)(Schlozman, Bradley) (Entered: 04/14/2022) |
| 04/25/2022 | 92 | NOTICE by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab of taking deposition of Voter Participation Center on May 17, 2022 (Schillings, Scott) (Entered: 04/25/2022) |
| 04/28/2022 | 93 | Unopposed MOTION for Extension of Time to File response as to 90 MOTION to Compel *Production of Documents* by Plaintiff Voter Participation Center (referred to Magistrate Judge Gwynne E. Birzer) (Johnson, Mark) (Entered: 04/28/2022) |
| 05/02/2022 | 94 | ORDER granting 93 Plaintiff Voter Participation Center's Unopposed MOTION for Extension of Time to File response as to 90 MOTION to Compel. Response deadline is extended up to and including 5/5/2022. Signed by Magistrate Judge Gwynne E. Birzer on 05/02/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (sa) (Entered: 05/02/2022) |

| | | |
|---|---|---|
| 05/05/2022 | 95 | NOTICE by Plaintiffs VoteAmerica, Voter Participation Center of taking deposition of Office of Kansas Secretary of State on 05/18/2022 (Johnson, Mark) (Entered: 05/05/2022) |
| 05/05/2022 | 96 | RESPONSE by Plaintiff Voter Participation Center re 90 Motion to Compel *(Plaintiff Voter Participation Center's Opposition to Defendant Scott Schwab's Motion to Compel Production of Documents)* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Johnson, Mark) (Entered: 05/05/2022) |
| 05/11/2022 | 97 | Consent MOTION for Order *(Consent Motion for An Order Continuing to Hold in Abeyance Proceedings Regarding Attorneys' Fees and Expenses)* by Plaintiffs VoteAmerica, Voter Participation Center.(Johnson, Mark) (Entered: 05/11/2022) |
| 05/11/2022 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 97 Consent MOTION for Order** *(Consent Motion for An Order Continuing to Hold in Abeyance Proceedings Regarding Attorneys' Fees and Expenses).* **The motion will be resolved by the District Judge. (spa)** (Entered: 05/13/2022) |
| 05/12/2022 | 98 | REPLY TO RESPONSE TO MOTION by Defendant Scott Schwab re 90 Motion to Compel Production of Documents. (Schlozman, Bradley) (Entered: 05/12/2022) |
| 05/12/2022 | 99 | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Wade P. K. Carr as to VoteAmerica, Voter Participation Center (Carr, Wade) (Entered: 05/12/2022) |
| 05/13/2022 | 100 | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Krystle M. S. Dalke as to Stephen M. Howe, Derek Schmidt, Scott Schwab (Dalke, Krystle) (Entered: 05/13/2022) |
| 05/20/2022 | 101 | CERTIFICATE OF SERVICE of Defendants' First Supplemental Rule 26 Initial Disclosures by Stephen M. Howe, Derek Schmidt, Scott Schwab. (Schlozman, Bradley) (Entered: 05/20/2022) |
| 05/31/2022 | 102 | ORDER **sustaining**, for substantially the reasons stated in the motion, 97 Consent Motion For An Order Continuing To Hold In Abeyance Proceedings Regarding Attorneys' Fees And Expenses. Proceedings regarding the award of attorneys' fees and related expenses in this action are held in abeyance until 45 days after issuance of a final judgment in this action. Signed by District Judge Kathryn H. Vratil on 5/31/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (as) (Entered: 05/31/2022) |
| 05/31/2022 | 103 | NOTICE OF SERVICE by VoteAmerica, Voter Participation Center of Plaintiff's Revised Discovery Responses (Johnson, Mark) (Entered: 05/31/2022) |
| 06/02/2022 | 104 | MEMORANDUM AND ORDER granting in part and denying in part 90 Motion to Compel. Signed by Magistrate Judge Gwynne E. Birzer on 6/2/2022. (heo) (Entered: 06/02/2022) |
| 06/07/2022 | 105 | NOTICE OF SERVICE by Scott Schwab of Discovery (Schlozman, Bradley) (Entered: 06/07/2022) |
| 06/22/2022 | 106 | MOTION for attorney Christopher Lapinig to appear pro hac vice ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5806411.) by Plaintiffs VoteAmerica, Voter Participation Center (referred to Magistrate Judge Gwynne E. Birzer) (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Johnson, Mark) (Entered: 06/22/2022) |
| 06/23/2022 | 107 | CERTIFICATE OF SERVICE of Plaintiff Voter Participation Center's Second Requests for Production and Interrogatories to Defendant Schwab by Voter Participation Center. (Johnson, Mark) (Entered: 06/23/2022) |

Appellate Case: 25-3138     Document: 24-1     Date Filed: 11/07/2025     Page: 19

| 06/24/2022 | 108 | NOTICE OF SERVICE by Scott Schwab of Fifth Request for Production of Documents to Plaintiff Voter Participation Center (Schlozman, Bradley) (Entered: 06/24/2022) |
| --- | --- | --- |
| 06/28/2022 | 109 | ORDER granting 106 Motion to Appear Pro Hac Vice of Christopher Lapinig for VoteAmerica and Voter Participation Center pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Gwynne E. Birzer on 6/28/22. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ala) (Entered: 06/28/2022) |
| 07/11/2022 | 110 | CERTIFICATE OF SERVICE of Responses to Defendant Scott Schwab's Fourth Request for Production of Documents by Voter Participation Center. (Johnson, Mark) (Entered: 07/11/2022) |
| 07/15/2022 | 111 | NOTICE OF SERVICE by Stephen M. Howe, Derek Schmidt, Scott Schwab of Defendants' Expert Witness Designation (Schlozman, Bradley) (Entered: 07/15/2022) |
| 07/22/2022 | 112 | Joint MOTION to Amend Scheduling Order by Plaintiffs VoteAmerica, Voter Participation Center (referred to Magistrate Judge Gwynne E. Birzer) (Johnson, Mark) Modified event on 7/25/2022 (ca). (Entered: 07/22/2022) |
| 07/25/2022 | 113 | NOTICE OF SERVICE by Scott Schwab of Responses and Objections to Plaintiff Voter Participation Center's Second Request for Production of Documents on Defendant Scott Schwab (Schlozman, Bradley) (Entered: 07/25/2022) |
| 07/25/2022 | 114 | NOTICE OF SERVICE by Scott Schwab of Responses and Objections to Voter Participation Center's Second Set of Interrogatories to Defendant Scott Schwab (Schlozman, Bradley) (Entered: 07/25/2022) |
| 07/26/2022 | 115 | FIRST AMENDED SCHEDULING ORDER and ORDER granting 112 Motion to Amend Scheduling Order. Discovery deadline 9/14/2022. Dispositive motion deadline 10/14/2022. Proposed Pretrial Order due by 9/20/2022. Pretrial Conference set for 9/27/2022 at 10:00 AM by Telephone GEB - CONFERENCE LINE 1-888-363-4749 ACCESS CODE 9686294 before Magistrate Judge Gwynne E. Birzer. Bench Trial set for 5/1/2023 at 09:00 AM in KC Courtroom 440 (KHV) before District Judge Kathryn H. Vratil. Signed by Magistrate Judge Gwynne E. Birzer on 7/26/2022. (ca) (Entered: 07/26/2022) |
| 07/29/2022 | 116 | OBJECTION(S) to *Defendants' Expert Witness Designation of Kenneth J. Block* by Voter Participation Center. (Johnson, Mark) (Entered: 07/29/2022) |
| 08/04/2022 | 117 | NOTICE by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab of taking deposition of Lionel Dripps on August 30, 2022. (Schlozman, Bradley) (Entered: 08/04/2022) |
| 08/12/2022 | 118 | MOTION to Extend Rebuttal Expert Disclosure Deadline by Plaintiffs VoteAmerica, Voter Participation Center. (referred to Magistrate Judge Gwynne E. Birzer) (Johnson, Mark) Modified on 8/13/2022 to change the motion type. (mam) (Entered: 08/12/2022) |
| 08/15/2022 | 119 | CERTIFICATE OF SERVICE of First Supplemental Disclosures Pursuant to Federal Rule of Civil Procedure 26(e) by Voter Participation Center. (Johnson, Mark) (Entered: 08/15/2022) |
| 08/15/2022 | 120 | CERTIFICATE OF SERVICE of Amended Objections and Responses to Defendant Scott Schwab's Fourth Request for Production of Documents by Voter Participation Center. (Johnson, Mark) (Entered: 08/15/2022) |

Appellate Case: 25-3138     Document: 24-1     Date Filed: 11/07/2025     Page: 20

| 08/15/2022 | 121 | NOTICE OF SERVICE by Stephen M. Howe, Derek Schmidt, Scott Schwab of Defendants' Supplemental Expert Witness Designation (Schlozman, Bradley) (Entered: 08/15/2022) |
| 08/15/2022 | 122 | RESPONSE by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab re 118 Motion to Extend Rebuttal Expert Disclosure Deadline. (Schlozman, Bradley) (Entered: 08/15/2022) |
| 08/16/2022 | 123 | REPLY TO RESPONSE TO MOTION by Plaintiffs VoteAmerica, Voter Participation Center re: 118 Motion for Extension of Time (Johnson, Mark) (Entered: 08/16/2022) |
| 08/21/2022 | 124 | NOTICE OF TELEPHONE CONFERENCE: Telephone Conference before Magistrate Judge Gwynne E. Birzer set for 8/24/2022 at 11:00 AM. Counsel shall call the CONFERENCE LINE at 1-888-363-4749, enter ACCESS CODE 9686294, and follow the prompts to join the conference. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (spa) (Entered: 08/21/2022) |
| 08/24/2022 | 125 | MINUTE ENTRY for proceedings held before Magistrate Judge Gwynne E. Birzer: TELEPHONE CONFERENCE held on 8/24/2022. (Tape #11:00-11:35.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (spa) (Entered: 08/24/2022) |
| 08/25/2022 | 126 | ORDER granting 118 Motion for Extension of Time to File. The Court held a telephone conference on 8/24/22 regarding the Plaintiffs' Motion to Extend Rebuttal Expert Disclosure Deadline (ECF 118), Defendants' Response to Plaintiffs' Motion to Extend Rebuttal Expert Disclosure Deadline (ECF 122), and Plaintiffs' Reply in Support of Plaintiffs' Motion to Extend Rebuttal Expert Disclosure Deadline (ECF 123). Plaintiffs appeared by Alice Huling, and Defendants appeared by Bradley Joseph Schlozman. After due consideration of the briefing and hearing arguments of counsel the Court GRANTS the Plaintiffs' Motion and further ORDERS: 1) Rebuttal experts shall be disclosed on or before 9/2/22, and the Court strongly encourages the parties to make rebuttal expert disclosures as soon as possible; 2) Plaintiffs shall provide the Defendants with available deposition dates for their rebuttal expert at the time of disclosure. The deposition dates offered by the Plaintiff shall be within 7 days of the disclosure; 3) The Court declines to modify any other deadlines in the Court's First Amended Scheduling Order, (ECF 115). The parties should continue to confer regarding any future discovery related differences and are encouraged to contact the Court in the event any such disputes cannot be resolved through the conferral process. Signed by Magistrate Judge Gwynne E. Birzer on 8/25/22. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (spa) (Entered: 08/25/2022) |
| 09/02/2022 | 127 | NOTICE by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab of taking deposition of Dr. Eitan D. Hersh on September 6, 2022 (Schlozman, Bradley) (Entered: 09/02/2022) |
| 09/06/2022 | 128 | CERTIFICATE OF SERVICE of Rebuttal Expert Witness Designation by Voter Participation Center. (Johnson, Mark) (Entered: 09/06/2022) |
| 09/06/2022 | 129 | MOTION for attorney Nicole A. Palmadesso to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-5860656.) by Plaintiffs VoteAmerica, Voter Participation Center. (referred to Magistrate Judge Gwynne E. Birzer) (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Johnson, Mark) (Entered: 09/06/2022) |
| 09/06/2022 | 130 | ORDER granting 129 Motion to Appear Pro Hac Vice of Nicole A. Palmadesso for VoteAmerica and Voter Participation Center pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Gwynne E. Birzer on 9/6/2022. (This is a |

Appellate Case: 25-3138     Document: 24-1     Date Filed: 11/07/2025     Page: 21

| | | |
|---|---|---|
| | | TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ala) (Entered: 09/06/2022) |
| 09/09/2022 | 131 | NOTICE by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab of taking deposition of Jamie Shew on September 15, 2022 (Schlozman, Bradley) (Entered: 09/09/2022) |
| 09/12/2022 | 132 | Unopposed MOTION to Extend Discovery Deadline Limited to Johnson County Document Production in Response to Rule 45 Subpoena. by Plaintiffs VoteAmerica, Voter Participation Center (referred to Magistrate Judge Gwynne E. Birzer) (Johnson, Mark) (Entered: 09/12/2022) |
| 09/12/2022 | 133 | NOTICE by Plaintiffs VoteAmerica, Voter Participation Center of taking deposition of Debbie Cox on 9/9/2022 (Johnson, Mark) (Entered: 09/12/2022) |
| 09/12/2022 | 134 | NOTICE by Plaintiffs VoteAmerica, Voter Participation Center of taking deposition of Andrew Howell on 9/14/2022 (Johnson, Mark) (Entered: 09/12/2022) |
| 09/12/2022 | 135 | NOTICE by Plaintiffs VoteAmerica, Voter Participation Center of taking deposition of Connie Schmidt on 9/19/2022 (Johnson, Mark) (Entered: 09/12/2022) |
| 09/12/2022 | 136 | NOTICE by Plaintiffs VoteAmerica, Voter Participation Center of taking deposition of Kenneth J. Block on 9/16/2022 (Johnson, Mark) (Entered: 09/12/2022) |
| 09/21/2022 | 137 | ORDER. On 9/19/22 the parties informally contacted the Court regarding Plaintiffs' Unopposed Motion to Extend Discovery Deadline Limited to Johnson County Document Production in Response to Rule 45 Subpoena. (ECF No. 132). Based upon the information provided by the parties, the Plaintiffs no longer seek the relief requested in their Motion. The Court FINDS the Motion moot. Signed by Magistrate Judge Gwynne E. Birzer on 9/21/22. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (spa) (Entered: 09/21/2022) |
| 09/27/2022 | 138 | MINUTE ENTRY for proceedings held before Magistrate Judge Gwynne E. Birzer: FINAL PRETRIAL CONFERENCE held on 9/27/2022. (Tape #10:00-10:40 ATT.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (spa) (Entered: 09/27/2022) |
| 09/27/2022 | 139 | ORDER. On 9/27/22, the Court convened the parties for a pretrial conference. Plaintiffs appeared by and through counsel, Hayden Johnson, Nicole Palmadesso, Jonathan Youngwood, and Meredith Karp. Defendants appeared by and through counsel, Bradley Schlozman and Scott Schillings. The Court reviewed the proposed pretrial order and after discussion with the parties ORDERS counsel to confer and submit a revised proposed pretrial order on or before 10/7/22 based upon the issues discussed and direction given by the Court during the pretrial conference. Signed by Magistrate Judge Gwynne E. Birzer on 9/27/22. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(spa) (Entered: 09/27/2022) |
| 09/30/2022 | 140 | PRETRIAL ORDER ENTERED Dispositive motion deadline 10/14/2022. Bench Trial set for 5/1/2023 at 09:00 AM in KC Courtroom 440 (KHV) before District Judge Kathryn H. Vratil. See Order for complete list of deadlines. Signed by Magistrate Judge Gwynne E. Birzer on 9/30/2022. (ca) (Entered: 09/30/2022) |
| 10/14/2022 | 141 | MOTION for Summary Judgment *Regarding Counts I - III* by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab (Schlozman, Bradley) (Entered: 10/14/2022) |
| 10/14/2022 | 142 | MEMORANDUM IN SUPPORT of 141 MOTION for Summary Judgment *Regarding Counts I - III* by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab (Attachments: # 1 Ex. A - Howell Affidavit, # 2 Ex. B - Shew Deposition Placeholder, # 3 Ex. C - Caskey Deposition, # 4 Ex. D - Exhibit 6 to Caskey Deposition, # 5 Ex. E - |

Appellants' Appendix - Vol. I - 019

Appellate Case: 25-3138     Document: 24-1     Date Filed: 11/07/2025     Page: 22

| | | |
|---|---|---|
| | | VPC133 Placeholder, # 6 Ex. F - Dripps Deposition Placeholder, # 7 Ex. G - Lopach Deposition Placeholder, # 8 Ex. H - Response to 2nd Interrogatories, # 9 Ex. I - Sample of VPC Cover Letter, # 10 Ex. J - Sample VPC Prefilled Application, # 11 Ex. K - Response to RFA, # 12 Ex. L - VPC 134 Placeholder, # 13 Ex. M - Block's Initial Declaration, # 14 Ex. N - Block's Supplemental Declaration, # 15 Ex. O - Block's Exhibit XI Placeholder, # 16 Ex. P - Block's Exhibit V Placeholder, # 17 Ex. Q - Examples of Deficient Ballot Applications, # 18 Ex. R - Advance Voting Apps to Deceased Voters, # 19 Ex. S - Howell Deposition, # 20 Ex. T - Cox Deposition, # 21 Ex. U - Cox Affidavit, # 22 Ex. V - Text of Notice, # 23 Ex. W - Examples of Correspondence, # 24 Ex. X - VPC Call Center FAQs, # 25 Ex. Y - Emails, # 26 Ex. Z - House and Senate HB2332 Testimony, # 27 Ex. AA - Response to 1st Interrogatories, # 28 Ex. BB - Response to 1st Interrogatories) (Schlozman, Bradley) (Entered: 10/14/2022) |
| 10/14/2022 | 143 | Unopposed SEALED MOTION for Leave to File Under Seal by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab (Attachments: # 1 Proposed Sealed Document Defendants' Memorandum in Support of Motion for Summary Judgment Regarding Counts I-III, # 2 Proposed Sealed Document Ex. B, # 3 Proposed Sealed Document Ex.E, # 4 Proposed Sealed Document Ex. F, # 5 Proposed Sealed Document Ex. G, # 6 Proposed Sealed Document Ex. L, # 7 Proposed Sealed Document Ex. O, # 8 Proposed Sealed Document Ex. P)(Schlozman, Bradley) (Entered: 10/14/2022) |
| 10/14/2022 | 144 | MOTION for Summary Judgment by Plaintiff Voter Participation Center (Johnson, Mark) (Entered: 10/14/2022) |
| 10/14/2022 | 145 | MEMORANDUM IN SUPPORT of 144 Motion for Summary Judgment by Plaintiff Voter Participation Center (Attachments: # 1 Declaration of Mark Johnson, # 2 Ex. 1, # 3 Ex. 2, # 4 Ex. 3, # 5 Ex. 4, # 6 Ex. 5, # 7 Ex. 8, # 8 Ex. 9, # 9 Ex. 10, # 10 Ex. 11, # 11 Ex. 12, # 12 Ex. 13, # 13 Ex. 14, # 14 Ex. 15, # 15 Ex 16, # 16 Ex. 17, # 17 Ex. 18, # 18 Ex. 19, # 19 Ex. 20, # 20 Ex. 21, # 21 Ex. 22, # 22 Ex. 23, # 23 Ex. 24, # 24 Ex. 25, # 25 Ex. 26, # 26 Ex. 27, # 27 Ex. 28, # 28 Ex. 29, # 29 Ex. 30, # 30 Ex. 31, # 31 Ex. 32, # 32 Ex. 33, # 33 Declaration of Lopach, # 34 Ex. A, # 35 Ex. B, # 36 Ex. C, # 37 Ex. 34) (Johnson, Mark) Modified on 10/18/2022 to remove VoteAmerica as a filer. (mam) (Entered: 10/15/2022) |
| 10/15/2022 | 146 | SEALED MOTION for Leave to File Under Seal by Plaintiff Voter Participation Center. (Attachments: # 1 Proposed Sealed Document, # 2 Proposed Sealed Document, # 3 Proposed Sealed Document, # 4 Proposed Sealed Document)(Johnson, Mark) Modified on 10/18/2022 to remove VoteAmerica as a filer. (mam) (Entered: 10/15/2022) |
| 10/15/2022 | 147 | SEALED MOTION for Leave to File Under Seal by Plaintiff Voter Participation Center. (Attachments: # 1 Proposed Sealed Document, # 2 Proposed Sealed Document, # 3 Proposed Sealed Document, # 4 Proposed Sealed Document, # 5 Proposed Sealed Document)(Johnson, Mark) Modified on 10/18/2022 to remove VoteAmerica as a filer. (mam) (Entered: 10/15/2022) |
| 10/15/2022 | 148 | MOTION to Exclude by Plaintiff Voter Participation Center. (Johnson, Mark) Modified on 10/18/2022 to remove VoteAmerica as a filer. (mam) (Entered: 10/15/2022) |
| 10/15/2022 | 149 | MEMORANDUM IN SUPPORT of 148 Motion to Exclude by Plaintiff Voter Participation Center. (Attachments: # 1 Ex. 1, # 2 Ex. 2, # 3 Ex. 3, # 4 Ex. 4, # 5 Ex. 5, # 6 Ex. 6, # 7 Ex. 7, # 8 Ex. 8)(Johnson, Mark) Modified on 10/18/2022 to remove VoteAmerica as a filer. (mam) (Entered: 10/15/2022) |
| 10/26/2022 | 150 | MEMORANDUM AND ORDER overruling 143 Motion for Leave to File Under Seal; overruling 146 Motion for Leave to File Under Seal; overruling 147 Motion for Leave to File Under Seal. Signed by District Judge Kathryn H. Vratil on 10/26/2022. (ca) (Entered: 10/26/2022) |

| 10/28/2022 | 151 | MEMORANDUM IN SUPPORT of 141 MOTION for Summary Judgment *Regarding Counts I - III* by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab (Attachments: # 1 Ex. A - Howell Affidavit, # 2 Ex. B - Shew Deposition, # 3 Ex. C - Caskey Deposition, # 4 Ex. D - Exhibit 6 to Caskey Deposition, # 5 Ex. E - VPC133, # 6 Ex. F - Dripps Deposition, # 7 Ex. G - Lopach Deposition, # 8 Ex. H - Response to 2nd Interrogatories, # 9 Ex. I - Sample of VPC Cover Letter, # 10 Ex. J - Sample VPC Prefilled Application, # 11 Ex. K - Response to RFA, # 12 Ex. L - VPC 134, # 13 Ex. M - Block's Initial Declaration, # 14 Ex. N - Block's Supplemental Declaration, # 15 Ex. O - Block's Exhibit XI, # 16 Ex. P - Block's Exhibit V, # 17 Ex. Q - Examples of Deficient Ballot Applications, # 18 Ex. R - Advance Voting Apps to Deceased Voters, # 19 Ex. S - Howell Deposition, # 20 Ex. T - Cox Deposition, # 21 Ex. U - Cox Affidavit, # 22 Ex. V - Exhibit 15 to Cox Deposition, # 23 Ex. W - Examples of Correspondence, # 24 Ex. X - VPC 561-562 - Confidential Waived, # 25 Ex. Y - Emails from VPC - Confidential Waived, # 26 Ex. Z - House and Senate HB2332 Testimony, # 27 Ex. AA - Plaintiffs' Response to Interrogatories, # 28 Ex. BB - Plaintiffs' Response to Interrogatories) (Schlozman, Bradley) (Entered: 10/28/2022) |
| 10/28/2022 | 152 | RESPONSE by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab re 148 Motion to Exclude *the Testimony and Report of Kenneth J. Block* (Attachments: # 1 Ex. A, Decl. of Kenneth J. Block, # 2 Ex. B, Dep. Tr. of Kenneth Joseph Block, # 3 Ex. C, Kenneth J. Block Curriculum Vitae, # 4 Ex. D, Supplemental Decl. of Kenneth J. Block, # 5 Ex. E, Lionel Dripps Dep. Tr., # 6 Ex. F, Hersh Tr.)(Schillings, Scott) (Entered: 10/28/2022) |
| 11/04/2022 | 153 | MEMORANDUM IN SUPPORT of 148 MOTION to Exclude *(Memorandum of Law in Support of Plaintiff Voter Participation Center's Motion to Exclude the Testimony and Report of Kenneth J. Block)* by Plaintiffs VoteAmerica, Voter Participation Center (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Johnson, Mark) (Entered: 11/04/2022) |
| 11/04/2022 | 154 | MEMORANDUM IN SUPPORT of 144 MOTION for Summary Judgment *(Plaintiff's Memorandum of Law in Support of Their Motion for Summary Judgment)* by Plaintiffs VoteAmerica, Voter Participation Center (Attachments: # 1 Declaration of Mark Johnson, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34)(Johnson, Mark) (Entered: 11/04/2022) |
| 11/04/2022 | 155 | RESPONSE by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab re 144 Motion for Summary Judgment (Attachments: # 1 Ex. A - Andrew Howell Affidavit, # 2 Ex. F - Lionel Dripps Deposition, # 3 Ex. H - Pls' Response to Defs' 2nd Set of ROGS No. 16, # 4 Ex. I - Sample of VPC's cover letter, pre-filled application, and Envelope, # 5 Ex. K - Pls' Response to Defs' RFA No 8, # 6 Ex. L - VPC 134, # 7 Ex. M - Ken Block's Initial Declaration, # 8 Ex. N - Ken Block's Supplemental Declaration, # 9 Ex. O - Ex. XI to Block's Supplemental Declaration, # 10 Ex. P - Ex. 5 to Block's Initial Declaration, # 11 Ex. Q - Examples of Shawnee County Deficient Ballot Applications, # 12 Ex. R - Advance ballots apps from Shawnee County sent to deceased voters, # 13 Ex. U - Debbie Cox Affidavit, # 14 Ex. V - Ex. 15 to Debbie Cox Deposition, # 15 Ex. W - Exs of correspondence between Shawnee County Election Office and voters, # 16 Ex. X - VPC 561-562 - Confidential Waived, # 17 Ex. Y - Emails from VPC - Confidential Waived, # 18 Ex. Z - House and Senate HB2332 Testimony, # 19 Ex. CC - VPC_s Response to Schwab_s 1st RFP, # 20 Ex. DD - Correspondence to Meredith Karp 06-08-22, # 21 Ex. |

Appellate Case: 25-3138    Document: 24-1    Date Filed: 11/07/2025    Page: 24

| | | |
|---|---|---|
| | | EE - Redacted Study Absentee Ballott Applications, # 22 Ex. FF - Schmidt Deposition Excerpts 09-16-22, # 23 Ex. GG - Shew Deposition Excerpts 09-15-22, # 24 Ex. HH - Caskey Deposition Excerpts 05-24-22, # 25 Ex. JJ - Lopach Deposition Excerpts 05-18-22, # 26 Ex. KK - Howell Deposition Excerpts 09-14-22, # 27 Ex. LL - Cox Deposition Excerpts 09-09-22, # 28 Ex. MM - Hersh Deposition Excerpts 09-06-22)(Schlozman, Bradley) (Entered: 11/04/2022) |
| 11/04/2022 | 156 | MEMORANDUM IN OPPOSITION by Plaintiffs VoteAmerica, Voter Participation Center re 141 MOTION for Summary Judgment *Regarding Counts I - III (Plaintiff Voter Participation Center's Opposition to Defendants' Motion for Summary Judgment)* (Attachments: # 1 Declaration of Mark Johnson, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18)(Johnson, Mark) (Entered: 11/04/2022) |
| 11/14/2022 | 157 | MOTION FOR LEAVE to File Motion to Exclude the Testimony and Report of Kenneth J. Block Out of Time by Plaintiff Voter Participation Center (Johnson, Mark) (Entered: 11/14/2022) |
| 11/14/2022 | 158 | MEMORANDUM IN SUPPORT of 148 MOTION to Exclude, 157 Motion for Leave to File Motion to Exclude the Testimony and Report of Kenneth J. Block Out of Time by Plaintiff Voter Participation Center. (Johnson, Mark) (Entered: 11/14/2022) |
| 11/14/2022 | 159 | EXHIBITS IN SUPPORT of 158 Memorandum in Support of Motion by Plaintiff Voter Participation Center. (Johnson, Mark) (Entered: 11/14/2022) |
| 11/15/2022 | 160 | ORDER regarding future dates for this case. See Order for all deadlines. Jury Trial date is advanced to 3/13/2023 at 09:00 AM in KC Courtroom 440 (KHV) before District Judge Kathryn H. Vratil. Signed by District Judge Kathryn H. Vratil on 11/15/2022. (ca) (Entered: 11/15/2022) |
| 11/16/2022 | 161 | ORDER sustaining 157 Plaintiff Voter Participation Center's Motion to File Its Motion to Exclude the Testimony and Report of Kenneth J. Block Out of Time. Signed by District Judge Kathryn H. Vratil on 11/16/2022. (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (alh) (Entered: 11/16/2022) |
| 11/18/2022 | 162 | REPLY TO RESPONSE TO MOTION by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab re: 141 Motion for Summary Judgment Regarding Counts I - III. (Attachments: # 1 Ex. CC - VPC's Response to Schwab's 1st RFP, # 2 Ex. DD - Letter Schillings to Karp 06-08-22, # 3 Ex. EE - Redacted Study, # 4 Ex. FF - Connie Schmidt Deposition Excerpts, # 5 Ex. HH - Bryan Caskey Deposition Excerpts, # 6 Ex. MM - Eitan Hersh Deposition Excerpts, # 7 Ex. NN - Additional Jamie Shew Deposition Excerpts, # 8 Ex. OO - Additional Lionel Dripps Deposition Excerpts, # 9 Ex. PP - Additional Thomas Lopach Deposition Excerpts, # 10 Ex. QQ - Aditional Andrew Howell Deposition Excerpts, # 11 Ex. RR - Additional Deborah Cox Deposition Excerpts, # 12 Ex. SS - Schwab's First Request for Production, # 13 Ex. TT - Schwab's Second Request for Production, # 14 Ex. UU - Defendants' Subpoena of Andrew Howell)(Schlozman, Bradley) (Entered: 11/18/2022) |
| 11/18/2022 | 163 | REPLY TO RESPONSE TO MOTION by Plaintiff Voter Participation Center re 144 Motion for Summary Judgment. (Attachments: # 1 Ex. 1)(Johnson, Mark) (Entered: 11/18/2022) |
| 11/23/2022 | 164 | Joint MOTION for extension of time *to file stipulations* by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab (Schlozman, Bradley) (Entered: 11/23/2022) |

Appellate Case: 25-3138     Document: 24-1     Date Filed: 11/07/2025     Page: 25

| 11/23/2022 | 165 | ORDER sustaining 164 Joint Motion for Extension of Time to File Stipulations. Supplemental Stipulations due by 5:00 PM on December 8th, 2022. Signed by District Judge Kathryn H. Vratil on 11/23/2022. (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (alh) (Entered: 11/23/2022) |
|---|---|---|
| 12/08/2022 | 166 | NOTICE of Joint Uncontroverted and Controverted Facts by VoteAmerica, Voter Participation Center (Attachments: # 1 Appendix A)(Johnson, Mark) (Entered: 12/08/2022) |
| 12/08/2022 | 167 | NOTICE of Declaration of Alice C.C. Huling in Support of Plaintiff Voter Participation Center's Additional Facts Included in Parties' Submission of Uncontroverted and Controverted Facts by VoteAmerica, Voter Participation Center re 166 Notice (Other) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Johnson, Mark) (Entered: 12/08/2022) |
| 12/09/2022 | 168 | NOTICE OF SUPPLEMENTAL AUTHORITY by Stephen M. Howe, Derek Schmidt, Scott Schwab re: MOTION for Summary Judgment *Regarding Counts I - III* 141 filed by Defendant Scott Schwab, Defendant Derek Schmidt, Defendant Stephen M. Howe (Attachments: # 1 Exhibit A)(Schlozman, Bradley) (Entered: 12/09/2022) |
| 12/14/2022 | 169 | RESPONSE to 168 Notice of Supplemental Authority, by Plaintiffs VoteAmerica, Voter Participation Center. (Johnson, Mark) (Entered: 12/14/2022) |
| 01/19/2023 | 170 | ORDER SETTING PRETRIAL FILING DEADLINES Status Conference set for 2/3/2023 at 01:00 PM by Telephone KHV - CONFERENCE LINE 1-888-363-4749 ACCESS CODE 1654737 before District Judge Kathryn H. Vratil. Jury Trial set for 3/13/2023 at 09:00 AM in KC Courtroom 440 (KHV) before District Judge Kathryn H. Vratil. SEE ORDER FOR ALL DEADLINES. Signed by District Judge Kathryn H. Vratil on 1/19/2023. (Attachments: # 1 Attachment 1, # 2 Attachment 2)(ca) (Entered: 01/19/2023) |
| 01/19/2023 | 171 | AMENDED ORDER SETTING PRETRIAL FILING DEADLINES: Status Conference set for 2/3/2023 at 01:00 PM by Telephone KHV - CONFERENCE LINE 1-888-363-4749 ACCESS CODE 1654737 before District Judge Kathryn H. Vratil. Bench Trial set for 3/13/2023 at 09:00 AM in KC Courtroom 440 (KHV) before District Judge Kathryn H. Vratil. SEE ORDER FOR ALL DEADLINES. Signed by District Judge Kathryn H. Vratil on 1/19/2023. (Attachments: # 1 Attachment 1, # 2 Attachment 2)(ca) (Entered: 01/19/2023) |
| 01/20/2023 | 172 | Joint MOTION for Order *to Remove from Trial Docket* by Plaintiffs VoteAmerica, Voter Participation Center (Johnson, Mark) (Entered: 01/20/2023) |
| 01/23/2023 | 173 | NOTICE of Hearing: THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. A Telephone Conference has been scheduled for 1/24/2023 at 04:00 PM before District Judge Kathryn H. Vratil. Participants must dial CONFERENCE LINE 1-888-363-4749 and enter ACCESS CODE 1654737 to join the conference. (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (alh) (Entered: 01/23/2023) |
| 01/24/2023 | 174 | MINUTE ENTRY for proceedings held before District Judge Kathryn H. Vratil: TELEPHONE CONFERENCE/MOTION HEARING was held on 1/24/2023. 141 Motion for Summary Judgment; 144 Motion for Summary Judgment; 148 Motion to Exclude; and 172 Motion for Order OVERRULED. See attached minute sheet for further. (Court Reporter Nancy Wiss.) (alh) (Entered: 01/25/2023) |
| 01/30/2023 | 175 | TRANSCRIPT of Telephone Conference held 1/24/2023 before Judge Kathryn H Vratil, Court Reporter Nancy Wiss, 913-735-2354, nancy_wiss@ksd.uscourts.gov. Transcript purchased by: Bradley Joseph Schlozman. |

**NOTICE RE REDACTION OF TRANSCRIPTS:** Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 5/1/2023. (nw) (Entered: 01/30/2023)

| | | |
|---|---|---|
| 02/02/2023 | 176 | JOINT STIPULATION *(Revised) by all Parties of Uncontroverted and Controverted Facts* by Stephen M. Howe, Derek Schmidt, Scott Schwab. (Schlozman, Bradley) Modified title on 2/3/2023. (jsh) (Entered: 02/02/2023) |
| 02/03/2023 | 177 | ENTRY OF APPEARANCE by Allison Walter on behalf of VoteAmerica, Voter Participation Center (Walter, Allison) (Entered: 02/03/2023) |
| 02/03/2023 | 178 | MINUTE ENTRY for proceedings held before District Judge Kathryn H. Vratil: STATUS CONFERENCE was held on 2/3/2023. (Court Reporter Nancy Wiss.) (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.) (alh) (Entered: 02/03/2023) |
| 02/16/2023 | 179 | ORDER - The dates when the Court is available for oral argument apparently do not work for counsel. As the result, the case is hereby deemed submitted without oral argument. Signed by District Judge Kathryn H. Vratil on 2/16/2023. (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.)(alh) (Entered: 02/16/2023) |
| 03/27/2023 | 180 | NOTICE of Supplemental Authority by Voter Participation Center (Attachments: # 1 Ex. A)(Johnson, Mark) (Entered: 03/27/2023) |
| 04/03/2023 | 181 | RESPONSE to 180 Notice (Other) *of Supplemental Authority* by Defendants Stephen M. Howe, Derek Schmidt, Scott Schwab. (Schlozman, Bradley) (Entered: 04/03/2023) |
| 04/03/2023 | 182 | NOTICE of Substitution of Party by Stephen M. Howe, Derek Schmidt, Scott Schwab (Schlozman, Bradley) (Entered: 04/03/2023) |
| 05/04/2023 | 183 | MEMORANDUM AND ORDER entering judgment in favor of plaintiff. Signed by District Judge Kathryn H. Vratil on 5/4/2023. (ca) (Entered: 05/04/2023) |
| 05/04/2023 | 184 | JUDGMENT. Decision by the Court. Pursuant to the Memorandum and Order (Doc. 183 ) filed on May 4, 2023 and the Stipulated Order for Permanent Injunction and Declaratory Judgment (Doc. 73 ) filed February 25, 2022, judgment is granted in favor of plaintiffs VoteAmerica and Voter Participation Center against defendants Scott Schawb, in his official capacity as Secretary of State of the State of Kansas, Kris Kobach, in his official capacity as Attorney General of the State of Kansas, and Stephen M. Howe, in his official capacity as District Attorney of Johnson County, on plaintiffs' claims, plus costs. Kansas Statutes Annotated § 25- 1122(l)(1) is unconstitutional, facially and as-applied to VoteAmerica and Voter Participation Center. The second sentence of Kansas Statutes Annotated § 25-1122(k)(2) is unconstitutional, facially and as-applied to Voter Participation Center. Defendants are enjoined from enforcing such provisions. Signed by deputy clerk on 5/4/2023. (ca) (Entered: 05/04/2023) |
| 05/22/2023 | 185 | Joint MOTION for Order *Holding in Abeyance Proceedings Regarding Attorneys' Fees and Expenses* by Plaintiffs VoteAmerica, Voter Participation Center (Johnson, Mark) (Entered: 05/22/2023) |

Appellate Case: 25-3138     Document: 24-1     Date Filed: 11/07/2025     Page: 27

| 05/23/2023 | 186 | ORDER granting 185 Joint MOTION for Order Holding in Abeyance Proceedings Regarding Attorneys' Fees and Expenses. Signed by District Judge Kathryn H. Vratil on 5/23/2023. (kas) (Entered: 05/23/2023) |
| 06/01/2023 | 187 | NOTICE OF APPEAL as to 184 Judgment by Defendants Stephen M. Howe, Kris Kobach, and Scott Schwab. Filing fee $505, Internet Payment Receipt Number AKSDC-6074631. (Schlozman, Bradley) Modified on 6/1/2023 to correct docket text information (kas). (Entered: 06/01/2023) |
| 06/01/2023 | 188 | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA re 187 Notice of Appeal. (Attachments: # 1 Preliminary Packet)(heo) (Entered: 06/01/2023) |
| 06/05/2023 | 189 | APPEAL DOCKETED in 10CCA on 6/1/2023 and assigned Appeal No. 23-3100 re 187 Notice of Appeal, filed by Kris Kobach, Scott Schwab, Stephen M. Howe. (heo) (Entered: 06/05/2023) |
| 06/14/2023 | 190 | TRANSCRIPT ORDER FORM: No Transcript Required filed by Stephen M. Howe, Kris Kobach, Derek Schmidt, Scott Schwab re 187 Notice of Appeal - Final Judgment, (Schlozman, Bradley) (Entered: 06/14/2023) |
| 06/15/2023 | 191 | LETTER TO 10CCA stating record is complete re 187 Notice of Appeal. (Appeal No. 23-3100) (heo) (Entered: 06/15/2023) |
| 08/24/2023 | 192 | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Allison Walter as to VoteAmerica, Voter Participation Center (Johnson, Mark) (Entered: 08/24/2023) |
| 02/15/2024 | 193 | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Hayden Johnson as to VoteAmerica, Voter Participation Center (Johnson, Mark) (Entered: 02/15/2024) |
| 12/04/2024 | 194 | APPEAL MANDATE from 10CCA: The judgment of that court is reversed. The case is remanded to the United States District Court for the District of Kansas for further proceedings in accordance with the opinion of this court. (Appeal No. 23-3100) (Attachments: # 1 Transmittal Letter)(kmc) (Entered: 12/04/2024) |
| 12/09/2024 | 195 | ORDER: A telephone status conference is scheduled for **12/17/2024 at 01:00 PM in Telephone KHV - CONFERENCE NUMBER: 913-423-1010 CONFERENCE ID: 239 763 968** before District Judge Kathryn H. Vratil. Counsel shall be prepared to discuss the nature and schedule of further proceedings, given the Tenth Circuit mandate on December 4, 2024. Counsel should confer in advance of the conference and if possible, submit **no later than 5:00 PM on December 15, 2024** a proposed plan and schedule for such further proceedings. Signed by District Judge Kathryn H. Vratil on 12/9/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jsh) (Entered: 12/09/2024) |
| 12/13/2024 | 196 | NOTICE OF CHANGE OF SETTING FOR STATUS CONFERENCE: **THIS IS AN OFFICIAL NOTICE FOR THIS HEARING** Status Conference, set for appearances by telephone conference on **12/17/2024 at 01:00 PM** before District Judge Kathryn H. Vratil, *has been changed* to **Video Conference - Zoom**. Zoom invitation will be provided to counsel of record by email. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jsh) (Entered: 12/13/2024) |
| 12/15/2024 | 197 | Joint MOTION for Order *Regarding Remand Plan and Schedule and Joint Motion for Order Holding in Abeyance Proceedings Regarding Attorneys' Fees* by Defendants Scott Schwab, Derek Schmidt, Kris Kobach, Stephen M. Howe (Schlozman, Bradley) (Entered: 12/15/2024) |
| 12/16/2024 | 198 | ORDER: The parties' 197 Joint Proposed Remand Plan And Schedule And Joint Motion For An Order Holding In Abeyance Proceedings Regarding Attorneys' Fees And Expenses |

Appellate Case: 25-3138    Document: 24-1    Date Filed: 11/07/2025    Page: 28

filed December 15, 2024 is SUSTAINED. The parties shall submit written submissions on the remaining issues in this matter for resolution by the Court as follows: (1) **On or before January 31, 2025**, plaintiffs shall file an opening brief limited to 30 pages, excluding exhibits; (2) **On or before March 14, 2025**, defendants shall file a response brief limited to 30 pages, excluding exhibits; and (3) **On or before April 4, 2025**, plaintiffs may file a reply brief limited to 15 pages, excluding exhibits. All proceedings regarding the award of attorneys' fees and costs in this action shall be held in abeyance until 45 days after issuance of a final judgment in this action, including the final resolution of any appeal, including any petition for a writ for certiorari in the U.S. Supreme Court or decision by the U.S. Supreme Court, filed in relation to this action. The status conference scheduled for 12/17/2024 at 1:00 PM is CANCELLED. Signed by District Judge Kathryn H. Vratil on 12/15/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jsh) (Entered: 12/16/2024)

| | | |
|---|---|---|
| 01/31/2025 | 199 | MOTION for attorney Katherine Hamilton to appear pro hac vice ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6575268.) by Plaintiffs VoteAmerica, Voter Participation Center (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Johnson, Mark) (Entered: 01/31/2025) |
| 01/31/2025 | 200 | APPELLANT'S BRIEF by VoteAmerica, Voter Participation Center. (Attachments: # 1 Declaration of Mark P. Johnson in Support of Plaintiffs' Opening Brief, # 2 Exhibit 1 to Declaration, # 3 Exhibit 2 to Declaration, # 4 Exhibit 3 to Declaration) (Johnson, Mark) (Entered: 01/31/2025) |
| 02/05/2025 | 201 | ORDER sustaining 199 Motion to Appear Pro Hac Vice of Katherine Hamilton for Plaintiffs VoteAmerica and Voter Participation Center pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by District Judge Kathryn H. Vratil on 2/5/2025. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jsh) (Entered: 02/05/2025) |
| 03/14/2025 | 202 | RESPONSE to 200 Brief Following Remand by Defendants Stephen M. Howe, Kris Kobach, Scott Schwab. (Schlozman, Bradley) (Entered: 03/14/2025) |
| 03/17/2025 | 203 | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Christopher Lapinig as to VoteAmerica, Voter Participation Center. (Johnson, Mark) (Entered: 03/17/2025) |
| 04/04/2025 | 204 | REPLY to 202 Response *Following Remand* by Plaintiffs VoteAmerica, Voter Participation Center. (Johnson, Mark) (Entered: 04/04/2025) |
| 04/09/2025 | 205 | NOTICE OF ADDITIONAL AUTHORITIES by Stephen M. Howe, Kris Kobach, Derek Schmidt, Scott Schwab (Attachments: # 1 Exhibit A)(Schlozman, Bradley) (Entered: 04/09/2025) |
| 07/03/2025 | 206 | MEMORANDUM AND ORDER: The second sentence of K.S.A. § 25-1122(k)(2) is an unconstitutional infringement on plaintiff Voter Participation Center's First Amendment right to freedom of speech. The Court therefore enjoins defendants from enforcing the second sentence of K.S.A. § 25-1122(k)(2). If any parties want to be heard on the issue of judicial notice, they may file a motion with the Court **on or before July 14, 2025 at 5:00 PM**. Signed by District Judge Kathryn H. Vratil on 7/3/2025. (jsh) (Entered: 07/03/2025) |
| 07/16/2025 | 207 | ORDER: On July 3, 2025, the Court ordered that if any party wanted to be heard on the issue of judicial notice, they needed to file a motion with the Court on or before July 14, 2025 at 5:00 PM. *See* 206 Memorandum And Order. The parties did not file a motion with the Court by that date. It is therefore ordered that the Clerk of the Court enter judgment in favor of plaintiff on Count I. The second sentence of K.S.A. § 25-1122(k)(2) is an unconstitutional infringement on plaintiff's First Amendment right to freedom of speech, and the Court therefore enjoins defendants from enforcing the second sentence of K.S.A. § 25-1122(k)(2). *See* 206 Memorandum And Order. It is further ordered that pursuant to |

Appellants' Appendix Vol. I - 026

Appellate Case: 25-3138     Document: 24-1     Date Filed: 11/07/2025     Page: 29

| | | |
|---|---|---|
| | | the 194 Tenth Circuit Mandate filed December 4, 2024, the Clerk enter judgment in favor of defendants on Counts II and III. Signed by District Judge Kathryn H. Vratil on 7/16/2025. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jsh) (Entered: 07/16/2025) |
| 07/16/2025 | 208 | JUDGMENT: Judgment is entered in favor of plaintiff Voter Participation Center on Count I. The second sentence of K.S.A. § 25-1122(k)(2) is an unconstitutional infringement on plaintiff's First Amendment right to freedom of speech. The Court therefore enjoins defendants from enforcing the second sentence of K.S.A. § 25-1122(k)(2).<br><br>Judgment is entered in favor of defendants Scott Schwab, Kris Kobach, and Stephen M. Howe on Counts II and III. Signed by deputy clerk on 7/16/2025. (jsh) (Entered: 07/16/2025) |
| 08/13/2025 | 209 | NOTICE OF APPEAL by Defendants Stephen M. Howe, Kris Kobach, Scott Schwab. Filing fee paid $605.00. Internet Payment Receipt Number AKSDC-6741629. (Schlozman, Bradley) Modified to add payment information on 8/13/2025. (jsh) (Entered: 08/13/2025) |
| 08/13/2025 | | APPEAL FEE PAID in the amount of $605 Receipt No. AKSDC-6741629: Re Notice of Appeal - Final Judgment 209 filed by Kris Kobach, Scott Schwab, Stephen M. Howe (THIS IS A TEXT ONLY ENTRY-NO DOCUMENT IS ASSOCIATED WITH THIS TRANSACTION) (msb) (Entered: 08/13/2025) |
| 08/13/2025 | 210 | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA: Re 209 Notice of Appeal - Final Judgment (Attachment: # 1 Preliminary Record on Appeal)(msb) (Entered: 08/13/2025) |
| 08/14/2025 | 211 | APPEAL DOCKETED in 10CCA on 8/14/2025 and assigned Appeal No. 25-3138 re 209 Notice of Appeal - Final Judgment filed by Kris Kobach, Scott Schwab, Stephen M. Howe. (jal) (Entered: 08/14/2025) |
| 08/28/2025 | 212 | TRANSCRIPT ORDER FORM: No Transcript Required filed by Stephen M. Howe, Kris Kobach, Scott Schwab. Re 209 Notice of Appeal - Final Judgment. (msb) (Entered: 08/29/2025) |
| 08/29/2025 | 213 | LETTER TO 10CCA stating record is complete. Re 209 Notice of Appeal - Final Judgment (Appeal No. 25-3138) (msb) (Entered: 08/29/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/16/2025 13:38:29 | | |
| **PACER Login:** | schlozmanb | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-02253-KHV |
| **Billable Pages:** | 25 | **Cost:** | 2.50 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**KANSAS CITY DIVISION**

| | |
|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER, | |
| Plaintiffs, | Civil Action No.  2:21-CV-2253 |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; DEREK SCHMIDT, in his official capacity as Attorney General of the State of Kansas; STEPHEN M. HOWE in his official capacity as District Attorney of Johnson County, | |
| Defendants. | |

Plaintiffs VoteAmerica and Voter Participation Center ("Plaintiffs") file this Complaint for Declaratory and Injunctive Relief against Defendants Scott Schwab, in his official capacity as the Kansas Secretary of State, Derek Schmidt, in his official capacity as the Kansas Attorney General, and Stephen M. Howe, in his official capacity as District Attorney of Johnson County ("Defendants"), for violation of Plaintiffs' First and Fourteenth Amendment rights and breach of the dormant Commerce Clause, and allege the following:

**INTRODUCTION**

1.      This lawsuit challenges restrictions on political speech and activity in violation of the First and Fourteenth Amendments and the dormant Commerce Clause of the United States Constitution.  Plaintiffs seek to enjoin enforcement of certain provisions of a new Kansas law, HB 2332, that unconstitutionally chill and burden their core political speech and associational rights. HB 2332 prohibits Plaintiffs from employing their most effective means of persuading voters to

1

engage in the democratic process: mailing advance mail ballot applications to registered Kansas voters, complete with a pre-addressed return envelope, and personalizing those applications by prefilling the individual's name and address information.  Providing Kansas voters with printed copies of advance mail ballot applications sends a powerful message encouraging eligible Kansans to vote with advance mail voting ballots, reassuring Kansans that voting by mail is safe and secure, and emphasizing the importance of democratic participation by every eligible citizen.  This type of "interactive communication concerning political change" is "core political speech."  *Meyer v. Grant*, 486 U.S. 414, 422 (1988).  The challenged provisions cannot survive the exacting scrutiny applied to restrictions on such core political speech.

2.       Kansas law permits all eligible citizens to vote by an advance mail voting ballot (also known as voting-by-mail or absentee voting), instead of voting in person.  An eligible citizen may cast an advance mail voting ballot before or on Election Day, either by mailing a completed ballot or dropping off the ballot at the voter's local election office.  Plaintiffs VoteAmerica and Voter Participation Center are vocal advocates of advance mail voting in Kansas because advance mail voting encourages and facilitates participation by the entire electorate.  Voting by advance ballot provides a means of democratic participation for registered voters, including particularly those who face difficulties with voting in person due to, for example, work or school obligations, lack of transportation, illness, or disability.

3.       Nonpartisan civic organizations such as Plaintiffs have long played a vital role in our democracy, persuading citizens to engage with the political process by providing them with the necessary applications and forms—including advance mail ballot applications—to facilitate that engagement.  Plaintiffs served this important function in Kansas during the 2020 election, helping achieve historic turnout by encouraging and helping tens of thousands of Kansans to vote

2

through advance mail ballots.  Indeed, an estimated 69,577 Kansas voters requested advance mail ballots in the 2020 general election using applications provided by Plaintiff Voter Participation Center.

4.      Rather than embracing Plaintiffs' messaging to persuade eligible citizens to vote by advance mail ballot, the State enacted HB 2332 to prohibit Plaintiffs' advance ballot application operations in Kansas.   HB 2332 includes at least two unconstitutional restrictions on the distribution of advance mail voting applications by third-party organizations (collectively, the "Ballot Application Restrictions").  Each of these two provisions is challenged by Plaintiffs in this lawsuit.

5.      *First*, HB 2332 *bans* any person who is not a resident of or domiciled in Kansas from mailing or causing to be mailed an advance mail ballot application to a Kansas voter (the "Out-of-State Distributor Ban").  Because neither VoteAmerica nor Voter Participation Center is a resident of or domiciled in Kansas, the Out-of-State Distributor Ban precludes Plaintiffs' current and planned efforts to persuade and assist Kansas voters to vote using advance mail ballots.

6.      *Second*, HB 2332 prohibits mailing any advance mail ballot application that has been personalized with the voter's information, *even where voters provide that information themselves* (the "Personalized Application Prohibition").   Providing Kansas voters with personalized advance mail voting applications is a critical part of VoteAmerica's and Voter Participation Center's communications with Kansas voters.  By sending a personalized advance mail ballot application, Plaintiffs convey the message that the recipient is personally entitled to, and should, participate in the democratic process by requesting an advance mail ballot application. Plaintiffs believe that personalizing advance mail ballot applications enhances the effectiveness of Plaintiffs' message encouraging individuals to exercise their right to vote by mail, increasing the

Appellants' Appendix - Vol. I - 030

likelihood that a voter will engage in the democratic process. Yet HB 2332 would prohibit Plaintiffs—under threat of criminal sanctions—from using this tried and tested method of persuading potential Kansas voters to vote by mail.

7. Thus, the Ballot Application Restrictions violate Plaintiffs' First Amendment rights by banning Plaintiffs' core political speech and discriminating based on the content of Plaintiffs' communications, Plaintiffs' identity as out-of-state speakers, and the viewpoints Plaintiffs express. Moreover, the Out-of-State Distributor Ban violates the dormant Commerce Clause because it implements new protectionist measures affecting interstate commerce that explicitly disadvantage Plaintiffs as non-residents of Kansas and their use of the instrumentalities of commerce.

8. If Plaintiffs continue to mail advance mail voting applications to Kansas voters after HB 2332 becomes effective on January 1, 2022—as they had planned to do before the new law was enacted—they risk steep fines and criminal sanctions. The Ballot Application Restrictions are also unconstitutionally overbroad, sweeping in protected speech for no legitimate purpose. These overbroad provisions violate Plaintiffs' First Amendment and Due Process rights, will chill their constitutionally protected core political speech, and diminish their message of encouraging broad political participation in Kansas through the distribution of advance mail ballots.

9. For organizations like Plaintiffs VoteAmerica and Voter Participation Center that do not reside and are not domiciled in Kansas, HB 2332 makes it impossible to continue their mission of expanding, encouraging, and assisting voter participation through their advance voting operations in Kansas.

10. Because Plaintiffs' advance voting operations will be burdened, scaled back, less effective, and potentially altogether eliminated, the number of voices who will convey Plaintiffs' message of encouraging democratic participation by all eligible Kansans through the use of

4

advance mail voting ballots and, as a result, the size of the audience who will receive that message, will be reduced.

11.     The Ballot Application Restrictions do not serve, and cannot be justified by, any compelling state interest.

12.     The challenged provisions of HB 2332 violate the U.S. Constitution and their enforcement must be enjoined.

## JURISDICTION AND VENUE

13.     This action is brought under the United States Constitution.  The Court, therefore, has jurisdiction to hear this case pursuant to 28 U.S.C.  §§ 1331, 1343, 1357, and 42 U.S.C. § 1983. It also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C.  §§ 2201 and 2202, to grant the declaratory relief requested.

14.     This Court has personal jurisdiction over Defendants in their official capacity because each is a citizen and elected officer in the State of Kansas and their principal places of business are in Kansas.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants in their official capacities reside in Kansas, and because a substantial portion of the events giving rise to these claims occurred in this district.

## PARTIES

### A.     Plaintiffs

16.     *VoteAmerica.*  Plaintiff VoteAmerica is a California-based 501(c)(3) nonprofit, nonpartisan organization.  VoteAmerica's core mission is to persuade and assist eligible American voters to engage in the electoral process, with a particular emphasis on voting by mail, which VoteAmerica believes is the most effective way to ensure the broadest participation in elections.

5

It does so by providing access to trusted election information, open platform technology, and education programs to support and empower voters to navigate the path to exercising their vote.

17.   A key component of VoteAmerica's civic engagement messaging is providing voters with information and resources to facilitate their applications for mail and absentee ballots, or in Kansas, advance voting ballots.  The VoteAmerica website provides extensive guides and tools for voter registration; absentee, mail, or advance voting; and voting in person in each state. VoteAmerica's resources for advance voting in Kansas consist of a guide to advance voting rules, including deadlines, identification requirements, and other instructions, as well as links to relevant election offices and other election resources.

18.   VoteAmerica's primary resource for promoting advance voting in Kansas is an interactive Absentee and Mail Ballot tool that allows voters to provide their name, address, date of birth, email, and phone number and receive an official advance mail voting application form partially prefilled with the information the voter provided, which they can complete and send to the appropriate local election official.  The tool also signs voters up for follow-up communications from VoteAmerica to assist them in voting in that election and future elections, as well as further voter engagement communications from VoteAmerica. During the 2020 election, VoteAmerica staffed the Absentee and Mail Ballot tool with at least three researchers at all times to keep the information provided on the tool up-to-date.

19.   VoteAmerica's Absentee and Mail Ballot tool delivered personalized advance mail voting applications to Kansas voters by email during the 2020 election cycle.  During the 2020 election cycle, the web tool offered users in four states—Texas, Montana, Ohio, and Utah—the option to receive a pre-printed personalized advanced voting application by mail in addition to email.  In 2020, VoteAmerica mailed 16,520 absentee ballot applications to voters in these states.

6

VoteAmerica plans to provide this personalized print-and-mail feature nationwide and is actively planning to offer the service to Kansas voters.

20.     The print-and-mail feature would enable Kansas voters to choose whether to receive their personalized advance mail voting application by mail, email, or both.  When a voter chooses to receive their application by mail, VoteAmerica's print-and-mail feature sends the personalized application to be printed by a secure third-party printer and mailed by first class mail to the voter, along with instructions, a blank advance mail voting application form, and a pre-addressed, postage paid envelope for the voter to submit the application directly to their county election official.  Expanding the print-and-mail feature is vital to serving VoteAmerica's mission to support and empower the most vulnerable voters to navigate the path to exercising their vote. It enables VoteAmerica to reach a broader audience with its message, including low-income and low-propensity voters who may have fewer resources for printing and postage and less access to those services.

21.     The Absentee and Mail Ballot tool is available to potential voters on the VoteAmerica website and on the websites of partner organizations.  VoteAmerica makes its tool freely available for this purpose.  Partner organizations have used VoteAmerica's Absentee and Mail Ballot tool to engage voters throughout the country.

22.     VoteAmerica seeks to reach the largest possible number of potential voters with its voter engagement message by pairing the tools and resources on its website with other modes of speech, including peer-to-peer texting, campus engagement, billboards, and digital ad campaigns, to assist voters at each step of the voting process.  These communications guide voters to VoteAmerica's online tools and resources, which in turn serve as a foundation for further communications with Kansas voters about engaging in the political process. VoteAmerica also

7

shares graphics, messaging, and other communications products with partners to amplify its message.

23.     VoteAmerica provides resources and communications to millions of voters in all fifty states, including Kansas.  During the 2020 election cycle, more than one million registered voters nationwide requested a vote-by-mail ballot through VoteAmerica's online resources.  At least 7,700 Kansas voters used VoteAmerica's Absentee and Mail Voting tool during Kansas's most recent elections to receive a personalized advance ballot application.  VoteAmerica also helped more than 6,000 Kansas voters register to vote through its online tools and mailed voter registration forms to 981 Kansas voters.  At least 28,500 Kansas voters currently subscribe to VoteAmerica's educational emails and reminder text messages.  VoteAmerica anticipates that the number of Kansas voters who wish to use its resources will increase and has invested in scaling its technology and outreach programs to meet anticipated demand.   It plans to continue communicating educational messages, assistance, and reminders about voting, including during the 2020 election cycle.

24.     Prior to enactment of HB 2332, VoteAmerica planned to continue offering its Absentee and Mail Voting tool to Kansas voters going forward, including after January 1, 2022.  As part of this service, VoteAmerica planned to use its print-and-mail feature to mail advance mail voting applications to Kansas voters upon request.

25.     But for the Ballot Application Restrictions, VoteAmerica would encourage Kansas voters to vote by advance mail ballot, and facilitate such advance mail voting, by mailing personalized advance mail ballot applications requested by those voters.  If HB 2332's Absentee Ballot Restrictions are not enjoined, VoteAmerica will be precluded from doing so altogether and

prohibited from fulfilling its essential purpose in Kansas: to persuade and assist Kansas voters to participate in the democratic process by voting by advance mail ballot.

26.     ***Voter Participation Center.***   Plaintiff Voter Participation Center ("VPC") is a Washington, D.C.-based 501(c)(3) nonprofit, nonpartisan organization founded in 2003.  VPC's mission is to provide voter registration, early voting, vote by mail, and get out the vote resources and information to traditionally underserved groups, including young voters, voters of color, and unmarried women.

27.     VPC focuses its efforts on associating and communicating with and encouraging these potential voters to increase their engagement with the political process and assist them in doing so.  VPC has designed and implemented direct mail programs to send mass mailers to their target demographics with resources for eligible citizens to submit voter registration applications and absentee ballot applications.  In 2020 alone, through their direct mail programs and other voter engagement activities, VPC sent more than 60 million absentee ballot applications across the country.  In 2018, VPC distributed more than 6.8 million absentee ballot applications nationally.

28.     In Kansas, these direct mail efforts are VPC's primary and, VPC believes, most effective form of communicating with and assisting Kansas voters.

29.     VPC's mail campaign is designed to encourage Kansans to participate in elections through advance mail voting.  VPC uses statewide voter registration files for the State of Kansas to identify target voters who are registered to vote but have not yet applied for an advance ballot. In 2020, using state-generated voter registration lists, VPC paid for nearly 1.2 million advance mail voting applications to be sent to Kansas voters, partnering with a 501(c)(4) organization called the Center for Voter Information to facilitate sending the mailers.  In 2018, VPC mailed more than 90,000 advance mail voting applications to Kansas voters.

9

30.     VPC's mailers include a cover letter that encourages the voter to request and cast an advance ballot; a printed copy of an advance mail voting application obtained directly from the Kansas Secretary of State; and a pre-addressed, postage-paid envelope addressed to the voter's county election office.  VPC personalizes the advance mail voting application with some of the voter's information obtained from state-generated registration records.

31.     The cover letter included in the mailer provides instructions for submitting the advance mail voting application to the voter's county election official, and clearly states that the recipient should not submit the enclosed advance mail voting application if they have already requested an advance mail ballot.  For example, mailers sent to Kansas voters in the 2020 election cycle stated: "[i]f you've already submitted a request for a ballot by mail for the 2020 General Election, there is no need to submit another request."  VPC's mailers also provide instructions to recipients about how to unsubscribe from VPC's mailing list.

32.     VPC's mailers convey VPC's message of encouraging voting by mail and assisting voters to do so.  An estimated 69,577 Kansas voters submitted an advance mail voting application provided by VPC to their county election official in the 2020 general election, and an estimated 5,342 voters did so for the 2018 general election.

33.     To execute its direct mail programs, VPC pays data vendors to identify target demographics, as well as direct mail consulting firms and professional printers to produce and send mailers to its targeted eligible citizens over an election cycle.  Because VPC's operations are nationwide, it submits millions of printing requests at a time for mailers intended to be sent to potential voters in multiple states, including Kansas.  In addition, VPC requests updated voter records from state election officials to proactively remove from VPC's mailing lists voters who have already requested or submitted an advance mail voting application.

10

34.     Prior to the enactment of HB 2332, VPC planned to continue communicating with and assisting Kansas voters by mailing personalized advance mail voting applications going forward, including after January 1, 2022 and during the November 2022 election cycle.  If HB 2332's Out-of-State Distributor Ban and Personalized Application Prohibition are not enjoined, VPC will have to stop its advance mail voting application direct mail program in Kansas entirely. VPC will thus be precluded from fulfilling its mission in Kansas of encouraging and supporting traditionally underserved Kansas voters to vote by mail.

## B.     Defendants

35.     Defendant Scott Schwab is the Secretary of State of Kansas and is sued in his official capacity.  As the chief elections official of the State, he is responsible for overseeing all Kansas elections and administering the State's election laws and regulations.  Defendant Schwab also issues guidance and instruction to county election officers on a range of election procedures and requirements.  Kan. Stat. Ann. § 25-124.  Kansas law permits Defendant Schwab to adopt rules and regulations related to advance voting, including the general form of advance voting ballots and applications for advance mail voting.  *Id.*  §§ 25-1131, 25-1121(a)-(b), 25-1122d(c); *see also* HB 2332, Session of 2021 (Kan.), §§ 3(k)(2), (m).

36.     Defendant Derek Schmidt is the Attorney General of the State of Kansas and is sued in his official capacity.  As the State's chief law enforcement officer, he has the authority and discretion to investigate and prosecute violations of state law, including criminal violations. *See* Kan. Stat. Ann. §§ 22-2202(q); 75-708.  The Kansas Attorney General also consults with and advises county attorneys in prosecuting criminal matters, Kan. Stat. Ann. § 75-704, and "shall, at the request of the[] secretary of state . . . prosecute or defend for the state all actions, civil or criminal, relating to any matter connected with" the department of state, *id.* § 75-703.  HB 2332

11

also requires Defendant Schmidt to investigate complaints alleging violations of the new Out-of-State Distributor Ban and permits him to prosecute such civil violations.  HB 2332, § 3(*l*)(2)-(3).

37.     Defendant Stephen M. Howe is the District Attorney of Johnson County and is sued in his official capacity.  Defendant Howe is responsible for investigating and prosecuting "all" criminal violations of state law in Johnson County.  Kan. Stat. Ann. §§ 19-702, 22a-107.  Because violations of HB 2332's Personalized Application Prohibition are class C nonperson misdemeanors, Defendant Howe is charged with prosecuting these violations in Johnson County. *See* HB 2332, § 3(k)(5).

**GENERAL ALLEGATIONS**

**I.     Advance Voting in Kansas**

38.     Any eligible citizens in Kansas may cast their ballot through advance voting.  Kan. Stat. Ann. § 25-1122(a).  There are two types of advance voting in Kansas: advance voting in person (*i.e.*, early voting), and advance mail voting.  *Id.* §§ 25-1122(b)-(c).  To vote by advance mail ballot, an eligible citizen must first file an advance mail voting application with the county election officer where the voter resides or where the voter is authorized to vote as a former precinct resident.  *Id.* § 25-1122(a).  For primary elections held in August of relevant years, voters must submit applications for advance mail voting no earlier than April 1 of the election year and no later than the Tuesday of the week preceding the election.  *Id.* § 25-1122(f)(1).  For general elections held in November of relevant years, voters must submit applications for advance mail voting no earlier than 90 days prior to the election and no later than the Tuesday of the week preceding the election.  *Id.* § 25-1122(f)(2).  Voters must provide their Kansas driver's license number, Kansas nondriver's ID card number, or a copy of one of the forms of identification specified in Kan. Stat. Ann. § 25-2908(h) in their advance mail voting application.  *Id.* § 25-1122(e)(2).  County election

12

officers are also required to verify that the voter's signature matches the signature on file in the county voter registration records before providing the voter with an advance voting ballot. *Id.* § 25-1122(e)(1).

39. Officials at the state and local level participate in administering advance mail voting. The Secretary of State coordinates advance voting statewide by promulgating rules that seek to establish uniform procedures and prescribe standard forms for printed materials including applications for advance mail voting. *See id.* § 25-1122(k); *see also* HB 2332 § 3(m). County election officers administer advance voting locally by, *inter alia*, accepting and processing advance mail voting applications, providing advance mail ballots to eligible citizens, receiving voted ballots, and ultimately accepting or rejecting advance mail voted ballots. *Id.* §§ 25-1122(e)-(j). The county election officer also is required to prepare and maintain a list of the names of all persons who have filed advance mail voting applications and make that list available to registered voters for inspection upon request. *Id.* § 25-1122(i).

40. The official advance mail voting application form promulgated by the Secretary of State of Kansas was publicly available online on the Secretary of State's website, on county election offices' websites, and on third-party websites during the 2020 election cycle.

41. Kansas held two statewide election days in 2020. Primary elections for offices including the U.S. Senate, the U.S. House of Representatives, the Kansas Senate, and the Kansas House of Representatives, among others, were held on August 4, 2020. The 2020 general election was held on November 3, 2020. The deadline to submit advance mail voting applications to county election officials was July 28 for the 2020 primary election and October 27 for the 2020 general election.

13

42.     The 2020 elections saw historic turnout among Kansans of all political persuasions and, given the COVID-19 pandemic, a steep increase in advance mail voting.

43.     More than 1.3 million Kansans voted in the November 2020 election compared to approximately 1.23 million voters in November 2016, an increase of nearly 6%.  And in the November 2020 election, more Kansans voted by advance mail ballot than in the 2018 and 2016 elections combined.

44.     The 2020 elections in Kansas were safe and secure.  On July 30, 2020, shortly before the August 2020 primary, Defendant Schwab noted that the State "ha[d] implemented measures to ensure the security and safety of the August and November elections."[1]  Shortly after the November 2020 election, Defendant Schwab's office confirmed that assessment: "Kansas did not experience any widespread, systematic issues with voter fraud, intimidation, irregularities or voting problems. . . . We are very pleased with how the election has gone up to this point."[2]

## II.     Plaintiffs' Advance Mail Voting Operations

45.     VoteAmerica delivered personalized advance mail voting applications to Kansas voters by email via its Absentee and Mail Ballot tool during the 2020 election cycle.  In addition, VoteAmerica has plans to provide its print-and-mail feature in Kansas in the upcoming 2022 election.  The print-and-mail feature would enable a Kansas voter to choose whether to receive their personalized advance mail voting application by mail, email, or both.  When a voter chooses to receive their application by mail, VoteAmerica's print-and-mail feature sends the personalized application to be printed by a secure third-party printer and mailed by first class mail to the voter,

---

[1] Secretary Schwab Responds to November Election Delay Suggestion, Kansas Secretary of State (July 30, 2020), https://sos.ks.gov/media-center/media-releases/2020/07-30-20-secretary-schwab-responds-to-november-election-delay-suggestion.html.

[2] Nick Corasaniti, Reid J. Epstein & Jim Rutenburg, *The Times Called Officials in Every State: No Evidence of Voter Fraud*, N.Y. Times (Nov. 19, 2020), https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html.

14

along with instructions, a blank advance mail voting application form, and a pre-addressed, postage paid envelope for the voter to submit the application directly to their county election official.

46.    In 2020, VPC paid for nearly 1.2 million mailers that included advance mail voting applications to be sent in Kansas.  The application form was obtained from the Kansas Secretary of State's website. The mailers also included a pre-addressed, postage-paid envelope addressed to the voter's county election office, and a persuasive cover letter with instructions for completing and submitting the applications.

47.    The cover letter encouraged the voter to request and cast an advance ballot.  For example, mailers sent to Kansans in the 2020 election cycle included the following messages: "County election officials in Kansas encourage voters to use mail ballots in upcoming elections," "[v]oting by mail is EASY," and "[y]ou can even research the candidates as you vote."

48.    In the lead up to the 2020 general election, the Kansas Director of Elections at the time, Bryan Caskey, confirmed to VPC in writing that the advance mail voting application form and instructions that VPC was planning to distribute to Kansas voters were consistent with Kansas law and with the forms that the Secretary of State's office uses.

49.    VPC has plans to continue encouraging and assisting Kansas voters to vote by advance mail ballot by mailing personalized advance mail voting applications going forward, including after January 1, 2022 and during the November 2022 election cycle.

50.    The mailers contemplated by both VoteAmerica and VPC for the lead up to the November 2022 election are core political speech because they communicate the message that eligible citizens should participate in the political process by requesting, completing, and submitting an advance mail ballot.  Essential to the effective communication of this message is the

15

inclusion of an advance mail voting application in the mailer.  These mailers are VoteAmerica's and VPC's most effective and preferred method for effectuating their core missions of expanding and encouraging voter engagement, particularly among low-income individuals who might otherwise be unable to print and submit an advance mail voting application because of lack of access to the internet, printing services, and/or envelopes and stamps.

### III.   HB 2332's Ballot Application Restrictions

51.   Following the 2020 election, on May 3, 2021, the Kansas Legislature overrode the Governor's veto to enact HB 2332.  Plaintiffs challenge two provisions of HB 2332.  Each targets Plaintiffs' core political speech and freedom of association by restricting their ability to encourage and assist Kansas voters to participate in elections by mail.  HB 2332 goes into effect on January 1, 2022.  HB 2332 § 11.

### A.   The Ban on Out-of-State Distribution

52.   HB 2332 bans all out-of-state persons and organizations from distributing advance mail voting applications to Kansas voters.  Section 3(*l*)(1) (to be codified at Kan. Stat. Ann. § 25-1122) provides: "No person shall mail or cause to be mailed an application for an advance voting ballot, unless such person is a resident of this state or is otherwise domiciled in this state."  This provision is a blanket ban on all out-of-state speakers; it applies regardless of whether the sender is mailing single advance mail voting applications in response to requests from individual Kansas voters or mass mailing unsolicited advance mail voting applications.

53.   Despite its overbroad sweep, HB 2332 imposes harsh civil penalties for violations: $20 for "*[e]ach instance* in which a person mails an application for an advance voting ballot." H.B.  2332 § 3(*l*)(3) (emphasis added).  There is no cap on the total liability a person or organization can face for violations of HB 2332's Out-of-State Distributor Ban.  Organizations

16

like Plaintiffs may send advance mail voting applications to hundreds of thousands of Kansas voters.

54.    Furthermore, HB 2332 permits "[a]ny individual" to "file a complaint in writing with the attorney general alleging a violation of" the Out-of-State Distribution Ban, and the attorney general is *required* to investigate all complaints.  H.B.  2332 § 3(*l*)(2) ("Upon receipt of a complaint, the attorney general shall investigate[.]").  The attorney general also has the power to "file an action against any person found to have violated this [provision]."  *Id.*

55.    HB 2332 establishes a speaker-based prior restraint on Plaintiffs' right to engage in core political speech by mailing advance mail voting applications to Kansas voters.  It applies to out-of-state speakers, but not to in-state speakers.  This ban prohibits the central component of Plaintiffs' model for encouraging, associating with and assisting Kansas voters in participating in the democratic process by advance voting by mail.  It severely undercuts the effectiveness of Plaintiffs' speech and expressive conduct on the importance and effectiveness of advance voting by mail, merely because Plaintiffs reside outside of Kansas.

56.    HB 2332 also imposes a content-based restriction on speech.  It prohibits out-of-state entities from mailing advance mail voting applications, but it does not prohibit them from mailing other communications, including other communications relating to voting.

57.    Likewise, HB 2332 discriminates based on Plaintiffs' pro-advance-mail-voting viewpoint.  It singles out organizations that seek to promote advance mail voting in Kansas for disfavored treatment, while imposing no restrictions on speakers that advocate against Kansans voting by advance ballot.

58.    HB 2332's Out-of-State Distributor Ban imposes a severe burden on Plaintiffs' rights to free speech and free association.

17

59.     Because VoteAmerica and VPC do not maintain residency or domicile in Kansas, they will be barred from communicating and associating with Kansas voters by mailing advance mail voting applications.

60.     HB 2332's overbroad restriction on causing advance mail voting applications to be mailed, combined with the law's harsh, uncapped penalties for noncompliance, will also chill Plaintiffs' exercise of their rights to free speech and association.  HB 2332 § 3(*l*)(1).  For instance, Plaintiffs will be deterred from assisting and associating with partners that mail advance mail voting applications to voters in Kansas, due to the risk that these expressive activities and associations will make them liable for causing advance mail voting applications to be mailed.  HB 2332 § 3(*l*)(1).

61.     The risk of HB 2332's steep civil penalties for violations of the Out-of-State Distributor Ban would make it prohibitive for VoteAmerica and VPC to operate their advance voting programs in Kansas.

62.     The State has no compelling interest, or even rational basis, for imposing a restraint based on content, speaker, and viewpoint that so severely restricts Plaintiffs' political speech and associations, and the Out-of-State Distributor Ban is not narrowly tailored to further any such interest.  If the State's objective were to prevent voters from receiving or submitting duplicate ballot applications, HB 2332's Out-of-State Distributor Ban would be simultaneously under- and overinclusive: a Kansas-based political party could send a voter one hundred advance mail ballot applications without penalty, while an out-of-state organization that seeks to encourage voting and provide needed assistance is prohibited from sending even a single advance mail voting application, even if that is the only advance mail voting application mailed to the voter.  HB 2332's

18

Out-of-State Distributor Ban also applies regardless of whether the voter has *requested* the sender to mail them an advance mail voting application.

63.     To the extent that the State seeks to ensure that voters do not receive multiple advance mail ballots, existing law requires local election officials to maintain a list of every voter who requested an advance mail ballot application and make that list available to registered voters for inspection upon request.  Kan. Stat. Ann. § 25-1122(i).  Upon information and belief, these lists ensure that local election officials do not send out more than one advance mail ballot to an eligible citizen, even if that voter submits more than one advance mail ballot application.

### B.     The Personalized Application Prohibition

64.     Even if Plaintiffs were not wholly barred from distributing advance mail voting applications by virtue of their residency, HB 2332 would still bar Plaintiffs from sending Kansas voters personalized advance mail voting applications that include information such as the voter's name and address. This prohibition applies even if the information is derived directly from the State's voter list or the voters have provided this information themselves and specifically requested a personalized advance mail ballot application.

65.     Section 3(k)(2) (to be codified at Kan. Stat. Ann. § 25-1122) provides: "No portion of such [advance mail voting application] shall be completed prior to mailing such application to the registered voter."

66.     The statutory prohibition applies to "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot and includes an application for an advance voting ballot in such mailing."  HB 2332 § 3(k)(*1*).  HB 2332 does not define what it means to "solicit by mail," leaving unanswered whether the restriction applies to, for example, circumstances in which the voter asks for an application, fills it out, and receives a prefilled version to file with election officials.

19

67.     The consequences of falling within the law's overbroad sweep are severe.  A violation of the Personalized Application Prohibition is a class C nonperson misdemeanor, which contains no scienter requirement and is punishable by up to one month in jail and/or fines.  *Id.*  § 3(k)(5); Kan. Stat. Ann. §§ 21-6602(a)(3), (b).

68.     Section 3(k)(4) carves out limited and narrow exceptions to the Personalized Application Prohibition: it permits the mailing of partially-completed advance mail voting applications by state and county election officials, by the state's single Protection & Advocacy for Voting Access (PAVA) agency under the Help America Vote Act of 2002, and by any entity required to provide information about elections under federal law.  These exceptions would not alleviate the burden, for example, on a voter whose disabilities make it difficult to fill out a ballot and who asks Plaintiff VoteAmerica for a personalized advance mail voting application that they could then simply sign and return to their county election office.

69.     The Personalized Application Prohibition substantially restricts the content of the communications Plaintiffs can send to Kansas voters, interferes with Plaintiffs' ability to associate with, engage, and assist voters, and reduces the effectiveness of Plaintiffs' speech and expressive conduct.

70.     For instance, the Personalized Application Prohibition would prohibit Kansans from using the print-and-mail feature of VoteAmerica's Absentee and Mail Ballot tool, which will soon enable any Kansas voter to visit VoteAmerica.com, click "Request Your Mail-In Ballot" or "Request Your Absentee Ballot," provide their personal information, and receive a copy by mail of the Kansas Secretary of State's Application for Advance Ballot by Mail prefilled with the information the voter provided.  In using this tool, the voter voluntarily agrees to receive further civic engagement communications from VoteAmerica.  The Personalized Application Prohibition

20

would substantially impede VoteAmerica's efforts to build a broad associational base with which it can communicate further with Kansas voters about political engagement and civic participation.

71.     Both VoteAmerica and VPC believe that mailing personalized advance mail ballot applications more effectively communicates their message of encouraging voting by mail than simply mailing unfilled advance mail voting applications.  If Plaintiffs are limited to sending blank applications—on threat of criminal charges—that would substantially reduce the efficacy of their efforts to encourage voting by mail.

72.     The Personalized Application Prohibition imposes serious harms on Plaintiffs' freedom of speech and freedom of association.  The prohibition would substantially alter both the method by which Plaintiffs seek to engage with voters and the content of Plaintiffs' communications.

73.     The State has no compelling interest, or even rational basis, for so severely restricting the content of Plaintiffs' political speech.  To the extent the State seeks to prevent the submission of fraudulent advance mail ballot applications, existing laws criminalize the creation or submission of a fraudulent advance mail ballot application.  *See* Kan. Stat. Ann. § 25-2431. Further, local election officials are required to identify errors or anomalies by matching the signature on advance mail voting applications to the voter's signature on file in county voter registration records systems and by verifying the voter's driver's license or ID number provided on the advance mail voting application and/or a copy of their photo ID.  Kan Stat. Ann. § 25-1122(e)(1)-(2).  Indeed, the Secretary of State proclaimed that there was no problem with fraud in the 2020 election.

74.     Upon information and belief, there were no widespread errors in election administration arising from the distribution of personalized advance mail voting applications.  In

21

any event, the HB 2332 Personalized Application Prohibition is not meaningfully, and certainly not narrowly, tailored to address any such conceivable errors in election administration.

75.   The Personalized Application Prohibition is also substantially overbroad because it prohibits personalization even when the pre-filled information is correct, and when voters themselves provide the information and request such an application.

## CAUSES OF ACTION

### Count I: Freedom of Speech
### (Claims Pursuant to 42 U.S.C. § 1983 Against All Defendants for Violations of Plaintiffs' First Amendment Rights)

76.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-75 as if fully set forth herein.

77.   The First Amendment to the United States Constitution prohibits government abridgment of the freedom of speech.

78.   The First Amendment applies to the states through the Fourteenth Amendment.  In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

79.   Like circulating an initiative petition for signatures or conducting voter registration, persuading voters to vote by advance mail ballot and facilitating such voting is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"  *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988).  Whether a citizen should participate in an election and exercise their right to vote by absentee ballot is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking" sanctions or other penalties.  *Meyer*, 486 U.S.  at 421; *see also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 186–87 (1999).

22

80.     Together and individually, the Ballot Application Restrictions in HB 2332 unconstitutionally curtail Plaintiffs' core political speech, which includes their interactive communications and activities aimed at encouraging Kansas voters to participate in democracy through advance mail voting.   Plaintiffs' activities represent a political and philosophical statement.  Plaintiffs take a position and express a point of view in the ongoing debate on whether to engage or to disengage from the political process, and urge eligible citizens to participate through the advance mail voting opportunities offered to all Kansas citizens.

81.     Plaintiffs' activities express their belief in the capacity and authority of the popular will to shape the composition and direction of the government in the democratic system.  Plaintiffs advocate for that belief by seeking to persuade Kansans to participate in democracy, by distributing the means for eligible citizens to do so, by convincing voters that voting by advance mail ballot is safe and secure, and by helping them request an advance mail ballot.  The challenged HB 2332 Ballot Application Restrictions thus inhibit Plaintiffs' core political speech and expressive conduct that are at the heart of First Amendment protections.

82.     HB 2332's Ballot Application Restrictions obstruct Plaintiffs' core political speech by "reducing the total quantum of speech on a public issue" because the law wholly bans an entire class of non-resident speakers, *see Meyer*, 486 U.S. at 423, and by hindering Plaintiffs' right "to select what they believe to be the most effective means for" expressing their core political speech, *see id.* at 424.  These restrictions "reduce[] the voices available to convey political messages," *Buckley*, 525 U.S. at 210 (Thomas, J., concurring), because they either preclude or substantially impair Plaintiffs' ability to engage with potential voters and to encourage political participation through the use of advance mail voting.

83.     The Out-of-State Distributor Ban disfavors Plaintiffs' speech based on its content, the identity of the speaker, and the viewpoints Plaintiffs express.

84.     The Out-of-State Distributor Ban is an unconstitutional content-based restriction on Plaintiffs' First Amendment communications because it defines the coverage of its prohibition based on the subject of Plaintiffs' speech.   The ban targets its restrictions on out-of-state organizations' communications about voting by advance mail ballots, but allows the same organizations to make identical communications in other content areas, such as voter registration. Likewise, it prevents Plaintiffs and similar out-of-state organizations from sending mailers discussing advance mail voting in Kansas but does not prohibit analogous mailers communicating other content.  The Out-of-State Distributor Ban is thus a paradigmatic content-based restriction on speech.

85.     The Out-of-State Distributor Ban is also an unconstitutional speaker-based restraint on Plaintiffs' First Amendment rights.  The ban allows speakers who are Kansans to speak about advance mail ballot applications, but prohibits the exact same speech from Plaintiffs and other similarly situated non-resident civic organizations.  This disparate treatment unconstitutionally favors the speech of some speakers and bars the exact same speech from others.

86.     The   Out-of-State   Distributor   Ban   constitutes   unconstitutional   viewpoint discrimination.  The provision restricts Plaintiffs' First Amendment rights because of the positions they espouse; it prevents Plaintiffs from speaking in favor of advance mail ballots by way of distributing advance mail ballot applications and empowering Kansans to use that method of voting, but would not restrict Plaintiffs' speech if they advocated for Kansans not to vote by advance mail ballot.

24

87.     These infirmities of the Out-of-State Distributor Ban, standing alone, would warrant strict scrutiny.  Defendants cannot satisfy that standard because they have no compelling, substantial, or even rational interests in restricting Plaintiffs' core political speech, much less in doing so based on what Plaintiffs say, who says it, and the viewpoints they express.  Far from being narrowly tailored, as the strict scrutiny standard requires, the Out-of-State Distributor Ban is both over- and under-inclusive.  It allows in-state speakers distributing advance ballot applications to potentially cause confusion and burdens, but bars an out-of-state speaker who actually helps alleviate confusion and burdens.

88.     The Out-of-State Distributor Ban severely burdens Plaintiffs' First Amendment rights to engage in election-related speech.  Coupled with the threat of substantial civil penalties for even an inadvertent violation, HB 2332's ban on out-of-state distributors heavily encumbers Plaintiffs' political expression.  By excising an entire class of speakers on this subject, the law severely burdens Plaintiffs' rights to convey their message and further it by engaging more individuals in the political process through advance mail voting.  These burdens are not justified by any legitimate state interests and are not necessary to serve any state interests.

89.     The Personalized Application Prohibition, coupled with the threat of criminal penalties, is likewise a severe and discriminatory burden on Plaintiffs' First Amendment rights.  The Personalized Application Prohibition restricts Plaintiffs' core political speech by proscribing their "most effective means for" engaging with their audience and only "leaves open 'more burdensome' avenues of communication."  *Meyer*, 486 U.S. at 424.  Plaintiffs' method of encouraging and assisting Kansans to use advance voting opportunities relies on personalizing applications for voters through information that the voter provides or that is publicly available.  The Personalized Application Prohibition, and its steep criminal sanctions for even inadvertent

25

violations, severely restricts Plaintiffs' core political speech, and may prevent them from speaking with Kansans about advance mail voting applications at all.

90. The Personalized Application Prohibition is also an unconstitutional content-based restriction on Plaintiffs' First Amendment rights. Its limitations apply only to particular speech because of the topic discussed and it defines the category of covered communications by their content. The prohibition singles out personalized advanced voting applications but has no such prohibition on other similar forms of speech. For example, it does not prohibit personalizing applications for Plaintiffs' voter registration activities.

91. Because the Personalized Application Prohibition burdens core political speech and restricts speech based on its content, it is subject to strict scrutiny. The Defendants cannot meet that standard because they have no compelling, substantial, or even rational interests that justify restricting Plaintiffs' core political speech or doing so based on the content of their speech. Far from being narrowly tailored, as the standard requires, the Personalized Application Prohibition applies even when voters themselves solicited and directly inputted the information, and even when the information is drawn directly from reliable State-generated voter registration lists.

92. Backed by the threat of steep criminal sanctions that punish even inadvertent violations with potential fines and incarceration, HB 2332's ban on personalizing advanced ballot applications heavily encumbers Plaintiffs' First Amendment rights. These burdens are not justified by any legitimate state interests.

93. Plaintiffs' credible fear of prosecution engenders caution to avoid inadvertent violations of the Ballot Application Restrictions, which would generate financial sanctions and significant criminal penalties. The restrictions thus chill Plaintiffs' protected speech and force Plaintiffs to self-censor.

26

94.     Under the exacting scrutiny standard applied in *Meyer* and *Buckley*—indeed, under any level of judicial scrutiny—the challenged requirements in HB 2332 violate Plaintiffs' First Amendment free speech rights.

## Count II: Freedom of Association
### (Claims Pursuant to 42 U.S.C. § 1983 Against All Defendants for Violations of Plaintiffs' First Amendment Rights)

95.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-94 as if fully set forth herein.

96.     The First Amendment prohibits government abridgment of the freedom of association. *See Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 430 (1963).

97.     The Ballot Application Restrictions in HB 2332 directly and severely burden Plaintiffs' associational rights by preventing Plaintiffs from banding together with others to engage potential voters and assist community members to further participate in the civic community through advance mail voting.  These restrictions prevent Plaintiffs from broadening the base of public participation in and support for their activities promoting democratic engagement through voting an advance mail ballot.  The challenged provisions will reduce the options and opportunities for Plaintiffs to associate with potential voters and jointly participate in First Amendment-protected activities with them and other civic engagement organizations.

98.     The Out-of-State Distributor Ban entirely prohibits Plaintiffs from associating with Kansas voters through Plaintiffs' advance mail ballot application programs.  The overbroad ban on causing any advance mail voting application to be mailed, and the burdensome monetary sanctions for any violation, also inhibit Plaintiffs from recruiting, consulting, and otherwise associating with Kansas-based organizations that do advance voting activities for fear of incurring

27

crippling penalties.   The Out-of-State Distributor Ban specifically impedes Plaintiff VoteAmerica's ability to associate with local partner organizations that use VoteAmerica's Absentee and Mail Voting tool on their own websites to assist Kansas voters with advance mail voting applications.

99.     The Personalized Application Prohibition interferes with Plaintiffs' use of an effective advance mail voting application service as a means to associate with voters.  It involves a direct regulation of the communications and political association between Plaintiffs and Kansans that seeks to increase participation in democracy and effect change.  The provision eliminates the method by which Plaintiffs connect with voters at the advance ballot application phase to gain a foothold with Kansans for further association and group engagement for political expression.

100.    For example, Plaintiff VoteAmerica assists voters by personalizing the advance ballot application with the information they provided.  In providing that information, the voter also voluntarily agrees to receive further communications from VoteAmerica.  This streamlined process enables VoteAmerica to build a broad associational base with which it can communicate further about civic participation.  By eliminating this service to voters, the Personalized Application Prohibition removes one of Plaintiffs' critical tools for developing and enhancing their political associations.

101.    Together and individually, the Ballot Application Restrictions impose a severe burden on Plaintiffs' freedom of association and are subject to strict scrutiny.

102.    The Ballot Application Restrictions are not narrowly tailored to serve any compelling state interest.  They restrict Plaintiffs and all similarly situated organizations from engaging with voters and civic organizations on this subject in their preferred and most effective manner.

28

103. These requirements cannot satisfy even a more lenient standard of review because they do not actually advance and are not rationally related to any legitimate regulatory interest. They do nothing more than hinder civic organizations from associating with voters concerning advance ballot applications and other future engagement in the political process.

104. Under the scrutiny standard applied in *Meyer* and *Buckley*—indeed, under any level of judicial scrutiny—the challenged requirements in HB 2332 violate Plaintiffs' First Amendment guarantee of freedom of association.

## Count III: Substantial Overbreadth
### (Claims Pursuant to 42 U.S.C. § 1983 Against All Defendants for Violations of Plaintiffs' First Amendment Rights)

105. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-104 as if fully set forth herein.

106. The First Amendment prohibits government abridgment of the freedom of speech through the enactment of substantially overbroad laws. *See Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 577 (1987).

107. HB 2332's Out-of-State Distributor Ban and Personalized Application Prohibition are unconstitutionally overbroad, as they needlessly regulate a substantial amount of constitutionally protected expression and associations.

108. The Ballot Application Restrictions' threat of civil and criminal penalties for violations will impermissibly chill Plaintiffs' protected speech, including Plaintiffs' efforts to inform voters about their right to file an advance ballot application and the process for doing so.

109. The Out-of-State Distributor Ban is overbroad because it prohibits every single out-of-state individual or organization from engaging in political expression by mailing or causing to be mailed an application for an advance voting ballot.

29

110.    The Personalized Application Prohibition is also unconstitutionally overbroad.  The substantial overbreadth of the provision would sweep in a range of protected First Amendment activity by applying regardless of whether the advance ballot application distributor is sending personalized applications in response to isolated requests from voters or mass applications on an unsolicited basis.  Such unconstitutional applications of the substantially overbroad Personalized Application Prohibition would also include a situation where the advance ballot application is solicited by voters and the voters themselves provides Plaintiffs with the required personalized information.  The few narrow exceptions to the Personalized Application Prohibition do not meaningfully limit its unconstitutional overbreadth.

111.    The Ballot Application Restrictions also contain steep criminal and civil sanctions for even a single inadvertent violation.  These penalties lack any cap on liability or scienter requirement that might possibly mitigate their unconstitutional overbreadth.

112.    These substantially overbroad provisions in HB 2332 risk capricious enforcement, and therefore do not survive First Amendment scrutiny.

## Count IV: Dormant Commerce Clause
**(Claims Against Defendants Scott Schwab and Derek Schmidt for Violations of Commerce Clause, U.S. Const. art. I, § 8, cl. 3)**

113.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-112 as if fully set forth herein.

114.    The Commerce Clause not only vests Congress with power to "regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, but "also prohibits state laws that unduly restrict interstate commerce," *Tenn Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019).  This so-termed "dormant" Commerce Clause "prevents the States from adopting protectionist measures and thus preserves a national market for goods and services," *id.*,

by prohibiting state laws that "discriminate against or burden the interstate flow of articles of commerce," *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 98 (1994).

115. HB 2332's Out-of-State Distributor Ban is per se unconstitutional under the dormant Commerce Clause because it discriminates against and unjustifiably burdens interstate commerce.

116. The Out-of-State Distributor Ban directly regulates the articles, instrumentalities, and flow of interstate commerce that Plaintiffs employ to conduct their absentee ballot application business.

117. Plaintiffs are engaged in commerce both "as a provider of goods and services" and "as a purchaser[.]" *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 573–74 (1997). Plaintiffs provide a product and service for Kansans seeking to participate in the electoral process using an advance ballot application. To do so, Plaintiffs purchase physical mailer materials, open Post Office boxes, and buy intangible goods such as voter data. Plaintiffs also purchase various services, including but not limited to data aggregation, web hosting, consulting, printing, and mailing. Plaintiffs fundraise to support their programs by showcasing the positive effects of their work in Kansas and nationally. Plaintiffs and their agents effectuate their programs by entering the stream of commerce and utilizing the channels and instrumentalities of interstate commerce in the form of transportation and mail service.

118. The Out-of-State Distributor Ban is facially discriminatory against interstate commerce because it explicitly proscribes non-residents' mailer activities involving advance ballot applications but favors Kansas residents engaged in the same conduct.

31

119.    Indeed, the Out-of-State Distributor Ban is facially discriminatory against interstate commerce because it also restricts even entities residing in Kansas from contracting with out-of-state vendors and thereby "caus[ing] to be mailed an application for an advance voting ballot."

120.    The Out-of-State Distributor Ban also directly infringes on Congress's Commerce Clause authority to regulate the channels and instrumentalities of interstate commerce, including but not limited to mail service.  For example, it forces Plaintiffs and similar out-of-state entities to redirect their stream of commerce by entirely cutting off mail conveyance.

121.    There are no legitimate justifications for the ban's discriminatory treatment of out-of-state entities.  To the extent any justifications exist, they can be served by reasonable nondiscriminatory alternatives.

122.    The Out-of-State Distributor Ban constitutes a substantial burden on interstate commerce.  It prevents Plaintiffs and similar organizations from engaging in commerce in Kansas concerning this subject at all.  The ban causes Plaintiffs to incur compliance and other costs while also diminishing Plaintiffs' ability to raise funds for their programs.  Moreover, affected out-of-state entities such as Plaintiffs who fail to comply with HB 2332's requirements are subject to substantial monetary penalties under the statute.

123.    The local benefits advanced by HB 2332's discrimination against and substantial burdens on interstate commerce are virtually nonexistent.  These burdens are also excessive to any perceived local benefit, and Kansas cannot show by concrete evidence that nondiscriminatory alternatives to the flat ban are unworkable or fail to promote local interests.  For example, Kansas could implement reasonable, non-discriminatory procedures for both in-state and out-of-state entities to follow.

32

124.    Moreover, the Out-of-State Distributor Ban involves a national interest in federal elections that extends well beyond any local concerns.  The burdens on national elections reinforce that Kansas's regulations are not merely to serve local objectives that might justify the substantial burdens of HB 2332.

125.    Thus, the Out-of-State Distributor Ban is a per se violation of the dormant Commerce Clause because it discriminates against and unjustifiably burdens interstate commerce.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A.    Declare that the challenged provisions in HB 2332 violate the First and Fourteenth Amendments, both facially and as-applied to Plaintiffs;

B.    Declare that the Out-of-State Distributor Ban violates the Commerce Clause, both facially and as applied to Plaintiffs;

C.    Preliminarily and permanently enjoin Defendants from enforcing the challenged provisions in HB 2332, including the punitive sanctions contained therein;

D.    Retain jurisdiction to render any and all further orders that this Court may deem necessary;

E.    Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this suit pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920; and

F.    Grant any and all other relief this Court deems just and proper.


 Dated June 2, 2021

By: _____

        Tedrick A. Housh III

LATHROP GPM LLP
Tedrick A. Housh III (KS #15414)

33

Reid K. Day (KS #78783)
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone: (816) 292-2000
Facsimile:  (816) 292-2001
tedrick.housh@lathropgpm.com
reid.day@lathropgpm.com

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice* forthcoming)
Meredith D. Karp (*pro hac vice* forthcoming)
Brooke Jarrett (*pro hac vice* forthcoming)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
bonnie.jarrett@stblaw.com

CAMPAIGN LEGAL CENTER
Aseem Mulji* (*Pro Hac Vice Forthcoming*)
Dana Paikowsky* (*Pro Hac Vice Forthcoming*)
Rob Weiner (*Pro Hac Vice Forthcoming*)
Hayden Johnson (*Pro Hac Vice Forthcoming*)
Jade Ford** (*Pro Hac Vice Forthcoming*)
1101 14TH Street, NW, St. 400
Washington, D.C. 20005
(212) 736-2000
amulji@campaignlegalcenter.org
DPaikowsky@campaignlegalcenter.org
RWeiner@campaignlegalcenter.org
HJohnson@campaignlegalcenter.org
JFord@campaignlegalcenter.org

*Attorneys for Plaintiffs*

* Licensed to practice in CA only; supervised by
Robert N. Weiner, member of the D.C. Bar

** Licensed to practice in NY only; supervised by
Robert N. Weiner, member of the D.C. Bar

34

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION**

|  |  |
|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER,<br><br>          Plaintiffs,<br><br>     v.<br><br>SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; DEREK SCHMIDT, in his official capacity as Attorney General of the State of Kansas; STEPHEN M. HOWE in his official capacity as District Attorney of Johnson County,<br><br>          Defendants. | Civil Action No.  2:21-CV-2253<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**PLAINTIFFS' DESIGNATION OF PLACE OF TRIAL**

Pursuant to the Rules of Practice of the United States District Court for the District of

Kansas Rule 40.2(a), Plaintiffs VoteAmerica and Voter Participation Center ("Plaintiffs") hereby

designate Kansas City, Kansas, as the place of trial for this litigation.

Dated June 2, 2021

By: _____

    Tedrick A. Housh III

LATHROP GPM LLP
Tedrick A. Housh III (KS #15414)
Reid K. Day (KS #78783)
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone: (816) 292-2000
Facsimile:  (816) 292-2001
tedrick.housh@lathropgpm.com
reid.day@lathropgpm.com

Appellants' Appendix - Vol. I - 062

And

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice* forthcoming)
Meredith D. Karp (*pro hac vice* forthcoming)
Brooke Jarrett (*pro hac vice* forthcoming)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
bonnie.jarrett@stblaw.com

CAMPAIGN LEGAL CENTER
Aseem Mulji (*Pro Hac Vice Forthcoming*)
Dana Paikowsky (*Pro Hac Vice Forthcoming*)
Rob Weiner (*Pro Hac Vice Forthcoming*)
Hayden Johnson (*Pro Hac Vice Forthcoming*)
Jade Ford (*Pro Hac Vice Forthcoming*)
1101 14TH Street, NW, St. 400
Washington, D.C. 20005
(212) 736-2000
amulji@campaignlegalcenter.org
DPaikowsky@campaignlegalcenter.org
RWeiner@campaignlegalcenter.org
HJohnson@campaignlegalcenter.org
JFord@campaignlegalcenter.org

*Attorneys for Plaintiffs*

2

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

VOTEAMERICA and VOTER PARTICIPATION CENTER

**DEFENDANTS**

SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; DEREK SCHMIDT, in his ...

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

LATHROP GPM LLP
Tedrick A. Housh III
Reid K. Dav

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☒ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983, U.S. Const. amend. I, U.S. Const. amend. XIV, U.S. Const. art. I, § 8, cl. 3

Brief description of cause:
Unlawful Restrictions on Political Speech and Activity in Violation of First and Fourteenth Amendment Rights and Dormant Commerce Clause

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.   DEMAND $ _____   CHECK YES only if demanded in complaint:   JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   Jun 2, 2021

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

VOTEAMERICA AND VOTER                )
PARTICIPATION CENTER,                )
                                     )
    *Plaintiffs*,                      )
                                     )
vs.                                  )   Case No. 2:21-cv-2253-KHV-GEB
                                     )
SCOTT SCHWAB, in his official capacity as )
Secretary of State of the State of Kansas; )
DEREK SCHMIDT, in his official capacity as )
Attorney General of the State of Kansas; and )
STEPHEN M. HOWE, in his official capacity )
as District Attorney of Johnson County, )
                                     )
    *Defendants*.                      )
_____)

### DEFENDANTS' ANSWER

Defendants Scott Schwab, Derek Schmidt, and Stephen Howe, each sued in their official capacities and acting by and through the undersigned counsel, submit this Answer and affirmative and other defenses to Plaintiffs' Complaint. Unless expressly admitted, Defendants deny each and every allegation in the Complaint, including any allegations in the Introduction, unnumbered and numbered paragraphs, titles, headings, and subheadings. Defendants also deny all allegations for which they lack knowledge or information sufficient to form a belief about the truth of the allegation. Paragraph headings and titles are included in this Answer only for the purposes of organization and reference. Any statutes, regulations, case law, documents, or data cited in the Complaint speak for themselves. Defendants reserve the right to amend and supplement this Answer as appropriate or necessary.

### Introduction

1.     Paragraph 1 to Plaintiffs' Complaint does not set forth factual allegations to which a response is required. The paragraph asserts legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations.

2.     The first two sentences of Paragraph 2 assert legal conclusions to which no response

is required.  To the extent a response is required, Defendants deny the allegations and the Kansas statutes governing advance balloting by mail speak for themselves.  Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in third and fourth sentences of Paragraph 2 and, on that basis, deny them.

3.     Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 3 and, on that basis, deny them.

4.     Defendants deny the allegations contained in Paragraph 4.

5.     Paragraphs 5-12 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

<u>Jurisdiction and Venue</u>

6.     Paragraphs 13-15 are admitted.

<u>Parties</u>

7.     Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in Paragraphs 16-34 and, on that basis, deny them.

8.     In Paragraph 35, Defendants admit that Scott Schwab is the Secretary of State.  The remainder of this Paragraph constitute legal conclusions to which no response is required.  The statutes that are quoted in these paragraphs speak for themselves.

9.     In Paragraph 36, Defendants admit that Derek Schmidt is the Attorney General. The remainder of this Paragraph constitute legal conclusions to which no response is required. The statutes that are quoted in these paragraphs speak for themselves.

10.     In Paragraph 37, Defendants admit that Stephen M. Howe is the District Attorney of Johnson County.  The remainder of this Paragraph constitute legal conclusions to which no response is required.  The statutes that are quoted in these paragraphs speak for themselves.

<u>General Allegations</u>

11.     Paragraphs 38-39 constitute legal conclusions to which no response is required. The statutes that are quoted in these paragraphs speak for themselves.  To the extent a response is required, Defendants deny the allegations.

2

12. Defendants admit in Paragraph 40 that the official advance mail ballot application form promulgated by the Secretary of State was publicly available online on the websites of the Secretary of State and Johnson County election office. Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in the remainder of Paragraph 40 and, on that basis, deny them.

13. Paragraph 41 is admitted.

14. Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 42 and, on that basis, deny them.

15. Paragraph 43 is admitted.

16. Defendants admit that Paragraph 44 accurately quotes the press release issued by Defendant Schwab on July 30, 2020. Defendants lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this Paragraph 42 and, on that basis, deny them.

17. Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in Paragraphs 45-47 and, on that basis, deny them.

18. Paragraph 48 is admitted.

19. Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph 49 and, on that basis, deny them.

20. Paragraph 50 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

21. Defendants admit in Paragraph 51 that the Kansas Legislature overrode the Governor's veto to enact H.B. 2332, and that the statute takes effect January 1, 2022. The remainder of this Paragraph asserts legal conclusions to which no response is required.

22. Paragraphs 52-58 assert legal conclusions to which no response is required. The statutes quoted in these paragraph speaks for themselves. To the extent a response is required, Defendants deny the allegations.

23. Defendants deny the allegations in Paragraph 59.

3

24. Paragraphs 60 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

25. Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph 61 and, on that basis, deny them.

26. Paragraphs 62 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

27. The allegations contained in Paragraph 63 are legal conclusions that attempt to construe Kansas statutes and thus do not require a response. The statutes speak for themselves. To the extent a response is required, Defendants deny the allegations.

28. Paragraphs 64 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

29. The statutes in Paragraphs 65-66 speak for themselves and require no response. To the extent these Paragraphs attempt to interpret the statutes, the assertions are legal conclusions to which no response is required. To the extent any further response is required, Defendants deny the allegations.

30. The statute quoted in Paragraph 67 speaks for itself and requires no response. The value-laden judgment of the statute's impact is not a factual allegation, but to the extent a response is required, Defendants deny the allegations.

31. The statute quoted in Paragraph 68 speaks for itself and requires no response. To the extent a response is required, Defendants deny the allegations.

32. Paragraphs 69 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

33. Defendants deny the allegations in Paragraph 70.

34. Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph 71 and, on that basis, deny them.

35. Paragraphs 72 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations. As far as how Plaintiffs will adapt

4

to H.B. 2332, that is a matter on which Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations, and on that basis, deny them.

36. The statutes quoted in Paragraph 73 speak for themselves and require no response. This paragraph also asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that the State has no compelling interest or rational basis for enacting the prohibitions contained in H.B. 2332.

37. Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in the first sentence of Paragraph 74 and, on that basis, deny them. With respect to the second sentence of that Paragraph, Defendants deny that the prohibitions in Section 3(k)(2) of H.B. 2332 do not meaningfully address and are not narrowly tailored to address conceivable errors in election administration.

38. Paragraph 75 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

### Causes of Action

#### *Count I – Freedom of Speech*

39. Defendants incorporate by reference as if fully set forth herein their answers and responses to Paragraphs 1-76 of Plaintiffs' Complaint.

40. Paragraph 77 asserts legal conclusions to which no response is required.

41. Paragraph 78 asserts legal conclusions to which no response is required.

42. Paragraph 79 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that Plaintiffs' distribution of advance mail ballot applications to voters constitutes core political speech.

43. Paragraph 80 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that H.B. 2332 unconstitutionally curtails Plaintiffs' freedom of speech.

44. Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in the first sentence of Paragraph 81 and, on that basis, deny them. Paragraph

5

81 also asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that H.B. 2332 unconstitutionally curtails Plaintiffs' freedom of speech.

45.     Paragraph 82 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that H.B. 2332 unconstitutionally curtails Plaintiffs' freedom of speech.

46.     Defendants deny the allegations in Paragraph 83.

47.     Paragraph 84 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that the "Out-of-State Distributor Ban" unconstitutionally curtails Plaintiffs' freedom of speech.

48.     Paragraph 85 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that the "Out-of-State Distributor Ban" represents an unconstitutional speaker-based restraint.

49.     Paragraph 86 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that the "Out-of-State Distributor Ban" represents unconstitutional viewpoint discrimination.

50.     Paragraph 87 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

51.     Paragraph 88 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that the "Out-of-State Distributor Ban" severely burdens Plaintiffs' First Amendment rights to engage in election-related speech and that any restrictions in the statute are not necessary or justified by legitimate state interests.

52.     Paragraph 89 asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that the Personalized Application Prohibition represents a severe and discriminatory burden on Plaintiffs' First Amendment rights.

6

53.     Paragraph 90 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the Personalized Application Prohibition amounts to an unconstitutional content-based restriction on Plaintiffs' First Amendment rights.

54.     Paragraph 91 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the Personalized Application Prohibition burdens core political speech and that the State has no compelling, substantial, or rational basis for adopting this restriction.

55.     Paragraph 92 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

56.     With respect to Paragraph 93's allegations regarding Plaintiffs' supposed fears of prosecution, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations and, on that basis, deny them.  This Paragraph also asserts legal conclusions to which no response is required.  To the extent a response is required, however, Defendants deny the allegations.

57.     Paragraph 94 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

### Count II – Freedom of Speech

58.     Defendants incorporate by reference as if fully set forth herein their answers and responses to Paragraphs 1-95 of Plaintiffs' Complaint.

59.     Paragraph 96 asserts a legal conclusion to which no response is required.

60.     Paragraph 97 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the Ballot Application Restrictions in H.B. 2332 directly and severely burden Plaintiffs' associational rights under the First Amendment.

61.     Paragraph 98 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the "Out-

7

of-State Distributor Ban" prohibits Plaintiffs from associating with Kansas voters, inhibits them from recruiting, consulting, and otherwise associating with Kansas-based organizations, or impedes their ability to associate with local partner organizations.

62.     Defendants deny the allegations in Paragraph 99 that the Personalized Application Prohibition interferes with Plaintiffs' associational rights under the First Amendment.  Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in the last sentence of Paragraph 99 and, on that basis, deny them as well.

63.     Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in the last sentence of Paragraph 100 and, on that basis, deny them.  To the extent that this Paragraph also contains legal conclusions, those require no response, but to the extent a response is required, Defendants deny them.

64.     Paragraph 101 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the Ballot Application Restrictions in H.B. 2332 impose a severe burden on the Plaintiffs' associational rights under the First Amendment.

65.     Paragraph 102 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the Ballot Application Restrictions not narrowly tailored to serve compelling state interests.

66.     Paragraph 103 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the Ballot Application Restrictions not rationally related to legitimate state regulatory interests.

67.     Paragraph 104 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

*Count III – Overbreadth*

68.     Defendants incorporate by reference as if fully set forth herein their answers and responses to Paragraphs 1-105 of Plaintiffs' Complaint.

69.     Paragraph 106 asserts a legal conclusion to which no response is required.

8

70.    Paragraph 107 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the Ballot Application Restrictions are unconstitutionally overbroad.

71.    Paragraph 108 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the Ballot Application Restrictions impermissibly chill Plaintiffs' protected speech rights.

72.    Paragraph 109 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

73.    Paragraph 110 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the Personalized Application Prohibition is violated if an advance mail ballot application is solicited by a voter rather than by the Defendants.

74.    Paragraph 111 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

75.    Paragraph 112 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

*Count IV – Dormant Commerce Clause*

76.    Defendants incorporate by reference as if fully set forth herein their answers and responses to Paragraphs 1-113 of Plaintiffs' Complaint.

77.    Paragraph 114 asserts a legal conclusion to which no response is required.

78.    Paragraph 115 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

79.    Paragraph 116 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegation that the Out-of-State Distributor Ban directly regulates interstate commerce.

80.    Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in the last sentence of Paragraph 117 and, on that basis, deny them.  To the extent

9

that this Paragraph also contains legal conclusions, those require no response, but to the extent a response is required, Defendants deny them and specifically deny that the Plaintiffs are engaged in commerce within the meaning of the Dormant Commerce Clause.

81. Paragraph 118 asserts a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that the Out-of-State Distributor Ban violates the Constitution.

82. Paragraph 119 asserts a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that the Out-of-State Distributor Ban violates the Constitution.

83. Paragraph 120 asserts a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that the Out-of-State Distributor Ban infringes on Congress' Commerce Clause authority.

84. Paragraph 121 asserts a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that the State has no legitimate justification for the Out-of-State Distributor Ban.

85. Paragraph 122's first sentence asserts a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegation and specifically deny that the Out-of-State Distributor Ban constitutes a substantial burden on interstate commerce. With respect to the second and third sentences of this Paragraph, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in the last sentence of Paragraph 117 and, on that basis, deny them. With respect to the final sentence of the Paragraph, the statutory text speaks for itself.

86. Defendants deny the allegations in Paragraph 123 that there are no State/local interests that would justify the Out of State Distributor Ban or that the alleged burdens imposed by this statute outweigh such State/local interests.

87. Paragraph 124 asserts a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations and specifically deny that the Out-

10

of-State Distributor Ban involves a national interest in elections that extends beyond any local concerns.

88.    Paragraph 125 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations.

## AFFIRMATIVE AND OTHER DEFENSES

89.    Defendants incorporate by reference as if fully set forth herein their answers and responses to Paragraphs 1-125 of Plaintiffs' Complaint.

90.    Plaintiffs fail to state a claim upon which relief can be granted.

91.    Plaintiffs lack standing to challenge H.B. 2332 and/or to seek the relief requested in their Complaint.

## DEMAND FOR RELIEF

WHEREFORE, having fully answered the allegations in Plaintiffs' Complaint, Defendants request that (a) judgment be entered dismissing Plaintiffs' Complaint and (b) this Court grant the Defendants such other relief as it deems just and equitable.

Respectfully Submitted,

By: /s/ Bradley J. Schlozman
Bradley J. Schlozman (KS Bar #17621)
Scott R. Schillings (Bar # 16150)
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, KS  67206
Tel.: (316) 267-2000
Fax: (316) 630-8466
E-mail: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com

*Attorneys for Defendants*

11

## CERTIFICATE OF SERVICE

I certify that on December 9, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the e-mail addresses on the electronic mail notice list, including counsel for the Plaintiff.

By: /s/ Bradley J. Schlozman

Appellants' Appendix - Vol. I - 076

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER,   ) ) ) | |
| Plaintiffs,   ) ) | |
| v.   ) ) | **CIVIL ACTION** |
| SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; DEREK SCHMIDT, in his official capacity as Attorney General of the State of Kansas; STEPHEN M. HOWE in his official capacity as District Attorney of Johnson County,   ) ) ) ) ) ) ) ) | **No. 21-2253-KHV** |
| Defendants.   ) ) | |

### MEMORANDUM AND ORDER NUNC PRO TUNC

VoteAmerica and Voter Participation Center bring suit for declaratory and injunctive relief against Scott Schwab in his official capacity as Kansas Secretary of State, Derek Schmidt in his official capacity as Kansas Attorney General and Stephen M. Howe in his official capacity as District Attorney of Johnson County.  Complaint For Declaratory And Injunctive Relief (Doc. #1) filed June 2, 2021.  Plaintiffs allege that defendants violated their First and Fourteenth Amendment rights and breached the Dormant Commerce Clause.  Plaintiffs seek a preliminary injunction against enforcement of two provisions of HB 2332, which will be codified as K.S.A. § 25–1122: (1) Section 3(l)(1), which bars persons and organizations that are not residents of or domiciled in Kansas from mailing or causing to be mailed advance mail ballot applications to Kansas voters and (2) Section 3(k)(2), which criminalizes mailing personalized advance ballot applications.

On September 8, 2021, the Court held an evidentiary hearing on plaintiffs' motion for preliminary injunction.  This matter is before the Court on Defendants' Motion To Dismiss

<u>Plaintiffs' Complaint</u> (Doc. #26) filed July 9, 2021[1] and <u>Plaintiffs' Motion For Preliminary Injunction</u> (Doc. #24) filed July 8, 2021.

## I.     <u>Motion To Dismiss</u>

In ruling on a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement to relief.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009).  To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—not merely conceivable—on its face.  <u>Id.</u> at 679–80; <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  To determine whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense.  <u>Iqbal</u>, 556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions.  <u>See id.</u> at 678.  Plaintiffs make a facially plausible claim when they plead factual content from which the Court can reasonably infer that defendants are liable for the misconduct alleged.  <u>Id.</u> However, plaintiffs must show more than a sheer possibility that defendants have acted unlawfully—it is not enough to plead facts that are "merely consistent with" defendants' liability. <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557).  A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand.  <u>Id.</u>  Similarly, where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not "shown"—that the pleaders are entitled to relief.  <u>Id.</u> at 679.  The degree of specificity

---

[1]     On August 27, 2021, the Court overruled <u>Defendants' Motion To Dismiss</u> (Doc. #26) in part, finding that plaintiffs' complaint was not subject to dismissal for lack of subject matter jurisdiction.  The Court reserved ruling on defendants' arguments with regard to failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P.

Appellants' Appendix - Vol. I - 078

necessary to establish plausibility and fair notice depends on context; what constitutes fair notice under Fed. R. Civ. P. 8(a)(2) depends on the type of case.  Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008).

When ruling on a Rule 12(b)(6) motion, the Court does not analyze potential evidence that the parties might produce or resolve factual disputes.  Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002).  A motion to dismiss does not ask the Court to analyze plaintiffs' likelihood of success on the merits; rather, the Court must find only a reason to believe that plaintiffs have a "reasonable likelihood of mustering factual support for the claims," Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007), and that their claims are "plausible." Twombly, 550 U.S. at 570.

Highly summarized, plaintiffs' complaint alleges as follows:[2]

## A.    Voting In Kansas

Kansas law permits any eligible voter to cast an advance ballot.  Kansas has two types of advance voting: advance voting in person (i.e., early voting) and advance mail voting.[3]  Advance voting requires a voter to apply to a county election officer for a mail-in ballot.  The Secretary of State coordinates advance voting statewide by creating uniform procedures and forms.  County election officers administer voting locally by accepting and processing applications, providing ballots to eligible voters, receiving ballots that have been cast and ultimately accepting or rejecting ballots.  County election officers also prepare and maintain lists of persons who have filed advance voting applications.  During the 2020 election cycle, the advance voting application form was

---

[2]     The Court assumes that the reader is familiar with the allegations of plaintiffs' complaint and does not attempt to recite them in their entirety.

[3]     All references to advance voting are references to advance voting by mail.  This case does not involve early voting in person.

publicly available on the web sites of the Kansas Secretary of State, local election offices and various third parties.

To apply for an advance mail ballot, a voter must provide a Kansas driver's license number, a Kansas nondriver's ID card number or another specified form of identification.  A county election officer must verify that the voter's signature matches the signature on file in voter registration records.  Voters may cast advance ballots on or before Election Day, either by mailing completed ballots or dropping off their ballots at a local election office.

In 2020, Kansas voters of all political persuasions turned out in historic numbers. Particularly given COVID-19, Kansas also saw a steep increase in advance mail voting.  More than 1.3 million Kansans voted in the 2020 general election, nearly six per cent more than in 2016. More Kansans voted by advance mail ballot in November of 2020 than the elections in 2016 and 2018 combined.  Shortly after the 2020 election, the Secretary of State's office stated that "Kansas did not experience any widespread, systematic issues with voter fraud intimidation, irregularities or voting problems. . . . We are very pleased with how the election has gone up to this point."

In March of 2021, the Kansas Legislature introduced HB 2332 to regulate the advance ballot application process.  Governor Laura Kelly vetoed the bill on April 23, 2021.  On May 3, 2021, the Kansas Senate and House overrode the Governor's veto, and HB 2332 will become effective on January 1, 2022.  HB 2332, § 11.

HB 2332 contains two provisions (collectively, "Ballot Application Restrictions") that are at issue in this action.

### 1.      Out-of-State Distributor Ban

HB 2332 bans any person from mailing an advance voting application or causing an application to be mailed, unless the sender is a resident of Kansas or domiciled in Kansas.

HB 2332, § 3(l)(1) (the "Out-of-State Distributor Ban").  This ban applies whether the sender is mailing a single application in response to a request from an individual Kansas voter or is engaged in mass mailing of unsolicited applications.

The legislation imposes a civil penalty of $20.00 for "[e]ach instance in which a person mails an application for an advance voting ballot."  HB 2332, § 3(l)(3).  Anybody can file a complaint alleging a violation of the Out-of-State Distributor Ban, and the attorney general must investigate all complaints.  HB 2332, § 3(l)(2).  The attorney general may also file suit against anyone who violates this provision.

### 2.    Personalized Application Prohibition

The "Personalized Application Prohibition" prohibits the mailing of any advance mail ballot application that has been personalized with a voter's information, even where the voter has personally provided that information.  The Prohibition applies to any person who by mail solicits a registered voter to apply for an advance voting ballot and includes in such mailing an application for an advance voting ballot.  HB 2332, § 3(k)(1).

Personalized application violations are class C nonperson misdemeanors, which are punishable by up to one month in jail and/or fines.  HB 2332, § 3(k)(5); K.S.A. § 21-6602(a)(3).  The Personalized Application Prohibition does not apply to state or county election officials or to entities which must provide information about elections under federal law.  HB 2332, § 3(k)(4).

### B.    Parties

Plaintiffs are out-of-state, nonpartisan organizations which provide voter information, applications and forms to facilitate political engagement by voters, including advance mail ballot applications.  Such organizations have long played a vital role in democracy by persuading citizens to engage with the political process.

VoteAmerica is a California-based 501(c)(3) nonprofit, nonpartisan organization.  Its core mission is to help eligible voters engage in the electoral process, emphasizing voting by mail. VoteAmerica believes that voting by mail is the most effective way to ensure the broadest participation in elections.  To empower voters to exercise their votes, VoteAmerica provides access to trusted election information, open platform technology and education programs.   The VoteAmerica web site provides extensive guides and tools for voter registration, absentee, mail and advance voting and voting in person in all 50 states, including Kansas.  Its resources for advance voting in Kansas include a guide to advance voting rules, deadlines, links to local election offices, instructions and other relevant resources.

VoteAmerica engages voters by pairing tools and resources on its web site with other modes of speech to help voters in the voting process.  These communications guide voters to its on line tools and resources and facilitate further communications with Kansas voters about the political process.  To amplify its message, VoteAmerica shares graphics, messaging and other communications products with partners.

VoteAmerica's primary resource for promoting advance voting in Kansas is an interactive Absentee and Mail Ballot request tool.  The tool allows voters to provide their names, addresses, dates of birth, emails and phone numbers, and populate the ballot application forms with that information.  Voters receive the application forms with the voter-provided information pre-completed.  Voters then sign and complete the forms and send them to their local election officials. The tool automatically signs up voters for follow-up communications from VoteAmerica to help them vote in future elections.  In addition to the VoteAmerica web site, the Absentee Mail Ballot request tool is available on the web sites of partner organizations of VoteAmerica.

During the 2020 election cycle, the tool delivered personalized advance voting applications

-6-

to Kansas voters by email.  In four other states, voters have the option to receive a pre-printed personalized application by mail.  VoteAmerica is actively planning to offer this personalized print-and-mail feature service to Kansas voters.

With its preprinted applications, VoteAmerica sends blank advance mail voting application forms and pre-addressed, postage-paid envelopes.  Expanding the print-and-mail feature will enable VoteAmerica to reach a broader audience, including low-income and low propensity voters with fewer resources and decreased access to postage and printing.

During the 2020 election cycle, at least 7,700 Kansas voters used the VoteAmerica tool to receive a personalized ballot application.  VoteAmerica helped more than 6,000 Kansans register to vote, and at least 28,500 Kansas voters currently subscribe to VoteAmerica's educational emails and reminder text messages.  VoteAmerica is invested in scaling its technology and outreach programs to meet anticipated demand and plans to continue communicating educational messages, assistance and reminders about voting.

Before the Legislature enacted HB 2332, VoteAmerica planned to keep offering its tool to Kansas voters after January 1, 2022.  Upon request, it also planned to use its print-and-mail feature to mail advance mail voting applications to Kansas voters.

Voter Participation Center ("VPC") is a Washington, D.C.-based 501(c)(3) nonprofit, nonpartisan organization.  Its mission is to provide voter registration, early voting, vote by mail and get-out-to-vote resources and information to traditionally underserved groups, including young voters, voters of color and unmarried women.

VPC has implemented direct mail programs to send mass mailers to its target demographic. These mass mailers contain resources for eligible voters to submit voter registrations and absentee ballot applications.  VPC believes that direct mail is the most effective form of communicating

-7-

with and helping Kansas voters.  The mail campaign encourages advance voting.  VPC uses Kansas' statewide voter registration files to identify registered voters who have not requested an advance ballot application, and in 2020, it sent nearly 1.2 million advance voting applications to Kansas voters.  To facilitate these efforts, VPC has partnered with a 501(c)(4) organization called the Center for Voter Information.  VPC requests updated voter records from state election officials to proactively remove voters who have already requested or submitted advance voting applications.

VPC mailers include a cover letter encouraging voters to request and cast advance ballots; printed copies of an advance ballot application from the Kansas Secretary of State web site; and pre-addressed, postage-paid envelopes addressed to the county election offices.  VPC personalizes the voter's application with the information from the state-generated registration records.  The cover letter clearly instructs the voter not to submit more than one request.  The mailers encourage voting by mail and help voters do so.  Mailers sent to Kansans during the 2020 election cycle included messages such as: "County election officials in Kansas encourage voters to use mail ballots in upcoming elections," "Voting by mail is EASY" and "You can even research the candidates as you vote."  In the 2020 election cycle, an estimated 69,577 Kansas voters submitted VPC-provided advance voting applications to their county election officials.

Before the Legislature enacted HB 2332, VPC planned to continue communicating and helping Kansas voters by mailing personalized advance mail voting applications after January 1, 2022, and during the 2022 election cycle.

Scott Schwab is the Kansas Secretary of State.  As the State's chief elections official, Schwab oversees all Kansas elections and administers the State's election laws and regulations. He also issues guidance and instructions to county election officers.

Derek Schmidt is the Kansas Attorney General.  As the State's chief law enforcement officer, Schmidt has the authority and discretion to investigate and prosecute violations of State law, including criminal violations.  HB 2332 requires Schmidt to investigate complaints alleging violations of the Out-of-State Distributor Ban and permits him to prosecute such civil violations.

Stephen Howe is the District Attorney of Johnson County.  Howe is responsible for investigating and prosecuting all criminal violations of state law in Johnson County.  Because HB 2332's Personalized Application Prohibition violations are class C nonperson misdemeanors, Howe will prosecute these violations in Johnson County.

On June 2, 2021, plaintiffs filed suit against defendants in their official capacities, alleging violations of the First and Fourteenth Amendments and the Dormant Commerce Clause. Specifically, Count 1 alleges that the Ballot Application Restrictions violate the First Amendment by targeting plaintiffs' core political speech, i.e. their advocacy for advance mail voting, communicated through mailing of advance ballot application packets.  Count 2 alleges that the Ballot Application Restrictions inhibit plaintiffs' First Amendment right to associate with others to encourage and help Kansas voters to vote by mail.  Count 3 alleges that the Ballot Application Restrictions are overly broad, regulating and chilling a substantial amount of plaintiffs' constitutionally protected speech and associations.  Finally, Count 4 alleges that the Out-of-State Distributor Ban violates the Dormant Commerce Clause by facially discriminating against non-Kansas residents, including plaintiffs, in restricting them from mailing advance voting applications to Kansas residents.

### C.    Analysis

As noted, plaintiffs bring four claims: (1) HB 2332 violates their First Amendment rights to freedom of speech (Count 1); (2) HB 2332 violates their First Amendment rights to freedom to

-9-

associate (Count 2); (3) HB 2332 is overbroad (Count 3); and (4) the Out-of-State Distributor Ban of HB 2332 violates the Dormant Commerce Clause (Count 4).  Pursuant to Rule 12(b)(6), defendants ask the Court to dismiss plaintiffs' complaint for failure to state a claim on which relief may be granted.

As to Count 1, defendants argue that the Ballot Application Restrictions apply only to non-expressive conduct, not to any form of speech, and that as a matter of law, they do not violate the First Amendment.  As to Count 2, defendants argue that when a state invokes its constitutional authority to regulate elections, the restrictions on individual rights to associate—which will inevitably ensue—do not violate the First Amendment.  As to Count 3, defendants argue that as a matter of law, the restrictions in question are not overly broad in violation of the First Amendment. Finally, as to Count 4, defendants argue that the Dormant Commerce Clause does not apply to the restrictions aimed at minimizing voter confusion, eliminating voter fraud and preserving the limited resources of state election offices.

The Court considers each claim in turn.

1. First Amendment Freedom of Speech Claim (Count 1)

Plaintiffs allege that the Ballot Application Restrictions violate their freedom of speech because they restrict their right to send packets which contain advance voting applications to Kansas voters and thus target core political speech.  Complaint (Doc. #1), ¶ 55.  Plaintiffs argue that in violation of the First Amendment, the Out-of-State Distributor Ban is content-based, viewpoint-based and speaker-based, and targets only non-resident speakers and pro-mail voting messages.  Id., ¶¶ 82, 84.  Plaintiffs also argue that the Personalized Application Prohibition singles out personalized advanced voting applications, without prohibiting other forms of speech.  Id., ¶¶ 89–91.

-10-

Defendants ask the Court to dismiss Count 1 because HB 2332 "prohibits no spoken or written expression whatsoever" and applies to non-expressive conduct, not to speech—and most certainly not to core political speech. Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) filed July 9, 2021 at 17, 20. Accordingly, the Court first analyzes whether HB 2332 regulates speech—that is, whether the First Amendment even applies to plaintiffs' application packets and personalized ballot applications.

The First Amendment, made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment "literally forbids the abridgement only of speech," but its protection is not limited to just spoken or written words. Texas v. Johnson, 491 U.S. 397, 404 (1989). Conduct that is "sufficiently imbued with elements of communication"—known as "inherently expressive" conduct—falls within the scope of the First and Fourteenth Amendments. Id.; Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 66 (2006). In deciding whether particular conduct is "inherently expressive," courts look to whether the conduct shows "an intent to convey a particular message" and whether "the likelihood was great that the message would be understood by those who viewed it." Voting for Am., Inc. v. Steen, 732 F.3d 382, 388 (5th Cir. 2013) (quoting Johnson, 491 U.S. at 404).

Citing Lichenstein v. Hargett, 489 F. Supp. 3d 742 (M.D. Tenn. 2020), defendants argue that in mailing application packets and distributing personalized ballot applications, plaintiffs are not engaging in speech or expressive conduct. Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) at 16–17. Lichtenstein involved First Amendment challenges to a Tennessee statute which prohibited anyone except election officials from providing applications for absentee ballots. 489 F. Supp. 3d at 748. The district court held that the law did not prohibit

-11-

spoken or written expression, and therefore did not restrict expressive conduct.  Id. at 773.

Plaintiffs correctly respond that Lichtenstein is not germane because their application packets

include speech that communicates a pro-mail voting message.   Furthermore, mailing the

application packets is inherently expressive conduct that the First Amendment embraces.  See

League of Women Voters of Fla. v. Cobb, 447 F. Supp. 2d 1314 (S.D. Fla. 2006); see also

Democracy N.C. v. N.C. State Bd. of Elections, 476 F. Supp. 3d 158 (M.D. N.C. 2020); Priorities

USA v. Nessel, 462 F. Supp. 3d 792 (E.D. Mich. 2020).

Accepting their factual allegations as true, plaintiffs have sufficiently alleged that HB 2332

violates their First Amendment rights to engage in free speech and expressive conduct.  In other

words, defendants are not entitled to dismissal of Count 1 on the theory that HB 2332 exclusively

regulates conduct, not speech.

## 2.      First Amendment Freedom Of Association Claim (Count 2)

Count 2 alleges that the Ballot Application Restrictions chill plaintiffs' associational rights

under the First Amendment because they impede plaintiffs' ability to engage and broaden their

network and association base for political change.  Complaint (Doc. #1), ¶¶ 51, 60, 98–99; see also

supra Section I.C.1.  Defendants do not dispute that the restrictions hinder plaintiffs' right to

associate but argue that as a matter of law, the State may do so in exercising its constitutional

authority to regulate elections.  Defendants' Memorandum In Support Of Motion To Dismiss

(Doc. #27) at 18.

The right to associate to advance beliefs and ideas is at the heart of the First Amendment.

NAACP v. Button, 371 U.S. 415, 430 (1963).  An organization's attempt to broaden the base of

public participation in and support for its activities is conduct "undeniably central to the exercise

of the right of association."  Am. Ass'n of People with Disabilities v. Herrera, 690 F. Supp. 2d

-12-

1183, 1202 (D.N.M. 2010), on reconsideration in part, No. CIV-08-0702 JB/WDS, 2010 WL 3834049 (D.N.M. July 28, 2010) (quoting Tashjian v. Republican Party of Conn., 479 U.S. 208, 214–15 (1986)). The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958); see Kusper v. Pontikes, 414 U.S. 51, 56–57 (1973).

The freedom of association encompasses not only the right to associate with others but also the right to choose how one associates with others. See Boy Scouts of Am. v. Dale, 530 U.S. 640, 653 (2000) ("As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression."). Public endeavors which "assist people with voter registration are intended to convey a message that voting is important," and which expend resources "to broaden the electorate to include allegedly under-served communities," qualify as expressive conduct which implicates the First Amendment freedom of association. Democracy N.C., 476 F. Supp. 3d at 223 (quoting Am. Ass'n of People with Disabilities, 690 F. Supp. 2d at 1215–16).

Here, plaintiffs allege that the Out-of-State Distributor Ban prevents them from "recruiting, consulting, and otherwise associating with Kansas organizations that distribute [advance mail voting] applications." Complaint (Doc. #1), ¶¶ 60, 98. Working with these Kansas organizations allows them to increase the number of voices which share the message that voters are entitled to and should participate in the democratic process. Id., ¶¶ 6, 10, 20. Plaintiffs allege that the Personalized Application Prohibition interferes with their associational rights by prohibiting them from working with Kansas organizations to provide the Absentee and Mail Voting tool and limits their ability to "associate for the purposes of assisting persons" in requesting an application for an

-13-

advance ballot.  Id., ¶¶ 99–100.

Defendants have a legitimate interest in regulating elections.  Utah Republican Party v. Cox, 892 F.3d 1066, 1084 (10th Cir. 2018); see Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 191 (2008) (describing state interest generally as interest in "protecting the integrity and reliability of the electoral process"); Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes.").  Defendants, however, do not contest that plaintiffs have an associational interest in engaging with Kansas residents about advance mail voting.  Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) at 18.

In Am. Ass'n of People with Disabilities v. Herrera, supra, nonprofit organizations engaged in voter-registration activities challenged a New Mexico law that allegedly burdened their right to expressive association.  690 F. Supp. 2d at 1190.  Like defendants here, defendants in that case conceded that the statute restricted plaintiffs' ability to associate, but argued that the burdens imposed by the challenged laws were non-existent when weighed against the State's substantial interest in regulating elections.  Id. at 1220.  On a motion to dismiss, however, the district court properly refused to weigh the relative burdens of the restrictions.  Id.

Accepting plaintiffs' allegations as true—as the Court must do in addressing a motion to dismiss—plaintiffs in this case have sufficiently alleged that HB 2332 violates their First Amendment rights to engage in free association.  Defendants are not entitled to dismissal of Count 2 on the theory that HB 2332 only minimally burdens plaintiffs' right to associate, because on this record the Court cannot weigh the relative burdens of plaintiffs' First Amendment rights against the State's professed interest in regulating elections.  Therefore the Court overrules defendants' motion to dismiss Count 2.

-14-

### 3.   Overbreadth Claim (Count 3)

Count 3 alleges that the Ballot Application Restrictions are unconstitutionally overbroad, in violation of the First Amendment, because they "needlessly regulate a substantial amount of constitutionally protected expression and associations," and "impermissibly chill [p]laintiffs' protected speech." Complaint (Doc. #1), ¶¶ 106–08. Plaintiffs bring both as-applied and facial overbreadth challenges. Plaintiffs argue that as applied to them, the restrictions are overbroad because (1) HB 2332 reaches a substantial amount of constitutionally protected activity in delivering their pro-mail voting message; (2) they cannot financially partner with other organizations to encourage Kansas voters to vote by mail; and (3) the threat of criminal and civil penalties impermissibly chills their speech. Id., ¶¶ 52–54, 59, 65, 109. For largely the same reasons, plaintiffs also raise a facial attack that HB 2332 necessarily chills the speech of others not before the Court. Id., ¶¶ 52, 73, 93, 108. Plaintiffs argue that HB 2332 reaches a substantial amount of constitutionally protected expression and exceeds any legitimate state interest in avoiding fraud, minimizing voter confusion and facilitating an orderly administration of the electoral process, and that they sufficiently state a claim under Rule 12(b)(6).

Defendants seek dismissal on the theory that as a matter of law, because plaintiffs may communicate their messages in other ways, the restrictions do not substantially impair their constitutional activity, as required to state a valid overbreadth claim. Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) at 25.

Facial challenges and as-applied challenges can overlap conceptually. See Doe v. Reed, 561 U.S. 186, 194 (2010). Where the "claim and the relief that would follow . . . reach beyond the particular circumstances of the[] plaintiffs," "they must satisfy th[e] standards for a facial challenge to the extent of that reach." Id. Therefore, to determine whether plaintiffs have stated

-15-

a valid claim upon which relief may be granted, the Court analyzes their claims under the heightened facial challenge standard.  Id.; see United States v. Stevens, 559 U.S. 460, 472–73 (2010).

In general, to succeed in a typical facial attack, plaintiffs must establish that "no set of circumstances exists [in] which [the statute] would be valid, or that the statute lacks any plainly legitimate sweep." Stevens, 559 U.S. at 473 (citations omitted).  Generally, facial challenges are strongly disfavored, but overbreadth challenges under the First Amendment are an exception to that rule because the "statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973); see Virginia v. Hicks, 539 U.S. 113, 118 (2003) (First Amendment overbreadth doctrine exception to normal rule for facial challenges).  The Supreme Court has cautioned, however, that the concept of substantial overbreadth is not readily reduced to an exact definition.  Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984).

A court should address an overbreadth challenge when the law may chill the free speech rights of parties not before the court, especially when the statute imposes criminal sanctions.  West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1367 (10th Cir. 2000); see also Hicks, 539 U.S. at 118–20.  To succeed on an overbreadth challenge, plaintiffs must show that the "potential chilling effect on protected expression is both real and substantial."  United States v. Brune, 767 F.3d 1009, 1018 (10th Cir. 2014) (quoting Jordan v. Pugh, 425 F.3d 820, 828 (10th Cir. 2005)).  At the motion to dismiss stage, the Court need not determine whether the illegitimate applications of the statute substantially outweigh the legitimate applications of the statute.  Animal Legal Def. Fund v. Reynolds, No. 419CV00124JEGHCA, 2019 WL 8301668, at *12 (S.D. Iowa Dec. 2, 2019).  At this stage of the litigation, plaintiffs need only allege "a claim to relief that is plausible

-16-

on its face," describing instances of arguable overbreadth of HB 2332.  Twombly, 550 U.S. at 570; Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008).

          a.          Substantial Impairment Of Plaintiffs' Constitutionally Protected Rights

As noted above, plaintiffs allege that the Out-of-State Distributor Ban reaches a substantial amount of their constitutionally protected activity in delivering their pro-mail voting messages. HB 2332 bars plaintiffs from mailing application packets that contain applications for advance mail ballots to Kansas voters and also prohibits them from even "causing" such applications to be mailed.  Complaint (Doc. #1), ¶¶ 52, 59, 109; HB 2332, § 3(l)(1).  HB 2332 also prevents plaintiffs from extending financial support and encouragement to partner organizations who work to mail applications to Kansas voters or Kansas residents who mail applications to Kansas-based families. Complaint (Doc. #1), ¶¶ 52, 60.  Under the Personalized Application Prohibition, plaintiffs cannot distribute applications for advance ballots which contain personalized information from the State's voter database or the voter himself.  Id., ¶¶ 29, 45.  Plaintiffs allege that the penalties associated with both restrictions will chill their speech and associational rights, as they will be deterred from engaging in constitutionally protected speech.

          b.          Substantial Impairment Of Rights Of Other Parties

Plaintiffs allege that HB 2332 substantially impairs and chills not only their speech, but the speech of others not before the Court.  Specifically, plaintiffs allege that it will prevent out-of-state organizations from extending financial support and encouragement to Kansas partner organizations and residents who mail advance ballot applications to Kansas voters, and substantially impair the ability of Kansas-based organizations to advocate for voting by mail. Plaintiffs allege that HB 2332 authorizes penalties which, when applied to all out-of-state entities, will deprive society of an "uninhibited marketplace of ideas."  Taxpayers for Vincent, 466 U.S.

at 800, n.19.

As noted, the Court has determined that plaintiffs asserted a plausible claim that HB 2332 implicates protected speech.   Defendants counter that plaintiffs' examples are "hypothetical scenarios" and argue that the statute has several legitimate applications; plaintiffs, however, allege more than a single "discrete application of the statute that may be problematic."  Free Speech Coal., Inc. v. Holder, 729 F. Supp. 2d 691, 733 (E.D. Pa. 2010), aff'd in part, vacated in part, remanded sub nom. Free Speech Coal., Inc. v. Att'y Gen. of U.S., 677 F.3d 519 (3d Cir. 2012).

c.      Weighing The Legitimate State Interests

For a statute to be overly broad, the overbreadth must not only be real, but substantial, judged in relation to the statute's plainly legitimate sweep.  New York v. Ferber, 458 U.S. 747, 771 (1982).  Defendants put forward three alleged interests in enacting HB 2332: avoiding fraud, minimizing voter confusion and facilitating an orderly administration of the electoral process.  On a motion to dismiss, the Court does not determine whether potentially illegitimate applications substantially outweigh any legitimate applications of the statute. [4]  Reynolds, 2019 WL 8301668, at *12.  To state a plausible claim, plaintiffs need only allege a meaningful number of illegitimate applications.  Id.; see also People for Ethical Treatment of Animals v. Hinckley, 526 F. Supp. 3d 218, 239 (S.D. Tex. 2021).

HB 2332 has clearly legitimate purposes: eliminating voter fraud, preventing voter confusion and preserving limited resources to maintain orderly administration of the electoral process.  Plaintiffs, however, raise significant issues whether protected expression will fall prey to

---

[4]      The Court recognizes that on a motion for summary judgment or at trial, it would consider evidence on the statute's limiting construction when determining what constitutes an illegitimate application of the statute.  See West v. Derby Unified School Dist. No. 260, 23 F. Supp. 2d 1223, 1234 (D. Kan. 1998), aff'd, 206 F.3d 1358 (10th Cir. 2000).

-18-

the statute.  See Ferber, 458 U.S. at 773.  Accepting plaintiffs' allegations as true, they allege a "realistic chilling effect" on their First Amendment rights and those not before the Court.  See Faustin v. City and Cnty. Of Denver, Colo., 423 F.3d 1192, 1199–1200 (10th Cir. 2005); see also West, 206 F.3d at 1367.  Plaintiffs plausibly allege that the First Amendment protects their pro-mail voting advocacy speech, and that HB 2332 prohibits the exercise of their First Amendment rights.  Plaintiffs are not "brainstorming hypotheticals."  See Nat'l Press Photographers Ass'n v. McCraw, 504 F. Supp. 3d 568, 586–87 (W.D. Tex. 2020).

Defendants are not entitled to dismissal of Count 3 on the ground that as a matter of law, HB 2332 does not substantially impair constitutional activities and is not overbroad.

### 4.   Dormant Commerce Clause Claim (Count 4)

Plaintiffs allege that because HB 2332 restricts non-Kansas residents from mailing advance voting applications to Kansas residents, it violates the Dormant Commerce Clause by discriminating against and unjustifiably burdening interstate commerce.  U.S. Const. art. I, § 8, cl.3; Complaint (Doc. #1), ¶¶ 115, 118; Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion To Dismiss (Doc. #31) filed July 30, 2021 at 25–26.  Defendants argue that plaintiffs have not stated an actionable claim because the State has legitimate purposes of eliminating potential voter fraud, minimizing voter confusion and preserving limited resources, and that the State's right to regulate elections is beyond the reach of the Dormant Commerce Clause.  Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) at 27–28; Defendants' Reply To Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion To Dismiss (Doc. #41) filed August 20, 2021 at 24.  Defendants also argue that the State is exempt from the Dormant Commerce Clause because it is a market participant.

Plaintiffs respond that a statute which mandates differential treatment of in-state and out-

-19-

of-state entities is *per se* invalid under the Dormant Commerce Clause; that the State's right to regulate elections is not exempt from scrutiny under the Dormant Commerce Clause; and that the State cannot show that nondiscriminatory alternatives would be insufficient to protect its alleged interests.

The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations and among the several States." U.S. Const. art. I, § 8, cl. 3. While the Commerce Clause is more frequently invoked as authority for federal legislation, the so-called Dormant Commerce Clause limits state legislation which adversely effects interstate commerce. See Hughes v. Oklahoma, 441 U.S. 322, 326 (1979). The focus of a Dormant Commerce Clause challenge is whether a state law improperly interferes with interstate commerce. Direct Mktg. Ass'n v. Brohl, 814 F.3d 1129, 1135 (10th Cir. 2016); see W. Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 192 (1994) ("Th[e] negative aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors") (internal citations omitted).

Under the Dormant Commerce Clause, the Court must first analyze whether the statute "regulates evenhandedly with only 'incidental' effects on interstate commerce or discriminates against interstate commerce." Or. Waste Sys., Inc. v. Dept. of Env't Quality of Or., 511 U.S. 93, 99 (1994) (quoting Hughes, 441 U.S. at 336). Discrimination means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. Id. If a restriction on commerce is discriminatory, it is virtually *per se* invalid. Id. (citing Chem. Waste Mgmt., Inc. v. Hunt, 504 U.S. 334, 344 n.6 (1992)). A state regulation that discriminates against interstate commerce will survive constitutional challenge only if the state shows "it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory

-20-

alternatives." Direct Mktg. Ass'n, 814 F.3d at 1136 (citing Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 581 (1997)).

Defendants do not deny that plaintiffs are engaged in interstate commerce or that HB 2332 restricts non-Kansas residents from mailing advance voting applications to Kansans.[5] Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) at 27. On this record, HB 2332 is not an even-handed regulation which only incidentally discriminates against non-residents such as plaintiffs. Accordingly, to survive constitutional challenge, defendants must show that HB 2332 advances legitimate local purposes that cannot be adequately served by reasonable, nondiscriminatory alternatives. In attempting to do so, defendants cite three goals of HB 2332: to "minimize voter confusion, eliminate potential voter fraud, and preserve limited resources from being expended on rectifying problems flowing from the same, including having to wade through duplicative advance mail voting applications." Id. at 27–28. Defendants argue that HB 2332 "limits the amount of advance mail voting applications a voter receives" and ensures the State's ability to verify the accuracy of the sender's disclosures through Kansas records. Id. at 28. Lastly, defendants argue that the goal of the Out-of-State Distributor Ban is not economic protectionism, and in fact, defendants would prefer that no third-party organizations be allowed to distribute advance voting applications. Id. at 29. Plaintiffs respond that the State's "legitimate interests" do not justify discrimination against non-residents because the restrictions (1) do not combat voter

---

[5]     Defendants attempt to argue that under the Elections Clause, Article I, Section 4, Clause 1 of the Constitution, States may prescribe the "Times, Places, and Manner of holding Elections," and that this authority forecloses plaintiffs' cause of action. Defendants raise this argument for the first time in their reply brief, Defendants' Reply To Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion To Dismiss (Doc. #41) at 24 and therefore the Court does not consider it. See United States v. Gurule, 461 F.3d 1238, 1248 (10th Cir. 2006) (courts generally do not consider arguments raised for the first time in reply brief); see also Novosteel SA v. U.S., Bethlehem Steel Corp., 284 F.3d 1261, 1274 (Fed. Cir. 2002) (reply brief does not provide moving party new opportunity to present yet another issue for court consideration).

confusion or fraud, or preserve resources; (2) the Ban does not limit the number of advance voting applications a Kansas voter may receive; (3) voters may still receive and submit duplicate applications; and (4) defendants have no evidence that out-of-state distributors as a class behave differently from in-state distributors. Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion To Dismiss (Doc. #31) at 27–28. Defendants do not persuasively refute these points or establish why their legitimate local objectives could not be achieved by reasonable, nondiscriminatory alternatives.

Plaintiffs sufficiently allege that the Out-of-State Distributor Ban is *per se* illegal, as it prevents out-of-state, but not in-state, residents from mailing advance ballot applications. Accepting plaintiffs' allegations and giving them the benefit of all favorable inferences, they sufficiently plead that the State's legitimate interests in regulating elections do not justify the discriminatory restrictions.

As noted, defendants also argue that the Dormant Commerce Clause does not apply to the State because it is a market participant. This exception "covers States that go beyond regulation and themselves participate in the market so as to exercise the right to favor their own citizens over others." Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 339 (2008) (internal citations omitted). This exception reflects "a basic distinction between States as market participants and States as market regulators." Id. (internal citations omitted). In arguing that the state is a market participant, defendants go beyond the allegations of the complaint. See GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997) (court must exclude outside material unless motion converted to one for summary judgment under Rule 56). The Court does not consider this argument in deciding defendants' motion to dismiss.

Defendants are also not entitled to dismissal of Count 4 on the theory that as a matter of

law the State has legitimate interests which cannot be served by reasonable, nondiscriminatory alternatives.  On a motion to dismiss, the Court confines its inquiry to the allegations of plaintiffs' complaint and cannot evaluate the sufficiency or weight of interests which defendants invoke to defeat those allegations.  Therefore, the Court overrules defendants' motion to dismiss Count 4.

## II.   Preliminary Injunction

Plaintiffs seek to preliminarily enjoin enforcement of HB 2332 because (1) they are substantially likely to succeed on the merit of their claims that the Ballot Application Restrictions violate the First Amendment and/or the Dormant Commerce Clause; (2) violation of First Amendment rights constitutes irreparable harm; (3) the injunction would not inflict substantial harm on defendants because HB 2332 does not serve important state interests; and (4) an injunction would further the public interest.  Plaintiffs' Memorandum Of Law In Support Of Motion For Preliminary Injunction (Doc. #25) filed July 8, 2021 at 2–4.

Defendants oppose plaintiffs' motion.  Defendants assert that plaintiffs' motion is flawed because (1) plaintiffs' claims have no substantive legal merit; (2) the State's regulatory interests outweigh any minor impact on the rights of plaintiffs and voters whom they represent; (3) plaintiffs have shown no risk of imminent harm to democracy; and (4) a preliminary injunction is not necessary because HB 2332 will not take effect until January 1, 2022 and advance ballot applications for the primaries in 2022 cannot be accepted until April 1, 2022.  Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) filed July 22, 2021 at 2–3; HB 2332, § 3, 11.

The purpose of a preliminary injunction is "to preserve the status quo pending the outcome of the case."  Tri-State Generation & Transmission Ass'n Inc. v. Shoshone River Power Inc., 805 F.2d 351, 355 (10th Cir. 1986).  A preliminary injunction is a drastic and extraordinary remedy,

-23-

and courts do not grant it as a matter of right.  Paul's Beauty Coll. v. United States, 885 F. Supp. 1468, 1471 (D. Kan. 1995); see Nova Health Sys. v. Edmondson, 460 F.3d 1295, 1298 (10th Cir. 2006) (preliminary injunction is extraordinary remedy, and right to relief must be clear and unequivocal).  To obtain a preliminary injunction, plaintiffs must establish (1) a substantial likelihood that they will eventually prevail on the merits; (2) irreparable injury unless a preliminary injunction issues; (3) that the threatened injury outweighs whatever damage the proposed preliminary injunction may cause to defendants; and (4) that, if issued, a preliminary injunction, will not be contrary to the public interest.  Tri-State Generation, 805 F.2d at 355.  If the moving parties demonstrate that the second, third and fourth factors "tip strongly" in their favor, the test is modified and the moving parties "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue for litigation and deserving of more deliberate investigation."  Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc., 455 F.3d 1107, 1113 (10th Cir. 2006).

### A.  Findings Of Fact

As noted, the Court conducted an evidentiary hearing on September 8, 2021.  As witnesses, plaintiffs called Daniel McCarthy, Vice President of Finance and Operations for VoteAmerica and Thomas Lopach, President and Chief Executive Officer for VPC.  Defendants called Bryan Caskey, Kansas Director of Elections; Andrew Howell, Shawnee County Elections Commissioner; and Connie Schmidt, retired Johnson County Elections Commissioner.  Based on the evidence received at that hearing, the Court makes the following findings of fact:

Plaintiffs are out-of-state, nonpartisan organizations whose mission is to persuade citizens to engage with the political process, with a focus on advance mail voting.

VoteAmerica's mission is to "see an electorate where all voters are informed and

-24-

participate time after time in our elections." It specifically seeks to engage low propensity voters who are usually "neglected by partisan efforts and partisan turnout." Transcript Of Preliminary Injunction Motion Hearing Before The Honorable Kathryn H. Vratil, United States Senior District Judge (Doc. #45) filed September 14, 2021 at 7–8. VoteAmerica provides a range of services to potential voters, including a database of election laws for each state, municipality and county; voter registration verification; mail-in ballot request tools; and election reminders. Id. at 8–9. These services require VoteAmerica to work directly with secretaries of state and local election officials and administrators. Id. at 23.

VoteAmerica offers a vote by mail service, which allows citizens to go to its web site and fill out advance mail ballot request forms which contain their personal information (name, address, driver's license, etc.). Id. at 9. VoteAmerica then prints and mails the ballot request form to the voter. Id. VoteAmerica's goal is to encourage safe voting, especially for populations who may be disabled, who lack the technology to print and mail a ballot request form or who need to work on election day, and thus expand participation in the electoral process. Id. By November of 2021, VoteAmerica plans to fully develop the Kansas tool for advance mail voting services. Id. at 10, 12. Its goal is to offer the tool for the 2022 election cycle, as it has done in other states. Id. at 10, 12. To be successful, the mail ballot request tool requires significant planning and financial expense. Id. at 10–12. Other web sites with similar voting missions may embed VoteAmerica's tool on their platforms. Id. at 12. Such partnerships align with VoteAmerica's mission because as more voices share the pro-mail voting message, voters are more likely to listen. Id. at 12–13.

When voters request advance mail voting application packets, they receive personalized absentee ballot forms; blank absentee ballot forms; instruction forms that are personalized with local election office information; pro-voting messages such as "Your vote matters. Get this in on

time;" and a free hotline number for nonpartisan advice.  Id. at 13–16.  VoteAmerica includes a blank absentee form so a voter can correct any errors in the personalized information or give the blank application to another voter.  Id. at 17–18.  VoteAmerica includes an envelope addressed to the local election office with pre-paid postage.  Id. at 18.  The personalized ballot application reduces the voter's burden in accessing the right to vote and increases the likelihood that the voter will submit the ballot application.  Id. at 16–17.  Mr. McCarthy believes that without the personalized ballot application, VoteAmerica will have lower response rates, especially among low-income and low-resource voters, and that its mission will suffer.[6]  Id. at 20.  The entire packet is vital to VoteAmerica's mission and serves to communicate and persuade voters to participate in the electoral process.  Id. at 28.

VoteAmerica plans to offer vote by mail services to Kansans in the 2022 election cycle. Though it did not offer the personalized request tool in 2020, about 7,700 Kansans requested advance voting application packets from VoteAmerica.  Id. at 22.  According to Mr. McCarthy, the Out-of-State Distributor Ban would end VoteAmerica's efforts in Kansas, as it could cost around $100,000 to become a resident of Kansas.  Id. at 19.  The ban on personalized ballot applications would detract from VoteAmerica's mission, as it would become more complicated for low-income, low-resource voters to access ballot applications.  Id. at 20.  The ban would also create coding issues, as VoteAmerica would need to hire an engineer to create a specific exception on its web site for Kansas residents.  Id.  Mr. McCarthy testified that overall, the most significant issue would be the isolation of Kansas residents; they would "always [have] an asterisk," lowering the potential impact of its communications.  Id. at 21, 27.

---

[6]    VoteAmerica monitors response rates by tracking "voter files" during an election cycle to see whether voters have returned their ballot applications to their local election offices. Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 29.

Like VoteAmerica, VPC's mission is to engage low propensity voting groups (people of color, unmarried women and young people) at levels equal to their actual representation in the population.  Id. at 39.   VPC uses direct mail and digital means to achieve this mission. Ninety per cent of VPC's work is focused on direct mail programs, "bring[ing] democracy to people's doors."  Id. at 40.  In 2020, because that election cycle drastically increased VPC's digital footprint, VPC also partnered with a non-profit organization called the Center for Voter Information.  Id. at 42.  Moving forward, VPC plans to operate separately from the Center for Voter Information.  Id.

VPC mailers include a cover letter which explains and encourages voting by mail; reminds the voter to submit only one ballot application request; identifies a web site to check the status of an application; includes a personalized ballot application obtained on a form from the Kansas Secretary of State; and includes a photocopy of a pre-paid return envelope to the election office. Id. at 42–45.  To ensure the accuracy of the personalized information, VPC communicates with both the Kansas Secretary of State and the county election administrators.  Id. at 47–48; Plaintiffs' Exhibits In Support Of Their Motion For Preliminary Injunction (Doc. #43-2 Exhibit 6 Emails). Mr. Lopach testified that these communications involve (1) checking to make sure VPC has used the proper forms and (2) letting election offices know how many forms VPC plans to mail to each county.  Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 52, 76–78.  At the suggestion of election administrators from various states, VPC added the reminder to submit only one ballot application.  Id. at 42.

Like Mr. McCarthy, Mr. Lopach testified that response rates significantly increase with the inclusion of personalized ballot applications and pre-paid postage mailers.  Id. at 45–46.  Many voters do not own printers or may not be able to access the internet, and in mailing their application

packets, such voters rely heavily on VPC resources. Id. at 50. VPC highlights each personalized ballot application to draw a voter's attention to (1) providing additional information where necessary, (2) verifying that personalized information is accurate and (3) the importance of submitting only one ballot application. Id. at 50, 57. By keeping up-to-date internal records on who has requested ballot applications, VPC tries to prevent voters from sending multiple ballot applications. Id. at 48.

For the 2022 election cycle, VPC plans to send voter registration mailings to roughly 70,000 Kansans, communicating with these voters every three to four months before the November election. Id. at 49. In 2020, VPC sent 371 million pieces of mail nationwide (voter registration applications, vote by mail applications and election day information pamphlets). Id. at 58. In 2022, these communications will include reminders to vote and information necessary to make an informed decision about voting in person on election day or in advance by mail. Id. at 49. Mr. Lopach testified that HB 2332 will inhibit VPC's ability to effectively engage with Kansans. Id. It will prevent VPC from mailing personalized ballot applications, thus reducing response rates and increasing the potential number of errors. Id. at 49, 60. The ban on out-of-state distributors will likely limit all of VPC's mail programs in Kansas, because VPC is not a Kansas resident and it cannot afford to become one. Id. at 49–50, 61.

Since February of 2015, Mr. Caskey has been responsible for overseeing Kansas elections at the national and state levels and for assisting 105 county election offices at the local level. Id. at 62–63. He has been in the state election office since February of 1998. Id. at 63. Mr. Caskey testified that since 1996, any Kansas voter may vote before election day for any reason, either by mail or in person. Id. "Unlike many states which struggle to implement mail balloting for the first time, Kansas . . . has 25 years of experience with mail ballots." Id. at 84. To vote by mail, a voter

-28-

must complete an advance mail ballot application, which is available on line, in person, by mail or by email. Id. at 63–64. The process in each county is a little different. Id. at 64. Before 2020, a handful of counties sent advance mail voting applications to all registered voters. Id. In 2020, approximately 50 per cent of counties did so. Id.

In the primary election cycle in 2020, Mr. Caskey's office received twice as many phone calls compared to the 2016 election from all parts of the State. Id. at 66–68. Voters submitted three times as many advance ballot applications, compared to 2016, and more than 90 per cent of those voters submitted ballots. Id. at 75, 85. The added phone calls increased his office's workload. Id. at 67. The phone calls did not pertain to novel questions, but remained "consistent with previous elections." The only new questions had to do with COVID-19. Id. at 68. According to Mr. Caskey, the 2020 elections "were successful and . . . were conducted according to Kansas law, and . . . voters were allowed to vote privately, securely, accurately and had their vote counted for who they intended to vote for." Id. at 81–82; Plaintiffs' Exhibits In Support Of Their Motion For Preliminary Injunction (Doc. #43-2 Exhibit 7 11.16.20 Letter from Sec. of State).

Mr. Caskey testified that duplicate advance ballot applications impact the integrity of the election process because they take more time. Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 69. He testified that while it typically takes one to three minutes to process an initial ballot application, a duplicate application "dramatically" increases the amount of time needed. Id. The Election Voter Information System ("ELVIS") tracks registered voters in Kansas in real time. Id. at 71. Outside organizations may request this information from Mr. Caskey's office. Id. As it gets closer to the election, however, more requests come in and it takes more time to update ELVIS. Id. at 72.

Mr. Caskey testified that his office will work with the "appropriate stakeholders" to

-29-

determine what regulations under HB 2332 will look like. Id. at 74. The goal is for regulations to take effect before the primary election in August of 2022, which will require at least three or four months of processing time. Id.

Mr. Howell, Shawnee County Elections Commissioner, testified that before 2020, Shawnee County did not proactively mail advance ballot applications to all registered voters, but voters could use the election web site to retrieve applications. Id. at 89. In 2020, Shawnee County proactively mailed a blank application to each registered voter. Id. at 90. Because ELVIS updated the voter database every day, Shawnee County did not pre-populate the ballot application forms with personalized information. Id. at 92.

In 2020, Shawnee County received 24,699 advance mail ballot applications, of which 2,955 were duplicates. Shawnee County had a budget overrun of $400,000 for the 2020 election, with around $20,000 due to duplicate ballot applications. Id. at 96. Every ballot application is tracked against ELVIS to ensure that no voter receives more than one mail ballot. If ELVIS indicates that a voter may be submitting a duplicate ballot application, a local election official must verify that the name, address and signature match the voter record on file and check identifying information, such as driver's license number and date of birth. Id. at 96–97. If the ballot application is not a duplicate, the official must process the application and mail a ballot to the voter within 48 hours. Id. at 104. A voter often has legitimate reasons to submit more than one ballot application, such as changes in personal information or mailing addresses. Id. at 102. If the ballot application is a true duplicate, the election official engages what is called a "cure process." Id. at 98. The first stage of the cure process is to contact the voter, either by email, mail or phone call, to make certain "that we know who the person is, we know who we're sending it to, and that it's handled correctly." Id. at 98–99. This process may take anywhere from five to ten minutes on average but may take

-30-

up to 30 minutes if it is not easily resolved.  Id. at 99.  The cure process is not just limited to duplicate ballot applications; some applications enter the process because the application is missing information, a voter forgot to sign the application, a voter failed to include a driver's license number or other reasons.  Id. at 102.  In 2020, the Shawnee County election office hired 25 to 30 people to handle cure processes and process applications within the required 48 hours.  Id. at 100–01.  Mr. Howell's office did not anticipate receiving as many mail ballot applications as it did.  Id. at 101.

Ms. Schmidt served as the Johnson County Election Commissioner for 11 years, first from 1995 to 2005 and then again in 2020.  Id. at 111.  In 2020, Johnson County mailed more than 165,000 mail ballot applications and processed a little more than 200,000 applications.  Id. at 112.  Before 2020, Johnson County did not proactively send out actual advance mail voting applications to all registered voters.  In 2020, it changed its policy.  Id. at 113.  In 2020, Johnson County received well more than three times as many ballot applications, compared to typical presidential election years.  Id. at 112–13.  Before 2020, Johnson County received some duplicate ballot applications, but not as many as it did in 2020.  Id. at 113.  The processing time for each duplicate application ranged from five to ten minutes.  Id. at 114.  After the 2020 election, Ms. Schmidt tweeted that the Kansas general election was both "historic and successful."  Id. at 118.

## B. Likelihood Of Success On The Merits

Plaintiffs contend that they are likely to succeed on the merits of their constitutional claims that HB 2332 violates their rights under the First and Fourteenth Amendments and the Dormant Commerce Clause.  Plaintiffs' Memorandum Of Law In Support Of Motion For Preliminary Injunction (Doc. #25) at 11, 22; see also supra Section I.C.1–4.  Defendants argue that plaintiffs are unlikely to succeed on the merits because their activities do not involve speech under the First

-31-

Amendment (let alone core political speech), and the restrictions do not contravene the Dormant Commerce Clause.   Defendants also argue that even if the restrictions implicate the First Amendment, they must be reviewed under the Anderson-Burdick test, Anderson-Celebrezze, 460 U.S. 780 (1983); Burdick v. Takushi, 504 U.S. 428 (1992), and that because HB 2332 imposes "reasonable, neutral, non-discriminatory prophylactic measures," plaintiffs will not be entitled to relief.   Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 16–17.

As noted above, plaintiffs sufficiently allege that HB 2332 violates their rights to engage in protected speech and expressive conduct under the First Amendment.   The Court therefore addresses the likelihood that plaintiffs will eventually prevail on those claims.

### 1.   What Level Of Scrutiny Is Warranted?

To determine the likelihood of plaintiffs' eventual success on the merits, the Court must determine which level of scrutiny applies: strict scrutiny or the Anderson-Burdick balancing test. See Chandler v. City of Arvada, Colo., 292 F.3d 1236, 1241 (10th Cir. 2002); Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson, 236 F.3d 1174, 1196 (10th Cir. 2000). Federal courts often disagree on what level of scrutiny applies to state election and voter registration laws.  Plaintiffs argue that the Ballot Application Restrictions are subject to strict or "exacting scrutiny" because they restrict plaintiffs' ability to engage in core political speech.[7] Defendants argue that because the restrictions do not target speech, the Court should analyze them under the more flexible Anderson-Burdick balancing test.   Defendants' Response To Plaintiffs'

---

[7]      Specifically, plaintiffs argue that strict scrutiny applies because HB 2332 (1) abridges their core political speech, (2) limits their speech based on content, viewpoint and speaker identity and (3) curbs the overall quantum of speech available to the election or voting process.  Complaint (Doc. #1), ¶¶ 60–61, 69–72, 80–82, 88–89.

Motion For A Preliminary Injunction (Doc. #29) at 13; see Anderson, 460 U.S. at 789; Burdick, 504 U.S. at 433–34.

Although voting is of the "most fundamental significance under our constitutional structure," the right to vote in any manner and the right to associate for political purposes through the ballot is not absolute.  Utah Republican Party, 892 F.3d at 1076–77 (quoting Burdick, 504 U.S. at 433).  The Constitution grants states the authority to regulate the "Times, Places, and Manner" of elections.  Id. at 1076 (citing Tashjian, 479 U.S. at 217); U.S. Const. art. 1, § 4, cl.1.  When a state invokes its constitutional authority to regulate elections, an individual's right to vote and associate with others may be affected.  Anderson, 460 U.S. at 788; see Timmons, 520 U.S. at 358 ("States may, and inevitably must, enact reasonable regulations of parties, elections and ballots to reduce election- and campaign-related disorder").  An example of permissible regulation is a decision to close the polls at 7:00 pm instead of 8:00 pm.  Utah Republican Party, 892 F.3d at 1077.  In evaluating the validity of a state election regulation under Anderson-Burdick, a Court applies a flexible standard, "weigh[ing] the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against the precise interests which the State advances to justify the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden plaintiffs' rights.  Fish v. Schwab, 957 F.3d 1105, 1122 (10th Cir. 2020) (citing Burdick, 504 U.S. at 434).  The degree of scrutiny "will wax and wane with the severity of the burden imposed on the right to vote in any given case; heavier burdens will require closer scrutiny; lighter burdens will be approved more easily."  Fish, 957 F.3d at 1124 (quoting Burdick, 504 U.S. at 434).

The Supreme Court has declined to apply Anderson-Burdick to cases which govern election-related speech rather than the "mechanics of the electoral process."  McIntyre v. Ohio

-33-

Elections Comm'n, 514 U.S. 334, 345 (1995); see also Lerman v. Bd. of Elections in City of New York, 232 F.3d 135, 146 (2d Cir. 2000) ("Restrictions on core political speech so plainly impose a severe burden that application of strict scrutiny clearly will be necessary") (citing Buckley v. Am. Const. L. Found. Inc., 525 U.S. 182, 208 (1999) (Thomas, J., concurring)). Strict scrutiny applies to restrictions on core First Amendment activities. See Yes On Term Limits, Inc. v. Savage, 550 F.3d 1023, 1028–29 (10th Cir. 2008). Under strict scrutiny, a state must assert a significant and compelling government interest which is sufficiently narrowly tailored to serve that interest. See Perry Educ. Ass'n. v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45 (1983); see also Dias v. City & Cnty. of Denver, 567 F.3d 1169, 1181 (10th Cir. 2009) ("If a legislative enactment burdens a fundamental right, the infringement must be narrowly tailored to serve a compelling government interest.").

The Tenth Circuit has applied the Anderson-Burdick test, which it has characterized as a "highly fact specific inquiry," when deciding the "constitutionality of content-neutral regulation of the voting process." Libertarian Party of N.M. v. Herrera, 506 F.3d 1303, 1308 (10th Cir. 2007); Campbell v. Buckley, 203 F.3d 738, 745 (10th Cir. 2000). It acknowledges that strict scrutiny must be applied, however, "where the government restricts the overall quantum of speech available to the election or voting process." Campbell, 203 F.3d at 745. In fact, the Tenth Circuit has expressly identified circumstances which merit strict scrutiny: restrictions on campaign expenditures, the available pool of political petition circulators or other supporters of an initiative or candidate, or the anonymity of such supporters. Id. Other courts have noted that some laws which govern elections, particularly election-related speech and associations, go beyond the intersection between voting rights and election administration, and veer into the area where "the First Amendment 'has its fullest and most urgent application.'" Tennessee State Conf. of NAACP

-34-

v. Hargett, 420 F. Supp. 3d 683, 701 (M.D. Tenn. 2019) (quoting Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 223 (1989)).

HB 2332 addresses more than the time, place or manner of election administration, and impacts speech in a way that is not minimal.  See Utah Republican Party, 892 F.3d at 1076–77. The Ballot Application Restrictions regulate First Amendment-protected activity in ways that are not merely incidental; in effect, they limit "the overall quantum of speech available."  Campbell, 203 F.3d at 745; see McCullen v. Coakley, 573 U.S. 464, 489 (2014) ("Commenting on matters of public concern [is] classic form[] of speech that lie[s] at the heart of the First Amendment. When the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden.") (quoting Schenck v. Pro-Choice Network of W. New York, 519 U.S. 357, 377 (1997)).  HB 2332 goes beyond invoking the State's constitutional authority to regulate election processes and involves direct regulation of communication among private parties who are advocating for particular change—more voting by mail, especially in under-represented populations.  HB 2332 significantly inhibits communication with voters about proposed political change and eliminates voting advocacy by plaintiffs and other out-of-state entities, based on the content of their message and the residency of the advocate.  Accordingly, the Court applies strict scrutiny to evaluate plaintiffs' likelihood of success on the merits.  Campbell, 203 F.3d at 745; McIntyre, 514 U.S. at 346 (limitations on political expression subject to strict scrutiny) (citing Meyer v. Grant, 486 U.S. 414, 420 (1988)).

Before the Court addresses plaintiffs' likelihood of success under the strict scrutiny standard, it notes that on this record, the difference between strict scrutiny and the Anderson-Burdick balancing framework is not necessarily relevant.  Anderson-Burdick falls back to a "less-searching examination closer to rational basis" when the challenged law is "minimally

-35-

burdensome" on the exercise of constitutional rights. Ohio Democratic Party v. Husted, 834 F.3d 620, 627 (6th Cir. 2016) (citing Burdick, 504 U.S. at 434). If the burden is "severe," however, Anderson-Burdick leads to strict scrutiny, with restrictions failing unless they are narrowly tailored to advance compelling state interests. Id. (citing Burdick, 504 U.S. at 434); Yes On Term Limits, 550 F.3d at 1028 (citing Republican Party of Minn. v. White, 536 U.S. 765, 774–75 (2002)); Schmitt v. LaRose, 933 F.3d 628, 639 (6th Cir. 2019) ("The first, most critical step is to consider the severity of the restriction" and if law imposes severe burdens on plaintiffs' rights, apply strict scrutiny).

Plaintiffs have produced evidence of significant burdens associated with HB 2332, and defendants have provided almost no factual basis for disputing plaintiffs' claims that HB 2332 will drastically limit the number of voices advocating for the politically controversial topic of voting by mail, limit the audience which proponents can reach and make it less likely that proponents will gather the necessary support to continue sharing their message. See Chandler, 233 F. Supp. 2d at 1311 (citing Meyer, 486 U.S. at 422; Meyer, 120 F.3d at 1099). HB 2332 will have the inevitable effect of reducing the total quantum of speech on an important public issue. Plaintiffs have shown a sufficiently heavy burden on First Amendment rights to justify a significantly more demanding standard of review than the "rational basis" standard which defendants seek to satisfy under Anderson-Burdick. For this reason, on this record, plaintiffs' likelihood of success on the merits does not depend on whether the Court applies the Anderson-Burdick balancing test.

2.   Strict Scrutiny Analysis

To survive strict scrutiny, defendants must show that the restrictions of HB 2332 are narrowly tailored to serve a compelling state interest. Yes On Term Limits, 550 F.3d at 1028 (citing Republican Party of Minn., 536 U.S. at 774–75). Here, defendants identify three

-36-

government interests at issue: "avoiding fraud, minimizing voter confusion, and facilitating an orderly administration of the electoral process." Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 2. The Court analyzes each government interest in turn.

### a.     Preventing Voter Fraud

Defendants argue that HB 2332 prevents voter fraud because it limits the number of advance ballot applications that each Kansas voter may receive. Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 15. They argue that when a voter receives more than one ballot application, it invites fraud, which the State has a strong interest in avoiding. Id. Fraud may affect the outcome of a close election, dilute the right of citizens to cast ballots that carry the appropriate weight and undermine public confidence in the fairness of elections and legitimacy of the announced outcome. Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2340 (2021); see also Crawford, 553 U.S. at 191.

Defendants' argument has superficial appeal, but it actually boils down to an issue of administrative efficiency. The state employs a rigorous process to make sure that no voter can receive a duplicate mail ballot. Apparently, these procedures are highly effective.[8] The real issue seems to be that the process of preventing duplicate ballots takes more time than the process of

---

[8]     Defendants presented no evidence of any voter fraud effectuated through advance voting by mail, or a single instance in which a voter received duplicate mail ballots. On October 8, 2021, when the Court asked defense counsel about what evidence supported the legislature's rationale for HB 2332, he responded that the State had no legal duty to present evidence of its rationale, citing FCC v. Beach Commc'ns, Inc., 508 U.S. 307 (1993). In Beach Commc'ns, the Supreme Court held that a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if any reasonably conceivable state of facts could provide a rational basis for the classification. Id. at 313–14. It also held that "for purposes of rational-basis review," equal protection does not demand that the legislature or governing decisionmaker articulate the purpose or rationale for the classification. Id. at 315. This case is distinguishable, however, from Beach Commc'ns. This is not an Equal Protection case and the Ballot Application Restrictions are not subject to rational-basis review under Anderson-Burdick or any other test.

dealing with requests for initial ballots.

While preventing voter fraud is a potentially compelling state interest, HB 2332 is not narrowly tailored to prevent voter fraud. HB 2332 does not limit the potential number of applications a voter may receive, because in-state residents may mail Kansas voters any number of advance ballot applications. In-state residents must disclose their name, address and (if the sender is an organization) the name of its president, chief executive officer, or executive director. HB 2332, § 3(k)(1). It seems unlikely that such information deters voter fraud, but the record contains no evidence on that point. If such information does deter voter fraud, the State could allow out-of-state entities to exercise their First Amendment rights after they provide the same information. See Yes On Term Limits, 550 F.3d at 1030; see also Chandler, 292 F.3d at 1242–44. The record contains no evidence that duplicate ballot applications disproportionately originate with out-of-state organizations. When plaintiffs challenge a content-based speech restriction, the State must prove that proposed alternatives would not be as effective as the challenged statute. Ashcroft v. ACLU, 542 U.S. 656, 665 (2004). Defendants have not met that burden in this case.

In Yes On Term Limits, supra, Oklahoma residents challenged a law that created a residency requirement for initiative petition circulators. 2007 WL 2670178 at *1. Initially, the district court found that the state's restriction on non-resident petition circulation was narrowly tailored to serve the compelling state interest of promoting the integrity of the electoral system, with an emphasis on eliminating fraud. Id. at *7–8. The state's main evidence consisted of the allegedly fraudulent practices of a "handful of non-resident circulators." Yes On Term Limits, 550 F.3d at 1030–31. The Tenth Circuit overturned the district court's ruling, finding that the evidence did not support a finding that as a class, non-resident circulators were more likely than resident circulators to engage in fraud. Id. at 1031. It therefore held that Oklahoma had failed to

-38-

prove that banning all non-resident circulators was a narrowly tailored means to prevent fraud. Id. at 1029, 1031.

On this record, defendants have not shown that HB 2332 is narrowly tailored to prevent voting fraud. The record contains no evidence that out-of-state entities are more likely than in-state entities to encourage voter fraud or that HB 2332 is necessary to prevent Kansas voters from receiving duplicate mail ballots. Plaintiffs will likely demonstrate that HB 2332 impermissibly restricts their ability to engage in protected First Amendment activity and that it is not narrowly tailored to serve the admittedly compelling state interest of preventing voter fraud.

b.      Minimizing Voter Confusion

Defendants argue that HB 2332 prevents voter confusion, as it limits the number of advance ballot applications that a Kansas voter may receive and reduces any mistaken belief that the applications originated from election officials. Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 17. The State's interest in minimizing voter confusion is connected to its broader legitimate interest in protecting election integrity. Fish v. Kobach, 189 F. Supp. 3d 1107, 1148 (D. Kan. 2016), aff'd, 840 F.3d 710 (10th Cir. 2016).

With respect to voter confusion, Mr. Caskey testified that local election offices received more phone calls in 2020 than in 2016—an increase which he attributed to voter confusion. Mr. Howell also testified that "after talking with voters," it became clear that plaintiffs and similar entities caused the duplicate ballot applications.[9]

Although minimizing voter confusion is a compelling interest, HB 2332 is not narrowly tailored to serve that interest. Local election offices received more phone calls in 2020, but other

---

[9]      Defendants did not call any witness who claimed to be a "confused voter" or who received numerous ballot applications. Transcript Of Oral Arguments Re: Preliminary Injunction Before The Honorable Kathryn H. Vratil, United States Senior District Judge at 45.

-39-

than calls about COVID-19, the questions received "were consistent with previous elections." Id.

at 68.  The 2020 election had the highest return rate of ballot applications and a record number of

advance ballot votes; in fact, the number of mail-in ballots tripled.  Id. at 85.  Such evidence of

voter confusion is not persuasive, given the record turnout and the fact that other than COVID-19,

voter questions were not different from in previous elections.  Id. at 68.  Furthermore, even if some

voters were confused about receiving duplicate ballot applications, defendants presented no

evidence on how limiting participation by out-of-state speakers or mailing of personalized ballot

applications would serve to prevent that confusion.

In short, defendants have not shown that HB 2332 is narrowly tailored to alleviate voter

confusion.  Plaintiffs are likely to demonstrate that HB 2332 restricts their ability to engage in

protected First Amendment activity and is not narrowly tailored to serve a compelling state

interest.

c.      Ensuring Orderly Administration Of Elections

Defendants argue that HB 2332 ensures orderly administration of elections because it

prevents local election offices from spending limited resources to wade through duplicate

applications for mail ballots.  Defendants' Response To Plaintiffs' Motion For A Preliminary

Injunction (Doc. #29) at 27.  Preserving the integrity and administration of the electoral process is

a compelling state interest.  Fish, 957 F.3d at 1133.

As noted, defendant's witnesses testified about the amount of time which they require to

process a ballot application and ensure it is not a duplicate.  Transcript Of Preliminary Injunction

Motion Hearing (Doc. #45) at 96–99.  When a ballot application is received, the election official

has 48 hours to confirm that the application is not a duplicate, process it and mail a ballot to the

voter.  Id. at 104.  Local election officials employ ELVIS to ensure that no voter who submits more

-40-

than one ballot application receives more than one ballot.  An official takes one to three minutes to process an initial application.  Id. at 69.  If ELVIS indicates that a voter has already submitted an application, the process may take on average five to ten minutes (up to 30 minutes) to determine whether the application is a true duplicate.  Id. at 99, 114.  As noted above, in 2020, both the Shawnee County and Johnson County election offices received duplicate ballot applications. Shawnee County hired 25 to 30 people to handle ballot applications and because its office did not anticipate so many advance applications, Shawnee County went $20,000 over budget in handling duplicate applications.  Id. at 96, 100–01.  Duplicate ballot applications significantly slowed down the Johnson County election office work flow, even with the additional 30 to 40 "temps" hired to help manage the applications.  Id. at 114–15.

While orderly administration of elections is an important government interest, HB 2332 is not narrowly tailored to serve that interest.  Defendants argue that HB 2332 will limit the number of duplicate ballot applications which the local election offices receive, and in turn decrease the amount of resources required to process the applications.  On this record, however, it is not clear that out-of-state entities contribute to duplicate applications in any meaningful way.  The 2020 election cycle presented historic challenges defendants have not tied to advance mail ballot applications that originated with out-of-state residents.  Id. at 95–97.  Before 2020, few local election offices mailed advance ballot applications to all registered voters.  In 2020, for the first time, both Shawnee County and Johnson County proactively did so.  Id. at 89, 113.  Approximately 50 per cent of all counties in Kansas did so.  Id. at 64.  The record contains no evidence about the source of duplicate ballot applications or whether voters submitted duplicate requests because of COVID-19, anticipated delays in postal delivery service or increased interest in voting itself.  The 2020 election cycle had a record number of Kansans register to vote, cast votes in advance, cast

-41-

votes by mail and return their actual ballots. Id. at 85. The 2020 election cycle was not similar to the election cycles in 2008, 2012 or 2016 and the record does not address the obvious reasons for the lack of similarity. Accordingly, while defendants' evidence is credible, it is not persuasive.

Kansas officials publicly declared that the 2020 election was successful, without "any widespread, systematic issues [of] voter fraud, intimidation, irregularities, or voting problems." Secretary Schwab Responds to November Election Delay Suggestion, Kansas Secretary of State (July 30, 2020), https://sos.ks.gov/media-center/media-releases/2020/07-30-20-secretary-schwab-responds-to-november-election-delay-suggestion.html; Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 118. Mr. Caskey testified that the Kansas elections system has 25 years of experience with mail ballot applications, developing institutional knowledge, procedures and infrastructure to "securely process the anticipated increase in mail ballots." Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 83–84. Both statements refute any compelling need to enact HB 2332, and defendants have not shown that HB 2332 is narrowly tailored to ensure the orderly administration of elections. Plaintiffs will likely demonstrate that HB 2332 restricts their ability to engage in protected First Amendment activity and that it is not narrowly tailored to serve a compelling state interest.

Defendants have therefore failed to prove that HB 2332 is narrowly tailored to achieve any of the State's allegedly compelling interests. Given the evidence before the Court, plaintiffs have shown that they are likely to succeed on the merits of their freedom of speech First Amendment claim (Count 1).

For purposes of preliminary injunctive relief, the Court need not inquire into the likely merit of plaintiffs' other three claims.

-42-

C.      **Likelihood Of Irreparable Harm**

Because they are likely to prevail on the merits of their First Amendment freedom of speech claim, plaintiffs argue that absent an injunction, they will suffer irreparable harm.  Defendants argue that plaintiffs will not suffer any harm at all because the statute does not take effect until early 2022, and the election offices cannot accept applications until April 1, 2022.

The Supreme Court and the Tenth Circuit have instructed that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Verlo v. Martinez, 820 F.3d 1113, 1127 (10th Cir. 2016) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)); Heideman v. S. Salt Lake City, 348 F.3d 1182, 1190 (10th Cir. 2003); see also Awad v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary").

Precedent dictates that the Court must treat alleged First Amendment harms "gingerly." Heideman, 348 F.3d at 1190.  Plaintiffs have sufficiently pled that unless enjoined, HB 2332 will limit Kansas voters in navigating the path to ballot access and interfere with plaintiffs' First Amendment rights.  See Verlo, 820 F.3d at 1127.  Such losses are ones that money damages cannot redress, so this factor weighs strongly in favor of an injunction.  See United Utah Party v. Cox, 268 F. Supp. 3d 1227, 1259 (D. Utah 2017).

D.      **Balance Of The Equities**

Plaintiffs argue that the prospect of substantial harm to them dramatically outweighs any harm which an injunction would impose on defendants.  Plaintiffs' Memorandum Of Law In Support Of Motion For Preliminary Injunction (Doc. #25) at 29.  Defendants argue that plaintiffs will suffer no harm, especially compared to the harm which the State will suffer if an injunction is granted because whenever a State is "enjoined by a court from effectuating statutes enacted by

-43-

representatives of its people, it suffers a form of irreparable injury." Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 29–30 (citing Maryland v. King, 567 U.S. 1301, 1303 (2012)).

Injury to plaintiffs who are deprived of First Amendment rights almost always outweighs the potential harm to the government if an injunction is granted. Verlo v. City & Cnty. of Denver, Co., 124 F. Supp. 3d 1083, 1095 (D. Colo. 2015), aff'd sub nom. Verlo v. Martinez, 820 F.3d 1113 (10th Cir. 2016). Here, the restrictions would substantially impair, if not effectively eliminate, plaintiffs' ability to convey their message to their target audience in a timely and effective manner. For VoteAmerica, including the personalized ballot application in their communications packet is the most "effective way to communicate that you find it important for someone to do something." Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 16. For VPC, these distributions increased the voters' likelihood of returning the ballot applications to their local Kansas election offices. Id. at 46–47. The response rate would drop significantly without these packets, as most of VPC's targeted audience do not own printers or cannot access the internet to secure an advance ballot application. Id. at 50.

In countering these injuries, the State has not provided evidence that any potential injury from an injunction is fairly traceable to plaintiffs or other out-of-state organizations. See Verlo, 820 F.3d at 1127. At the evidentiary hearing and at oral argument, defendants cited no evidence that duplicate ballot applications disproportionately originate with out-of-state speakers or that voter confusion results from plaintiffs' mailings, as opposed to mailings by in-state organizations or topics that have nothing to do with voting by mail. Mr. Caskey stated that county officials received ballot applications with improper information but did not tie those incorrect applications

to plaintiffs or to other out-of-state organizations.[10]   Defendants also failed to present evidence that the time required to process duplicate applications in 2020 exceeded processing times in 2008, 2012 or 2016 on account of specific problems which HB 2332 purports to address.  Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 75, 85.   Defendants posited no numbers which showed anything more than "light administrative burdens," which might not even be solved by an out-of-state ban, since Kansans may still solicit applications by mail from in-state residents. See Fish, 840 F.3d at 754–55.

HB 2332 does not appear to address any immediate problem and delayed implementation is not likely to cause material harm, even if it is eventually found to be constitutional and enforceable.  Awad, 670 F.3d at 1132.  In weighing the balance of equities, the substantial denial of fundamental constitutional rights clearly outweighs the prospect of demonstrated administrative burdens on the Kansas Secretary of State and local election offices.  See Fish, 840 F.3d at 755.

Plaintiffs make a strong showing that their threatened injury outweighs any potential harm to defendants in granting this injunction.

### E.      The Public Interest

Plaintiffs argue that implementation of HB 2332 will also harm the public and that it is always in the public interest to prevent a violation of a party's constitutional rights.  Plaintiffs' Memorandum Of Law In Support Of Motion For Preliminary Injunction (Doc. #25) at 30; see also Verlo, 820 F.3d at 1127.   Defendants argue that public confidence in government will be undermined if the Court invalidates a statute that has made its way through the legislative process. Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 30.

---

[10]      Such a connection is theoretical at best, because in 2020 out-of-state organizations mailed ballot applications and "approximately 50 percent of the counties sent out an application to every registered voter."  Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 64.

The Tenth Circuit repeatedly acknowledges the strong public interest in protecting First Amendment rights. Awad, 670 F.3d at 1132; Verlo, 820 F.3d at 1127–28 (citing Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir. 2005)); Am. C.L. Union v. Johnson, 194 F.3d 1149, 1163 (10th Cir. 1999).   With the other three factors leaning in favor of granting the preliminary injunction and the critical constitutional issues which still need to be decided, the public interest factor also leans in favor of granting the preliminary injunction.

**IT IS THERFORE ORDERED** that Defendants' Motion To Dismiss Plaintiffs' Complaint (Doc. #26) filed July 9, 2021 is **OVERRULED**.

**IT IS FURTHERED ORDERED** that Plaintiffs' Motion For Preliminary Injunction (Doc. #24) filed July 8, 2021 is **SUSTAINED**.   The Court hereby enjoins enforcement of Sections 3(k)(2) and 3(1)(1) of HB 2332.   Pending further order of the Court, this Order shall remain effective until the conclusion of the case.

Dated this 19th day of November, 2021 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER, | |
| Plaintiffs, | Civil Action No. 2:21-CV-2253 |
| v. | |
| SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; DEREK SCHMIDT, in his official capacity as Attorney General of the State of Kansas; STEPHEN M. HOWE in his official capacity as District Attorney of Johnson County, | |
| Defendants. | |

**STIPULATED ORDER FOR PERMANENT INJUNCTION
AND DECLARATORY JUDGMENT**

WHEREAS Plaintiffs VoteAmerica and Voter Participation Center (collectively, "Plaintiffs") filed a Complaint in this case against Defendants Scott Schwab, in his official capacity as Secretary of State of the State of Kansas; Derek Schmidt, in his official capacity as Attorney General of the State of Kansas; and Stephen M. Howe in his official capacity as District Attorney of Johnson County (collectively, "Defendants");

WHEREAS Plaintiffs allege that Defendants' enforcement of sections 3(k)(2) and 3(*l*)(1) of Kansas House Bill (HB) 2332 (codified at Kan. Stat. Ann. § 25-1122) violate their rights under the First and Fourteenth Amendments to the U.S. Constitution, and, as to section 3(*l*)(1) only, the Commerce Clause of the U.S. Constitution, as more fully set out in the Complaint;

WHEREAS Plaintiffs' Complaint seeks declaratory and injunctive relief to redress the alleged unlawful conduct, attorneys' fees, and costs;

WHEREAS Plaintiffs filed a motion to preliminarily enjoin Defendants from enforcing the challenged sections, and the Court issued an order granting Plaintiffs' motion and preliminarily enjoined Defendants from enforcing Sections 3(k)(2) and 3(*l*)(1) of HB 2332;

WHEREAS Defendants answered Plaintiffs' Complaint and did not appeal the Court's entry of a preliminary injunction;

WHEREAS Defendants as well as Plaintiffs wish to resolve this matter in part;

WHEREAS the Parties have stipulated to the entry of this Order and agree to be bound by its terms;

WHEREAS Defendants, without admitting any allegations in the Complaint beyond those admitted in their answer, do not object to entry of partial judgment in favor of Plaintiffs with respect to the entry of this Order;

WHEREAS Defendants stipulate that they will not appeal this Order;

WHEREAS entry of this stipulated Order will partially resolve Plaintiffs' freedom of speech, freedom of association, and overbreadth claims (Counts I, II, and III of the Complaint, respectively) as to section 3(*l*)(1) of HB 2332 and fully resolve Plaintiffs' dormant Commerce Clause claim (Count IV of the Complaint);

WHEREAS this stipulated Order will be entered under Federal Rule of Civil Procedure 65 and will constitute a final judgment in this matter as to the aforementioned claims;

WHEREAS the parties will continue to litigate Plaintiffs' claims (Counts I, II, and III) as to section 3(k)(2) of HB 2332, but the parties further stipulate that section 3(k)(2) does not apply to persons who mail or cause to be mailed an application for an advance voting ballot with any portion completed to a registered voter where the portion of such application completed prior to mailing is completed at the request of the registered voter.  For the avoidance of doubt, the parties

2

stipulate that where a registered voter asks a person to mail or cause to be mailed an advance voting ballot application to the registered voter, and that person does so, that person does not "solicit[] by mail a registered voter to file an application for an advance voting ballot" as set forth in section 3(k)(1) of HB 2332;

THEREFORE, the Court HEREBY ORDERS:

1.      Section 3(*l*)(1) of HB 2332 violates the First and Fourteenth Amendments, both facially and as-applied to Plaintiffs.

2.      Defendants, their agents, employees, representatives, attorneys, and all persons in active concert or participation therewith, are permanently enjoined from enforcing section 3(*l*)(1) of HB 2332, including the penalties contained therein.

3.      Plaintiffs' claims for declaratory and injunctive relief under the dormant Commerce Clause (Count IV) shall stand dismissed as moot.

4.      Plaintiffs are the prevailing parties on Counts I, II, and III with respect to section 3(*l*)(1), and are entitled to an award of attorneys' fees and costs of this suit pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988.  Within 45 days of this Order the parties shall attempt to reach an agreement regarding the amount of attorneys' fees and costs due to Plaintiffs.  If they are unable to do so, Plaintiffs may file a motion for attorneys' fees and costs.

5.      Defendants, their agents, employees, representatives, attorneys, and all persons in active concert or participation therewith, are permanently enjoined from enforcing section 3(k)(2) of HB 2332 against persons who mail or cause to be mailed an application for an advance voting ballot to a registered voter where the registered voter has asked such person(s) to mail or cause to be mailed an application for an advance voting ballot to such registered voter.

3

**IT IS SO ORDERED.**


Dated: ___2/25/2022___        ___s/ Kathryn H. Vratil_____
                              U.S. District Judge Kathryn H. Vratil

**We agree to abide by the terms of this Order**

Respectfully Submitted,

By: */s/ Mark P. Johnson*
Mark P. Johnson
KS Bar #22289, D. Kan. #22289
Wade Carr KS Bar #25105, D. Kan. #25105
DENTONS US LLP
4520 Main Street, Suite 1100
Kansas City, MO 64105
816/460-2400
816/531-7545 (fax)
mark.johnson@dentons.com
wade.carr@dentons.com

Danielle M. Lang (*pro hac vice*)
Robert N. Weiner (*pro hac vice*)
Alice C.C. Huling (*pro hac vice*)
Aseem Mulji (*pro hac vice*)
Hayden Johnson (*pro hac vice*)
CAMPAIGN LEGAL CENTER
1101 14th Street, NW, St. 400
Washington, D.C. 20005
(202) 736-2200
DLang@campaignlegalcenter.org
RWeiner@campaignlegalcenter.org
AHuling@campaignlegalcenter.org
AMulji@campaignlegalcenter.org
HJohnson@campaignlegalcenter.org

Jonathan K. Youngwood (*pro hac vice*)
Meredith D. Karp (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
bonnie.jarrett@stblaw.com

*Attorneys for Plaintiffs*

Dated: February 22, 2022

**We agree to abide by the terms of this Order**

Respectfully Submitted,

By: */s/ Bradley J. Schlozman*
Bradley J. Schlozman (KS Bar #17621)
Scott R. Schillings (Bar # 16150)
HINKLE LAW FIRM LLC
1617 North Waterfront Parkway, Suite 400
Wichita, KS 67206
Tel.: (316) 267-2000
Fax: (316) 630-8466
E-mail: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com

*Attorneys for Defendants*

Dated: February 22, 2022

5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| VOTEAMERICA and<br>VOTER PARTICIPATION CENTER,<br><br>*Plaintiffs,*<br><br>vs.<br><br>SCOTT SCHWAB, in his official capacity as<br>Secretary of State of the State of Kansas;<br>DEREK SCHMIDT, in his official capacity as<br>Attorney General of the State of Kansas; and<br>STEPHEN M. HOWE, in his official capacity as<br>District Attorney of Johnson County,<br><br>*Defendants.* | Case No. 2:21-cv-02253-KHV-GEB |

**PRETRIAL ORDER**

On September 27, 2022, U.S. Magistrate Judge Gwynne E. Birzer conducted a pretrial conference in this case by telephone. Plaintiffs VoteAmerica and Voter Participation Center ("VPC") appeared through counsel Jonathan Youngwood, Meredith, Karp, Hayden Johnson, and Nicole Palmadesso. Defendants Scott Schwab, Derek Schmidt, and Stephen M. Howe appeared through counsel Bradley J. Schlozman and Scott Schillings.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

1.     **PRELIMINARY MATTERS.**

a.     **Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. § 1331 and is not disputed.

**b.**   **Personal Jurisdiction.**   The court's personal jurisdiction over the parties is not disputed.

**c.**   **Venue.**   Venue in this court is not disputed.

**d.**   **Governing Law.**   Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues remaining in this case are governed exclusively by the following federal laws:  U.S. Const. amend. I; U.S. Const. amend. XIV; and 42 U.S.C. § 1983.

**2.**   **STIPULATIONS.**

Counsel for the parties have conferred in good faith to prepare comprehensive lists of stipulated facts and exhibits.   Although counsel have made substantial progress on these stipulations as summarized below, there may be additional facts and exhibits to which the parties may be able to stipulate for purposes of trial.   The court's ruling on any summary-judgment motions and/or any motions to exclude expert testimony is also likely to impact what stipulated facts and exhibits would be relevant at trial.

**a.**   The following facts are stipulated:

**i.**   Defendant Kansas Secretary of State Scott Schwab does business in and is an elected official in the state of Kansas.

**ii.**   Defendant Schwab is the Chief Election Officer for the State of Kansas.

**iii.**   As the Chief Election Official for the State of Kansas, Defendant Schwab is responsible for overseeing all Kansas elections and administering the State's election laws and regulations. Defendant Schwab also issues guidance and instruction to county election officers on a range of election procedures and requirements. Kan. Stat. Ann. § 25-124.

**iv.**   Defendant Kansas Attorney General Derek Schmidt does business in and is an elected official in the state of Kansas.

**v.**   Defendant Schmidt is the Chief Legal Officer for the State of Kansas.

2

**vi.** Defendant Johnson County District Attorney Stephen M. Howe does business in and is an elected official in the state of Kansas.

**vii.** Plaintiff VPC is a Washington, D.C.-based 501(c)(3) nonprofit organization founded in 2003.

**viii.** Plaintiff VPC's mission is to provide voter registration, early voting, vote by mail, and get out the vote resources and information to traditionally underserved groups, including young voters, voters of color, and unmarried women.

**ix.** Plaintiff VPC designs and implements direct mail programs to send mass mailers to their mission populations.

**x.** Plaintiff VPC sent advance mail voting mailers to eligible Kansas voters during the 2020 election cycle.

**xi.** The Election Voter Information System ("ELVIS") is the Kansas state voter registration database.

**xii.** Election officials in Kansas's 105 counties are responsible for maintaining the voter files for voters within their respective counties and ELVIS reflects the voter data maintained by those county officials.

**xiii.** When a voter registration application is received by a county election office, that office inputs the voter's registration information into the state's central database and thereby creates a voter record in ELVIS.

**xiv.** ELVIS is a dynamic system that reflects in real-time changes that are made to individual voter files. County election officials input information on voters, including the voters' registration and advance mail ballot information.

**xv.** Kansas conducted a post-election audit after the 2020 general election.

**xvi.** The 2020 post-election audit did not reveal any systemic fraud in the Kansas general election.

**xvii.** On February 10, 2021, House Bill No. 2332 ("HB 2332") was formally introduced in the Kansas Legislature.

**xviii.** HB 2332 pertains to various election-related matters including the solicitation by mail of advance voting ballot applications.

**xix.** After the amendment process, HB 2332 was passed by the Kansas House (83-38) and Senate (27-11) and was presented to Governor Laura Kelly on April 16, 2021.

3

**xx.**    Governor Kelly vetoed HB 2332 and returned the bill to the House on April 23, 2021.

**xxi.**    On May 3, 2021, the Legislature overrode the governor's veto of HB 2332 (voting 86-37 in the House and 28-12 in the Senate).

**xxii.**    Section 3(k)(2) of HB 2332 (codified at K.S.A. 25-1122(k)(2)) states that "The application for an advance voting ballot included in [a mail solicitation to a registered voter to file an advance voting ballot application] shall be the official application for advance ballot by mail provided by the secretary of state. No portion of such application shall be completed prior to mailing such application to the registered voter." This statute will be referred to as the "Personalized Application Prohibition."

**xxiii.**    Section 3(k)(2) of HB 2332 does not apply to persons who mail or cause to be mailed an application for an advance voting ballot with any portion completed to a registered voter where the portion of such application completed prior to mailing is completed at the request of the registered voter.  In other words, where a registered voter asks a person to mail or cause to be mailed an advance voting ballot application to such registered voter, and that person does so, that person does not "solicit[] by mail a registered voter to file an application for an advance voting ballot" as set forth in Section 3(k)(1) of HB 2332.

**xxiv.**    Section 3(*l*)(1) of HB 2332 provides that "No person shall mail or cause to be mailed an application for an advance voting ballot, unless such person is a resident of this state or is otherwise domiciled in this state."  This statute will be referred to as the "Out-of-State Distributor Ban."

**xxv.**    At passage, Sections 3(k)(2) and 3(*l*)(1) of HB 2332 were scheduled to go into effect on January 1, 2022.

**xxvi.**    In a Memorandum & Order on November 19, 2021 (and a *nunc pro tunc* Order on December 15, 2021), District Judge Vratil preliminarily enjoined enforcement of Sections 3(k)(2) and 3(*l*)(1) of HB 2332.

**xxvii.**    Defendants, via a Stipulation with Plaintiffs that the Court entered on February 25, 2022, agreed to a permanent injunction against the enforcement of the Out-of-State Distributor Ban as violative of Plaintiffs' First and Fourteenth Amendment rights.  Those claims have thus been fully resolved and are no longer part of this litigation (other than Plaintiffs' request for their attorney fees as prevailing parties).

**xxviii.**    The only claims remaining in dispute pertain to the Personalized Application Prohibition.

**xxix.**    The Personalized Application Prohibition does not cover Plaintiff VoteAmerica's conduct because Plaintiff VoteAmerica  mails personalized

4

advance voting ballot applications to voters who have requested them via its interactive website. Thus, Plaintiff VoteAmerica has not participated in any discovery in this case.

xxx.    Generally, to vote by mail in Kansas, a voter must complete an advance voting ballot application and return it to the county election office in the county in which the voter is registered to vote.

xxxi.   If an advance voting ballot application has been timely submitted to the county election office, an individual working in such office processes the application and, if the county accepts the application, the county will mail the voter an advance ballot packet.

xxxii.  Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the General Election and the Tuesday of the week preceding such General Election.  K.S.A. 25-1122(f)(2).

xxxiii. Other than voters entitled to receive ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq.*, counties cannot transmit advance ballots to voters prior to the 20th day before the election for which an application has been received.  K.S.A. 25-1123(a) and 25-1220.  Ballots must be issued to advance voting voters within two business days of the receipt of the voter's application by the county election office starting on the commencement of the 20-day period before the election. K.S.A. 25-1123(a).

xxxiv.  If a received advance voting ballot application does not contain sufficient information or if the information is illegible, or there is a signature mismatch or missing signature, the county election office must attempt to contact the voter to obtain the correct information and/or signature before Election Day.  K.A.R. 7-36-7 and 7-36-9; K.S.A. 25-1122(e).  If the voter cannot be contacted, or it would be impracticable to make contact before the election, the voter will be mailed a provisional ballot.  K.A.R. 7-36-7(f).

xxxv.   Once an advance voting ballot application has been received and processed by the county election office, the fact and date of such processing is recorded in ELVIS.  The office also documents in ELVIS the date on which it transmits the regular or provisional ballot to the voter.

xxxvi.  The 2020 General Election in Kansas had record turnout (1,375,125 total votes cast, a 70.9% turnout rate) and a steep increase in advance mail voting (459,229 voted by mail).  This compared to 1,039,085 total votes cast in the 2018 General Election, a 56.4% turnout rate, with 152,267 votes cast by mail.  It also compared to 1,225,667 total votes cast in the 2016 General Election, a 67.4% turnout rate, with 173,457 votes having been cast by mail. *See* https://sos.ks.gov/elections/elections-statistics.html.

xxxvii. Plaintiff VPC sent advance voting ballot application mailers to Kansas voters in connection with the 2020 General Election.

xxxviii. Plaintiff VPC's advance ballot application mailers contained a cover letter, a Kansas advance voting ballot application, and a pre-paid, pre-addressed envelope that voters could use to send a completed application to the appropriate county election office.

xxxix. In 2020, VPC received Kansas active voter registration lists through its vendor (Catalist) on January 31, April 10, and September 15.

xl. VPC sent five "waves" of advance voting ballot application mailers to Kansas voters in advance of the 2020 General Election.  The dates were as follows:

 a. Wave A: data uploaded on 7/6/2020, mailer expected in homes 8/17/2020

 b. Wave B: data uploaded on 7/27/2020, mailer expected in homes 8/26/2020

 c. Wave C: data uploaded on 8/10/2020, mailer expected in homes 9/8/2020

 d. Wave D: data uploaded on 8/24/2020, mailer expected in homes 9/16/202

 e. Wave E: data uploaded on 8/24/2020, mailer expected in homes 9/28/2020

b. The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

 i. HB 2332, Caskey Deposition Exhibit 2

 ii. Chapter I. Voter Registration, Caskey Deposition Exhibit 5

 iii. Application for Advance Ballot by Mail, Form AV1M, Caskey Deposition Exhibit 7

 iv. Email correspondence, Caskey Deposition Exhibit 8, KS000209VA – 215VA

 v. PowerProfile Processing Early Voters, Caskey Deposition Exhibit 8a, KS000216VA – 231VA

6

    **vi.**          Chapter II. Election Administration, Caskey Deposition Exhibit 9, KS000121VA – 201VA

    **vii.**        Email correspondence, Caskey Deposition Exhibit 10, KS000233VA – 237VA

    **viii.**     Email correspondence, Caskey Deposition Exhibit 15, KS001922VA – 2068VA

    **ix.**          Email correspondence, Caskey Deposition Exhibit 16, VPC000048 – 050

    **x.**           Email correspondence, Caskey Deposition Exhibit 17, KS000001VA – 007VA

**3.**    **FACTUAL CONTENTIONS.**

    **a.**        **Plaintiff Voter Participation Center's Factual Contentions.**

Plaintiff VPC incorporates the stipulated facts regarding HB 2332's legislative history and content. The Personalized Application Prohibition applies to "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot and includes an application for an advance voting ballot in such mailing." HB 2332 § 3(k)(1). A violation of the Personalized Application Prohibition is a class C nonperson misdemeanor. *See id.* § 3(k)(5); K.S.A. §§ 21-6602(a)(3), (b). It contains no scienter requirement, and a violation is punishable by up to one month in jail and/or fines. *Id.* The Personalized Application Prohibition does not limit the number of advance mail voting applications a person or nongovernmental organization may solicit by mail. Put another way, it does not concern duplicative applications sent to registered Kansas voters.

Plaintiff VPC's core mission is to provide voter registration, early voting, vote by mail, and get-out-the-vote resources and information to traditionally underserved groups, including young voters, voters of color, and unmarried women. It encourages these voters to participate in elections through advance mail voting by sending registered voters in its mission populations, among other things, advance mail ballot applications. VPC sent personalized mailers to Kansas voters in 2018 and 2020 and is in the process of sending personalized mailers to Kansas voters for

7

the 2022 general election. VPC intends to send personalized mailers to Kansas voters for future elections.

In the 2020 election cycle, the Kansas Director of Elections confirmed to VPC in writing that its advance mail voting application form and instructions complied with Kansas law and with the forms that the Secretary of State's office uses. VPC provides this notice in order to ensure it includes accurate election information and forms in the mailings it sends to Kansas voters and also to provide the Election Director with an opportunity to provide feedback.

The personalized advance ballot application mailers VPC sends to Kansas voters include a letter encouraging the voter to request and cast an advance ballot; a printed copy of an advance mail voting application obtained directly from the Kansas Secretary of State's website and personalized with the voter's name and address obtained from state registration records via VPC's data vendor; and a postage-paid envelope addressed to the voter's county election office. VPC's mailers include messages expressing VPC's advocacy in favor of mail voting.

**Count I:** VPC believes that intermixing encouragement with information about the mail voting process and a personalized application for the eligible Kansas voter receiving the mailer most effectively conveys its message that the recipient—the person for whom the enclosed application is personalized—should participate via advance mail voting. The Personalized Application Prohibition would limit the overall quantum and content of VPC's speech, would abridge VPC's ability to express its viewpoint on advance mail voting and discriminate against VPC's pro-advance mail voting views, and would stop VPC from engaging in what it believes is the most effective way to communicate its pro-advance mail voting message.

Kansas election officials have indicated that the state held an effective election in 2020 under unprecedented circumstances with the highest percentage of advance mail ballot voters ever

8

experienced in a statewide election. After the 2020 general election Kansas conducted a post-election audit that revealed no systemic fraud in that election. Other Kansas laws, including provisions of HB 2332 not challenged in this lawsuit, address the purported interests raised by Defendants in defense of Section 3(*k*)(2). Moreover, personalized advance mail voting applications with typeface voter information derived from the voter file can and do reduce any perceived burdens on county election officials processing the applications.

**Count II:** VPC consults with and aids other organizations that distribute personalized advance voting applications to Kansas voters. The Personalized Application Prohibition would prevent VPC's collaboration with other pro-voting organizations in this way. It would also eliminate the method and content of speech by which VPC connects with voters at the advance ballot application phase to build a relationship with Kansans for further association and engagement for political expression.

**Count III:** The Personalized Application Prohibition is unconstitutionally overbroad because it would ban distribution of personalized advance mail ballot applications even if the personalized information exactly matches the voter's registration.  Additionally, it has no scienter requirement and carries criminal sanctions. HB 2332 § 3(k)(5); K.S.A. §§ 21-6602(a)(3), (b). Defendants improperly conflate "inaccurately pre-filled and/or duplicate pre-filled advance voting ballot applications." The Personalized Application Prohibition bans any personalized applications (not only those that are "inaccurately pre-filled") and does not ban duplicate applications.

**b.      Defendants' Factual Contentions.**

The only statutory prohibition still at dispute in this case is K.S.A. 25-1122(k)(2), which generally prohibits soliciting voters by mail with an advance voting ballot application that has been pre-filled in whole or in part.  Defendants submit that the Kansas Legislature had strong interests

9

in adopting this Pre-Filled Application Prohibition and the impact on Plaintiffs' First Amendment rights, if any, is outweighed by those State interests.

### i.      *State Interests.*

The proliferation of pre-filled advance voting ballot applications in connection with the 2020 General Election, many of which were completed by VPC (through its sister organization, CVI), caused substantial confusion, frustration, and anger among Kansas voters who received such unsolicited applications from third-parties not affiliated with a state or county election office. These pre-filled applications were replete with data that did not match voters' information in the State's voter file.  The waves of duplicate applications sent to Kansas voters exacerbated the electorate's confusion, frustration, and anger.

The surge of inaccurate and duplicate pre-filled advance voting ballot applications adversely impacted efficient election administration by taxing the ability of overburdened county election offices to timely process such applications and enhanced the possibility that mistakes would be made both in connection with advance voting ballot applications and election administration in general.  VPC's mailing of waves of pre-filled advance voting ballot applications to Kansas voters increased the number of individuals submitting multiple/duplicate applications, thereby increasing the workload of election officials and testing their limits to administer the election efficiently and ensure adequate safeguards.

### a.      Minimizing Voter Confusion / Preserving Voter Confidence

After receiving unsolicited duplicate and/or inaccurate pre-filled advance voting ballot applications from VPC and other third-party organizations, voters across the State contacted their county election offices and the Secretary of State's Office in the months preceding the 2020 General Election to express their confusion, frustration, and anger at what they had received.  Many voters believed that they were required to send in to the county election office any and all

10

applications they received in the mail, particularly those that were partially pre-filled.  Many voters erroneously believed that the county was responsible for mailing out the inaccurate and/or duplicate applications.

VPC's practices contributed greatly to the confusion, frustration, and anger experienced by the Kansas electorate.  In fact, VPC was so concerned about the reliability of the information it was receiving from its vendor, and so uneasy about the accuracy of the data it was using to pre-populate the advance voting ballot applications it had sent to voters, that it felt the need to include only *blank* advance voting ballot applications with subsequent waves of mailings.

Meanwhile, Defendants will demonstrate other problems with VPC's mailings of pre-filled advance voting ballot applications to Kansas voters, including the following:

- Due to the 4-6 week lead time between the date that VPC sent its data to its printer for pre-filling advance voting ballot applications for Kansas voters and the date such applications arrived in voters' mailboxes, *at best*, VPC was using a Kansas voter file from April 10, 2020 to pre-populate the advance voting ballot applications being sent to Kansas voters in connection with the November 2020 election.  Kansas election officials identified multiple voters whom VPC sent advance voting ballot applications in connection with the 2020 General Election, yet whose registration status had been cancelled prior to April 10, 2020.

- Many of the VPC mailer file records had no voter registration number associated with the voter even though every individual in Kansas' voter file has a voter registration number;

- There were multiple pairs of matched records in which two different voters showed the same voter registration number;

- In VPC's first wave of mailing, hundreds of voters to whom it sent pre-filled advance voting ballot applications had had their voter registrations cancelled prior to the date that VPC sent the mailers to the printer; and

- VPC continued to send pre-filled advance voting ballot applications to voters who had already sent in applications or whose voter registration had previously been cancelled.

Individuals whose voter registration has been formally cancelled by the State but who subsequently receives a pre-filled advance voting ballot application encouraging him/her to send

11

that application in for an advance ballot is likely going to be confused as to how to interpret and what to do with such mailing.  The State has a strong interest in avoiding such situations.

Because VPC sent its data to its printer for pre-filling advance voting ballot applications for Kansas voters nearly 4-6 weeks before such mailings were expected to land in the mailbox of such voters, it was virtually guaranteed that voters who promptly completed and sent in such applications to their county election office would receive additional pre-populated application from CVI after submitting the initial one.

VPC's own data reveals that large numbers of duplicate applications were submitted by the Kansas voters whom it targeted in the 2020 General Election.  The problems created by duplicate applications were exponentially disproportionate to anything that had ever previously occurred.  Defendants will present evidence of the number and percentage of duplicate applications in Ford, Shawnee, and Johnson Counties.  The percentage of duplicate advance voting ballot applications in these counties ranged from nine to eighteen percent of all advance voting ballot applications received.

Moreover, the number of duplicate applications likely would have been greater but for the telephone calls that county election officials had with many other confused voters who called to ask whether they were required to submit the duplicate application(s) they had received from outside organizations even though they had already submitted another application.  Election officials frequently had to look up voters' information in ELVIS to determine the status of a prior application and to advise the voter whether he/she needed to send in another one.

VPC further exacerbated this voter confusion and frustration, as well as the toll on county election offices, by instructing voters who might have any concerns about the mailings and pre-

filled applications that they received from VPC to call their respective county election office rather than VPC itself.

### b. Minimizing Potential Voter Disenfranchisement

When an advance voting ballot application is submitted to a county election office with incomplete or inaccurate information, county election officials, when feasible, undertake a "cure" procedure, attempting to contact the voter in an effort to gather the correct information. If election officials are unable to reach the voter or secure the correct information in a timely manner, the voter may ultimately only receive a provisional ballot by mail that may not be counted.

### c. Efficient and Orderly Election Administration

The amount of time that county election officials had to expend reviewing and processing inaccurately pre-filled and/or duplicate advance voting ballot applications in connection with the 2020 General Election was substantial. State law requires that such applications received after the start of early voting must be processed within two business days. Every piece of information on every application must be verified against the information in ELVIS. A voter will be sent an advance ballot only if everything matches. On average, it takes an experienced election official 3-5 minutes to process an accurate, non-duplicative application. It takes election officials as much as 15-30 minutes to process advance voting ballot applications where the information does not match. The burden that processing inaccurate or duplicate advance voting ballot applications has on already overworked election officials is substantial.

Many voters who submitted pre-filled advance voting ballot applications (and thus received advance ballots) also showed up to vote on Election Day. When these voters were told that they would have to vote a provisional ballot, they became confused and often agitated. Having to deal

13

with voters who sent in pre-filled advance voting ballot applications and later attempted to vote in person further burdened election officials.

### ii.     *Problems Created by VPC and Similarly-Situated Entities in Other States*

Kansas was not the only state to be plagued by voter confusion, anger, and frustration from VPC's mailing of pre-filled absentee ballot applications to voters.  Indeed, Defendants will present evidence of problems experienced by other states from VPC's practices.

### iii.     *De Minimis Impact on Plaintiffs' First Amendment Rights*

Defendants dispute that Kansas' Personalized Application Prohibition implicates VPC's First Amendment rights at all.  But even it somehow does, there is no competent or admissible evidence in the record that pre-filling an advance voting ballot application conveys any particular message to voters or that voters understand any such message from such pre-filled application. Nor is there any competent or admissible record evidence that pre-filling the advance voting ballot applications included in its mailers more effectively communicates any message about the benefits of voting by mail than a blank application would.  There is, in short, simply no evidence in the record – other than VPC's own *ipse dixit* – that the Personalized Application Prohibition diminishes (let alone makes it impossible to achieve) their objectives of encouraging broad political participation or expanding the use of advance voting and voting by mail.

Likewise, there is no evidence that the State's Personalized Application Prohibition impedes VPC from associating with either voters or other civic advocacy organizations in pursuit of these goals.  VPC is free to communicate any message it wants in the materials it sends to voters, and it is able to include an advance voting ballot application in those mailers.  It is similarly unrestricted in its right to affiliate with any other organization in furthering its stated objectives.

4. **LEGAL CLAIMS AND DEFENSES.**

a. **Plaintiff VoteAmerica's Claims Have Been Fully Resolved via Stipulation**

Plaintiffs claimed in their Complaint that the enforcement of K.S.A. 25-1122(*l*)(1) would violate their rights under the First and Fourteenth Amendments to the U.S. Constitution, and the Commerce Clause of the U.S. Constitution.  The parties resolved all those claims pursuant to a Stipulation (Doc. 73), which Judge Vratil signed on Feb. 25, 2022.  As part of that Stipulation, the Court permanently enjoined the enforcement of K.S.A. 25-1122(*l*)(1), declared Plaintiffs to be prevailing parties on Counts I-III of the Complaint with respect to that subsection, dismissed as moot the Commerce Clause claim, and directed that Plaintiffs were entitled to attorney fees and costs pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988.  The Court separately directed that Plaintiffs' motion deadline for any fees and expenses in connection with those claims would be extended until 45 days following the issuance of a final judgment in the case.  (Doc. 52).

All of VoteAmerica's claims have been resolved by virtue of the Stipulation.  Only the claims of Plaintiff VPC, which are directed at H.B. 2332 §3(k)(2), remain pending.

b. **Plaintiff Voter Participation Center's Claims.**

Plaintiff asserts that they are entitled to recover upon the following theories, which correspond to Counts I-III of the Complaint:

i. **Count I:** The Personalized Application Prohibition, Section 3(k)(2) in HB 2332, violates Plaintiff's First Amendment rights to freedom of speech. Persuading voters to vote by advance mail ballot and facilitating such voting constitutes core political speech and expressive conduct at the heart of First Amendment protections. The Personalized Application Prohibition unconstitutionally precludes or substantially impairs Plaintiff's ability to engage in such protected activities. Because it burdens core political speech and restricts speech based on content, the

15

identity of the speaker, and viewpoints, it is subject to strict scrutiny. Defendants cannot meet this heightened standard, as the Personalized Application Prohibition is not narrowly tailored to serve any compelling state interest.

**ii.** VPC contends that *Anderson-Burdick* balancing does not apply to this case, in which VPC challenges restrictions on its own First Amendment free speech rights, not others' right to vote or access the ballot. Even if *Anderson-Burdick* were the appropriate legal framework, strict scrutiny would apply because the Personalized Application Prohibition severely burdens VPC's speech. Regardless of the level of scrutiny, Defendants' witnesses have not demonstrated that the fact that applications are personalized has caused voter confusion, voter disenfranchisement, inefficient or disorderly election administration, or voter fraud. Defendants have not produced any evidence that their recited harms are real, or that the Personalized Application Prohibition will in fact alleviate these asserted harms or is sufficiently tailored to address these asserted harms. Defendants have not produced any evidence that alternative measures that burden substantially less speech would fail to achieve the government's interests. VPC's rebuttal expert witness, Dr. Eitan Hersh, will establish that the conclusions of Defendants' proposed expert Ken Block (to the extent they are found to be admissible) are inaccurate and/or unreliable.

**iii.** **Count II:** The Personalized Application Prohibition in HB 2332 directly and severely burdens Plaintiff's First Amendment associational rights by preventing Plaintiff from banding together with others to engage potential voters and assisting community members to participate further in the civic community through advance mail voting. Because the Personalized Application Prohibition burdens Plaintiff's rights to association protected by the First Amendment,

16

it is subject to strict scrutiny. Defendants cannot meet this heightened standard, as the Personalized Application Prohibition is not narrowly tailored to serve any compelling state interest.

    **iv.**      **Count III:** The First Amendment prohibits the government restriction of speech through the enactment of substantially overbroad laws. The Personalized Application Prohibition is unconstitutionally overbroad, as it needlessly regulates a substantial amount of constitutionally protected expression and associations and impermissibly chills Plaintiff's protected speech. It burdens a substantial amount of innocent associations and protected speech such as applications personalized with information that is true or exactly matches a voter's registration. The Personalized Application Prohibition is not limited to "inaccurately" prefilled information. It does not prohibit "duplicate" advance mail ballot applications at all.

    **v.**      To the extent Defendants' asserted defenses were not raised in their Motion to Dismiss (Doc. 27) or Answer (Doc. 55), such defenses were not preserved and are therefore waived; specifically, points (1)(c)-(d) and (3) of Defendants' Defenses, below, do not appear in their Motion to Dismiss or Answer. However, Defendants' Defenses do not appear to be defenses, but merely arguments that Plaintiff has not met its burden.

    **c.**      **Defendants' Defenses.**

Defendant asserts the following defenses:

    **i.**      Kansas' Personalized Application Prohibition in K.S.A. 25-1122(k)(2) targets only non-expressive conduct and does not implicate any First Amendment rights.

        **a.**      Neither pre-filling an advance voting ballot application, nor mailing the same to potential voters, represents inherently expressive conduct.

        **b.**      Nothing in K.S.A. 25-1122(k)(2) impedes VPC from communicating any message it seeks to impart regarding political participation, advance voting, or voting by mail.

17

**c.** The Personalized Application Prohibition is properly reviewed under the most deferential standard – rational basis scrutiny.

**d.** The Personalized Application Prohibition is rationally related to legitimate state interests (set forth in Section III.B. above). And those state interests outweigh any impact – to the extent there even is one – that the Personalized Application Prohibition has on VPC's First Amendment right.

**ii.** Even if K.S.A. 25-1122(k)(2) implicates VPC's First Amendment rights, the statute is viewpoint- and content-neutral and not subject to heightened scrutiny.

**a.** The Personalized Application Prohibition does not target core political speech.

**b.** The Personalized Application Prohibition does not restrict VPC from communicating with anyone about anything.

**c.** Assuming the First Amendment is implicated, the proper standard for evaluating VPC's claims is the *Anderson-Burdick* balancing test.

**d.** The burden on VPC's speech and advocacy efforts is extremely minimal.

**e.** Although Plaintiffs produced no competent evidence that the Personalized Application Prohibition inhibits their ability to achieve their alleged objectives of encouraging broad political participation or expanding the use of advance voting and voting by mail, it would not matter even if they had because the First Amendment does not guarantee success in outcomes.

**f.** The State's compelling interests in adopting this statute (set forth in Section III.B. above) outweigh any potential burden on VPC's First Amendment rights.

**g.** Although inapplicable, the Personalized Application Prohibition would survive heightened scrutiny as well.

**iii.** The Personalized Application Prohibition does not contravene VPC's freedom of association rights.

**a.** Mailing a pre-filled advance voting ballot application does not implicate the freedom of association.

18

    **b.**    Nothing in K.S.A. 25-1122(k)(2) impedes VPC from associating with voters or other civic advocacy organizations in pursuit of its goals

**iv.**    VPC's overbreadth claim fails to meet the elements for such a cause of action.

    **a.**    The Personalized Application Prohibition is not overbroad as a facial matter or as applied to VPC's conduct.

    **b.**    The Personalized Application Prohibition does not implicate VPC's First Amendment rights.

    **c.**    The Personalized Application Prohibition targets only non-expressive conduct.

    **d.**    There are an infinite number of ways for VPC to communicate its messages regarding political participation, advance voting, or voting by mail.

**5.**    **DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

**a.**  Plaintiff VPC does not seek any damages. Instead, Plaintiff VPC only seeks the following declaratory and injunctive relief pursuant to 42 U.S.C. § 1983:

    **i.**    A declaration that Section 3(k)(2) of HB 2332 violates the First and Fourteenth Amendments, both facially and as-applied to Plaintiff VPC;

    **ii.**    An order enjoining Defendants from enforcing the Section 3(k)(2) of HB 2332, including the punitive sanctions contained therein;

    **iii.**    An order retaining jurisdiction to render any and all further orders that this Court may deem necessary;  and

    **iv.**    Any other relief the Court deems proper.

**b.**  Plaintiffs also seek attorneys' fees and costs incurred in bringing this suit pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

**6.**    **AMENDMENTS TO PLEADINGS.**

None.

Appellants' Appendix - Vol. I - 146

7.      **DISCOVERY.**

Discovery is now complete.

8.      **MOTIONS.**

a.      **Pending Motions.**

There are no pending motions.

b.      **Additional Pretrial Motions.**

After the pretrial conference, Plaintiff VPC intends to file a motion for summary judgment and may also file a motion to exclude testimony of the Defendants' expert witness.  Defendants likewise intend to file a motion for summary judgment.  The dispositive-motion deadline, as established in the scheduling order and any amendments, is **October 14, 2022**.  The parties should follow the summary-judgment guidelines on the court's website:

*http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

c.      **Motions Regarding Expert Testimony.**  All motions to exclude the testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed in accordance with the dispositive-motion deadline stated above.

9.      **TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **May 1, 2023, at 9:00 a.m., in Kansas City, Kansas**.  This case will be tried by the court sitting without a jury.  Trial is expected to take approximately 5 days.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the

20

trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**10.     ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The status of settlement negotiations is as follows.  The parties currently believe the prospects for settlement of this case are poor and they do not believe that further court-ordered ADR would be helpful.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties.  Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated September 30, 2022, at Wichita, Kansas.

s/ Gwynne E. Birzer

_____

GWYNNE E. BIRZER
U. S. Magistrate Judge

21

**We agree to abide by the terms of this Order**

Respectfully Submitted,

By:  /s/ Mark P. Johnson____
Mark P. Johnson (KS Bar #22289)
DENTONS US LLP
4520 Main Street, Suite 1100
Kansas City, MO 64105
Tel: (816) 460-2400
Fax: (816) 531-7545
mark.johnson@dentons.com

Danielle M. Lang (*pro hac vice*)
Alice C.C. Huling (*pro hac vice*)
Hayden Johnson (*pro hac vice*)
Christopher Lapinig (*pro hac vice*)
CAMPAIGN LEGAL CENTER
1101 14th Street, NW, St. 400
Washington, D.C. 20005
Tel: (202) 736-2200
dlang@campaignlegalcenter.org
ahuling@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org
clapinig@campaiginlegalcenter.org

Jonathan K. Youngwood (*pro hac vice*)
Meredith D. Karp (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Nicole A. Palmadesso (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
bonnie.jarrett@stblaw.com
nicole.palmadesso@stblaw.com

*Attorneys for Plaintiffs*

**We agree to abide by the terms of this Order**

Respectfully Submitted,

By:  /s/ Bradley J. Schlozman____
Bradley J. Schlozman (KS Bar #17621)
Scott R. Schillings (Bar # 16150)
HINKLE LAW FIRM LLC
1617 North Waterfront Parkway, Suite 400
Wichita, KS 67206
Tel.: (316) 267-2000
Fax: (316) 630-8466
E-mail: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com

*Attorneys for Defendants*

22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VOTEAMERICA and
VOTER PARTICIPATION CENTER,

     *Plaintiffs,*

vs.

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
DEREK SCHMIDT, in his official capacity as
Attorney General of the State of Kansas; and
STEPHEN M. HOWE, in his official capacity as
District Attorney of Johnson County,

     *Defendants.*

Case No. 2:21-cv-02253-KHV-GEB

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT REGARDING COUNTS I-III**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................. iii

SUMMARY OF EXHIBITS .............................................................................. vi

INTRODUCTION ............................................................................................. 1

STATEMENT OF UNCONTROVERTED FACTS ........................................ 3

STANDARD OF REVIEW ............................................................................. 21

ARGUMENT ................................................................................................... 22

I.    Sending a Voter a Partially Completed Advance Mail Ballot Application is *Conduct*, Not *Speech* ........................................................ 22

    A.   *The Partially Completed Advance Mail Ballot Applications that VPC Sends to Voters are Not Inherently Expressive* ......................... 22

    B.   *The Cases that the District Court Cited in Preliminary Injunction / Motion to Dismiss Order are Inapposite* ................................ 28

    C.   *The Pre-Filled Application Prohibition is Rationally Related to the State's Legitimate Interests* ................................................ 32

II.   Even if the First Amendment is Implicated, the Pre-Filled Application Prohibition is Viewpoint- and Content-Neutral and not Subject to Heightened Scrutiny .......................................................... 33

    A.   *The Pre-Filled Application Prohibition Does Not Target Core Political Speech* ......................................................................... 33

    B.   *Assuming the First Amendment is Implicated, the Proper Standard for Evaluating VPC's Claims is the Anderson-Burdick Test* ............. 39

III.  The Pre-Filled Application Prohibition Does Not Contravene VPC's Freedom of Association Rights ............................................................. 44

IV.  VPC's Overbreadth Claim Has No Merit ........................................... 46

    A.   *The Pre-Filled Application Prohibition is Not Overbroad as Applied to VPC's Activities* ....................................................... 47

    B.   *The Pre-Filled Application Prohibition is Not Facially Overbroad* ......... 48

**CONCLUSION** ................................................................................................ **49**

**CERTIFICATE OF SERVICE** ......................................................................... **50**

ii

## TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*ACLU v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008)..................................................... 40

*Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988)......................................................... 47

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................... 39

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 21

*Armour v. City of Indianapolis, Ind.*, 566 U.S. 673 (2012) .......................................... 28

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021)................................. 32, 42, 43, 44

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ............................................................... 47

*Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491 (1985)............................................... 47

*Buckley v. American Constit. Law Found., Inc.*, 552 U.S. (1999).................................. 37

*Burdick v. Takushi*, 504 U.S. 428 (1992)................................................................. 39, 40

*Burson v. Freeman*, 504 U.S. 191 (1992) ........................................................ 33, 37, 39, 43

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................. 21

*CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571 (6th Cir. 2015) .............. 41

*Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004)..... 41

*City of Austin v. Reagan Nat'l Advert. of Austin*, 142 S. Ct. 1464 (2022)................ 35, 36

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984)................................... 22

*Clark v. Schmidt*, 493 F. Supp.3d 1018 (D. Kan. 2020) ............................................... 48

*Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988) ........................................................ 21

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) ........................................ 42

*Dallas v. Stanglin*, 490 U.S. 19 (1989).......................................................................... 45

*DCCC v. Ziriax*, 487 F. Supp.3d 1207 (N.D. Okla. 2020) ............................................ 27

*Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp.3d (M.D.N.C. 2020) ...................... 29

*Doe v. Reed*, 561 U.S. 186 (2010) ..................................................................... 32, 37, 38

*DSCC v. Pate*, 950 N.W.2d 1 (Iowa 2020).................................................................... 33

*Duda v. Elder*, 7 F.4th 899 (10th Cir. 2021)................................................................. 21

*Faustin v. City & Cty. of Denver, Colo.*, 423 F.3d 1192 (10th Cir. 2005) ................... 47

*Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366 (9th Cir. 2016) ...................... 29

iii

*Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020) ........................................................ 40

*HealthOne of Denver, Inc. v. UnitedHealth Group, Inc.*, 872 F. Supp.2d 1154 (D. Colo. 2012) 41

*Heller v. Doe*, 509 U.S. 312 (1993) .......................................................................... 32

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ........................................... 25

*Knox v. Brnovich*, 907 F.3d 1167 (9th Cir. 2018) ..................................................... 29

*League of Women Voters of Fla. v. Cobb*, 447 F. Supp.2d 1314 (S.D. Fla. 2006) ...................... 28

*League of Women Voters v. Browning,* 575 F. Supp.2d 12989 (S.D. Fla. 2008 ......................... 27

*Lichtenstein v. Hargett*, 489 F. Supp.3d 742 (M.D. Tenn. 2020) ........................................ 31, 44

*Lichtenstein v. Hargett*, __ F. Supp.3d __, 2021 WL 5826246 (M.D. Tenn. Dec. 7, 2021) ........ 31

*Marchioro v. Chaney*, 442 U.S. 191 (1979) ................................................................. 33

*Meyer v. Grant*, 486 U.S. 414 (1988) ........................................................... 27, 34, 37, 38

*N.M. Youth Organized v. Herrera*, 611 F.3d 669 (10th Cir. 2010) ..................................... 47

*Nahno-Lopez v. Houser*, 625 F.3d 1279 (10th Cir. 2010) ............................................... 21

*Navajo Health Found.-Sage Mem. Hosp., Inc. v. Burwell,*
    256 F. Supp.3d 1186 (D.N.M. 2015) ...................................................................... 28

*New Ga. Project v. Raffensperger*, 484 F. Supp.3d 1265 (N.D. Ga. 2020) ............................ 29

*New Ga. Project v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020) .................................. 29

*New York v. Ferber*, 458 U.S. 747 (1982) .................................................................. 47

*Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) ....................................... 40

*Priorities USA v. Nessel*, 462 F. Supp.3d 792 (E.D. Mich. 2020) ....................................... 30

*Priorities USA v. Nessel*, 487 F. Supp.3d 599 (E.D. Mich. 2020) ....................................... 30

*Priorities USA v. Nessel*, 978 F.3d 976 (6th Cir. 2020) ................................................. 31

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ........................................................... 35

*Richardson v. Tex. Sec'y of State*, 978 F.3d 220 (5th Cir. 2020) ..................................... 43

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ........................................................... 45

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ........... 22, 25

*Save Palisade Fruitlands v. Todd*, 279 F.3d 1204 (10th Cir. 2002) ..................................... 32

*SEC v. GenAudio, Inc.*, 32 F.4th 902 (10th Cir. 2022) ................................................... 21

*Sickles v. Campbell Cnty., Ky.*, 501 F.3d 726 (6th Cir. 2007) ......................................... 25

*Storer v. Brown*, 415 U.S. 724 (1974) ..................................................................... 33

*Texas v. Johnson*, 491 U.S. 397 (1989) .................................................................... 23

iv

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ........................................... 24, 36

*Troublé v. The Wet Seal, Inc.*, 179 F. Supp.2d 291 (S.D.N.Y. 2001) ........................................ 41

*United States v. O'Brien*, 391 U.S. 367 (1968) .................................................................. 25

*United States v. Streett*, 434 F. Supp. 3d 1125 (D.N.M. 2020) ............................................ 48

*United States v. Williams*, 553 U.S. 285 (2008) ................................................................ 46

*Univ. of Kan. v. Sinks*, 565 F. Supp.2d 1216 (D. Kan. 2008) ............................................. 41

*Univ. of Tex. v. Camenish*, 451 U.S. 390 (1981) ............................................................... 28

*Utah Republican Party*, 892 F.3d ................................................................................... 39

*Virginia v. Hicks*, 539 U.S. 113 (2004) .............................................................. 46, 47, 49

*VoteAmerica v. Raffensperger*, __ F. Supp.3d __, 2022 WL 2357395
   (N.D. Ga. June 30, 2022) .................................................................................. 2, 27, 46

*Voting for Am. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ....................................... 22, 26, 28, 29, 38

*Voting for Am., Inc. v. Andrade*, 488 F. App'x 890 (5th Cir. 2012) ....................................... 45

*West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358 (10th Cir. 2000) ............................... 49

Statutes

52 U.S.C. § 20301 ....................................................................................................... 5

K.S.A. 25-1122 ....................................................................... 1, 3, 4, 5, 6, 23, 24, 28, 49

K.S.A. 25-1123 ........................................................................................................... 5

K.S.A. 25-1220 ........................................................................................................... 5

Rules

Fed. R. Evid. 801(c) .................................................................................................... 41

Regulations

Kan. Admin. Reg. 7-36-7 .............................................................................................. 6

Kan. Admin. Reg. 7-36-9 .............................................................................................. 6

## SUMMARY OF EXHIBITS

A.     Andrew Howell Affidavit
B.     Jamie Shew Deposition
C.     Bryan Caskey Deposition
D.     Kansas Secretary of State's Office – Voter Registration Data Request Form
E.     VPC's advance voting ballot application mailing statistics for 2020 General Election
F.     Lionel Dripps Deposition
G.     Tom Lopach Deposition
H.     Pls.' Resp. to Interrog. No. 16 in Defs.' Second Set of Interrogs.
I.     Sample of VPC's cover letter, pre-filled advance voting ballot application, and envelope sent to Kansas voters in 2020 General Election
J.     Sample VPC pre-filled advance voting ballot application
K.     Pls.' Response to Defs.' RFA No. 8
L.     Kansas Voters to whom VPC sent advance voting ballot application in 2020 General Election
M.     Ken Block's Initial Declaration
N.     Ken Block's Supplemental Declaration
O.     Ex. XI to Ken Block's Supplemental Declaration
P.     Ex. V to Ken Block's Initial Declaration
Q.     Examples of CVI-pre-filled deficient advance voting ballot applications received from Shawnee County voters
R.     Advance voting ballot applications sent by VPC to deceased voters in Shawnee County
S.     Andrew Howell Deposition
T.     Debbie Cox Deposition
U.     Debbie Cox Affidavit
V.     Text of notice placed in Ford County newspapers by Debbie Cox regarding CVI's mailing of advance voting ballot applications to voters
W.     Examples of correspondence between Shawnee County Election Office and voters submitting deficient advance voting ballot applications in 2020 General Election
X.     VPC Call Center FAQs
Y.     Emails between VPC's Counsel and Other States' Election Officials
Z.     Written Testimony from Kansas Secretary of State's Office to Kansas Legislature
AA.    Pls.' Resp. to Interrog. No. 8 in Def. Schwab's First Set of Interrogs.
BB.    Pls.' Resp. to Interrog. No. 4 in Def. Schwab's First Set of Interrogs.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VOTEAMERICA and
VOTER PARTICIPATION CENTER,

     *Plaintiffs,*

vs.

     Case No. 2:21-cv-02253-KHV-GEB

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
DEREK SCHMIDT, in his official capacity as
Attorney General of the State of Kansas; and
STEPHEN M. HOWE, in his official capacity as
District Attorney of Johnson County,

     *Defendants.*

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT REGARDING COUNTS I-III**

Defendants respectfully move for summary judgment with regard to Counts I-III of the Plaintiffs' Complaint, as they relate to Plaintiffs' constitutional challenge to Section 3(k)(2) of HB 2332 (codified at K.S.A. 25-1122(k)(2)).[1]  In support of such motion, Defendants state as follows:

**INTRODUCTION**

The only remaining issue in this case is whether a third-party has a right under the First Amendment to fill out *someone else's* advance voting ballot application.  In other words, does K.S.A. 25-1122(k)(2) constitute an impermissible restriction on speech or association under the First Amendment?  Defendants submit that a third party's pre-population of a voter's advance ballot application is neither expressive conduct nor speech warranting constitutional protection, and it has no impact as well on the third-party's freedom of association rights.

---

[1] All other claims in this matter have either been dismissed or resolved via a Stipulated Order.  *See* Dkt #73.

1

At the preliminary injunction stage of these proceedings, the Court concentrated the bulk of its analysis on a provision prohibiting only out-of-state entities from sending advance voting ballot applications to Kansas voters. Defendants accepted the Court's determination that the provision was unconstitutional and agreed to a permanent injunction against it. But the law now before the Court, which simply restricts third-parties from pre-filling anyone else's advance voting ballot application, is eminently reasonable and does not encroach on any constitutional rights.

Plaintiffs highlight that Kansas has experienced no recent, systematic election fraud. True enough, but Plaintiffs' argument ignores the applicable legal standard and the State's legitimate interests in adopting this legislation. The Legislature acted on what it deemed to be a serious concern with pre-filled advance voting ballot applications. As was evident in Kansas in 2020, and has been clear throughout the country for years, the activities of Plaintiff Voter Participation Center ("VPC") tend to precipitate anger, confusion, and frustration in the electorate; negatively impact the orderly and efficient administration of elections; and contribute to the diminution of public confidence in both the competency of election officials and the integrity of the electoral process. In fact, VPC itself was so concerned with erroneous data in the pre-filled advance voting ballot applications it was sending to voters during the 2020 General Election that it decided on its own to stop pre-populating applications for its target market for a period of time.

The election integrity measure being challenged here is a perfectly reasonable prophylactic designed to mitigate such harms. These same Plaintiffs challenged a virtually identical statute in Georgia, and the court there categorically rejected the claims. *See VoteAmerica v. Raffensperger*, __ F. Supp.3d __, 2022 WL 2357395 (N.D. Ga. June 30, 2022). Governing case law dictates that this Court likewise turn aside Plaintiffs' claims and afford substantial deference to Kansas' law. The State is not required to conduct its elections in an environment filled with chaos.

2

## STATEMENT OF UNCONTROVERTED FACTS

1.      Plaintiff VPC is a 501(c)(3) organization that, *inter alia*, provides early voting and vote-by-mail resources and information – including pre-filled advance voting ballot applications – to certain targeted groups of voters, primarily young voters, voters of color, and unmarried women.  Pretrial Order (Dkt #140) Stipulated Facts ("PTO-SF"), ¶¶ vii-viii.

2.      The Kansas Legislature introduced House Bill (H.B.) 2332 in February 2021 to address various election-related matters, including the solicitation by mail of advance voting ballot applications.  PTO-SF, ¶¶ xvii-xviii.

3.      The Legislature passed the legislation, as amended, by votes of 83-38 in the House and 27-11 in the Senate, but Governor Kelly vetoed the bill on April 23, 2021.  On May 3, the Legislature overrode the governor's veto (voting 86-37 in the House and 28-12 in the Senate).  PTO-SF, ¶¶ xix-xxi.

4.      Section 3(k)(2) of H.B. 2332 (codified at K.S.A. 25-1122(k)(2)) prohibits "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot and includes an application for an advance voting ballot in such mailing" from completing (i.e., pre-filling) any portion of such application prior to mailing such application to the registered voter.  This statute will be referred to as the "Pre-Filled Application Prohibition."  PTO-SF, ¶ xxii.

5.      K.S.A. 25-1122(k)(2) does not apply to persons who mail or cause to be mailed an application for an advance voting ballot with any portion completed to a registered voter where the portion of such application completed prior to mailing is completed at the request of the registered voter.  In other words, when a registered voter asks a person to mail or cause to be mailed an advance voting ballot application to such registered voter, and that person does so, that

3

person does not "solicit[] by mail a registered voter to file an application for an advance voting ballot" as set forth in K.S.A. 25-1122(k)(1).  Stipulation (Dkt #73), at 2-3.

6.    Section 3(*l*)(1) of HB 2332 (codified at K.S.A. 25-1122(*l*)(1)) provides that "[n]o person shall mail or cause to be mailed an application for an advance voting ballot, unless such person is a resident of this state or is otherwise domiciled in this state."  This statute will be referred to as the "Out-of-State Distributor Ban."  PTO-SF, ¶ xxiv.

7.    At passage, both Sections 3(k)(2) and 3(*l*)(1) of HB 2332 were scheduled to go into effect on January 1, 2022.  PTO-SF, ¶ xxv.

8.    On June 2, 2021, Plaintiffs commenced this lawsuit, alleging that the enforcement of K.S.A. 25-1122(k)(2) and 25-1122(*l*)(1) violated their First and Fourteenth Amendment rights and breached the Constitution's Dormant Commerce Clause.  With regard to the First and Fourteenth Amendment claims, Plaintiffs alleged that the statutes violated their freedom of speech (Count I) and freedom of association (Count II) and were unconstitutionally overbroad (Count III). Compl. (Dkt #1) at 22-33.

9.    In a Memorandum & Order on November 19, 2021 (and a *nunc pro tunc* Order on December 15, 2021), the Court preliminarily enjoined enforcement of Sections 3(k)(2) and 3(*l*)(1) of HB 2332.  Dkt #s 50, 61.

10.    Defendants, via a Stipulation with Plaintiffs that the Court entered on February 25, 2022, agreed to a permanent injunction against the enforcement of the Out-of-State Distributor Ban as violative of Plaintiffs' First and Fourteenth Amendment rights.  Those claims have thus been fully resolved and are no longer part of this litigation (other than Plaintiffs' request for their attorney fees as prevailing parties).  PTO-SF, ¶ xxvii.  The only claims remaining in dispute pertain to the Pre-Filled Application Prohibition.  PTO-SF, ¶ xxviii.

11.    The Pre-Filled Application Prohibition does not cover Plaintiff VoteAmerica's conduct because VoteAmerica only mails pre-populated advance voting ballot applications to voters who have specifically requested them via its interactive website.  As a result, VoteAmerica has not participated in any discovery in this case.  PTO-SF, ¶ xxix.

**Kansas' Voter Registration Database and the Process for Voting an Advance Ballot**

12.    To vote by mail in Kansas elections, a voter must complete an advance voting ballot application and return it to the county election office in the county in which the voter is registered to vote.  PTO-SF, ¶ xxx.

13.    Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the General Election and the Tuesday of the week preceding such General Election.  K.S.A. 25-1122(f)(2).  PTO-SF, ¶ xxxii.

14.    Other than voters entitled to receive ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq.*, counties cannot transmit advance ballots to voters prior to the 20th day before the election for which an application has been received. K.S.A. 25-1123(a) and 25-1220.  Thus, for all voters who properly submitted an advance voting ballot application prior to the 20th day before the election, the county election office will transmit an advance ballot to those voters on the 20th day before the election.  PTO-SF, ¶ xxxiii.

15.    With respect to advance voting ballot applications that are received by the county election office on or after the 20th day before the election, the county generally must process them within two business days of their receipt.   K.S.A. 25-1123(a).  PTO-SF, ¶ xxxiii.

16.    If an advance voting ballot application is timely submitted to the county election office, an official in such office processes the application and, if the information entered onto the application (including the signature) matches the information contained in the State's voter

5

registration database – the Electronic Voter Information System ("ELVIS") – the county will mail the voter an advance ballot packet.  PTO-SF, ¶ xxxi.

17.     If any of the required information on an advance voting ballot application does not match the information for that voter in ELVIS (e.g., name, address, driver's license number, non-driver's identification number, date of birth, political party in primary election, active registration status, signature, etc.), the county election office must attempt to contact the voter to obtain the correct information.  Kan. Admin. Reg. 7-36-7 and 7-36-9; K.S.A. 25-1122(e).  If the voter cannot be contacted, or it would be impracticable to make contact before the election, the voter will be mailed a provisional ballot.  Kan. Admin. Reg. 7-36-7(f).  PTO-SF, ¶ xxxiv.

18.     All of the information on an advance voting ballot application must precisely match the information in ELVIS in order for the county election office to process the application without having to contact the voter to cure mismatches or discrepancies.  Only the most clearly inadvertent mismatches (e.g., minor misspelling of street name, such as omitting the letter "e" in "George" in the street "George Williams Way," or signing as "Jim" despite being registered as "James") will be overlooked.  Ex. A at ¶ 25; Ex. B at 35:6-40:5; 48:6-51:7.

19.     County election officials will not send an advance ballot to a voter who submitted an application with an erroneous middle initial or suffix.  Ex. B at 48:25-50:7.

20.     Once an advance voting ballot application has been received and processed by the county election office, the fact and date of such processing is recorded in ELVIS.  The office also documents in ELVIS the date on which it transmits the regular or provisional ballot to the voter.  PTO-SF, ¶ xxxv.

21.     County election offices also document in ELVIS whether (and when) a voter has returned an advance ballot that was transmitted to the voter.  Ex. A at ¶ 23; Ex. C at 48:17-49:18.

22.     ELVIS is a dynamic system that is updated in real-time, meaning that once a county election office adds, deletes, or modifies a voter registration record, the system records that change immediately.  Ex. A at ¶ 10; Ex. C at 42:14-43:8.

23.     A list of all registered voters in Kansas can be purchased from the Secretary of State's office for a $200 fee.  Ex. C at 114:25-116:16; Ex. D.  That list comes from ELVIS and represents a snapshot in time of the State's voter file as it appears on the date that the voter registration list is generated.  Ex. C at 114:25-115:7.

24.     Any individual or organization similarly may obtain a list of all registered voters in Kansas who have submitted an advance voting ballot application that has been processed by a county election office (as of the date of the request).  This data can be purchased (or, in some counties, obtained for free) from either the Secretary of State's Office or a county election office.  Ex. C at 118:13-119:17, 121:3-124:21; Ex. B at 102:23.

25.     Because ELVIS is a dynamic system, even if a third-party utilizes voter registration information obtained from ELVIS to partially pre-fill advance voting ballot applications, some information on the pre-populated application may not match the State's voter file database when a voter receives the pre-filled application if there is a lag time between the date the third-party acquires the ELVIS data and the date it mails out the pre-filled application to the voter.  Ex. A at ¶ 10.

26.     Among the reasons that voter information in ELVIS may not match the information on a voter's pre-filled advance voting ballot application (completed by someone other than the voter) is that the data in ELVIS may have been updated (e.g., change of name, change of address, death, or ineligibility due to criminal conviction) since the date the voter file was generated and used by a third-party to pre-fill an application (using the stale data).  Ex. A at ¶ 10.

7

**VPC's Advance Voting Ballot Application Mailings in Kansas in 2020 General Election**

27.     The 2020 General Election in Kansas had record turnout (1,375,125 total votes cast, a 70.9% turnout rate) and a steep increase in advance mail voting (459,229 voted by mail).  This compared to 1,039,085 total votes cast in the 2018 General Election, which represented a 56.4% turnout rate with 152,267 votes cast by mail.  It also compared to 1,225,667 total votes cast in the 2016 General Election, which was a 67.4% turnout rate, with 173,457 votes having been cast by mail.  *See* https://sos.ks.gov/elections/elections-statistics.html.  PTO-SF, ¶ xxxvi.

28.     VPC – acting through its 501(c)(4) sister organization, the Center for Voter Information ("CVI") – mailed advance voting ballot application packets to approximately 507,864 Kansas voters in connection with the 2020 General Election.  Ex. E; Ex. F at 175:6-176:24, 177:24-178:15; Ex. G at 108:7-19, 123:17-124:6.

29.     VPC relied on a vendor, Catalist, LLC ("Catalist"), to provide the voter registration data for the Kansas voters whom VPC targeted with advance voting ballot application packets during the 2020 General Election.  Ex. G at 92:14-93:4; Ex. F at 164:7-13; Ex. H at 3.

30.     VPC received Kansas active voter registration lists from Catalist on January 31, April 10, and September 15 of 2020.  PTO-SF, ¶ xxxix.

31.     VPC CEO Lopach testified that he does not know how often Catalist requests an updated voter file from the Secretary of State's Office.  Ex. G at 104:2-105:13.

32.     VPC's advance ballot application mailers contained a cover letter, a Kansas advance voting ballot application, and a pre-paid, pre-addressed envelope that voters could use to send a completed application to the appropriate county election office.  PTO-SF, ¶ xxxviii.  A sample of VPC's cover letter, pre-filled advance voting ballot application, and pre-addressed envelope can be found at Exhibit I.

8

33. Due to the unique nature of VPC's pre-filled applications, election officials were easily able to identify them. Ex. A at ¶ 14; Ex. B at 18:10-21:22;

34. The advance voting ballot applications that were partially pre-filled or otherwise provided by VPC to Kansas voters in connection with the 2020 General Election (a) used a unique all-caps font (to the extent they were partially pre-filled), (b) contained a unique message – "It's as Easy as 1-2-3" on the back of the applications, (c) contained yellow highlighting on certain parts of the application, and (d) contained a code on the bottom margin of the application. A sample is available at Ex. J.

35. VPC sent five "waves" of mailers to Kansas voters for the 2020 General Election. The dates were as follows:

    a. Wave A: data uploaded on 7/6/2020, expected in homes on 8/17/2020;

    b. Wave B: data uploaded on 7/27/2020, expected in homes on 8/26/2020;

    c. Wave C: data uploaded on 8/10/2020, expected in homes on 9/8/2020;

    d. Wave D: data uploaded on 8/24/2020, expected in homes on 9/16/202; and

    e. Wave E: data uploaded on 8/24/2020, expected in homes on 9/28/2020.

PTO-SF, ¶ xl.

36. VPC only included *pre-filled* advance voting ballot applications (along with the other materials in the mailers) with Waves A, B, and E. Waves C and D included *blank* advance voting ballot applications. Ex. F at 163:6-164:16.

**Problems with Inaccurate Advance Voting Ballot Applications in 2020 General Election**

37. Although the information that Catalist (and, by extension, VPC) used to pre-fill advance voting ballot applications for voters was "based upon publicly available information" in ELVIS, Pls.' Resp. to Req. for Admis. No. 8, (attached as Ex. K), Catalist also merged commercial

9

data with the official State voter file in preparing the voter data it sent to VPC for use in pre-filling those applications.  Ex. F at 171:24-174:1.

38.    VPC Executive Vice President Lionel Dripps testified that VPC discovered, in the wake of Waves A and B, that approximately 3% of the pre-filled applications it had sent to voters throughout the United States contained an erroneous middle initial (i.e., an initial that did not match the data in the states' voter files), and approximately 5% of the pre-filled applications contained an erroneous suffix (i.e., a suffix that did not match the data in the states' voters files).  Ex. F at 167:24-170:9.

39.    Concerned about the accuracy of the voter data that it had received from Catalist, VPC opted to send blank advance voting ballot applications to Kansas voters in connection with Waves C and D.  Ex. F at 171:1-23.

40.    In its discovery responses, Plaintiffs produced a subset of the Kansas voters to whom it sent advance voting ballot applications in the 2020 General Election.  (The list contained 312,918 of the approximately 507,864 voters to whom VPC had sent applications).  Ex. L.

41.    Defendants' expert witness, Ken Block, analyzed Ex. L and identified numerous errors/deficiencies in the information that VPC was using to pre-populate the advance voting ballot applications sent to Kansas voters.  Ex. M.

42.    Because of the 4-6 week lead time between the date that VPC sent its data to its printer for pre-filling advance voting ballot applications and the date such applications arrived in voters' mailboxes, and based on the dates that VPC received updated Kansas voter files from Catalist, *at best*, VPC was using the Kansas voter file from April 10, 2020, to pre-populate the applications sent to Kansas voters in connection with the 2020 General Election.  Ex. M at ¶¶ 34-35.

10

43.     VPC did not remove from the database it used to pre-fill advance voting ballot applications any Kansas voters whose voter registrations had been cancelled prior to mailing those individuals pre-filled advance voting ballot applications during the 2020 General Election.  Ex. N at ¶ 10.

44.     In its first wave of mailings, which VPC sent to the printer on July 6, 2020, for delivery to voters on or about August 17, 2020, 385 Kansas voters to whom VPC sent pre-filled advance voting ballot applications had had their voter registrations cancelled prior to that date (due to death, change of residence, criminal conviction, etc.), and in many cases long before that date. Ex. N at ¶ 9; Ex. O (date of voters' cancelled registration is found in Column E).

45.     In its mailings to Kansas voters for the 2020 General Election, VPC sent out:

- 5 separate mailings to 176 of the 385 voters whose voter registrations had been cancelled (and thus been removed from the Kansas voter rolls) prior to the first VPC wave mailing;
- 4 separate mailings to 99 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing;
- 3 separate mailings to 39 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing; and
- 2 separate mailings to 11 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing.

Ex. N at ¶ 9; Ex. O.

46.     In the time between when VPC sent its mailers to the printer in connection with its first wave of mailings and its final wave of mailings for the 2020 General Election, hundreds of additional Kansas voters had had their voter registration cancelled yet still received a mailing from VPC due to its failure to remove such no-longer-registered voters.  Ex. N at ¶¶ 10-13.

47.     Mr. Block identified 23 pairs of matched records in which two different voters showed the same voter registration number, indicating that VPC had sent a pre-filled application

11

for Voter #1 to Voter #2. These individuals were properly separated in Kansas' own voter file to which VPC (and any other member of the public) had access. Ex. M at ¶¶ 23-24; Ex. P.

48.     Kansas election officials identified at least 15 voters to whom VPC sent advance voting ballot applications in connection with the 2020 General Election yet whose registration status had been cancelled in ELVIS *prior to April 10, 2020* (meaning that their names would not have appeared on a list of voters by anyone requesting the statewide voter file as of that date). Ex. O.

49.     VPC's use of stale (and thus often inaccurate) voter registration data to pre-fill the advance voting ballot applications it sent to Kansas voters imposed an extra burden on county election officials, who had to identify the deficiencies submitted by voters and then communicate with voters to correct the mismatched information. Ex. M at ¶ 39.

50.     The Shawnee County Election Office received a large number of advance voting ballot applications from voters that had been pre-filled by VPC and contained information that did not match the voters' information in ELVIS. The mismatched information included erroneous addresses, last names, suffixes, and/or middle initials. Ex. A at ¶¶ 11, 35. Examples can be found at Ex. Q (copies of inaccurate applications).

51.     The Shawnee County Election Office also received numerous advance voting ballot applications that had been pre-filled by VPC and sent to individuals who were deceased and whose voter registration in ELVIS had been cancelled prior to the time such applications had been printed. Ex. A at ¶ 12; Examples can be found at Ex. R.

52.     As a result of these inaccurately pre-filled advance voting ballot applications, the Shawnee County Election Office was "overwhelmed" with telephone calls, letters, e-mails, and in-office visits from voters who were confused, angry, and frustrated at what they had received

12

from VPC. Ex. A at ¶¶ 12, 37, 40, 44; Ex. S at 117:24-125:2; Mr. Howell himself spoke with hundreds of these angry, frustrated, and confused voters. Ex. S at 121:11-122:12.

53.     Voters communicating with Mr. Howell regarding inaccurately pre-filled advance voting ballot applications often believed (erroneously) that the applications had been sent to them by the Shawnee County Election Office, and they expressed anger and frustration at the purported incompetency of the office. Many of these voters voiced their incredulity that the office would send an application to the wrong address or use the wrong name in pre-filling the application when they had previously communicated such changes to the election office. Ex. A at ¶¶ 38, 40-42.

54.     Ford County Election Clerk Deborah Cox heard from so many confused, frustrated, and angry voters (20-30 per day) about the inaccurate and duplicate advance voting ballot applications they were receiving from VPC (via CVI) in the lead-up to the 2020 General Election that she sent an ad to three Ford County newspapers in an effort to remind voters that most pre-filled applications had come from CVI and not the county election office. Ex. T at 130:6-132:5; Ex. U at ¶ 37. The text of the ad can be found at Ex. V.

55.     Ms. Cox got the idea for the ad because a similar ad had been placed in the *Beloit Call* by Mitchell County Clerk Chris Treaster. Ex. T at 130:6-17.

56.     The Shawnee County Election Office sent out letters to the voters who submitted advance voting ballot applications containing information that did not match the data in ELVIS. Ex. A at 120:6-121:4. Examples of these letters can be found at Ex. W.

57.     Kansas Elections Director Bryan Caskey also received many calls from county election officials who complained that their offices were receiving pre-filled advance voting ballot applications in which the information on the form did not match the data in ELVIS. Ex. C at 150:13-152:15. In response to these calls, Mr. Caskey regularly discussed the problem with county

13

election officials during his weekly telephone conferences with them.  He also spoke personally with election officials in at least 60 of the State's 105 counties on the subject.  Ex. C at 212:20-213:11, 237:11-240:5.

58.     Mr. Caskey also spoke with many voters who expressed their anger, confusion, and frustration over the pre-filled advance voting ballot applications that they were receiving from third-parties such as VPC.  Ex. C at 209:15-210:9, 240:6-242:7.

59.     The Kansas Secretary of State's Office submitted written testimony to both the House and Senate Committees on Federal and State Affairs in March 2021 regarding the State's experience with advance voting ballot applications mailed to voters by third-parties in the 2020 General Election.  Among other things, the testimony advised the Legislature that, "[l]eading up to the 2020 general election, state and county election officials were inundated with calls from confused voters who submitted an advance by mail ballot application but continued to receive unsolicited advance ballot applications from third parties.  This created a substantial workload increase for local election offices who had to process thousands of duplicate forms at a time when county election officials were preparing for a high turnout, statewide election, in the middle of a pandemic."  Ex. Z.

60.     On average, it takes an experienced election official three to five minutes to process an accurate, non-duplicate advance voting ballot application.  Ex. A at ¶ 24; Ex. U at ¶ 23.

61.     If the information on a voter's advance voting ballot application does not match the information in ELVIS, or if the application is missing information, the election office will attempt to contact the voter (via telephone, U.S. mail, and/or e-mail) to determine the reason for the discrepancy or to obtain the missing information.  This contact can require multiple attempts.  The

14

office generally makes at least three attempts to reach the voter, assuming it is practicable.  Ex. A at ¶ 25; Ex. U at ¶ 24.

62.    If the county election office is able to reach the voter, it attempts to work with him/her to correct any discrepancies or omissions.  It may be necessary for the voter to submit a new advance voting ballot application or registration form.  The cumulative time to contact the voter and process the application in these situations averages around 15 minutes of staff time.  Ex. A at ¶ 26; Ex. U at ¶ 25.

63.    If the election office is unable to reach the voter or it would be impracticable to do so, the office will prepare a provisional ballot, assuming it is able to discern that the applicant is a registered voter.  The cumulative time to complete this whole process regularly takes thirty minutes or more of staff time. Ex. A at ¶ 26; Ex. U at ¶ 26.

64.    If the election office must send a provisional ballot to a voter after being unable to reach him/her in order to address defects on his/her application, there is a greater likelihood that the voter will not correct those defects prior to the county canvassing boards and thus will either not return the provisional ballot or will not have the ballot counted.  Ex. A at ¶ 28.

65.    VPC provided in discovery a set of FAQs intended to be used as canned responses for a call center to respond to individuals who contacted VPC about problems with the advance voting ballot applications that such individuals received from VPC.  Ex. X.  Two of the responses stated as follows:

**I got a form that has someone else's information on it- why did that happen?**

Thank you for reaching out. VPC is aware of this issue and is actively working to make sure it doesn't happen again. This issue was limited in scope and only affected a very small percentage of individuals.  In the meantime, we are happy to send you a new vote-by-mail application with the correct information, or I can tell you the link you can use to print it from your state's SoS website and then fill it out and mail back in the envelope we sent you.

15

**How did it happen? How are you making sure it won't happen again?**

The mistake was due to a printer error and they have taken responsibility for their mistake and have already added additional quality control measures, like installing an additional camera to monitor printing, and retraining printer staff, to prevent this type of situation in the future.

66.    VPC received complaints from election officials in states other than Kansas about the inaccurate absentee ballot applications that VPC was sending to voters in those states during the 2020 election cycle. Ex. Y (e-mails between VPC outside counsel Jennifer Carrier and other state election officials). The written/e-mail complaints that VPC produced in discovery came from officials in Virginia (VPC000364-000366; 000376-000383; 000388-000392; 000397, 000406); Iowa (VPC000407-000408; 000429-000431; 000434-435); Wisconsin (VPC000436-000439); and North Carolina (VPC000485-000487; 000496-000497).

**Duplicate Advance Voting Ballot Applications in 2020 General Election**

67.    The Kansas voters whom VPC targeted with mailings in the 2020 General Election received between one and five advance voting ballot applications from VPC. Ex. L; Ex. G at 206:9-207:14, 209:3-210:22.

68.    Of the approximately 507,864 Kansas voters to whom VPC sent at least one (and as many as five) advance voting ballot applications in connection with the 2020 General Election, at least 112,597 of those individuals used a VPC-provided pre-paid/pre-addressed envelope to mail their completed application back to their respective county election offices. Ex. E; Ex. F at 177:24-179:20; Ex. G at 123:17-124:20.

69.    The 112,597 Kansas voters who used a VPC-provided pre-paid/pre-addressed envelope to mail their completed applications back to their respective county election offices sent in 127,336 applications using the VPC-provided envelopes. In other words, approximately 14,739

16

duplicate applications were sent to county election offices by Kansas voters using a VPC-provided envelope. Ex. E; Ex. F at 178:16-182:3; Ex. G at 124:16-125:18.

70. Of the 112,597 Kansas voters who used a VPC-provided pre-paid/pre-addressed envelope to send in a completed advance voting ballot application to their county election office, only 111,199 voters ultimately received an advance ballot. In other words, 1,398 voters who returned an advance voting ballot application in a VPC-provided envelope never submitted a successful application such that they could receive an advance ballot in connection with the 2020 General Election. Ex. E; Ex. F at 182:20-184:1; Ex. G at 128:3-25.

71. In the 2020 General Election, the Shawnee County Election Office received and processed 23,156 advance voting ballot applications. That is, it sent regular or provisional advance ballots to 23,156 voters after having received advance voting ballot applications from these voters. In addition, it received 4,217 duplicate applications (i.e., applications from voters who had already submitted an application and to whom the office had already mailed a regular or provisional advance ballot). More than 15.4% of the total advance voting ballot applications that the office received, therefore, were duplicates. Ex. A at ¶ 15.

72. Of the 4,217 duplicate applications the Shawnee County Election Office received for the 2020 General Election: 3,676 were sets of two (i.e., voters sent in two applications); 407 were sets of three (i.e., voters sent in three applications); 99 were sets of four; 27 were sets of five; 6 were sets of six; 1 was a set of seven, and 1 was a set of nine. Ex. A ¶ 18.

73. The Shawnee County Election Office received very few (no more than a dozen) duplicate applications in connection with either the 2016 General Election (during which it received 7,394 total applications) or the 2018 General Election (during which it received 9,272 total applications). Ex. A at ¶ 17.

17

74.     Many voters told county election officials that they were confused by the pre-filled advance voting ballot applications that they had received during the 2020 General Election and believed (erroneously) that the applications had originated from the election office.  These voters told election officials that they thought they were required to complete and mail back the pre-filled applications to the county election office even if they had already submitted another application. Ex. A at ¶ 41; Ex. S at 269:14-270:1; Ex. U at ¶ 19.

75.     In the 2020 General Election, the Ford County Election Office received and processed 3,040 advance voting ballot applications.  That is, it sent regular or provisional advance ballots to 3,040 voters after having received advance voting ballot applications from these voters. In addition, it received 274 duplicate applications (i.e., applications from voters who had already submitted an application and to whom the office had already mailed a regular or provisional advance ballot).  Nearly 9% of the advance voting ballot applications that the office received, therefore, were duplicates.  Ex. U at ¶ 16.

76.     The Ford County Election Office received only a handful (no more than five) duplicate applications in connection with either the 2016 General Election or the 2018 General Election.  Ex. U at ¶ 18.

77.     Although Kansas election officials did not attempt to quantify how many duplicate advance voting ballot applications in the 2020 General Election involved VPC-pre-populated applications, the majority of duplicate applications are believed to have been pre-filled by VPC. Ex. A at ¶ 16; Ex. U at ¶ 17.

78.     Kansas Elections Director Bryan Caskey also had "dozens if not hundreds of conversations" with county election officials regarding the "flood" of duplicate advance voting ballot applications that were being submitted by voters to such offices.  Ex. C at 150:13-19.

18

**Impact of Duplicate Advance Voting Ballot Applications on Election Administration**

79.     When a voter submits duplicate advance voting ballot applications to a county election office in connection with a single election, the office must conduct the same review and verifications of each application upon receipt.  One step in this process is to determine if the voter had previously submitted another application and was previously sent a regular or provisional advance ballot.  If there are any differences between the original application and the new/duplicate application (e.g., different name or mailing address), the office will attempt to contact the voter to determine the reason for the discrepancy.  Ex. A at ¶ 29; Ex. U at ¶ 27.

80.     After receiving a duplicate application, the county election office cannot assume that the initially submitted application was correct.  Depending on the situation, the office may need to send a provisional ballot to the voter.  For this reason, the review of a duplicate application usually takes more staff time than the review of the initially submitted application.  If the office does not have to contact the voter, the review of the duplicate application generally takes 7-10 minutes.  If the office does have to contact the voter, the review of the duplicate application can take from 15-30 minutes (and occasionally more) of total staff time.  Ex. A at ¶ 30; Ex. U at ¶ 28.

81.     The Shawnee County Election Office typically assigns 6-7 staff members to handle the processing of advance voting ballot applications.  Nearly double that number had to be assigned to the task for the 2020 General Election.  The most significant time burden and strain on staff came from having to contact thousands of voters who had submitted inaccurate or duplicate applications.  At one point, Mr. Howell had to assign almost 30 staff members just to review and process applications in order to ensure that the office could process applications within the 2-day deadline imposed by State law.   Ex. A at ¶ 33.

19

82.     Prior to Election Day in November 2020, the Shawnee County Election Office responded to many confused voters who had returned pre-filled advance voting ballot applications but who insisted that they did not actually intend to request and vote an advance ballot. The voters told election officials that they thought they were required to return the application. Election officials expended substantial time and resources responding to those voters. Ex. A at ¶ 47.

83.     Approximately 718 voters in the 2020 General Election voted on Election Day in Shawnee County (usually by provisional ballot) after having submitted an advance voting ballot application and having received an advance ballot. In the 2016 General Election, just 141 voters voted on Election Day (usually by provisional ballot) after having mailed in an advance voting ballot application and having received an advance ballot. Ex. A at ¶ 47.

**Alleged Effectiveness of Pre-Filling VPC's Advance Voting Ballot Applications**

84.     VPC's Rule 30(b)(6) witness, Mr. Lopach, testified that he cannot "speak to how an individual or a group of people would respond to a pre-filled vote-by-mail application versus a blank vote-by-mail application." Ex. G at 98:17-99:20.

85.     Mr. Lopach testified that he does not know if the recipient of a pre-filled advance voting ballot application "views a political message in whether or not their name is filled out on" the application. Ex. G at 99:22-100:10.

86.     Mr. Lopach testified that nothing in the Pre-Filled Application Prohibition prohibits VPC from banding together with other persons or organizations to engage potential voters and assist community members in encouraging advance mail voting. Ex. G at 189:18-191:14.

87.     Mr. Lopach testified that, other than the restriction on inserting a voter's name and address on an advance voting ballot application, nothing in the Pre-Filled Application Prohibition restricts VPC from encouraging individuals to participate in the democratic process, instructing

20

them how to obtain or vote an advance ballot, encouraging them to do so, or communicating any other message in the mailers sent to targeted voters. Ex. G at 183:9-187:19.

## STANDARD OF REVIEW

Summary judgment under Rule 56(c) is appropriate if the pleadings, depositions, answers to interrogatories, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Id.* at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. *Id.* at 252.

The movant bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the burden then shifts to the non-moving party to show that genuine issues remain for trial as to those dispositive matters for which the non-moving party carries the burden of proof. *SEC v. GenAudio, Inc.*, 32 F.4th 902, 920 (10th Cir. 2022). To carry this burden, the non-moving party must go beyond the pleadings and designate specific facts supported by competent evidence. *Id.*; *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).

Although the Court views the record in the light most favorable to the non-moving party, *Duda v. Elder*, 7 F.4th 899, 905 (10th Cir. 2021), it must grant summary judgment if the non-movant's evidence is merely colorable or is not significantly probative. *Liberty Lobby*, 477 U.S. at 250-51. Nor can the non-moving party rely on ignorance of facts, speculation or suspicion, hoping that something will turn up at trial. *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988). Only by showing a sufficient factual disagreement over an essential element to its claim can the non-movant survive a motion for summary judgment. *GenAudio, Inc.*, 32 F.4th at 920.

21

**ARGUMENT**

As narrowed, this case no longer involves activity protected by the First Amendment. The prohibited conduct that VPC challenges – the pre-population of third-parties' advance voting ballot applications – is simply not expressive in nature. Kansas' Pre-Filled Application Prohibition must be reviewed, therefore, under the most deferential rational basis standard. But even if the First Amendment is triggered, there is emphatically no core political speech involved, and the requisite balancing of interests tilts heavily (if not entirely) in the State's direction.

**I.     Sending a Voter a Partially Completed Advance Mail Ballot Application is *Conduct*, Not *Speech***

VPC's First Amendment challenges to the Pre-Filled Application Prohibition must fail because the statute restricts neither speech nor association. The only thing being limited is *non-expressive conduct*. The First Amendment is thus not implicated here. "[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies," *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984), and VPC falls far short of this mark.

> *A.     The Partially Completed Advance Mail Ballot Applications that VPC Sends to Voters are Not Inherently Expressive*

While the First Amendment safeguards both speech and certain types of conduct, "only conduct that is 'inherently expressive' is entitled to First Amendment protection." *Voting for Am. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006) ("FAIR")). In assessing whether specific conduct has "sufficient 'communicative elements' to be embraced by the First Amendment, courts look to whether the conduct shows an 'intent to convey a particular message' and whether 'the likelihood

was great that the message would be understood by those who viewed it.'" *Id.* (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)).

VPC contends that by personalizing the advance voting ballot applications it sends to potential Kansas voters it engages in core political speech aimed at informing and assisting voters in the electoral process. More specifically, VPC claims that, "[t]hrough its personalized mailers, [it] engages in persuasive speech meant to encourage voters to vote by mail; persuade them that doing so is easy, safe, secure, and accessible; educate them about their right to vote by mail; and assist them in exercising that right." Ex. AA. Pre-filling these applications allegedly "expresses [its] position on the important and controversial political issue of voting by mail." *Id.*

But the conduct at issue – pre-populating an advance voting ballot application with the name and address of the intended recipient and mailing it to the voter (who did not request it) – is entirely separate from the messages VPC seeks to convey about mail voting. The messages that VPC communicates to voters about the vote-by-mail process and the alleged utility thereof are delivered through the contents of *a cover letter that VPC sends with the application, not through the application itself*. That cover letter, and the message contained therein, a copy of which is found at Ex. I, is wholly unaffected by the Pre-Filled Application Prohibition. The pre-filling of the application itself, on the other hand, embodies *conduct*, not expression.

Nothing in the challenged statute impedes VPC from engaging in any of the messaging that it imparts through its cover letter. VPC is in no way prevented from publishing or mailing content that educates Kansans on how to vote by mail or the purported benefits of doing so. Nor is VPC restricted from advocating in favor of voting an absentee ballot through the mail. SOF ¶ 87. In the wake of Kansas' agreement to a permanent injunction against the enforcement of K.S.A. 25-1122(*l*)(1), *see* Dkt #73, VPC is not even prohibited from including a blank advance mail ballot

application in its mailings.  For that matter, neither VPC nor any other entity is precluded from assisting a voter in completing such an application or in mailing a partially completed application to a voter who has affirmatively requested one.  *Id.* at 2-3.[2]  In short, every avenue of expressive conduct remains available.

The only thing VPC cannot do is partially complete the advance voting ballot application it sends to voters who have not requested one from VPC (as is true of all the voters to whom it sends such pre-filled applications).  But there is no conceivable "speech" on that application.  It is simply a state-created form.  *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997) (recognizing that while a person or party may express beliefs or ideas through a ballot, "[b]allots serve primarily to elect candidates, not as forums for political expression.").  There is nothing that can be filled out on the form other than a voter's county of residence, address, date of birth, phone number, date of application, and signature, all of which are unique to the individual voter.  VPC has no discretion regarding the information entered into those fields if it wants the form to be accepted by election officials.  There is no space on the face of the form for any sort of messaging, nor would any messaging be permitted on that part of the official application.

Moreover, even if sending a *blank* advance voting ballot application to a voter somehow was endowed with sufficient communicative elements to trigger the First Amendment – conduct which is not prohibited by Kansas law – it does not follow that a separate message would be conveyed by *pre-filling* the application by adding the voter's name and address to the lines on the official state form.  There is nothing "inherently expressive" about an individual's name and

---

[2] As noted in the Stipulation, "where a registered voter asks a person to mail or cause to be mailed an advance voting ballot application to the registered voter, and that person does so, that person does not "solicit[] by mail a registered voter to file an application for an advance voting ballot" as set forth in section 3(k)(1) of HB 2332 [K.S.A. 25-1122(k)(1)]."  Dkt #73 at 2-3.  This is why Plaintiff VoteAmerica's claims are no longer part of the case.

address in the context of an official ballot application, especially when the application is being completed by someone other than the voter. Furthermore, Plaintiffs have produced no evidence that any recipient of such a personalized application discerns any particular message from the pre-filling of their personal information by a third party. SOF ¶¶ 84-85.

The Supreme Court in *FAIR* expressly "rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 547 U.S. at 65-66 (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)). Instead, the Court has "extended First Amendment protection only to conduct that is inherently expressive." *Id.* at 66. And where the expressive component of an individual's "actions is not created by the conduct itself but by the speech that accompanies it," that "explanatory speech is . . . strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection under" the First Amendment. *Id.* Were the rule otherwise, "a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

VPC construes all of the materials contained in its mailing to voters – i.e., the cover letter, the transmittal envelope, the return envelope, and the pre-filled advance voting ballot application – as a message in whole. The First Amendment, however, "does not protect any conduct that at some point might have a *connection* to speech." *Sickles v. Campbell Cnty., Ky.*, 501 F.3d 726, 734 (6th Cir. 2007) (emphasis added). The application must be disaggregated from the cover letter. A contrary ruling would not only depart from the Supreme Court's directive in *FAIR*, but it would also allow a plaintiff to claim to have engaged in speech at the highest level of generality and then seek to sweep in virtually all conduct allegedly related to that speech as constitutionally protected. The First Amendment is not nearly so broad. *See Holder v. Humanitarian Law Project*, 561 U.S.

25

1, 25 (2010) (speech cannot be defined at the highest "level of generality" in assessing the reasonableness of government regulations on conduct).

VPC's CEO claims that the organization's messaging is more effective and successful when it pre-populates the applications "because there is a higher rate of return if the voter sees their [sic] name and address pre-filled." Ex. G at 150:2-19. Even if true – and VPC produced no competent evidence to support this argument during discovery – the argument would be irrelevant. As the Fifth Circuit noted in rejecting a similar argument in the context of voter registration forms, "[plaintiffs] essentially seek a First Amendment right not just to speak out or engage in 'expressive conduct' but also to succeed in their ultimate goal regardless of any other consideration." *Steen*, 732 F.3d at 391 (quotation omitted). "Only two possibilities flow from this reasoning. . . . [Either] throwing voter registration forms in the trash would have to be constitutionally protected expressive conduct," or "supporting voter registration is the canvasser's speech, while actually completing the forms is the voter's speech, and collecting and delivering the forms are merely conduct." *Id.* at 391-92. In explaining why this theory cannot be squared with First Amendment case law, the Fifth Circuit observed:

> One clear principle that can be derived from the long line of election-related speech cases is that the degree of protection afforded under the First Amendment does not vary in accordance with anyone's regard for the content of the message at issue. Thus, the logic of the Appellees extends to parties who wish to see fewer citizens vote even if it is true that Appellees' ultimate goal is to have more citizens vote. The prevailing cases also do not extend First Amendment protection to an "anything goes" philosophy that seeks to insulate any conduct that may relate in any way to speech or expression. Here, Appellees offer a novel interpretation of the First Amendment. They contend that expressive activity, the promotion of voter registration in this case, is contingent upon the "success" factor of *actually registering voters*. While the First Amendment protects the right to express political views, nowhere does it guarantee the right to ensure those views come to fruition. To maintain otherwise would mean that a group seeking to discourage voting and voter registration would have the "right" to achieve its expressive goals by throwing the registration cards away.

26

*Id.* at 392 n.5 (emphasis in original) (internal citation omitted). VPC's novel theory would render virtually every feature of a state's electoral regulatory scheme vulnerable to constitutional attack just because such law might stand in the way of an advocacy organization's effort to maximize the success of its operations.

Unsurprisingly, the overwhelming majority of courts to examine the issue have concluded that the distribution of advance voting ballot applications is *not* protected speech. In fact, these same Plaintiffs challenged a virtually indistinguishable Georgia statute, adopted just months before the Kansas provision, on the same grounds asserted here. The court rejected those claims, holding that pre-filled absentee ballot application restrictions do not entail expressive conduct subject to First Amendment protection. *See VoteAmerica v. Raffensperger*, __ F. Supp.3d __, 2022 WL 2357395, at *7-9 (N.D. Ga. June 30, 2022). The court reasoned that "distributing forms prefilled with a prospective voter's own personal information" does "not require the type of interactive debate and advocacy that the Supreme Court constituted core political speech in *Meyer* [*v. Grant*, 486 U.S. 414 (1988)]." *Raffensperger*, 2022 WL 2357395, at *7. The court further added:

> [C]ombining speech (in the cover information) with the conduct of sending an application form, as Plaintiffs do here, is not sufficient to transform the act of sending the application forms into protected speech. Plaintiffs' pro-absentee voting message is not necessarily intrinsic to the act of sending prospective voters an application form. . . . As in [*FAIR*], the expressive component of sending application packages in this case is not created by the conduct itself but by the included cover information encouraging the recipient to vote. The necessity of the cover message is 'strong evidence' that the conduct of sending an application form is not so inherently expressive as to qualify for First Amendment protection.

*Id.* at *9; *accord DCCC v. Ziriax*, 487 F. Supp.3d 1207, 1235 (N.D. Okla. 2020) ("[C]ompleting a ballot request for another voter, and collecting and returning ballots of another voter, do no communicate any particular message. Those actions are not expressive. . . ."); *League of Women Voters v. Browning*, 575 F. Supp.2d 1298, 1319 (S.D. Fla. 2008) (same).

27

The bottom line is that pre-filling advance voting ballot applications is *non-expressive conduct* that the State is free to regulate as part of a legitimate, non-discriminatory election process. As such, the Pre-Filled Application Prohibition is subject only to rational basis scrutiny. *Steen*, 732 F.3d at 392; *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 681 (2012) (government classification that involves neither a "fundamental right" nor a "suspect" classification is constitutionally valid if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification.").

B.     *The Cases that the District Court Cited in its Preliminary Injunction / Motion to Dismiss Order are Inapposite.*

Defendants acknowledge that this Court reached a contrary conclusion in its order denying our motion to dismiss and granting Plaintiffs a preliminary injunction. However, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Tex. v. Camenish*, 451 U.S. 390, 395 (1981). Nor are they binding at the summary judgment phase. *Navajo Health Found.-Sage Mem. Hosp., Inc. v. Burwell*, 256 F. Supp.3d 1186, 1224 (D.N.M. 2015). In any event, the Court's analysis largely focused on K.S.A. 25-1122(*l*)(1)'s Out-of-State Distributor Ban, which is no longer at issue in this case. Analyzed separately, the notion that the act of a third-party in writing someone else's name on an official state form is constitutionally-protected expressive conduct would stretch the First Amendment well beyond its limits. The three non-binding cases that the Court cited in support of its reasoning (Dkt #61 at 12) – to the extent they were even correctly decided – do not justify a similar conclusion in the far narrower context now presented by the Pre-Filled Application Prohibition.

In *League of Women Voters of Fla. v. Cobb*, 447 F. Supp.2d 1314 (S.D. Fla. 2006), the court addressed a First Amendment challenge to a statute imposing deadlines for the submission of voter registration applications and fines for late submissions by any organization other than a

political party. *Id.* at 1315. The court held that these laws implicated plaintiffs' free speech and association rights because the "collection and submission of voter registration drives is intertwined with speech and association." *Id.* at 1333-34. This decision was largely an outlier and runs against the overwhelming case law – including the only two circuits to have squarely addressed the issue – that sending or collecting forms is *not* expressive conduct. *See New Ga. Project v. Raffensperger*, 484 F. Supp.3d 1265, 1300-01 (N.D. Ga. 2020) (collecting cases, including *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018), *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 372 (9th Cir. 2016), and *Steen*, 732 F.3d at 391)), *aff'd* 976 F.3d 1278 (11th Cir. 2020). Moreover, as noted below, voter registration forms are fundamentally distinct from absentee ballot applications. In any event, in the wake of the parties' Stipulation, neither VPC nor any other entity is restricted under Kansas law from sending advance mail ballot applications to voters, nor is VPC subject to any rules or regulations that are not equally applicable to all other private parties and organizations.

Similarly, in *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp.3d 159 (M.D.N.C. 2020), plaintiffs mounted a First Amendment challenge to a North Carolina statute that restricted, *inter alia*, third-parties from assisting voters in completing and returning absentee ballots. *Id.* at 173. Conceding that most other judges had reached a different result, the court in *Democracy N.C.* nevertheless concluded that "assisting voters in filling out a request form for an absentee ballot is expressive conduct which implicates the First Amendment." 476 F. Supp.3d at 224.[3] But once

---

[3] Notably, although the court determined at the preliminary injunction phase that assisting voters in filling out absentee ballot request forms implicates the First Amendment, it went on to hold that *Anderson-Burdick* balancing – not strict scrutiny – applies to such laws and that "the burdens on Plaintiffs' First Amendments speech and association rights are justified by the State's interest in preventing fraud." *Democracy N.C.*, 476 F. Supp.3d at 224. Moreover, in ruling on defendants' motion to dismiss, the court expressed misgivings with its prior ruling and explicitly noted that it was *not* ruling "that assisting voters in filling out a request form for an absentee ballot is expressive conduct which implicates the First Amendment as a matter of law." __ F. Supp.3d __, 2022 WL 715973, at *6-8 (M.D.N.C. Mar. 10, 2022). The court opted instead to simply *assume* the First Amendment applied at the motion to dismiss stage and then address the matter definitively at summary judgment or trial. *Id.* at *8.

29

again, nothing in Kansas law prevents a third-party from assisting a voter in completing an advance mail ballot application. To the contrary, the parties' Stipulation makes clear that if a voter requests such assistance, the statute is not violated. Dkt #73 at 2-3. In fact, *in-person* interactions – whether involving an advance mail ballot application or otherwise – between third-parties and voters are wholly unregulated by the State's Pre-Filled Application Prohibition. Only the *unsolicited* (i.e., unrequested) pre-population of advance ballot applications sent to voters through the mail by third-party organizations is prohibited by the statute.

The final case cited by this Court was *Priorities USA v. Nessel*, 462 F. Supp.3d 792 (E.D. Mich. 2020). There, the plaintiffs sought an injunction against Michigan's absentee ballot law on the grounds that it contravened their First Amendment speech and association rights to assist voters with absentee ballot applications. In particular, plaintiffs alleged that the statute's requirement that, other than family or household members, only voters registered in Michigan can assist voters in submitting absentee ballot applications violates the First Amendment because it prohibits the plaintiffs "from engaging in core political expression." *Priorities USA v. Nessel*, 487 F. Supp.3d 599, 609 (E.D. Mich. 2020). Plaintiffs further claimed that the law's restriction on non-family or household members from soliciting a voter to return an absentee ballot application also violated the First Amendment. *Id.* Although the court opted for the minority view and held that Michigan's absentee ballot prohibitions regulated expressive conduct and was subject to heightened scrutiny, *id.* at 609-612, it ultimately denied plaintiffs injunctive relief, holding that "the state's interests in preventing fraud and abuse in the absentee ballot application process and maintaining public confidence in the absentee voting process are sufficiently important interests and are sufficiently

30

related to the limitations and burdens set forth in [the statute] . . . that plaintiffs are unlikely to succe[ed] on their First Amendment challenge to the Absentee Ballot Law." *Id.* at 615.[4]

Contrary to the position of the Plaintiffs (and, with respect, of the Court) at the preliminary injunction stage, this case is also highly similar to *Lichtenstein v. Hargett*, 489 F. Supp.3d 742 (M.D. Tenn. 2020), which involved a constitutional challenge to a Tennessee statute prohibiting anyone other than an election official from giving an absentee ballot application to another person. The district court there concluded that the restriction on distribution of absentee voter applications was not a ban on core political speech at all, *id.* at 773, as it did "not restrict anyone from interacting with anyone about anything." *Id.* at 770. Of course, the avenues of communication available to VPC here are far broader than those available in *Lichtenstein*, which flatly prohibited the sending of *any* absentee ballot applications to voters. Kansas' Pre-Filled Application Prohibition merely restricts the *unsolicited* mailing of pre-populated applications. This Court sought to distinguish *Lichtenstein* on the grounds that VPC's "application packets include speech that communicates a pro-mail voting message." Dkt #61 at 12. But there is no basis for this factual distinction. Indeed, as the *Lichtenstein* district court subsequently made clear in its order dismissing the case, the plaintiffs there – just like VPC – included a blank absentee ballot application with the other "voter engagement materials" they sent to voters. *Lichtenstein v. Hargett*, __ F. Supp.3d __, 2021 WL 5826246, at *6 (M.D. Tenn. Dec. 7, 2021).

---

[4] Interestingly, the plaintiffs did not appeal the denial of their motion for a preliminary injunction, but the defendants did appeal a separate part of the ruling in which the district court *granted* a preliminary injunction on plaintiffs' claim that a state law prohibiting third-parties from paying for the transportation of voters to the polls unless the voter is physically unable to walk. The Sixth Circuit promptly reversed that holding. *See Priorities USA v. Nessel*, 978 F.3d 976, 984 (6th Cir. 2020) (noting that "a statute can be a prophylactic rule intended to prevent the potential for fraud where enforcement is otherwise difficult" and that Michigan's law was properly "intended to prevent fraud and undue influence.").

31

C.    *The Pre-Filled Application Prohibition is Rationally Related to the State's Legitimate Interests.*

Because the First Amendment is not implicated, the Pre-Filled Application Prohibition is properly evaluated under rational basis review. *See Save Palisade Fruitlands v. Todd*, 279 F.3d 1204, 1210-13 (10th Cir. 2002) (where statute neither infringes on a federal fundamental right nor affects a suspect classification, it is subject to rational basis scrutiny). Under this extremely liberal standard, the statute "need only be rationally related to a legitimate government purpose." *Id.* at 1210. The "statute is presumed constitutional and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe*, 509 U.S. 312, 320-21 (1993) (internal citation and alterations omitted). "A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification" because a "legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* at 320. Nor must the statute have been adopted with "mathematical nicety." *Id.* at 321. Rather, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Id.* The Pre-Filled Application Prohibition easily satisfies this standard.

The State's regulatory interests in the Pre-Filled Application Prohibition are the avoidance of voter confusion, facilitation of orderly and efficient election administration, enhancement of public confidence in the integrity of the electoral process, and deterrence of voter fraud. All are well-recognized and indisputably legitimate interests in the context of election administration. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021) (combatting fraud is "strong and entirely legitimate" reason for enacting voting laws); *Doe v. Reed*, 561 U.S. 186, 197-98 (2010) ("The State's interest in preserving the integrity of the electoral process is undoubtedly

32

important . . . [and it] extends more generally to promoting transparency and accountability in the electoral process."); *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (State has "compelling interest in protecting voters from confusion and undue influence."); *Marchioro v. Chaney*, 442 U.S. 191, 196 (1979) ("The State's interest in ensuring that [its electoral] process is conducted in a fair and orderly fashion is unquestionably legitimate."); *Storer v. Brown*, 415 U.S. 724, 730 (1974) ("[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."); *DSCC v. Pate*, 950 N.W.2d 1, 5-7 (Iowa 2020) (rejecting constitutional challenge to statute that prohibited third-parties from pre-populating voters' absentee ballots).

VPC seems to think it is doing a favor for Kansas voters and election officials alike by pre-populating advance voting ballot applications with information that does not necessarily match the data in ELVIS. The confusion, frustration, anger, and chaos in the 2020 General Election give lie to that suggestion. As Ms. Cox and Messrs. Howell and Caskey described from Kansas' 2020 experience, and as VPC's emails from Virginia, Iowa, Wisconsin, and North Carolina confirmed elsewhere, VPC's actions precipitated significant consternation among voters who received both inaccurate and duplicate advance voting ballot applications, adversely impacted election officials' ability to administer the election in an efficient manner, contributed to a decline in the public's confidence in the fairness of election procedures, and tested the limits of procedural safeguards. SOF ¶¶ 49-83. The Pre-Filled Application Prohibition is clearly related to each of the aforementioned legitimate state interests. There can be no serious question, therefore, that Kansas had a rational basis for adopting this legislation.

33

II.     **Even if the First Amendment is Implicated, the Pre-Filled Application Prohibition is Viewpoint- and Content-Neutral and Not Subject to Heightened Scrutiny**

A.     *The Pre-Filled Application Prohibition Does Not Target Core Political Speech.*

If, notwithstanding the preceding analysis, the Court still concludes that the Pre-Filled Application Prohibition targets expressive conduct, there is certainly no "core political speech" at issue and thus no basis for imposing "exacting" or "strict" scrutiny in the claims challenging this statute.

In promulgating a heightened scrutiny standard, VPC relies upon *Meyer*, 486 U.S. at 414. Parroting language from that opinion, VPC claims that the Pre-Filled Application Prohibition restricts its core political speech by proscribing its "most effective method available – distribution of pre-filled advance mail ballot applications to potential Kansas voters – to communicate its message that voters should participate in the democratic process and, in particular, should do so through advance mail ballots." Ex. BB.  VPC further avers that the law represents a content-based restriction on its First Amendment rights, apparently theorizing that the statute's "limitations apply to particular speech because of the topic discussed and it defines the category of covered communications by their content." Dkt #1 at ¶ 90.  For example, VPC suggests, "[t]he prohibition singles out personalized advance voting applications but has no such prohibition on other similar forms of speech," such as "personalizing applications for . . . voter registration activities." *Id.*

There are numerous flaws in VPC's argument.  First, VPC produced no evidence in support of its theories regarding (i) the messages that voters understand from its pre-filled advance voting ballot applications or (ii) the effectiveness of pre-filling those applications.  In fact, VPC's CEO (Plaintiffs' Rule 30(b)(6) witness) testified that he did not even know if the recipient of a pre-filled application "views a political message in whether or not their name is filled out on" the application. SOF ¶ 85.

34

Second, any restrictions imposed by the Pre-Filled Application Prohibition are viewpoint-and content-neutral.  The Supreme Court recently clarified its jurisprudence as to what constitutes a "content-based" regulation of speech.  *See City of Austin v. Reagan Nat'l Advert. of Austin*, 142 S. Ct. 1464 (2022).  That case involved a regulation of signage, with different rules applying to signs located on the premises of the place being advertised versus signs located offsite.  The Court first reiterated that a "regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content' – that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *Id.* at 1471 (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).  But the Court then criticized the overly broad interpretation that many lower courts have ascribed to *Reed*.  The Court explained that if the government's regulatory distinctions "require[] an examination of speech only in service of drawing neutral" lines, then the regulation "is agnostic as to content." *City of Austin*, 142 S. Ct. at 1471.  In other words, the mere fact that one must read something to determine the applicability of a regulation does *not* render it content-based.  *Id.*  To the contrary, "absent a content-based purpose or justification," the challenged law will be deemed content neutral and strict scrutiny will not be warranted.  *Id.*

Just as was true of the signs in *City of Austin*, the Pre-Filled Application Prohibition is agnostic as to content.  *Nothing* in the law precludes VPC from communicating any information or viewpoint whatsoever about advance voting, voting by mail, or any other topic.  VPC concedes this fact.  Indeed, Mr. Lopach admitted in his deposition that the Pre-Filled Application Prohibition does not restrict VPC from encouraging individuals to participate in the democratic process, from instructing them how to obtain or vote an advance ballot, from encouraging them to vote early or

35

by mail, or from communicating any other message in the mailers that it sends to targeted voters. SOF ¶ 87.

Like the signs in *City of Austin*, pre-filling advance ballot applications also expresses no "idea or message." *See id.* at 1474 (rejecting "view that *any* examination of speech or expression inherently triggers heightened First Amendment concern."). The applications at issue here, which are simply official state forms with no room for any extraneous communications, are designed solely to facilitate voters' ability to procure advance ballots, not to spread political messages of any sort. Given the Supreme Court's clear statement that "[b]allots serve primarily to elect candidates, not as forums for political expression," *Timmons*, 520 U.S. at 363, there is no possible basis for suggesting that pre-filling a ballot *application* can serve a communicative purpose.

As for VPC's argument that the Pre-Filled Application Prohibition represents a content-based restriction because the State does not likewise limit the pre-filling of voter registration forms, this overlooks critical distinctions between the two in their timing, effect, operation, and impact. The submission of a voter registration application is several steps removed from the act of casting a ballot. Initial voter registration applicants are also new to the State's electoral infrastructure, with no immediately accessible election database in place to adjudge the accuracy of all the data in the submission. By contrast, voters seeking an advance voting ballot application are already registered to vote and have all their pertinent data in the State's voter file. The application, in turn, must precisely match the State's voter file data before an advance ballot will be issued. SOF ¶ 18. Moreover, advance voting ballot applications are much more directly connected to the act of voting. The risks of voter confusion and voter fraud are thus heightened, as is – most importantly – the potentially adverse impact on the efficiency and effectiveness of the election administration process. The differential treatment of the two has nothing at all to do with *content*; it is simply a

36

byproduct of the often dissimilar issues and potential problems raised in these two distinct parts of the electoral system.

The Supreme Court rejected a similar argument in *Burson*, which involved a constitutional challenge to a Tennessee statue prohibiting the solicitation of votes and the display of campaign materials within 100 feet of a polling place. Casting aside the plaintiff's claim that the statute was an unlawful content-based restriction on her free speech rights because it did not *also* limit other types of speech such as charitable and commercial solicitation or exit polling within that 100-foot zone, the Court held that "the failure to regulate all speech" does not render a statute "fatally underinclusive." 504 U.S. at 207. Rather, the Court explained, "States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist." *Id.* Any other ruling would bring states to a standstill.

VPC's legal theory improperly conflates the speech issues at play (and the accompanying jurisprudence) in the context of referendum petitions – as in both *Meyer* and *Buckley v. American Constitutional Law Foundation, Inc.*, 552 U.S. 182 (1999) – with the *absence* of such issues in the absentee ballot application process. When it comes to a referendum, an "individual's signature will express the view that the law subject to the petition should be overturned. Even if the signer is agnostic as to the merits of the underlying law, his signature still expresses the political view that the question should be considered 'by the whole electorate.'" *Doe*, 561 U.S. at 195 (citing *Meyer*, 486 U.S. at 421). "In either case, the expression of a political view implicates a First Amendment right." *Id.* That is why restrictions on who can interact with the public in procuring referendum signatures are seen as having "specifically regulated the process of advocacy itself, dictating who [can] speak (only unpaid circulators and registered voters) or how to go about speaking (with name badges and subsequent detailed reports)," thereby "reducing the total

37

quantum of speech, the number of voices who will convey [the plaintiffs'] message and the hours they can speak, and . . . the size of the audience they can reach." *Steen*, 732 F.3d 390 (quoting *Meyer*, 486 U.S. at 422-23).

By contrast, Kansas' Pre-Filled Application Prohibition does not restrict anyone from communicating with anyone else about anything. It does not even limit a third-party from mailing a blank advance voting ballot application to another voter. Nor does it limit a third-party from providing a pre-populated application to a voter who has specifically requested it. The only thing being constrained is the mailing of an unsolicited, pre-filled application. Under no reasonable interpretation can such a *de minimis* regulation be deemed to be a limitation on core political speech such that it warrants the kind of sanctified constitutional protection and exacting scrutiny that VPC demands.

Even if the Court finds that prohibiting the mailing of unsolicited, pre-filled advance ballot applications entails expressive conduct, the State would *still* be entitled to deference in the review of such law. As the Supreme Court explained in *Doe*, a case challenging the compelled disclosure of signatory information on referendum petitions, which is indisputably expressive conduct, the electoral context is highly relevant to the nature of its First Amendment review. 561 U.S. at 195. The Court noted: "We allow States significant flexibility in implementing their own voting systems. To the extent a regulation concerns the legal effect of a particular activity in that process, the government will be afforded substantial latitude." *Id.* at 195-96 (citation omitted); *see also id.* at 212-13 (Sotomayor, J., concurring) ("States enjoy considerable leeway to choose the subjects that are eligible for placement on the ballot and to specify the requirements for obtaining ballot access . . . [E]ach of these structural decisions inevitably affects – at least to some degree – the individual's right to speak about political issues and to associate with others for political ends. ...

38

It is by no means necessary for a State to prove that such reasonable, nondiscriminatory restrictions are narrowly tailored to its interests."); *cf. Burson*, 504 U.S. at 206-08 (rejecting First Amendment overbreadth challenge to a statute establishing a 100-foot buffer zone outside polling places on Election Day within which *no one* could display or distribute *any* campaign materials or solicit votes on the grounds that the restraint was a valid prophylactic measure designed to prevent difficult-to-detect voter intimidation and election fraud).

> **B.      Assuming the First Amendment is Implicated, the Proper Standard for Evaluating VPC's Claims is the Anderson-Burdick Test.**

Assuming the Court even finds that the First Amendment is implicated, the proper standard of review is the *Anderson-Burdick* test. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). When a State invokes its constitutional authority to regulate elections to ensure that they are fair and orderly, the resulting restrictions will "inevitably affect – at least to some degree – the individual's right to vote and his right to associate with others for political ends." *Anderson*, 460 U.S. at 788. These burdens "must necessarily accommodate a State's legitimate interest in providing order, stability, and legitimacy to the electoral process." *Utah Republican Party*, 892 F.3d at 1077. That is why a State's "important regulatory interests are generally sufficient to justify reasonable, non-discriminatory restrictions" on election procedures. *Anderson*, 460 U.S. at 789.

There is "no 'litmus-paper' test that will separate valid from invalid restrictions." *Id.* The Court instead applies a "more flexible standard." *Burdick*, 504 U.S. at 434. Under this flexible approach, referred to as *Anderson/Burdick* balancing, a "court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into

39

consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Cox*, 892 F.3d at 1077 (quoting *Burdick*, 504 U.S. at 434)); *Fish v. Schwab*, 957 F.3d 1105, 1121-22 (10th Cir. 2020).

Although highly flexible, this balancing test does contain certain core guidelines. If a state imposes "severe restrictions on a plaintiff's constitutional rights . . . , its regulations survive only if 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. 434. But "minimally burdensome and nondiscriminatory regulations are subject to a less-searching examination closer to rational basis and the State's important regulatory interests are generally sufficient to justify the restrictions." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (citing *Burdick*, 504 U.S. at 434). "Regulations falling somewhere in between – i.e., regulations that impose a more-than-minimal but less-than-severe burden – require a 'flexible' analysis, weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Id.* (quotation omitted). Lurking in the background at all times, however, is the fundamental principle that "states have wide latitude in determining how to manage their election procedures." *ACLU v. Santillanes*, 546 F.3d 1313, 1321 (10th Cir. 2008).

As described above, the burden on Plaintiffs' advocacy work is minimal. Yet the State's interests in adopting the Pre-Filled Application Prohibition are substantial, outweighing any minor inconveniences that Plaintiffs may experience, particularly when subjected (as they must be) to a highly deferential rational basis review. *See Burdick*, 504 U.S. at 434.

The proliferation of pre-filled advance voting ballot applications in the 2020 General Election triggered substantial confusion, anger, and frustration among the electorate, diminished public confidence in the electoral process, had a significantly negative impact on the efficiency of election administration, and pushed the limits of the State's anti-fraud safeguards. A big part of

40

the problem was that the third-party-pre-filled applications sent to voters often contained erroneous information. Not only were confused and angry voters inundating county election officials with complaints on the issue,[5] but VPC itself was concerned enough with the faulty data it had received from Catalist (and used to pre-populate the applications sent to targeted voters) that it decided on its own to stop pre-filling the applications and began sending out blank applications for a period of time. SOF ¶¶ 38-39. It is hard to see how one can knock the State for seeking to mitigate an issue that VPC itself recognized as a serious dilemma.

In addition to sending out inaccurate advance voting ballot applications, VPC also caused large numbers of duplicate applications to be submitted. While the use of mail ballots was clearly higher in 2020 than in previous years, the staggering onslaught of duplicate applications submitted to county elections was exponentially higher than the growth in advance voting. In Shawnee and Ford Counties alone, thousands of confused voters told election officials that they thought the pre-

---

[5] Ms. Cox and Messrs. Howell and Caskey referenced the hundreds of wholly unsolicited telephone calls and office visits that they received from voters expressing confusion, frustration, and anger about the inaccurate and duplicate pre-filled advance voting ballot applications they were receiving. The sentiments expressed by such voters are *not* inadmissible hearsay. They are not being offered to establish the truth of the matter asserted or to prove a fact remembered or believed. *See* Fed. R. Evid. 801(c). They are simply offered to demonstrate voters' state of mind after receiving such materials. Testimony about a third-party's confusion is either not hearsay at all or it falls within the hearsay exception under Rule 803(3). *See CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 589 (6th Cir. 2015) (witness' testimony about telephone call with declarant in which declarant expressed confusion about the status of order "was not offered for the truth of the matter asserted . . . but rather was probative of the declarant's confusion."); *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 132-33 (3d Cir. 2004) (bank tellers' testimony about customers' out-of-court statements regarding customers' confusion was either not hearsay or fell within exception under Rule 803(3); *Univ. of Kan. v. Sinks*, 565 F. Supp.2d 1216, 1230-31 (D. Kan. 2008) (declarants' out-of-court statements about their confusion over similarity of trademarks fell within Rule 803(3) hearsay exception); *HealthOne of Denver, Inc. v. UnitedHealth Group, Inc.*, 872 F. Supp.2d 1154, 1168 (D. Colo. 2012) (same); *Troublé v. The Wet Seal, Inc.*, 179 F. Supp.2d 291, 298-99 (S.D.N.Y. 2001) (out-of-court statements by customers offered to show customer confusion was not hearsay because testimony was offered "to show the customers' state of mind – that they were confused – as opposed to the truth of what they said;" and Rule 803(3) provided alternative basis for statements' admissibility).

41

filled applications had come from the county election office and had to be returned, even if the voter had already submitted another application during the election cycle. SOF ¶ 74. One voter in Shawnee County submitted *seven* separate applications and another submitted *nine*, each of which, of course, had to be carefully reviewed by election officials. SOF ¶¶ 73, 79-80. The problems were simply unprecedented.

Meanwhile, county election officials were forced to expend huge amounts of time dealing with voter complaints, processing inaccurate and duplicate applications, undertaking the necessary cure processes to ensure that voters who submitted inaccurate and duplicate applications were given an opportunity to correct any errors and thus receive (and vote) an advance ballot. All of this was occurring at the same time that election officials were having to perform the myriad other tasks that go along with conducting a major federal election. The end result was chaos that greatly taxed the time and resources of already short-staffed and overworked county election offices. The trust and confidence that election officials had worked so hard to build up with their constituencies also began to erode, as voters – falsely believing the materials from VPC had come from the county – accused these officials of incompetency for sending out applications riddled with errors.

The problem was not limited to Kansas; VPC's activities wreaked havoc with election offices in many other states, evidenced by the written complaints that VPC received from officials in Virginia, Iowa, Wisconsin, and North Carolina. SOF ¶ 66. This is critical because a state is not restricted to demonstrating harms only within its own borders in justifying the kind of legislative enactments at issue here. *See Brnovich*, 141 S. Ct. at 2348 (upholding Arizona's ballot collection restrictions despite "Arizona ha[ving] the good fortune to avoid" fraud, and referencing fraud from proscribed activity in North Carolina); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 194-95 (2008) (upholding Indiana voter ID law even though "[t]he record contained no evidence of

42

any such fraud actually occurring in Indiana at any time in its history," but noting that "flagrant examples of such fraud in other parts of the country have been documented throughout this Nation's history"); *Burson*, 504 U.S. at 208-09 (upholding dismissal of facial attack on Tennessee law prohibiting solicitation of voting and campaign materials within 100 feet of polling place despite the State producing no evidence of the necessity of that boundary, and noting that the Court "never has held a State to the burden of demonstrating empirically the objective effects on political stability that are produced by the voting regulation in question").

The State also has an interest in avoiding potential fraud. *See Brnovich*, 141 S. Ct. at 2340. The risk of voter fraud is particularly acute with mail-in voting. *See, e.g., Crawford*, 553 U.S. at 195-96; *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 239 (5th Cir. 2020); Comm'n on Fed. Elections Reform ("Baker-Carter Commission"), *Bldg. Confidence in U.S. Elections* 46 (Sept. 2005) ("Absentee ballots remain the largest source of potential voter fraud."). While Kansas appears to have avoided any systemic fraud in its recent elections, the surge of inaccurate and duplicate pre-filled advance voting ballot applications in 2020 taxed the ability of overburdened county election offices to timely and efficiently process such applications, which also necessarily increased the opportunity for mistakes to be made both in connection with advance voting ballot applications and election administration in general. The idea that election-related criminal laws currently on the books represent a baseline above which a legislature cannot go without justifying to a federal court why such greater sanction is necessary is at odds with the separation of powers among the coordinate branches.

The restrictions imposed by the Pre-Filled Application Prohibition are virtually identical to those in *Raffensperger*, where the court rejected the same constitutional claims asserted here. *See* 2022 WL 2357395, at *12-18. The statue now before this Court is also far less rigorous than

43

the outright bar on third-party distribution of absentee ballots at play in *Lichtenstein*. Yet that court, in upholding a more restrictive Tennessee law against constitutional claims similar to those here, recognized the State's strong regulatory interests that apply with equal or greater force in Kansas:

> Among other things, there is a rational basis to believe that by prohibiting everyone (other than election commission employees) from distributing absentee-ballot applications, the State can: (a) increase the integrity of the absentee ballot process by, among other things, better ensuring that an absentee-ballot application is being submitted by someone who truly wants to submit the application, that the applicant does not miss out on voting absentee (and perhaps, as a direct result, voting at all) due to misleading addressing or other information provided by a distributor, and that the applicant is not mistakenly provided by election officials with multiple absentee ballots; and (b) decrease the risk of voter confusion arising from, among other things, voters' receipt of (i) applications mistakenly believed by some recipients to be from election officials, (ii) applications from multiple distributors, or (iii) incorrect addressing or other information from the distributor regarding absentee voting.

*Lichtenstein*, 489 F. Supp.3d at 783-84.

Not only is there no narrow tailoring requirement under the *Anderson-Burdick* framework, but as the Supreme Court recently explained, a State's "entire system of voting" – not just the impact on a small segment of the electorate – must be examined "when assessing the burden imposed by a challenged provision." *Brnovich*, 141 S. Ct. at 2340. Under those circumstances, VPC can establish no entitlement to relief.

## III. The Pre-Filled Application Prohibition Does Not Contravene VPC's Freedom of Association Rights

VPC additionally claims that the Pre-Filled Application Prohibition abridges its First Amendment freedom of association. Little, if anything, appears to be left of this cause of action in the wake of the parties' Stipulation. *See* Dkt #73. Mr. Lopach, in fact, conceded that Kansas' law does not constrain VPC from banding together with other persons or organizations to engage potential voters and encourage the use of advance mail voting. SOF ¶ 86.

44

At an abstract level, VPC contends that the challenged statute prevents the organization from "broadening the base of public participation in and support for [its] activities promoting democratic engagement through voting an advance mail ballot." Dkt #1 at ¶ 97.  More specifically, VPC alleges that the restrictions on pre-filling unsolicited advance ballot applications amount to "a direct regulation of the communications and political association between [VPC] and Kansans that seeks to increase participation in democracy and effect change." *Id.* at ¶ 99.  VPC goes on to say that the statute "eliminates the method by which [it] connect[s] with voters at the advance ballot application phase to gain a foothold with Kansans for further association and group engagement for political expression." *Id.*  This claim fails on both the facts and the law.

Freedom of association protects "joining in a common endeavor" or engaging in "collective effort on behalf of shared goals." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 622 (1984).  It does not protect connections between people who "are not members of any organized association," are "strangers to one another," and do not come together to "take positions on public questions." *Dallas v. Stanglin*, 490 U.S. 19, 24-25 (1989).

Mailing pre-populated advance voting ballot applications to voters with whom VPC has no connection does not implicate the freedom of association.  It is a unilateral act that can be ignored by the would-be associate.  The recipients are not members of any organization or otherwise joined in a common endeavor or collective effort on behalf of shared goals, but are strangers who simply receive similar mass-mailers.  Some complete the application in the hope of electing a particular candidate, some complete it in the hope of electing that candidate's opponent, some complete it and never vote, and some ignore it altogether.  Moreover, unlike a referendum or initiative petition that requires joint effort, "applications are individual, not associational, and may be successfully submitted without the aid of another." *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 898

45

n.13 (5th Cir. 2012). If these sorts of bare communications constituted First Amendment association, then most of modern civilization would be immune from regulation. The court in *Raffensperger* rejected this same cause of action asserted by these same Plaintiffs involving virtually the same statute. *Raffensperger*, 2022 WL 2357395, at *10. This Court should reach the identical result.

## IV. VPC's Overbreadth Claim Has No Merit

VPC additionally claims that the Pre-Filled Application Prohibition is unconstitutionally overbroad. It raises both facial and as-applied attacks on the statute. Dkt #1 at ¶¶ 107-108. In particular, VPC claims that restrictions on personalizing unsolicited advance ballot applications amount to "a direct regulation of the communications and political association between [VPC] and Kansans that seeks to increase participation in democracy and effect change." *Id.* at ¶ 99. VPC suggests that the statute "eliminates the method by which [it] connect[s] with voters at the advance ballot application phase to gain a foothold with Kansans for further association and group engagement for political expression." *Id.* This claim does not survive scrutiny.

When making an overbreadth claim pursuant to the First Amendment, the challenger must show that the statute in question "punishes a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2004); *see also United States v. Williams*, 553 U.S. 285, 292 (2008) ("In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial,* not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."). In other words, the mere fact that *some* impermissible applications of a law may be conceivable does not render that law unconstitutionally overbroad; there must be a realistic danger that the law will *significantly* compromise recognized First Amendment protections. This is particularly true

46

where, as is the case here, *conduct* and not merely speech is involved. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The Court examines both the text of the law and the facts on the ground when undertaking this analysis. *Faustin v. City & Cty. of Denver, Colo.*, 423 F.3d 1192, 1199 (10th Cir. 2005) (citing *Hicks*, 539 U.S. at 122).

The overbreadth doctrine is "strong medicine" and thus must be applied "with hesitation, and then only as a last resort." *New York v. Ferber*, 458 U.S. 747, 769 (1982). Thus, if a statute is readily susceptible to a narrowing construction that will remedy any constitutional infirmity, the statute will be upheld. *Va. v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988). To the extent a statute is not readily susceptible to a narrowing construction, if the unconstitutional language is severable from the remainder of the statute, "that which is constitutional may stand while that which is unconstitutional will be rejected." *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 502 (1985) (quotations omitted). Moreover, even if a law touches on political speech protected by the First Amendment, declaring a statute invalid may not be appropriate in light of the State's interests. "[T]here comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law – particularly a law that reflects legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Faustin*, 423 F.3d at 1199 (quoting *Hicks*, 539 U.S. at 119).

A.    *The Pre-Filled Application Prohibition is Not Overbroad as Applied to VPC's Activities*

When considering an as-applied overbreadth challenge, courts recognize that a statute in question may be constitutional in many of its applications but not as applied to the plaintiff and his/her applicable circumstances. *See N.M. Youth Organized v. Herrera*, 611 F.3d 669, 677 n.5 (10th Cir. 2010). "A successful as-applied challenge is, thus, a necessary, but not sufficient,

47

ingredient to a successful facial challenge." *United States v. Streett*, 434 F. Supp. 3d 1125, 1171–72 (D.N.M. 2020).

VPC alleges that its ability to encourage Kansans to engage in the democratic process is burdened because it will not be able to include a pre-filled advance voting ballot application in its mailers. But its CEO, Mr. Lopach, acknowledged that, other than not being allowed to insert a voter's name and address on the ballot application, nothing in the Kansas law restricts VPC from encouraging individuals to participate in the democratic process, instructing them how to obtain or vote an advance ballot, encouraging them to do so, or communicating any other message in the mailers sent to targeted voters. There is no bar whatsoever to VPC's ability to send mailers expressing any message it wishes to convey about the importance of voting in general or voting by mail via an advance-ballot, how to vote in person or by mail, or where to access an advance mail voting application. VPC can even include a blank application in the mailing. There are thus an infinite number of ways for VPC to communicate its message. The only thing being restricted is not speech at all; it is *non-expressive conduct* – i.e., pre-filling the advance voting ballot applications that VPC sends to Kansans who did not request one.

This logistical prohibition was adopted by the Legislature to prevent confusion among voters, facilitate greater confidence in the electoral process and those who administer it, ensure a more efficient and orderly administration of elections, and minimize the potential for fraud. To suggest that the Pre-Filled Application Prohibition impermissibly regulates a substantial amount of Plaintiffs' protected speech and associations rings hollow.

B.     *The Pre-Filled Application Prohibition is Not Facially Overbroad*

"Facial challenges based on overbreadth are disfavored," *Clark v. Schmidt*, 493 F. Supp.3d 1018, 1033 (D. Kan. 2020), and the Court must begin its analysis by presuming that the statute is

48

constitutional.  *Id.*  In this case, VPC's inability to satisfy the standards necessary to establish an as-applied challenge is also fatal to its facial overbreadth challenge.  As noted, the challenged statute allows for an unlimited array of expressive conduct and core political speech.  There is no prohibition at all on communicating with voters about anything having to do with voting (or any other subject, for that matter).  There is, in short, no impairment (let alone a substantial impairment) of any constitutionally-protected activity.  "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)."  *Hicks*, 539 U.S. at 124.  Nor has VPC come close to demonstrating that K.S.A. 25-1122(k)(2) will have a chilling effect on the First Amendment rights of parties not before the court.  *See West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1367 (10th Cir. 2000) (requiring the plaintiff to show the existence of a "realistic danger" that will "significantly compromise recognized First Amendment protections of parties not before the court.").  In sum, VPC's overbreadth claim has no merit.

## CONCLUSION

For the reasons stated herein, Defendants respectfully request that the Court grant their motion for summary judgment with regard to Counts I-III of the Plaintiffs' Complaint.

Respectfully Submitted,

By /s/ Bradley J. Schlozman
Bradley J. Schlozman, Kansas Bar #17621
Scott R. Schillings, Kansas Bar #16150
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, Kansas 67206
Telephone: (316) 267-2000
Facsimile: (316) 630-8466
Email: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com

*Attorneys for Defendants*

49

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of October 2022, I electronically filed the foregoing Defendants' Memorandum in Support of Motion for Summary Judgment Regarding Counts I-III with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By /s/ Bradley J. Schlozman

50