Case No. 25-3138

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

**VOTEAMERICA and VOTER PARTICIPATION CENTER,**

*Plaintiffs-Appellees*

v.

**SCOTT SCHWAB, in his official capacity as Kansas Secretary of State; KRIS KOBACH, in his official capacity as Kansas Attorney General; and STEPHEN M. HOWE, in his official capacity as District Attorney of Johnson County**

*Defendants-Appellants*

## APPELLANTS' APPENDIX – VOLUME II

Appeal from the U.S. District Court for the District of Kansas
Honorable Kathryn H. Vratil, District Judge
District Court Case No. 2:21-CV-02253-KHV-GEB

Kris Kobach
  Attorney General
Anthony J. Powell
  Solicitor General
**Kansas Attorney General's Office**
120 SW 10th Ave., Room 200
Topeka, KS 66612-1597
Tel.: (785) 296-2215
Fax: (785) 291-3767
Email: anthony.powell@ag.ks.gov
Email: kris.kobach@ag.ks.gov

Bradley J. Schlozman
Scott R. Schillings
Garrett R. Roe
**HINKLE LAW FIRM LLC**
1617 N. Waterfront Parkway, Ste. 400
Wichita, KS 67206
Tel: (316) 267-2000
Fax: (316) 264-1518
Email: bschlozman@hinklaw.com
Email: sschillings@hinklaw.com
Email: groe@hinklaw.com

i

## TABLE OF CONTENTS – VOLUME II

Document                                                                                              Page(s)

Plaintiff VPC's Memorandum in Support of Summary Judgment........................207

Defendants' Response to Plaintiffs' Motion for Summary Judgment...................260

Plaintiff VPC's Opposition to Defendants' Motion for Summary Judgment .......343

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

VOTEAMERICA and VOTER
PARTICIPATION CENTER,

    Plaintiffs,

  v.

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
DEREK SCHMIDT, in his official capacity
as Attorney General of the State of Kansas;
STEPHEN M. HOWE, in his official capacity
as District Attorney of Johnson County,

    Defendants.

Civil Action No. 2:21-CV-2253

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

### *Oral Argument Requested*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS............................. 2

PROCEDURAL HISTORY..................................................................................... 17

LEGAL STANDARD............................................................................................. 18

ARGUMENT.......................................................................................................... 19

I.      The Undisputed Facts Demonstrate That Plaintiff's Mailing of Personalized
        Ballot Applications Constitutes Protected First Amendment Speech, Conduct, and
        Association............................................................................................... 19

II.     The Undisputed Facts Establish That The Personalized Application Prohibition is
        Subject to Strict Scrutiny. ....................................................................... 24

        A.      The Personalized Application Prohibition Infringes Plaintiff's Core
                Political Speech Under *Meyer-Buckley*. ...................................... 25

        B.      The Personalized Application Prohibition is Content- and Viewpoint-
                based Discrimination of Plaintiff's Speech.................................... 27

        C.      The Personalized Application Prohibition Infringes Associational Rights. ......... 29

        D.      The *Anderson-Burdick* Framework is the Improper Analysis to Apply, But
                Nevertheless Requires Strict Scrutiny. ......................................... 31

        E.      The Personalized Application Prohibition is Unconstitutionally
                Overbroad. ...................................................................................... 33

III.    Defendants Cannot Meet Their Burden To Show the Personalized Application
        Prohibition Is Narrowly Tailored To Serve A Compelling State Interest. ......... 34

        A.      The Personalized Application Prohibition Does Not Serve a Compelling
                State Interest.................................................................................. 35

        B.      The Personalized Application Prohibition is Not Narrowly Tailored. ......... 37

                1.      The Personalized Application Prohibition is Not Narrowly
                        Tailored to Ease Election Administration.......................... 38

                2.      The Personalized Application Prohibition is Not Narrowly
                        Tailored to Prevent Voter Fraud or Promote Voter Confidence.............. 40

3.     The Personalized Application Prohibition is Not Narrowly
Tailored to Prevent Voter Confusion. .......................................................... 42

CONCLUSION ................................................................................................................... 43

ii

# TABLE OF AUTHORITIES

## Cases

*ACORN v. City of Tulsa, Okl.,*
835 F.2d 735 (10th Cir. 1987)...........................................................................23

*Adams v. Am. Guarantee & Liab. Ins. Co.,*
233 F.3d 1242 (10th Cir. 2000).........................................................................19

*ALDF v. Kelly,*
434 F. Supp. 3d 974 (D. Kan. 2020) .............................................................29, 38

*ALDF v. Kelly,*
9 F.4th 1219 (10th Cir. 2021)..........................................................................22, 29

*Am. Ass'n of People with Disabilities v. Herrera,*
690 F. Supp. 2d 1183 (D.N.M. 2010) ..................................................................24

*Anderson v. Celebrezze,*
460 U.S. 780 (1983)...........................................................................................31

*Artes-Roy v. City of Aspen,*
31 F.3d 958 (10th Cir. 1994)..............................................................................38

*Ashcroft v. Am. C.L. Union,*
542 U.S. 656 (2004)...........................................................................................38

*Bethune-Hill v. Va. State Bd. of Elections,*
137 S. Ct. 788 (2017)....................................................................................35, 36

*Bolger v. Youngs Drug Prod. Corp.,*
463 U.S. 60 (1983).............................................................................................43

*Bones v. Honeywell Int'l, Inc.,*
366 F.3d 869 (10th Cir. 2004).............................................................................19

*Bourgeois v. Peters,*
387 F.3d 1303 (11th Cir. 2004)...........................................................................35

*Boy Scouts of Am. v. Dale,*
530 U.S. 640 (2000) ...........................................................................................30

*Brewer v. City of Albuquerque,*
18 F.4th 1205 (10th Cir. 2021).......................................................................38, 42

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973) ...........................................................................................33

iii

*Brown v. Hartlage*,
   456 U.S. 45 (1982) ............................................................................................ 19

*Buckley v. Am. Const. L. Found., Inc.*,
   525 U.S. 182 (1999) ................................................................................... passim

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ............................................................................................. 37

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ......................................................................................... 31

*Chandler v. City of Arvada*,
   292 F.3d 1236 (10th Cir. 2002) ............................................................. 24, 25, 26

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
   142 S. Ct. 1464 (2022) ................................................................................ 28, 29

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*,
   447 U.S. 530 (1980) ......................................................................................... 43

*Democracy N.C. v. N.C. State Bd. of Elections*,
   476 F. Supp. 3d 158 (M.D. N.C. 2020) .............................................................. 24

*Doe v. Reed*,
   561 U.S. 186 (2010) ......................................................................................... 20

*Fish v. Kobach*
   304 F. Supp. 3d 1027 (D. Kan. 2018) ................................................................ 18

*Fish v. Schwab*,
   957 F.3d 1105 (10th Cir. 2020) ......................................................................... 32

*Grynberg v. Total*
   538 F.3d 1336 (10th Cir. 2008) ......................................................................... 18

*Harmon v. City of Norman, Oklahoma*,
   981 F.3d 1141 (10th Cir. 2020) ......................................................................... 33

*Healy v. James*,
   408 U.S. 169 (1972) ......................................................................................... 30

*iMatter Utah v. Njord*,
   774 F.3d 1258 (10th Cir. 2014) ......................................................................... 34

*Kusper v. Pontikes*,
   414 U.S. 51 (1973) ..................................................................................... 30, 31

iv

*League of Women Voters v. Hargett,*
  400 F. Supp. 3d 706 (M.D. Tenn. 2019) ..................................................... 22, 23, 24, 33

*Lichtenstein v. Hargett,*
  489 F. Supp. 3d 742 (M.D. Tenn. 2020) ................................................................ 22

*Martin v. City of Struthers, Ohio,*
  319 U.S. 141 (1943) ............................................................................................. 43

*McCraw v. City of Oklahoma City,*
  973 F.3d 1057 (10th Cir. 2020) ........................................................................... 38

*McIntyre v. Ohio Election Comm'n,*
  514 U.S. 334 (1995) ................................................................................... 23, 28, 32

*McLaughlin v. City of Lowell,*
  140 F. Supp. 3d 177 (D. Mass. 2015) ............................................................. 35, 36

*Meyer v. Grant,*
  486 U.S. 414 (1988) ...................................................................................... passim

*NAACP v. Button,*
  371 U.S. 415 (1963) ......................................................................................... 29, 31

*NetChoice, LLC v. Att'y Gen., Fla.,*
  34 F.4th 1196 (11th Cir. 2022) ............................................................................ 23

*Peck v. McCann,*
  43 F.4th 1116 (10th Cir. 2022) ...................................................................... 28, 38

*Priorities USA v. Nessel,*
  462 F. Supp. 3d 792 (E.D. Mich. 2020) .............................................................. 24

*Pueblo Neighborhood Health Ctrs., Inc. v. Losavio,*
  847 F.2d 642 (10th Cir. 1988) ............................................................................. 38

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ......................................................................................... 28, 29

*Republican Party of Minnesota v. White,*
  536 U.S. 765 (2002) ............................................................................................. 34

*Richmond Newspapers, Inc. v. Virginia,*
  448 U.S. 555 (1980) ............................................................................................. 20

*Schaumburg v. Citizens for a Better Env't,*
  444 U.S. 620 (1980) ............................................................................................. 21

v

*SD Voice v. Noem,*
    432 F. Supp. 3d 991 (D.S.D. 2020)......................................................................... 29

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)........................................................................................... 22

*Spence v. Washington,*
    418 U.S. 405 (1974)........................................................................................... 23

*Tashjian v. Republican Party of Conn.,*
    479 U.S. 208 (1986)........................................................................................... 40

*Thornburgh v. Abbott,*
    490 U.S. 401 (1989)........................................................................................... 40

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994)........................................................................................... 35

*United States v. Hernandez-Calvillo,*
    39 F.4th 1297 (10th Cir. 2022)........................................................................... 34

*United States v. Stevens,*
    559 U.S. 460 (2010)........................................................................................... 33

*Verlo v. Martinez,*
    820 F.3d 1113 (10th Cir. 2016)........................................................................... 37

*VoteAmerica v. Schwab*
    576 F. Supp. 3d 862 (D. Kan. 2021)............................................................. passim

*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.,*
    259 F.3d 1226 (10th Cir. 2001)........................................................................... 18

*Yes On Term Limits, Inc. v. Savage,*
    550 F.3d 1023 (10th Cir. 2008)..................................................................... passim

**Statutes**

52 U.S.C. § 20301 ................................................................................................... 3

52 U.S.C. § 21083 ................................................................................................... 2

Fed. R. Civ. P. 56 ................................................................................................... 19

H.B. 2332 § 3(k) ............................................................................................... 16, 17

H.B. 2332 § 3(k)(2), (m) ......................................................................................... 2

H.B. 2332 § 3(k)(5) ............................................................................................... 28

vi

H.B. 2332, Session of 2021 (Kan.) ....................................................................................... 2

K.A.R. § 7-36-7 ..................................................................................................................... 4

K.A.R. § 7-36-9 ..................................................................................................................... 4

K.S.A. § 21-6602 ................................................................................................................. 17

K.S.A. § 21-6602(a)(3) ................................................................................................... 27, 28

K.S.A. § 21-6602(b) ............................................................................................................. 28

K.S.A. § 25-1121 ................................................................................................................... 2

K.S.A. § 25-1122 .......................................................................................................... passim

K.S.A. § 25-1122(k) ............................................................................................................ 29

K.S.A. § 25-1122(k)(2)-(5) ................................................................................................. 27

K.S.A. § 25-1123 .............................................................................................................. 3, 4

K.S.A. § 25-1124 ................................................................................................................... 4

K.S.A. § 25-1131 ................................................................................................................... 2

K.S.A. § 25-1220 ................................................................................................................... 3

K.S.A. § 25-124 ..................................................................................................................... 2

K.S.A. § 25-2431 ........................................................................................................... 15, 42

vii

## PRELIMINARY STATEMENT

This case presents a narrow question: can a prohibition on civic organizations distributing personalized vote-by-mail applications, the Personalized Application Prohibition, survive strict First Amendment scrutiny? The Court has already considered the central legal questions in the case and decided them in Plaintiff's favor. Plaintiff Voter Participation Center's communications containing a personalized application represents "election-related speech and associations" and "inherently expressive conduct." *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 875, 888 (D. Kan. 2021). And the Prohibition's abridgment of Plaintiff's protected speech "go[es] beyond the intersection between voting rights and election administration, and veer[s] into the area where the First Amendment has its fullest and most urgent application." *Id.* at 888 (citations and quotations omitted). The uncontroverted facts established during discovery only further reinforce that these legal conclusions continue to apply here.

Thus, the issue left to be resolved is whether the State can establish, through admissible evidence, that such an abridgement of First Amendment rights will survive strict scrutiny. On the developed record here, it remains the case that "[D]efendants have not shown that [the Prohibition] is narrowly tailored to alleviate" any of the asserted state interests. *Id.* at 891. And Defendants likewise fail to carry their burden to prove that any stated interests are real as opposed to merely conjectural or post-hoc rationalizations that cannot satisfy strict scrutiny. No genuine dispute of material fact remains to assist in answering this question. Based on the record, Defendants cannot sustain their asserted justifications for the Personalized Application Prohibition's infringement of Plaintiff VPC's core First Amendment rights. The law cannot withstand strict scrutiny and the Court should enter summary judgment in favor of Plaintiff.

1

## PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS

### I.   Advance Mail Voting in Kansas

1.   Defendant Kansas Secretary of State Scott Schwab does business in and is an elected official in the state of Kansas. *See* Stipulations, Pretrial Order, Dkt. No. 140 (Sept. 30, 2022) ("Stipulated Facts"), at § 2(a)(i).

2.   Defendant Schwab is the Chief Election Officer for the State of Kansas. *See id.* at §2(a)(ii).

3.   As the Chief Election Official for the State of Kansas, Defendant Schwab is responsible for overseeing all Kansas elections and administering the State's election laws and regulations. Defendant Schwab also issues guidance and instruction to county election officers on a range of election procedures and requirements. *See id.* at §2(a)(iii) (citing K.S.A. § 25-124).

4.   Kansas law permits Defendant Schwab to adopt rules and regulations related to advance voting, including the general form of advance voting ballots and applications for advance mail voting. K.S.A. §§ 25-1131, 25-1121(a)-(b), 25-1122d(c); *see also* HB 2332, Session of 2021 (Kan.), §§ 3(k)(2), (m).

5.   Defendant Schwab, as Kansas's Secretary of State, is responsible for maintaining an online voter registration database. 52 U.S.C. § 21083(a)(1)(A).

6.   The Kansas state voter registration database is known as the Election Voter Information System ("ELVIS"). *See* Stipulated Facts at § 2(a)(xi).

7.   Election officials in Kansas's 105 counties are responsible for maintaining the voter files for voters within their respective counties and ELVIS reflects the voter data maintained by those county officials. *See id.* at §2(a)(xii).

2

8.      When a voter registration application is received by the respective county election office, they input that voter's registration information into the state's central database by hand and thereby create a voter record in ELVIS. *See id.* at § 2(a)(xiii).

9.      ELVIS is a dynamic system that reflects in real-time changes that are made to individual voter files. County election officials input information on voters, including the voters' registration and advance mail ballot information. *See id.* § 2(a)(xiv).

10.     To vote by mail in Kansas a voter must complete an advance voting ballot application and return it to the county election office in the county in which the voter is registered to vote. *See id.* at § 2(a)(xxx).

11.     If an advance voting ballot application has been timely submitted to the county election office, an individual working in such office processes the application and, if the county accepts the application, the county will mail the voter an advance ballot packet. *See id.* at § 2(a)(xxxi).

12.     Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the General Election and the Tuesday of the week preceding such General Election. K.S.A. § 25-1122(f)(2).

13.     Other than voters entitled to receive ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq.*, counties cannot transmit advance ballots to voters prior to the 20th day before the election for which an application has been received. K.S.A. §§ 25-1123(a), 25-1220.

14.     Ballots must be issued to advance voting voters within two business days of the receipt of the voter's application by the election office or the commencement of the 20-day period. K.S.A. § 25-1123(a).

Appellants' Appendix - Vol. II - 217

15.     If an advance mail ballot application does not contain sufficient information, does not match the voter file, or if the information is illegible, the election office confirms the validity of the application before accepting it. K.A.R. § 7-36-7 and 7-36-9; K.S.A. §§ 25-1122(e), 25-1124; Declaration of Mark Johnson in Support of Plaintiff Voter Participation Center's Motion to Dismiss (Oct. 14, 2022) ("Johnson Decl."),[1] Ex. 1, (Deposition of Connie Schmidt (Sept. 16, 2022) ("Schmidt Tr.")) 91:8-17, 93:9-13, 110:24-111:16; *id.* at Ex. 2, (Deposition of Deborah Jean Cox (Sept. 9, 2022) ("Cox Tr.")) 52:14-53:6, 56:22-57:11, 72:6-16; *id.* at Ex. 3, (Deposition of Jameson Shew (Sept. 15, 2022) ("Shew Tr.") 51:12-13; *id.* at Ex. 4, (Deposition of Andrew Howell (Sept. 14, 2022) ("Howell Tr.") 66:13-25, 77:12-78:17, 132:17-133:21, 138:5-11, 147:8-148:23; *id.* at Ex. 5, (30(b)(6) Deposition of the office of Kansas Secretary of State (May 24, 2022) ("KS SOS Tr.")), Ex. 9 (Kansas Election Standards on Election Administration) at KS000167VA.

16.     In such cases, county election office must attempt to contact the voter to obtain the correct information and cure the application. Johnson Decl., Ex. 1, (Schmidt Tr.) 130:14-131:22; *id.* at Ex. 2, (Cox Tr.) 69:12-21; *id.* at Ex. 3, (Shew Tr.) 40:6-14.

17.     If the voter cannot be contacted, or it would be impracticable to make contact before the election, the voter will be mailed a provisional ballot. K.A.R. § 7-36-7(f); Stipulated Facts at § 2(a)(xxxiv).

18.     Once an advance voting ballot application has been received and processed by the county election office, the fact and date of such processing is recorded in ELVIS. The office also documents in ELVIS the date on which it transmits the regular or provisional ballot to the voter. *See* Stipulated Facts at § 2(a)(xxxv).

---

[1] The Declaration of Mark Johnson is filed concurrently herewith.

## II.   VPC's Program and Speech

19.   Plaintiff Voter Participation Center is a 501(c)(3) nonprofit, nonpartisan organization founded in 2003. *See* Stipulated Facts at § 2(a)(vii); Johnson Decl., Ex. 6 (Deposition of Thomas Lopach (May 18, 2022) ("Lopach Tr.")) 57:25-58:1, 58:24-59:4; Declaration of Thomas Lopach in Support of Plaintiff Voter Participation Center's Motion to Dismiss (Oct. 13, 2022) ("Lopach Decl.")[2] ¶ 2.

20.   Plaintiff VPC's core mission is to promote voting among traditionally underserved groups, including young voters, voters of color, and unmarried women at rates commensurate with voters in other groups. *See* Stipulated Facts at § 2(a)(viii); Johnson Decl., Ex. 7 (Deposition of Lionel Dripps (Aug. 30, 2022) ("Dripps Tr.")) 111:25-112:9; *id.* at Ex. 6, (Lopach Tr.) 153:12-16, 96:14-17, 204:3-6; *id.* at Ex. 8 (September 8, 2021 Hearing on Plaintiffs' Motion for Preliminary Injunction ("9/8/2021 PI Tr.")) 50:9-20 (Thomas Lopach testimony); Lopach Decl. ¶ 7-11, 28.

21.   VPC primarily encourages these voters to register and to participate in the electoral process through direct mailings. *See* Stipulated Facts at §2(a)(ix); Johnson Decl., Ex. 6 (Lopach Tr.) 146:24-147:15; Lopach Decl. ¶¶ 7, 13.

22.   Distributing advance ballot applications is a common part of civic engagement communications among partisan and nonpartisan actors alike. *See, e.g.*, Johnson Decl., Ex. 3 (Shew Tr.) 22:23-24:6; *id.* at Ex. 8  (9/8/2021 PI Tr.) 70:18-25 (Bryan Caskey testimony).

23.   VPC encourages registered Kansas to participate in this manner by mailing voters a package communication that advocates for mail voting and provides a personalized advance mail ballot application. *See* Stipulated Facts at §2(a)(x); Johnson Decl., Ex. 7 (Dripps Tr.) 124:14-125:2; Lopach Decl. ¶¶ 12, 17-18, 21, 23-24.

---

[2] The Declaration of Thomas Lopach is filed concurrently herewith.

24.     VPC considers providing young voters, voters of color, and unmarried women—who may have fewer resources for, and less access to, printing and postage—with the necessary personalized applications is key to effectively advocating its message.  Johnson Decl., Ex. 6 (Lopach Tr.) 185:25-186:3; *id.* at Ex. 8 (9/8/2021 PI Tr.) 59:23-60:20; Lopach Decl. ¶¶ 10, 21, 23, 28.

25.     Doing so provides the voter simple access to an advance mail ballot application that is personalized with required information from the voter file. Lopach Decl. ¶ 21.

26.     VPC believes that distributing personalized advance mail ballot applications as a part of its advance mail voting mailer conveys its viewpoint that voting by mail is convenient and a good option for the recipient to participate in democracy. Johnson Decl., Ex. 6 (Lopach Tr.) 149:11-13, 150:13-19, 151:14-16, 183:9-184:1, 185:21-186:3, 188:1-4; *id.* at Ex. 7 (Dripps Tr.) 192:5-13; *id.* at Ex. 8 (9/8/2021 PI Tr.) 44:24-45:7, 49:17-24 (Thomas Lopach testimony); Lopach Decl. ¶¶ 9, 23-24, 66.

27.     VPC is a data-driven operation. It tracks recipient responses to its communications and conducts randomized control trials to evaluate the effectiveness of its mailings. Johnson Decl., Ex. 7 (Dripps Tr.) 77:24-79:17, 116:3-18; *id.* at Ex. 6 (Lopach Tr.) 14:15-20:13, 33:2-35:3, 112:13-24, 116:17-117:12, 155:1-157:15, 165:1-166:9, 170:7-174:9.

28.     VPC engages experts in voting behavior and quantitative research, who support VPC's belief that personalizing applications is effective at conveying the organization's pro-advance mail voting message. Lopach Decl. ¶ 16; Johnson Decl., Ex. 6 (Lopach Tr.) 13:15-16:10; *id.* at Ex. 7 (Dripps Tr.) 159:20-160:16.

29.     VPC also personalizes its applications with prefilled information to make the application processing easier for election officials. Lopach Decl. ¶ 60.

30.     Kansas county election officials indicated their support for the benefits of prefilling for a mailer communication's effectiveness. Johnson Decl., Ex. 1 (Schmidt Tr.) 85:6-14 (noting that handwriting can be harder to read than typeface), 108:15-18; *id.* at Ex. 2 (Cox Tr.) 149:20-150:14. Douglas County Elections Director Jamie Shew testified that if not for budgetary constraints, his office would prefer to personalize the applications sent to voters with their prefilled information. *Id.* at Ex. 3 (Shew Tr.) 24:15-20.

31.     In 2020, Johnson County sent applications for the primary and general elections to all voters in the county, opting to expend additional resources to personalize the applications and in fact prefilled *more* information than VPC's communications by also adding the voter's date of birth. *See id.* at Ex. 1 (Schmidt Tr.) 222:10-227:7, 234:23-236:20, 284:2-8; *id.* at Ex. 9 (Schmidt Tr. Ex. 32) (Apr. 16, 2020 emails); *id.* at Ex. 10 (Schmidt Tr. Ex. 35) (2020 prefilled Johnson County advance mail ballot application mailer); *id.* at Ex. 11 (Schmidt Tr. Ex. 38) (same).

32.     Staff in the Johnson County Elections Office decided to "pre-fill as much of the [voter's] information from their registrant record as possible," *id.* at Ex. 12 (Schmidt Tr. Ex. 31) at 3 (Apr. 2, 2020 emails), believing that doing so "makes it easier for the voter and reduces mistakes that we then have to work harder to fix on the back end," *id.* at Ex. 9 (Schmidt Tr. Ex. 32) at 1 (Apr. 16, 2020 emails).

33.     VPC's mailer communications sent to Kansas voters also included a letter encouraging the voter to request and cast an advance ballot with instructions on how to do so, or if they choose, to opt out of future VPC communications; a step-by-step guide and other assistance for how voters may submit the included application; and a postage-paid envelope addressed to the voter's county election office. Lopach Decl., Ex. A (2020 VPC mailer) at VPC000001-005.

7

34.     The letter's opening paragraph specifically refers to "the enclosed advance voting application already filled out with [the voter's] name and address" and mentions the personalization in the closing "P.S." message: "We have already filled in your name and address on the enclosed form. Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope." *See id.* at VPC000002. The step-by-step guide was printed on the reverse side of the enclosed personalized advance ballot application. *Id.* at VPC000004.

35.     To personalize the applications it sends, VPC uses statewide voter registration files obtained via its data vendors and fills-in parts of the advance mail ballot applications with the voter's information as it appears in the state records. Johnson Decl., Ex. 6 (Lopach Tr.) 91:4-92:18; Lopach Decl. ¶¶ 37-40. VPC culls its lists to ensure that the information is accurate and current and that it is running its program as efficiently as possible. *See* Lopach Decl. ¶¶ 18, 39; Johnson Decl., Ex. 6 (Lopach Tr.) 33:2-35:3, 92:13-25, 93:20-96:8; *id.* at Ex. 7 (Dripps Tr.) 123:13-21, 147:16-20.

36.     VPC now contracts with two data vendors so that it can use data from whichever vendor has the most up-to-date data at the moment a program's mailing list is being created in a given state. Johnson Decl., Ex. 6 (Lopach Tr.) 100:12-101:13; *id.* at Ex. 7 (Dripps Tr.) 123:13-21, 147:16-20; Lopach Decl. ¶ 39.

37.     VPC carefully designs this package of materials to convey to the recipient VPC's message that this particular Kansan should participate in the democratic process by mail voting, that voting by mail is easy, and that VPC's audience can act on this encouragement by returning the supplied advance mail ballot application that VPC has personalized. Lopach Decl. ¶¶ 11, 17-18, 22, 28-29;  Johnson Decl., Ex. 8 (9/8/2021 PI Tr.) 47:7-13.

8

38.     In 2018, VPC sent approximately 90,000 advance mail ballot application mailers to Kansas voters in a single wave of mailers. Lopach Decl. ¶ 35.

39.     Approximately 5,000 Kansans applied for an advance mail ballot in 2018 using a personalized application from VPC. Lopach Decl. ¶ 26.

40.     In 2020, VPC anticipated that the pandemic would result in many voters voting by mail for the first time. Johnson Decl., Ex. 7 (Dripps Tr.) 136:4-16; Lopach Decl. ¶ 33.

41.     VPC therefore increased the amount that it communicated with Kansas voters about advance mail voting in 2020 to five waves of mailers and sending nearly 1.2 million advance mail ballot application mailers to Kansas voters. Lopach Decl. ¶¶ 34-35.[3]

42.     An estimated 69,000 Kansas voters submitted an advance mail voting application provided by VPC to their county election official in the 2020 general election. Lopach Decl. ¶ 26. Other individuals ignored VPC's communications (Johnson Decl., Ex. 13 (Lopach Tr. Ex. 4) at VPC000133), and some requested to not receive future communications. *Id.* at Ex. 14 (Lopach Tr. Ex. 3) at VPC000135 (VPC's 2018 and 2020 unsubscribe lists).

43.     For the 2022 election, VPC sent one wave of advance mail voting mailers sent approximately 4 weeks apart. *Id.* at Ex. 7 (Dripps Tr.) 135:12-20; Lopach Decl. ¶¶ 47, 52.

---

[3] Only three of the five waves of mail included personalized advance ballot applications. In 2020, VPC learned that its data vendor was, contrary to VPC's wishes, supplementing middle initials and suffixes to the information it had obtained from states' voter files for a small subset of the individuals on its mailing lists—less than 5% of its mailers. Lopach Decl. ¶ 48. VPC decided not to personalize the applications included in its third and fourth mailer waves while the issue was resolved. *Id.* ¶ 49. Once VPC was confident the data vendor was no longer supplementing the state's voter list information, the organization resumed prefilling as its most effective method of communicating its pro-mail voting message to voters. *Id.* ¶ 50.

44.     The 2022 mailers contain the same basic components as VPC's prior mailer communications, including personalized advance mail ballot applications. Lopach Decl. ¶ 17; *id.* at Ex. B at VPC000743-746 (2022 VPC mailer).

45.     VPC also sent a follow-up letter in September 2022 to remind voters that they have previously received a personalized advance mail ballot application and further encouraging the voter to return the application and vote by advance mail ballot. *Id.* at ¶ 52; Johnson Decl., Ex. 6 (Lopach Tr.) 30:3-10.

46.     Each year, VPC notifies the Kansas Director of Elections of its upcoming advance mail voting program and seeks feedback on the forms and instructions regarding advance mail voting that VPC plans to distribute. *See* Johnson Decl., Ex. 15 (KS SOS Tr. Ex. 15) KS001922VA—2068VA (Apr. 19, 2018 email);[4] Johnson Decl., Ex. 16 (KS SOS Tr. Ex. 16) VPC000048—50 (June 22, 2020 to July 1, 2020 email thread);[5] Johnson Decl., Ex. 18 (Dripps Tr. Ex. 8) VPC000706-09 (July 28, 2022 emails); *id.* at Ex. 19 (Dripps Tr. Ex. 9) VPC000712-16 (Aug. 25, 2022 emails).

47.     In the 2020 election cycle, the Kansas Director of Elections confirmed to VPC in writing that its advance mail voting application form and instructions complied with Kansas law and with the forms that the Secretary of State's office uses. Johnson Decl., Ex. 16 (KS SOS Tr. Ex. 16) VPC000048—50 (June 22, 2020 to July 1, 2020 email thread).

48.     VPC understands that the Personalized Application Prohibition would prevent it from its most effective means of conveying its pro-mail voting message, and as such would make VPC reconsider its resource allocation decision to convey its communications in Kansas if it

---

[4] *See* also Stipulated Facts at §§ 2(b)(viii) (stipulating to admissibility).
[5] *See* also Stipulated Facts at §§ 2(b)(ix) (stipulating to admissibility).

cannot speak in this manner. Lopach Decl. ¶¶ 55-66; *see also id.* ¶ 18 ("[p]ersonalizing the applications with prefilled information drawn from states' voter registration files best ensures that VPC's message and assistance are both effective and accurate"); Johnson Decl., Ex. 6 (Lopach Tr.) 150:14-19, 151:14-16, 185:21-186:3, 188:1-4; *Id.* at Ex. 8 (PI Hearing Tr.) 44:24-45:7, 49:17-24, 60:11-20 (Thomas Lopach testimony).

## III.    2020 Election

49.    The 2020 General Election in Kansas had record turnout (1,375,125 total votes cast, a 70.9% turnout rate) and had more votes cast than the 2018 General election (1,039,085 total votes cast, a 56.4% turnout rate) and the 2016 General Election (1,225,667 total votes cast, a 67.4% turnout rate). *See* Stipulated Facts at §2(a)(xxxvi).

50.    Conducting a high-turnout presidential election race held in the middle of a worldwide pandemic introduced many challenges for those tasked with administering it. *See* Johnson Decl., Ex. 1 (Schmidt Tr.) 155:7–156:20; *id.* at Ex. 2 (Cox Tr.) 98:25-100:13; *id.* at Ex. 4 (Howell Tr.) 49:2-25; *id.* at Ex. 3 (Shew Tr.) 85:5-24.

51.    It also presented new hurdles for voters who wanted to participate without jeopardizing the health of themselves or their loved ones. *Id.* at Ex. 1 (Schmidt Tr.) 149:4-150:6.

52.    As a result, there was a mass shift in the way voters voted in 2020, with a steep increase in advance mail voting; 459,229 Kansans voted by mail in the 2020 General Election as compared to 152,267 votes cast by mail during the 2018 General Election and 173,457 votes cast by mail in the 2016 General Election. *See* Stipulated Facts at § 2(a)(xxxvi); *see also* Johnson Decl., Ex. 17 (KS SOS Tr.) 274:19-22; *id.* at Ex. 1 (Schmidt Tr.) 74:21-24, 138:21-139:6, 149:4-150:6; *id.* at Ex. 2 (Cox Tr.) 98:25-100:13; *id.* at Ex. 4 (Howell Tr.) 240:9-241:10; *compare id.* at Ex. 3 (Shew Tr.) 84:3-12, 85:5-24.

11

53.     As the use of mail voting increased during the 2020 General Election, a national debate unfolded about the efficacy and security of mail voting as public figures both in Kansas and nationwide discouraged voters from voting by mail. *See, e.g., id.* at Ex. 20 (Bryan Lowry & Sarah Ritter, *Despite Trump's attacks, Kansas voters request 2020 mail ballots at historic rate,* The Kansas City Star (May 29, 2020), https://www.kansascity.com/news/politics-government/article243052656.html).

54.     Given both the novel challenges of the 2020 election and the public debate concerning voters' confidence in mail voting, many organizations, campaigns, and elections offices, including Plaintiff VPC as well as Kansas election officials, sought to encourage voters to vote by mail. *Compare,* Lopach Decl. at Ex. A (2020 VPC mailer) *and* Johnson Decl., Ex. 21 (Schmidt Tr. Ex. 17) (May 18, 2020 emails); *see also* Johnson Decl., Ex. 1 (Schmidt Tr.) 287:4-14.

55.     Several Kansas counties sent mailers regarding the advance mail voting process, including advance mail ballot applications, to their registered voters. *See, e.g.,* Johnson Decl., Ex. 1 (Schmidt Tr.) 82:25-83:2; *id.* at Ex. 2 (Cox Tr.) 102:9-15; *id.* at Ex. 3 (Shew Tr.) 21:23-22:2.

56.     The Johnson County election office opted to send advance mail ballot applications that were prepopulated with the voter's data on the application form. *Id.* at Ex. 1 (Schmidt Tr.) 227:2-236:20, 240:12-243:12; 285:12-286:19; *see also id.* at Ex. 12 (Schmidt Tr. Ex. 31) (Apr. 3, 2020 emails); *id.* at Ex. 9 (Schmidt Tr. Ex. 32) (Apr. 16, 2020 emails); *id.* at Exs. 10 (Schmidt Tr. Ex. 35), 22 (Schmidt Tr. Ex. 36), 23 (Schmidt Tr. Ex. 37) and 11 (Schmidt Tr. Ex. 38) (redacted examples of Johnson County prefilled mailers from May 2020).

57.     Kansas election officials engaged in this and other outreach efforts especially because many Kansans were voting by advance mail ballot for the first time in 2020 and had

12

questions about the process. *See, e.g., id.* at Ex. 1 (Schmidt Tr.) 241:2-4 ("Again, these are reminders because a lot of our voters, in 2020, during COVID, have never dealt with voting by mail before."), 297:25-298:8; *id.* at Ex. 24 (Schmidt Tr. Ex. 43) (Johnson County FAQ and Facebook post); *id.* at Ex. 2 (Cox Tr.) 91:18-24, 107:9-15, 146:3-147:19.

58.      When incomplete or inaccurate applications were submitted, county election officials attempted to help voters cure them regardless of whether the voter had used a blank form or a form pre-populated with personalized information and without incurring a particular burden from those that were prefilled. *Id.* at Ex. 1 (Schmidt Tr.) 84:18-85:20, 86:22-87:5, 134:6-22, 135:25-136:13, 294:2-13; *id.* at Ex. 2 (Cox Tr.) 67:9-68:1; 89:3-90:5; *id.* at Ex. 4 (Howell Tr.) 245:13-246:16, 252:11-23; *id.* at Ex. 17 (KS SOS Tr.) 250:18-252:6.

59.      During the 2020 election cycle, many voters who had concerns about lost advance mail ballot applications or mail delays called their respective election office to inquire about the status of their application. *Id.* at Ex. 1 (Schmidt Tr.) 195:1-196:8, 293:13-18; *see also id.* at Ex. 2 (Cox Tr.) 73:25-74:5, 100:14-101:1.

60.      Others chose to re-submit their application out of an abundance of caution. *Id.* at Ex. 1 (Schmidt Tr.) 120:12-24; *id.* at Ex. 2 (Cox Tr.) 100:14-101:1. In some cases this resulted in duplicative advance mail ballot applications being received in county election offices. *Id.* at Ex. 1 (Schmidt Tr.) 309:1-6 ("The bigger issue for us was apps coming from outside the State of Kansas to our voters, and multiple applications."), 288:3-12, 293:7-294:13, 308:8-11, 309:1-6; *Id.* at Ex. 17 (KS SOS Tr.) 150:13-19 (testifying to conversations about duplicate applications that election offices received in the 2020 election); *id.* at Ex. 2 (Cox Tr.) 91:13-17; 100:19-101:1; *id.* at Ex. 3 (Shew Tr.) 73:13-74:7.

61.     Other voters' concerns of mail delays were grounded in experience. *See, e.g., id.* at Ex. 1 (Schmidt Tr.) 195:1-197:21, 201:7-12, 211:24-212:8, 293:13-294:1; *id.* at Ex. 25 (Schmidt Tr. Ex. 25) (July 22, 2020 Johnson County Election Office Facebook post); *id.* at Ex. 26 (Schmidt Tr. Ex. 26) (July 24, 2020 emails); *id.* at Ex. 27 (Schmidt Tr. Ex. 27) (Apr. 11, 2020 emails).

62.     When voters called their election offices about advance mail ballot applications received in the mail, officials instructed voters that the application forms were legitimate and that the voters could complete and submit those applications if they chose to do so. *See, e.g., id.* at Ex. 1 (Schmidt Tr.) 297:25-298:8; *id.* at Ex. 24 (Schmidt Tr. Ex. 43) (Johnson County FAQ and Facebook post).

63.     Voters who expressed a desire to not do so, election officials informed the voter that the applications could be discarded. *See id.* at Ex. 1 (Schmidt Tr.) 294:20-295:1; *id.* at Ex. 2 (Cox Tr.) 139:20-140:3.

64.     The 2020 General Election nevertheless saw high turnout throughout Kansas and state and local Kansas election officials deemed it a successful election. *Id.* at Ex. 17 (KS SOS Tr.) 274:5-22, 282:8-9; *id.* at Ex. 1 (Schmidt Tr.) 167:10-168:11; *id.* at Ex. 28 (Schmidt Tr. Ex. 15) (Aug. 5, 2020 letter); *id.* at Ex. 29 (Schmidt Tr. Ex. 23) (Johnson County Board of Canvassers report); *id.* at Ex. 30, Press Release, Kansas Att'y Gen., *AG Derek Schmidt: Kansas asks U.S. Supreme Court to hear Texas election lawsuit* (Dec. 9, 2020), https://ag.ks.gov/media-center/news-releases/2020/12/09/ag-derek-schmidt-kansas-asks-u.s.-supreme-court-to-hear-texas-election-lawsuit, (quoting Defendant Schmidt that "Kansas ran its elections honestly and by the rules...."); *id.* at Ex. 31, Russel Falcon, *Zero evidence of voter fraud in any state, including Kansas officials report to NYT*, KSNT (Nov. 11, 2020), https://www.ksnt.com/news/kansas/zero-evidence-of-voter-fraud-in-any-state-including-kansas-officials-report-to-nyt, (quoting Defendant

14

Schwab that "Kansas did not experience any widespread, systematic issues with voter fraud, intimidation, irregularities or voting problems. . . .").

65.    The advance mail voting process includes multiple safeguards against fraud, *id.* at Ex. 1 (Schmidt Tr.) 64:3-20, 124:9-25, 212:25-216:9; *id.* at Ex. 2 (Cox Tr.) 58:5-8; *id.* at Ex. 4 (Howell Tr.) 42:9-23, 113:4-19, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. *See, e.g.*, K.S.A. § 25-2431.

66.    The 2020 post-election audit produced no evidence that voter fraud was a concern in Kansas. Johnson Decl., Ex. 17 (KS SOS Tr.) 282:25-283:13; *id.* at Ex. 1 (Schmidt Tr. 212:25-213:22, 292:1-5; *id.* at Ex. 2 (Cox Tr.) 105:5-106:9; *id.* at Ex. 4 (Howell Tr.) 42:9-23.

## IV.    Passage of HB 2332

67.    On February 10, 2021, the Kansas Legislature introduced HB 2332, which, among other things, sought to tightly restrict the distribution of advance ballot applications to potential Kansas voters. *See* Stipulated Facts at § 2(a)(xvii).

68.    On March 17, 2021, the Kansas Secretary of State's Office submitted written testimony on HB 2332 that did not include any discussion of prefilled advance mail ballot applications. Stipulated Facts at § 2(b)(x); *see also* Johnson Decl., Ex. 32 (KS SOS Tr. Ex. 17) *id.* at Ex. 17 (KS SOS Tr.) 295:21-297:7.

69.    The Office's official position was "neutral." *Id.*

70.    On May 3, 2021, the Legislature enacted HB 2332 over the Governor's veto. *See* Stipulated Facts at § 2(a)(xxi); Johnson Decl., Ex. 33 (Schmidt Tr. Ex. 4) (Governor Kelly's veto letter).

71.    Plaintiffs challenged two of HB 2332's provisions, but only one—the Personalized Application Prohibition—is still at issue in this lawsuit. *See* Stipulated Facts at § 2(a)(xxviii).

15

72.    HB 2332's Personalized Application Prohibition bans any person or organization from mailing registered Kansas voters a personalized advance mail voting application that is prefilled with any information, such as a voter's name and address. *See* H.B. 2332 § 3(k)(2) (codified at K.S.A. § 25-1122(k)(2)) ("No portion of such [advance mail voting application] shall be completed prior to mailing such application to the registered voter.").

73.    This prohibition applies to "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot and includes an application for an advance voting ballot in such mailing," even if the prefilled information is derived from the State's publicly available voter registration file. *Id.*[6]

74.    A violation of the Personalized Application Prohibition is a class C nonperson misdemeanor, which contains no scienter requirement and is punishable by up to one month in jail and/or fines. *Id.* § 3(k)(5); K.S.A. §§ 21-6602(a)(3), (b).

75.    HB 2332 carves out limited and narrow exceptions to the Personalized Application Prohibition by permitting a subset of state and county election officials to mail prefilled advance mail voting applications. *Id.* § 3(k)(4).

76.    In defense of the Personalized Application Prohibition the State has asserted interests such as "[m]inimizing voter confusion" and disenfranchisement, "[p]reserving and enhancing voter confidence," and reducing the rejection of inaccurate applications, inefficiencies in election administration, and potential for voter fraud. Johnson Decl., Ex. 34 (Defendant Schwab's Responses and Objections to Plaintiff's First Interrogatories) at 3-4.

---

[6] The Parties' February 2022 Stipulated Agreement states that the prohibition does not apply when a voter requests an application, fills it out online, and is mailed the filled version for signature and submission.

16

77.     These rationales for the Personalized Application Prohibition are not a part of the Legislative Record for HB 2332. *See* Kansas House Bill 2332 (2021), Legislative Record, http://kslegislature.org/li/b2021_22/measures/hb2332/ (last accessed Oct. 14, 2022).

## PROCEDURAL HISTORY

On June 2, 2021, Plaintiffs Voter Participation Center ("VPC" or "Plaintiff") and VoteAmerica (collectively, "Plaintiffs") filed this action against Scott Schwab, in his official capacity as Secretary of State of the State of Kansas; Derek Schmidt, in his official capacity as Attorney General of the State of Kansas; and Stephen M. Howe, in his official capacity as District Attorney of Johnson County (collectively, "Defendants"). ECF No. 1.

Plaintiffs' complaint alleges that Defendants' enforcement of the challenged HB 2332 provisions would violate their rights under the First and Fourteenth Amendments to the U.S. Constitution, and, as to Out-of-State Distributor Ban only, the Commerce Clause of the U.S. Constitution, and seeks declaratory and injunctive relief, attorneys' fees, and costs. *Id.* at ¶¶ 76-125.

On July 8, 2021, Plaintiffs filed a motion for preliminary injunction. ECF No. 24. On July 9, 2021, Defendants filed a motion to dismiss for failure to state a claim and for lack of jurisdiction. ECF No. 26. On August 27, 2021, the Court rejected the jurisdictional arguments that Defendants advanced in their motion to dismiss, finding that "Defendants' arguments with regard to jurisdiction are without merit under well established, long-standing principles of law" and holding that the action "is not subject to dismissal for lack of subject matter jurisdiction." ECF No. 42.

On September 8, 2021, the Court held an evidentiary hearing on Plaintiffs' motion for preliminary injunction, ECF No. 43, and on October 8, 2021, the Court heard oral argument on the motion, ECF No. 48. On November 19, 2021, the Court rejected the remainder of Defendants' motion to dismiss and granted Plaintiffs' motion for preliminary injunction, enjoining the

17

enforcement of the Personalized Application Prohibition and the Out-of-State Distributor Ban until the conclusion of the case. ECF No. 50.

By a stipulated order, on February 25, 2022, the Court permanently enjoined Defendants from enforcing the Out-of-State Distributor Ban, finding that the ban violated the First and Fourteenth Amendments, both facially and as applied to Plaintiffs, and dismissing Plaintiffs' claim under the Dormant Commerce Clause as moot. ECF No. 73 at 3.[7] The Court also entered the parties' stipulated agreement that the Personalized Application Ban does not apply to persons who mail or cause to be mailed an advance mail ballot application with any portion completed at the request of the registered voter. *Id.* at 2-3. The only remaining issue is the lawfulness of all other applications of the Personalized Application Ban. Discovery closed on September 14, 2022, and a bench trial is currently set for May 1, 2023. ECF No. 115.

## LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences from the evidence most favorably to the non-movant, "the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law." *Fish v. Kobach*, 304 F. Supp. 3d 1027, 1031-32 (D. Kan. 2018) (citing Fed. R. Civ. P. 56(a)); *accord Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

A fact is material only if it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). The material fact "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.

---

[7] The parties stipulated that the Personalized Application Prohibition does not cover Plaintiff VoteAmerica's conduct because Plaintiff VoteAmerica mails personalized advance voting ballot applications to voters who have requested them via its interactive website. Thus, Plaintiff VoteAmerica has not participated in any discovery in this case.

18

2000); *see also Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings."). VPC seeks summary judgment because nothing in the record here, even construed in favor of Defendants, constitutes a genuine issue of material fact "such that a reasonable jury could return a verdict for the non-moving party." *Bones*, 366 F.3d at 875.

## ARGUMENT

The Personalized Application Prohibition abridges Plaintiff VPC's core political speech and associational rights without any compelling or sufficiently tailored justification. In an area where free speech rights are most robust, the State has passed a categorical ban that is divorced from evidence or facts and criminally prohibits Plaintiff's most effective means of advocating its pro-advance mail voting message. The ways in which the Prohibition violates Plaintiff's First Amendment rights are numerous, while evidence supporting the State's asserted interests in the law is lacking. The Personalized Application Prohibition fails strict scrutiny, and the Court should enter summary judgment in favor of Plaintiff.

I.   **The Undisputed Facts Demonstrate That Plaintiff's Mailing of Personalized Ballot Applications Constitutes Protected First Amendment Speech, Conduct, and Association.**

Speech concerning the electoral process is interpreted broadly and given utmost protection because "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs[,]" which "of course includes … all such matters relating to political processes." *Brown v. Hartlage*, 456 U.S. 45, 52–53 (1982) (citation omitted). Because the First Amendment was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Meyer v. Grant*, 486 U.S. 414, 421 (1988) (citation omitted), it requires vigilant application "to guard against undue

19

hindrances to political conversations and the exchange of ideas," *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 191-92 (1999).[8]

Accordingly, Plaintiff VPC's communications advocating for advance mail voting and supplying a personalized application for Kansans to vote by mail is protected political speech, expressive conduct, and associational activity. In granting Plaintiffs' motion for a preliminary injunction and denying Defendants' motion to dismiss, this Court held that VPC had sufficiently alleged that the Personalized Application Prohibition violates VPC's right to engage in protected speech, expressive conduct, and free association under the First Amendment. *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 886 (D. Kan. 2021). In so doing, the Court rejected Defendants' argument that the First Amendment does not apply to VPC's mailing of personalized ballot applications. *Id.* at 875 (concluding that the "application packets include speech that communicates a pro-mail voting message" that "mailing the application packets is inherently expressive conduct that the First Amendment embraces"). Because the undisputed evidence establishes VPC's factual allegations, this Court should hold that VPC's mailing of personalized advance mail ballot applications implicates those First Amendment protections.

First, VPC's distribution of personalized advance mail ballot applications is "communication among private parties who are advocating for particular change—more voting by mail, especially in under-represented populations." *Id.* at 888. Plaintiffs' speech "involve[s] . . . the expression of a desire for political change," "communication of information" to encourage and

---

[8] Robust protections for election-related speech also serves a structural role in promoting self-government. *See, e.g., Doe v. Reed*, 561 U.S. 186, 195 (2010) (Having "cho[sen] to tap the energy and the legitimizing power of the democratic process," the State "must accord the participants in that process the First Amendment rights that attach to their roles"); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587 (1980) (Brennan, J., concurring) ("[T]he First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a structural role to play in securing and fostering our republican system of self-government.")

20

assist voters, and "dissemination and propagation of views and ideas" about the electoral process. *Meyer*, 486 U.S. at 421, 422 & n.5 (citing *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)). Plaintiff's message "involves both the expression of a desire for [an engaged electorate] and a discussion of the merits of [absentee voting]." *Id.* at 421. Plaintiff promotes the benefits of mail voting to reach its desired political change: a broadened electorate that includes traditionally underserved voters, not just those who can easily vote in-person or have the resources and time to independently navigate the mail-voting process. *See* SOF ¶¶ 20, 24. In the debate of whether to trust or distrust mail voting, Plaintiffs advise trust and encourage Kansans to use this safe and convenient method. *See* SOF ¶¶ 26, 37.   To persuade voters to turn Plaintiff's encouragement into action, VPC creates and disseminates communications that provide the necessary information, instruction, and resources for voters to apply for an advance mail ballot. *See* SOF ¶¶ 21-23. This is core political speech. *Meyer*, 486 U.S. at 422.

VPC's distribution of personalized advance mail voting applications specifically is protected speech in numerous ways. Distributing personalized applications encourages and facilitates Plaintiff's pro-mail voting message and is "characteristically intertwined" with expressing it. *Schaumburg*, 444 U.S. at 632. The personalized application is an integral component of the entire communication that, as a package, conveys VPC's pro-voting message. *See* SOF ¶¶ 23-29. Defendants' attempt to disaggregate VPC's communication, urging it to merely send a letter with or without a blank application, would undermine the blanket First Amendment protections of core political speech here. The Court should reject Defendants' narrow view of the First Amendment that "would countenance slicing and dicing the activities involved in the plaintiffs'" speech, "both because doing so would allow the government to burden the protected [speech] indirectly and because the entire [pro-mail voting] activity implicates the freedom of the

21

plaintiffs to associate with others for the advancement of common beliefs that is protected by the First and Fourteenth Amendments." *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (citations, quotations, and internal alterations omitted). And it violates Plaintiff's "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing," *Meyer*, 486 U.S. at 424, as discussed *infra* Part II.A.

VPC's personalization of the advance mail voting applications is also speech in and of itself. "[T]he creation and dissemination of information are speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *accord ALDF v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021). As this Court recognized in distinguishing *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742 (M.D. Tenn. 2020), a case involving the distribution of blank applications, that decision was "not germane" in part because "distributing personalized ballot applications" instead "include[s] speech that communicates a pro-mail voting message." *VoteAmerica*, 576 F. Supp. 3d at 874-75. VPC's personalization of its communications is speech in the literal sense—words on a page. However, this personalization is also critical to how VPC expresses its pro-mail voting message in its mailers. *See* SOF ¶¶ 23-29. Unlike anonymous mass mailings, VPC uses the personalized applications to convey its belief that the *particular voter* to whom VPC sent its mailer should apply for an advance mail ballot and participate in the democratic process. *See* SOF ¶ 28. The personalization expresses to that specific voter that voting by mail will be convenient and accessible *for them*, creating a seamless path for that voter to act on VPC's persuasion.

*Second*, sending personalized applications is expressive conduct. As the Court recognized, VPC's personalized mailers "communicate[] a pro-mail voting message" that "is inherently expressive conduct that the First Amendment embraces." *VoteAmerica*, 576 F. Supp. 3d at 875. "Conduct that is intended and reasonably perceived to convey a message falls within the free

22

speech guarantee of the first amendment." *ACORN v. City of Tulsa, Okl.*, 835 F.2d 735, 742 (10th Cir. 1987). The question is "whether the reasonable person would interpret [the conduct] as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1212 (11th Cir. 2022) (citation omitted). The "nature of [the] activity, combined with the factual context and environment in which it [is] undertaken," demonstrates that the "activity [is] sufficiently imbued with elements of communication" to be expressive conduct. *Spence v. Washington*, 418 U.S. 405, 409-10 (1974). The expressive nature is beyond doubt where, as here, conduct is "intertwined with speech and association." *League of Women Voters of Tenn.*, 400 F. Supp. 3d at 720. A personalized application is a critical component of a VPC's mailer, which is a single, unified package of speech.

Further, VPC's distribution of a personalized application is expressive conduct because both the political moment and the surrounding context of the mailer make clear that it is imbued with expressive elements. VPC intends to convey a pro-mail voting message in personalizing its applications. *See* SOF ¶¶ 23-29. And a reasonable recipient would interpret "some sort of message" in receiving VPC's mailer, *NetChoice*, 34 F.4th at 1212, evidenced by over 69,000 Kansans acting on VPC's mailer to submit an application in 2020. *See* SOF ¶¶ 42. Indeed, in taking sides on the national debate about mail voting, VPC adopts a strong stance in favor—the only stance that would lend itself to sending a personalized application. VPC's speech and conduct "advoca[ting for] a politically controversial viewpoint" is "the essence of First Amendment expression." *McIntyre v. Ohio Election Comm'n*, 514 U.S. 334, 347 (1995).

*Third*, VPC's distribution of personalized applications is also protected associational activity. As the Court ruled, "[a]n organization's attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of

23

association." *VoteAmerica*, 576 F. Supp. 3d at 875 (citation and quotations omitted). This includes "[p]ublic endeavors which assist people," "are intended to convey a message that voting is important," and which expend resources "to broaden the electorate to include allegedly under-served communities" *Id.* (citation omitted). VPC engages in such associational endeavors. *See* SOF ¶¶ 20, 24.

Finally, numerous courts have recognized that materially indistinguishable activity advocating for mail voting or increased voter registration represents protected speech, conduct, or associational activity. *See, e.g., League of Women Voters of Tenn.*, 400 F. Supp. 3d at 720; *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 224 (M.D. N.C. 2020); *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 812 (E.D. Mich. 2020); *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202, 1215-16 (D.N.M. 2010). And multiple binding decisions in the petition circulator context have recognized broad First Amendment protections for civic organizations' speech encouraging voters' engagement in the political process. *See Meyer*, 486 U.S. at 422-23; *Buckley*, 525 U.S. at 186, 192; *Chandler*, 292 F.3d at 1241; *Yes On Term Limits*, 550 F.3d at 1028. In short, finding that Plaintiff's activities are protected speech—as this Court did at the preliminary injunction stage—is grounded in numerous First Amendment doctrines and persuasive and binding authorities recognizing speech rights in the same or analogous contexts. Because the undisputed evidence establishes VPC's factual allegations, this Court should again hold that the First Amendment protects VPC's speech, expressive conduct, and free association.

II.   **The Undisputed Facts Establish That The Personalized Application Prohibition is Subject to Strict Scrutiny.**

The Personalized Application Prohibition infringes VPC's First Amendment rights in numerous respects that make it subject to strict scrutiny. Indeed, this Court previously applied

strict scrutiny in considering the Personalized Application Prohibition because, on the facts before the Court on Plaintiffs' motion for preliminary injunction, this Court found that the Personalized Application Prohibition, in effect, limits "the overall quantum of speech available," "involves direct regulation of communication among private parties who are advocating for particular change," and "significantly inhibits communicating with voters about proposed political change and eliminates voting advocacy by plaintiffs . . . based on the content of their message." *VoteAmerica*, 576 F. Supp. 3d at 888 (internal quotations omitted). The undisputed facts further establish that no genuine factual disputes exist with respect to these findings. Rather, they demonstrate that the Personalized Application Prohibition (i) abridges Plaintiff's core political speech by proscribing VPC's most effective means of conveying its pro-advance mail voting message and reducing the overall quantum of speech delivering that message; (ii) is content- and viewpoint-based discrimination because it regulates only pro-advance mail voting communications; (iii) limits Plaintiff's associational activity; and (iv) is unconstitutionally overbroad. For any of these independently sufficient reasons, the Court should again apply strict scrutiny and grant summary judgment for Plaintiff.

A.   **The Personalized Application Prohibition Infringes Plaintiff's Core Political Speech Under *Meyer-Buckley*.**

The Personalized Application Prohibition unconstitutionally abridges Plaintiff's core political speech. As explained *supra* Part I, VPC's mailer communications with personalized applications constitute protected speech and conduct taking a stance favoring more voting by mail, especially by underserved voting groups. Under the *Meyer-Buckley* standard, this is "core political speech" for which First Amendment protection is "at its zenith." *Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002) (quoting *Meyer*, 486 U.S. at 425).

25

The Personalized Application Prohibition abridges Plaintiff's core political speech under *Meyer-Buckley* in two independently sufficient ways: (1) it eliminates what Plaintiff VPC believes is the "most effective means" of communicating its message, *id.* at 1244 (quoting *Meyer*, 486 U.S. at 424); and (2) it "restricts the overall quantum of speech available to the election or voting process." *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1028 (10th Cir. 2008).

First, the Personalized Application Prohibition criminally prohibits what Plaintiff believes is the most effective means of conveying its pro-advance mail voting message: distributing mailers including personalized applications. "The First Amendment protects [VPC's] right, 'not only to advocate their cause but also to select what they believe to be the most effective means for so doing.'" *Chandler*, 292 F.3d at 1244 (quoting *Meyer*, 486 U.S. at 424)). VPC believes that "[p]ersonalizing the applications with prefilled information best ensures that VPC's message and assistance are both effective and accurate." SOF ¶ 48 (Lopach declaration, Lopach deposition); *see also* SOF ¶ 28. VPC has consistently attested to this belief that personalizing applications effectively advocates its pro-advance mail ballot message, both by connecting with and convincing the voter recipient to engage with VPC's communication. SOF ¶ 26. HB 2332 directly regulates civic organizations' most effective method of conveying their pro-advance mail voting method by making the practice not just prohibited but a criminal offense punishable by jailtime. K.S.A. §§ 25-1122(k)(2)-(5), 21-6602(a)(3).

Second, the Personalized Application Prohibition threatens to "limit[] the quantum of this speech" concerning advance mail voting by eliminating one form of VPC's expression of its message and disincentivizing VPC from speaking on the issue in Kansas at all. *Yes On Term Limits*, 550 F.3d at 1028. As the Court stated, the prohibition "involves direct regulation of communication among private parties who are advocating for particular change—more voting by mail, especially

26

in under-represented populations." *VoteAmerica*, 576 F. Supp. 3d at 888. Such regulation "will *have the inevitable effect* of reducing the total quantum of speech on an important public issue." *Id.* at 889 (emphasis added). It does so by "limit[ing] the number of voices advocating for the politically controversial topic of voting by mail, limit[ing] the audience which proponents can reach and mak[ing] it less likely that proponents will gather the necessary support to continue sharing their message." *Id.* VPC's personalization of the application is itself speech—integrally intertwined with its overall pro-advance mail voting message—and the Personalized Application Prohibition makes that expression a criminal offense. SOF ¶¶ 26, 28, 74; H.B. 2332 § 3(k)(5); K.S.A. §§ 21-6602(a)(3), (b). And by taking away VPC's most effective means of conveying its message, the Personalized Application Prohibition would make VPC reconsider its resource allocation decision to convey its communications in Kansas if it cannot speak in this manner. SOF ¶ 48. The provision "regulate[s] First Amendment-protected activity in ways that are not merely incidental; in effect, [it] limit[s] 'the overall quantum of speech available.'" *VoteAmerica*, 576 F. Supp. 3d at 888 (citation omitted).

In sum, the Personalized Application Prohibition abridges Plaintiffs' core political speech by limiting what Plaintiff's believe is a most effective means of conveying its message and reducing the overall quantum of speech. Such speech restrictions are subject to strict scrutiny. *Yes On Term Limits*, 550 F.3d at 1028.

**B.     The Personalized Application Prohibition is Content- and Viewpoint-based Discrimination of Plaintiff's Speech.**

The Personalized Application Prohibition is also subject to strict scrutiny because it indisputably targets and infringes Plaintiff's speech based on its content and the viewpoint VPC expresses. Facially "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves

27

that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A restriction is content-based and warrants strict scrutiny if it "applies to particular speech because of the topic discussed or the idea or message expressed," *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed*, 576 U.S. at 163), or if it defines the "category of covered documents . . . by their content," *McIntyre*, 514 U.S. at 345.

This Court previously concluded "HB 2332 significantly inhibits communication with voters about proposed political change," including "based on the content of their message[.]" *VoteAmerica*, 576 F. Supp. 3d at 888, and Defendants cannot reasonably dispute this finding based on the record. Indeed, the provision "targets and prohibits speech based on its content"— personalized information on advance mail ballot applications. *Peck v. McCann*, 43 F.4th 1116, 1134–35 (10th Cir. 2022). It then "single[s] out [this] topic or subject matter for differential treatment," *City of Austin*, 142 S. Ct. at 1472, by proscribing the content that may appear on Plaintiff's communications. K.S.A. § 25-1122(k)(2). The provision also defines the speech regulation based on the category of covered documents: "The application for an advance voting ballot included" in a communication that "solicits by mail a registered voter to file an application." *Id.* § 25-1122(k)(1)-(2). This prohibition does not apply to any other types of communications, including those involving voter registration. *See, e.g.*, *McIntyre*, 514 U.S. at 345 (holding that a restriction only on publications designed to influence voters in an election discriminated based on content because the document's content defined the law's coverage); *Buckley*, 525 U.S. at 209 (Thomas, J., concurring) (reasoning that restrictions on initiative petitions but not candidate petitions were content-based). Thus, the provision is content-based discrimination because it singles out Plaintiff's communications based on VPC's personalization of its applications to

advocate for mail voting. Such regulations that "target speech based on its communicative content" are "presumptively invalid." *ALDF v. Kelly*, 434 F. Supp. 3d 974, 997 (D. Kan. 2020) (Vratil, J.) (citations omitted), *aff'd*, 9 F.4th 1219 (10th Cir. 2021).

The Personalized Application Prohibition is also viewpoint discrimination. "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *City of Austin*, 142 S. Ct. at 1472. But "[g]overnment discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *ALDF*, 9 F.4th at 1229 (quoting *Reed*, 576 U.S. at 168). The Personalized Application Prohibition is viewpoint discrimination because only communications *advocating* advance mail voting would include a personalized application. Thus, Personalized Application Prohibition imposes no limit on communications taking a position *against* mail voting because that contrary message would, by default, not include a personalized application. *See, e.g., SD Voice v. Noem*, 432 F. Supp. 3d 991, 996 (D.S.D. 2020) (finding a law viewpoint discriminatory because it "specifically applies a burden to the speech of those who 'solicit' others to sign ballot measure petitions, but not those who solicit them not to do so"). Such content- and viewpoint-based speech restrictions are subject to strict scrutiny and are "presumptively unconstitutional." *Reed*, 576 U.S.at 163-64.

## C.   The Personalized Application Prohibition Infringes Associational Rights.

Finally, the Personalized Application Prohibition is subject to strict scrutiny because interferes with VPC's associational rights. As this Court has acknowledge, "[t]he right to associate to advance beliefs and ideas is at the heart of the First Amendment." *VoteAmerica*, 576 F. Supp. 3d at 875 (citing *NAACP v. Button*, 371 U.S. 415, 430 (1963)). This "freedom of association encompasses not only the right to associate with others but also the right to choose how one

associates with others." *Id.* at 875 (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000)). And Plaintiff's associational rights are "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference" on their "means of communicating" to further their associations. *Healy v. James*, 408 U.S. 169, 181-83 (1972). Accordingly, a restriction is unconstitutional even if it does not "deprive those in the [plaintiff's] position of all opportunities to associate." *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973).

Here, the Personalized Application Prohibition interferes with VPC's associational rights by limiting its ability to associate with Kansans to persuade them to vote by mail and assist them with requesting an advance mail ballot. Moreover, the Personalized Application Prohibition forecloses VPC from using the assistance it offers its intended population of underrepresented voters to gain a foothold for future electoral engagement with those voters. VPC personalizes its communications to encourage specific voters to act on its advocacy and to make the application processing easier for election officials. SOF ¶¶ 26, 28, 30-32, 37 But VPC also personalizes its communications because it has carefully identified *these specific voters* as individuals with whom VPC wants to band together to increase electoral participation, tout the security and convenience advantages of mail voting, and provide inroads for future engagement on electoral issues. SOF ¶¶ 28, 37. VPC tracks which recipients are responsive to its communications and methodically tests its messaging to ensure that it is effectively reaching its specific identified audience and building a relationship with those voters to create a more inclusive electorate. *See* SOF ¶ 27. VPC also sends a follow-up letter to voter recipients that references its prior communications and continues to associate with voters throughout the voting process. SOF ¶ 45. And VPC provides an explicit unsubscribe notice on its communications, and offers four different unsubscribe methods overall, to allow recipients to remove themselves from VPC's lists and help ensure that VPC is associating

30

with voters who are engaged with VPC's advocacy. SOF ¶ 42 (Lopach declaration and Dripps deposition).

VPC's associational activities are a modern analogy to the protected activity in *NAACP v. Button*. There, the Supreme Court blocked a law that restricted NAACP's associational activity informing and soliciting clients for litigation. *Button*, 371 U.S. at 421, 434. The law violated NAACP's First Amendment rights because it prevented them from associating to persuade others to action and using those associations to build relationships and bring litigation, their chosen "means for achieving" its desired change. *Id.* at 429-31; *see also id.* at 437 (ruling that "advocating lawful means of vindicating legal rights" through signing up as a plaintiff in litigation is protected associational activity). Similarly here, VPC uses prefilled applications as its chosen means of affecting change: persuading its audience to take action by requesting a mail ballot. VPC relies on the effectiveness of its personalized communications, and the ease with which voters can act on VPC's persuasion, to build relationships to increase mail voting in Kansas. As in *Button*, the restrictions on VPC's activity abridges its ability "to engage in association for the advancement of beliefs and ideas" to "persuade [their audience] to action." *Id.* at 430, 437. Such encroachment warrants strict scrutiny. *Id.* at 438; *Kusper*, 414 U.S. at 59.

D.      **The *Anderson-Burdick* Framework is the Improper Analysis to Apply, But Nevertheless Requires Strict Scrutiny.**

The balancing and sliding scale scrutiny standard developed under the *Anderson-Burdick* framework[9] is not applicable to Plaintiff's advocacy to Kansans to encourage vote by mail. This is because "some laws which govern elections, particularly election-related speech and

---

[9] Under *Anderson-Burdick*, courts are permitted to apply lesser scrutiny to laws that are (1) "nondiscriminatory" and (2) impose insubstantial restrictions on the right of "access to the ballot." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *accord Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983). For the reasons described *supra*, the Personalized Application Prohibition is neither nondiscriminatory nor a regulation of voters' or candidates' right of ballot access.

31

associations, go beyond the intersection between voting rights and election administration, and veer into the area where the First Amendment has its fullest and most urgent application." *VoteAmerica*, 576 F. Supp. 3d at 888 (citations and quotations omitted). As such, "[t]he Supreme Court has declined to apply *Anderson-Burdick* to cases which govern election-related speech rather than the 'mechanics of the electoral process.'" *Id.* at 887 (quoting *McIntyre*, 514 U.S. at 345).

As this Court has previously concluded, HB 2332 goes beyond time, place, and manner restrictions on election administration and the State's authority to regulate election processes. *Id.* at 888. The Personalized Application Prohibition impacts speech in a way that is not minimal or incidental: it makes it more difficult to engage in VPC's chosen mode of communication, involves direct regulation of communication among private parties who are advocating for more voting by mail in under-represented populations, and significantly inhibits VPC's communication with voters about proposed political change based on the content of its message. This limitation on political expression is subject to strict scrutiny.

Even if *Anderson-Burdick* were an appropriate analytical lens, strict scrutiny would still apply because HB 2332 severely burdens VPC's speech. *Fish v. Schwab*, 957 F.3d 1105, 1124-25 (10th Cir. 2020). Burdens on core political speech are *per se* severe. *See Buckley*, 525 U.S. at 207 (Thomas, J., concurring). And the evidence further establishes that the Personalized Application Prohibition "impacts speech in a way that is not minimal." *VoteAmerica*, 576 F. Supp. 3d at 888 (citation omitted). Indeed, the inability to personalize applications in Kansas would eliminate VPC's most effective way of furthering its speech and association, and would deter VPC from allocating its limited resource to convey its communications to Kansans. *See* SOF ¶ 48 (Lopach declaration, Lopach deposition, Lopach PI testimony). On the other side of the balance, Kansas's

32

interest in the Personalized Application Prohibition is virtually nonexistent. *See infra* Part III. Defendants have not gathered evidence that meaningfully differs from what they presented during the preliminary injunction hearing in this case. Thus, "the difference between strict scrutiny and the *Anderson-Burdick* balancing framework is not necessarily relevant" based on the developed facts here, and the prohibition fails under both. *VoteAmerica*, 576 F. Supp. 3d at 888; *see also League of Women Voters of Tenn.*, 400 F. Supp. 3d at 725 n.9 (observing that *Anderson-Burdick* "is just another road to strict scrutiny").

**E.     The Personalized Application Prohibition is Unconstitutionally Overbroad.**

The Personalized Application Prohibition is an unconstitutionally overbroad restriction of First Amendment protected activity, both facially and as-applied to Plaintiff. The ban "lacks any plainly legitimate sweep," *United States v. Stevens*, 559 U.S. 460, 473 (2010), and its "very existence may cause others not before the court to refrain from constitutionally protected speech or expression," *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *VoteAmerica*, 576 F. Supp. 3d at 877 (concluding that a "law may chill the free speech rights of parties not before the court, especially when the statute imposes criminal sanctions"). "Establishing substantial overbreadth … requires a comparison between the legitimate and illegitimate applications of the law." *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1153 (10th Cir. 2020) (citation omitted)

Based on the record, the illegitimate applications of HB 2332 to curb protected speech far exceeds any potential legitimate applications. The legitimate applications are hypothetical or rare—the prohibition attacks applications that are personalized with incorrect information or fraudulently prefilled incorrectly. . But the record indicates neither issue is a serious problem in Kansas. The illegitimate applications are far broader. VPC's communications are personalized using reliable data from specialized vendors hired to professionally manage and maintain voter information and culls its lists with the goal of keeping the information accurate and current.  SOF

¶ 35. But even if an organization drew directly from the Kansas voter file to instantaneously personalize and deliver applications,[10] HB 2332 would still prohibit that practice. Thus, the law overbroadly prohibits *all* personalization of applications, regardless of source or timing, meaning that "many of [the statute's] potential applications involve protected speech." *United States v. Hernandez-Calvillo*, 39 F.4th 1297, 1311 (10th Cir. 2022). This broad-sweeping law, combined with the criminal penalty that lacks a scienter requirement, "creat[es] a real danger that the statute will chill First Amendment expression." *Id.* at 1300.

### III. Defendants Cannot Meet Their Burden To Show the Personalized Application Prohibition Is Narrowly Tailored To Serve A Compelling State Interest.

Throughout this litigation, Defendants have proffered a variety of justifications for the Personalized Application Prohibition. But "when a law infringes on the exercise of First Amendment rights, its proponent … bears the burden of establishing its constitutionality" through evidence. *iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014) (citation omitted). To survive strict scrutiny, its proponents have the burden to prove that the law is narrowly tailored to serve a compelling state interest. *Republican Party of Minnesota v. White*, 536 U.S. 765, 774-75 (2002). The State cannot meet this burden. Defendants lack the evidence needed to show an actual compelling interest as opposed to a post hoc rationalization developed in response to this litigation. Nor have Defendants developed any evidence that would alter this Court's previous holding that the Personalized Application Prohibition is not narrowly tailored to any of the proffered interests. As such, the Personalized Application Prohibition's abridgment of Plaintiff's protected First Amendment rights cannot be justified, and summary judgment is warranted.

---

[10] Even for this type of practically infeasible mailing program, however, inaccuracies or out-of-date information in the state voter registration file would still inevitably result in some errors in personalization. *See, e.g.*, Schmidt Tr. 58:20-24, 107:19-24.

A.    **The Personalized Application Prohibition Does Not Serve a Compelling State Interest.**

The Personalized Application Prohibition serves no compelling state interest. In applying strict scrutiny, a court must look to the "actual considerations that provided the essential basis for the [decision-making], not post hoc justifications the legislature in theory could have used but in reality did not." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017). That is, "after-the-fact explanations cannot help a law survive strict scrutiny" under the First Amendment. *McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 190 (D. Mass. 2015); *see also Bourgeois v. Peters*, 387 F.3d 1303, 1323 (11th Cir. 2004) (rejecting defendant's effort "to engage in post hoc rationalizations of its policy" in the context of a First Amendment challenge).

Here, the legislative record for the Prohibition is silent regarding the state interests purportedly served. Despite the Legislature's silence, Defendants have developed an evolving list of justifications for the Prohibition, such as "[m]inimizing voter confusion" and disenfranchisement, "[p]reserving and enhancing voter confidence," and reducing the rejection of inaccurate applications, inefficiencies in election administration, and potential for voter fraud. *See* SOF ¶ 76; *see also VoteAmerica*, 576 F. Supp. 3d at 878 ("Defendants put forward three alleged interests in enacting HB 2332: avoiding fraud, minimizing voter confusion and facilitating an orderly administration of the electoral process.").

But what Defendants have in number of stated interests, they lack in evidence supporting that these "recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality op.) (citations omitted). Defendants fail to "do more than simply posit the existence of the disease sought to be cured." *Id.*; *see also Buckley*, 525 U.S. at 210 (Thomas, J., concurring) (applying *Turner* and concluding that "the State has failed to satisfy its burden of

35

demonstrating that fraud is a real, rather than a conjectural, problem"). Defendants' unsupported, "after-the-fact explanations cannot help [the Prohibition] survive strict scrutiny." *McLaughlin*, 140 F. Supp. 3d at 190. They are "post hoc justifications the legislature in theory could have used but in reality did not," not the "actual considerations that provided the essential basis" for the Prohibition, as strict scrutiny requires. *Bethune-Hill*, 137 S. Ct. at 799.

In fact, the evidence demonstrates that Kansas election officials are concerned not with any purported harm caused by prefilled, personalized information on advance mail ballot applications, but with voters' receipt of *multiple* applications. *See* SOF ¶ 30 (Shew testifying that the Douglas County election office would like to prefill information on applications but cannot due to budgetary constraints); SOF ¶ 58 (Cox testifying that the only inquiry that Ford County election office received about prefilled information was one voter asking why her middle initial had been printed incorrectly) (Caskey testifying that he does not recall any particular conversations that he had with election offices about concerns about prefilled applications and that his office does not possess any data or notes memorializing such conversations); SOF ¶ 60 (Schmidt testified "The bigger issue for us was apps coming from outside the State of Kansas to our voters, and multiple applications.") (Caskey testifying to conversations about duplicate applications that election offices received in the 2020 election); SOF ¶ 68 (Caskey testifying that his office made no mention of prefilled applications as a concern in its testimony or communications before HB 2332's passage).

The Personalized Application Prohibition—or any other part of HB 2332—does not address this distribution of duplicate applications.[11] The Prohibition does nothing to prevent a

---

[11] In theory, HB 2332's Out-of-State Distributor Ban could have indirectly addressed this concern (*i.e.*, forbidding an out-of-state organization from sending communications reduces the overall

person or organization from mailing several blank advance mail ballot applications to a particular voter. In any event, VPC has built-in financial and practical incentives to avoid sending successive personalized applications to voters who have already applied, filters its recipient lists for this purpose, and has itself decided to reduce the number of mailings sent to voters now that the uniquely challenging 2020 election conditions have subsided. *See* SOF ¶¶ 35, 43.

In sum, the Personalized Application Prohibition addresses neither election officials' expressed concerns in the record nor the purported interests Defendants assert. Untethered from a state interest, compelling or otherwise, the Prohibition cannot withstand constitutional scrutiny.

### B.   The Personalized Application Prohibition is Not Narrowly Tailored.

In addition, the disconnect between the Personalized Application Prohibition and any compelling, or even legitimate, government interest is fatal under any level of scrutiny. This is especially true under the "well-nigh insurmountable" scrutiny required here. *Meyer*, 486 U.S. at 425. Indeed, even if the *Anderson-Burdick* balancing framework were applied here, burdening Plaintiff's core political speech requires the State to demonstrate that the Prohibition is "narrowly tailored to advance a compelling state interest." *VoteAmerica*, 576 F. Supp. 3d at 887.

To be narrowly tailored, the restriction must: (i) be the least restrictive means available to achieve the compelling interest (*i.e.*, must not burden any more speech than necessary), *see Verlo v. Martinez*, 820 F.3d 1113, 1134 (10th Cir. 2016); and (ii) not be underinclusive by having "a loose fit between its means and the [government]'s interest," *McCraw v. City of Oklahoma City,*

---

number), but this Ban was so patently unconstitutional that even Defendants agreed to enjoining its enforcement. *See* ECF 73. Any such restriction would likely violate the First Amendment. There is nothing constitutionally suspect about speakers conveying their message more than once and well-established case law forbids speech infringements seeking to limit the quantity of speech. *See Meyer*, 486 U.S. at 422; *Buckley v. Valeo*, 424 U.S. 1, 39 (1976) (holding that federal campaign finance expenditure limits violated the First Amendment by "restrict[ing] the quantity of campaign speech by individuals, groups, and candidates" and "limit[ing] political expression at the core of our electoral process").

37

973 F.3d 1057, 1077 (10th Cir. 2020); *accord ALDF*, 434 F. Supp. 3d at 1002 (Vratil, J.). The discovery record has confirmed that Defendants cannot carry their "heavy burden of demonstrating that [the] restriction is 'the least restrictive means among available, effective alternatives.'" *Peck v. McCann*, 43 F.4th 1116, 1135 (10th Cir. 2022) (quoting *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 665-66 (2004)). When the Personalized Application Prohibition's "restrictions on speech and expressive conduct are juxtaposed against the paltry record evidence of real, non-speculative harms ameliorated by the" law in this case, it is clear the Prohibition fails strict scrutiny and warrants summary judgment for Plaintiff. *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1226 (10th Cir. 2021).

1.      **The Personalized Application Prohibition is Not Narrowly Tailored to Ease Election Administration.**

Defendants speculate that its asserted interest in easing election administration would be furthered by banning personalization of applications. The State additionally asserts that its interest in minimizing the potential for voter disenfranchisement is similarly furthered by HB 2332. *See* SOF ¶ 76. These speculations are not borne out by any record evidence. Each county election official deposed in this case discussed challenges presented by the unprecedented volume of mail voting that occurred during the 2020 general election. *See* SOF ¶¶ 50, 52. To the extent they indicated that the administration burden processing the high volume of advance mail ballot applications in 2020 was affected by third party distribution of applications, they uniformly identified voters' inquiries about and submission of multiple applications as its primary source; not *personalized* applications. *See* SOF ¶ 60. Speculation for an interest is insufficient to create a genuine issue of material fact, and Plaintiff on summary judgment "has no burden to disprove unsupported claims of his opponent." *Artes-Roy v. City of Aspen*, 31 F.3d 958, 963 (10th Cir. 1994) (quoting *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988)).

Moreover, county election offices have similar processes in place to cure incomplete or inaccurate applications submitted by voters. *See* SOF ¶ 40. These cure processes apply regardless of whether the voter had used a blank form or a form pre-populated with personalized information. *See* SOF ¶ 58. The record does not contain admissible evidence that there was a greater likelihood of errors that trigger the cure process on applications with personalized information. *Id*. Nor is there any evidence in the record that elections offices spent more time curing personalized applications than they would have had voters only started with blank applications. *Id*. Indeed, county election officials attested that they did not track personalized applications and could not accurately decipher whether an application was prefilled by a third party or typed in by a voter. *Id*. (Cox testimony). Processing prefilled applications was not identified as a particular source of additional burden, and the State offers no evidence that prefilling caused administrative concerns. *Id*. (Howell testimony).[12]

Nothing in the record indicates that these benefits are outweighed by any inefficiencies created by voters' use of prefilled applications, making it impossible for the State to demonstrate that the Personalized Application Prohibition is sufficiently narrowly tailored. *See Yes On Term Limits*, 550 F.3d at 1029 (finding an Oklahoma law insufficiently narrow where the asserted state interest relied on an assumption that non-resident circulators lead to an increased prevalence of fraudulent activity than resident circulators for which the state "provided no data to this effect").

---

[12] Nothing in the evidence indicates causation, or indeed any sort of connection, between personalized applications and voters' submission of multiple applications. Any tortured attempt to connect these two things further demonstrates that the Personalization Prohibition is not narrowly tailored to this professed State interest. In fact, the evidence makes clear that in some cases the use of prefilled applications actually reduces the election offices' workload. *See* SOF ¶ 30 (Cox testified "Q: Is it fair to say that at least in some ways, prefilled application – prefilled information increases the likelihood and the ease that your office can match information between the voter file and application? A: Normally, I would say yes.").

39

The State's "general speculation that some administrative burden might" be eased by the Prohibition is insufficient "to justify a meat-ax abridgment of [] First Amendment rights." *Thornburgh v. Abbott*, 490 U.S. 401, 433 (1989) (Stevens, J., concurring and dissenting in part).

Similarly, while theoretically personalized information may trigger the cure process that the voter did not complete, the State has no evidence of this, and there is no evidence indicating that voters are systemically disenfranchised due to their use of personalized applications. Narrow tailoring cannot rest on an assumption. *Yes On Term Limits*, 550 F.3d at 1029.

Further, even if the facts in this case did indicate that personalized applications result in some inefficiencies—they do not—that type of minimal administrative burden would not justify infringement on protected political speech. The Supreme Court has held that while a state may "take administrative and financial considerations into account" in developing its election laws, the "possibility of future increases in the cost of administering the election system is not a sufficient basis here for infringing [others'] First Amendment rights." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 218 (1986) (concerning state law requiring closed primaries); *see also Buckley*, 525 U.S. at 192 (discussing lack of narrow tailoring to interest in administrative efficiency).

### 2. The Personalized Application Prohibition is Not Narrowly Tailored to Prevent Voter Fraud or Promote Voter Confidence.

The State has also attempted to justify the Personalized Application Prohibition as an effort to combat voter fraud or promote voter confidence. While this may be a compelling purpose in the abstract, the record here does not include any evidence indicating that the law would further this interest. To the contrary, the uncontroverted record shows that Kansas election officials are not concerned about fraud with respect to personalized advance mail ballot applications. *See* SOF ¶¶ 30-32, 65-66. And Defendants cannot identify admissible evidence showing that personalized

applications deteriorated voter confidence in elections, much less to any degree that could justify the Prohibition under strict scrutiny.

Additionally, discovery in this case makes clear that the occurrence of voter fraud in general is not a serious concern in Kansas elections. *See* SOF ¶¶ 65-66. (Caskey testimony confirming that the 2020 post-election audits did not reveal any systemic fraud in Kansas's elections). This is due, at least in part, to other provisions in Kansas law meant to safeguard against voter fraud within advance mail voting. *See* SOF ¶ 65 (Schmidt testimony on the multiple stages at which fraud can be detected and prevented). Local election officials review the voter's signature on both the application and the ballot to those in county voter registration records (with a notice and cure process). *See* SOF ¶¶ 15-16. Election officials also verify the driver's license or ID number on the application and/or a copy of their photo ID. *See* SOF ¶ 15. Existing laws also criminalize creation or submission of fraudulent advance mail ballot applications. *See, e.g.*, K.S.A. § 25-2431. Additionally, the ELVIS system itself limits election officials to issuing a single active ballot to a voter. *See* SOF ¶ 65.

The evidence makes clear that these preexisting laws and safeguards sufficiently address any purported State interest in preventing fraud in advance mail voting, particularly given the admitted lack of fraud in the last election. *See, e.g.*, SOF ¶ 65 (Cox testifying "Q: And is it fair to say that these verification procedures safeguard against potential vote by mail fraud? A: It should, yes."). And such existing safeguards already promote voter confidence by ensuring that the voter who applies for an advance mail ballot is who they say they are, and that the eligible voter will be allowed to vote only their own individual ballot. *See* SOF ¶ 65 (Schmidt testimony). Thus, at best the Personalized Application Prohibition is redundant; any claim that it is narrowly tailored to address voter fraud is without merit. *See Buckley*, 525 U.S. at 204-05; *Meyer*, 486 U.S. at 426-27.

### 3. The Personalized Application Prohibition is Not Narrowly Tailored to Prevent Voter Confusion.

The State's asserted interest in protecting against voter confusion stemming from third parties' distribution of personalized advance mail ballot applications is also not supported by admissible evidence of such confusion. At best the record includes anecdotes, suppositions, and hearsay on this point, *see* SOF ¶ 57 which do not raise a genuine issue of material fact for trial.[13] While any voter confusion is regrettable, a "handful" of unverifiable accounts of its existence "do[] not support the inference" that prefilled applications cause voter confusion, and cannot justify restrictions on core political speech. *See Yes On Term Limits* 550 F.3d at 1029 (citing *Buckley*, 525 U.S. at 204 n. 23); *see also Brewer*, 18 F.4th at 1227 (affirming grant of summary judgment where there was "little evidence of non-speculative harms or interests that the [challenged law's] restrictions alleviate in a direct and material way").

Additionally, the record demonstrates that there are numerous less-restrictive avenues for assuaging voter confusion about the advance mail voting process. For example, Johnson County publicized FAQs and utilized social media outreach to explain to voters in bulk that applications received from Plaintiff were legitimate and could be used to apply for an advance mail ballot. *See* SOF ¶ 57 (Schmidt testimony and exhibit). In Ford County, the election office put notice in the newspaper informing voters that civic organizations were sending applications and that voters were not under any obligation to submit such applications. *Id.* (Cox testimony). These are only a few of the many ways in which election officials throughout Kansas, and nationwide, address voter

---

[13] Despite hearsay objections sustained during the preliminary injunction hearing, Defendants have not deposed any Kansas voters. They continue to rely exclusively on the testimony of Kansas election officials as evidence of the state interests that purportedly justify the Personalized Application Prohibition.

42

confusion. It cannot be disputed that the Personalized Application Prohibition is not the State's least-restrictive means of achieving this interest.

Finally, individual recipients who find the personalized applications' contents to be confusing, misleading, or incompatible with their voting preferences are not required to engage with the communication. Such a voter, if she finds the application "objectionable" for whatever reason, can "escape exposure . . . simply by transferring the [mailer] from envelope to wastebasket." *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 542 (1980); *see also Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 72 (1983). Many Kansans seemingly availed themselves of this disposal option and the explicit ability to unsubscribe from VPC's mailing list in 2020, *see* SOF ¶ 42, and in fact some election officials explicitly presented this option to voters who complained about receipt of applications. *See* SOF ¶ 63. And while some of those throwing out the application may find its distribution to be an annoyance, it is fundamental to our First Amendment jurisprudence that freedom of speech "may not be withdrawn even if it creates [a] minor nuisance for a community[.]" *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943).

## CONCLUSION

Plaintiffs respectfully request that this Court grant summary judgment to Plaintiff VPC, permanently enjoin the Personalized Application Prohibition, and grant all such permanent relief that this Court deems just and proper.

43

Date: October 14, 2022

By:  /s/ Mark P. Johnson

Mark P. Johnson

Danielle M. Lang (*pro hac vice*)
Alice C.C. Huling (*pro hac vice*)
Christopher Lapinig (*pro hac vice*)
Hayden Johnson (*pro hac vice*)
**CAMPAIGN LEGAL CENTER**
1101 14th Street, NW, St. 400
Washington, D.C. 20005
(202) 736-2200
DLang@campaignlegalcenter.org
AHuling@campaignlegalcenter.org
CLapinig@campaignlegalcenter.org
HJohnson@campaignlegalcenter.org

Mark P. Johnson KS Bar #22289, D. Kan. #22289
**DENTONS US LLP**
4520 Main Street, Suite 1100
Kansas City, MO 64105
816/460-2400
816/531-7545 (fax)
mark.johnson@dentons.com

Jonathan K. Youngwood (*pro hac vice*)
Meredith D. Karp (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Nicole A. Palmadesso (*pro hac vice*)
**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
bonnie.jarrett@stblaw.com

*Attorneys for Plaintiffs*

44

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on this 4th day of November 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all Counsel of record.

/s/ *Mark P. Johnson*
Mark P. Johnson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VOTEAMERICA and
VOTER PARTICIPATION CENTER,

     *Plaintiffs,*

vs.

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
DEREK SCHMIDT, in his official capacity as
Attorney General of the State of Kansas; and
STEPHEN M. HOWE, in his official capacity as
District Attorney of Johnson County,

     *Defendants.*

Case No. 2:21-cv-02253-KHV-GEB

## **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

SUMMARY OF EXHIBITS ..................................................................................... vi

I.      INTRODUCTION .......................................................................................... 1

II.     DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF
        UNCONTOVERTED FACTS ........................................................................ 3

III.    DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS ............. 31

IV.     ARGUMENT ................................................................................................ 43

        I.      Sending a Voter a Partially Completed Advance Mail Ballot Application is
                *Conduct*, Not *Speech* ................................................................ 44

                A.      *The Partially Completed Advance Mail Ballot Applications
                        that VPC Sends to Voters are Not Inherently Expressive* ........................ 44

                B.      *The Cases that the District Court Cited in its Preliminary Injunction /
                        Motion to Dismiss Order are Inapposite* ................................................. 52

                C.      *The Pre-Filled Application Prohibition is Rationally Related to the State's
                        Legitimate Interests* ........................................................................ 55

        II.     Even if the First Amendment is Implicated, the Pre-Filled Application
                Prohibition is Viewpoint- and Content-Neutral and not Subject to
                Heightened Scrutiny .................................................................... 57

                A.      *The Pre-Filled Application Prohibition Does Not Target Core Political
                        Speech* .............................................................................. 57

                B.      *Assuming the First Amendment is Implicated, the Proper Standard for
                        Evaluating VPC's Claims is the Anderson-Burdick Test* ..................... 62

        III.    The Pre-Filled Application Prohibition Does Not Contravene VPC's Freedom
                of Association Rights .................................................................... 68

        IV.     VPC's Overbreadth Claim Has No Merit ....................................... 70

                A.      *The Pre-Filled Application Prohibition is Not Overbroad as Applied to
                        VPC's Activities* ................................................................... 72

                B.      *The Pre-Filled Application Prohibition is Not Facially Overbroad* ......... 73

i

V.      CONCLUSION ........................................................................................................ 73

CERTIFICATE OF SERVICE ........................................................................................ 75

ii

## TABLE OF AUTHORITIES

Page(s)

Cases

*ACLU v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008)............................................................... 63

*Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988)....................................................... 71

*American Ass'n of People with Disabilities v. Herrera*, 690 F. Supp.2d 1183 (D.N.M. 2010).... 55

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................. 62

*Armour v. City of Indianapolis, Ind.*, 566 U.S. 673 (2012) .......................................... 52

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021)....................... 21, 56, 66, 67, 68, 69

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ............................................................. 71

*Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491 (1985)............................................. 72

*Burdick v. Takushi*, 504 U.S. 428 (1992).......................................................... 62, 63, 64

*Burns v. Bd. of Cnty. Comm'rs*, 330 F.3d 1275 (10th Cir. 2003) ................................. 10

*Burson v. Freeman*, 504 U.S. 191 (1992).................................................... 56, 60, 61, 67

*City of Austin v. Reagan Nat'l Advert. of Austin*, 142 S. Ct. 1464 (2022)............................. 58, 59

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984)................................... 44

*Clark v. Schmidt*, 493 F. Supp.3d 1018 (D. Kan. 2020) ............................................... 73

*Cook v. Gralike*, 531 U.S. 510 (2001) ....................................................................... 46

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) .................................... 66, 67

*Dallas v. Stanglin*, 490 U.S. 19 (1989)...................................................................... 69

*DCCC v. Ziriax*, 487 F. Supp.3d 1207 (N.D. Okla. 2020) ............................................ 51

*Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp.3d (M.D.N.C. 2020) ..................... 54

*Democracy N.C. v. N.C. State Bd. of Elections*, __ F. Supp.3d __, 2022 WL 715973, at *6-8 (M.D.N.C. Mar. 10, 2022) ........................................................................... 54

*Doe v. Reed*, 561 U.S. 186 (2010) .................................................................. 56, 60, 61

*DSCC v. Pate*, 950 N.W.2d 1 (Iowa 2020)................................................................. 56

*Faustin v. City & Cty. of Denver, Colo.*, 423 F.3d 1192 (10th Cir. 2005) ............................. 71, 72

*Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366 (9th Cir. 2016) ...................................... 54

*Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020) ........................................................ 62

*Good v. Bd. of Cnty. Comm'rs*, 331 F. Supp.2d 1315 (D. Kan. 2004) ........................................ 21

*Heller v. Doe*, 509 U.S. 312 (1993) .......................................................................................... 56

*Hill v. Colorado*, 530 U.S. 703 (2000) .................................................................................... 65

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ........................................................ 48

*In re Motor Fuel Temperature Sales Pracs. Litig.*, 07-1840, 2012 WL 13050524
    (D. Kan. Apr. 4, 2012) ...................................................................... 8, 12, 16, 19, 22, 28, 29

*Knox v. Brnovich*, 907 F.3d 1167 (9th Cir. 2018)..................................................................... 54

*League of Women Voters v. Browning,* 575 F. Supp.2d 12989 (S.D. Fla. 2008.......................... 51

*League of Women Voters v. Hargett*, 400 F. Supp.3d 706...................................................... 48, 53

*Lichtenstein v. Hargett*, 489 F. Supp.3d 742 (M.D. Tenn. 2020) .................................... 51, 67, 68

*Lichtenstein v. Hargett*, __ F. Supp.3d __, 2021 WL 5826246, at *35
    (M.D. Tenn. Dec. 7, 2021)............................................................................................... 49

*Marchioro v. Chaney*, 442 U.S. 191 (1979) .............................................................................. 56

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)........................................................ 64

*Meyer v. Grant*, 486 U.S. 414 (1988) ...................................................................... 50, 57, 60, 61

*Meyer* and *Buckley v. American Constitutional Law Foundation, Inc.*, 552 U.S.  (1999) ........... 60

*N.M. Youth Organized v. Herrera*, 611 F.3d 669 (10th Cir. 2010) ............................................ 72

*Navajo Health Found.-Sage Mem. Hosp., Inc. v. Burwell*,
    256 F. Supp.3d 1186 (D.N.M. 2015) ............................................................................... 52

*NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022)........................................... 47

*New Ga. Project v. Raffensperger*, 484 F. Supp.3d 1265 (N.D. Ga. 2020)............................. 53, 54

*New York v. Ferber*, 458 U.S. 747 (1982) ................................................................................. 71

*Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016).............................................. 63

*Priorities USA v. Nessel*, 462 F. Supp.3d 792 (E.D. Mich. 2020).............................................. 52

*Priorities USA v. Nessel*, 487 F. Supp.3d 599 (E.D. Mich. 2020)......................................... 52, 53

*Priorities USA v. Nessel*, No. 19-13341, 2022 WL 4272299 (E.D. Mich. Sept. 15, 2022).... 51, 53

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .......................................................................... 58

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ......................................................... 65

*Richardson v. Tex. Sec'y of State*, 978 F.3d 220 (5th Cir. 2020)................................................ 67

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) .......................................................................... 69

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006)...... 44, 47, 48

*Save Palisade Fruitlands v. Todd*, 279 F.3d 1204 (10th Cir. 2002)............................................ 55

*Sickles v. Campbell Cnty., Ky.*, 501 F.3d 726 (6th Cir. 2007)..................................................... 48

iv

*Storer v. Brown*, 415 U.S. 724 (1974) ........................................................................... 56

*Texas v. Johnson*, 491 U.S. 397 (1989) ................................................................... 44, 47

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ............................... 46, 59

*United States v. O'Brien*, 391 U.S. 367 (1968) ........................................................ 47, 48

*United States v. Streett*, 434 F. Supp. 3d 1125 (D.N.M. 2020) ..................................... 72

*United States v. Williams*, 553 U.S. 285 (2008) ........................................................... 71

*Univ. of Tex. v. Camenish*, 451 U.S. 390 (1981) ......................................................... 52

*Utah Republican Party v. Cox*, 892 F.3d 1066 (10th Cir. 2018) .................................. 62

*Virginia v. Hicks*, 539 U.S. 113 (2004)............................................................... 71, 72, 73

*VoteAmerica v. Raffensperger*, __ F. Supp.3d __, 2022 WL 2357395
(N.D. Ga. June 30, 2022) ................................................................... 2, 50, 51, 64, 67, 69

*VoteAmerica v. Schwab*, 576 F. Supp. 3d 862 (D. Kan. 2021)...................................... 51

*Voting for Am. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ................. 44, 48, 49, 50, 51, 52, 53, 54, 61

*Voting for Am., Inc. v. Andrade*, 488 F. App'x 890 (5th Cir. 2012)............................... 69

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................................................ 65, 66

*West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358 (10th Cir. 2000)................................. 73

Statutes

52 U.S.C. § 20301............................................................................................................ 5

52 U.S.C. § 21083............................................................................................................ 3

K.S.A. 25-124 ................................................................................................................. 3

K.S.A.25-1121 ................................................................................................................ 3

K.S.A. 25-1122 .............................................................. 1, 3, 4, 5, 6, 18, 29, 30, 31, 45, 52, 68, 73

K.S.A. 25-1123 ............................................................................................................... 5

K.S.A. 25-1124 ............................................................................................................... 6

K.S.A. 25-1131 ............................................................................................................... 3

K.S.A. 25-1214 ............................................................................................................... 5

K.S.A. 25-1220 ............................................................................................................... 5

K.S.A. 25-2431 ............................................................................................................. 27

K.S.A. 21-6602 ............................................................................................................. 29

Regulations

Kan. Admin. Reg. 7-36-7.................................................................................................. 6, 31

Kan. Admin. Reg. 7-36-9.................................................................................................. 6, 31

## SUMMARY OF EXHIBITS

A.      Andrew Howell Affidavit
B.      [reserved]
C.      [reserved]
D.      [reserved]
E.      [reserved]
F.      Lionel Dripps Deposition Excerpts
G.      [reserved]
H.      Pls.' Resp. to Interrog. No. 16 in Defs.' Second Set of Interrogs.
I.      Sample of VPC's cover letter, pre-filled advance voting ballot application, and envelope sent to Kansas voters in 2020 General Election
J.      [reserved]
K.      Pls.' Response to Defs.' RFA No. 8
L.      Kansas Voters to whom VPC sent advance voting ballot application in 2020 General Election
M.      Ken Block's Initial Declaration
N.      Ken Block's Supplemental Declaration
O.      Ex. XI to Ken Block's Supplemental Declaration
P.      Ex. V to Ken Block's Initial Declaration
Q.      Examples of CVI-pre-filled deficient advance voting ballot applications received from Shawnee County voters
R.      Advance voting ballot applications sent by VPC to deceased voters in Shawnee County
S.      [reserved]
T.      [reserved]
U.      Debbie Cox Affidavit
V.      Text of notice placed in Ford County newspapers by Debbie Cox regarding CVI's mailing of advance voting ballot applications to voters
W.      Examples of correspondence between Shawnee County Election Office and voters submitting deficient advance voting ballot applications in 2020 General Election
X.      VPC Call Center FAQs
Y.      Emails between VPC's Counsel and Other States' Election Officials
Z.      Written Testimony from Kansas Secretary of State's Office to Kansas Legislature
AA.     [reserved]
BB.     [reserved]
CC.     VPC's Resp. to Def. Schwab's First Req. for Produc. of Docs.
DD.     Letter from Scott Schillings to Meredith Karp (June 8, 2022)
EE.     Redacted Study on Pre-Filled Absentee Ballot Applications
FF.     Connie Schmidt Deposition Excerpts

GG.        Jamie Shew Deposition Excerpts

HH.        Bryan Caskey Deposition Excerpts

II.        [reserved]

JJ.        Tom Lopach Deposition Excerpts

KK.        Andrew Howell Deposition Excerpts

LL.        Debbie Cox Deposition Excerpts

MM.        Eitan Hersh Deposition Excerpts

Appellants' Appendix - Vol. II - 267

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VOTEAMERICA and
VOTER PARTICIPATION CENTER,

*Plaintiffs,*

vs.

Case No. 2:21-cv-02253-KHV-GEB

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
DEREK SCHMIDT, in his official capacity as
Attorney General of the State of Kansas; and
STEPHEN M. HOWE, in his official capacity as
District Attorney of Johnson County,

*Defendants.*

**DEFENDANTS' RESPONSE TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendants Scott Schwab, Derek Schmidt, and Stephen M. Howe, by and through counsel, respectfully submit this Response to Plaintiffs' Motion for Summary Judgment (Dkt. 144). In support of the same, Defendants state as follows:

**I. – Introduction**

The only remaining issue in this case is whether a third-party has a right under the First Amendment to fill out *someone else's* advance voting ballot application. In other words, does K.S.A. 25-1122(k)(2) constitute an impermissible restriction on speech or association under the First Amendment? Defendants submit that a third party's pre-population of a voter's advance ballot application is neither expressive conduct nor speech warranting constitutional protection, and it has no impact as well on the third-party's freedom of association rights.

Without even bothering to cite the recent decision in *VoteAmerica v. Raffensperger*, __ F. Supp.3d __, 2022 WL 2357395 (N.D. Ga. June 30, 2022), where the court categorically rejected *these same Plaintiffs'* constitutional challenge to a virtually identical Georgia statute on the basis that a prohibition against third-parties pre-filling other persons' absentee ballot applications does not implicate the First Amendment, Plaintiffs now reiterate the same legal arguments they advanced at the preliminary injunction phase of the case. At the preliminary injunction stage, however, this Court concentrated the bulk of its analysis on a provision prohibiting only out-of-state entities from sending advance voting ballot applications to Kansas voters. Defendants accepted the Court's determination that the provision was unconstitutional and agreed to a permanent injunction against it. But the Pre-Filled Application Prohibition – the only statute still in dispute – is eminently reasonable and neither implicates nor violates any constitutional rights. While Defendants do not believe that the governing case law requires the State to produce *any* evidence in support of the Legislature's passage of this statute, the post-discovery record amply justifies the State's basis for adopting this common sense provision.

The Legislature acted on what it deemed to be a serious concern with pre-filled advance voting ballot applications. As was evident in Kansas in 2020, and has been clear throughout the country for years, the activities of Plaintiff Voter Participation Center ("VPC") tend to precipitate anger, confusion, and frustration in the electorate; negatively impact the orderly and efficient administration of elections; and contribute to the diminution of public confidence in both the competency of election officials and the integrity of the electoral process. Kansas' Pre-Filled Application Prohibition is a perfectly reasonable prophylactic designed to mitigate such harms. Ironically, VPC itself was so concerned with erroneous data in the pre-filled advance voting ballot applications it was sending to voters during the 2020 General Election that it decided on its own to stop pre-populating applications for its target market for a period of time. The State is entitled

to substantial deference in undertaking the measures that it did, and there is no basis whatsoever for granting Plaintiffs' summary judgment motion.

## II. – Defendants' Response to Plaintiffs' Statement of Uncontroverted Facts

1.      Defendant Kansas Secretary of State Scott Schwab does business in and is an elected official in the state of Kansas. *See* Stipulations, Pretrial Order, Dkt. No. 140 (Sept. 30, 2022) ("Stipulated Facts"), at § 2(a)(i).

**RESPONSE:  Uncontroverted.**

2.      Defendant Schwab is the Chief Election Officer for the State of Kansas.  *See id.* at §2(a)(ii).

**RESPONSE:  Uncontroverted.**

3.      As the Chief Election Official for the State of Kansas, Defendant Schwab is responsible for overseeing all Kansas elections and administering the State's election laws and regulations. Defendant Schwab also issues guidance and instruction to county election officers on a range of election procedures and requirements.  *See id.* at §2(a)(iii) (citing K.S.A. 25-124).

**RESPONSE:  Uncontroverted.**

4.      Kansas law permits Defendant Schwab to adopt rules and regulations related to advance voting, including the general form of advance voting ballots and applications for advance mail voting. K.S.A. 25-1131, 25-1121(a)-(b), 25-1122d(c); *see also* HB 2332, Session of 2021 (Kan.), §§ 3(k)(2), (m).

**RESPONSE:  Uncontroverted.**

5.      Defendant Schwab, as Kansas's Secretary of State, is responsible for maintaining an online voter registration database.  52 U.S.C. § 21083(a)(1)(A).

**RESPONSE:  It is uncontroverted that the Secretary of State's Office maintains a statewide voter registration database.  However, the office does not modify, add, or delete any records in the database as that task is performed by county election offices.  Ex. HH at 40:5-42:17.**

6.      The Kansas state voter registration database is known as the Election Voter Information System ("ELVIS").  *See* Stipulated Facts at § 2(a)(xi).

**RESPONSE:  Uncontroverted.**

7.      Election officials in Kansas's 105 counties are responsible for maintaining the voter files for voters within their respective counties and ELVIS reflects the voter data maintained by those county officials.  *See id.* at §2(a)(xii).

**RESPONSE:  Uncontroverted.**

8.      When a voter registration application is received by the respective county election office, they input that voter's registration information into the state's central database by hand and thereby create a voter record in ELVIS.  *See id.* at § 2(a)(xiii).

**RESPONSE:  Uncontroverted.**

9.      ELVIS is a dynamic system that reflects in real-time changes that are made to individual voter files. County election officials input information on voters, including the voters' registration and advance mail ballot information.  *See id.* § 2(a)(xiv).

**RESPONSE:  Uncontroverted.**

10.     To vote by mail in Kansas a voter must complete an advance voting ballot application and return it to the county election office in the county in which the voter is registered to vote.  *See id.* at § 2(a)(xxx).

**RESPONSE:  It is uncontroverted that this paragraph is "generally" true; however, it is incomplete.  Voters who are on the permanent advance voting list (K.S.A. 25-1122(h)) and voters who vote by mail pursuant to the Uniformed and Overseas Citizens Absentee**

**Voting Act (K.S.A. 25-1214** *et seq.***) are not required to file an advance voting ballot application every time the voter wishes to vote by mail.**

11.     If an advance voting ballot application has been timely submitted to the county election office, an individual working in such office processes the application and, if the county accepts the application, the county will mail the voter an advance ballot packet. *See id.* at § 2(a)(xxxi).

**RESPONSE:  Uncontroverted.**

12.     Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the General Election and the Tuesday of the week preceding such General Election.  K.S.A. 25-1122(f)(2).

**RESPONSE:  Uncontroverted.**

13.     Other than voters entitled to receive ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 et seq., counties cannot transmit advance ballots to voters prior to the 20th day before the election for which an application has been received. K.S.A. 25-1123(a), 25-1220.

**RESPONSE:  Uncontroverted.**

14.     Ballots must be issued to advance voting voters within two business days of the receipt of the voter's application by the election office or the commencement of the 20-day period. K.S.A. 25-1123(a).

**RESPONSE:  Controverted in part.  When an election official receives a** *properly completed* **advance voting ballot application that matches the information in the ELVIS database (i.e., the application has been fully submitted in accordance with K.S.A. 25-1122), a ballot must be mailed to the voter within two business days of the commencement of the 20-day period.  If the voter submits an** *inaccurate or incomplete application***, however,**

**adherence to the two-day policy is not always possible. The county election office will attempt to contact the voter and "cure" the application and still meet that deadline. Ex. KK at 188:13-189:22. But it is not always possible.**

15.     If an advance mail ballot application does not contain sufficient information, does not match the voter file, or if the information is illegible, the election office confirms the validity of the application before accepting it. K.A.R. § 7-36-7 and 7-36-9; K.S.A. §§ 25-1122(e), 25-1124; Declaration of Mark Johnson in Support of Plaintiff Voter Participation Center's Motion to Dismiss (Oct. 14, 2022) ("Johnson Decl."),1 Ex. 1, (Deposition of Connie Schmidt (Sept. 16, 2022) ("Schmidt Tr.")) 91:8-17, 93:9-13, 110:24-111:16; *id.* at Ex. 2, (Deposition of Deborah Jean Cox (Sept. 9, 2022) ("Cox Tr.")) 52:14-53:6, 56:22-57:11, 72:6-16; *id.* at Ex. 3, (Deposition of Jameson Shew (Sept. 15, 2022) ("Shew Tr.") 51:12-13; *id.* at Ex. 4, (Deposition of Andrew Howell (Sept. 14, 2022) ("Howell Tr.") 66:13-25, 77:12-78:17, 132:17-133:21, 138:5-11, 147:8-148:23; *id.* at Ex. 5, (30(b)(6) Deposition of the office of Kansas Secretary of State (May 24, 2022) ("KS SOS Tr.")), Ex. 9 (Kansas Election Standards on Election Administration) at KS000167VA.

**RESPONSE:  Uncontroverted.**

16.     In such cases, county election office must attempt to contact the voter to obtain the correct information and cure the application. Johnson Decl., Ex. 1, (Schmidt Tr.) 130:14-131:22; *id.* at Ex. 2, (Cox Tr.) 69:12-21; *id.* at Ex. 3, (Shew Tr.) 40:6-14.

**RESPONSE:  Uncontroverted.**

17.      If the voter cannot be contacted, or it would be impracticable to make contact before the election, the voter will be mailed a provisional ballot. K.A.R. § 7-36-7(f); Stipulated Facts at § 2(a)(xxxiv).

**RESPONSE:  Uncontroverted.**

18.     Once an advance voting ballot application has been received and processed by the county election office, the fact and date of such processing is recorded in ELVIS. The office also documents in ELVIS the date on which it transmits the regular or provisional ballot to the voter. See Stipulated Facts at § 2(a)(xxxv).

**RESPONSE:  Uncontroverted.**

19.     Plaintiff Voter Participation Center is a 501(c)(3) nonprofit, nonpartisan organization founded in 2003. See Stipulated Facts at § 2(a)(vii); Johnson Decl., Ex. 6 (Deposition of Thomas Lopach (May 18, 2022) ("Lopach Tr.")) 57:25-58:1, 58:24-59:4; Declaration of Thomas Lopach in Support of Plaintiff Voter Participation Center's Motion to Dismiss (Oct. 13, 2022) ("Lopach Decl.") ¶ 2.

**RESPONSE:   Controverted in part, but immaterial.  VPC's activities in Kansas in the 2020 General Election cast doubt on whether it is a non-partisan organization.  *See* Ex. M at 5-6.**

20.     Plaintiff VPC's core mission is to promote voting among traditionally underserved groups, including young voters, voters of color, and unmarried women at rates commensurate with voters in other groups. See Stipulated Facts at § 2(a)(viii); Johnson Decl., Ex. 7 (Deposition of Lionel Dripps (Aug. 30, 2022) ("Dripps Tr.")) 111:25-112:9; id. at Ex. 6, (Lopach Tr.) 153:12-16, 96:14-17, 204:3-6; id. at Ex. 8 (September 8, 2021 Hearing on Plaintiffs' Motion for Preliminary Injunction ("9/8/2021 PI Tr.")) 50:9-20 (Thomas Lopach testimony); Lopach Decl. ¶ 7-11, 28.

**RESPONSE:  Uncontroverted but immaterial.**

21.     VPC primarily encourages these voters to register and to participate in the electoral process through direct mailings. See Stipulated Facts at §2(a)(ix); Johnson Decl., Ex. 6 (Lopach Tr.) 146:24-147:15; Lopach Decl. ¶¶ 7, 13.

**RESPONSE:  Uncontroverted but immaterial.  The only issue in this case is whether pre-filling an advance voting ballot application constitutes speech or expressive conduct and communicates a message that is constitutionally protected.  *See In re Motor Fuel Temperature Sales Pracs. Litig.*, 07-1840, 2012 WL 13050524, at \*2 (D. Kan. Apr. 4, 2012).**

22.     Distributing advance ballot applications is a common part of civic engagement communications among partisan and nonpartisan actors alike. *See, e.g.*, Johnson Decl., Ex. 3 (Shew Tr.) 22:23-24:6; *id.* at Ex. 8 (9/8/2021 PI Tr.) 70:18-25 (Bryan Caskey testimony).

**RESPONSE:  Controverted to the extent Plaintiffs claim that "distributing ballot applications is a common part of civic engagement communications."  Nothing VPC cites supports that statement.  In any event, the only issue in this case is whether pre-filling an advance voting ballot application constitutes speech or expressive conduct or communicates a message that is constitutionally protected.  *See In re Motor Fuel Temperature Sales Pracs. Litig.*, 07-1840, 2012 WL 13050524, at \*2 (D. Kan. Apr. 4, 2012).  And that's a legal issue.**

23.     VPC encourages registered Kansas [sic] to participate in this manner by mailing voters a package communication that advocates for mail voting and provides a personalized advance mail ballot application.  *See* Stipulated Facts at §2(a)(x); Johnson Decl., Ex. 7 (Dripps Tr.) 124:14-125:2; Lopach Decl. ¶¶ 12, 17-18, 21, 23-24.

**RESPONSE:  It is uncontroverted that VPC sends mailers to Kansas voters that include information advocating for mail voting and that at least some of those mailers include a personalized advance voting ballot application.  However, whether pre-filling an advance voting ballot application represents speech or expressive conduct that communicates any type of message is a legal conclusion, not a fact that would be admissible in evidence, and thus is not to be considered for summary judgment.  *See In re Motor Fuel Temperature Sales Pracs. Litig.*, 2012 WL 13050524, at \*2.**

24.    VPC considers providing young voters, voters of color, and unmarried women—who may have fewer resources for, and less access to, printing and postage—with the necessary personalized applications is key to effectively advocating its message. Johnson Decl., Ex. 6 (Lopach Tr.) 185:25-186:3; *id.* at Ex. 8 (9/8/2021 PI Tr.) 59:23-60:20; Lopach Decl. ¶¶ 10, 21, 23, 28.

**RESPONSE:  Controverted.  While VPC may "consider" the pre-filling of advance voting ballot applications as "key" to the effectiveness of its message, there is no competent evidence in the record to support VPC's assertion that sending an unsolicited, *pre-filled* application is more effective at advocating its message than sending a blank application. VPC did not designate any expert or submit competent and admissible evidence that pre-filled applications have higher rates of return than blank applications.**

**Defendants explicitly requested during discovery any studies that VPC believed supported its belief that pre-filled advance voting ballot applications were more effective than blank applications.  Ex. CC, #4, 15.  Initially, VPC produced one "study" that does not address pre-filled vs. blank applications.  Ex. JJ at 16:6-17:13.  At his deposition, Mr. Lopach then identified a purported "study" conducted in 2006 by Dr. Mann with VPC's predecessor organization, Ex. JJ at 17:15-20:13, and a second purported "study" by Dr. Green which, when finally disclosed, was merely an expert report in another case, dated March 21, 2022. Ex. JJ at 27:3-27:18.  Following the deposition, Defendants requested a copy of the 2006 study referenced by Mr. Lopach given that it was not previously produced due to the timeframe of the requested documents.  Ex. DD.  In response, VPC produced a 111-page document, all but four pages of which was redacted.  Ex. EE.  The document stated that VPC's predecessor conducted a study in 2006 that "tested both the messages of its mailings and different combinations of mail and phone calls."  Ex. EE at 92.  The only unredacted**

portion of the alleged study that was produced was a two-sentence conclusion stating that a "pre-populated form produces a higher response rate than a blank form." Ex. EE at 96. The study is inadmissible hearsay and, without some expert witness to testify about it, VPC cannot rely on it in support of its motion.

Mr. Lopach also lacks the requisite personal knowledge to rely upon Dr. Mann's study. Indeed, Mr. Lopach testified that he did not know "the size of the sample or anything else" about the study. Ex. JJ at 19:2-19:9. Mr. Lopach likewise testified that he is "not aware of any studies examining how the recipient of a vote-by-mail mailing that is pre-filled compared to one that is not pre-filled [or] how the recipient reacts or responds to that mailing." Ex. JJ at 27:19-28:13. To now imply that such studies exist in his Declaration amounts to a sham affidavit. *See Burns v. Bd. of Cnty. Comm'rs*, 330 F.3d 1275, 1281-82 (10th Cir. 2003).

25.    Doing so provides the voter simple access to an advance mail ballot application that is personalized with required information from the voter file. Lopach Decl. ¶ 21.

RESPONSE:  Controverted but immaterial.  VPC V.P. Lionel Dripps testified that VPC does *not* solely use information from the Kansas voter file to pre-fill applications; rather, its vendor (Catalist) merges commercially available data with information from the State's voter file.  Ex. F at 173:14-174:1.

26.    VPC believes that distributing personalized advance mail ballot applications as a part of its advance mail voting mailer conveys its viewpoint that voting by mail is convenient and a good option for the recipient to participate in democracy. Johnson Decl., Ex. 6 (Lopach Tr.) 149:11-13, 150:13-19, 151:14-16, 183:9-184:1, 185:21-186:3, 188:1-4; *id.* at Ex. 7 (Dripps Tr.) 192:5-13; *id.* at Ex. 8 (9/8/2021 PI Tr.) 44:24-45:7, 49:17-24 (Thomas Lopach testimony); Lopach Decl. ¶¶ 9, 23-24, 66.

**RESPONSE:  Uncontroverted that this is VPC's "belief," but VPC's subjective beliefs are immaterial in establishing this assertion as fact.  VPC conceded that it does not know if voters receive any message from a pre-filled advanced ballot application.  Ex. JJ at 98:17-100:10; 151:18-152:2.  Indeed, Mr. Lopach testified that he could not "speak to how an individual or group of people would respond to prefilled vote-by-mail application versus a blank vote-by-mail application outside of the study we did in 2006 or other studies presented by academics or practitioners who have done similar work." (none of which were produced in his case).  Ex. JJ at 99:2-99:7.  Mr. Lopach lacks the personal knowledge to support his claim that a pre-filled application "conveys" VPC's viewpoint to a voter.**

27.     VPC is a data-driven operation. It tracks recipient responses to its communications and conducts randomized control trials to evaluate the effectiveness of its mailings. Johnson Decl., Ex. 7 (Dripps Tr.) 77:24-79:17, 116:3-18; *id.* at Ex. 6 (Lopach Tr.) 14:15-20:13, 33:2-35:3, 112:13-24, 116:17-117:12, 155:1-157:15, 165:1-166:9, 170:7-174:9.

**RESPONSE:   It is uncontroverted that VPC "tracks recipient responses to its communications" to the extent it is claiming that it tracks when the recipients of its mailings use its pre-paid, pre-addressed envelopes to send advance voting ballot applications to county election offices.  But Defendants controvert that VPC knows whether or how a voter perceives any purported messages from pre-filling advance voting ballot applications.  *See* Response to SOF ¶ 26 above.**

28.     VPC engages experts in voting behavior and quantitative research, who support VPC's belief that personalizing applications is effective at conveying the organization's pro-advance mail voting message. Lopach Decl. ¶ 16; Johnson Decl., Ex. 6 (Lopach Tr.) 13:15-16:10; *id.* at Ex. 7 (Dripps Tr.) 159:20-160:16.

**RESPONSE: Controverted. VPC is improperly trying to admit expert testimony, apparently by Christopher B. Mann, via lay witness Lopach, to support its claim. VPC did not designate or disclose any expert (i) "in voting behavior and quantitative research" or (ii) who could address the issue of whether "personalizing applications is effective at conveying the organization's pro-advance mail voting message." Moreover, any studies that VPC officials may have relied upon to assess the efficacy of its program are inadmissible hearsay. In any event, whether pre-filling advance voting ballot applications is expressive conduct that conveys a "message" is a legal question, not a question of fact, and thus cannot be relied upon for summary judgment.** *In re Motor Fuel Temperature Sales Pracs. Litig.***, 2012 WL 1305024, at \*2.**

29.     VPC also personalizes its applications with pre-filled information to make the application processing easier for election officials. Lopach Decl. ¶ 60.

**RESPONSE: Controverted. It is uncontroverted that VPC pre-fills advance mail ballot applications, but it is controverted that doing so makes it "easier for election officials" to process.**

**Mr. Lopach is not qualified to testify as to what is "easier for election officials to process[.]" He has never worked in an election office so this statement is entirely speculative and without foundation. Ex. JJ at 125:20-126:8. In fact, he admitted that he has to defer to county election officials regarding what is entailed in processing applications.** *Id.*

**The evidence also shows that pre-filled applications are often** *not* **easier for election officials to process. Shawnee County's Election Office, for example, received numerous pre-filled advance voting ballot applications from voters with information that did not match the State's voter file and/or applications from (or on behalf of) individuals who had died or whose registrations had otherwise been cancelled. Ex. A at ¶¶ 11-12, 35; Ex. Q (examples of**

inaccurate applications); Ex. R (examples of applications of previously canceled voters). These inaccurate pre-filled applications "overwhelmed" the Shawnee County Election Office with telephone calls, letters, e-mails, and in-office visits from voters who were confused, angry, and frustrated at what they had received from VPC.  Ex. A at ¶¶ 12, 37, 40, 44; Ex. KK at 117:24-125:2.  Shawnee County Election Commissioner Andrew Howell personally spoke with hundreds of angry, frustrated, and confused voters about their pre-filled applications.  Ex. KK at 121:11-122:12.

Other election officials experienced similar calls from confused, angry, and frustrated voters.  Ex. LL at 130:6-132:5; Ex. U at ¶ 37; Ex. HH at 150:13-152:15, 209:15-210:9, 212:20-213:1, 237:11-245:20.  Indeed, the problems caused by VPC's pre-filled applications are not unique to Kansas as other states have had similar issues.  Ex. Y (e-mails between VPC outside counsel Jennifer Carrier and other state election officials).

30.     Kansas county election officials indicated their support for the benefits of prefilling for a mailer communication's effectiveness. Johnson Decl., Ex. 1 (Schmidt Tr.) 85:6-14 (noting that handwriting can be harder to read than typeface), 108:15-18; *id.* at Ex. 2 (Cox Tr.) 149:20-150:14. Douglas County Elections Director Jamie Shew testified that if not for budgetary constraints, his office would prefer to personalize the applications sent to voters with their prefilled information. Id. at Ex. 3 (Shew Tr.) 24:15-20.

RESPONSE:  The first sentence is controverted in part.  The second sentence is uncontroverted.

The citation to Ms. Schmidt's deposition transcript simply states the "obvious" that "[s]ometimes handwriting can be hard to read." Ex. FF at 85:6-14.  Ms. Schmidt later added that "hard to read" handwriting does not generally "increase the amount of time for the application processing" due to other information on an application.  Ex. FF at 85:15-85:20.

**Ms. Cox's deposition transcript merely notes that hand-written applications contain inaccuracies at times related to Hispanic last names. Ex. LL at 149:2-150:14. And Shawnee County Election Commissioner Andrew Howell *rejected* any perceived benefit from a typed as opposed to handwritten advance ballot application. Ex. KK at 270:22-271:12.**

**The statement also fails to account for the abundance of evidence that election officials were burdened by pre-filled advance mail ballot applications. Ex. A at ¶¶ 11-12, 35, 37, 40, 44; Ex. Q (examples of inaccurate applications); Ex. R (examples of applications of previously canceled voters); Ex. KK at 117:24-125:2; Ex. LL at 130:6-132:5; Ex. U at ¶ 37; Ex. HH at 150:13-152:15, 209:15-210:9, 212:20-213:1, 237:11-245:20; Ex T, Cox Tr. at 89:7-89:20, 139:9-140:3).**

31.     In 2020, Johnson County sent applications for the primary and general elections to all voters in the county, opting to expend additional resources to personalize the applications and in fact prefilled more information than VPC's communications by also adding the voter's date of birth. *See id.* at Ex. 1 (Schmidt Tr.) 222:10-227:7, 234:23-236:20, 284:2-8; id. at Ex. 9 (Schmidt Tr. Ex. 32) (Apr. 16, 2020 emails); *id.* at Ex. 10 (Schmidt Tr. Ex. 35) (2020 prefilled Johnson County advance mail ballot application mailer); *id.* at Ex. 11 (Schmidt Tr. Ex. 38) (same).

**RESPONSE:  Uncontroverted, but immaterial.**

32.     Staff in the Johnson County Elections Office decided to "pre-fill as much of the [voter's] information from their registrant record as possible," *id.* at Ex. 12 (Schmidt Tr. Ex. 31) at 3 (Apr. 2, 2020 emails), believing that doing so "makes it easier for the voter and reduces mistakes that we then have to work harder to fix on the back end," *id.* at Ex. 9 (Schmidt Tr. Ex. 32) at 1 (Apr. 16, 2020 emails).

**RESPONSE:  Uncontroverted, but immaterial.**

33.     VPC's mailer communications sent to Kansas voters also included a letter encouraging the voter to request and cast an advance ballot with instructions on how to do so, or if they choose, to opt out of future VPC communications; a step-by-step guide and other assistance for how voters may submit the included application; and a postage-paid envelope addressed to the voter's county election office. Lopach Decl., Ex. A (2020 VPC mailer) at VPC000001-005.

**RESPONSE:  Uncontroverted.**

34.     The letter's opening paragraph specifically refers to "the enclosed advance voting application already filled out with [the voter's] name and address" and mentions the personalization in the closing "P.S." message: "We have already filled in your name and address on the enclosed form. Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope." *See id.* at VPC000002.  The step-by-step guide was printed on the reverse side of the enclosed personalized advance ballot application. *Id.* at VPC000004.

**RESPONSE:  Uncontroverted.**

35.     To personalize the applications it sends, VPC uses statewide voter registration files obtained via its data vendors and fills-in parts of the advance mail ballot applications with the voter's information as it appears in the state records. Johnson Decl., Ex. 6 (Lopach Tr.) 91:4-92:18; Lopach Decl. ¶¶ 37-40. VPC culls its lists to ensure that the information is accurate and current and that it is running its program as efficiently as possible. *See* Lopach Decl. ¶¶ 18, 39; Johnson Decl., Ex. 6 (Lopach Tr.) 33:2-35:3, 92:13-25, 93:20-96:8; *id.* at Ex. 7 (Dripps Tr.) 123:13-21, 147:16-20.

**RESPONSE:  Controverted.  VPC Executive V.P. Lionel Dripps specifically testified that VPC does *not* pre-populate advance voting ballot applications simply with information drawn from the State voter file.  Ex. F at 171:24-172:17.  Rather, VPC's vendor supplements**

the State file with commercially available data.  Ex. F at 173:13-174:1.  Moreover, the commercial data used to "supplement" the information from the State voter file included faulty data.  *Id.*  Thus, the pre-filled applications VPC sent to voters in connection with the 2020 General Election often did *not* match "the voter's information as it appears in the state records."  Because VPC, in pre-filling applications for use in the 2020 General Election, also used voter data that its vendor had obtained from the State *at least* 4-6 months before those applications were mailed to voters, the information on the pre-filled application often had changed and did not match the data by the time VPC sent its mailer to the voter.  Ex. M at ¶¶ 34-35.

36.     VPC now contracts with two data vendors so that it can use data from whichever vendor has the most up-to-date data at the moment a program's mailing list is being created in a given state. Johnson Decl., Ex. 6 (Lopach Tr.) 100:12-101:13; *id.* at Ex. 7 (Dripps Tr.) 123:13-21, 147:16-20; Lopach Decl. ¶ 39.

RESPONSE:  Uncontroverted.

37.     VPC carefully designs this package of materials to convey to the recipient VPC's message that this particular Kansan should participate in the democratic process by mail voting, that voting by mail is easy, and that VPC's audience can act on this encouragement by returning the supplied advance mail ballot application that VPC has personalized. Lopach Decl. ¶¶ 11, 17-18, 22, 28-29; Johnson Decl., Ex. 8 (9/8/2021 PI Tr.) 47:7-13.

RESPONSE:  Uncontroverted but immaterial.  The only issue in this case is whether pre-filling an advance voting ballot application constitutes speech or expressive conduct and communicates a message that is constitutionally protected.  *See In re Motor Fuel Temperature Sales Pracs. Litig.*, 07-1840, 2012 WL 13050524, at *2 (D. Kan. Apr. 4, 2012).

38.    In 2018, VPC sent approximately 90,000 advance mail ballot application mailers to Kansas voters in a single wave of mailers. Lopach Decl. ¶ 35.

**RESPONSE:  Uncontroverted but immaterial.**

39.    Approximately 5,000 Kansans applied for an advance mail ballot in 2018 using a personalized application from VPC. Lopach Decl. ¶ 26.

**RESPONSE:  Uncontroverted but immaterial.**

40.    In 2020, VPC anticipated that the pandemic would result in many voters voting by mail for the first time. Johnson Decl., Ex. 7 (Dripps Tr.) 136:4-16; Lopach Decl. ¶ 33.

**RESPONSE:  Uncontroverted but immaterial.**

41.    VPC therefore increased the amount that it communicated with Kansas voters about advance mail voting in 2020 to five waves of mailers and sending nearly 1.2 million advance mail ballot application mailers to Kansas voters. Lopach Decl. ¶¶ 34-35.

**RESPONSE:  Uncontroverted.**

42.    An estimated 69,000 Kansas voters submitted an advance mail voting application provided by VPC to their county election official in the 2020 general election. Lopach Decl. ¶ 26. Other individuals ignored VPC's communications (Johnson Decl., Ex. 13 (Lopach Tr. Ex. 4) at VPC000133), and some requested to not receive future communications. Id. at Ex. 14 (Lopach Tr. Ex. 3) at VPC000135 (VPC's 2018 and 2020 unsubscribe lists).

**RESPONSE:  Uncontroverted but immaterial.**

43.    For the 2022 election, VPC sent one wave of advance mail voting mailers sent approximately 4 weeks apart. Id. at Ex. 7 (Dripps Tr.) 135:12-20; Lopach Decl. ¶¶ 47, 52.

**RESPONSE:  Uncontroverted but ambiguous.  Defendants does not controvert that at least one of VPC's waves of mailings was sent approximately 4 weeks apart from others.**

44.     The 2022 mailers contain the same basic components as VPC's prior mailer communications, including personalized advance mail ballot applications. Lopach Decl. ¶ 17; *id.* at Ex. B at VPC000743-746 (2022 VPC mailer).

**RESPONSE:  Uncontroverted but immaterial.  The mailers that VPC sent in the most recent 2022 election – more than a year after the Kansas Legislature enacted K.S.A. 25-1122(k)(2), at least in part in response to VPC's activities in Kansas in 2020 – are irrelevant to this lawsuit.**

45.     VPC also sent a follow-up letter in September 2022 to remind voters that they have previously received a personalized advance mail ballot application and further encouraging the voter to return the application and vote by advance mail ballot. Id. at ¶ 52; Johnson Decl., Ex. 6 (Lopach Tr.) 30:3-10.

**RESPONSE:  Uncontroverted but immaterial.  The mailers that VPC sent in the most recent 2022 election – more than a year after the Kansas Legislature enacted K.S.A. 25-1122(k)(2), at least in part in response to VPC's activities in Kansas in 2020 – are irrelevant to this lawsuit.**

46.     Each year, VPC notifies the Kansas Director of Elections of its upcoming advance mail voting program and seeks feedback on the forms and instructions regarding advance mail voting that VPC plans to distribute. *See* Johnson Decl., Ex. 15 (KS SOS Tr. Ex. 15) KS001922VA—2068VA (Apr. 19, 2018 email); Johnson Decl., Ex. 16 (KS SOS Tr. Ex. 16) VPC000048—50 (June 22, 2020 to July 1, 2020 email thread); Johnson Decl., Ex. 18 (Dripps Tr. Ex. 8) VPC000706-09 (July 28, 2022 emails); *id.* at Ex. 19 (Dripps Tr. Ex. 9) VPC000712-16 (Aug. 25, 2022 emails).

**RESPONSE:  Uncontroverted but immaterial.**

47.    In the 2020 election cycle, the Kansas Director of Elections confirmed to VPC in writing that its advance mail voting application form and instructions complied with Kansas law and with the forms that the Secretary of State's office uses. Johnson Decl., Ex. 16 (KS SOS Tr. Ex. 16) VPC000048—50 (June 22, 2020 to July 1, 2020 email thread).

**RESPONSE:  Uncontroverted, but immaterial.**

48.    VPC understands that the Personalized Application Prohibition would prevent it from its most effective means of conveying its pro-mail voting message, and as such would make VPC reconsider its resource allocation decision to convey its communications in Kansas if it cannot speak in this manner. Lopach Decl. ¶¶ 55-66; *see also id.* ¶ 18 ("[p]ersonalizing the applications with prefilled information drawn from states' voter registration files best ensures that VPC's message and assistance are both effective and accurate"); Johnson Decl., Ex. 6 (Lopach Tr.) 150:14-19, 151:14-16, 185:21-186:3, 188:1-4; Id. at Ex. 8 (PI Hearing Tr.) 44:24-45:7, 49:17-24, 60:11-20 (Thomas Lopach testimony).

**RESPONSE:  Controverted.  While VPC may believe that pre-filling the advance voting ballot applications it sends to voters is the most effective means of conveying whatever message it wants to convey in its mailers, there is no competent evidence in the record to support it.  *See* Response to SOF ¶ 24.  Moreover, whether a third-party's pre-filling of another person's advance voting ballot application even involves expressive conduct is a legal question, not a factual question, and is inappropriate for inclusion in a summary judgment motion's statement of facts.  *See In re Motor Fuel Temperature Sales Pracs. Litig.*, 2012 WL 1305024, at \*2.**

49.    The 2020 General Election in Kansas had record turnout (1,375,125 total votes cast, a 70.9% turnout rate) and had more votes cast than the 2018 General election (1,039,085 total

votes cast, a 56.4% turnout rate) and the 2016 General Election (1,225,667 total votes cast, a 67.4%

turnout rate). See Stipulated Facts at §2(a)(xxxvi).

**RESPONSE:  Uncontroverted.**

50.    Conducting a high-turnout presidential election race held in the middle of a

worldwide pandemic introduced many challenges for those tasked with administering it. See

Johnson Decl., Ex. 1 (Schmidt Tr.) 155:7–156:20; id. at Ex. 2 (Cox Tr.) 98:25-100:13; *id.* at Ex. 4

(Howell Tr.) 49:2-25; *id.* at Ex. 3 (Shew Tr.) 85:5-24.

**RESPONSE:  Uncontroverted but immaterial.**

51.    It also presented new hurdles for voters who wanted to participate without

jeopardizing the health of themselves or their loved ones. *Id.* at Ex. 1 (Schmidt Tr.) 149:4-150:6.

**RESPONSE:  Controverted but immaterial.  The cited exhibit does not support the**

**statement in ¶ 51, and it is speculation as to what voters in 2020 thought as they cast their**

**ballots and selected the method for doing so.**

52.    As a result, there was a mass shift in the way voters voted in 2020, with a steep

increase in advance mail voting; 459,229 Kansans voted by mail in the 2020 General Election as

compared to 152,267 votes cast by mail during the 2018 General Election and 173,457 votes cast

by mail in the 2016 General Election. See Stipulated Facts at § 2(a)(xxxvi); see also Johnson Decl.,

Ex. 17 (KS SOS Tr.) 274:19-22; id. at Ex. 1 (Schmidt Tr.) 74:21-24, 138:21-139:6, 149:4-150:6;

id. at Ex. 2 (Cox Tr.) 98:25-100:13; id. at Ex. 4 (Howell Tr.) 240:9-241:10; compare id. at Ex. 3

(Shew Tr.) 84:3-12, 85:5-24.

**RESPONSE:  It is uncontroverted that the figures in ¶ 52 are correct.  Whether that**

**was a "massive shift" as a "result" of Covid-19 is speculation and not material to summary**

**judgment anyway.  In fact, Douglas County Election Clerk Jamie Shew indicated that the**

increase in voting-by-mail "wasn't as big of a change" for Douglas County.  **Ex. GG at 84:3-84:12.**

53.     As the use of mail voting increased during the 2020 General Election, a national debate unfolded about the efficacy and security of mail voting as public figures both in Kansas and nationwide discouraged voters from voting by mail. *See, e.g., id.* at Ex. 20 (Bryan Lowry & Sarah Ritter, *Despite Trump's attacks, Kansas voters request 2020 mail ballots at historic rate*, The Kansas City Star (May 29, 2020), https://www.kansascity.com/news/politics-government/article243052656.html).

**RESPONSE:  Controverted and immaterial.  The national debate over the efficacy and security of mail-in-voting commenced long before 2020.  *See, e.g.*, Baker-Carter Comm'n Report, cited in *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2347 (2021).  In any event, this paragraph is irrelevant to the issues in this summary judgment motion.  It is also hearsay to the extent a newspaper article is being relied upon to prove the truth of the matter asserted.  *See Good v. Bd. of Cnty. Comm'rs*, 331 F. Supp.2d 1315, 1327 (D. Kan. 2004).**

54.     Given both the novel challenges of the 2020 election and the public debate concerning voters' confidence in mail voting, many organizations, campaigns, and elections offices, including Plaintiff VPC as well as Kansas election officials, sought to encourage voters to vote by mail. Compare, Lopach Decl. at Ex. A (2020 VPC mailer) and Johnson Decl., Ex. 21 (Schmidt Tr. Ex. 17) (May 18, 2020 emails); *see also* Johnson Decl., Ex. 1 (Schmidt Tr.) 287:4-14.

**RESPONSE:  It is uncontroverted that VPC sent letters encouraging voters to vote by mail.  It is also uncontroverted that the Johnson County Election Office encouraged mail voting.  However, Johnson County did not want individuals to vote exclusively by mail.  *See* Johnson Decl., Ex. 21 (Schmidt Tr. Ex. 17) at 3 ("I think we want to encourage people to vote**

by mail but also let them know that it is safe to vote in person if they want to do that."). The remainder of SOF ¶ 54, discussing the "novel challenge of the 2020 election and the public debate concerning voters' confidence in mail voting" is speculation/argument, not fact, and is neither supported by the citations nor appropriate for inclusion in the statement of facts of a summary judgment motion. *See In re Motor Fuel Temperature Sales Pracs. Litig.*, 2012 WL 1305024, at *2.

55.     Several Kansas counties sent mailers regarding the advance mail voting process, including advance mail ballot applications, to their registered voters. See, e.g., Johnson Decl., Ex. 1 (Schmidt Tr.) 82:25-83:2; *id.* at Ex. 2 (Cox Tr.) 102:9-15; *id.* at Ex. 3 (Shew Tr.) 21:23-22:2.

**RESPONSE:  Uncontroverted and immaterial.**

56.     The Johnson County election office opted to send advance mail ballot applications that were prepopulated with the voter's data on the application form. *Id.* at Ex. 1 (Schmidt Tr.) 227:2-236:20, 240:12-243:12; 285:12-286:19; *see also id.* at Ex. 12 (Schmidt Tr. Ex. 31) (Apr. 3, 2020 emails); *id.* at Ex. 9 (Schmidt Tr. Ex. 32) (Apr. 16, 2020 emails); *id.* at Exs. 10 (Schmidt Tr. Ex. 35), 22 (Schmidt Tr. Ex. 36), 23 (Schmidt Tr. Ex. 37) and 11 (Schmidt Tr. Ex. 38) (redacted examples of Johnson County prefilled mailers from May 2020).

**RESPONSE:  Uncontroverted and immaterial.**

57.     Kansas election officials engaged in this and other outreach efforts especially because many Kansans were voting by advance mail ballot for the first time in 2020 and had questions about the process. *See, e.g., id.* at Ex. 1 (Schmidt Tr.) 241:2-4 ("Again, these are reminders because a lot of our voters, in 2020, during COVID, have never dealt with voting by mail before."), 297:25-298:8; *id.* at Ex. 24 (Schmidt Tr. Ex. 43) (Johnson County FAQ and Facebook post); *id.* at Ex. 2 (Cox Tr.) 91:18-24, 107:9-15, 146:3-147:19.

**RESPONSE: It is uncontroverted that numerous Kansans voted by mail for the first time in 2020 and that Kansas election officials engaged in outreach efforts to assist voters in that regard. However, it is controverted that the evidence cited by VPC supports its assertion that election officials engaged in outreach about the vote-by-mail process "*especially* because many Kansans were voting by advance mail ballot for the first time." The "reminder" testimony that VPC references from Ms. Schmidt pertained to an exhibit from her deposition, Johnson Decl., Ex. 22 (Schmidt Tr. Ex. 36) at 2, which addressed the fact that voters must submit separate advance voting ballot applications for both the primary and the general election. Ex. FF at 239:14-241:4. The FAQ cited by VPC was issued because of voter confusion caused by VPC's mailers. Ex. FF at 295:17-298:9; Johnson Decl., Ex. 24 (Schmidt Tr. Ex. 43). Similarly, the testimony of Ms. Cox cited by VPC addresses voter confusion caused by a third-party's mailers, not caused by voters voting for the first time by mail. Ex. LL at 89:3-91:25, 107:9-15. Ms. Cox even placed an ad in the newspaper to address the voter confusion caused by third-party mailers. Ex. LL at 130:6-132:21; 146:3-147:13. Ms. Cox testified that various errors in the applications, including misspelled last names, wrong middle initials, and wrong birth dates, also were a cause of voter anger and confusion, not that voters were voting by mail for the first time. Ex. LL at 139:16-9-139:24.**

58.    When incomplete or inaccurate applications were submitted, county election officials attempted to help voters cure them regardless of whether the voter had used a blank form or a form pre-populated with personalized information and without incurring a particular burden from those that were prefilled. *Id.* at Ex. 1 (Schmidt Tr.) 84:18-85:20, 86:22-87:5, 134:6-22, 135:25-136:13, 294:2-13; *id.* at Ex. 2 (Cox Tr.) 67:9-68:1; 89:3-90:5; *id.* at Ex. 4 (Howell Tr.) 245:13-246:16, 252:11-23; *id.* at Ex. 17 (KS SOS Tr.) 250:18-252:6.

**RESPONSE:  It is uncontroverted that the election office attempted to help voters cure an application regardless of whether it is prefilled or not.  However, the remainder is controverted.  First, VPC's citations do not support the assertion that election officials did not "incur[] a particular burden from those [applications] that were prefilled."  Second, the claim that election officials did not incur a particular burden from pre-filled applications is demonstrably false.  Mr. Howell testified that incorrectly completed prefilled applications caused significant burdens on the Shawnee County Election Office, typically taking three to five times longer to process than accurately completed applications.  Ex. KK at 252:24-253:23.  Both the cure process and the extensive communications with angry and confused voters were extremely taxing on election officials.  Ex. A at ¶¶ 12, 25-28, 37, 40, 44; Ex. U at ¶¶ 24-26, 37.**

59.    During the 2020 election cycle, many voters who had concerns about lost advance mail ballot applications or mail delays called their respective election office to inquire about the status of their application. *Id.* at Ex. 1 (Schmidt Tr.) 195:1-196:8, 293:13-18; *see also id.* at Ex. 2 (Cox Tr.) 73:25-74:5, 100:14-101:1.

**RESPONSE:  Uncontroverted, but immaterial.**

60.    Others chose to re-submit their application out of an abundance of caution. *Id.* at Ex. 1 (Schmidt Tr.) 120:12-24; *id.* at Ex. 2 (Cox Tr.) 100:14-101:1. In some cases this resulted in duplicative advance mail ballot applications being received in county election offices. *Id.* at Ex. 1 (Schmidt Tr.) 309:1-6 ("The bigger issue for us was apps coming from outside the State of Kansas to our voters, and multiple applications."), 288:3-12, 293:7-294:13, 308:8-11, 309:1-6; *Id.* at Ex. 17 (KS SOS Tr.) 150:13-19 (testifying to conversations about duplicate applications that election offices received in the 2020 election); *id.* at Ex. 2 (Cox Tr.) 91:13-17; 100:19-101:1; *id.* at Ex. 3 (Shew Tr.) 73:13-74:7.

**RESPONSE:  It is uncontroverted that tens of thousands of Kansas voters submitted multiple advance voting ballot applications in connection with the 2020 General Election. However, VPC's claim that applications were "re-submitted . . . out of an abundance of caution" with the mail is controverted.  VPC's citations do not support that allegation.  The evidence shows that voters were confused and submitted multiple applications because they received multiple advance ballot applications from third-party groups, particularly the Center for Voter Information (via VPC).  Ex. FF at 293:24-295:9 (describing a group from "Springfield, Missouri" as the problem); Ex. LL at 144:2-144:22 (explaining that advance applications sent to voters by VPC "were the ones that [she] noticed [] would have multiple applications sent from the same person."); Ex. KK at 256:22-257:5 (noting that "the most time for staff to deal with inaccuracies and duplicates were the ones that came from the Center for Voter Information.").  Indeed, many confused voters believed they *had* to send in these additional applications in order to be able to vote.  Ex. KK at 255:21-256:4; Ex. A at ¶ 53.**

61.     Other voters' concerns of mail delays were grounded in experience. *See, e.g., id.* at Ex. 1 (Schmidt Tr.) 195:1-197:21, 201:7-12, 211:24-212:8, 293:13-294:1; *id.* at Ex. 25 (Schmidt Tr. Ex. 25) (July 22, 2020 Johnson County Election Office Facebook post); *id.* at Ex. 26 (Schmidt Tr. Ex. 26) (July 24, 2020 emails); *id.* at Ex. 27 (Schmidt Tr. Ex. 27) (Apr. 11, 2020 emails).

**RESPONSE:  Uncontroverted, but immaterial.**

62.     When voters called their election offices about advance mail ballot applications received in the mail, officials instructed voters that the application forms were legitimate and that the voters could complete and submit those applications if they chose to do so. *See, e.g., id.* at Ex. 1 (Schmidt Tr.) 297:25-298:8; *id.* at Ex. 24 (Schmidt Tr. Ex. 43) (Johnson County FAQ and Facebook post).

**RESPONSE:  Uncontroverted, but immaterial.  Many voters who called about the pre-filled advance voting ballot applications they received from CVI were angry, frustrated, and confused.  Election officials had to explain to the voters that such applications were not from the election office and did not have to be returned if the voter did not want to do so.  Ex. LL, Cox Tr., 89:3-89:20, 139:16-140:3; Ex. FF at 294:8-295:1.**

63.     Voters who expressed a desire to not do so, election officials informed the voter that the applications could be discarded.  *See id.* at Ex. 1 (Schmidt Tr.) 294:20-295:1; *id.* at Ex. 2 (Cox Tr.) 139:20-140:3.

**RESPONSE:  Uncontroverted.**

64.     The 2020 General Election nevertheless saw high turnout throughout Kansas and state and local Kansas election officials deemed it a successful election. *Id.* at Ex. 17 (KS SOS Tr.) 274:5-22, 282:8-9; *id.* at Ex. 1 (Schmidt Tr.) 167:10-168:11; *id.* at Ex. 28 (Schmidt Tr. Ex. 15) (Aug. 5, 2020 letter); *id.* at Ex. 29 (Schmidt Tr. Ex. 23) (Johnson County Board of Canvassers report); *id.* at Ex. 30, Press Release, Kansas Att'y Gen., *AG Derek Schmidt: Kansas asks U.S. Supreme Court to hear Texas election lawsuit* (Dec. 9, 2020), https://ag.ks.gov/media-center/news-releases/2020/12/09/ag-derek-schmidt-kansas-asks-u.s.-supreme-court-to-hear-texas-election-lawsuit, (quoting Defendant Schmidt that "Kansas ran its elections honestly and by the rules…."); *id.* at Ex. 31, Russel Falcon, *Zero evidence of voter fraud in any state, including Kansas officials report to NYT*, KSNT (Nov. 11, 2020), https://www.ksnt.com/news/kansas/zero-evidence-of-voter-fraud-in-any-state-including-kansas-officials-report-to-nyt, (quoting Defendant Schwab that "Kansas did not experience any widespread, systematic issues with voter fraud, intimidation, irregularities or voting problems. . . .").

**RESPONSE:  Uncontroverted, but immaterial.**

65.     The advance mail voting process includes multiple safeguards against fraud, *id.* at Ex. 1 (Schmidt Tr.) 64:3-20, 124:9-25, 212:25-216:9; *id.* at Ex. 2 (Cox Tr.) 58:5-8; *id.* at Ex. 4 (Howell Tr.) 42:9-23, 113:4-19, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. *See, e.g.*, K.S.A. § 25-2431.

**RESPONSE:  Uncontroverted, but immaterial.**

66.     The 2020 post-election audit produced no evidence that voter fraud was a concern in Kansas. Johnson Decl., Ex. 17 (KS SOS Tr.) 282:25-283:13; *id.* at Ex. 1 (Schmidt Tr. 212:25-213:22, 292:1-5; *id.* at Ex. 2 (Cox Tr.) 105:5-106:9; id. at Ex. 4 (Howell Tr.) 42:9-23.

**RESPONSE:  Controverted.  First, the cited testimony is misstated.  Mr. Caskey testified that the post-election audits did not "reveal any systematic fraud in Kansas elections in 2020."  The cited testimony of Ms. Schmidt did not even discuss post-election audits.**

**Second, post-election audits do not address possible voter fraud resulting from pre-filled advance mail ballot applications.  A post-election audit merely verifies that "every ballot that was cast was accounted for and counted properly either by hand or by machine." Ex. HH at 283:14-283:21; Ex. LL at 105:19-106:9 (explaining that a post-election audit occurs by hand-counting the votes cast in 1% of the precincts and verifying that number matches the machine count); Ex. KK at 40:24-41:15 (explaining that the audit occurs by verifying that a hand count of the votes match what was reported on election night and covers a minimal number of precincts).  Fraud in applying for, obtaining, and casting a mail ballot would not be revealed by a post-election audit.**

67.     On February 10, 2021, the Kansas Legislature introduced HB 2332, which, among other things, sought to tightly restrict the distribution of advance ballot applications to potential Kansas voters. See Stipulated Facts at § 2(a)(xvii).

**RESPONSE:  It is uncontroverted that HB 2332 was introduced on Feb. 10, 2021. But the characterization that it "sought to tightly restrict the distribution of advance ballot applications to potential Kansas voters" is attorney argument, not a fact (let alone an uncontroverted fact), and thus not appropriate for inclusion in a summary judgment motion. *In re Motor Fuel Temperature Sales Pracs. Litig.*, 2012 WL 1305024, at \*2.**

68.    On March 17, 2021, the Kansas Secretary of State's Office submitted written testimony on HB 2332 that did not include any discussion of prefilled advance mail ballot applications. Stipulated Facts at § 2(b)(x); *see also* Johnson Decl., Ex. 32 (KS SOS Tr. Ex. 17); *id.* at Ex. 17 (KS SOS Tr.) 295:21-297:7.

**RESPONSE:  Controverted.  The document, which speaks for itself, references the fact that "mailings [from third-parties] may not collect information required by federal or state law, resulting in incomplete mail ballot applications. For instance, state law requires a government issued identification number or a copy of a government issued ID with advance by mail ballot applications.  In addition, a voter signature is required for those who wish to request an advance by mail ballot. If a voter does not provide that information, their application is incomplete."  The document also explicitly identifies "the Center for Voter Information based out of Springfield, Missouri" as one of the entities mailing pre-filled advance voting ballot applications to Kansas voters.**

69.    The Office's official position was "neutral." *Id.*

**RESPONSE:  Uncontroverted, but immaterial.**

70.    On May 3, 2021, the Legislature enacted HB 2332 over the Governor's veto. *See* Stipulated Facts at § 2(a)(xxi); Johnson Decl., Ex. 33 (Schmidt Tr. Ex. 4) (Governor Kelly's veto letter).

**RESPONSE:  Uncontroverted, but immaterial.**

71.    Plaintiffs challenged two of HB 2332's provisions, but only one—the Personalized Application Prohibition—is still at issue in this lawsuit. See Stipulated Facts at § 2(a)(xxviii).

**RESPONSE:  Uncontroverted.**

72.    HB 2332's Personalized Application Prohibition bans any person or organization from mailing registered Kansas voters a personalized advance mail voting application that is prefilled with any information, such as a voter's name and address. See H.B. 2332 § 3(k)(2) (codified at K.S.A. § 25-1122(k)(2)) ("No portion of such [advance mail voting application] shall be completed prior to mailing such application to the registered voter.").

**RESPONSE: Uncontroverted.**

73.    This prohibition applies to "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot and includes an application for an advance voting ballot in such mailing," even if the prefilled information is derived from the State's publicly available voter registration file. *Id.*

**RESPONSE:  Uncontroverted.**

74.    A violation of the Personalized Application Prohibition is a class C nonperson misdemeanor, which contains no scienter requirement and is punishable by up to one month in jail and/or fines. Id. § 3(k)(5); K.S.A.§§ 21-6602(a)(3), (b).

**RESPONSE:  Whether the pre-filled advance ballot prohibition contains a "scienter requirement" is a statutory construction argument being made in a statement of facts.  It is a legal conclusion, not a factual claim, and is thus inappropriate for inclusion in the statement of facts.  *In re Motor Fuel Temperature Sales Practices Litigation*, 2012 WL 1305024, at \*2.**

75.     HB 2332 carves out limited and narrow exceptions to the Personalized Application Prohibition by permitting a subset of state and county election officials to mail prefilled advance mail voting applications. *Id.* § 3(k)(4).

**RESPONSE:  Uncontroverted that K.S.A. 25-1122(k)(4) provides exceptions for state and county election officials.**

76.     In defense of the Personalized Application Prohibition the State has asserted interests such as "[m]inimizing voter confusion" and disenfranchisement, "[p]reserving and enhancing voter confidence," and reducing the rejection of inaccurate applications, inefficiencies in election administration, and potential for voter fraud. Johnson Decl., Ex. 34 (Defendant Schwab's Responses and Objections to Plaintiff's First Interrogatories) at 3-4.

**RESPONSE:  Uncontroverted.**

77.     These rationales for the Personalized Application Prohibition are not a part of the Legislative Record for HB 2332. See Kansas House Bill 2332 (2021), Legislative Record, http://kslegislature.org/li/b2021_22/measures/hb2332/ (last accessed Oct. 14, 2022).

**RESPONSE:  Controverted and immaterial.  First, as a matter of law, the Legislature was not required to memorialize its interests in adopting the legislation as part of any formal record.  Second, Plaintiffs only cite to the bill page of the Kansas Legislature's website and thus have not shown that their citation is to the entire "Legislative Record."  Second, at least one proponent did cite voter confusion, inaccurate applications, and other information that would address these categories.  Testimony of John M. Toplikar in Support of H.B. 2332 (http://kslegislature.org/li/b2021_22/committees/ctte_h_electns_1/documents/testimony/202 10218_18.pdf) (last visited Oct. 25, 2002).  Third, the Kansas County Clerks & Election Officials testified that they "appreciate[d] Representative Toplikar's intent under this bill and d[id] not disagree with what he [was] trying to accomplish."  Testimony of Rick Piepho,**

**Kansas County Clerks & Election Officials Elections Committee Chari,** *available at*
http://kslegislature.org/li/b2021_22/committees/ctte_h_electns_1/documents/testimony/2021
0218_15.pdf **(last visited Oct. 25, 2022).  The Secretary's testimony likewise highlighted these
issues.  Ex. Z, Secretary of State Testimony.**

### III. – Defendants' Statement of Additional Material Facts

1.      If any of the required information on an advance voting ballot application does not
match the information for that voter in ELVIS (e.g., name, address, driver's license number, non-
driver's identification number, date of birth, political party in primary election, active registration
status, signature, etc.), the county election office must attempt to contact the voter to obtain the
correct information.  Kan. Admin. Reg. 7-36-7 and 7-36-9; K.S.A. 25-1122(e).  If the voter cannot
be contacted, or it would be impracticable to make contact before the election, the voter will be
mailed a provisional ballot.  Kan. Admin. Reg. 7-36-7(f).  PTO-SF, ¶ xxxiv. (Defs.' MSJ SOF ¶
17)

2.      All of the information on an advance voting ballot application must precisely match
the information in ELVIS in order for the county election office to process the application without
having to contact the voter to cure mismatches or discrepancies.  Only the most clearly inadvertent
mismatches (e.g., minor misspelling of street name, such as omitting the letter "e" in "George" in
the street "George Williams Way," or signing as "Jim" despite being registered as "James") will
be overlooked.  Ex. A at ¶ 25; Ex. GG at 35:6-40:5; 48:6-51:7. (Defs.' MSJ SOF ¶ 18)

3.      VPC relied on a vendor, Catalist, LLC ("Catalist"), to provide the voter registration
data for the Kansas voters whom VPC targeted with advance voting ballot application packets
during the 2020 General Election.  Ex. JJ at 92:14-93:4; Ex. F at 164:7-13; Ex. H at 3.  (Defs.'
MSJ SOF ¶ 29)

4.      VPC received Kansas active voter registration lists from Catalist on January 31, April 10, and September 15 of 2020.  PTO-SF, ¶ xxxix.  (Defs.' MSJ SOF ¶ 30)

5.      VPC's advance ballot application mailers contained a cover letter, a Kansas advance voting ballot application, and a pre-paid, pre-addressed envelope that voters could use to send a completed application to the appropriate county election office.  PTO-SF, ¶ xxxviii.  A sample of VPC's cover letter, pre-filled advance voting ballot application, and pre-addressed envelope can be found at Exhibit I.  (Defs.' MSJ SOF ¶ 32)

6.      VPC sent five "waves" of mailers to Kansas voters for the 2020 General Election. The dates were as follows:

a.      Wave A: data uploaded on 7/6/2020, expected in homes on 8/17/2020;

b.      Wave B: data uploaded on 7/27/2020, expected in homes on 8/26/2020;

c.      Wave C: data uploaded on 8/10/2020, expected in homes on 9/8/2020;

d.      Wave D: data uploaded on 8/24/2020, expected in homes on 9/16/2020; and

e.      Wave E: data uploaded on 8/24/2020, expected in homes on 9/28/2020.

PTO-SF, ¶ xl.  (Defs.' MSJ SOF ¶ 35)

7.      Although the information that Catalist (and, by extension, VPC) used to pre-fill advance voting ballot applications for voters was "based upon publicly available information" in ELVIS, Pls.' Resp. to Req. for Admis. No. 8, (attached as Ex. K), Catalist also merged commercial data with the official State voter file in preparing the voter data it sent to VPC for use in pre-filling those applications.  Ex. F at 171:24-174:1. (Defs.' MSJ SOF ¶ 37)

8.      VPC Executive Vice President Lionel Dripps testified that VPC discovered, in the wake of Waves A and B, that approximately 3% of the pre-filled applications it had sent to voters throughout the United States contained an erroneous middle initial (i.e., an initial that did not match the data in the states' voter files), and approximately 5% of the pre-filled applications contained

an erroneous suffix (i.e., a suffix that did not match the data in the states' voters files).  Ex. F at 167:24-170:9.  (Defs.' MSJ SOF ¶ 38)

9.      Concerned about the accuracy of the voter data that it had received from Catalist, VPC opted to send blank advance voting ballot applications to Kansas voters in connection with Waves C and D.  Ex. F at 171:1-23.  (Defs.' MSJ SOF ¶ 39)

10.      In its discovery responses, Plaintiffs produced a subset of the Kansas voters to whom it sent advance voting ballot applications in the 2020 General Election.  (The list contained 312,918 of the approximately 507,864 voters to whom VPC had sent applications).  Ex. L.  (Defs.' MSJ SOF ¶ 40)

11.      Defendants' expert witness, Ken Block, analyzed Ex. L and identified numerous errors/deficiencies in the information that VPC was using to pre-populate the advance voting ballot applications sent to Kansas voters.  Ex. M.  (Defs.' MSJ SOF ¶ 41)

12.       Because of the 4-6 week lead time between the date that VPC sent its data to its printer for pre-filling advance voting ballot applications and the date such applications arrived in voters' mailboxes, and based on the dates that VPC received updated Kansas voter files from Catalist, *at best*, VPC was using the Kansas voter file from April 10, 2020, to pre-populate the applications sent to Kansas voters in connection with the 2020 General Election.  Ex. M at ¶¶ 34-35.  (Defs.' MSJ SOF ¶ 42)

13.      VPC did not remove from the database it used to pre-fill advance voting ballot applications any Kansas voters whose voter registrations had been cancelled prior to mailing those individuals pre-filled advance voting ballot applications during the 2020 General Election.  Ex. N at ¶ 10.  (Defs.' MSJ SOF ¶ 43)

14.      In its first wave of mailings, which VPC sent to the printer on July 6, 2020, for delivery to voters on or about August 17, 2020, 385 Kansas voters to whom VPC sent pre-filled

advance voting ballot applications had had their voter registrations cancelled prior to that date (due to death, change of residence, criminal conviction, etc.), and in many cases long before that date. Ex. N at ¶ 9; Ex. O (date of voters' cancelled registration is found in Column E).  (Defs.' MSJ SOF ¶ 44)

15.     In its mailings to Kansas voters for the 2020 General Election, VPC sent out:

- 5 separate mailings to 176 of the 385 voters whose voter registrations had been cancelled (and thus been removed from the Kansas voter rolls) prior to the first VPC wave mailing;
- 4 separate mailings to 99 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing;
- 3 separate mailings to 39 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing; and
- 2 separate mailings to 11 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing.

Ex. N at ¶ 9; Ex. O.  (Defs.' MSJ SOF ¶ 45)

16.     In the time between when VPC sent its mailers to the printer in connection with its first wave of mailings and its final wave of mailings for the 2020 General Election, hundreds of additional Kansas voters had had their voter registration cancelled yet still received a mailing from VPC due to its failure to remove such no-longer-registered voters.  Ex. N at ¶¶ 10-13.  (Defs.' MSJ SOF ¶ 46)

17.     Mr. Block identified 23 pairs of matched records in which two different voters showed the same voter registration number, indicating that VPC had sent a pre-filled application for Voter #1 to Voter #2.  These individuals were properly separated in Kansas' own voter file to which VPC (and any other member of the public) had access.  Ex. M at ¶¶ 23-24; Ex. P.  (Defs.' MSJ SOF ¶ 47)

18.     Kansas election officials identified at least 15 voters to whom VPC sent advance voting ballot applications in connection with the 2020 General Election yet whose registration status had been cancelled in ELVIS *prior to April 10, 2020* (meaning that their names would not

have appeared on a list of voters by anyone requesting the statewide voter file as of that date).  Ex. O.  (Defs.' MSJ SOF ¶ 48)

19.     VPC's use of stale (and thus often inaccurate) voter registration data to pre-fill the advance voting ballot applications it sent to Kansas voters imposed an extra burden on county election officials, who had to identify the deficiencies submitted by voters and then communicate with voters to correct the mismatched information.  Ex. M at ¶ 39.  (Defs.' MSJ SOF ¶ 49)

20.     The Shawnee County Election Office received a large number of advance voting ballot applications from voters that had been pre-filled by VPC and contained information that did not match the voters' information in ELVIS.  The mismatched information included erroneous addresses, last names, suffixes, and/or middle initials.  Ex. A at ¶¶ 11, 35.  Examples can be found at Ex. Q (copies of inaccurate applications).  (Defs.' MSJ SOF ¶ 50)

21.     The Shawnee County Election Office also received numerous advance voting ballot applications that had been pre-filled by VPC and sent to individuals who were deceased and whose voter registration in ELVIS had been cancelled prior to the time such applications had been printed.  Ex. A at ¶ 12; Examples can be found at Ex. R.  (Defs.' MSJ SOF ¶ 51)

22.     As a result of these inaccurately pre-filled advance voting ballot applications, the Shawnee County Election Office was "overwhelmed" with telephone calls, letters, e-mails, and in-office visits from voters who were confused, angry, and frustrated at what they had received from VPC.  Ex. A at ¶¶ 12, 37, 40, 44; Ex. KK at 117:24-125:2; Mr. Howell himself spoke with hundreds of these angry, frustrated, and confused voters.  Ex. KK at 121:11-122:12.  (Defs.' MSJ SOF ¶ 52)

23.     Voters communicating with Mr. Howell regarding inaccurately pre-filled advance voting ballot applications often believed (erroneously) that the applications had been sent to them by the Shawnee County Election Office, and they expressed anger and frustration at the purported

incompetency of the office.  Many of these voters voiced their incredulity that the office would send an application to the wrong address or use the wrong name in pre-filling the application when they had previously communicated such changes to the election office.  Ex. A at ¶¶ 38, 40-42. (Defs.' MSJ SOF ¶ 53)

24.     Ford County Election Clerk Deborah Cox heard from so many confused, frustrated, and angry voters (20-30 per day) about the inaccurate and duplicate advance voting ballot applications they were receiving from VPC (via CVI) in the lead-up to the 2020 General Election that she sent an ad to three Ford County newspapers in an effort to remind voters that most pre-filled applications had come from CVI and not the county election office.  Ex. LL at 130:6-132:5; Ex. U at ¶ 37.  The text of the ad can be found at Ex. V.  (Defs.' MSJ SOF ¶ 54)

25.     Ms. Cox got the idea for the ad because a similar ad had been placed in the *Beloit Call* by Mitchell County Clerk Chris Treaster.  Ex. LL at 130:6-17.  (Defs.' MSJ SOF ¶ 55)

26.     The Shawnee County Election Office sent out letters to the voters who submitted advance voting ballot applications containing information that did not match the data in ELVIS. Ex. KK at 120:6-121:4.  Examples of these letters can be found at Ex. W.  (Defs.' MSJ SOF ¶ 56)

27.     Kansas Elections Director Bryan Caskey also received many calls from county election officials who complained that their offices were receiving pre-filled advance voting ballot applications in which the information on the form did not match the data in ELVIS.  Ex. HH at 150:13-152:15.  In response to these calls, Mr. Caskey regularly discussed the problem with county election officials during his weekly telephone conferences with them.  He also spoke personally with election officials in at least 60 of the State's 105 counties on the subject.  Ex. HH at 212:20-213:11, 237:11-240:5.  (Defs.' MSJ SOF ¶ 57)

28.      Mr. Caskey also spoke with many voters who expressed their anger, confusion, and frustration over the pre-filled advance voting ballot applications that they were receiving from third-parties such as VPC.  Ex. HH at 209:15-210:9, 240:6-242:7.  (Defs.' MSJ SOF ¶ 58)

29.      The Kansas Secretary of State's Office submitted written testimony to both the House and Senate Committees on Federal and State Affairs in March 2021 regarding the State's experience with advance voting ballot applications mailed to voters by third-parties in the 2020 General Election.  Among other things, the testimony advised the Legislature that, "[l]eading up to the 2020 general election, state and county election officials were inundated with calls from confused voters who submitted an advance by mail ballot application but continued to receive unsolicited advance ballot applications from third parties.  This created a substantial workload increase for local election offices who had to process thousands of duplicate forms at a time when county election officials were preparing for a high turnout, statewide election, in the middle of a pandemic."  Ex. Z.  (Defs.' MSJ SOF ¶ 59)

30.      On average, it takes an experienced election official three to five minutes to process an accurate, non-duplicate advance voting ballot application.  Ex. A at ¶ 24; Ex. U at ¶ 23.  (Defs.' MSJ SOF ¶ 60)

31.      If the information on a voter's advance voting ballot application does not match the information in ELVIS, or if the application is missing information, the election office will attempt to contact the voter (via telephone, U.S. mail, and/or e-mail) to determine the reason for the discrepancy or to obtain the missing information.  This contact can require multiple attempts.  The office generally makes at least three attempts to reach the voter, assuming it is practicable.  Ex. A at ¶ 25; Ex. U at ¶ 24.  (Defs.' MSJ SOF ¶ 61)

32.      If the county election office is able to reach the voter, it attempts to work with him/her to correct any discrepancies or omissions.  It may be necessary for the voter to submit a

new advance voting ballot application or registration form.  The cumulative time to contact the voter and process the application in these situations averages around 15 minutes of staff time.  Ex. A at ¶ 26; Ex. U at ¶ 25.  (Defs.' MSJ SOF ¶ 62)

33.     If the election office is unable to reach the voter or it would be impracticable to do so, the office will prepare a provisional ballot, assuming it is able to discern that the applicant is a registered voter.  The cumulative time to complete this whole process regularly takes thirty minutes or more of staff time. Ex. A at ¶ 26; Ex. U at ¶ 26.  (Defs.' MSJ SOF ¶ 63)

34.     If the election office must send a provisional ballot to a voter after being unable to reach him/her in order to address defects on his/her application, there is a greater likelihood that the voter will not correct those defects prior to the county canvassing boards and thus will either not return the provisional ballot or will not have the ballot counted.  Ex. A at ¶ 28.  (Defs.' MSJ SOF ¶ 64)

35.     VPC provided in discovery a set of FAQs intended to be used as canned responses for a call center to respond to individuals who contacted VPC about problems with the advance voting ballot applications that such individuals received from VPC.  Ex. X.  Two of the responses stated as follows:

**I got a form that has someone else's information on it- why did that happen?**

Thank you for reaching out. VPC is aware of this issue and is actively working to make sure it doesn't happen again. This issue was limited in scope and only affected a very small percentage of individuals.  In the meantime, we are happy to send you a new vote-by-mail application with the correct information, or I can tell you the link you can use to print it from your state's SoS website and then fill it out and mail back in the envelope we sent you.
**How did it happen? How are you making sure it won't happen again?**

The mistake was due to a printer error and they have taken responsibility for their mistake and have already added additional quality control measures, like installing an additional camera to monitor printing, and retraining printer staff, to prevent this type of situation in the future.  (Defs.' MSJ SOF ¶ 65)

36.     VPC received complaints from election officials in states other than Kansas about the inaccurate absentee ballot applications that VPC was sending to voters in those states during the 2020 election cycle.  Ex. Y (e-mails between VPC outside counsel Jennifer Carrier and other state election officials).  The written/e-mail complaints that VPC produced in discovery came from officials in Virginia (VPC000364-000366; 000376-000383; 000388-000392; 000397, 000406); Iowa (VPC000407-000408; 000429-000431; 000434-435); Wisconsin (VPC000436-000439); and North Carolina (VPC000485-000487; 000496-000497). (Defs.' MSJ SOF ¶ 66)

37.     The Kansas voters whom VPC targeted with mailings in the 2020 General Election received between one and five advance voting ballot applications from VPC.  Ex. L; Ex. JJ at 206:9-207:14, 209:3-210:22.  (Defs.' MSJ SOF ¶ 67)

38.     Of the approximately 507,864 Kansas voters to whom VPC sent at least one (and as many as five) advance voting ballot applications in connection with the 2020 General Election, at least 112,597 of those individuals used a VPC-provided pre-paid/pre-addressed envelope to mail their completed application back to their respective county election offices.  Ex. E; Ex. F at 177:24-179:20; Ex. JJ at 123:17-124:20.  (Defs.' MSJ SOF ¶ 68)

39.     The 112,597 Kansas voters who used a VPC-provided pre-paid/pre-addressed envelope to mail their completed applications back to their respective county election offices sent in 127,336 applications using the VPC-provided envelopes.  In other words, approximately 14,739 duplicate applications were sent to county election offices by Kansas voters using a VPC-provided envelope.  Ex. E; Ex. F at 178:16-182:3; Ex. JJ at 124:16-125:18.  (Defs.' MSJ SOF ¶ 69)

40.     Of the 112,597 Kansas voters who used a VPC-provided pre-paid/pre-addressed envelope to send in a completed advance voting ballot application to their county election office, only 111,199 voters ultimately received an advance ballot.  In other words, 1,398 voters who returned an advance voting ballot application in a VPC-provided envelope never submitted a

successful application such that they could receive an advance ballot in connection with the 2020 General Election.  Ex. E; Ex. F at 182:20-184:1; Ex. JJ at 128:3-25.  (Defs.' MSJ SOF ¶ 70)

41.     In the 2020 General Election, the Shawnee County Election Office received and processed 23,156 advance voting ballot applications.  That is, it sent regular or provisional advance ballots to 23,156 voters after having received advance voting ballot applications from these voters.  In addition, it received 4,217 duplicate applications (i.e., applications from voters who had already submitted an application and to whom the office had already mailed a regular or provisional advance ballot).  More than 15.4% of the total advance voting ballot applications that the office received, therefore, were duplicates.  Ex. A at ¶ 15.  (Defs.' MSJ SOF ¶ 71)

42.     Of the 4,217 duplicate applications the Shawnee County Election Office received for the 2020 General Election:  3,676 were sets of two (i.e., voters sent in two applications); 407 were sets of three (i.e., voters sent in three applications); 99 were sets of four; 27 were sets of five; 6 were sets of six; 1 was a set of seven, and 1 was a set of nine.  Ex. A ¶ 18.  (Defs.' MSJ SOF ¶ 72)

43.     The Shawnee County Election Office received very few (no more than a dozen) duplicate applications in connection with either the 2016 General Election (during which it received 7,394 total applications) or the 2018 General Election (during which it received 9,272 total applications).  Ex. A at ¶ 17.  (Defs.' MSJ SOF ¶ 73)

44.     Many voters told county election officials that they were confused by the pre-filled advance voting ballot applications that they had received during the 2020 General Election and believed (erroneously) that the applications had originated from the election office.  These voters told election officials that they thought they were required to complete and mail back the pre-filled applications to the county election office even if they had already submitted another application.  Ex. A at ¶ 41; Ex. KK at 269:14-270:1; Ex. U at ¶ 19.  (Defs.' MSJ SOF ¶ 74)

45.     In the 2020 General Election, the Ford County Election Office received and processed 3,040 advance voting ballot applications.  That is, it sent regular or provisional advance ballots to 3,040 voters after having received advance voting ballot applications from these voters. In addition, it received 274 duplicate applications (i.e., applications from voters who had already submitted an application and to whom the office had already mailed a regular or provisional advance ballot).  Nearly 9% of the advance voting ballot applications that the office received, therefore, were duplicates.  Ex. U at ¶ 16.  (Defs.' MSJ SOF ¶ 75)

46.     The Ford County Election Office received only a handful (no more than five) duplicate applications in connection with either the 2016 General Election or the 2018 General Election.  Ex. U at ¶ 18.  (Defs.' MSJ SOF ¶ 76)

47.     Although Kansas election officials did not attempt to quantify how many duplicate advance voting ballot applications in the 2020 General Election involved VPC-pre-populated applications, the majority of duplicate applications are believed to have been pre-filled by VPC. Ex. A at ¶ 16; Ex. U at ¶ 17.  (Defs.' MSJ SOF ¶ 77)

48.     Kansas Elections Director Bryan Caskey also had "dozens if not hundreds of conversations" with county election officials regarding the "flood" of duplicate advance voting ballot applications that were being submitted by voters to such offices.  Ex. HH at 150:13-19. (Defs.' MSJ SOF ¶ 78)

49.     When a voter submits duplicate advance voting ballot applications to a county election office in connection with a single election, the office must conduct the same review and verifications of each application upon receipt.  One step in this process is to determine if the voter had previously submitted another application and was previously sent a regular or provisional advance ballot.  If there are any differences between the original application and the new/duplicate

application (e.g., different name or mailing address), the office will attempt to contact the voter to determine the reason for the discrepancy.  Ex. A at ¶ 29; Ex. U at ¶ 27.  (Defs.' MSJ SOF ¶ 79)

50.     After receiving a duplicate application, the county election office cannot assume that the initially submitted application was correct.  Depending on the situation, the office may need to send a provisional ballot to the voter.  For this reason, the review of a duplicate application usually takes more staff time than the review of the initially submitted application.  If the office does not have to contact the voter, the review of the duplicate application generally takes 7-10 minutes.  If the office does have to contact the voter, the review of the duplicate application can take from 15-30 minutes (and occasionally more) of total staff time.  Ex. A at ¶ 30; Ex. U at ¶ 28. (Defs.' MSJ SOF ¶ 80)

51.     The Shawnee County Election Office typically assigns 6-7 staff members to handle the processing of advance voting ballot applications.  Nearly double that number had to be assigned to the task for the 2020 General Election.  The most significant time burden and strain on staff came from having to contact thousands of voters who had submitted inaccurate or duplicate applications.  At one point, Mr. Howell had to assign almost 30 staff members just to review and process applications in order to ensure that the office could process applications within the 2-day deadline imposed by State law.   Ex. A at ¶ 33.  (Defs.' MSJ SOF ¶ 81)

52.     Prior to Election Day in November 2020, the Shawnee County Election Office responded to many confused voters who had returned pre-filled advance voting ballot applications but who insisted that they did not actually intend to request and vote an advance ballot.  The voters told election officials that they thought they were required to return the application.  Election officials expended substantial time and resources responding to those voters.  Ex. A at ¶ 47.  (Defs.' MSJ SOF ¶ 82)

53.     Approximately 718 voters in the 2020 General Election voted on Election Day in Shawnee County (usually by provisional ballot) after having submitted an advance voting ballot application and having received an advance ballot.  In the 2016 General Election, just 141 voters voted on Election Day (usually by provisional ballot) after having mailed in an advance voting ballot application and having received an advance ballot.  Ex. A at ¶ 47. (Defs.' MSJ SOF ¶ 83)

54.     VPC's Rule 30(b)(6) witness, Mr. Lopach, testified that he cannot "speak to how an individual or a group of people would respond to a pre-filled vote-by-mail application versus a blank vote-by-mail application." Ex. JJ at 98:17-99:20.  (Defs.' MSJ SOF ¶ 84)

55.     Mr. Lopach testified that he does not know if the recipient of a pre-filled advance voting ballot application "views a political message in whether or not their name is filled out on" the application.   Ex. JJ at 99:22-100:10.  (Defs.' MSJ SOF ¶ 85)

56.     Mr. Lopach testified that nothing in the Pre-Filled Application Prohibition prohibits VPC from banding together with other persons or organizations to engage potential voters and assist community members in encouraging advance mail voting.  Ex. JJ at 189:18-191:14.  (Defs.' MSJ SOF ¶ 86)

57.     Mr. Lopach testified that, other than the restriction on inserting a voter's name and address on an advance voting ballot application, nothing in the Pre-Filled Application Prohibition restricts VPC from encouraging individuals to participate in the democratic process, instructing them how to obtain or vote an advance ballot, encouraging them to do so, or communicating any other message in the mailers sent to targeted voters.   Ex. JJ at 183:9-187:19. (Defs.' MSJ SOF ¶ 87)

**IV. – Argument**

As narrowed, Plaintiffs' lawsuit no longer involves activity protected by the First Amendment.  The prohibited conduct that VPC challenges – the pre-population of third-parties'

advance voting ballot applications – is not expressive in nature.  Kansas' Pre-Filled Application

Prohibition must be reviewed, therefore, under the most deferential rational basis standard.  But

even if the First Amendment is triggered, there is emphatically no core political speech involved,

and the requisite balancing of interests tilts heavily (if not entirely) in the State's direction.

**I.      Sending a Voter a Partially Completed Advance Mail Ballot Application is _Conduct_, Not _Speech_**

VPC's First Amendment challenges to the Pre-Filled Application Prohibition must fail

because the statute restricts neither speech nor association.  The only thing being limited is _non-_

_expressive conduct_.  The First Amendment is thus not implicated here.  "[I]t is the obligation of

the person desiring to engage in assertedly expressive conduct to demonstrate that the First

Amendment even applies," _Clark v. Cmty. for Creative Non-Violence_, 468 U.S. 288, 293 n.5

(1984), and VPC falls far short of this mark.

> _A.      The Partially Completed Advance Mail Ballot Applications that VPC Sends to Voters are Not Inherently Expressive_

While the First Amendment safeguards both speech and certain types of conduct, "only

conduct that is 'inherently expressive' is entitled to First Amendment protection." _Voting for Am._

_v. Steen_, 732 F.3d 382, 388 (5th Cir. 2013) (citing _Rumsfeld v. Forum for Academic and_

_Institutional Rights, Inc._, 547 U.S. 47, 66 (2006) ("FAIR")).  In assessing whether specific conduct

has "sufficient 'communicative elements' to be embraced by the First Amendment, courts look to

whether the conduct shows an 'intent to convey a particular message' and whether 'the likelihood

was great that the message would be understood by those who viewed it.'" _Id._ (quoting _Texas v._

_Johnson_, 491 U.S. 397, 404 (1989)).

VPC contends that by pre-filling the advance voting ballot applications it mails to potential

Kansas voters it engages in core political speech aimed at informing and assisting voters in the

electoral process.  More specifically, VPC claims it is engaged in speech in three ways.  First, it

argues that its pre-filled applications promote the benefits of mail voting in pursuit of political change and that the pre-filled nature of the application is "characteristically intertwined" with that message. Br. at 21. Second, VPC maintains that adding a voter's name and address to an official state form is protected speech not only because it represents "words on a page," but also because that data conveys VPC's belief that the particular voter to whom the VPC mailer and application were sent should apply for an advance ballot and vote by mail. Br. at 22. Third, VPC avers that pre-filling the application amounts to expressive conduct based on the "political moment and the surrounding context of the mailer," and that a "reasonable recipient would interpret some sort of message" upon receiving VPC's mailer. Br. at 23.

None of these theories has merit. The conduct at issue – pre-populating an advance voting ballot application with the name and address of the intended recipient and mailing it to the voter (who did not request it) – is entirely separate from the messages VPC seeks to convey about mail voting. The messages that VPC communicates to voters about the vote-by-mail process and the alleged utility thereof are delivered through the contents of *a cover letter that VPC sends with the application, not through the application itself.* That cover letter, and the message contained therein, *see* Ex. I, is wholly unaffected by the Pre-Filled Application Prohibition. The pre-filling of the application itself, on the other hand, embodies *conduct*, not expression.

Nothing in the challenged statute impedes VPC from engaging in any of the messaging that it imparts through its cover letter. VPC is in no way prevented from publishing or mailing content that educates Kansans on how to vote by mail or the purported benefits of doing so. Nor is VPC restricted from advocating in favor of voting an absentee ballot through the mail. In the wake of Kansas' agreement to a permanent injunction against the enforcement of K.S.A. 25-1122(*l*)(1), *see* Dkt #73, VPC is not even prohibited from including a blank advance mail ballot application in its mailings. For that matter, neither VPC nor any other entity is precluded from assisting a voter in

completing such an application or in mailing a partially completed application to a voter who has affirmatively requested one. *Id.* at 2-3. In short, every avenue of expressive conduct remains available.

The only thing VPC cannot do is partially complete the advance voting ballot application it sends to voters who have not requested one from VPC (as is true of all the voters to whom it sends such pre-filled applications). But there is no conceivable "speech" on that application. It is simply a state-created form. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997) (recognizing that while a person or party may express beliefs or ideas through a ballot, "[b]allots serve primarily to elect candidates, not as forums for political expression."). Furthermore, Kansas retains broad authority to regulate how a voter obtains a ballot. *See Cook v. Gralike*, 531 U.S. 510, 523 (2001) ("[T]he Elections Clause grants to the States 'broad power' to prescribe the procedural mechanisms for holding congressional elections.") (citations omitted). The fact that Plaintiffs include the voter's information on the form does not convey a message to a particular voter. Pls. Br. at 22. The information to be included on the form is a voter's county of residence, address, date of birth, phone number, date of application, and signature, all of which are unique to the individual voter. VPC has no discretion regarding the information entered into those fields if it wants the form to be accepted by election officials. Defs.' Statement of Add'l Facts ("DSOAF") ¶¶ 1-2. There is no space in the fields for any sort of messaging, nor would any messaging be permitted on that part of the official application.

Moreover, even if sending a *blank* advance voting ballot application to a voter somehow was endowed with sufficient communicative elements to trigger the First Amendment – conduct which is not prohibited by Kansas law – it does not follow that a separate message would be conveyed by *pre-filling* the application by adding the voter's name and address to the lines on the official state form. There is nothing "inherently expressive" about an individual's name and

address in the context of an official ballot application, especially when the application is being completed by someone other than the voter.  And even if there was any conceivable speech flowing from the insertion of a voter's biographical data on the application that the voter must submit to the county election office, it would be the speech of the *voter*, not the *third-party*.

Furthermore, despite Plaintiffs' claim that voters who receive pre-filled applications must discern "some sort of message" therefrom, Br. at 23 (citing *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022), Plaintiffs have produced no evidence that *any* message is received by a prospective voter from the pre-filled application itself.  *See* DSOAF ¶¶ 54-55.  In fact, VPC's CEO (and 30(b)(6) witness), Mr. Lopach, admitted that it would be entirely speculative for VPC to believe that a voter discerned *any* message from a pre-filled application.  *Id.*  Of course, even if voters did discern "some sort of message," that would not be enough; the voter must understand the intended message.  Plaintiffs' "some sort of message" theory is at odds with the Supreme Court's directive that, before conduct can "possess[] sufficient communicative elements" to qualify for First Amendment protections, there must be a showing  of "[a]n intent to convey a *particularized* message" and a finding that "*the message* would be understood by those who viewed it." *Johnson*, 491 U.S. at 404 (emphasis added).

Additionally, the Supreme Court in *FAIR* expressly "rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 547 U.S. at 65-66 (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).  Instead, the Court has "extended First Amendment protection only to conduct that is inherently expressive." *Id.* at 66.  And where the expressive component of an individual's "actions is not created by the conduct itself but by the speech that accompanies it," that "explanatory speech is . . . strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection under" the First

Amendment. *Id.* Were the rule otherwise, "a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

VPC construes all of the materials combined in its mailing to voters – i.e., the cover letter, the transmittal envelope, the return envelope, and the pre-filled advance voting ballot application – as a single message and insists that the pre-filled application itself cannot be disaggregated from the other materials contained therein. Br. at 21. The First Amendment, however, "does not protect any conduct that at some point might have a *connection* to speech." *Sickles v. Campbell Cnty., Ky.*, 501 F.3d 726, 734 (6th Cir. 2007) (emphasis added). The application must be disaggregated from the cover letter. A contrary ruling would not only depart from the Supreme Court's directive in *FAIR*, but it would also allow a plaintiff to claim to have engaged in speech at the highest level of generality and then seek to sweep in virtually all conduct allegedly related to that speech as constitutionally protected. The First Amendment is not nearly so broad. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 25 (2010) (speech cannot be defined at the highest "level of generality" in assessing the reasonableness of government regulations on conduct).

VPC responds that the Court cannot "slice and dice" the activities involved in its speech. Br. at 21. To support this theory, VPC cites *League of Women Voters v. Hargett*, 400 F. Supp.3d 706. 720 (M.D. Tenn. 2019), a case regulating individuals engaging in voter registration activities. But the language that VPC quotes from that case is from *the dissent* in *Steen*. *Id.* (quoting *Steen*, 732 F.3d at 401). The *Steen majority*, on the other hand, correctly found, consistent with Supreme Court precedent, that an apparently limitless variety of conduct cannot be labeled "speech" any time a person engaging in such conduct intends thereby to express an idea. *Id.* at 388-390.

VPC next argues that some sort of message must have been understood by the recipients of its mailers because more than 69,000 Kansans returned one or more VPC-pre-filled advance voting ballot applications to county election offices. Br. at 23. Once again, there is no evidence

in the record that voters understood any message from the pre-filled nature of the VPC application, and the fact that VPC sent applications to more than 500,000 Kansans in connection with the 2020 General Election casts doubt on this allegation.  More importantly, the mailers that VPC sent to Kansas voters did not consist merely of advance voting ballot applications.  Included with the pre-filled application was a cover letter discussing the virtues of mail voting, the process for obtaining and voting an advance ballot, and a pre-addressed, postage pre-paid envelope in which to return the completed application to the county election office.  DSOAF ¶ 5.  VPC has produced no admissible evidence to show that a voter discerns any message from the pre-filled application itself, separate and apart from the other materials and messaging in the mailer.

In any event, even if VPC's factual argument were true, it would be irrelevant.  As the Fifth Circuit noted in rejecting a similar argument in the context of voter registration forms, "[plaintiffs] essentially seek a First Amendment right not just to speak out or engage in 'expressive conduct' but also to succeed in their ultimate goal regardless of any other consideration." *Steen*, 732 F.3d at 391 (quotation omitted); *see also Lichtenstein v. Hargett*, __ F. Supp.3d __, 2021 WL 5826246, at *35 (M.D. Tenn. Dec. 7, 2021) (same for mailing absentee ballot applications).  "Only two possibilities flow from this reasoning. . . . [Either] throwing voter registration forms in the trash would have to be constitutionally protected expressive conduct," or "supporting voter registration is the canvasser's speech, while actually completing the forms is the voter's speech, and collecting and delivering the forms are merely conduct." *Steen,* 732 F.3d at 391-92.  In explaining why this theory cannot be squared with First Amendment case law, the Court observed:

> One clear principle that can be derived from the long line of election-related speech cases is that the degree of protection afforded under the First Amendment does not vary in accordance with anyone's regard for the content of the message at issue.  Thus, the logic of the Appellees extends to parties who wish to see fewer citizens vote even if it is true that Appellees' ultimate goal is to have more citizens vote.  The prevailing cases also do not extend First Amendment protection to an "anything goes" philosophy that seeks to insulate any conduct that may relate in any way to speech or expression.  Here, Appellees offer a novel interpretation of

> the First Amendment. They contend that expressive activity, the promotion of
> voter registration in this case, is contingent upon the "success" factor of *actually
> registering voters.*   While the First Amendment protects the right to express
> political views, nowhere does it guarantee the right to ensure those views come to
> fruition.   To maintain otherwise would mean that a group seeking to discourage
> voting and voter registration would have the "right" to achieve its expressive goals
> by throwing the registration cards away.

*Id.* at 392 n.5 (emphasis in original) (internal citation omitted).   VPC's novel theory would render

virtually every feature of a state's electoral regulatory scheme vulnerable to constitutional attack

just because such law might stand in the way of an advocacy organization's effort to maximize the

success of its operations.

Unsurprisingly, the overwhelming majority of courts to examine the issue have concluded

that the distribution of advance voting ballot applications is *not* protected speech.   In fact, these

same Plaintiffs challenged a virtually indistinguishable Georgia statute, adopted just months before

the Kansas provision, on the same grounds asserted here.   The court rejected those claims, holding

that pre-filled absentee ballot application restrictions do not entail expressive conduct subject to

First Amendment protection.  *See VoteAmerica*, 2022 WL 2357395, at *7-9.   The court reasoned

that "distributing forms prefilled with a prospective voter's own personal information" does "not

require the type of interactive debate and advocacy that the Supreme Court constituted core

political speech in *Meyer* [*v. Grant*, 486 U.S. 414 (1988)]."  *VoteAmerica*, 2022 WL 2357395, at

*7.   The court further added:

> [C]ombining speech (in the cover information) with the conduct of sending an
> application form, as Plaintiffs do here, is not sufficient to transform the act of
> sending the application forms into protected speech.  Plaintiffs' pro-absentee voting
> message is not necessarily intrinsic to the act of sending prospective voters an
> application form. . . . As in [*FAIR*], the expressive component of sending applica-
> tion packages in this case is not created by the conduct itself but by the included
> cover information encouraging the recipient to vote. The necessity of the cover
> message is 'strong evidence' that the conduct of sending an application form is not
> so inherently expressive as to qualify for First Amendment protection.

*Id.* at *9; *accord Priorities USA v. Nessel*, No. 19-13341, 2022 WL 4272299, at *5-6 (E.D. Mich. Sept. 15, 2022); *DCCC v. Ziriax*, 487 F. Supp.3d 1207, 1235 (N.D. Okla. 2020) ("[C]ompleting a ballot request for another voter, and collecting and returning ballots of another voter, do not communicate any particular message.  Those actions are not expressive. . . ."); *League of Women Voters v. Browning*, 575 F. Supp.2d 1298, 1319 (S.D. Fla. 2008) (same).

*Lichtenstein v. Hargett*, 489 F. Supp.3d 742 (M.D. Tenn. 2020) is also directly on point, contrary to the position of the Plaintiffs (and, with much respect, of the Court) at the preliminary injunction stage.  *Lichtenstein* involved a constitutional challenge to a Tennessee law prohibiting anyone other than an election official from giving an absentee ballot application to another person. The district court there concluded that the restriction on distribution of absentee voter applications was not a ban on core political speech at all, *id.* at 773, as it did "not restrict anyone from interacting with anyone about anything."  *Id.* at 770.  At the preliminary injunction phase, this Court sought to distinguish *Lichtenstein* on the grounds that VPC's "application packets include speech that communicates a pro-mail voting message."  *VoteAmerica v. Schwab*, 576 F. Supp.3d 862, 875 (D. Kan. 2021).  But the *Lichtenstein* court subsequently made clear in its order dismissing the case that the plaintiffs there – just like VPC – included a blank absentee ballot application with the other "voter engagement materials" they sent to voters.  *Lichtenstein*, 2021 WL 5826246, at *6.  Of course, the avenues of communication available to VPC here are far broader than those available in *Lichtenstein*, which flatly prohibited the sending of *any* absentee ballot applications to voters. Kansas' Pre-Filled Application Prohibition merely restricts the *unsolicited* mailing of pre-populated applications.

The bottom line is that pre-filling advance voting ballot applications is *non-expressive conduct* that the State is free to regulate as part of a legitimate, non-discriminatory election process. As such, the Pre-Filled Application Prohibition is subject only to rational basis scrutiny.  *Steen*,

732 F.3d at 392; *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 681 (2012) (government classification that involves neither a "fundamental right" nor a "suspect" classification is constitutionally valid if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification.").

> B.      *The Cases that the District Court Cited in its Preliminary Injunction / Motion to Dismiss Order are Inapposite*

Defendants acknowledge that this Court reached a contrary conclusion in its order denying our motion to dismiss and granting Plaintiffs a preliminary injunction.  However, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."  *Univ. of Tex. v. Camenish*, 451 U.S. 390, 395 (1981).  Nor are they binding at the summary judgment phase.  *Navajo Health Found.-Sage Mem. Hosp., Inc. v. Burwell*, 256 F. Supp.3d 1186, 1224 (D.N.M. 2015).  In any event, the Court's analysis largely focused on K.S.A. 25-1122(*l*)(1)'s Out-of-State Distributor Ban, which is no longer at issue in this case.  Analyzed separately, the notion that the act of a third-party in writing someone else's name on an official state form is constitutionally-protected expressive conduct would stretch the First Amendment well beyond its limits.

The cases that Plaintiffs cite in their summary judgment motion do not justify a similar conclusion in the far narrower context now presented by the Pre-Filled Application Prohibition. In *Priorities USA v. Nessel*, 462 F. Supp.3d 792 (E.D. Mich. 2020), for example, plaintiffs sought an injunction against Michigan's absentee ballot law on the grounds that it contravened their First Amendment speech and association rights to assist voters with absentee ballot applications.  In particular, plaintiffs alleged that the statute's requirement that, other than family or household members, only voters registered in Michigan can assist voters in submitting absentee ballot applications violates the First Amendment because it prohibits the plaintiffs "from engaging in core political expression." *Priorities USA v. Nessel*, 487 F. Supp.3d 599, 609 (E.D. Mich. 2020).

Plaintiffs further claimed that the law's restriction on non-family or household members from soliciting a voter to return an absentee ballot application also violated the First Amendment. *Id.*

Although the district court initially opted for the minority view and held that Michigan's absentee ballot prohibitions regulated expressive conduct and was subject to heightened scrutiny, *id.* at 609-612, it ultimately denied plaintiffs injunctive relief, holding that "the state's interests in preventing fraud and abuse in the absentee ballot application process and maintaining public confidence in the absentee voting process are sufficiently important interests and are sufficiently related to the limitations and burdens set forth in [the statute] . . . that plaintiffs are unlikely to succe[ed] on their First Amendment challenge to the Absentee Ballot Law." *Id.* at 615. Moreover, *just over a month ago, the district court reversed its prior rulings and granted judgment to the defendants on the pleadings, concluding that the law involved solely non-expressive conduct. Priorities USA*, 2022 WL 4272299, at *5.

In *League of Women Voters*, the court confronted a statute that, *inter alia*, required private parties to (i) register with the State before engaging in most voter registration drives, (ii) deliver voter registration forms to authorities within ten days of a voter registration drive, (iii) avoid copying or retraining data collected on the voter registration form, and (iv) include disclaimers on any public communications with voters in connection with voter registration assistance. 400 F. Supp.3d at 711-13. The court held, and the defendants conceded, that the voter registration drives amounted to core First Amendment conduct. *Id.* at 720. Citing the *dissenting opinion* in *Steen*, 732 F.3d at 388 (Davis, J., dissenting), the court then reasoned that the discrete, logistical aspects of Tennessee's voter registration law could not be separated from the expressive parts of the statute. *League of Women Voters*, 400 F. Supp.3d at 720. This wrongly decided opinion was an outlier and runs against the overwhelming case law – including the only two circuits to have squarely addressed the issue – that sending or collecting forms is *not* expressive conduct. *See New*

*Ga. Project v. Raffensperger*, 484 F. Supp.3d 1265, 1300-01 (N.D. Ga. 2020) (collecting cases, including *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018), *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 372 (9th Cir. 2016), and *Steen*, 732 F.3d at 391)), *aff'd* 976 F.3d 1278 (11th Cir. 2020).   And as described in more detail below, voter registration forms and activity are fundamentally distinct from absentee ballot applications and the advocacy related thereto.

Similarly, in *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp.3d 159 (M.D.N.C. 2020), plaintiffs mounted a First Amendment challenge to a North Carolina statute that restricted, *inter alia*, third-parties from assisting voters in completing and returning absentee ballots.   *Id.* at 173.   Conceding that most other judges had reached a different result, the court in *Democracy N.C.* nevertheless concluded that "assisting voters in filling out a request form for an absentee ballot is expressive conduct which implicates the First Amendment."   476 F. Supp.3d at 224.[1]   In later ruling on the defendants' motion to dismiss, the court expressed misgivings with its prior decision at the preliminary injunction phase of the case and explicitly noted that it was *not* ruling "that assisting voters in filling out a request form for an absentee ballot is expressive conduct which implicates the First Amendment as a matter of law."   *Democracy N.C. v. N.C. State Bd. of Elections*, __ F. Supp.3d __, 2022 WL 715973, at *6-8 (M.D.N.C. Mar. 10, 2022).   The court opted instead to simply *assume* the First Amendment applied at the motion to dismiss stage and then address the matter definitively at summary judgment or trial.   *Id.* at *8.

In any event, nothing in Kansas law prevents a third-party from assisting a voter in completing an advance mail ballot application.   To the contrary, the parties' Stipulation makes clear that if a voter requests such assistance, the statute is not violated.   Dkt #73 at 2-3.   In fact, *in-*

---

[1] Notably, although the court determined at the preliminary injunction phase that assisting voters in filling out absentee ballot request forms implicates the First Amendment, it went on to hold that *Anderson-Burdick* balancing – not strict scrutiny – applies to such laws and that "the burdens on Plaintiffs' First Amendments speech and association rights are justified by the State's interest in preventing fraud." *Democracy N.C.*, 476 F. Supp.3d at 224.

*person* interactions between third-parties and voters are wholly unregulated by the State's Pre-Filled Application Prohibition. Only the *unsolicited* (i.e., unrequested) pre-population of advance ballot applications sent to voters through the mail by third-party organizations is prohibited by the statute.

Finally, *American Association of People with Disabilities v. Herrera*, 690 F. Supp.2d 1183 (D.N.M. 2010), involved a challenge to a New Mexico law that (i) required third-parties to register with the State before conducting voter registration drives, (ii) limited the number of registration forms that a third-party could accept from prospective voters in any such drive, and (iii) mandated that third-parties return any voter registration applications within 48 hours of receipt. *Id.* at 1188. The court concluded that these restrictions on voter registration activity implicated the plaintiffs' First Amendment rights, and it proceeded to apply *Anderson-Burdick* balancing. *Id.* at 1212-20. The court's denial of the defendants' motion to dismiss in that case, however, shines little to no light on this action. Not only is voter registration activity materially different than assistance with absentee ballot applications, but the sole conduct by Kansas' Pre-Filled Application Prohibition is the mailing of unsolicited, pre-filled applications. There are no restrictions at all in Kansas with respect to the type of in-person interactions that the court in *Herrera* found so important.

> C.    *The Pre-Filled Application Prohibition is Rationally Related to the State's Legitimate Interests*

Because the First Amendment is not implicated, the Pre-Filled Application Prohibition is properly evaluated under rational basis review. *See Save Palisade Fruitlands v. Todd*, 279 F.3d 1204, 1210-13 (10th Cir. 2002) (where statute neither infringes on a federal fundamental right nor affects a suspect classification, it is subject to rational basis scrutiny). Under this extremely liberal standard, the statute "need only be rationally related to a legitimate government purpose." *Id.* at 1210. The "statute is presumed constitutional and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis

has a foundation in the record." *Heller v. Doe*, 509 U.S. 312, 320-21 (1993) (internal citation and alterations omitted). "A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification" because a "legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* at 320. Nor must the statute have been adopted with "mathematical nicety." *Id.* at 321. Rather, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Id.* The Pre-Filled Application Prohibition easily satisfies this standard.

The State's regulatory interests in the Pre-Filled Application Prohibition are the avoidance of voter confusion, facilitation of orderly and efficient election administration, enhancement of public confidence in the integrity of the electoral process, and deterrence of voter fraud. All are well-recognized and indisputably legitimate interests in the context of election administration. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021) (combatting fraud is a "strong and entirely legitimate" reason for enacting voting laws); *Doe v. Reed*, 561 U.S. 186, 197-98 (2010) ("The State's interest in preserving the integrity of the electoral process is undoubtedly important . . . [and it] extends more generally to promoting transparency and accountability in the electoral process."); *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (State has "compelling interest in protecting voters from confusion and undue influence."); *Marchioro v. Chaney*, 442 U.S. 191, 196 (1979) ("The State's interest in ensuring that [its electoral] process is conducted in a fair and orderly fashion is unquestionably legitimate."); *Storer v. Brown*, 415 U.S. 724, 730 (1974) ("[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."); *DSCC v. Pate*, 950 N.W.2d 1, 5-7 (Iowa 2020) (rejecting constitutional challenge to statute that prohibited third-parties from pre-populating voters' absentee ballots).

VPC seems to think it is doing a favor for Kansas voters and election officials alike by pre-populating advance voting ballot applications with information that does not necessarily match the data in ELVIS.  The confusion, frustration, anger, and chaos in the 2020 General Election give lie to that suggestion.  As Ms. Cox and Messrs. Howell and Caskey described from Kansas' 2020 experience, and as VPC's emails from Virginia, Iowa, Wisconsin, and North Carolina confirmed elsewhere, VPC's actions precipitated significant consternation among voters who received both inaccurate and duplicate advance voting ballot applications, adversely impacted election officials' ability to administer the election in an efficient manner, contributed to a decline in the public's confidence in the fairness of election procedures, and tested the limits of procedural safeguards. DSOAF, ¶¶ 19-53.  The Pre-Filled Application Prohibition is clearly related to each of the aforementioned legitimate state interests.  There can be no serious question, therefore, that Kansas had a rational basis for adopting this legislation.

**II.     Even if the First Amendment is Implicated, the Pre-Filled Application Prohibition is Viewpoint- and Content-Neutral and Not Subject to Heightened Scrutiny**

*A.     The Pre-Filled Application Prohibition Does Not Target Core Political Speech*

If, notwithstanding the preceding analysis, the Court still concludes that the Pre-Filled Application Prohibition targets expressive conduct, there is certainly no "core political speech" at issue and thus no basis for imposing "exacting" or "strict" scrutiny in the claims challenging this statute, as Plaintiffs advocate.  Br. at 24-29.

In arguing for a heightened scrutiny standard, VPC relies upon *Meyer*, 486 U.S. at 414. Parroting language from that opinion, VPC maintains that the Pre-Filled Application Prohibition restricts its core political speech by "proscribing [its] most effective means of conveying its pro-advance mail voting message and reducing the overall quantum of speech delivering that message."  Br. at 25.  VPC further avers that the law represents "content- and viewpoint-based discrimination because it regulates only pro-advance mail voting communications."  *Id.*

There are numerous flaws in VPC's argument. First, VPC produced no evidence in support of its theories regarding (i) any alleged message that voters understand from its pre-filled advance voting ballot applications or (ii) the effectiveness of pre-filling those applications. In fact, VPC's CEO (Plaintiffs' Rule 30(b)(6) witness) testified that he did not even know if the recipient of a pre-filled application "views a political message in whether or not their name is filled out on" the application. DSOAF ¶ 55.

Second, any restrictions imposed by the Pre-Filled Application Prohibition are viewpoint- and content-neutral. The Supreme Court recently clarified its jurisprudence as to what constitutes a "content-based" regulation of speech. *See City of Austin v. Reagan Nat'l Advert. of Austin*, 142 S. Ct. 1464 (2022). That case involved a regulation of signage, with different rules applying to signs located on the premises of the place being advertised versus signs located offsite. The Court first reiterated that a "regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content' – that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *Id.* at 1471 (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). But the Court then criticized the overly broad interpretation that many lower courts have ascribed to *Reed*. The Court explained that if the government's regulatory distinctions "require[] an examination of speech only in service of drawing neutral" lines, then the regulation "is agnostic as to content." *City of Austin*, 142 S. Ct. at 1471. The mere fact that one must read something to determine the applicability of a regulation does *not* render it content-based. *Id.* To the contrary, "absent a content-based purpose or justification," the challenged law will be deemed content neutral and strict scrutiny will not be warranted. *Id.*

The Pre-Filled Application Prohibition is agnostic as to content. *Nothing* in the law precludes VPC from communicating any information or viewpoint whatsoever about advance voting, voting by mail, or any other topic. VPC concedes this fact. Mr. Lopach admitted in his

deposition that the Pre-Filled Application Prohibition does not restrict VPC from encouraging individuals to participate in the democratic process, from instructing them how to obtain or vote an advance ballot, from encouraging them to vote early or by mail, or from communicating any other message in the mailers that it sends to targeted voters.  DSOAF ¶ 57.

Like the signs in *City of Austin*, pre-filling advance ballot applications also expresses no "idea or message."  *See City of Austin*, 142 S. Ct. at 1474 (rejecting "view that *any* examination of speech or expression inherently triggers heightened First Amendment concern.").  The applications at issue here, which are official state forms with no room for any extraneous communications, are designed solely to facilitate voters' ability to procure advance ballots, not to spread political messages of any sort.  Given the Supreme Court's clear statement that "[b]allots serve primarily to elect candidates, not as forums for political expression," *Timmons*, 520 U.S. at 363, there is no basis for suggesting that pre-filling a ballot *application* can serve a communicative purpose.

As for VPC's argument that the Pre-Filled Application Prohibition represents a content-based restriction because the State does not likewise limit the pre-filling of voter registration forms, Br. at 28, this overlooks critical distinctions between the two in their timing, effect, operation, and impact.  The submission of a voter registration application is several steps removed from the act of casting a ballot.  Initial voter registration applicants are also new to the State's electoral infrastructure, with no immediately accessible election database in place to adjudge the accuracy of all the data in the submission.  By contrast, voters seeking an advance voting ballot application are already registered to vote and have all their pertinent data in the State's voter file.  The application, in turn, must precisely match the State's voter file data before an advance ballot will be issued.  DSOAF ¶ 2.  Moreover, advance voting ballot applications are much more directly connected to the act of voting.  The risks of voter confusion and voter fraud are thus heightened, as is – most importantly – the potentially adverse impact on the efficiency and effectiveness of the

election administration process.  The differential treatment of the two has nothing at all to do with *content*; it is simply a byproduct of the often dissimilar issues and potential problems raised in these two distinct parts of the electoral system.

The Supreme Court rejected a similar argument in *Burson*, which involved a constitutional challenge to a Tennessee statute prohibiting the solicitation of votes and the display of campaign materials within 100 feet of a polling place.  Casting aside the plaintiff's claim that the statute was an unlawful content-based restriction on her free speech rights because it did not *also* limit other types of speech such as charitable and commercial solicitation or exit polling within that 100-foot zone, the Court held that "the failure to regulate all speech" does not render a statute "fatally underinclusive."  504 U.S. at 207.  Rather, the Court explained, "States adopt laws to address the problems that confront them.  The First Amendment does not require States to regulate for problems that do not exist."  *Id.*  Any other ruling would bring states to a standstill.

VPC's legal theory improperly conflates the speech issues at play in referendum petitions – as in both *Meyer* and *Buckley v. American Constitutional Law Foundation, Inc.*, 552 U.S. 182 (1999) – with the *absence* of such issues in the absentee ballot application process.  When it comes to a referendum, an "individual's signature will express the view that the law subject to the petition should be overturned.  Even if the signer is agnostic as to the merits of the underlying law, his signature still expresses the political view that the question should be considered 'by the whole electorate.'"  *Doe*, 561 U.S. at 195 (citing *Meyer*, 486 U.S. at 421).  "In either case, the expression of a political view implicates a First Amendment right."  *Id.*  That is why restrictions on who can interact with the public in procuring referendum signatures are seen as having "specifically regulated the process of advocacy itself, dictating who [can] speak (only unpaid circulators and registered voters) or how to go about speaking (with name badges and subsequent detailed reports)," thereby "reducing the total quantum of speech, the number of voices who will convey

[the plaintiffs'] message and the hours they can speak, and . . . the size of the audience they can reach." *Steen*, 732 F.3d 390 (quoting *Meyer*, 486 U.S. at 422-23).

By contrast, Kansas' Pre-Filled Application Prohibition does not restrict anyone from communicating with anyone else about anything. It does not even limit a third-party from mailing a blank advance voting ballot application to another voter. Nor does it limit a third-party from providing a pre-filled application to a voter who has requested it. The only thing being constrained is the mailing of unsolicited, pre-filled applications. Under no reasonable interpretation can such a *de minimis* regulation be deemed to be a limitation on core political speech such that it warrants the kind of sanctified constitutional protection and exacting scrutiny that VPC demands.

Even if the Court finds that prohibiting the mailing of unsolicited, pre-filled advance ballot applications entails expressive conduct, the State would *still* be entitled to deference in the review of such law. As the Supreme Court explained in *Doe*, a case challenging the compelled disclosure of signatory information on referendum petitions, which is indisputably expressive conduct, the electoral context is highly relevant to the nature of its First Amendment review. 561 U.S. at 195. The Court noted: "We allow States significant flexibility in implementing their own voting systems. To the extent a regulation concerns the legal effect of a particular activity in that process, the government will be afforded substantial latitude." *Id.* at 195-96 (citation omitted); *see also id.* at 212-13 (Sotomayor, J., concurring) ("States enjoy considerable leeway to choose the subjects that are eligible for placement on the ballot and to specify the requirements for obtaining ballot access . . . [E]ach of these structural decisions inevitably affects – at least to some degree – the individual's right to speak about political issues and to associate with others for political ends. ... It is by no means necessary for a State to prove that such reasonable, nondiscriminatory restrictions are narrowly tailored to its interests."); *cf. Burson*, 504 U.S. at 206-08 (rejecting First Amendment overbreadth challenge to a statute establishing a 100-foot buffer zone outside polling places on

Election Day within which *no one* could display or distribute *any* campaign materials or solicit votes on the grounds that the restraint was a valid prophylactic measure designed to prevent difficult-to-detect voter intimidation and election fraud).

> B.      *Assuming the First Amendment is Implicated, the Proper Standard for Evaluating VPC's Claims is the Anderson-Burdick Test*

If the Court finds that the First Amendment is implicated, the proper standard of review is the *Anderson-Burdick* test. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). When a State invokes its constitutional authority to regulate elections to ensure that they are fair and orderly, the resulting restrictions will "inevitably affect – at least to some degree – the individual's right to vote and his right to associate with others for political ends." *Anderson*, 460 U.S. at 788. These burdens "must necessarily accommodate a State's legitimate interest in providing order, stability, and legitimacy to the electoral process." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018). That is why a State's "important regulatory interests are generally sufficient to justify reasonable, non-discriminatory restrictions" on election procedures. *Anderson*, 460 U.S. at 789.

There is "no 'litmus-paper' test that will separate valid from invalid restrictions." *Id.* The Court instead applies a "more flexible standard." *Burdick*, 504 U.S. at 434. Under this flexible approach, referred to as *Anderson/Burdick* balancing, a "court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Cox*, 892 F.3d at 1077 (quoting *Burdick*, 504 U.S. at 434)); *Fish v. Schwab*, 957 F.3d 1105, 1121-22 (10th Cir. 2020).

Although highly flexible, this balancing test does contain certain core guidelines. If a state imposes "severe restrictions on a plaintiff's constitutional rights . . . , its regulations survive only if 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. 434. But "minimally burdensome and nondiscriminatory regulations are subject to a less-searching examination closer to rational basis and the State's important regulatory interests are generally sufficient to justify the restrictions." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (citing *Burdick*, 504 U.S. at 434). "Regulations falling somewhere in between – i.e., regulations that impose a more-than-minimal but less-than-severe burden – require a 'flexible' analysis, weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Id.* (quotation omitted). Lurking in the background at all times, however, is the fundamental principle that "states have wide latitude in determining how to manage their election procedures." *ACLU v. Santillanes*, 546 F.3d 1313, 1321 (10th Cir. 2008).

In an effort to avoid *Anderson-Burdick* balancing and effectively isolate this Court on a jurisprudential island where virtually no court has gone before, VPC contends that the Pre-Filled Application Prohibition does not involve the mechanics of the electoral process, but instead entails the direct regulation of communication among private parties who are advocating for political change and more voting by mail. Br. at 32. VPC has mischaracterized the purpose and effect of this election integrity statute. The law merely regulates what information may be included on an advance voting ballot application when that application is mailed, unsolicited, to a voter from a third-party. This facilitates more efficient election administration, ensures that the information on the application is correct, and minimizes voters' confusion and frustration as to why they received a prefilled – and occasionally inaccurately pre-filled – application from a third-party not affiliated with their county election office. This, in turn, enhances confidence in the electoral process and minimizes the possibility of voter fraud when an application is mailed to an address where a voter

no longer lives.  In short, the law regulates what information may be included on an application to obtain a ballot, an essential part of the mechanics of the electoral process; it does *not* regulate speech.  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (distinguishing between laws regulating election mechanics and pure speech); *see also Burdick*, 504 U.S. at 433 (law that "governs . . . the voting process itself" is a quintessential election law); *VoteAmerica*, 2022 WL 2357395, at *13 (law prohibiting pre-filling of absentee ballot applications is best "described as a regulation that governs the mechanics of an election process").

Furthermore, the State's interests in adopting the Pre-Filled Application Prohibition are substantial, outweighing any minor inconveniences that Plaintiffs may experience, particularly when subjected (as they must be) to a highly deferential rational basis review.  *See Burdick*, 504 U.S. at 434.  The proliferation of pre-filled advance voting ballot applications in the 2020 General Election triggered substantial confusion, anger, and frustration among the electorate, diminished public confidence in the electoral process, had a significantly negative impact on the efficiency of election administration, and pushed the limits of the State's anti-fraud safeguards.  A big part of the problem was that the third-party-pre-filled applications sent to voters often contained erroneous information.  DSOAF ¶¶ 7-27.  (Contrary to VPC's misrepresentation of the record, Br. at 36-37, the problem was *not* confined to merely duplicate applications.)  Not only were confused and angry voters inundating county election officials with complaints on the issue,[2] but VPC itself was concerned enough with the faulty data it had received from Catalist (and used to pre-populate the applications sent to targeted voters) that it decided on its own to stop pre-filling the applications and began sending out blank applications for a period of time.  DSOAF ¶¶ 8-9.  It is hard to see

---

[2] For a discussion of why these voters' statements were not hearsay, *see* Defs.' MSJ (Dkt. 151) at 41 n.5.

how one can legitimately criticize the State for seeking to mitigate an issue that VPC itself recognized as a serious dilemma.

VPC's farfetched advocacy of a "narrowly tailored" standard (Br. at 37-43) falls flat.  To begin with, there is no core political speech (or any expressive conduct at all, for that matter) at play with the Pre-Filled Application Prohibition.  But even if there were, narrow tailoring simply requires that the law "not unnecessarily circumscribe protected expression." *Republican Party of Minnesota v. White*, 536 U.S. 765, 775 (2002).  If a "content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill v. Colorado*, 530 U.S. 703, 726 (2000).  In that instance, the test is satisfied if the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989).  The Prefilled Prohibition meets that test.  Rather than completely prohibiting third parties from distributing advance voting ballot applications, or prohibiting third party assistance in pre-filling such applications, Kansas acted narrowly to address the specific problem it saw: third-party, unsolicited pre-filled applications.

While VPC seeks to declare the related problem of duplicate applications irrelevant and unconnected to the Pre-Filled Application Prohibition, the opposite is true.  As Andrew Howell and Debbie Cox noted, many voters submitted duplicate applications to county election offices because, after receiving pre-filled applications, they believed that they were required to return them even if they had already submitted another one.  DSOAF ¶ 44.  And VPC caused large numbers of duplicate applications to be submitted.  While the use of mail ballots was clearly higher in 2020 than in previous years, the staggering onslaught of duplicate applications submitted to county elections was exponentially higher than the growth in advance voting.  In Shawnee and Ford Counties alone, thousands of confused voters told election officials that they thought the pre-filled

applications had come from the county election office and had to be returned, even if the voter had already submitted another application during the election cycle. *Id.* One voter in Shawnee County submitted *seven* separate applications and another submitted *nine*, each of which, of course, had to be carefully reviewed by election officials. DSOAF ¶¶ 43, 49-50. The problems were simply unprecedented.

Meanwhile, county election officials were forced to expend large amounts of time dealing with voter complaints, processing inaccurate and duplicate applications, undertaking the necessary cure processes to ensure that voters who submitted inaccurate and duplicate applications were given an opportunity to correct any errors and thus receive (and vote) an advance ballot. All of this was occurring at the same time that election officials were having to perform the myriad other tasks that go along with conducting a major federal election. The end result was chaos that greatly taxed the time and resources of already short-staffed and overworked county election offices. The trust and confidence that election officials had worked so hard to build up with their constituencies also began to erode, as voters – falsely believing the materials from VPC had come from the county – accused these officials of incompetency for sending out applications riddled with errors.

The problem was not limited to Kansas; VPC's activities wreaked havoc with election offices in many other states, evidenced by the written complaints that VPC received from officials in Virginia, Iowa, Wisconsin, and North Carolina. DSOAF ¶ 36. This is critical because a state is not restricted to demonstrating harms only within its own borders in justifying the kind of legislative enactments at issue here. *See Brnovich*, 141 S. Ct. at 2348 (upholding Arizona's ballot collection restrictions despite "Arizona ha[ving] the good fortune to avoid" fraud, and referencing fraud from proscribed activity in North Carolina); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 194-95 (2008) (upholding Indiana voter ID law even though "[t]he record contained no evidence of any such fraud actually occurring in Indiana at any time in its history," but noting that

"flagrant examples of such fraud in other parts of the country have been documented throughout this Nation's history"); *Burson*, 504 U.S. at 208-09 (upholding dismissal of facial attack on Tennessee law prohibiting solicitation of voting and campaign materials within 100 feet of polling place despite the State producing no evidence of the necessity of that boundary, and noting that the Court "never has held a State to the burden of demonstrating empirically the objective effects on political stability that are produced by the voting regulation in question").

The State also has an interest in avoiding potential fraud. *See Brnovich*, 141 S. Ct. at 2340. The risk of voter fraud is particularly acute with mail-in voting. *See, e.g., Crawford*, 553 U.S. at 195-96; *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 239 (5th Cir. 2020); Comm'n on Fed. Elections Reform ("Baker-Carter Commission"), *Bldg. Confidence in U.S. Elections* 46 (Sept. 2005) ("Absentee ballots remain the largest source of potential voter fraud."). While Kansas appears to have avoided any systemic fraud in its recent elections, the surge of inaccurate and duplicate pre-filled advance voting ballot applications in 2020 taxed the ability of overburdened county election offices to timely and efficiently process such applications, which also necessarily increased the opportunity for mistakes to be made both in connection with advance voting ballot applications and election administration in general. The idea that election-related criminal laws currently on the books represent a baseline above which a legislature cannot go without justifying to a federal court why such greater sanction is necessary is at odds with the separation of powers among the coordinate branches.

The restrictions imposed by the Pre-Filled Application Prohibition are virtually identical to those in *VoteAmerica*, where the court rejected the same constitutional claims asserted here. *See* 2022 WL 2357395, at *12-18. The statue now before this Court is also far less rigorous than the outright bar on third-party distribution of absentee ballots at play in *Lichtenstein*. Yet that court,

in upholding a more restrictive Tennessee law against constitutional claims similar to those here,

recognized the State's strong regulatory interests that apply with equal or greater force in Kansas:

> Among other things, there is a rational basis to believe that by prohibiting everyone (other than election commission employees) from distributing absentee-ballot applications, the State can: (a) increase the integrity of the absentee ballot process by, among other things, better ensuring that an absentee-ballot application is being submitted by someone who truly wants to submit the application, that the applicant does not miss out on voting absentee (and perhaps, as a direct result, voting at all) due to misleading addressing or other information provided by a distributor, and that the applicant is not mistakenly provided by election officials with multiple absentee ballots; and (b) decrease the risk of voter confusion arising from, among other things, voters' receipt of (i) applications mistakenly believed by some recipients to be from election officials, (ii) applications from multiple distributors, or (iii) incorrect addressing or other information from the distributor regarding absentee voting.

*Lichtenstein*, 489 F. Supp.3d at 783-84.

Not only is there no narrow tailoring requirement under the *Anderson-Burdick* framework,

but as the Supreme Court recently explained, a State's "entire system of voting" – not just the

impact on a small segment of the electorate – must be examined "when assessing the burden

imposed by a challenged provision." *Brnovich*, 141 S. Ct. at 2340.  Under those circumstances,

VPC can establish no entitlement to relief.

## III.   The Pre-Filled Application Prohibition Does Not Contravene VPC's Freedom of Association Rights

VPC also claims (Br. at 29-31) that the Pre-Filled Application Prohibition abridges its First

Amendment freedom of association.  Little appears to be left of this cause of action, however, in

the wake of the parties' Stipulation.  *See* Dkt. 73.  Mr. Lopach, in fact, conceded that K.S.A. 25-

1122(k)(2) does not constrain VPC from banding together with other persons or organizations to

engage potential voters and encourage the use of advance mail voting.  DSOAF ¶ 56.

VPC argues that it has identified specific voters with whom it wants to band together and

tout the ease and virtues of voting early via mail.  Br. at 30.  VPC further notes that it tracks which

targeted voters use its pre-paid envelopes to submit advance voting ballot applications to county election offices so that it can assess the effectiveness of the communication and somehow "build a relationship" with that voter.  *Id.*  But these theories fail on both the facts and the law.

Freedom of association protects "joining in a common endeavor" or engaging in "collective effort on behalf of shared goals."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 622 (1984).  It does not protect connections between people who "are not members of any organized association," are "strangers to one another," and do not come together to "take positions on public questions."  *Dallas v. Stanglin*, 490 U.S. 19, 24-25 (1989).

Mailing pre-populated advance voting ballot applications to voters with whom VPC has no connection does not implicate the freedom of association.  It is a unilateral act that can be ignored by the would-be associate.  The recipients are not members of any organization or otherwise joined in a common endeavor or collective effort on behalf of shared goals, but are strangers who simply receive similar mass-mailers.  Some complete the application in the hope of electing a particular candidate, some complete it in the hope of electing that candidate's opponent, some complete it and never vote, and some ignore it altogether.  Moreover, unlike a referendum or initiative petition that requires joint effort, "applications are individual, not associational, and may be successfully submitted without the aid of another."  *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 898 n.13 (5th Cir. 2012).  If these sorts of bare communications constituted First Amendment association, then most of modern civilization would be immune from regulation.  The court in *VoteAmerica* rejected this same cause of action asserted by these same Plaintiffs involving virtually the same statute.  *VoteAmerica*, 2022 WL 2357395, at *10.  This Court should reach the identical result.

## IV.    VPC's Overbreadth Claim Has No Merit

VPC additionally claims that the Pre-Filled Application Prohibition is unconstitutionally overbroad.  It raises both facial and as-applied attacks on the statute.  Br. at 33-34.  VPC argues that the legitimate applications of the statute are hypothetical or rare, particularly because, in pre-populating the advance voting ballot applications it sends to voters, VPC "us[es] reliable data from specialized vendors hired to professionally manage and maintain voter information and culls its lists from with the goal of keeping the information accurate and current."  Br. at 33.  This is rich.

First, the evidence produced in discovery revealed that, in pre-filling its applications, VPC used voter data that its vendor (Catalist) had obtained from the Secretary of State's Office *at least 4-6 months* before those applications were mailed to and received by voters.  DSOAF ¶ 3-4, 6, 12.  As Ken Block pointed out, this meant that VPC failed to remove many hundreds of voters whose registrations had been cancelled (as a result of change of residency, criminal conviction, death, etc.) prior to the mailings.  *Id.* at ¶¶ 14-19.  VPC's own rebuttal expert confirmed that VPC was well aware of the often stale data on its mailers, yet decided it was not worth the trouble to update the information to ensure that the pre-filled applications reflected only the latest and most accurate data possible.  *See* Ex. MM at 147:20-148:18.

Second, VPC discovered, in the wake of its first two waves of mailings to voters for the 2020 General Election that approximately 3% of the pre-filled applications it had sent to voters contained an erroneous middle initial (i.e., an initial that did not match the data in the states' voter files), and approximately 5% of the pre-filled applications contained an erroneous suffix (i.e., a suffix that did not match the data in the states' voters files).  DSOAF ¶ 8.  Following this discovery, VPC was so concerned about the accuracy of the voter data that it had received from Catalist that it send blank advance voting ballot applications to Kansas voters in connection with its third and fourth waves of mailers.  *Id.* at ¶ 9.

Third, the adverse impact that pre-filled applications had on both voters and county election officials was substantial. DSOAF ¶¶ 19-53. Even if, as VPC insists, there were occasions when a pre-filled application might have some beneficial effect, the Kansas Legislature was certainly well within its authority to address and mitigate the concerns expressed by voters and county election officials alike.

In any event, VPC's overbreadth cause of action falls flat on the law. When making an overbreadth claim pursuant to the First Amendment, the challenger must show that the statute in question "punishes a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2004); *see also United States v. Williams*, 553 U.S. 285, 292 (2008) ("In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial,* not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."). In other words, the mere fact that *some* impermissible applications of a law may be conceivable does not render that law unconstitutionally overbroad; there must be a realistic danger that the law will *significantly* compromise recognized First Amendment protections. This is particularly true where, as is the case here, *conduct* and not merely speech is involved. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The Court examines both the text of the law and the facts on the ground when undertaking this analysis. *Faustin v. City & Cty. of Denver, Colo.*, 423 F.3d 1192, 1199 (10th Cir. 2005) (citing *Hicks*, 539 U.S. at 122).

The overbreadth doctrine is "strong medicine" and thus must be applied "with hesitation, and then only as a last resort." *New York v. Ferber*, 458 U.S. 747, 769 (1982). Thus, if a statute is readily susceptible to a narrowing construction that will remedy any constitutional infirmity, the statute will be upheld. *Va. v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988). To the extent a statute is not readily susceptible to a narrowing construction, if the unconstitutional language is

severable from the remainder of the statute, "that which is constitutional may stand while that which is unconstitutional will be rejected." *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 502 (1985) (quotations omitted). Moreover, even if a law touches on political speech protected by the First Amendment, declaring a statute invalid may not be appropriate in light of the State's interests. "[T]here comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law – particularly a law that reflects legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Faustin*, 423 F.3d at 1199 (quoting *Hicks*, 539 U.S. at 119).

A.    *The Pre-Filled Application Prohibition is Not Overbroad as Applied to VPC's Activities*

When considering an as-applied overbreadth challenge, courts recognize that a statute in question may be constitutional in many of its applications but not as applied to the plaintiff and his/her applicable circumstances. *See N.M. Youth Organized v. Herrera*, 611 F.3d 669, 677 n.5 (10th Cir. 2010). "A successful as-applied challenge is, thus, a necessary, but not sufficient, ingredient to a successful facial challenge." *United States v. Streett*, 434 F. Supp. 3d 1125, 1171–72 (D.N.M. 2020).

VPC alleges that its ability to encourage Kansans to engage in the democratic process is burdened because it will not be able to include a pre-filled advance voting ballot application in its mailers. But its CEO, Mr. Lopach, acknowledged that, other than not being allowed to insert a voter's name and address on the ballot application, nothing in the Kansas law restricts VPC from encouraging individuals to participate in the democratic process, instructing them how to obtain or vote an advance ballot, encouraging them to do so, or communicating any other message in the mailers sent to targeted voters. There is no bar whatsoever to VPC's ability to send mailers expressing any message it wishes to convey about the importance of voting in general or voting by mail via an advance-ballot, how to vote in person or by mail, or where to access an advance

mail voting application.  VPC can even include a blank application in the mailing.  There are thus an infinite number of ways for VPC to communicate its message.  The only thing being restricted is not speech at all; it is *non-expressive conduct* – i.e., pre-filling the advance voting ballot applications that VPC sends to Kansans who did not request one.

B.      *The Pre-Filled Application Prohibition is Not Facially Overbroad*

"Facial challenges based on overbreadth are disfavored," *Clark v. Schmidt*, 493 F. Supp.3d 1018, 1033 (D. Kan. 2020), and the Court must begin its analysis by presuming that the statute is constitutional.  *Id.*  In this case, VPC's inability to satisfy the standards necessary to establish an as-applied challenge is also fatal to its facial overbreadth challenge.  As noted, the challenged statute allows for an unlimited array of expressive conduct and core political speech.  There is no prohibition at all on communicating with voters about anything having to do with voting (or any other subject, for that matter).  There is, in short, no impairment (let alone a substantial impairment) of any constitutionally-protected activity.  "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)."  *Hicks*, 539 U.S. at 124.  Nor has VPC come close to demonstrating that K.S.A. 25-1122(k)(2) will have a chilling effect on the First Amendment rights of parties not before the court.  *See West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1367 (10th Cir. 2000) (requiring the plaintiff to show the existence of a "realistic danger" that will "significantly compromise recognized First Amendment protections of parties not before the court.").  In sum, VPC's overbreadth claim has no merit.

**V. – Conclusion**

For all the reasons stated herein, Defendants request that the Court deny Plaintiffs' motion for summary judgment.

Respectfully Submitted,

By /s/ Bradley J. Schlozman
Bradley J. Schlozman (KS Bar #17621)
Scott R. Schillings (KS Bar #16150)
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, Kansas 67206
Telephone: (316) 267-2000
Facsimile: (316) 630-8466
Email: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of November 2022, I electronically filed the foregoing Defendants' Response to Plaintiffs' Motion for Summary Judgment with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By /s/ Bradley J. Schlozman

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

VOTEAMERICA and
VOTER PARTICIPATION CENTER,

      *Plaintiffs,*

vs.

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
DEREK SCHMIDT, in his official capacity as
Attorney General of the State of Kansas; and
STEPHEN M. HOWE, in his official capacity as
District Attorney of Johnson County,

      *Defendants.*

C.A. NO. 2:21-cv-02253-KHV-GEB

## PLAINTIFF VOTER PARTICIPATION CENTER'S OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF UNCONTROVERTED
FACTS ........................................................................................................................................ 4

PLAINTIFF VPC'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS ......... 75

LEGAL STANDARD ................................................................................................................. 83

ARGUMENT .............................................................................................................................. 83

I.       THE PERSONALIZED APPLICATION PROHIBITION RESTRICTS
         PLAINTIFF'S SPEECH, EXPRESSIVE CONDUCT, AND ASSOCIATION ............... 83

         A.       Personalizing Advance Mail Ballot Applications and Distributing Them to
                  VPC's Target Voters Is Protected First Amendment Activity ............................. 84

                  1.       Distributing Personalized Applications Is Core Political Speech ............. 84
                  2.       Distributing Personalized Advance Mail Ballot Applications Is
                           Expressive Conduct ..................................................................................... 88
                  3.       Distributing Personalized Advance Mail Ballot Applications Is
                           Protected Associational Activity ................................................................ 90

         B.       Defendants Fail to Distinguish the Precedent on which the Court Relied in
                  Granting Plaintiff's Motion for a Preliminary Injunction .................................... 91

         C.       Defendants' Argument That the Personalized Application Prohibition Does
                  Not Restrict First Amendment Activity Because Other Methods of
                  Communication Remain Available to VPC Is Contrary to Settled Law .............. 94

II.      THE PERSONALIZED APPLICATION PROHIBITION IS SUBJECT TO STRICT
         SCRUTINY ..................................................................................................................... 96

         A.       Strict Scrutiny Applies ........................................................................................ 96

                  1.       The Prohibition Abridges Plaintiff's Core Political Speech ..................... 96
                  2.       The Prohibition Is Content- and Viewpoint-Discriminatory ................... 98
                  3.       The Prohibition Infringes on Plaintiff's Associational Rights ................ 100
                  4.       The Prohibition is Unconstitutionally Overbroad .................................... 101

         B.       *Anderson-Burdick* Does Not Apply ................................................................... 103

Appellants' Appendix - Vol. II - 344

C.      Rational Basis Review Does Not Apply ............................................................... 104

III.   DEFENDANTS CANNOT SHOW THAT THE PROHIBITION SERVES ANY
        STATE INTEREST ...................................................................................................... 105

CONCLUSION ......................................................................................................................... 109

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACORN v. City of Tulsa*,
  835 F.2d 735 (10th Cir. 1987) ..................................................................................... 86

*Adams v. Am. Guarantee & Liab. Ins. Co.*,
  233 F.3d 1242 (10th Cir. 2000) ............................................................................. 81, 92

*Am. Ass'n of People with Disabilities v. Herrera*,
  690 F. Supp. 2d 1183 (D.N.M. 2010) ......................................................................... 90

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ............................................................................................ 101, 102

*Animal Legal Defense Fund v. Schmidt*,
  434 F. Supp. 3d 974 (D. Kan. 2020) ........................................................................... 85

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ..................................................................................................... 85

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000) ..................................................................................................... 98

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ................................................................................................... 100

*Buckley v. Am. Const. L. Found., Inc.*,
  525 U.S. 182 (1999) ............................................................................... 82, 85, 97, 102

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ................................................................................................... 101

*Burson v. Freeman*,
  504 U.S. 191 (1992) ..................................................................................................... 96

*Cal. Democratic Party v. Jones*,
  530 U.S. 567 (2000) ..................................................................................................... 92

*Chandler v. City of Arvada*,
  292 F.3d 1236 (10th Cir. 2002) ............................................................................. 90, 95

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  142 S. Ct. 1464 (2022) ........................................................................................... 96, 97

iii

*City of Dallas v. Stanglin*,
  490 U.S. 19 (1989) ............................................................................................ 89

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984) .......................................................................................... 88

*Democracy N.C. v. N.C. Board of Elections*,
  476 F. Supp. 3d at 224.................................................................................. 91, 92

*Democracy N.C. v. N.C. State Bd. of Elections*,
  476 F. Supp. 3d 158 (M.D.N.C. 2020)............................................................... 90

*Doe v. Reed*,
  561 US. 186 (2010) ........................................................................................... 86

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
  472 U.S. 749 (1985) .......................................................................................... 85

*Furr v. Ridgewood Surgery & Endoscopy Ctr., LLC*,
  192 F. Supp. 3d 1230 (D. Kan. 2016) ................................................................ 81

*Harmon v. City of Norman*,
  981 F.3d 1141 (10th Cir. 2020).......................................................................... 99

*Healy v. James*,
  408 U.S. 169 (1972) .......................................................................................... 89

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) .............................................................................................. 84

*Hurley v. Irish–Am., Gay, Lesbian & Bisexual Grp. Of Boston*,
  515 U.S. 557 (1995) .......................................................................................... 87

*Kusper v. Pontikes*,
  414 U.S. 51 (1973) ............................................................................................ 98

*League of Women Voters of Florida v. Cobb*,
  447 F. Supp. 2d 1314 (S.D. Fla. 2006)............................................................... 92

*League of Women Voters of Tenn. v. Hargett*,
  400 F. Supp. 3d 706 (M.D. Tenn. 2019) ....................................................... 84, 90

*League of Women Voters v. Browning*,
  575 F. Supp. 2d 1298 (S.D. Fla. 2008)............................................................... 90

*Lichtenstein v. Hargett*,
  489 F. Supp. 3d 742 (M.D. Tenn. 2020) ..................................................... 84, 106

iv

*McInnis v. Fairfield Cmtys., Inc.*,
    458 F.3d 1129 (10th Cir. 2006) .......................................................................................... 104

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ..................................................................................................... 95, 101

*Meyer v. Grant*,
    486 U.S. 414 (1988) ................................................................................................... passim

*NAACP v. Button*,
    371 U.S. 415 (1963) ....................................................................................................... 89, 98

*NetChoice, LLC v. Att'y Gen., Fla.*,
    34 F.4th 1196 (11th Cir. 2022) ............................................................................................ 87

*Priorities USA v. Nessel*,
    2:19-cv-13341, 2022 WL 4272299 (E.D. Mich. Sept. 15, 2022) ("*Nessel III*") ....................... 90

*Priorities USA v. Nessel*,
    462 F. Supp. 3d 792 (E.D. Mich. 2020) ("*Nessel I*") ................................................................. 90

*Priorities USA v. Nessel*,
    487 F. Supp. 3d 599 (E.D. Mich 2020) ("*Nessel II*") ............................................................... 90

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ............................................................................................................ 97

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ............................................................................................................ 84

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) .............................................................................................................. 88

*Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980) ....................................................................................................... 82, 83

*Sickles v. Campbell County, Kentucky*,
    501 F.3d 726 (6th Cir. 2007) ............................................................................................... 84

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................................................................ 84

*Spence v. Wash.*,
    418 U.S. 405 (1974) ............................................................................................................ 88

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997) ............................................................................................................ 85

v

*United States v. Joe*,
  8 F.3d 1488 (10th Cir. 1993) ................................................................................. 104

*United States v. Stevens*,
  559 U.S. 460 (2010) ............................................................................................... 99

*Virginia v. Hicks*,
  539 U.S. 113 (2004) ............................................................................................... 99

*VoteAmerica v. Raffensperger*,
  No. 1:21-cv-01390-JPB, 2022 WL 2357395 (N.D. Ga. June 30, 2022) ........................... 91, 106

*VoteAmerica v. Schwab*,
  576 F. Supp. 3d 862 (D. Kan. 2021) .................................................................. passim

*Voting for America v. Steen*,
  732 F.3d 382 (5th Cir. 2013) ........................................................................ 91, 92, 93

*Yes On Term Limits v. Savage*,
  550 F.3d 1023 (10th Cir. 2008) .................................................................... 90, 96, 102

**Statutes**

Fed. R. Civ. P. 56(a) ...................................................................................................... 81

Federal Rule of Evidence 803(3) ................................................................................. 104

**PRELIMINARY STATEMENT**

Defendants fail to establish they are entitled to summary judgment on each of Plaintiff VPC's three claims that the Personalized Application Prohibition (I) abridges VPC's First Amendment freedom of speech; (II) abridges VPC's First Amendment freedom of association; and (III) is unconstitutionally overbroad.

The Court previously held after the preliminary injunction hearing on September 8, 2021, that Defendants failed to substantiate any legitimate state interests supporting Kansas House Bill 2332's Personalized Application Prohibition and the Court preliminarily enjoined the provision for violating First Amendment rights. Nearly a year later, Defendants have failed to develop any meaningfully different evidence than was before this Court last year.

On February 25, 2022, this Court entered a stipulated order for permanent injunction and declaratory judgment in Plaintiffs' favor on Counts I, II, and III, thereby permanently enjoining the enforcement of the Out-of-State Distributor Ban as violative of Plaintiffs' First Amendment rights. After months of discovery, the parties cross-moved for summary judgment. But Defendants are stuck in the past. Throughout their moving brief, Defendants attempt to rehash the same arguments this Court has already rejected. And they emphasize purported issues from voters' receipt and/or submission of multiple advance mail ballot applications, on which the Personalized Application Prohibition has no bearing. In numerous ways, Defendants fail to grapple with the factual record, the Court's prior ruling in Plaintiff's favor, and the live issues actually presented in this case.

*First*, rather than argue for their entitlement to judgment as a matter of law on undisputed *facts*, Defendants focus their brief on re-litigating the same legal issues this Court decided at the preliminary injunction phase. They argue that Plaintiff's personalization of applications is not speech, but this Court has already concluded that it is. Defendants attempt to distinguish cases

1

Case 2:21-cv-02253-KHV   Document 156   Filed 11/04/22   Page 9 of 118

Appellate Case: 25-3138   Document: 24-2   Date Filed: 11/07/2025   Page: 147

cited by the Court in reaching that opinion, but they offer no compelling reason—whether legal or factual—for this Court to depart from its prior ruling.  The issue before this Court is now narrower, limited only to the Personalized Application Prohibition, but it is not different.  As explained below, in Plaintiff's motion for summary judgment (ECF No. 154), and by this Court, VPC's personalization of advance mail voting applications is core political speech, expressive conduct, and associational activity.  Just as at the preliminary injunction phase, Plaintiff's mailers with personalized applications are unified packages of core political speech.  Plaintiff's personalization itself is speech that conveys a message to particular underrepresented voters: *you*—the carefully selected recipient of this mailer—can and should vote by mail, and here is how.  And Plaintiff's distribution of personalized applications is also expressive conduct and protected associational activity.  However one describes VPC's activity, it is protected under the First Amendment.

*Second*, the Personalized Application Prohibition should be reviewed under a strict scrutiny standard.  Not only does the Personalized Application Prohibition abridge Plaintiff's activity that requires utmost First Amendment protection, but it is also impermissible content- and viewpoint-based discrimination and constitutionally overbroad.  Contrary to Defendants' argument, the *Anderson-Burdick* standard applied to general ballot-access cases is not the appropriate framework through which to consider restrictions on speech among private parties advocating for greater participation in the political process.

*Third*, even under *Anderson-Burdick*, Defendants' arguments fail.  Despite the undisputed fact that the Out-of-State Distributor Ban is no longer at issue, Defendants double down on their argument that voters receiving *duplicate* advance mail ballot applications harm Defendants' purported state interests.  But duplicate applications are irrelevant to the Personalized Application Prohibition at issue here, which places no limitation on the *number* of advance mail ballot

2

Appellants' Appendix - Vol. II - 351

applications a third-party entity like VPC may distribute to Kansas voters.  Defendants paper over this conceptual gap by consistently conflating perceived issues from *duplicate* applications and *personalized* applications.  No less than six times throughout their brief, Defendants use the joint phrase "inaccurate and duplicate" advance voting ballot applications, and in numerous other instances they cite the record concerning duplicate applications to purportedly support a proposition about their personalization.  But these are two entirely distinct concepts, and only the latter has any bearing on the issues remaining in this case.  Defendants attempt to lump the concepts together—without offering any cogent reason to do so—because the record is clear that no compelling state interests justify the Personalized Application Prohibition.  At the least, Defendants fail to show the absence of genuine disputes of material facts specific to VPC's personalization of applications as required for summary judgment in favor of Defendants.

Defendants' arguments have already failed.  Rather than muster new evidence to support their assertions, Defendants opt for repetition and conflation.  The Court should again reject Defendants' contentions, which fail to establish that they are entitled to summary judgment on any of Plaintiff's three claims.  Instead, the Court should grant summary judgment for Plaintiff.

3

### PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS[1]

### PLAINTIFF'S GENERAL OBJECTIONS IN RESPONDING TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS

1.      Plaintiff objects to Defendants' submission of unsubstantiated facts that are not supported by a citation.

2.      Plaintiff objects to any legal arguments and/or conclusions of law in Defendants' statements.

3.      Evidence cited by Defendants in support or in contradiction of any particular fact or proposition should not be construed as the only evidence supporting or contradicting the fact or proposition in question, and Plaintiff specifically reserves the right to provide additional evidence as is necessary and appropriate.

4.      The phrase "uncontroverted" shall not be construed as a concession by Plaintiff that a statement is material, complete, supports the proposition which is cited, admissible or otherwise relevant.

5.      Plaintiff reserves its right to challenge the admissibility of any statement and cited materials in future proceedings, including at trial.

6.      The phrase "uncontroverted" is used solely in the context of Defendants' motion for summary judgment and Plaintiff reserves all other objections including, but not limited to, its

---

[1]      For ease of reference and in accordance with Rule 56.1(b)(1) of the Rules of Practice of the United States District Court for the District of Kansas, Plaintiff responded to each of Defendants' Statements of Uncontroverted Facts by transposing Defendants' enumerated paragraphs in Defendants' Memorandum of Law in Support of the Motion for Summary Judgment and supplied Plaintiff's response immediately below the aforesaid paragraph. *See* ECF No. 142 at 10.  Plaintiff removed Defendants' headings from this Response because they are not part of separately numbered paragraphs which require a response.  Plaintiff disputes Defendants' headings and further notes that they are largely argumentative as opposed to organizational.

right to object to or contest each of Defendants' assertions of fact at the appropriate time, including the right to challenge such assertions of fact at trial.

7.      Plaintiff objects to Defendants statements of purported material facts to the extent such purported issues of material fact are incapable of admission as evidence and, therefore, not appropriately before the Court on Defendants' motion for summary judgment.

8.      Plaintiff does not concede that the content of Defendants' statements concern material facts for this case.

9.      Because Defendants' section headings are not statements of uncontroverted facts without a factual citation, no response is required.

10.     In furnishing responses, Plaintiff does not agree or concede that the content of Defendants' statements concern material facts.

11.     Plaintiff objects to the extent Defendants rely on unsworn expert reports in support of its purported statements of material fact as unsworn expert reports may not be considered as evidence in support of a motion for summary judgment. *Stonebarger v. Union Pac. R.R. Co.*, 76 F. Supp. 3d 1228, 1235 (D. Kan. 2015) ("This court has repeatedly emphasized that, when tested at summary judgment, the proponent of expert testimony may not simply present the unsworn report of the proposed expert.").

12.     Plaintiff objects to the extent Defendants' purported statements of material fact are not relevant or material to the issues raised by their Motion for Summary Judgment as certain facts are not referenced in Defendants' brief in support of their Motion for Partial Summary Judgment or relate to matters for which Defendants do not seek summary judgment. *McCormick v. City of Lawrence*, 2008 U.S. Dist. LEXIS 32347, at *12-13 n.1 (D. Kan. Apr. 18, 2008) ("With respect to those aspects of defendant[]'s Statement of Uncontroverted Facts that are not included in the court's

5

Statement of Facts, the court sustains plaintiff's objections and excludes them from the summary judgment record largely because they are either not supported by the evidence of record cited by defendant and/or defendant [] has not shown them to be relevant to the particular claim at issue.").

**RESPONSES**

**DEFENDANTS' UNCONTROVERTED FACT ¶ 1:**

1.      Plaintiff VPC is a 501(c)(3) organization that, *inter alia*, provides early voting and vote-by-mail resources and information – including pre-filled advance voting ballot applications – to certain targeted groups of voters, primarily young voters, voters of color, and unmarried women.  Pretrial Order (Dkt #140) Stipulated Facts ("PTO-SF"), ¶¶ vii-viii.

**PLAINTIFF'S RESPONSE TO ¶ 1:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.  With respect to Defendants' use of "targeted groups of voters," Plaintiff Voter Participation Center ("Plaintiff" or "VPC") is a Washington, D.C.-based 501(c)(3) organization that was founded in 2003 with a mission of providing voter registration, early voting, vote by mail, and get out to vote resources to traditionally under-represented groups, including young voters, voters of color, and unmarried women.  *See* Pretrial Order, ECF No. 140, Stipulations ("Pretrial Order Stipulated Facts" or "PTO-SF") ¶¶ 2(a)(vii)-(viii).

**DEFENDANTS' UNCONTROVERTED FACT ¶ 2:**

2.      The Kansas Legislature introduced House Bill (H.B.) 2332 in February 2021 to address various election-related matters, including the solicitation by mail of advance voting ballot applications.  PTO-SF ¶¶ xvii-xviii.

**PLAINTIFF'S RESPONSE TO ¶ 2:**

This statement is not cited in Defendants' brief and therefore this legislative history of HB 2332 is immaterial.  To the extent a response is required: Uncontroverted.

6

**DEFENDANTS' UNCONTROVERTED FACT ¶ 3:**

3.      The Legislature passed the legislation, as amended, by votes of 83-38 in the House and 27-11 in the Senate, but Governor Kelly vetoed the bill on April 23, 2021.  On May 3, the Legislature overrode the governor's veto (voting 86-37 in the House and 28-12 in the Senate). PTO-SF ¶¶ xix-xxi.

**PLAINTIFF'S RESPONSE TO ¶ 3:**

This statement is not cited in Defendants' brief and therefore this legislative history of HB 2332 is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 4:**

4.      Section 3(k)(2) of H.B. 2332 (codified at K.S.A. 25-1122(k)(2)) prohibits "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot and includes an application for an advance voting ballot in such mailing" from completing (i.e., pre-filling) any portion of such application prior to mailing such application to the registered voter. This statute will be referred to as the "Pre-Filled Application Prohibition."  PTO-SF ¶ xxii.

**PLAINTIFF'S RESPONSE TO ¶ 4:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.  However, Paragraph xxii of the Pretrial Order Stipulated Facts states that the statute will be referred to as the "*Personalized* Application Prohibition."  PTO-SF ¶ 2(a)(xxii) (emphasis added).  Defendants refer to this statute as the *Pre-Filled* Application Prohibition throughout their Statement of Facts and memorandum of law in support of their motion for summary judgment.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 5:**

5.      K.S.A. 25-1122(k)(2) does not apply to persons who mail or cause to be mailed an application for an advance voting ballot with any portion completed to a registered voter where the portion of such application completed prior to mailing is completed at the request of the registered voter.  In other words, when a registered voter asks a person to mail or cause to be mailed an advance voting ballot application to such registered voter, and that person does so, that person does not "solicit[] by mail a registered voter to file an application for an advance voting ballot" as set forth in K.S.A. 25-1122(k)(1).  Stipulation (Dkt #73), at 2-3.

**PLAINTIFF'S RESPONSE TO ¶ 5:**

This statement is not cited in Defendants' brief and therefore is immaterial to Defendants' motion.  To the extent a response is required: Uncontroverted.  *See* PTO-SF ¶ 2(a)(xxiii).

**DEFENDANTS' UNCONTROVERTED FACT ¶ 6:**

6.      Section 3(*l*)(1) of HB 2332 (codified at K.S.A. 25-1122(*l*)(1)) provides that "[n]o person shall mail or cause to be mailed an application for an advance voting ballot, unless such person is a resident of this state or is otherwise domiciled in this state."  This statute will be referred to as the "Out-of-State Distributor Ban."  PTO-SF ¶ xxiv.

**PLAINTIFF'S RESPONSE TO ¶ 6:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 7:**

7.      At passage, both Sections 3(k)(2) and 3(*l*)(1) of HB 2332 were scheduled to go into effect on January 1, 2022.  PTO-SF ¶ xxv.

8

**PLAINTIFF'S RESPONSE TO ¶ 7:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 8:**

8. On June 2, 2021, Plaintiffs commenced this lawsuit, alleging that the enforcement of K.S.A. 25-1122(k)(2) and 25-1122(*l*)(1) violated their First and Fourteenth Amendment rights and breached the Constitution's Dormant Commerce Clause.  With regard to the First and Fourteenth Amendment claims, Plaintiffs alleged that the statutes violated their freedom of speech (Count I) and freedom of association (Count II) and were unconstitutionally overbroad (Count III). Compl. (Dkt #1) at 22-33.

**PLAINTIFF'S RESPONSE TO ¶ 8:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 9:**

9. In a Memorandum & Order on November 19, 2021 (and a *nunc pro tunc* Order on December 15, 2021), the Court preliminarily enjoined enforcement of Sections 3(k)(2) and 3(*l*)(1) of HB 2332.  Dkt #s 50, 61.

**PLAINTIFF'S RESPONSE TO ¶ 9:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 10:**

10. Defendants, via a Stipulation with Plaintiffs that the Court entered on February 25, 2022, agreed to a permanent injunction against the enforcement of the Out-of-State Distributor

Ban as violative of Plaintiffs' First and Fourteenth Amendment rights.  Those claims have thus been fully resolved and are no longer part of this litigation (other than Plaintiffs' request for their attorney fees as prevailing parties).  PTO-SF ¶ xxvii.  The only claims remaining in dispute pertain to the Pre-Filled Application Prohibition.  PTO-SF ¶ xxviii.

**PLAINTIFF'S RESPONSE TO ¶ 10:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 11:**

11.     The Pre-Filled Application Prohibition does not cover Plaintiff VoteAmerica's conduct because VoteAmerica only mails pre-populated advance voting ballot applications to voters who have specifically requested them via its interactive website.  As a result, VoteAmerica has not participated in any discovery in this case.  PTO-SF ¶ xxix.

**PLAINTIFF'S RESPONSE TO ¶ 11:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 12:**

12.     To vote by mail in Kansas elections, a voter must complete an advance voting ballot application and return it to the county election office in the county in which the voter is registered to vote.  PTO-SF ¶ xxx.

**PLAINTIFF'S RESPONSE TO ¶ 12:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.  However, Paragraph xxx of the Pretrial Order Stipulated Facts states that to vote by mail in Kansas elections, *generally*, a voter must complete an advance

10

voting ballot application and return it to the county election office in the county in which the voter is registered to vote.  PTO-SF ¶ 2(a)xxx.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 13:**

13.     Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the General Election and the Tuesday of the week preceding such General Election.  K.S.A. 25-1122(f)(2).  PTO-SF ¶ xxxii.

**PLAINTIFF'S RESPONSE TO ¶ 13:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 14:**

14.     Other than voters entitled to receive ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq.*, counties cannot transmit advance ballots to voters prior to the 20th day before the election for which an application has been received.  K.S.A. 25-1123(a) and 25-1220.  Thus, for all voters who properly submitted an advance voting ballot application prior to the 20th day before the election, the county election office will transmit an advance ballot to those voters on the 20th day before the election.  PTO-SF ¶ xxxiii.

**PLAINTIFF'S RESPONSE TO ¶ 14:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Controverted in part.  Uncontroverted as to the first sentence.  *See* PTO-SF ¶ 2(a)xxxiii.  Controverted as to the second sentence.  Paragraph xxxiii of the Pretrial Order Stipulated Facts cites Kansas law: "Ballots must be issued to advance voting voters within two business days of the receipt of the voter's application by the county election office starting on the

11

commencement of the 20-day period before the election. K.S.A. 25-1123(a)." *Id.* The cited source

does not speak to what a county election office "will" or will not do; it merely quotes the law.

The cited source also does not support Defendants' characterization that applications

submitted prior to the 20th day before the election "must be issued" on the 20th day before the

election. To the extent Defendants use this statement as support for the inference that, for all voters

who properly submitted an advance voting application prior to the 20th day before the election,

the county election office did, in fact, transmit an advance ballot to those voters on the 20th day

before the election, that inference cannot be drawn in Defendants' favor on summary judgment; to

the extent Defendants do not seek to draw such inference, the purported fact is irrelevant to the

matters presented by their motion.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 15:**

15.     With respect to advance voting ballot applications that are received by the county

election office on or after the 20th day before the election, the county generally must process them

within two business days of their receipt. K.S.A. 25-1123(a). PTO-SF ¶ xxxiii.

**PLAINTIFF'S RESPONSE TO ¶ 15:**

This statement is not cited in Defendants' brief and therefore is immaterial. To the extent

a response is required: Uncontroverted. Plaintiff states that the deposition testimony of Shawnee

County Election Commissioner, Mr. Howell, demonstrates that this "general" rule is not always

followed. Mr. Howell testified that if an advance mail ballot application is not cured with 48 hours,

his office will "continue to work on it. If we can't get it out the door within 48 hours, then that

means there is some other issue that needs to be dealt with. So we're going to continue trying to

12

figure out why we couldn't get it out." *See* Ex. 1 (Excerpts of the Deposition of Andrew Howell (Sept. 14, 2022) ("Howell Tr.")) at 187:7-8.[2]

**DEFENDANTS' UNCONTROVERTED FACT ¶ 16:**

16.     If an advance voting ballot application is timely submitted to the county election office, an official in such office processes the application and, if the information entered onto the application (including the signature) matches the information contained in the State's voter registration database – the Electronic Voter Information System ("ELVIS") – the county will mail the voter an advance ballot packet.  PTO-SF ¶ xxxi.

**PLAINTIFF'S RESPONSE TO ¶ 16:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Controverted in part.  It is uncontroverted that, "If an advance voting ballot application has been timely submitted to the county election office, an individual working in such office processes the application[.]"  PTO-SF ¶ 2(a)xxxi.  The cited source does not support Defendants' characterization that, "if the information entered onto the application (including the signature) matches the information contained in the State's voter registration database – the Electronic Voter Information System ("ELVIS") – the county will mail the voter an advance ballot packet."  The cited source states, "if the county accepts the application, the county will mail the voter an advance ballot packet," but it does not speak to the county's standards or criteria for acceptance.  PTO-SF ¶ 2(a)xxxi.

---

2       Numbered Exhibits refer to the exhibits to the Declaration of Mark P. Johnson in Support of Plaintiff Voter Participation Center's Opposition to Defendants' Motion for Summary Judgment (Nov. 4, 2022), filed concurrently herewith.  Lettered Exhibits refer to the exhibits to Defendants' Motion for Summary Judgment.

13

**DEFENDANTS' UNCONTROVERTED FACT ¶ 17:**

17.     If any of the required information on an advance voting ballot application does not match the information for that voter in ELVIS (e.g., name, address, driver's license number, non-driver's identification number, date of birth, political party in primary election, active registration status, signature, etc.), the county election office must attempt to contact the voter to obtain the correct information.  Kan. Admin. Reg. 7-36-7 and 7-36-9; K.S.A. 25-1122(e).  If the voter cannot be contacted, or it would be impracticable to make contact before the election, the voter will be mailed a provisional ballot.  Kan. Admin. Reg. 7-36-7(f).  PTO-SF ¶ xxxiv.

**PLAINTIFF'S RESPONSE TO ¶ 17:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Controverted in part.  Controverted because and to the extent the cited sources do not support Defendants' claim that "the county election office must attempt to contact the voter" if "any of the required information . . . does not match the information for that voter in ELVIS."  The cited sources do not state or support Defendants' characterization that the county election office must contact the voter if the name, address, date of birth, political party, or registration status on the advance voting ballot application does not match the information for that voter on the voter registration list or ELVIS.

Paragraph xxxiv of the Pretrial Order Stipulated Facts states that the county election office must do so "[i]f a received advance voting ballot application does not contain sufficient information or if the information is illegible, or there is a signature mismatch or missing signature[.]"  PTO-SF ¶ 2(a)xxxiv.  Similarly, the cited regulation states, "If the application does not contain sufficient information or if the information is illegible, the county election officer shall contact the applicant to obtain the information before election day, if practicable."  Kan. Admin.

14

Reg. 7-36-7(a).  Kan. Admin. Regs. 7-36-7 and 7-36-9 and K.S.A. 25-1122(e) also pertain to signatures and driver's license or other identification numbers on an application.

It is uncontroverted that if it is not practicable to contact the applicant before the election or if the information, signature, or photocopy provided is incomplete or inconsistent with the voter registration list, the county election officer shall issue a provisional advance voting ballot.  PTO-SF ¶ 2(a)xxxiv; Kan. Admin. Reg. 7-36-7(f).

**DEFENDANTS' UNCONTROVERTED FACT ¶ 18:**

18.     All of the information on an advance voting ballot application must precisely match the information in ELVIS in order for the county election office to process the application without having to contact the voter to cure mismatches or discrepancies.  Only the most clearly inadvertent mismatches (e.g., minor misspelling of street name, such as omitting the letter "e" in "George" in the street "George Williams Way," or signing as "Jim" despite being registered as "James") will be overlooked.  Ex. A ¶ 25; Ex. B at 35:6-40:5; 48:6-51:7.

**PLAINTIFF'S RESPONSE TO ¶ 18:**

Controverted in part.  Because Defendants' Uncontroverted Fact ¶ 18 is compound, containing two factual allegations therein, Plaintiff has bifurcated this paragraph into subparts (a) and (b).  With respect to subpart (a) containing "All of the information on an advance voting ballot application must precisely match the information in ELVIS in order for the county election office to process the application without having to contact the voter to cure mismatches or discrepancies[,]" Plaintiff's response is that this fact is uncontroverted insofar as Exhibit A ¶ 25 speaks to the steps that staff in the Shawnee County Election Office take when the information on the application does not precisely match the information in ELVIS.  See Ex. A at ¶ 25.  *See* Ex. A at ¶ 25.  The cited sources do not speak to the steps any county election office takes to process

15

applications when the information on the application *does* precisely match the information on ELVIS or whether all such applications can be processed without having to contact the voter.

With respect to subpart (b) containing "Only the most clearly inadvertent mismatches (e.g., minor misspelling of street name, such as omitting the letter "e" in "George" in the street "George Williams Way," or signing as "Jim" despite being registered as "James") will be overlooked[,]" Plaintiff's response is that this fact is uncontroverted that the inadvertent mismatches described by Defendants will be overlooked. *See* Ex. B at 38:8-22, 38:23-39:3. This fact is controverted to the extent that the cited sources do not support Defendants' characterization that these are the "only" mismatches that would be overlooked. For example, Douglas County Elections Director, Mr. Shew, testified that differing prefixes would be overlooked. *See id.* at 48:21–23.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 19:**

19.     County election officials will not send an advance ballot to a voter who submitted an application with an erroneous middle initial or suffix. Ex. B at 48:25-50:7.

**PLAINTIFF'S RESPONSE TO ¶ 19:**

This statement is not cited in Defendants' brief and therefore is immaterial. To the extent a response is required: Controverted. The cited source does not support Defendants' characterization. Mr. Shew testified that if he or someone in his office (*i.e.*, county election officials in Douglas County) received an advance ballot application where the suffix did not match, that application would enter the curative process; he did not testify his office would not ultimately send this voter an advance ballot. Ex. B at 49:2-7. Similarly, Mr. Shew testified that his office would "go look and see . . . if the middle initial doesn't match." *Id.* at 50:1-7.

In Defendants' citation for this fact, Mr. Shew did not testify as to how election officials in any of the other 104 counties in Kansas would handle applications with erroneous middle initials

16

or suffixes. To the extent Defendants use this statement as support for the inferences that if any election officials in counties other than Douglas County received an application with erroneous middle initials or suffixes, then the election officials will not send an advance ballot to the voter, or that the election officials would enter those applications into the curative process, those inferences cannot be drawn in Defendants' favor on summary judgment.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 20:**

20.     Once an advance voting ballot application has been received and processed by the county election office, the fact and date of such processing is recorded in ELVIS. The office also documents in ELVIS the date on which it transmits the regular or provisional ballot to the voter. PTO-SF ¶ xxxv.

**PLAINTIFF'S RESPONSE TO ¶ 20:**

This statement is not cited in Defendants' brief and therefore is immaterial. To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 21:**

21.     County election offices also document in ELVIS whether (and when) a voter has returned an advance ballot that was transmitted to the voter. Ex. A ¶ 23; Ex. C at 48:17-49:18.

**PLAINTIFF'S RESPONSE TO ¶ 21:**

This statement is not cited in Defendants' brief and therefore is immaterial. To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 22:**

22.     ELVIS is a dynamic system that is updated in real-time, meaning that once a county election office adds, deletes, or modifies a voter registration record, the system records that change immediately. Ex. A ¶ 10; Ex. C at 42:14-43:8.

17

**PLAINTIFF'S RESPONSE TO ¶ 22:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 23:**

23.      A list of all registered voters in Kansas can be purchased from the Secretary of State's office for a $200 fee.  Ex. C at 114:25-116:16; Ex. D.  That list comes from ELVIS and represents a snapshot in time of the State's voter file as it appears on the date that the voter registration list is generated.  Ex. C at 114:25-115:7.

**PLAINTIFF'S RESPONSE TO ¶ 23:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 24:**

24.      Any individual or organization similarly may obtain a list of all registered voters in Kansas who have submitted an advance voting ballot application that has been processed by a county election office (as of the date of the request).  This data can be purchased (or, in some counties, obtained for free) from either the Secretary of State's Office or a county election office.  Ex. C at 118:13-119:17, 121:3-124:21; Ex. B at 102:23.

**PLAINTIFF'S RESPONSE TO ¶ 24:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Controverted in part.[3]  This statement is uncontroverted except to the extent that it suggests this data may be purchase or obtained at any time.  The 30(b)(6) witness for the

---

[3]      The citation to Mr. Shew's transcript cites a line that contains a question by counsel and no response from Mr. Shew.  *See* Ex. B at 102:23.  For the purposes of responding to this statement, Plaintiff assumes the correct citation is Ex. B at 102:23–103:24.

Office of the Secretary of State, Mr. Caskey, testified that during 2020, for the first time, the Secretary of State's office provided weekly updates to certain requesters of the people who had successfully submitted an advance mail ballot application and would be mailed a ballot. Ex. C at 121:20–124:21. Mr. Shew testified that this information was only available within 20 days of the election. Ex. 2 (Excerpts of the Deposition Transcript of Jameson Shew (Sept. 15, 2022) ("Shew Tr.")) at 103:10–24.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 25:**

25.     Because ELVIS is a dynamic system, even if a third-party utilizes voter registration information obtained from ELVIS to partially pre-fill advance voting ballot applications, some information on the pre-populated application may not match the State's voter file database when a voter receives the pre-filled application if there is a lag time between the date the third-party acquires the ELVIS data and the date it mails out the pre-filled application to the voter. Ex. A ¶ 10.

**PLAINTIFF'S RESPONSE TO ¶ 25:**

This statement is not cited in Defendants' brief and therefore is immaterial. To the extent a response is required: Uncontroverted.[4]

**DEFENDANTS' UNCONTROVERTED FACT ¶ 26:**

26.     Among the reasons that voter information in ELVIS may not match the information on a voter's pre-filled advance voting ballot application (completed by someone other than the voter) is that the data in ELVIS may have been updated (e.g., change of name, change of address,

---

[4]     The cited source does not support Defendants' statement. For the purposes of responding to this statement, Plaintiff assumes that the correct citation is Ex. A ¶ 9.

19

death, or ineligibility due to criminal conviction) since the date the voter file was generated and used by a third-party to pre-fill an application (using the stale data).  Ex. A ¶ 10.

**PLAINTIFF'S RESPONSE TO ¶ 26:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Controverted in part.  Plaintiff does not controvert this statement as it applies to changes of name or address. But, for changes related to eligibility—*e.g.* death or ineligibility due to criminal conviction—Mr. Caskey testified that those changes do not immediately cause the data not to match ELVIS, but rather for the data to match to an ineligible voter.  *See* Ex. 3 (Excerpts of the Deposition of Bryan Caskey (May 24, 2022) ("Caskey Tr.")) at 83:3-91:9; 102:11-103:10.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 27:**

27.     The 2020 General Election in Kansas had record turnout (1,375,125 total votes cast, a 70.9% turnout rate) and a steep increase in advance mail voting (459,229 voted by mail).  This compared to 1,039,085 total votes cast in the 2018 General Election, which represented a 56.4% turnout rate with 152,267 votes cast by mail.  It also compared to 1,225,667 total votes cast in the 2016 General Election, which was a 67.4% turnout rate, with 173,457 votes having been cast by mail.  *See* https://sos.ks.gov/elections/elections-statistics.html.  PTO-SF ¶ xxxvi.

**PLAINTIFF'S RESPONSE TO ¶ 27:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 28:**

28.     VPC – acting through its 501(c)(4) sister organization, the Center for Voter Information ("CVI") – mailed advance voting ballot application packets to approximately 507,864

Kansas voters in connection with the 2020 General Election.  Ex. E; Ex. F at 175:6-176:24, 177:24-178:15; Ex. G at 108:7-19, 123:17-124:6.

**PLAINTIFF'S RESPONSE TO ¶ 28:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Controverted in part.  This statement is controverted to the extent it suggests that all 507,864 voters were sent application packets by VPC.  Mr. Dripps testified that Ex. E could reflect not only VPC's mailers, but "it could have also been VPC's sister organization, CVI."  Ex. F. at 176:25-177:22.  The statement is otherwise uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 29:**

29.    VPC relied on a vendor, Catalist, LLC ("Catalist"), to provide the voter registration data for the Kansas voters whom VPC targeted with advance voting ballot application packets during the 2020 General Election.  Ex. G at 92:14-93:4; Ex. F at 164:7-13; Ex. H at 3.

**PLAINTIFF'S RESPONSE TO ¶ 29:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 30:**

30.    VPC received Kansas active voter registration lists from Catalist on January 31, April 10, and September 15 of 2020.  PTO-SF ¶ xxxix.

**PLAINTIFF'S RESPONSE TO ¶ 30:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 31:**

31.     VPC CEO Lopach testified that he does not know how often Catalist requests an updated voter file from the Secretary of State's Office.  Ex. G at 104:2-105:13.

**PLAINTIFF'S RESPONSE TO ¶ 31:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 32:**

32.     VPC's advance ballot application mailers contained a cover letter, a Kansas advance voting ballot application, and a pre-paid, pre-addressed envelope that voters could use to send a completed application to the appropriate county election office.   PTO-SF ¶ xxxviii. A sample of VPC's cover letter, pre-filled advance voting ballot application, and pre-addressed envelope can be found at Exhibit I.

**PLAINTIFF'S RESPONSE TO ¶ 32:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 33:**

33.     Due to the unique nature of VPC's pre-filled applications, election officials were easily able to identify them.  Ex. A ¶ 14; Ex. B at 18:10-21:22.

**PLAINTIFF'S RESPONSE TO ¶ 33:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Controverted in part.  This statement is uncontroverted except to the extent that Defendants seek to draw the inference that more than two election officials were easily able to identify VPC's personalized applications.  Defendants' broad use of "election officials"

22

mischaracterizes the cited sources, which are limited to the experience and qualifications of the two individuals whose testimony and affidavits Defendants purport to rely on herein, Mr. Howell and Mr. Shew.  See Ex. A ¶ 14; Ex. B at 18:10-21:22.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 34:**

34.     The advance voting ballot applications that were partially pre-filled or otherwise provided by VPC to Kansas voters in connection with the 2020 General Election (a) used a unique all-caps font (to the extent they were partially pre-filled), (b) contained a unique message – "It's as Easy as 1-2-3" on the back of the applications, (c) contained yellow highlighting on certain parts of the application, and (d) contained a code on the bottom margin of the application.  A sample is available at Ex. J.

**PLAINTIFF'S RESPONSE TO ¶ 34:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 35:**

35.     VPC sent five "waves" of mailers to Kansas voters for the 2020 General Election. The dates were as follows:

PTO-SF ¶ xl.

      a.     Wave A: data uploaded on 7/6/2020, expected in homes on 8/17/2020;

      b.     Wave B: data uploaded on 7/27/2020, expected in homes on 8/26/2020;

      c.     Wave C: data uploaded on 8/10/2020, expected in homes on 9/8/2020;

      d.     Wave D: data uploaded on 8/24/2020, expected in homes on 9/16/202; and

      e.     Wave E: data uploaded on 8/24/2020, expected in homes on 9/28/2020.

23

**PLAINTIFF'S RESPONSE TO ¶ 35:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 36:**

36.    VPC only included *pre-filled* advance voting ballot applications (along with the other materials in the mailers) with Waves A, B, and E. Waves C and D included *blank* advance voting ballot applications.  Ex. F at 163:6-164:16.

**PLAINTIFF'S RESPONSE TO ¶ 36:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 37:**

37.    Although the information that Catalist (and, by extension, VPC) used to pre-fill advance voting ballot applications for voters was "based upon publicly available information" in ELVIS, Pls.' Resp. to Req. for Admis.  No. 8, (attached as Ex. K), Catalist also merged commercial data with the official State voter file in preparing the voter data it sent to VPC for use in pre-filling those applications.  Ex. F at 171:24-174:1.

**PLAINTIFF'S RESPONSE TO ¶ 37:**

Controverted in part. This statement is not cited in Defendants' brief and therefore is immaterial.  Because Defendants' Uncontroverted Fact ¶ 37 is compound, containing two factual allegations therein, Plaintiff has bifurcated this paragraph into subparts (a) and (b).  With respect to subpart (a) containing "Although the information that Catalist (and, by extension, VPC) used to pre-fill advance voting ballot applications for voters was 'based upon publicly available information' in ELVIS, Pls.' Resp.  to Req.  for Admis.  No. 8, (attached as Ex. K)," Plaintiff's

24

response is that this fact is uncontroverted, subject to the initial objections and limitations raised therein.[5]

With respect to subpart (b) containing "Catalist also merged commercial data with the official State voter file in preparing the voter data it sent to VPC for use in pre-filling those applications[,]" Plaintiff's response is that this fact is controverted in part. This statement is uncontroverted except to the extent that (i) the testimony cited to herein refers to "data vendors," and does not specifically say "Catalist," *see* Ex. F at 173:13-19; (ii) Defendants seek to have inferences drawn in their favor that VPC intentionally or routinely uses commercial data merged with the state voter file; and (iii) Defendants characterize Catalist's merging of the data to have occurred specifically in Kansas. Mr. Dripps testified that VPC's data vendors mistakenly "appended commercial data" when merging records for only two of the five waves of mail. *See id.* at 172:25–174:9. Mr. Dripps's testimony on this matter also refers to data used in states other than Kansas, and that he did not know whether or to what extent Catalist appended commercial data to the voter data in Kansas specifically. *Id.* at 169:10–170:25, 171:24 –174:1; *see also* Ex. 4 (Excerpts of the Deposition of Lionel Dripps (Aug. 30, 2022) ("Dripps Tr.")) at 79:2–80:1.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 38:**

38.     VPC Executive Vice President Lionel Dripps testified that VPC discovered, in the wake of Waves A and B, that approximately 3% of the pre-filled applications it had sent to voters

---

[5]     Plaintiff maintains its general objections in its responses to Defendants' Requests for Admission ("RFAs") and maintains its specific objections to RFA No. 8, including Plaintiff's denial of RFA No. 8 to the extent it indicates that Plaintiff will knowingly send partially filled out advance mail ballot applications to potential Kansas voters who have already submitted an application. Plaintiff does not incorporate any admission in its response to Defendants' RFA No. 8 beyond the admission that it "intends to continue sending partially filled out advance ballot applications to registered Kansas voters based upon publicly available information in the statewide voter registration file," and maintains that it otherwise denies RFA No. 8. *See* Ex. K at 10.

25

throughout the United States contained an erroneous middle initial (i.e., an initial that did not match the data in the states' voter files), and approximately 5% of the pre-filled applications contained an erroneous suffix (i.e., a suffix that did not match the data in the states' voters files).  Ex. F at 167:24-170:9.

**PLAINTIFF'S RESPONSE TO ¶ 38:**

Controverted in part.  This statement is uncontroverted except to the extent that Defendants seemingly made a typographical error and switched the estimated percentages of the testimony.  Mr. Dripps testified that approximately 5% of the records had a middle name or initial and roughly 3% of the records had a suffix that did not match the voter file.  *See* Ex. F at 169:17-170:2.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 39:**

39.     Concerned about the accuracy of the voter data that it had received from Catalist, VPC opted to send blank advance voting ballot applications to Kansas voters in connection with Waves C and D.  Ex. F at 171:1-23.

**PLAINTIFF'S RESPONSE TO ¶ 39:**

Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 40:**

40.     In its discovery responses, Plaintiffs produced a subset of the Kansas voters to whom it sent advance voting ballot applications in the 2020 General Election.  (The list contained 312,918 of the approximately 507,864 voters to whom VPC had sent applications).  Ex. L.

**PLAINTIFF'S RESPONSE TO ¶ 40:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Controverted in part.  This statement is uncontroverted except to the extent that it suggests that all 507,864 voters were sent application packets by VPC.  Mr. Dripps testified

that Ex. E (from which Plaintiff presumes Defendants are deriving "the approximately 507,864 voters to whom VPC had sent applications) could reflect not only VPC's mailers, but "it could have also been VPC's sister organization, CVI." Ex. F. at 176:25-177:22. CVI is not a plaintiff in this action.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 41:**

41. Defendants' expert witness, Ken Block, analyzed Ex. L and identified numerous errors/deficiencies in the information that VPC was using to pre-populate the advance voting ballot applications sent to Kansas voters. Ex. M.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 41:**

This statement is not cited in Defendants' brief and therefore is immaterial. To the extent a response is required: Controverted in part. The statement is uncontroverted except to the extent that it (i) is vague to the extent it references to "numerous" purported errors and (ii) suggests that Mr. Block reliably identified any "errors/deficiencies" in VPC's information. Defendants do not cite specific findings or conclusions asserted by Mr. Block, including the nature or quantity of any purported errors or deficiencies in VPC's information. This statement is limited to Mr. Block's own assessment of Exhibit L. Plaintiff does not waive or acquiesce the materiality of this purported fact beyond this motion. Generally, Plaintiff's rebuttal expert, Dr. Eitan Hersh, testified that Mr. Block's methodology is "deeply flawed" and his claims are unsupported. *See generally* Ex. 5 (Expert Rebuttal Decl. and Rept. of Dr. Eitan D. Hersh ("Hersh Rpt.")).

Plaintiff reserves the right to dispute any such specific findings or conclusions, including but not limited to their admissibility or reliability based on Mr. Block's lack of expertise, unreliable methodology, and irrelevant testimony that would not assist the fact-finder in this case. *See*

27

*generally* Memorandum of Law in Support of Plaintiff Voter Participation Center's Motion To Exclude the Testimony and Report of Kenneth J. Block ("Pl.'s Mot. to Exclude"), ECF No. 153.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 42:**

42.     Because of the 4-6 week lead time between the date that VPC sent its data to its printer for pre-filling advance voting ballot applications and the date such applications arrived in voters' mailboxes, and based on the dates that VPC received updated Kansas voter files from Catalist, *at best*, VPC was using the Kansas voter file from April 10, 2020, to pre-populate the applications sent to Kansas voters in connection with the 2020 General Election.  Ex. M ¶¶ 34-35.

**PLAINTIFF'S RESPONSE TO ¶ 42:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Uncontroverted.  Plaintiff disputes that the cited source, Ex. M ¶¶ 34-35, supports Defendants' statement.  However, this statement is supported by comparing Ex. H (when VPC received data from Catalist) with Paragraph xl of the Pretrial Order Stipulated Facts (when VPC uploaded its data for its 2020 mailer).  *See* Ex. H at 3; PTO-SF ¶ 2(a)xl.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 43:**

43.     VPC did not remove from the database it used to pre-fill advance voting ballot applications any Kansas voters whose voter registrations had been cancelled prior to mailing those individuals pre-filled advance voting ballot applications during the 2020 General Election.  Ex. N ¶ 10.

**PLAINTIFF'S RESPONSE TO ¶ 43:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Controverted.   The cited source does not support Defendants' characterization that VPC did not remove *any* cancelled voter registrations from their mailing list.

28

At most, Mr. Block reasoned that VPC "failed to properly remove voters from the VPC mailer file that Kansas election officials removed from the voter rolls after the date of the first VPC mailing." Ex. N ¶ 10.  Mr. Block did not say VPC failed to remove *all* voters or *any* voters that fall into this category.  Mr. Block did not review any material that could prove such a conclusion.  Mr. Block analyzed a list of individuals who received mailers from VPC.  *See* Ex. M ¶ 9 (describing what Mr. Block analyzed).  But this list does not and cannot show the voters that *did not* receive mailers from VPC; the list cannot prove this negative.  The validity of Mr. Block's analysis is further contested by the testimony of Plaintiff's expert Dr. Eitan Hersh.  *See generally* Ex. 5 (Hersh Rpt.).  Mr. Hersh testified that Mr. Block failed to "estimat[e] the accuracy of the VPC file relative to a benchmark such as the raw Kansas voter file contemporaneous to the period in which VPC was sending mail[.]"  *Id.* ¶ 24.  Instead, "Mr. Block uses a non-contemporaneous file and selectively cherry-picks instances where he alleges that the VPC file is inaccurate and where the state file is accurate."  *Id.*

Moreover, Mr. Block is not an expert and his testimony should be excluded.  *See generally* Pl.'s Mot. to Exclude.  Because Mr. Block is not an expert, Plaintiff disputes Defendants' reliance on his testimony for the truth of the matter asserted.

Additionally, other evidence in this case demonstrates that VPC does remove voters whose registrations were, or should have been, cancelled.  Mr. Lopach testified that VPC excludes voters from the Kansas voter registration file who passed away or changed addresses.  *See* Ex. 6 (Excerpts of the Deposition of Thomas Lopach (May 18, 2022) ("Lopach Tr.")) 33:2-34:8.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 44:**

44.     In its first wave of mailings, which VPC sent to the printer on July 6, 2020, for delivery to voters on or about August 17, 2020, 385 Kansas voters to whom VPC sent pre-filled

advance voting ballot applications had had their voter registrations cancelled prior to that date (due to death, change of residence, criminal conviction, etc.), and in many cases long before that date. Ex. N ¶ 9; Ex. O (date of voters' cancelled registration is found in Column E).

**PLAINTIFF'S RESPONSE TO ¶ 44:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Controverted in part.  Plaintiff does not dispute that this statement reflects Mr. Block's testimony; except to the extent that the reasons for voter removal are not specifically enumerated in Exhibit O, apart from a few individuals whose obituary link is listed therein.  Thus, ¶ 44's enumeration of reasons are not factually supported by the citation referenced therein. However, this paragraph of Mr. Block's testimony relies on work performed by election officials whose identities are unknown to Mr. Block and with whom he never communicated. *See* Ex. N ¶ 5 ("Kansas election officials provided data to me in a spreadsheet"); Ex. 7 (Excerpts of the Deposition of Kenneth J. Block (Sept. 13, 2022) ("Block Tr.")) at 50:14–24; 150:4–8; 157:22– 158:8; 186:14–17; 206:9–11.  Mr. Block did not oversee, supervise, or test the information indirectly provided to him, ask the officials over the phone what they did, or e-mail the officials and ask them to set forth the process they undertook.  *Id.* 60:7–62:5, 187:6–188:18, 206:12–25. This unreliable evidence is inadmissible.  *See generally* Pl.'s Mot. to Exclude.  Moreover, the record is devoid of any foundation for the document on which Mr. Block relies.  His own knowledge of its origin is based on the out-of-court oral statements of his counsel.  *See* Ex. 7 (Block Tr.) 167:15–25, 205:22–206:23.  This document is inadmissible, as is Mr. Block's reporting of its contents.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 45:**

45.      In its mailings to Kansas voters for the 2020 General Election, VPC sent out:

30

- separate mailings to 176 of the 385 voters whose voter registrations had been cancelled (and thus been removed from the Kansas voter rolls) prior to the first VPC wave mailing;
- 4 separate mailings to 99 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing;
- 3 separate mailings to 39 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing; and
- 2 separate mailings to 11 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing.

Ex. N ¶ 9; Ex. O.

**PLAINTIFF'S RESPONSE TO ¶ 45:**

This statement is not cited in Defendants' brief and therefore is immaterial. To the extent a response is required: Controverted. Plaintiff does not dispute that this statement reflects Mr. Block's testimony. However, this paragraph of Mr. Block's testimony relies on work performed by election officials whose identities are unknown to Mr. Block and with whom he never communicated. *See* Ex. N ¶ 5 ("Kansas election officials provided data to me in a spreadsheet"); Ex. 7 (Block Tr.) at 50:14–24; 150:4–8; 157:22–158:8; 186:14–17; 206:9–11. Mr. Block did not oversee, supervise, or test the information indirectly provided to him, ask the officials over the phone what they did, or e-mail the officials and ask them to set forth the process they undertook. *Id.* 60:7–62:5, 187:6–188:18, 206:12–25. This unreliable evidence is inadmissible. *See generally* Pl.'s Mot. to Exclude. Moreover, the record is devoid of any foundation for the document on which Mr. Block relies. His own knowledge of its origin is based on the out-of-court oral statements of his counsel. *See* Ex. 7 (Block Tr.) 167:15–25, 205:22–208:14. This document is inadmissible, as is Mr. Block's reporting of its contents.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 46:**

46.     In the time between when VPC sent its mailers to the printer in connection with its first wave of mailings and its final wave of mailings for the 2020 General Election, hundreds of

31

additional Kansas voters had had their voter registration cancelled yet still received a mailing from VPC due to its failure to remove such no-longer-registered voters.  Ex. N ¶¶ 10-13.

**PLAINTIFF'S RESPONSE TO ¶ 46:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent a response is required: Controverted.  Plaintiff does not dispute that this statement reflects Mr. Block's testimony, with the exception that Defendants' use of "hundreds" mischaracterizes Mr. Block's report given that specificity is attainable.  Specifically, approximately 341 voters were removed from the voter rolls by the State of Kansas election officials.  *See* Ex. N ¶¶ 10-13.

However, these paragraphs of Mr. Block's testimony rely on work performed by election officials whose identities are unknown to Mr. Block and with whom he never communicated.  *See* Ex. N ¶ 5 ("Kansas election officials provided data to me in a spreadsheet"); Ex. 7 (Block Tr.) at 50:14–24; 150:4–8; 157:22–158:8; 186:14–17; 206:9–11.  Mr. Block did not oversee, supervise, or test the information indirectly provided to him, ask the officials over the phone what they did, or e-mail the officials and ask them to set forth the process they undertook.  *Id.* 60:7–62:5, 187:6–188:17, 206:12–25.  This unreliable evidence is inadmissible.  *See generally* Pl.'s Mot. to Exclude.  Moreover, the record is devoid of any foundation for the document on which Mr. Block relies.  *See* Ex. N ¶¶ 10-13 (reporting Mr. Block's reading of Ex. O).  His own knowledge of its origin is based on the out-of-court oral statements of his counsel.  *See* Ex. 7 (Block Tr.) 167:15–25, 205:22–208:14.  This document is inadmissible, as is Mr. Block's reporting of its contents.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 47:**

47.    Mr. Block identified 23 pairs of matched records in which two different voters showed the same voter registration number, indicating that VPC had sent a pre-filled application

32

for Voter #1 to Voter #2. These individuals were properly separated in Kansas' own voter file to which VPC (and any other member of the public) had access. Ex. M ¶¶ 23-24; Ex. P.

**PLAINTIFF'S RESPONSE TO ¶ 47:**

This statement is not cited in Defendants' brief and therefore is immaterial. To the extent a response is required: Controverted. The fact that two different voters showed the same voter registration number in VPC's files does *not* indicate that VPC sent a pre-filled application for Voter #1 to Voter #2. As Dr. Hersh explained, "[i]t is not clear to me what the consequences would be of these two individuals being accidentally listed with the same 'Voter ID' in the VPC records, if that is what happened, since the 'Voter ID' number is not populated on the mail application form." Ex. 5 (Hersh Rpt.) at 14.

Mr. Block's own exhibit—and his own, express notations in the "Note" column—demonstrate that Defendants' statement is false. *See* Ex. P. Two of the twenty-three "matched" pairs reflect the "Same exact record." *Id.* at 1. There is no "Voter #2"—both entries are for the same voter. Five more of the twenty-three "matched" pairs reflect two records "for two completely different people." *Id.* at 1-3. For another thirteen pairs, it is controverted that "these individuals were properly separated in Kansas' own voter file." On the contrary, Mr. Block's notations state that eleven Voter #2s in these pairs are "Not in voter file." *Id.* at 1-3. For three more of the twenty-three pairs, there is no one with Voter #2's name listed in the voter file. *See id.* at 1, 2.

Defendants' statement is demonstrably controverted by their own evidence.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 48:**

48.     Kansas election officials identified at least 15 voters to whom VPC sent advance voting ballot applications in connection with the 2020 General Election yet whose registration status had been cancelled in ELVIS *prior to April 10, 2020* (meaning that their names would not

33

have appeared on a list of voters by anyone requesting the statewide voter file as of that date).

Ex. O.

**PLAINTIFF'S RESPONSE TO ¶ 48:**

This statement is not cited in Defendants' brief and therefore is immaterial.  To the extent

a response is required: Controverted.  Assuming that the emphasized language "prior to April 10,

2020" does not include voters who were removed on April 10, 2020 itself, then there were only

fourteen voters on VPC's mailing list supposedly cancelled prior to April 10, 2020.

The cited source is an exhibit prepared by unknown election officials with whom neither

Mr. Block nor any witness in this case has communicated.  *See* Ex. N ¶ 5 ("Kansas election

officials provided data to me in a spreadsheet"); Ex. 7 (Block Tr.) at 50:14–24; 150:4–8; 157:22–

158:8; 186:14–17; 206:9–11.   Mr. Block did not oversee, supervise, or test the information

indirectly provided to him, ask the officials over the phone what they did, or e-mail the officials

and ask them to set forth the process they undertook.  *Id.* at 60:7–62:5; 187:6–188:18, 206:12–25.

This unreliable evidence is inadmissible.  *See generally* Pl.'s Mot. to Exclude.  Moreover, the

record is devoid of any foundation for the cited source.  Mr. Block's knowledge of its origin is

based on the out-of-court oral statements of his counsel.  *See* Ex. 7 (Block Tr.) 167:15–25, 219:19–

220:2.  This document is inadmissible.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 49:**

49.     VPC's use of stale (and thus often inaccurate) voter registration data to pre-fill the

advance voting ballot applications it sent to Kansas voters imposed an extra burden on county

election officials, who had to identify the deficiencies submitted by voters and then communicate

with voters to correct the mismatched information.  Ex. M ¶ 39.

34

**PLAINTIFF'S RESPONSE TO ¶ 49:**

Controverted.  The cited source does not support Defendants' characterization that VPC's voter registration data was "often inaccurate."  Paragraph 39 of Mr. Block's report does not speak to the frequency of "VPC's sending advance ballot applications to voters who had been removed from the rolls."  *See* Ex. M ¶ 39.  Nor does Paragraph 39 describe what election officials did "to figure out what is going on if that application was mailed."  *See id.*

Additionally, as Dr. Hersh explained, "Mr. Block provides no evidence that VPC practices 'impaired the ability of … election officials to do their jobs.'"  Ex. 5 (Hersh Rpt.) at ¶ 39.  Dr. Hersh explained that Mr. Block identified only *nine* instances where voters sent election officials applications that VPC had mailed to individuals whose voter registrations had been cancelled.  *See id.*  All nine were sent to voters in Shawnee County who had passed away.  *See* Ex. M ¶ 28.  Only two of these nine applications had been personalized by VPC.  *See* Ex. 8 (Ex. VIII to Block Report); Ex. 7 (Block Tr.) 238:20–239:14, 248:14–249:10; 278:12–279:3.  And *none* of those applications actually requested an advance mail ballot.  *See* Ex. 8 (Ex. VIII to Block Report).  To the extent the two returned personalized applications "imposed an extra burden on county election officials," it was *not* to "identify the deficiencies submitted by voters and then communicate with voters to correct the mismatched information."  These voters were deceased.  And Mr. Howell, Shawnee County Election Commissioner, testified that his "office would never send a mail ballot to someone who was marked deceased in ELVIS."  Ex. 1 (Howell Tr.) at 203:20–23.

As Dr. Hersh further explained, Mr. Block made no attempt to measure the burden of VPC's efforts on election officials.  *See* Ex. 5 (Hersh Rpt.) ¶¶ 40–41.  In fact, Dr. Hersh opined that "it seems likely that the VPC methods *reduced* the burden on election officials."  *Id.* ¶ 41 (emphasis in original).

35

Exhibit VII to Mr. Block's report (attached to the Johnson Decl. at Ex. 8), a compilation of applications and one of the document relied on by the cited source for ¶ 49, is itself inadmissible because it lacks a foundation.  This compilation was provided to Mr. Block by Defendants' counsel.  *See* Ex. M ¶ 28.  Mr. Block does not know the where Defendants' counsel obtained those nine applications.  Ex. 7 (Block Tr.) at 238:20–239:2.  They were not produced by Defendants.  And Mr. Howell did not recognize Exhibit VII to Mr. Block's report and testified that he did not give Mr. Block any documents.  Ex. 1 (Howell Tr.) at 205:25–206:3, 207:13–21.  The cited source is also based on a fifteen-minute phone call between Mr. Howell and Mr. Block.  *See* Ex. 7 (Block Tr.) 283:5–8; 279:4–13.  Mr. Block admitted that he did not analyze what Mr. Howell told him; rather, he was "just relaying the information that Mr. Howell told [him] over the phone."  *Id.* at 245:21–24.  This hearsay testimony is inadmissible.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 50:**

50.     The Shawnee County Election Office received a large number of advance voting ballot applications from voters that had been pre-filled by VPC and contained information that did not match the voters' information in ELVIS.  The mismatched information included erroneous addresses, last names, suffixes, and/or middle initials.  Ex. A ¶¶ 11, 35.  Examples can be found at Ex. Q (copies of inaccurate applications).

**PLAINTIFF'S RESPONSE TO ¶ 50:**

Controverted in part.  Plaintiff does not dispute that Mr. Howell's affidavit supports Defendants' statement.  However, Mr. Howell could not testify to "how much time his staff spent curing applications that contained prefilled information during the 2020 general election."  Ex. 1 (Howell Tr.) at 253:24–254:11.  Mr. Howell admitted his office "doesn't spend time determining" whether an application in the cure process was "prefilled or not.  It's really of question of was it

36

accurate, were there duplicates, was there some other issue . . . ."  *Id.*  Mr. Howell's deposition testimony that he does not keep track of whether applications were personalized undercuts paragraphs 11 and 35 of his affidavit in which he states that his office received a "substantial" or "large number" of applications personalized by VPC that did not match ELVIS. *Compare id. with* Ex. A. ¶¶ 11, 35.

Defendants' Exhibit Q contains a collection of fifty-one (non-Bates stamped)[6] advance mail ballot applications.  Plaintiff does not dispute that Defendants' Exhibit Q contains fifty-one examples of advanced mail ballot applications that appear to be personalized by VPC where the applicant crossed out some of the personalized information on the application.  However, Plaintiff disputes this purported fact insofar as Defendants seek to draw the inference that these crossed-out applications created an additional burden on Shawnee County election officials.  Of these fifty-one applications, only *twelve* appear to have entered the cure process, Ex. Q at pp. 1–9, (4 applications), 37–39 (2 applications), 48-53 (6 applications); and another *two* do not request a mail ballot, but rather indicate that the voter does not wish to vote by mail, *id.* at pp. 35, 36.  The remaining thirty-seven applications appear to have been personalized by VPC, but the voter

---

[6]     Exhibit Q appears to be a compilation of 51 advance mail ballot applications submitted to the Shawnee County Election Office and accompanying correspondence.  This compilation appears to have been drawn from Shawnee County's production of nearly 10,000 pages of applications for advance mail ballots (which were not limited to applications provided to voters by VPC).  Plaintiff notes that Shawnee County did not produce these applications with Bates stamps, but instead in over 300 named .pdf documents.

Defendants do not provide any information in this statement regarding who produced the documents, whether the documents were introduced as deposition exhibits, or information like the file name and page numbers at which these documents were produced, such that the documents are not locatable by VPC amongst the documents produced in this litigation without significant burden.  As such, Defendants do not provide an adequate foundation for Exhibit Q for the Court, or VPC, to assess the documents.

With that said, Plaintiff accepts only for the purposes of its response to this statement that the 51 advance mail ballot applications were personalized by VPC.

37

crossed out some personalized information and wrote-in their information.  During his deposition,

Mr. Howell was shown an application personalized by VPC, including a suffix.  Ex. 9 (Howell

Tr., Ex. 7 at 55) (excerpted).  The voter submitted the application to Shawnee County with the

suffix crossed out.  *Id.*  Looking at this exhibit, Mr. Howell admitted that if a voter crosses out a

piece of pre-filled information, as long as the information that is not scratched out is correct and

matches the system, the application would be accepted.  Ex. 1 (Howell Tr.) at 184:16–185:11.

Plaintiff further disputes that all fifty-one applications in Defendants' Exhibit Q contain

examples of personalized information filled in by VPC that is "erroneous."  For example, some

voters crossed out and replaced the first name and middle initial.  *See e.g.*, Ex. Q at 15, 16, 17.  It

is possible that VPC intended to send these applications to different recipients at the same address,

and that the crossed-out information did in fact match the intended recipient's information in

ELVIS.

Plaintiff further disputes that Exhibit Q's 51 applications support Defendants'

characterization that the Shawnee County Election Office received a "large number" applications

personalized by VPC with information that does not match the voter file; especially given Shawnee

County produced over 300 documents containing nearly 10,000 pages of applications for advance

mail ballots to Plaintiff in this matter, and Shawnee County received approximately 23,000

advance mail ballot applications in 2020 alone, *see* Ex. 1 (Howell Tr.) at 231:12–234:16.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 51:**

51.     The Shawnee County Election Office also received numerous advance voting ballot

applications that had been pre-filled by VPC and sent to individuals who were deceased and whose

voter registration in ELVIS had been cancelled prior to the time such applications had been printed.

Ex. A ¶ 12; Examples can be found at Ex. R.

38

**PLAINTIFF'S RESPONSE TO ¶ 51:**

Controverted.  This statement is based on inadmissible hearsay testimony.  Paragraph 12 of Mr. Howell's affidavit states, "We also received numerous calls from voters in 2020 who reported that multiple pre-populated applications had been sent to deceased individuals who had once lived at the address to which the application was sent."  Ex. A ¶ 12.  Mr. Howell's affidavit reports the out-of-court statements of voters.  Defendants seek to introduce Mr. Howell's affidavit to prove the truth of the matter asserted by the voters' out-of-court statements:  that "The Shawnee County Election Office also received numerous advance voting ballot applications that had been pre-filled by VPC and sent to individuals who were deceased."  Plaintiff disputes this forbidden hearsay inference.

Plaintiff disputes that the cited sources support Defendants' characterization that the Shawnee County Election Office received "numerous" applications that had been personalized by VPC and sent to deceased voters.  Paragraph 12 of Mr. Howell's affidavit does not state that he received numerous calls about personalized applications *from VPC*.  Ex. A. ¶ 12.  Mr. Howell's affidavit states that voters sent applications to his office to alert them of the voter's death, but Mr. Howell does not quantify how many applications were sent back to his office.  *Id.*  Moreover, Mr. Howell admitted at his deposition that he received "at least" "a couple" prefilled ballot applications that notes the voter is deceased.  Ex. 1 (Howell Tr.) at 199:6–13.  Plaintiff disputes Defendants' statement insofar as Defendants' seek to draw the inference that Mr. Howell's receipt of "a couple" of applications personalized to a deceased voter supports their statement that Shawnee County received "numerous" applications of this nature.

Plaintiff disputes that Defendants' Exhibit R supports their characterization that the Shawnee County Election Office received "numerous" applications that had been personalized by

39

VPC and sent to deceased voters whose registration had been cancelled before the application was printed. Defendants' Exhibit R contains eleven (non-Bates stamped)[7] advanced ballot applications sent by VPC. *See* Ex. R. Only ten of these applications were personalized by VPC. *See id.* at 13–14 (blank application sent by VPC). Two of these applications do not indicate the recipient is deceased. *See id.* at 1 (no notations), 2 (notation that "Moved out of state," but no notation that recipient is deceased). The remaining eight applications are personalized by VPC and contain hand-written annotations or notes that the recipient has passed away, but only four indicate the recipient's registration was cancelled on May 11, 2020, prior to when VPC uploaded data for its first mailing on July 6, 2020, *see id.* at 5-6, 7-8, 17-18; three indicate the recipient's application was cancelled between VPC's first data upload and when its first wave of mailers landed in homes on August 17, 2020, *see id.* at 3-4 (July 23), 11-12 (August 8), 19-22 (July 24); and one was

---

[7] Exhibit R appears to be a compilation of 11 advance mail ballot applications submitted to the Shawnee County Election Office and accompanying correspondence. This compilation appears to have been drawn from Shawnee County's production of nearly 10,000 pages of applications for advance mail ballots (which were not limited to applications provided to voters by VPC). Plaintiff notes that Shawnee County did not produce these applications with Bates stamps, but instead in over 300 named .pdf documents.

Defendants do not provide any information in this statement regarding who produced the documents, whether the documents were introduced as deposition exhibits, or information like the file name and page numbers at which these documents were produced, such that the documents are not locatable by VPC amongst the documents produced in this litigation without significant burden. As such, Defendants do not provide an adequate foundation for Exhibit R for the Court, or VPC, to assess the documents.

With that said, Plaintiff accepts only for the purposes of its response to this statement that the 11 advance mail ballot applications were sent by VPC, 10 of which were personalized by VPC.

The record does not contain an adequate foundation for Defendants' Exhibit R for the same reasons the record does not contain an adequate foundation for Defendants' Exhibit Q. For the purposes of responding to this statement, Plaintiff assumes Exhibit Q is a compilation of documents produced to Plaintiff by Shawnee County.

40

cancelled between VPC's third data upload on August 10, 2022 and when its third wave landed in homes on September 8, 2022, *see id.* at 15-16 (Sept. 1).[8]

Plaintiff disputes that the only arguably relevant 8 applications in Defendants' Exhibit R—out of the 10,000 pages of applications Shawnee County produced and the 23,000 applications Shawnee County received in 2020—support Defendants' statement that Shawnee County received "numerous advance voting ballot applications that had been pre-filled by VPC and sent to individuals who were deceased."  Plaintiff further disputes that the 4 applications sent to voters whose registrations had been cancelled prior to VPC's first data upload—or even the 7 cancelled prior to VPC's fifth data upload—supports Defendants' statement that Shawnee County received "numerous" applications personalized by VPC and sent to deceased voters "whose voter registration in ELVIS had been cancelled prior to the time such applications had been printed."

**DEFENDANTS' UNCONTROVERTED FACT ¶ 52:**

52.     As a result of these inaccurately pre-filled advance voting ballot applications, the Shawnee County Election Office was "overwhelmed" with telephone calls, letters, e-mails, and in-office visits from voters who were confused, angry, and frustrated at what they had received from VPC.  Ex. A ¶¶ 12, 37, 40, 44; Ex. S at 117:24-125:2; Mr. Howell himself spoke with hundreds of these angry, frustrated, and confused voters.  Ex. S at 121:11-122:12.

---

[8]     VPC sent five "waves" of advance voting ballot application mailers to Kansas voters in advance of the 2020 General Election..  The dates were as follows:

> Wave A: data uploaded on 7/6/2020, expected in homes on 8/17/2020;
> Wave B: data uploaded on 7/27/2020, expected in homes on 8/26/2020;
> Wave C: data uploaded on 8/10/2020, expected in homes on 9/8/2020;
> Wave D: data uploaded on 8/24/2020, expected in homes on 9/16/202; and
> Wave E: data uploaded on 8/24/2020, expected in homes on 9/28/2020.

PTO-SF ¶ xl.

41

**PLAINTIFF'S RESPONSE TO ¶ 52:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part. Plaintiff disputes this statement insofar as the phrase "what they had received from VPC" is vague and ambiguous. The only claims in dispute in this case concern the Personalized Application Prohibition, PTO-SF ¶ xxvii, which provides that no portion of an advance voting ballot application mailed to solicit a voter to file such an application may be completed prior to mailing, *id.* ¶ xxii. Defendants' cited sources support that voters were confused, angry, or frustrated about "what they had received from VPC," but those emotions were not directed toward *personalized* information.

Where the cited sources mention voters' reactions to inaccurate information, they consistently lump the issue of inaccurately personalized information to another, irrelevant issue, such as duplicate applications or confusion about the source of the information, *see, e.g.*, Ex. A ¶ 37 (these "inaccurate and duplicate applications"), or the reaction is not linked to personalization at all, *see, e.g.*, *id.* ¶ 44 (stating "voters thought they were *required* to return the application" sent by CVI, without linking voters' belief to the fact that the application was personalized). For example, Paragraph 40 of Mr. Howell's affidavit states that he "learned that many voters thought (erroneously) that the CVI-pre-filled applications had come from the Shawnee County Election Office." Ex. A ¶ 40. The paragraph explains that these voters expressed aggression or disbelief that *their county election office was incompetent* or *the county* would not have updated their information after being notified. This paragraph does not support the inference that voters would have had the same reaction had they realized a third party had personalized the applications.

42

The cited portions of Mr. Howell's deposition transcript do not support Defendants' statement that the Shawnee County Election Office was "overwhelmed" by communications from voters that were confused, angry, or frustrated about receiving *personalized* advance mail ballot applications in VPC's mailers.  Mr. Howell was asked repeatedly about concerns over incorrect information in advance mail ballot applications, and he consistently responded about concerns over duplicates.  *See* Ex. S at 117:24–123:9.[9]  When asked about duplicates, Mr. Howell clarified that he "personally handled more than 100 phone calls and probably had 25 or 30 walk-ins" "over duplicate advance mail ballot applications."  *Id.* 123:24–125:2.  Plaintiff disputes this statement insofar as Defendants seek to draw the inference that the Shawnee County Election Office was "overwhelmed" by voter outreach *about personalized information*, or that. Mr. Howell answered hundreds of calls *about personalized information.*

Mr. Howell's deposition testimony further controverts this statement.  Mr. Howell admitted that he "do[es]n't think that the prefilled information, in and of itself, was what all the concern was" with respect to the issues voter had during the 2020 election and the frustration they felt when they received applications from third parties. Ex. 1 (Howell Tr.) at 245:10–19.  He further admitted

---

[9]      When asked about "incorrect address information," he answered about "4,000 duplicates itself was a major time constraint and I personally took hundreds of calls from people upset for various reasons and various forms of issues with it," and staff time spent "on those duplicate applications." *Id.* 117:24 – 118:13.  When asked about "the inaccuracy of the information in an application," he answered that "the entire experience of dealing with all the duplicates, *whether correct or incorrect*, was overwhelming in and of itself."  *Id.* 119:6–14 (emphasis added).  When asked about "incorrect name information," he answered by "point[ing] to, again, the 4217 dups, alone were overwhelming enough," and "the duplicates certainly were the biggest single – single group that caused a lot of issues for us" *Id.* at 119:16–120:5.  When asked about "confusion or concern over prefilled information" and to clarify whether testimony about hundreds of calls was about "incorrect prefilled information, " he answered about "hundreds" of calls and clarifying that he could not quantify if those calls "were incorrect versus duplicate" *Id.* at 121:11–123:9. When asked about "the accuracy of prefilled advance mail ballot applications," he answered about duplicates, such as written comments that "hey, this is the third time I've seen this."  *Id.* at 122:19–123:9.

43

that he did not know if he "receiv[ed] any phone calls from a voter that they were confused because an application contained prefilled information" because they did not "sa[y] it exactly that way. I think the concern is, like I said multiple times, when people get multiple copies after they've already sent an application in . . . ." *Id.* at 248:20–249:18.

The cited sources are replete with inadmissible hearsay, including voter "report[s] that multiple pre-populated applications had been sent do deceased individuals," Ex. A ¶ 12, calls "complaining about *CVI*'s pre-filled applications," *id.* ¶ 37 (emphasis added), calls that "voters thought (erroneously) that the CVI-prefilled applications had come from the Shawnee County Election Office," *id.* ¶ 40, calls that voters "insisted that they did not actually intend to request and vote an advance ballot," *id.* ¶ 44, and "voters told us that they thought they were *required* to return the application," *id.*.  These sources cannot be used to draw the inference that the matter asserted in these out-of-court statements is true; namely that: pre-populated applications were sent to deceased individuals, voters thought CVI-prefilled applications had come from Shawnee County, voters had not intended to request and vote an advance ballot, or voters thought they were required to return CVI-prefilled applications.  To the extent Defendants use these sources to draw the inference that voters were confused, angry, or frustrated, even if Mr. Howell's perception of their demeanor were admissible under a hearsay exception, the *reason* for the voters' emotions would remain inadmissible. *See infra* fn. 25.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 53:**

53.   Voters communicating with Mr. Howell regarding inaccurately pre-filled advance voting ballot applications often believed (erroneously) that the applications had been sent to them by the Shawnee County Election Office, and they expressed anger and frustration at the purported incompetency of the office.  Many of these voters voiced their incredulity that the office would

44

send an application to the wrong address or use the wrong name in pre-filling the application when they had previously communicated such changes to the election office.  Ex. A ¶¶ 38, 40-42.

**PLAINTIFF'S RESPONSE TO ¶ 53:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case.  As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part.  This statement is unsupported by admissible evidence.  What voters said about why they were confused, frustrated, or angry, *see* Ex. A ¶ 38; what they said about their beliefs about the sender of the personalized applications, why they thought the Shawnee County Election Office was incompetent or harboring a political agenda, or was using the wrong name on personalized applications, *id.* ¶ 40; what they said about their thoughts about who was responsible for sending "prefilled and duplicate applications" or their beliefs that they were required to return them, *id.* ¶ 41; and what they said about the competency and credibility of the Shawnee County Election Office, *id.* ¶ 42, is all inadmissible hearsay.  To the extent Defendants use these sources to draw the inference that voters were confused, angry, or frustrated, even if Mr. Howell's perception of their demeanor were admissible under a hearsay exception, the *reason* for the voters' emotions would remain inadmissible.  *See infra* fn. 25.

This statement is also unsupported to the extent Defendants characterize voters' reactions to the fact that they received inaccurately personalized applications.  Plaintiff does not dispute that Mr. Howell's affidavit states that some voters expressed confusion, frustration, and anger about having received CVI-prefilled applications that contained inaccurate information.  Ex. A ¶ 38. Defendants mischaracterize the remainder of the cited sources, which pertain to voter reactions to receiving unsolicited or duplicate information, or voter confusion arising from the perceived

*sender* of the application (their county election office, not a third party) rather than the *content* of the application.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 54:**

54.    Ford County Election Clerk Deborah Cox heard from so many confused, frustrated, and angry voters (20-30 per day) about the inaccurate and duplicate advance voting ballot applications they were receiving from VPC (via CVI) in the lead-up to the 2020 General Election that she sent an ad to three Ford County newspapers in an effort to remind voters that most pre-filled applications had come from CVI and not the county election office.  Ex. T at 130:6-132:5; Ex. U ¶ 37.  The text of the ad can be found at Ex. V.

**PLAINTIFF'S RESPONSE TO ¶ 54:**

Controverted in part.  The fact that Ms. Cox sent an ad to three newspapers to remind voters that pre-filled applications had not come from the county election office is uncontroverted.  The text of the ad is uncontroverted.  The reason for Ms. Cox's taking this action is controverted.  The cited sources do not support Defendants' characterization that Ms. Cox took this action because she had heard from 20-30 voters per day *about the inaccurate and duplicate advance voting ballot applications from VPC*.  Paragraph 37 of Ms. Cox's affidavit is vague to the extent it refers to "overall voter confusion," but states that she published ads to clarify the source of the advanced mail ballot applications.  Ex. U ¶ 37.  Ms. Cox's deposition testimony resolves any ambiguity, and clearly states that voters called because they wanted to know "where did they get this information."  Ex. T at 131:19–132:12.   Neither source references concern about inaccurate or duplicate applications.

46

Insofar as Defendants seek to draw the inference that Ms. Cox took out ads because she heard from voters confused, angry, or frustrated about *inaccurately personalized information* on advance mail ballot applications mailed by VPC, this statement is unsupported.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 55:**

55.     Ms. Cox got the idea for the ad because a similar ad had been placed in the *Beloit Call* by Mitchell County Clerk Chris Treaster.  Ex. T at 130:6-17.

**PLAINTIFF'S RESPONSE TO ¶ 55:**

Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 56:**

56.     The Shawnee County Election Office sent out letters to the voters who submitted advance voting ballot applications containing information that did not match the data in ELVIS.  Ex. A at 120:6-121:4.  Examples of these letters can be found at Ex. W.

**PLAINTIFF'S RESPONSE TO ¶ 56:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case.  As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part.  Plaintiff does not dispute the general statement that Shawnee County election Office sent out letters to voters who submitted advance voting ballot applications containing information that did not match the data in ELVIS.  However, the cited sources do not support Defendants' statement.[10]  Mr. Howell's cited testimony references "a copy of every letter

---

[10]     Defendants' Exhibit A is Mr. Howell's affidavit, numbered with paragraphs.  For the purposes of responding to this statement, Plaintiff assumes that the correct citation is to Defendants' Exhibit S, excerpts of Mr. Howell's deposition transcript, which contains numbered lines.

47

that we sent out to every voter," but nowhere indicates that these letters were sent to voters who submitted advance voting ballot applications containing information that did not match the data in ELVIS. *See* Ex. S at 120:6–121:4.

The examples of the letters in Defendants' Exhibit W do not support this statement. At his deposition, Mr. Howell was shown a similar form letter, with the same logo at the top and the same general layout. *See* Ex. 1 (Howell Tr.) at 181:9–183:21; *compare* Ex. 10 (Howell Tr., Ex. 8) *with* Ex. W at 1–3, 6, 9–10. Mr. Howell testified that Ex. 10 (Howell Tr., Ex. 8) "looks like a form letter that we've used in the past, and I'm not aware whether this is a current one that we use now or not," and noted that the date field of these letters updates automatically. Ex. 1 (Howell Tr.) at 181:22–182:16. When asked about the form letters that address different issues, Mr. Howell further testified that he is "actually not that familiar with all the form letters that I sent you because some of those, like I said, are ones that we do not use currently," and that "it would be wrong to assume that, if these form letters have dates" in the body of the letter for 2022, then the letters have or will be used in 2022. *Id.* 182:21–183:20.

This statement is vague and ambiguous about which of these specific form letters were sent to voters, when, or how often. Several of these form letters do not address advance mail ballot applications that do not match ELVIS. *See* Ex. W at 3 (voter registration), 4 (data of birth for Help America Vote Act compliance), 5 (ineligibility due to felony status, not mismatched information), 6 (same). The one non-form letter does not address mismatched information between an application and ELVIS. *See id.* at 7-8 (addressing a voter question about CVI). Moreover, several of these letters appear to be outdates, as they have a different letterhead with a former employee listed. *See id.* at 4, 7 (listing Mark A. Stock). These form letters lack an adequate foundation and,

48

given that Defendants cite no evidence of these letters *actually* being sent to voters, their existence as blank "form" letters is irrelevant to any disputed issue in this case.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 57:**

57.     Kansas Elections Director Bryan Caskey also received many calls from county election officials who complained that their offices were receiving pre-filled advance voting ballot applications in which the information on the form did not match the data in ELVIS.  Ex. C at 150:13-152:15.  In response to these calls, Mr. Caskey regularly discussed the problem with county election officials during his weekly telephone conferences with them.  He also spoke personally with election officials in at least 60 of the State's 105 counties on the subject.  Ex. C at 212:20-213:11, 237:11-240:5.

**PLAINTIFF'S RESPONSE TO ¶ 57:**

Controverted in part.  Plaintiff does not dispute that Mr. Caskey testified that received calls from county election officials who *said* that they were experiencing problems.  Ex. C. at 151:14–152:3.  Mr. Caskey testified that he received complaints from county election officials about applications that were "prefilled out," with information that did not match the voter file.  *Id*. Insofar as Defendants seek to draw an inference from Mr. Caskey's testimony that these county election officials did in fact receive applications personalized with mismatched information, it is an inference about the truth of the matter asserted by an out-of-court declarant and is hearsay.

Plaintiff does not dispute that Mr. Caskey testified that county election officials from 60 out of 105 counties called him about their voters contacting them about prefilled applications.  *Id.* at 212:20–213:11.  Insofar as Defendants seek to draw an inferences from Mr. Caskey's testimony that these 60 county election officials did in fact have voters contacting them about personalized information, it is hearsay within hearsay: Defendants cannot rely on the voter's out-of-court

49

statement to her county election official about any issue with personalized information on an application for the truth of the matter asserted—that here was in fact any issue with personalized information on an application; nor can Defendants rely on the county election officials' out-of-court statements to Mr. Caskey that voters were complaining for the truth of the matter asserted—that the voters were in fact complaining.

Plaintiff does not dispute that Mr. Caskey testified that he spoke to election officials about the number of advance ballot applications, the quality of those applications, complaints from voters, and frustration with duplicates and time constraints. *See id.* at 237:11–240:5.  However, the cited source does not support Defendants' characterization that Mr. Caskey had these conversations "in response to" calls about *inaccuracies* with personalized applications; he had these calls "concerning voters in their counties receiving advance ballot applications that were prefilled," without reference to error. *See id.* at 212:20–213:4.  Additionally, Defendants may not rely on Mr. Caskey's testimony about what county election officials told him (*e.g.*, that voters were in fact "verifying"—presumably, submitting—"multiple applications") or what county election officials told him they had perceived (*e.g.*, that voters were angry, confused, and frustrated) or what the voters told their county election officials (*e.g.*, they were frustrated with the process) for the truth of the matter asserted. *See id.* at 237:11–240:5.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 58:**

58.     Mr. Caskey also spoke with many voters who expressed their anger, confusion, and frustration over the pre-filled advance voting ballot applications that they were receiving from third-parties such as VPC.  Ex. C at 209:15-210:9, 240:6-242:7.

50

**PLAINTIFF'S RESPONSE TO ¶ 58:**

Controverted in part.  It is uncontroverted that Mr. Caskey testified that he spoke to voters who expressed their anger, confusion and frustration.  This statement is controverted to the extent Defendants seek an inference that because Mr. Caskey received phone calls from voters saying that they received more than one application or asking why the State gave away their information, it is true that these voters in fact received more than one application or that the State in fact gave away their information because it is an inference about the truth of the matter asserted by an out-of-court declarant and is hearsay.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 59:**

59.    The Kansas Secretary of State's Office submitted written testimony to both the House and Senate Committees on Federal and State Affairs in March 2021 regarding the State's experience with advance voting ballot applications mailed to voters by third-parties in the 2020 General Election.  Among other things, the testimony advised the Legislature that, "[l]eading up to the 2020 general election, state and county election officials were inundated with calls from confused voters who submitted an advance by mail ballot application but continued to receive unsolicited advance ballot applications from third parties.  This created a substantial workload increase for local election offices who had to process thousands of duplicate forms at a time when county election officials were preparing for a high turnout, statewide election, in the middle of a pandemic." Ex. Z.

**PLAINTIFF'S RESPONSE TO ¶ 59:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case.  As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

51

Controverted in part.  This statement is uncontroverted to the extent it quotes Exhibit Z. However, Plaintiff states that the letter from the Kansas Secretary of State's Office is dated for February 18, 2021.  *See* Ex. Z, Kan. Sec. of State Letter, dated Feb. 18, 2021.  This statement is immaterial because the Personalized Application Prohibition places no limit on the number of unsolicited applications a third party may mail a voter.  *See* PTO-SF ¶¶ xxii, xxvii.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 60:**

60.     On average, it takes an experienced election official three to five minutes to process an accurate, non-duplicate advance voting ballot application.  Ex. A ¶ 24; Ex. U ¶ 23.

**PLAINTIFF'S RESPONSE TO ¶ 60:**

Controverted in part.  It is uncontroverted that the cited sources contain these statements as to Mr. Howell and Ms. Cox.  This estimation is therefore limited to those parties and their estimation of experienced election officials in their offices.  Mr. Howell further testified that if an advance mail ballot application is personalized with information that matches the information that is in ELVIS, it does not create an additional burden on his office to process the application.  *See* Ex. 1 (Howell Tr.) at 252:11–23.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 61:**

61.     If the information on a voter's advance voting ballot application does not match the information in ELVIS, or if the application is missing information, the election office will attempt to contact the voter (via telephone, U.S. mail, and/or e-mail) to determine the reason for the discrepancy or to obtain the missing information.  This contact can require multiple attempts.  The office generally makes at least three attempts to reach the voter, assuming it is practicable.  Ex. A ¶ 25; Ex. U ¶ 24.

52

**PLAINTIFF'S RESPONSE TO ¶ 61:**

Controverted in part. It is uncontroverted that the cited sources contain these statements as to Mr. Howell and Ms. Cox. This statement is therefore limited to the experience of the affiants on whom Defendants rely—Mr. Howell and Ms. Cox—and the practices of Shawnee and Ford County, respectively.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 62:**

62. If the county election office is able to reach the voter, it attempts to work with him/her to correct any discrepancies or omissions. It may be necessary for the voter to submit a new advance voting ballot application or registration form. The cumulative time to contact the voter and process the application in these situations averages around 15 minutes of staff time. Ex. A ¶ 26; Ex. U ¶ 25.

**PLAINTIFF'S RESPONSE TO ¶ 62:**

Controverted in part. It is uncontroverted that the cited sources contain these statements as to Mr. Howell and Ms. Cox. This statement is therefore limited to the practices of Shawnee and Ford County, respectively. This statement is controverted by Mr. Howell's admission that he could not estimate "the average amount of time it takes to cure an advance mail ballot application that is missing information" because "[t]here are just too many factors, every election is different, and I don't – I really don't think there is an average." Ex. 1 (Howell Tr.) at 168:22–169:10. Mr. Howell's deposition testimony directly contradicts his ability to estimate his statement in paragraph 26 of his affidavit. *See* Ex. A at ¶ 26. Plaintiff also states that Mr. Howell testified that the amount of time his staff spends curing applications "really isn't, to [him], a question of was it prefilled or not. It's really a question of was it accurate, were there duplicates, was there some other issue . . . ." Ex. 1 (Howell Tr.) at 253:24–254:11. Insofar as Defendants seek to draw an

53

inference that personalized applications take longer to process, that inference is controverted by Mr. Howell's deposition testimony.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 63:**

63. If the election office is unable to reach the voter or it would be impracticable to do so, the office will prepare a provisional ballot, assuming it is able to discern that the applicant is a registered voter. The cumulative time to complete this whole process regularly takes thirty minutes or more of staff time. Ex. A ¶ 26; Ex. U ¶ 26.

**PLAINTIFF'S RESPONSE TO ¶ 63:**

Controverted in part. It is uncontroverted that the cited sources contain these statements as to Mr. Howell and Ms. Cox. This statement is therefore limited to the experience of Mr. Howell and Ms. Cox and therefore is limited to the practices of Shawnee and Ford County, respectively.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 64:**

64. If the election office must send a provisional ballot to a voter after being unable to reach him/her in order to address defects on his/her application, there is a greater likelihood that the voter will not correct those defects prior to the county canvassing boards and thus will either not return the provisional ballot or will not have the ballot counted. Ex. A ¶ 28.

**PLAINTIFF'S RESPONSE TO ¶ 64:**

Controverted in part. Plaintiff does not dispute that Mr. Howell's affidavit contains this statement. Ex. A ¶ 28. However, this statement is limited to Mr. Howell's experience. Additionally, Mr. Howell testified that after election day, his office conducts further follow-up for provisional voters who need to provide additional information "even clear up right up until canvas." *See* Ex. 1 (Howell Tr.) at 192:15–193:17. The cure process continues for an additional 13 days, during which the Shawnee County election officials will "try to reach out to them to cure

54

the original problem." *Id.* at 195:3–14.  This 13-day period is many times longer than the usual two-day timeframe in which county election officials must process advance mail ballot applications.  *See* PTO-SF ¶ xxxiii.  Mr. Howell's deposition testimony is at odds with paragraph 28 of his affirmation.

## DEFENDANTS' UNCONTROVERTED FACT ¶ 65:

65.     VPC provided in discovery a set of FAQs intended to be used as canned responses for a call center to respond to individuals who contacted VPC about problems with the advance voting ballot applications that such individuals received from VPC.  Ex. X.  Two of the responses stated as follows:

> **I got a form that has someone else's information on it-why did that happen?**
>
> Thank you for reaching out.  VPC is aware of this issue and is actively working to make sure it doesn't happen again.  This issue was limited in scope and only affected a very small percentage of individuals.  In the meantime, we are happy to send you a new vote-by-mail application with the correct information, or I can tell you the link you can use to print it from your state's SoS website and then fill it out and mail back in the envelope we sent you.
>
> **How did it happen?  How are you making sure it won't happen again?**
>
> The mistake was due to a printer error and they have taken responsibility for their mistake and have already added additional quality control measures, like installing an additional camera to monitor printing, and retraining printer staff, to prevent this type of situation in the future.

## PLAINTIFF'S RESPONSE TO ¶ 65:

Controverted in part.  The quotation of the FAQs from Exhibit X is uncontroverted.  However, the cited source does not support Defendants' characterization of the intended purposes of the FAQs.  Defendants' Exhibit X itself demonstrates that the FAQs are used for voters who are interested in receiving an advance mail ballot application from VPC, not only individuals who have problems with VPC's mailers.  *See* Ex. X at 1 ("can you send me one?").

55

**DEFENDANTS' UNCONTROVERTED FACT ¶ 66:**

66.     VPC received complaints from election officials in states other than Kansas about the inaccurate absentee ballot applications that VPC was sending to voters in those states during the 2020 election cycle. Ex. Y (e-mails between VPC outside counsel Jennifer Carrier and other state election officials). The written/e-mail complaints that VPC produced in discovery came from officials in Virginia (VPC000364-000366; 000376-000383; 000388-000392; 000397, 000406); Iowa (VPC000407-000408; 000429-000431; 000434-435); Wisconsin (VPC000436-000439); and North Carolina (VPC000485-000487; 000496-000497).

**PLAINTIFF'S RESPONSE TO ¶ 66:**

Controverted in part. The cited sources do not support Defendants' characterization that these emails reflect "complaints" about "inaccurate" absentee ballot applications. Moreover, this characterization is vague. Evidence of inaccuracies on components of VPC's mailers are irrelevant to the issue at hand—personalization of portions of the application itself. The vast majority of Defendants' cited sources do not reflect inaccuracies with the personalized portions of the absentee ballot applications VPC sent to voters in states other than Kansas during the 2020 election cycle. Ex. Y at 1–3 (noting a potential issue with zip codes on the return address of VPC's envelopes), 4-5 (describing how VPC left a field *blank*—*i.e.*, the absence of personalization of this field), 6-8 (noting an issue with the city pre-addressed on VPC's prepaid return envelopes), 9 (same), 10-11 (same), 12-13 (same), 14-16 (same), 17-18 (same),[11] 19-25 (same), 26 (same), 34-37 (discussing

---

[11]     Plaintiff produced this document as a complete, three-page email chain bearing Bates numbers VPC000396 – VPC000398. Defendants unnecessarily excerpted this document. *See* Ex. 11. Plaintiff also produced the document containing VPC000408 as a complete, four-page email chain bearing bates numbers VPC000407 – VPC000410. Defendants unnecessarily excerpted this document. *See* Ex. 12. Plaintiff produced the document containing VPC000429 – VPC000431 as a complete, five-page email chain bearing bates numbers VPC000429 – VPC000433. Defendants unnecessarily excerpted this document as well. *See* Ex. 13.

56

suggested changes to instructions and information in mailers), 38-40 (same); 41-42 (noting past errors with VPC's *voter registration* mailing list).   Evidence of issues unaffected by the Personalized Application Prohibition are irrelevant and therefore immaterial.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 67:**

67.   The Kansas voters whom VPC targeted with mailings in the 2020 General Election received between one and five advance voting ballot applications from VPC.   Ex. L; Ex. G at 206:9-207:14, 209:3-210:22.

**PLAINTIFF'S RESPONSE TO ¶ 67:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case.   As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.   To the extent a response is required: Uncontroverted.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 68:**

68.   Of the approximately 507,864 Kansas voters to whom VPC sent at least one (and as many as five) advance voting ballot applications in connection with the 2020 General Election, at least 112,597 of those individuals used a VPC-provided pre-paid/pre-addressed envelope to mail their completed application back to their respective county election offices.   Ex. E; Ex. F at 177:24-179:20; Ex. G at 123:17-124:20.

**PLAINTIFF'S RESPONSE TO ¶ 68:**

Controverted.   This statement is controverted to the extent it suggests that all 507,864 voters in Exhibit E (from which this statement is derived) were sent application packets by VPC. This statement is further controverted to the extent it suggests that all 112,597 voters in Exhibit E used a VPC-provided envelope to mail their application back.   Mr. Dripps testified that Exhibit E

57

could reflect not only VPC's mailers, but "it could have also been VPC's sister organization, CVI."

Ex. F. at 177: 9–22.  *See* Ex. 14 Declaration of Thomas Lopach in Support of Plaintiff Voter

Participation Center's Motion to Dismiss (Oct. 13, 2022) ("Lopach Decl.")) ¶ 26 (stating

approximately 69,000 voters responded to advance mail ballot applications sent by VPC).  As

such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated

herein.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 69:**

69.     The 112,597 Kansas voters who used a VPC-provided pre-paid/pre-addressed

envelope to mail their completed applications back to their respective county election offices sent

in 127,336 applications using the VPC-provided envelopes.  In other words, approximately 14,739

duplicate applications were sent to county election offices by Kansas voters using a VPC-provided

envelope.  Ex. E; Ex. F at 178:16-182:3; Ex. G at 124:16-125:18.

**PLAINTIFF'S RESPONSE TO ¶ 69:**

Controverted.  This statement is controverted to the extent it suggests that all 112,597

voters in Exhibit E (from which this statement is derived) used a VPC-provided envelope to mail

their application back.  This statement is further controverted to the extent it suggests that all

127,336 applications in Exhibit E were sent using a VPC-provided envelope.  Mr. Dripps testified

that Exhibit E could reflect not only VPC's mailers, but "it could have also been VPC's sister

organization, CVI."   Ex. F. at 177: 9–22.   *See also* Ex. 14 (Lopach Decl.) ¶ 26 (stating

approximately 69,000 voters responded to advance mail ballot applications sent by VPC).

Moreover, Plaintiff states that the numbers included in ¶ 69 are from the 2020 General Election.

*See* Ex. G at 110:4-8.  Finally, this statement is cited as support for Defendants' motion for

58

summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 70:**

70.     Of the 112,597 Kansas voters who used a VPC-provided pre-paid/pre-addressed envelope to send in a completed advance voting ballot application to their county election office, only 111,199 voters ultimately received an advance ballot. In other words, 1,398 voters who returned an advance voting ballot application in a VPC-provided envelope never submitted a successful application such that they could receive an advance ballot in connection with the 2020 General Election. Ex. E; Ex. F at 182:20-184:1; Ex. G at 128:3-25.

**PLAINTIFF'S RESPONSE TO ¶ 70:**

Controverted. This statement is controverted to the extent it suggests that all 112,597 voters in Exhibit E (from which this statement is derived) used a VPC-provided envelope to mail their application back. Mr. Dripps testified that Exhibit E could reflect not only VPC's mailers, but "it could have also been VPC's sister organization, CVI." Ex. F. at 177: 9–22. *See also* Ex. 14 (Lopach Decl.) ¶ 26 (stating approximately 69,000 voters responded to advance mail ballot applications sent by VPC). Moreover, Plaintiff states that the numbers included in ¶ 70 are from the 2020 General Election. *See* Ex. 6 (Lopach Tr.) at 110:4-8. Finally, this statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 71:**

71.     In the 2020 General Election, the Shawnee County Election Office received and processed 23,156 advance voting ballot applications. That is, it sent regular or provisional advance

59

ballots to 23,156 voters after having received advance voting ballot applications from these voters.

In addition, it received 4,217 duplicate applications (i.e., applications from voters who had already

submitted an application and to whom the office had already mailed a regular or provisional

advance ballot).  More than 15.4% of the total advance voting ballot applications that the office

received, therefore, were duplicates.  Ex. A ¶ 15.

**PLAINTIFF'S RESPONSE TO ¶ 71:**

This statement is cited as support for Defendants' motion for summary judgment, but does

not reach an ultimate question in this case.  As such, this statement is immaterial and irrelevant for

the Court's consideration, as will be elaborated herein.

Controverted in part.  This statement is uncontroverted to the extent Paragraph 15 of the

Affidavit of Andrew Howell contains the statement set forth in ¶ 71.  However, this statement is

controverted to the extent Paragraph 15 of Mr. Howell's affidavit is contradicted by his testimony

during the Preliminary Injunction Hearing held on September 9, 2021.  *See* Ex. 15 (September 8,

2021 Hearing on Plaintiffs' Motion for Preliminary Injunction ("9/8/2021 PI Tr."))  at 92:18-19

(testifying that his office received 2,955 duplicate applications in 2020); *id.* at 96:8-14 (testifying

that his office received 24,699 applications that were not duplicates).  Moreover, the context is

incomplete.  This statement does not pertain to the number of duplicate applications the Shawnee

County Election Office received that were sent to voters by VPC.  It further omits that the number

of advance mail ballot applications the Shawnee County Election Office received during the 2020

general election increased by approximately 270 percent as compared to the 2016 general election,

and approximately 195 percent as compared to the 2018 general election.  *Compare* Ex. A ¶ 15

(stating that the Shawnee County Election Office received and "processed" 23,156 plus an

additional 4,217, totaling 27,373 applications received) with *id.* ¶ 17 (stating the Shawnee County

60

Election Office received 7,394 applications in 2016 and 9,272 applications in 2018). Finally, it omits that Mr. Howell testified during the Preliminary Injunction Hearing held on September 9, 2021 that the pandemic in 2020 was an unprecedented situation for him and his office. *See* Ex. 15 (9/8/2021 PI Tr.) at 104:21-25.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 72:**

72.     Of the 4,217 duplicate applications the Shawnee County Election Office received for the 2020 General Election: 3,676 were sets of two (i.e., voters sent in two applications); 407 were sets of three (i.e., voters sent in three applications); 99 were sets of four; 27 were sets of five; 6 were sets of six; 1 was a set of seven, and 1 was a set of nine. Ex. A ¶ 18.

**PLAINTIFF'S RESPONSE TO ¶ 72:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part. This statement is uncontroverted to the extent Paragraph 18 of the Affidavit of Andrew Howell contains the statement set forth in ¶ 72. However, the statement is controverted to the extent Paragraph 18 of Mr. Howell's affidavit is contradicted by his testimony during the Preliminary Injunction Hearing held on September 9, 2021. *See* Ex. 15 (9/8/2021 PI Tr.) at 92:23-93:2 ("2,703 of them were duplicates, 198 had three applications, 40 of them had four applications turned in, nine people had five applications turned in, four voters had six applications turned in, and one voter had seven applications turned into our office."). Moreover, the context is incomplete. This statement does not pertain to the number of duplicate applications the Shawnee County Election Office received that were sent to voters by VPC. It further omits that the number of advance mail ballot applications the Shawnee County Election Office received

during the 2020 general election increased by approximately 270 percent as compared to the 2016 general election, and approximately 195 percent as compared to the 2018 general election. *Compare* Ex. A ¶ 15 (stating that the Shawnee County Election Office received and "processed" 23,156 plus an additional 4,217, totaling 27,373 applications received) with *id.* ¶ 17 (stating the Shawnee County Election Office received 7,394 applications in 2016 and 9,272 applications in 2018). Finally, it omits that Mr. Howell testified during the Preliminary Injunction Hearing held on September 9, 2021 that the pandemic in 2020 was an unprecedented situation for him and his office. *See* Ex. 15 (9/8/2021 PI Tr.) at 104:21-25.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 73:**

73. The Shawnee County Election Office received very few (no more than a dozen) duplicate applications in connection with either the 2016 General Election (during which it received 7,394 total applications) or the 2018 General Election (during which it received 9,272 total applications). Ex. A ¶ 17.

**PLAINTIFF'S RESPONSE TO ¶ 73:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part. This statement is uncontroverted to the extent Paragraph 17 of the Affidavit of Andrew Howell contains the statement set forth in ¶ 73. This statement is uncontroverted to the extent the context is incomplete. This statement omits that VPC also sent advance mail ballot applications to Kansas voters in 2018. *See* Ex. 14 (Lopach Decl.) ¶ 26. It further omits that the number of advance mail ballot applications the Shawnee County Election Office received during the 2020 general election increased by approximately 270 percent as

62

compared to the 2016 general election, and approximately 195 percent as compared to the 2018 general election. *Compare* Ex. A ¶ 15 (stating that the Shawnee County Election Office received and "processed" 23,156 plus an additional 4,217, totaling 27,373 applications received) with *id.* ¶ 17 (stating the Shawnee County Election Office received 7,394 applications in 2016 and 9,272 applications in 2018). Finally, it omits that Mr. Howell testified during the Preliminary Injunction Hearing held on September 9, 2021 that the pandemic in 2020 was an unprecedented situation for him and his office. *See* Ex. 15 (9/8/2021 PI Tr.) at 104:21-25.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 74:**

74.     Many voters told county election officials that they were confused by the pre-filled advance voting ballot applications that they had received during the 2020 General Election and believed (erroneously) that the applications had originated from the election office. These voters told election officials that they thought they were required to complete and mail back the pre-filled applications to the county election office even if they had already submitted another application. Ex. A ¶ 41; Ex. S at 269:14-270:1; Ex. U ¶ 19.

**PLAINTIFF'S RESPONSE TO ¶ 74:**

This statement constitutes impermissible hearsay and is not admissible. Defendants cannot rely on these out-of-court statements to prove the truth of the matter asserted; namely, that the voters were in fact confused and they did in fact think they were required to complete additional advance mail ballot applications. Even if these statements were admissible to demonstrate the fact that the voters were confused under a hearsay exception, in no event could Defendants rely on the voters' statements to prove why they were confused. *See infra* fn. 25.

To the extent a response is required: Controverted. Plaintiff disputes that the cited material supports the vague and subjective characterization that "many voters told county election officials

that they were confused by the pre-filled advance voting ballot applications." At most, the cited material indicates some unquantified number of voters called Mr. Howell and individuals in the Ford County Clerk's office to ask if they were required to submit a pre-filled advance mail ballot application they had received from a third party—though not necessarily VPC—if they had already submitted an application, and Mr. Howell was told by an unquantified number of voters that they thought his office was sending the applications. *See* Ex. A ¶ 41 (stating that many voters told Mr. Howell that they thought his office was responsible for sending the applications and the voters believed they were required to return every application they received); Ex. S at 269:14-270:1 (testifying that Mr. Howell had conversations with voters where the voters said they thought they were receiving applications from his office that they had to return); Ex. U ¶ 19 (stating that voters called Ms. Cox's office to ask whether they were required to submit an application that "they had received from some third-party" if they had already submitted an application). Rather, Mr. Howell testified that, in his opinion, the pre-filling of applications was not the cause of voter confusion. *See* Ex. 1 (Howell Tr.) at 245:13-19 (Q. "Is it your opinion that -- that voters became even more confused and frustrated when the applications contained prefilled information?" A. "I don't think that the prefilled information, in and of itself, was what all of the concern was.").

**DEFENDANTS' UNCONTROVERTED FACT ¶ 75:**

75. In the 2020 General Election, the Ford County Election Office received and processed 3,040 advance voting ballot applications. That is, it sent regular or provisional advance ballots to 3,040 voters after having received advance voting ballot applications from these voters. In addition, it received 274 duplicate applications (i.e., applications from voters who had already submitted an application and to whom the office had already mailed a regular or provisional

64

advance ballot). Nearly 9% of the advance voting ballot applications that the office received, therefore, were duplicates. Ex. U ¶ 16.

**PLAINTIFF'S RESPONSE TO ¶ 75:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part. This statement is uncontroverted to the extent Paragraph 16 of the Affidavit of Debbie Cox contains the statement set forth in ¶ 75. This statement is controverted to the extent the context is incomplete. This statement does not pertain to the number of duplicate applications the Ford County Election Office received that were sent to voters by VPC. In fact, Ford County itself sent all voters advance ballot applications. *See* Ex. 16 (Excerpts of the Deposition Transcript of Deborah Jean Cox (Sept. 9, 2022) ("Cox Tr.")) at at 103:20-23. It further omits that Ms. Cox testified that her office "had a lot more voters voting by mail [in 2020 than 2016 and 2018], considerably more." *See id.* at 98:25-99:4.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 76:**

76. The Ford County Election Office received only a handful (no more than five) duplicate applications in connection with either the 2016 General Election or the 2018 General Election. Ex. U ¶ 18.

**PLAINTIFF'S RESPONSE TO ¶ 76:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

65

Controverted in part. This statement is uncontroverted to the extent Paragraph 18 of the Affidavit of Debbie Cox contains the statement set forth in ¶ 76. The statement is controverted to the extent the context is incomplete. This statement omits that both Ford County and VPC also sent advance mail ballot applications to Kansas voters in 2018. *See* Ex. 14 (Lopach Decl.) ¶ 26; Ex. 16 (Cox Tr.) at 103:20-23. It further omits that Ms. Cox testified that her office "had a lot more voters voting by mail [in 2020 than 2016 and 2018], considerably more." *See* Ex. 16 (Cox Tr.) at 98:25-99:4.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 77:**

77.      Although Kansas election officials did not attempt to quantify how many duplicate advance voting ballot applications in the 2020 General Election involved VPC-pre-populated applications, the majority of duplicate applications are believed to have been pre-filled by VPC. Ex. A ¶ 16; Ex. U ¶ 17.

**PLAINTIFF'S RESPONSE TO ¶ 77:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part. Plaintiff does not dispute that "Kansas election officials did not attempt to quantify how many duplicate advance voting ballot applications in the 2020 General Election involved VPC-pre-populated applications." Plaintiff disputes that the cited material supports the vague and subjective characterization that "the majority of duplicate applications are believed to have been pre-filled by VPC." At most, the cited material indicates Mr. Howell and Ms. Cox believe the majority of duplicate applications their offices received had been partially

pre-filled by CVI. Nevertheless, neither Mr. Howell nor Ms. Cox present any foundation for such belief, such that it should not be credited.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 78:**

78.     Kansas Elections Director Bryan Caskey also had "dozens if not hundreds of conversations" with county election officials regarding the "flood" of duplicate advance voting ballot applications that were being submitted by voters to such offices. Ex. C at 150:13-19.

**PLAINTIFF'S RESPONSE TO ¶ 78:**

This statement constitutes impermissible hearsay not admissible. Moreover, this statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part. This statement is uncontroverted to the extent the cited material contains the quoted language. This statement is controverted to the extent it does not pertain to the number of duplicate pre-filled advance mail ballot applications submitted by voters that were sent to voters by VPC.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 79:**

79.     When a voter submits duplicate advance voting ballot applications to a county election office in connection with a single election, the office must conduct the same review and verifications of each application upon receipt. One step in this process is to determine if the voter had previously submitted another application and was previously sent a regular or provisional advance ballot. If there are any differences between the original application and the new/duplicate application (e.g., different name or mailing address), the office will attempt to contact the voter to determine the reason for the discrepancy. Ex. A ¶ 29; Ex. U ¶ 27.

67

**PLAINTIFF'S RESPONSE TO ¶ 79:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein. To the extent a response is required: Uncontroverted; however, Plaintiff states that this purported factual assessment is based on the experience of the . This statement is therefore limited to the experience of the affiants on whom Defendants rely—Mr. Howell and Ms. Cox—and the practices of Shawnee and Ford County, respectively.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 80:**

80.    After receiving a duplicate application, the county election office cannot assume that the initially submitted application was correct. Depending on the situation, the office may need to send a provisional ballot to the voter. For this reason, the review of a duplicate application usually takes more staff time than the review of the initially submitted application. If the office does not have to contact the voter, the review of the duplicate application generally takes 7-10 minutes. If the office does have to contact the voter, the review of the duplicate application can take from 15-30 minutes (and occasionally more) of total staff time. Ex. A ¶ 30; Ex. U ¶ 28.

**PLAINTIFF'S RESPONSE TO ¶ 80:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration. To the extent a response is required: Controverted in part. It is uncontroverted that the cited sources contain these statements as to Mr. Howell and Ms. Cox. This statement is therefore limited to the experience of Mr. Howell and Ms. Cox, and therefore is limited to the practices of Shawnee and Ford County, respectively.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 81:**

81.      The Shawnee County Election Office typically assigns 6-7 staff members to handle the processing of advance voting ballot applications.  Nearly double that number had to be assigned to the task for the 2020 General Election.  The most significant time burden and strain on staff came from having to contact thousands of voters who had submitted inaccurate or duplicate applications.  At one point, Mr. Howell had to assign almost 30 staff members just to review and process applications in order to ensure that the office could process applications within the 2-day deadline imposed by State law.  Ex. A ¶ 33.

**PLAINTIFF'S RESPONSE TO ¶ 81:**

Controverted in part.  The record as to the "2-day deadline imposed by State law" is as follows.  Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the General Election and the Tuesday of the week preceding such General Election.  K.S.A. 25-1122(f)(2).  Other than voters entitled to receive ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301 *et seq*., counties cannot transmit advance ballots to voters prior to the 20th day before the election for which an application has been received.  K.S.A. 25-1123(a), 25-1220.  Ballots must be issued to advance voting voters within two business days of the receipt of the voter's application by the election office or the commencement of the 20-day period.  K.S.A. 25-1123(a).

Plaintiff does not dispute that Paragraph 33 of the Affidavit of Andrew Howell contains the statement set forth in ¶ 81, although the context is incomplete.  This statement does not pertain to the number of "inaccurate or duplicate" applications the Shawnee County Election Office received that were sent to voters by VPC.  It further omits that the number of advance mail ballot applications the Shawnee County Election Office received during the 2020 general election

69

increased by approximately 270 percent as compared to the 2016 general election, and approximately 195 percent as compared to the 2018 general election. *Compare* Ex. A ¶ 15 (stating that the Shawnee County Election Office received and 'processed' 23,156 plus an additional 4,217, totaling 27,373 applications received) with *id.* ¶ 17 (stating the Shawnee County Election Office received 7,394 applications in 2016 and 9,272 applications in 2018). Finally, it omits that Mr. Howell testified during the Preliminary Injunction Hearing held on September 9, 2021 that the pandemic in 2020 was an unprecedented situation for him and his office. *See* Ex. 15 (9/8/2021 PI Tr.) at 104:21-25.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 82:**

82. Prior to Election Day in November 2020, the Shawnee County Election Office responded to many confused voters who had returned pre-filled advance voting ballot applications but who insisted that they did not actually intend to request and vote an advance ballot. The voters told election officials that they thought they were required to return the application. Election officials expended substantial time and resources responding to those voters. Ex. A ¶ 47.

**PLAINTIFF'S RESPONSE TO ¶ 82:**

This statement constitutes impermissible hearsay not admissible. Moreover, this statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

To the extent a response is required: Controverted in part. This statement is uncontroverted to the extent the cited material contains the quoted language. This statement is controverted to the extent it does not pertain to the number of applications submitted by voters that were sent to voters by VPC.

70

**DEFENDANTS' UNCONTROVERTED FACT ¶ 83:**

83.      Approximately 718 voters in the 2020 General Election voted on Election Day in Shawnee County (usually by provisional ballot) after having submitted an advance voting ballot application and having received an advance ballot.  In the 2016 General Election, just 141 voters voted on Election Day (usually by provisional ballot) after having mailed in an advance voting ballot application and having received an advance ballot.  Ex. A ¶ 47.

**PLAINTIFF'S RESPONSE TO ¶ 83:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case.  As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part.  This statement is uncontroverted to the extent Paragraph 47 of the Affidavit of Andrew Howell contains the statement set forth in ¶ 83.  This statement is controverted to the extent the context is incomplete.  This statement does not pertain to the number of voters who ultimately decided to vote in person after submitting applications to the Shawnee County Election Office that were sent to voters by VPC.  It further omits that the number of advance mail ballot applications the Shawnee County Election Office received during the 2020 general election increased by approximately 270 percent as compared to the 2016 general election, and approximately 195 percent as compared to the 2018 general election.  *Compare* Ex. A ¶ 15 (stating that the Shawnee County Election Office received and 'processed' 23,156 plus an additional 4,217, totaling 27,373 applications received) with *id.* ¶ 17 (stating the Shawnee County Election Office received 7,394 applications in 2016 and 9,272 applications in 2018).  Finally, it omits that Mr. Howell testified during the Preliminary Injunction Hearing held on September 9, 2021 that the

71

pandemic in 2020 was an unprecedented situation for him and his office. *See* Ex. 15 (9/8/2021 PI Tr.) at 104:21-25.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 84:**

84.    VPC's Rule 30(b)(6) witness, Mr. Lopach, testified that he cannot "speak to how an individual or a group of people would respond to a pre-filled vote-by-mail application versus a blank vote-by-mail application." Ex. G at 98:17-99:20.

**PLAINTIFF'S RESPONSE TO ¶ 84:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part. This statement is uncontroverted to the extent that lines 98:17 through 99:20 of Mr. Lopach's deposition contains the statement set forth in ¶ 84. This statement is controverted to the extent the context is incomplete. Just after Mr. Lopach makes the aforementioned statement, he clarifies that he is unable to speak to differences "outside of the study we did in 2006 or other studies presented by academics or practitioners who have done similar work." Ex. G at 98:17-99:8. This referenced study evaluated the 2006 election cycle and indicated that pre-filled "vote-by-mail applications had a higher rate of return than blank vote-by-mail applications." Ex. 6 (Lopach Tr.) at 18:24-19:6. This study would constitute VPC's evaluation of the effectiveness. *See id.* at 20:7-13. Columbia University faculty have also evaluated this question and determined that pre-filled applications are "more successful at engaging voters" compared to blank applications. Ex. G at 27:10-15.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 85:**

85.     Mr. Lopach testified that he does not know if the recipient of a pre-filled advance voting ballot application "views a political message in whether or not their name is filled out on" the application.  Ex. G at 99:22-100:10.

**PLAINTIFF'S RESPONSE TO ¶ 85:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case.  As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part.  This statement is uncontroverted to the extent lines 99:22 through 100:10 of Mr. Lopach's deposition contains the statement set forth in ¶ 85.  This statement is controverted to the extent the context is incomplete.  The question arises from a clarification question as to how the recipient views the message, if any, from a partially-completed ballot as opposed to a not-partially-completed ballot application.  *See* Ex. G at 99:9-99:20.  Mr. Lopach testified that he could not testify to this inquiry.  *See id.*  Based on the question, Mr. Lopach testified that he would not know a recipient's political views.  *See id.* at 99:22-100:10.  The recipient's views from the application is separate from Mr. Lopach's understanding of effectuating VPC's mission to engage populations in democracy.  *See* Ex. 6 (Lopach Tr.) at 151:10-16.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 86:**

86.     Mr. Lopach testified that nothing in the Pre-Filled Application Prohibition prohibits VPC from banding together with other persons or organizations to engage potential voters and assist community members in encouraging advance mail voting.  Ex. G at 189:18-191:14.

73

**PLAINTIFF'S RESPONSE TO ¶ 86:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part. This statement is uncontroverted to the extent lines 189:18 through 191:14 of Mr. Lopach's deposition contain the statement set forth in ¶ 86. This statement is controverted to the extent the context is incomplete. Mr. Lopach's testimony cited therein included his belief that "our strongest encouragement of the use of advance mail voting is when we include a prefilled message to the voter[]" and that it limits the success of engagement with voters. Ex. G at 189:18-191:14.

**DEFENDANTS' UNCONTROVERTED FACT ¶ 87:**

87. Mr. Lopach testified that, other than the restriction on inserting a voter's name and address on an advance voting ballot application, nothing in the Pre-Filled Application Prohibition restricts VPC from encouraging individuals to participate in the democratic process, instructing them how to obtain or vote an advance ballot, encouraging them to do so, or communicating any other message in the mailers sent to targeted voters. Ex. G at 183:9-187:19.

**PLAINTIFF'S RESPONSE TO ¶ 87:**

This statement is cited as support for Defendants' motion for summary judgment, but does not reach an ultimate question in this case. As such, this statement is immaterial and irrelevant for the Court's consideration, as will be elaborated herein.

Controverted in part. This statement is uncontroverted to the extent lines 183:9 through 187:19 of Mr. Lopach's deposition contain the statement set forth in ¶ 87. This statement is controverted to the extent the context is incomplete. The most successful method of voter

74

engagement to convey a message and empower voters to participate in democracy is through a prefilled form.  Ex. 6 (Lopach Tr.) at 187:21-188:4.

## **PLAINTIFF VPC'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS**

### **I.      VPC's Program and Speech**

1.      Plaintiff VPC's core mission is to promote voting among traditionally under-represented groups, including young voters, voters of color, and unmarried women at rates commensurate with voters in other groups. *See* Stipulated Facts at § 2(a)(viii); Ex. 4 (Dripps Tr.) 111:25-112:9; Ex. 6 (Lopach Tr.) 153:12-16, 96:14-17, 204:3-6; Ex. 15 (9/8/2021 PI Tr.) 50:9-20 (Thomas Lopach testimony), Ex. 14 Lopach Decl. ¶ 7-11, 28.

2.      VPC believes that our country's democracy is better off when more eligible voters can participate and vote for the candidates of their choice and encouraging and assisting voters to participate in elections through mail voting is one of the best ways to ensure a robust democracy. Ex. 14 (Lopach Decl.) at ¶ 8, 10.

3.      VPC advocates mail voting to expand engagement among its target voters who do not have the ability and availability to vote in person or the resources and know-how to navigate the mail voting application process.  Ex. 14 (Lopach Decl.) at ¶ 10.

4.      VPC primarily encourages its target voters to register and to participate in the electoral process through direct mailings. *See* Stipulated Facts at §2(a)(ix); Ex. 6 (Lopach Tr.) 146:24-147:15; Ex. 14 (Lopach Decl.) ¶¶ 7, 13.

5.      VPC's core message is that advance mail voting is safe, secure, accessible, and beneficial.  Ex. 14 (Lopach Decl.) at ¶ 9.

6.      VPC encourages registered Kansas to participate in this manner by mailing its target voters a package communication that advocates for mail voting and provides a personalized

75

advance mail ballot application. *See* Stipulated Facts at §2(a)(x); Ex. 4 (Dripps Tr.) 124:14-125:2; Ex. 14 (Lopach Decl.) ¶¶ 12, 17-18, 21, 23-24.

7.      To personalize the applications it sends, VPC uses statewide voter registration files obtained via its data vendors and fills-in parts of the advance mail ballot applications with the voter's information as it appears in the state records.  Ex. 6 (Lopach Tr.) 91:4-92:18; Ex. 14 (Lopach Decl.) ¶¶ 37-40.

8.      The process for personalizing applications adds additional steps and cost to the application mailing process.  Ex. 14 (Lopach Decl.) ¶ 21; Ex. 2 (Shew Tr.) 24:7-14.

9.      In 2020, VPC's mailer communications sent to Kansas voters also included a letter encouraging the voter to request and cast an advance ballot with instructions on how to do so, or if they choose, to opt out of future VPC communications; a step-by-step guide and other assistance for how voters may submit the included application; and a postage-paid envelope addressed to the voter's county election office.  Ex. 14 (Lopach Decl.) at Ex. A (2020 VPC mailer).

10.     The letter's opening paragraph specifically refers to "the enclosed advance voting application already filled out with [the voter's] name and address" and mentions the personalization in the closing "P.S." message: "We have already filled in your name and address on the enclosed form. Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope." Ex. 14 (Lopach Decl.) at Ex. A at VPC000002. The step-by-step guide was printed on the reverse side of the enclosed personalized advance ballot application. *Id.* at VPC000004.

11.     The 2022 mailers contain the same basic components as VPC's prior mailer communications, including personalized advance mail ballot applications. Ex. 14 (Lopach Decl.) ¶ 17; *id.* at Ex. B at VPC000743-746 (2022 VPC mailer).

76

12.     VPC also sent a follow-up letter in September 2022 to remind voters that they have previously received a personalized advance mail ballot application and further encouraging the voter to return the application and vote by advance mail ballot. Ex. 14 (Lopach Decl.) at ¶ 52; Ex. 6 (Lopach Tr.) 30:3-10.

13.     VPC carefully designs this package of materials to convey to the recipient VPC's message that this particular Kansan should participate in the democratic process by mail voting, that voting by mail is easy, and that VPC's audience can act on this encouragement by returning the supplied advance mail ballot application that VPC has personalized. Ex. 14  (Lopach Decl.) ¶¶ 11, 17-18, 22, 28-29;  Ex. 15 (9/8/2021 PI Tr.) 47:7-13.

14.     VPC believes that distributing personalized advance mail ballot applications as a part of its advance mail voting mailer conveys its viewpoint that voting by mail is convenient and a good option for the recipient to participate in democracy. Ex. 6 (Lopach Tr.) 149:11-13, 150:13-19, 151:14-16, 183:9-184:1, 185:21-186:3, 188:1-4; Ex. 4 (Dripps Tr.) 192:5-13; Ex. 15 (9/8/2021 PI Tr.) 44:24-45:7, 49:17-24 (Thomas Lopach testimony); Ex. 14 (Lopach Decl.) ¶¶ 9, 23-24, 66.

15.     VPC believes that personalizing its applications increases voter engagement, which in turn allows VPC to build a broad associational base with potential voters in Kansas. Ex. 6 (Lopach Tr.) 167:22-168:15; Ex. 14 (Lopach Decl.) ¶¶ 21-22, 24, 28-30.

16.     VPC considers providing young voters, voters of color, and unmarried women—who may have less access to printing and postage—with the necessary personalized applications key to effectively advocating its message.  Ex. 6 (Lopach Tr.) 185:25-186:3; Ex. 15 (9/8/2021 PI Tr.) 59:23-60:20; Ex. 14 (Lopach Decl.) ¶¶ 10, 21, 23, 24.

17.     Doing so provides the voter simple access to an advance mail ballot application that is personalized with required information from the voter file.  Ex. 14 (Lopach Decl.) ¶ 18, 21.

77

18.     An estimated 69,000 Kansas voters submitted an advance mail voting application provided by VPC to their county election official in the 2020 general election.  Ex. 14 (Lopach Decl.) ¶ 26.

19.     VPC is a data driven operation.  VPC uses data to identify its target voters, tracks recipient responses to its communications and conducts randomized control trials to evaluate the effectiveness of its mailings.  Ex. 4 (Dripps Tr.) 77:24-79:17, 116:3-18; Ex. 6 (Lopach Tr.) 14:15-20:13, 116:17-117:12, 154:25-157:15, 165:1-166:9, 170:7-174:9.

20.     VPC engages experts in voting behavior and quantitative research, who support VPC's belief that personalizing applications is effective at conveying the organization's pro-advance mail voting message.  Ex. 14 (Lopach Decl.) ¶ 16; Ex. 6 (Lopach Tr.) 13:15-16:10; Ex. 4 (Dripps Tr.) 159:20-160:16.

21.     VPC (then named "Women's Voices. Women Vote") conducted a study that evaluated the 2006 election cycle (the "2006 Study"), including VPC's evaluation of the effectiveness of personalizing advance mail voting applications.  Ex. 6 (Lopach Tr.) at 17:15–18:7, 20:7–13.

22.     Mr. Lopach testified that the 2006 Study found that pre-filled "vote-by-mail applications had a higher rate of return than blank vote-by-mail applications."  Ex. 6 (Lopach Tr.) at 18:24-19:6.

23.     The 2006 Study concluded that "a pre-populated form produced a higher response rate than a blank form."   Ex. 17 (2006 Study, VPC000756) (excerpted) at VPC000851. Specifically, pre-populated forms had a response rate over 11% higher than un-populated forms. *See id.* at VPC000852.

78

**II.    The Burden of the Personalized Application Prohibition on VPC's Program and Speech**

24.    The Personalized Application Prohibition bans any person who solicits by mail a registered voter to file an advance mail ballot application and includes such an application in the mailing from completing of any portion an application prior to mailing the application to a registered voter, such as a voter's name and address.  PTO-SF ¶ xxii; H.B. 2332 § 3(k)(2) (codified at K.S.A. 25-1122(k)(2)).

25.    The Personalized Application Prohibition is not limited to only the inaccurate or fraudulent completion of any portion of an application.  H.B. 2332 § 3(k)(2) (codified at K.S.A. 25-1122(k)(2)).

26.    The Personalized Application Prohibition does not allow a person soliciting a registered voter to file an advance mail ballot application to mail that voter an application that has been completed with information from the Kansas voter rolls prior to mailing.  *See id.*

27.    The Personalized Application Prohibition does not limit the number of advance mail ballot applications that may be mailed to a registered voter.  *See id.*

28.    The Personalized Application Prohibition does not require the sender of advance mail ballot applications to identify itself on such mailings.  *See id.*

29.    A violation of the Personalized Application Prohibition is a class C nonperson misdemeanor, which contains no scienter requirement and is punishable by up to one month in jail and/or fines.  *Id.* § 3(k)(5); K.S.A. §§ 21-6602(a)(3), (b).

30.    VPC understands that the Personalized Application Prohibition would prevent it from its most effective means of conveying its pro-mail voting message.  Ex. 14 (Lopach Decl.) ¶ 18 ("[p]ersonalizing the applications with prefilled information drawn from states' voter registration files best ensures that VPC's message and assistance are both effective and accurate"),

79

¶¶ 55-66; Ex. 6 (Lopach Tr.) 150:13-19, 151:14-16, 185:21-186:3, 188:1-4; Ex. 15 (PI Hearing Tr.) 44:24-45:7, 49:17-24, 60:11-20 (Thomas Lopach testimony).

31.     VPC understands that the Personalized Application Prohibition would limit its associational activity with voters.  Ex. 6 (Lopach Tr.) 190:10-12.

### III.     VPC's Personalization of Applications Does Not Burden the State

32.     VPC Executive Vice President Lionel Dripps testified that VPC detected an error in the data it received from its data vendor whereby, nationally, roughly 5% of records had a middle name or initial and roughly 3% had a suffix that did not appear to match the voter file.  Ex. 4 (Dripps Tr.) 167:24-168:9, 169:17-170:2.

33.     Mr. Dripps testified that he did not know whether these errors appeared in the Kansas data in line with the national numbers.  Ex. 4 (Dripps Tr.) at 169:10-16, 170:11-25.

34.     Plaintiff's expert witness Dr. Eitan Hersh, who analyzed the expert reports of Defendants' proffered expert witness Kenneth Block, concluded that even assuming that all issues raised by Mr. Block represent actually erroneous or obsolete registrants contacted by VPC's mailers, the alleged issues raised by Mr. Block relate to just under 3% of the records in the VPC database.  *See* Ex. 5 (Hersh Rept.) ¶ 27.

35.     Mr. Block testified that he did not endeavor to compare the total number of purportedly erroneous records in his declaration and exhibits to the total records on VPC's mailing list.  *See* Ex. 7 (Block Tr.) 272:18-23.

36.     Mr. Block testified that he did not know "what the error rates are in VPC's data." Ex. 7 (Block Tr.) 267:18-268:7.

37.     Mr. Block testified that he does not know how many advance mail ballot applications that were submitted by voters and pre-filled by VPC were ultimately rejected by Kanas election officials.  Ex. 7 (Block Tr.) 272:9-17.

80

38. Mr. Block testified that he does not know, and is not offering an opinion as to, whether applications sent in on VPC mailers created more or less work for election officials than applications sent in by other individuals or organizations. Ex. 7 (Block Tr.) 268:14-24.

39. Mr. Howell testified that the personalization of applications did not cause voters to become more confused and frustrated. *See* Ex. 1 (Howell Tr.) 245:13-19 (Q. "Is it your opinion that -- that voters became even more confused and frustrated when the applications contained prefilled information?" A. "I don't think that the prefilled information, in and of itself, was what all of the concern was.").

40. Mr. Howell testified that that if a voter crossed out a prefilled suffix, and the remaining information on the application was correct, it would probably be accepted. *See* Ex. 1 (Howell Tr.) 184:16–185:11; Ex. 9 (Ex. 7 to Howell Dep.) at 55.

41. Ms. Schmidt testified that an application with a missing middle initial would still be processed so long as the remaining information on the application was correct. *See* Ex. 18 (Excerpts of the Deposition of Connie Schmidt (Sept. 16, 2022) ("Schmidt Tr.")) at 103:25-104:14.

42. Mr. Shew testified that he did not recall the Douglas County Elections Office receiving significantly more duplicate applications in 2020 compared to previous years and that, to the extent there was an increase, such an increase could be attributable to greater voter participation in the presidential election. *See* Ex. 2  (Shew Tr.) 74:3-19.

43. Ms. Cox testified that the Ford County Clerk's office had "a lot more mail ballot voting than we had in the past" because of the "COVID-19 pandemic." *See* Ex. 16 (Cox. Tr.) 102:3-8.

44. Ms. Cox further testified, "I did mail out [advance mail ballot] applications because of the COVID -- which I don't normally do a mass mailing. I did mail out to every registered voter

81

[advance mail ballot] applications for the primary and the general." *See* Ex. 16 (Cox. Tr.) 102:9-12.

45. Ms. Schmidt testified that the Johnson County Election Office did not detect any instances of voter fraud in 2020. *See* Ex. 18  (Schmidt Tr.) 212:25-213:22.

46. Ms. Cox testified that the Ford County Clerk's Office ran the 2020 elections successfully and that post-election audits detected no evidence of voter fraud. *See* Ex. 16 (Cox. Tr.) 105:5-106:9.

**LEGAL STANDARD**

Summary judgment should be granted only where the moving party shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant has the initial burden of demonstrating that there is no genuine issue of material fact which "might affect the outcome of the suit under governing law." *Furr v. Ridgewood Surgery & Endoscopy Ctr., LLC*, 192 F. Supp. 3d 1230, 1235 (D. Kan. 2016) (Vratil, J.) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Once the movant meets its initial burden, the nonmovant need only identify evidence of an issue of material fact which is "significantly probative and would enable a trier of fact to find in the nonmovant's favor." *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quoting *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).  In considering whether there are genuine disputes of material fact, courts must "view[] the record in the light most favorable to the nonmoving party." *Furr*, 192 F. Supp. 3d at 1246 (citing *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir. 1991)).

**ARGUMENT**

**I.  THE PERSONALIZED APPLICATION PROHIBITION RESTRICTS PLAINTIFF'S SPEECH, EXPRESSIVE CONDUCT, AND ASSOCIATION**

In granting Plaintiffs' motion for a preliminary injunction and denying Defendants' motion to dismiss, the Court correctly rejected Defendants' argument that the Personalized Application Prohibition "exclusively regulates conduct, not speech." *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 886 (D. Kan. 2021).  Despite discovery establishing the facts alleged in the Complaint and presented during the preliminary injunction evidentiary hearing, Defendants now advance this same argument and ask the Court to reverse its prior holding.  The Court should once again reject this request.  For the reasons below, and as further set forth in Plaintiff's motion for summary

83

judgment (ECF No. 154), the personalized applications are intertwined with VPC's overall communication, personalizing is itself Plaintiff's added speech, distributing personalized applications is expressive conduct, and Plaintiff's personalized mailers are associational activity.

**A.      Personalizing Advance Mail Ballot Applications and Distributing Them to VPC's Target Voters Is Protected First Amendment Activity**

1.      Distributing Personalized Applications Is Core Political Speech

As this Court already held, VPC's distribution of personalized advance mail ballot applications is "communication among private parties who are advocating for particular change— more voting by mail, especially in under-represented populations." *VoteAmerica*, 576 F. Supp. 3d at 888.[12]   This holding respects the Supreme Court's admonition that the First Amendment embraces a wide range of speech involving the political process and courts must "be vigilant . . . to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 192 (1999) (citing *Meyer v. Grant*, 486 U.S. 414, 421 (1988)).  Accordingly, the coverage of what counts as protected speech here is defined in broad terms, such as "the expression of a desire for political change," "communication of information," and "dissemination and propagation of views and ideas" about the electoral process.  *Meyer*, 486 U.S. at 421, 422 n.5 (citing *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)).

The Court's prior holding is now further supported by the facts developed in discovery.  It is undisputed that VPC's core mission is to promote voting among traditionally under-represented groups.  *See* Plaintiff VPC's Statement of Additional Uncontroverted Facts ("SOAF") ¶ 1; *see also*

---

[12]      Defendants' repeated yet conclusory assertion that the Court's prior decision "largely focused on [the] Out-of-State Distributor Ban" ignores the parts of the Court's opinion that specifically address the Personalized Application Prohibition and fails to appreciate that the Court's joint analysis applied to both challenged provisions. Defs.' Mot. for Summ. Judgment Br., ECF No. 151 ("Mot.") at 28.

Defendants' Statement of Uncontroverted Facts ("SOF") ¶ 1.  Specifically, VPC advocates for mail voting (and the ease and trustworthiness of mail voting) to increase engagement in these populations beyond just those voters who have the ability and availability to vote in person or the resources and know-how to navigate the mail voting application process without assistance.  *See* SOAF at ¶¶ 3, 5. To persuade voters to apply to vote by advance mail ballot, Plaintiff creates and disseminates preprinted advance mail ballot applications, personalized with information drawn from state records, that are distributed in a package with postage-paid return envelopes and letters that provide necessary information, instruction, and resources.  *See* SOAF ¶¶ 4, 6, 7, 9, 10, 13.

Defendants argue that VPC improperly construes all of the pieces of its mailing—the personalized application, together with the cover letter, instructions, and the prepaid return envelope—as constituting one message, and attempt to isolate the personalized application and minimize First Amendment protections. But Defendants ignore that the distribution of personalized applications is "characteristically intertwined" with VPC's pro-mail-voting communication.  *Schaumburg*, 444 U.S. at 632.[13]  The entire point of VPC's mailer is to convey a message that voting by mail is easy and provide direct assistance and the seamless means for how voters can engage in this manner.  *See* SOAF ¶¶ 4, 5, 6, 13, 14, 16, 17.  All other parts of VPC's communication are designed to reinforce the core component of its message: providing a personalized application.  *See* SOAF ¶¶ 7, 9, 10, 13.  Defendants' explicit efforts to "disaggregate[]" the "application . . . from the cover letter" (Mot. at 25), is in direct conflict with

---

[13]     Defendant's claim that the cover letter would be "wholly unaffected by the Pre-Filled Application Prohibition" (Mot. at 23), is belied by the record.  VPC's cover letter explicitly says, for example: "I have sent you the enclosed advanced ballot by mail application already filled out with your name and address."  *See* SOAF ¶ 10.  The purpose of VPC's cover letter, and other instructional materials, is to inform and persuade the recipient voter that opting to vote by mail is easily done *with the attached personalized application*.

the Supreme Court's "refus[al] to separate the component parts of" a communication "from the fully protected whole." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988); *see also League of Women Voters of Tenn. v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (rejecting "slicing and dicing" the plaintiffs' speech).[14]  This Court likewise recognized that VPC's mailer communications—including the personalized application—should be viewed in total. *VoteAmerica*, 576 F. Supp. 3d at 874-75 (distinguishing *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742 (M.D. Tenn. 2020), a case involving the distribution of blank applications, in part because VPC's "application packets include speech that communicates a pro-mail voting message").

But even in isolation, VPC's personalization of the advance mail voting applications is also protected by the First Amendment because VPC's prefilling is written speech.  The personalized applications include words chosen by VPC—specific names from the voter rolls and the associated addresses—written on a page.  *See* SOAF ¶¶ 6, 7, 9.  It amounts to "the creation and dissemination of information," specifically the identifying information reflected in the voter file, for voters to have on their application and use to easily submit it.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (finding that even "prescriber-identifying information" sold by pharmacies is informational

---

[14]    Defendants' citation to *Sickles v. Campbell County, Kentucky*, 501 F.3d 726 (6th Cir. 2007), has no bearing on the analysis of whether the personalized ballot application can be disaggregated from the rest of VPC's mailers for purposes of determining whether the Personalized Application Prohibition infringes First Amendment interests. The holding in *Sickles* is narrow: the government withholding money sent to inmates does not violate the senders' free speech rights even though there is some possibility that money may be used by the inmate to make phone calls. *Id.* at 734.  The connection between sending personalized advance mail voting applications along with a letter encouraging the submission of that application and instructions for how to do so is not nearly so tenuous.

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), is similarly off point.  There, the language to which Defendants cite pertains to the Court rejecting a pre-enforcement overbreadth challenge to a statute criminalizing knowingly providing material support to terrorist organizations where the plaintiffs failed to articulate beyond the most general terms the form of their intended advocacy for the organizations. *Id.* at 25.  VPC's articulation of the speech that it engages in, by contrast, is precise: distributing mailers that include personalized advance mail ballot applications.

speech); *accord Animal Legal Defense Fund v. Schmidt*, 434 F. Supp. 3d 974, 999 (D. Kan. 2020) (Vratil, J.), *aff'd sub nom. Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021).[15]

Defendants' reliance on *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), to argue that there is "no conceivable 'speech'" on an application VPC personalizes because it is "simply a state-created form" is misplaced. *See* Mot. at 24. The challenged law in *Timmons* prohibited candidates from appearing on a ballot as affiliated with more than one political party. 520 U.S. at 353-54. As a result, a minor political party could not be listed next to its preferred candidate if the candidate was running on the ticket of another political party. *Id.* The minor political party argued this inhibited its ability to communicate its endorsements on the ballot. *Id.* The Court rejected this argument because the party did not have the right to compel the state to design its ballot so that the party could "send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate." *Id.* at 563. The lesson from *Timmons* is therefore much narrower: parties have no speech right to compel what appears next to candidates' names on a ballot. Plaintiff's activity here bears no resemblance to *Timmons*, and the case does not support Defendants' broad rule that using "a state-created form" can never be communicative.

Instead, *Meyer* and *Buckley* foreclose that argument. Citizen petitions are state-created forms that advocates use to express their speech. And there is no dispute that distributing citizen petitions is expressive. *Meyer*, 486 U.S. at 421; *Buckley*, 525 U.S. at 192. Thus, even though the personalized ballot applications originate as a state-created form and have an administrative effect in the electoral process, that does not "somehow deprive[] that activity of its expressive

---

[15]     *See also Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct" (internal citations omitted)); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749 (1985) (credit report is "speech").

87

component, taking it outside the scope of the First Amendment." *Doe v. Reed*, 561 US. 186, 195 (2010); *see also id.* ("Petition signing remains expressive even when it has legal effect in the electoral process.").

Defendants further contend that personalizing applications cannot be speech because VPC can only write pre-determined information on the personalized communications (Mot. at 24), but this is contrary to the factual record. It is indisputable that VPC in fact *does* have discretion, and uses that discretion, regarding the information entered into the fields of the application: whose information gets inserted. *See* SOAF ¶¶ 6, 7. Selecting which voters will receive the application and personalizing with that voter's information is expression—it communicates VPC's belief that the particular voter whom VPC carefully selected and sent its mailer should apply for an advance mail ballot and participate in the democratic process. *See* SOAF ¶¶ 13, 14.

### 2.    Distributing Personalized Advance Mail Ballot Applications Is Expressive Conduct

Distributing personalized applications is also expressive conduct. As the Court recognized, VPC's mailing of its application packets "communicates a pro-mail voting message" that "is inherently expressive conduct that the First Amendment embraces." *VoteAmerica*, 576 F. Supp. 3d at 875. "Conduct that is intended and reasonably perceived to convey *a message* falls within the free speech guarantee of the First Amendment." *ACORN v. City of Tulsa*, 835 F.2d 735, 742 (10th Cir. 1987) (emphasis added). VPC's distribution of personalized advance mail voting applications conveys a message to its specified voter recipients: participation in democracy is good, doing so through mail voting is convenient and beneficial, and the identified voter should use the enclosed and already personalized application to start the process. *See* SOAF ¶¶ 13, 14.

Defendants attempt to render VPC's expression non-communicative by arguing that personalizing the application does not offer "a separate message," as compared to conveying a

88

generic application, and that recipients do not "discern[] any particular message" from the personalized application.  Mot. at 24-25.  This misstates both law and fact.  For conduct to be expressive, the speaker need not isolate a particular message apart from other types of expression because "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schonberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish–Am., Gay, Lesbian & Bisexual Grp. Of Boston*, 515 U.S. 557, 569 (1995) (citation omitted).  And Plaintiff is not required to provide evidence that a specific voter subjectively discerned a particular message, as Defendants contend.  Mot. at 25.  Rather, the standard is objective and broader: "whether the reasonable person would interpret [the conduct] as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1212 (11th Cir. 2022) (citation omitted).

But even if a specific message conveyed and received were required, the uncontroverted facts here satisfy that standard.  Defendants raise no genuine dispute of material fact to contest that Plaintiff personalizes the applications to express a specific pro-advance mail voting message to a specific voter recipient whose information VPC conveys on its communications.  *See* SOAF ¶ 13. And Defendants raise no genuine dispute of material fact that tens of thousands of Kansans did in fact receive and act on VPC's specific message by completing and submitting an application that VPC sent.  *See* SOAF ¶ 18.  There can be no doubt that Kansans interpreted VPC's mailing of the personalized applications as imparting the pro-voting message observed by this Court.

Defendants' expressive conduct analysis again attempts to divide the cover letter from the application, arguing that the cover letter's speech renders VPC's distribution of personalized advance mail ballot applications non-expressive.  Mot. at 25.  But, unlike in *Rumsfeld v. Forum*

89

*for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006), to which Defendants principally rely for this proposition, this is not a case where an observer of VPC's conduct, *i.e.*, a recipient of a personalized ballot application, would be unable to discern VPC's message without speech explaining it.  It defies common sense that a civic organization who was indifferent to whether an individual should submit a vote by mail application would expend the additional resources to send that individual a personalized application to do so.  Moreover, the expressive conduct analysis here *requires* looking to the context in which the personalized application is sent. *Spence v. Wash.*, 418 U.S. 405, 409-10 (1974) (courts must examine "the nature of [the speakers'] activity, combined with the factual context and environment in which it was undertaken"); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) (expressive conduct is examined "in context").  Viewing the personalized application in its context—the ongoing election cycle during which the personalized application arrives, as well as the rest of VPC's mailer—only supports that VPC is distributing the personalized application to further express its pro-advance mail voting message.

        3.      <u>Distributing Personalized Advance Mail Ballot Applications Is Protected Associational Activity</u>

VPC's personalized application communications are protected associational activity.  As set forth in Plaintiff's motion for summary judgment, VPC uses its personalized applications as outreach to build greater association with a specific group of selected voters and engages them in the political process with future communications.  *See* SOAF ¶¶ 1, 15, 19.  The Court previously recognized the implications of the Personalized Application Prohibition on Plaintiff's associational activity, and the facts confirm this holding.  *VoteAmerica*, 576 F. Supp. 3d at 875.

Defendants' categorical argument that the Personalized Application Prohibition has "no impact" on Plaintiff's association relies on their assertion that VPC's mailer communication "is a unilateral act that can be ignored by the would-be associate."  *See* Mot. at 1, 45.  But the First

Amendment's protections of associational interests cannot be predicated on whether the association currently exists or is at its beginning.  In *NAACP v. Button*, the plaintiff's efforts to solicit then-unassociated individuals to participate in litigation was protected as the means to *begin* an association.  371 U.S. 415, 429-32, 437 (1963).  Analogous facts were at issue in *Healy v. James*, where the Court protected a disfavored student group's associational activity seeking the "use of campus bulletin boards and the school newspaper" that were necessary to reach "new students" and create further associations to "remain a viable entity in a campus community."  408 U.S. 169, 181 (1972).  VPC's associational activity here is no different.  Defendants' cramped reading of associational rights to only protect *existing* associations is at odds with these cases.

Defendants' conclusions about Plaintiff's associational activity are also belied by the evidence.  The undisputed record shows that VPC identifies a specific group of voters to target for its associations and does in fact continue its association with those voters by, for example, tracking who responds to its personalized advance mail voting applications and following up by sending further get-out-the-vote communications. *See* SOAF ¶¶ 12, 18, 19. These circumstances are a far cry from *City of Dallas v. Stanglin*, where the Court denied associational protections because the plaintiffs were merely "patrons of the same business establishment" that admitted "anyone willing to pay the admission fee," they expressed no shared views or joint activity, and they engaged in no articulated associational outreach.  490 U.S. 19, 24-25 (1989).

**B.      Defendants Fail to Distinguish the Precedent on which the Court Relied in Granting Plaintiff's Motion for a Preliminary Injunction**

Binding and persuasive precedent recognizing First Amendment protections in the same or analogous contexts confirms that VPC's distribution of personalized advance mail ballot applications constitutes protected First Amendment activity.  Numerous courts have recognized that substantially similar activity advocating for and assisting voters with mail voting or voter

91

registration through distributing communications constitutes protected speech, expressive conduct, and association. *See, e.g.*, *League of Women Voters of Tenn.*, 400 F. Supp. 3d at 720; *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 224 (M.D.N.C. 2020); *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 812 (E.D. Mich. 2020) ("*Nessel I*"); *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202, 1215-16 (D.N.M. 2010). Similarly, multiple binding decisions have recognized broad First Amendment protections for civic organizations' speech in the analogous step in the democratic process of distributing and persuading citizens to sign petitions. *See Meyer*, 486 U.S. at 422-23; *Buckley*, 525 U.S. at 186, 192; *Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002); *Yes On Term Limits v. Savage*, 550 F.3d 1023, 1028 (10th Cir. 2008). The same broad protections apply to VPC and similar groups distributing and persuading Kansas citizens to vote by mail.

Defendants fail to accurately portray the governing caselaw. Defendants' assertion that "the overwhelming majority of courts to examine the issue have concluded that the distribution of advance voting ballot applications is *not* protected speech," Mot. at 27, is flatly wrong. Two of the three cases Defendants cite for this "overwhelming majority" relate to the *collection* of absentee ballot applications and voter registration applications, not distribution, and are therefore inapposite.[16] Later, Defendants once again argue that the "overwhelming case law," including two

---

[16] Moreover, in *League of Women Voters v. Browning*, the court assumed that even the collection and handling of voter registration applications was expressive for purposes of its analysis. 575 F. Supp. 2d 1298, 1319 (S.D. Fla. 2008). Defendants' reliance on *Priorities USA v. Nessel*, 487 F. Supp. 3d 599 (E.D. Mich 2020) ("*Nessel II*") (Mot. at 30-31), is misplaced for similar reasons. In a subsequent decision, although the district court held that *collection and delivery* of absentee ballot applications was not expressive, it specifically found that "Plaintiffs may *provide* potential absentee voters with blank applications" and "[i]n turn, such conduct could be a 'vehicle' to discuss the 'importance of voting, as well as the merits of candidates and ballot measures.'" *Priorities USA v. Nessel*, 2:19-cv-13341, 2022 WL 4272299, at *5 (E.D. Mich. Sept. 15, 2022) ("*Nessel III*") (emphasis added).

92

circuits, have held that "sending or collecting forms is *not* expressive conduct." Mot. at 29. Not so. Once again, all the cases Defendants cite related solely to *collection activity,* not the distinct distribution and persuasion activities. In fact, *Voting for America v. Steen*, "accepted" that "'distributing' voter registration forms" and 'helping' voters to fill out their forms" are expressive. 732 F.3d 382, 389-90 (5th Cir. 2013); *see id.* (finding that collection of completed voter registration forms is not speech but that "[s]oliciting, urging, and persuading [a] citizen to vote are the canvasser's speech"); *see also Democracy N.C. v. N.C. Board of Elections*, 476 F. Supp. 3d at 224 (finding that collecting and delivering ballot applications is not expressive but assistance with applications is); Pls.' Preliminary Injunction Reply Br. at 8-11 (ECF No. 33) (describing expressive differences between distribution and collection of voting-related forms).

Defendants ignore all the contrary precedent in tallying the weight of the case law. *See, e.g.*, Pl.'s Mot. for Summ. Judgment Br., ECF No. 154 at 24.[17] Thus, the "overwhelming majority" Defendants cite hinges on *VoteAmerica v. Raffensperger*, a wrongly decided preliminary injunction decision that is directly contrary to this Court's prior ruling. No. 1:21-cv-01390-JPB, 2022 WL 2357395, at *7-10 (N.D. Ga. June 30, 2022). The result in *Raffensperger* hinged on the district court's preliminary conclusion that nothing in VPC's distribution of vote-by-mail applications is protected speech. *Id.* This Court has already rejected that premise.[18]

---

[17]   Indeed, Defendants do little to say why the superficial distinctions it draws from the binding precedent in the petition circulator context are actually consequential, and they provide only minimal discussion of the key cases under *Meyer-Buckley*. *See, e.g.*, Mot. at 34.

[18]   While Defendants model their arguments for summary judgment on the reasoning in *Raffensberger* that this Court has already rejected, the internal contradictions in the *Raffensperger* decision also limit its persuasiveness. For example, the court ruled that the vote-by-mail application was not a vehicle for expression while later contradictorily ruling that a required disclaimer on the application *did* amount to compelled speech. *Id.* at *12.

Defendants' other attempts to distinguish relevant caselaw are unavailing. For example, Defendants argue that the holding in *Democracy North Carolina*—assisting voters by filling out part or all of a voter's a request for an absentee ballot is expressive conduct (476 F. Supp. 3d at 175, 224)—is inapplicable here because the Personalized Application Prohibition does not prohibit third parties from assisting voters in completing an advance mail ballot application.  Mot. at 29-30.  But Defendants then concede, as they must, that the Prohibition in fact *does* bar third parties from assisting voters by personalizing the distributed application. *Id*. The holding in *Democracy North Carolina* squarely applies.   Defendants likewise provide no convincing basis for distinguishing the free speech ruling in *League of Women Voters of Florida v. Cobb*, 447 F. Supp. 2d 1314 (S.D. Fla. 2006).   Even if Defendants' argument that "voter registration forms are fundamentally distinct from absentee ballot applications" was correct, those distinctions go to state rationales for restrictions, not the expressive nature of the communications.

C.      **Defendants' Argument That the Personalized Application Prohibition Does Not Restrict First Amendment Activity Because Other Methods of Communication Remain Available to VPC Is Contrary to Settled Law**

Ultimately, Defendants' argument that the Personalized Application Prohibition restricts non-expressive conduct—not First Amendment activity—boils down to Defendants' repeated insistence that VPC has other available methods to communicate its message.  However, that VPC remains "free to employ other means to disseminate their ideas" does not take their speech through distributing personalized applications "outside the bounds of First Amendment protection." *Meyer*, 486 U.S. at 424; *see also Cal. Democratic Party v. Jones*, 530 U.S. 567, 581 (2000) ("We have consistently refused to overlook an unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired.").

Defendants argue, relying again on *Voting for America v. Steen*, that what VPC actually seeks in distributing personalized advance mail ballot applications is not just to speak, but also to

94

succeed in its goal of getting voters to vote by mail. *See* Mot. at 26. As noted above, *Steen* does not concern the type of activity at issue here. 732 F.3d at 389-90. But more to the point is that, far from advocating for the success of their programs, VPC seeks to vindicate its "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer*, 486 U.S. at 424; *see also* SOAF ¶¶ 15, 19, 20. Defendants ignore this clear holding in *Meyer*.

Defendants misapprehend how the factual and legal circumstances of *Meyer* bear on this case. The *Meyer* plaintiffs were proponents of a ballot initiative petition concerning "whether the trucking industry should be deregulated in Colorado" who wished to gather the required signatures through paid circulators, which Colorado law banned. 486 U.S. at 421. The Supreme Court held this ban unconstitutional because restricting how plaintiffs could communicate their message— paying circulators—stripped plaintiffs of their most effective method for getting their message out and reduced the overall quantum of speech on the issue. *Id.* at 422-24. The question before the Supreme Court in *Meyer* was not whether paying circulators was itself speech, but whether by denying plaintiffs their most effective method of speaking, the ban violated the First Amendment. *Id.* Here, the challenged restriction is even more immediately related to preventing VPC from conveying its desired message, compared to *Meyer*. The Personalized Application Prohibition directly dictates the content of VPC's communications and eliminates VPC's core means of expressing its message through its activity: that voting by mail is convenient and beneficial, and to drive home that advocacy, here is the personalized application to so.

VPC's distribution of personalized applications is protected under the First Amendment. Not only is Plaintiff's pro-advance mail voting communication as a whole plainly speech, but the applications themselves, prepared and personalized by Plaintiff, are also speech, and the

95

distribution of those applications inherently conveys Plaintiff's message and furthers its associations. Plaintiff's communications concerning the fundamental political act of voting warrant at least as much protection as discussions about "whether the trucking industry should be deregulated in Colorado." *Meyer*, 486 U.S. at 421. Defendants' attempt to refute this with unsupported conclusory statements—and no genuine dispute of material fact—should be rejected.

## II. THE PERSONALIZED APPLICATION PROHIBITION IS SUBJECT TO STRICT SCRUTINY

Defendants argue that the proper standard is rational basis review because the First Amendment is not implicated and that, even if the First Amendment were implicated, the Personalized Application Prohibition is viewpoint- and content-neutral and therefore not subject to heightened scrutiny. But discovery has confirmed what this Court previously found: the Personalized Application Prohibition "significantly inhibits communicati[on] with voters about proposed political change and eliminates voting advocacy by plaintiffs." *VoteAmerica*, 576 F. Supp. 3d at 888 (internal quotations omitted). As such, the Prohibition infringes on Plaintiff's protected First Amendment rights and is subject to strict scrutiny.

### A. Strict Scrutiny Applies

There are four independent reasons why the Court should apply strict scrutiny: the Personalized Application Prohibition (1) abridges VPC's core political speech; (2) is content- and viewpoint-based; (3) limits VPC's associational activity; and (4) is unconstitutionally overbroad. Any one of Plaintiff's four grounds is sufficient to trigger strict scrutiny and this Court should reject Defendants' argument that a lower level of scrutiny applies.

### 1. The Prohibition Abridges Plaintiff's Core Political Speech

VPC's mailing of personalized advance mail ballot applications is core political speech. *See supra* Part I.A.1. VPC sends personalized advance mail ballot applications to encourage

96

specific individuals to vote by mail and participate in the democratic process. SOAF ¶¶ 6, 7. VPC's communications advocate for political change, both in the narrow sense that VPC engages with voters on the merits of the political question of whether voting by mail is a safe and effective (SOAF ¶¶ 13, 14), and in the broader sense, as VPC's advocacy for increased participation among under-represented groups is ultimately advocacy for an elected government that serves those people and their interests. *See* SOAF ¶ 2.   VPC's speech "advoca[ting for] a politically controversial viewpoint" in favor of voters trusting and using advance mail voting is "the essence of First Amendment expression." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). But the Personalized Application Prohibition "involves direct regulation of [this] communication among private parties who are advocating for particular change—more voting by mail, especially in under-represented populations." *VoteAmerica*, 576 F. Supp. 3d at 888.   By banning this "interactive communication concerning political change" the Prohibition abridges Plaintiff's core political speech, and the First Amendment protection warranted is "at its zenith." *See Chandler*, 292 F.3d at 1241 (internal citations omitted).

The Personalized Application Prohibition directly blocks VPC's most effective means of advocacy because it bans VPC from personalizing its applications.   SOAF ¶¶ 16, 24. While Defendants quibble with the actual effectiveness of this method of speech, *see* Mot. at 34,[19] they do not contest that "[t]he First Amendment protects [VPC's] right, 'not only to advocate their cause but also to select what they *believe* to be the most effective means for so doing.'" *Chandler*, 292 F.3d at 1244 (quoting *Meyer*, 486 U.S. at 424) (emphasis added).   Thus, VPC's belief that

---

[19]   Defendants erroneously claim that VPC has produced no evidence in support of its position that prefilling is effective. *See* Mot. at 25.   Not so.   Mr. Lopach testified that VPC conducted a study into the effect of personalizing information on vote-by-mail applications.   SOAF at ¶ 21, 22, 23.   The study's results were clear: "a pre-populated form produced a higher response rate than a blank form," increasing the response rate by over 11%. *Id*.

Appellants' Appendix - Vol. II - 446

personalizing applications most effectively advocates its pro-advance mail ballot message is what is relevant, and on that point VPC has been consistent and clear.  SOAF ¶¶ 20, 30.

Defendants assert that "this case no longer involves activity protected by the First Amendment," because VPC is able to send advance ballot applications.  *See* Mot. at 22.  But Defendants recitation of other means Plaintiff may employ to disseminate their ideas "does not take their speech . . . outside the bounds of First Amendment protection."  *See Meyer*, 486 U.S. at 424.  The Personalized Application Prohibition would "limit[] the quantum of [] speech" concerning advance mail voting by eliminating one form of VPC's expression of its message. *Yes On Term Limits*, 550 F.3d at 1028.

### 2.      The Prohibition Is Content- and Viewpoint-Discriminatory

The Personalized Application Prohibition "eliminates voting advocacy by plaintiffs . . . based on the content of their message . . . ." *VoteAmerica*, 576. F. Supp. 3d at 888.  The Prohibition quite literally defines the speech it regulates based on the category of document covered (SOAF ¶ 24), and bans the content VPC uses to convey its message: certain voters' names and addresses. SOF ¶ 4.  The Prohibition does not, however, apply to other types of communication.[20]

Defendants attempt to analogize the Personalized Application Prohibition to the regulation at it issue in *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, but the comparison is inapposite. In *City of Austin*, the Court reiterates its precedent that "[a] regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—

---

[20]      Defendants attempt to rely on *Burson v. Freeman*, 504 U.S. 191 (1992), to assert that the Prohibition is not content-based discrimination even though it applies to certain speech based on its content. *See* Mot. at 37. However, the Court found the restriction at issue in *Burson* to be content-based and consequently applied strict scrutiny. 504 U.S. at 198. There, the Court—noting that it was a rare case that survived strict scrutiny—ultimately found the law in question to be narrowly tailored to a serve a compelling state interest of ensuring voters can cast their ballots free from intimidation and fraud. *Id.* at 210. This is not a similarly rare case.  *See infra* Part III.

98

that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'"  142 S. Ct. 1464, 1471 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).  The Court differentiated the relevant city code at issue in *City of Austin* from that in *Reed* because the former the "d[id] not single out any topic or subject matter for different treatment . . . [r]ather the City's provisions distinguish based on location . . . ."  *Id.* at 1472-73.

Unlike the regulation in *City of Austin*, however, the Personalized Application Prohibition is not location-based or "agnostic as to content."  *Id.* at 1471.  To the contrary, the Personalized Application Prohibition singles out personalized information on advance mail ballot application and forbids such content.  SOF ¶ 4.  Defendants fail to meaningfully engage with the *City of Austin*'s analysis and instead resort to their refrain that personalizing advance ballot applications does not express a message.  Once again, this argument fails.

Additionally, Defendants present no argument apart from their *ipse dixit* assertion that the Personalized Application Prohibition is viewpoint-neutral.  To the contrary, however, it "inherently present[s] 'the potential for becoming a means of suppressing a particular point of view,'" because mailing a personalized application is only consistent with a pro-vote-by-mail message.  *See City of Austin*, 142 S. Ct. at 1473 (quoting *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)).  The process for personalizing applications adds additional steps and cost to the application mailing process (*see* SOAF ¶ 8), that only communications advocating for advance mal voting would undertake.  Discriminatory content- and viewpoint-based speech restrictions, such as the Personalized Application Prohibition, are subject to strict scrutiny and are "presumptively unconstitutional."  *Reed*, 576 U.S. at 163; *see also Buckley*, 525 U.S. at 186-87.

99

3.      The Prohibition Infringes on Plaintiff's Associational Rights

As this Court previously acknowledged, if the Personalized Application Prohibition limits VPC's ability to associate for the purposes of assisting voters request an application for an advance ballot, then it violates their First Amendment rights to engage in free association.  *See VoteAmerica*, 576 F. Supp. 3d at 876.  Contrary to Defendants' assertions, Mr. Lopach testified to exactly that: the Personalized Application Prohibition "limits the success of [VPC's] engagement with voters."  *See* SOAF ¶ 31.  The Prohibition need not be an outright ban on VPC's associational activities for it to be actionable.  *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973).  VPC's freedom of association encompasses their right to choose *how* to associate with others, and courts "give deference to an association's view of what would impair its expression."  *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000).

The undisputed evidence establishes that the Personalized Application Prohibition limits VPC's ability to associate with underrepresented voters and encourage them to vote by mail.  VPC personalizes its communications because it has carefully identified the *specific voters* with whom it wants to band together to increase electoral participation, tout the security and convenience advantages of mail voting, and provide inroads for future engagement on electoral issues.  *See* SOAF ¶¶ 13, 20.  This is akin to the protected activity in *NAACP v. Button*, where the Supreme Court held that the NAACP's First Amendment rights were violated by a law that prevented the organization from associating to persuade others to action and using those associations to build relationships and bring litigation, their chosen "means for achieving" its desired change.  371 U.S. at 429.  Defendants have not presented any evidence to the contrary.  There, as here, a restriction on plaintiff's ability "to engage in association for the advancement of beliefs and ideas" to "persuade [their audience] to action" warrants strict scrutiny.  *See id.*, 371 U.S. at 430, 437-38; *Kusper*, 414 U.S. at 59 (citations omitted).  Defendants do not argue otherwise.

100

4. The Prohibition is Unconstitutionally Overbroad

The Personalized Application Prohibition is unconstitutionally overbroad because it "punishes a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2004) (internal quotation omitted). Defendants counter this claim by, once again, asserting that personalizing an advance mail ballot application is not protected speech and that Plaintiff nevertheless has other means of communicating its message. *See* Mot. at 48. But Defendants' argument reflects a fundamental misunderstanding of the "comparison between the legitimate and illegitimate applications of the law" necessary to consider an overbreadth claim. *Harmon v. City of Norman*, 981 F.3d 1141, 1153 (10th Cir. 2020) (citation omitted). Specifically, Defendants do not describe the legitimate sweep of the Prohibition, perhaps because the ban "lacks any plainly legitimate sweep," *United States v. Stevens*, 559 U.S. 460, 473 (2010), and its enforcement "may chill the free speech rights of parties not before the court, especially when the statute imposes criminal sanctions." *VoteAmerica*, 576 F. Supp. 3d at 877. Rather, they note their purported state interests, but make no attempt to connect these interests to the application of the law. *See* Mot. at 48. Defendants' list of expressive conduct and speech that the Personalized Application Prohibition does *not* address, is entirely beyond the applications of the law—it reflects neither legitimate nor illegitimate applications. *See* Mot. at 48, 49.

Even if Defendants' stated interests were "legitimate," the Personalized Application Prohibition's legitimate sweep would be exceedingly narrow. Defendants dance around two potentially legitimate applications of the Prohibition: preventing inaccurately personalized applications and avoiding voter fraud. To the extent Defendants' purported interests are tied to personalization at all (as compared to a third party's mailing of duplicative applications to voters), they are limited to *inaccurately* pre-filled advance mail ballot applications. *See* SOF ¶¶ 52–54,

101

56–57, 61–64, 66 (noting inaccuracies or mismatches between the application and the Kansas voter rolls).[21]  Yet the Prohibition proscribes all personalization, regardless of accuracy. *See* SOAF ¶¶ 24, 25.

As applied to Plaintiff, it is clear that the Personalized Application Prohibition reaches far more speech than necessary.  Of the hundreds of thousands of personalized applications VPC mailed Kansas voters, the undisputed evidence shows that—at most—VPC experienced single-digit error rates with its mailers.  *See* SOAF ¶ 32, 33.  Given the lack of any evidenced errors with over 90% of VPC's personalization, the Personalized Application Prohibition plainly prohibits a significant amount of speech that does not implicate any of Defendants' stated interests.

On its face, the Personalized Application Prohibition punishes *all* personalization prior to mailing—not just inaccurate or fraudulent personalization.  Moreover, the Prohibition carries criminal penalties that "may cause others not before the court to refrain from constitutionally protected speech or expression."  *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).[22]  The illegitimate applications of the Prohibition far outweigh any potentially legitimate ones that might further interests referenced by Defendants, both as applied to VPC and to other third parties facing the Prohibition's criminal penalties. As such, the Personalized Application Prohibition is unconstitutionally overbroad and inappropriate for summary judgment in favor of Defendants.

---

[21]    Defendants' argument for summary judgment on Count III is completely devoid of citations to the record in this case.

[22]    Defendants rely on *Broadrick v. Oklahoma* to assert that what they characterize as VPC's "conduct" of sending personalized applications is held to some higher standard than other protected First Amendment speech. Mot. at 46-47. Firstly, the Prohibition implicates quintessential First Amendment communication, not non-expressive conduct. *See supra* Part I.A. And, as *Broadrick* itself makes clear, the overbreadth of a statute is "judged in relation to [its] plainly legitimate sweep," which here is unarticulated by Defendants and, to the extent it exists at all, is dwarfed by the statutes overbroad applications if allowed to take effect. 413 U.S. at 615.

102

Strict scrutiny applies for each of these reasons. As explained in VPC's moving brief (ECF 145), the Personalized Application Prohibition would not survive strict scrutiny. Thus, this Court should deny Defendants' motion for summary judgment.

### B.      *Anderson-Burdick* **Does Not Apply**

Defendants assert that even if the Prohibition does implicate First Amendment rights, the proper standard of review is the *Anderson-Burdick* test. But Defendants have not established as a matter of law that this test should apply, or that they would succeed under its standard.

As this Court previously noted, the Tenth Circuit applies this test when deciding the constitutionality of *content-neutral* regulation of the mechanics of the voting process. *See VoteAmerica*, 576 F. Supp. 3d at 887. That is not the scenario here, however, where the Personalized Application Prohibition is facially content- and viewpoint-based. *See supra* Part II.A.2. But even if it were content-neutral, the Prohibition is not a mere regulation of the voting process or the "mechanics of the electoral process." *McIntyre*, 514 U.S. at 345. The Personalized Application Prohibition does not apply to voters at all vis-à-vis their own applications. Instead, it is aimed specifically at third parties who are engaged in voting-related advocacy: those "who solicit[] by mail a registered voter to file an application for an advance voting ballot." *See* SOAF ¶ 24. This case, brought by an entity that cannot vote, is a far cry from the type of ballot access limitation cases in which courts developed the *Anderson-Burdick* framework. *See Burdick v. Takushi*, 504 U.S. 428, 432-35 (1992) (discussing the burden on ballot access imposed by state's requirement that one of three mechanisms be used to appear on a primary ballot); *Anderson v. Celebrezze*, 460 U.S. 780, 787-88 (1983) (discussing the burden on ballot access imposed by state's early filing deadline). The limitation at issue here goes beyond time, place, and manner restrictions on election administration and their effect on ballot access. *VoteAmerica*, 576 F. Supp. 3d at 888. It is a limitation on political expression and consequently warrants strict scrutiny.

103

But even if this Court were to apply *Anderson-Burdick*'s balancing and sliding scale approach, strict scrutiny would still apply because the Personalized Application Prohibition "impacts speech in a way that is not minimal." *Id.* at 888. The Personalized Application Prohibition is an outright ban on a key component of VPC's communications that the specified recipient should request an advance mail ballot application. *See* SOAF ¶¶ 6, 13, 14. Notwithstanding Defendants' bald assertion that "the burden on Plaintiffs' advocacy work is minimal," the Prohibition's burden on VPC's core speech is *per se* severe. Mot. at 40; *see Buckley*, 525 U.S. at 207 (Thomas, J., concurring); *see also Yes On Term Limits, Inc.*, 550 F.3d at 1028-29. Under *Anderson-Burdick*, this injury must be weighed against the relative interests of the state. Here, little to no undisputed facts support Defendants' purported interests, and they are far outweighed by VPC's constitutional injuries.[23] Thus, Defendants' have not established *Anderson-Burdick* balancing would lead this court to apply a less searching examination "closer to rational basis." *See* Mot. at 40. And even were a lesser level of scrutiny applied by way of the *Anderson-Burdick* framework, Defendants would not be entitled to summary judgment as they have failed to demonstrate Kansas's interest in the Personalized Application Prohibition. *See infra* Part III.

## C.  Rational Basis Review Does Not Apply

VPC's personalization of advance mail ballot applications is plainly speech—words on a page that convey to a particular person that she has the right to vote by mail and she should exercise that right. *See supra* Part I.A; *see also* SOAF ¶¶ 6, 7, 13. As this Court has already held, contrary to Defendants' arguments, rational basis review does not apply. *See* Mot. at 22, 28; *VoteAmerica*,

---

[23]   What scant evidence Defendants do offer in support of their purported interest—largely offered without citation to the record—appears to concern the increased amount of advance mail voting during the 2020 election and the number of duplicative applications received by elections offices. *See* Mot. at 40-41, n.5. Once the Court strips away that which is immaterial, devoid of support in the record, or legally unsound, there is nothing left of Defendants' argument.

104

576 F. Supp. 3d at 889 ("Plaintiffs have shown a sufficiently heavy burden on First Amendment rights to justify a significantly more demanding standard of review than the 'rational basis' standard . . . .").

In sum, Defendants have failed to establish as a matter of law that heightened scrutiny does not apply to Plaintiff's First Amendment claims and Defendants cannot support their *Anderson-Burdick* argument with material, undisputed facts. Thus, they are not entitled to summary judgment.

## III.    DEFENDANTS CANNOT SHOW THAT THE PROHIBITION SERVES ANY STATE INTEREST

Defendants cannot show that the Prohibition serves any state interest at all, falling far short of satisfying the standard for strict scrutiny or *any* heightened scrutiny.

Defendants claim that the Prohibition minimizes harm—including, *inter alia*, voter confusion, diminished efficiency of election administration, and potential voter fraud—allegedly caused by inaccurately personalized information on advance mail ballot applications. *See* Mot. at 32. But the record demonstrates that any harm that Defendants cite is *not* connected to inaccurately personalized information, but rather to voters and elections officials' receipt of multiple advance mail ballot applications, regardless of whether an application was personalized or not. *See* Mot. at 41-44; *see also supra* Pl.'s Resps. to Defs.' SOF at ¶¶ 49-83.

Implicitly recognizing that these are distinct issues, Defendants slyly attempt to conflate these issues by repeatedly deploying the phrase "inaccurate and duplicate applications." *See* Mot. at 13, 33, 41 n.5, 42, 43. The reason Defendants try to muddy the water is there is little undisputed evidence that inaccurately personalized applications negatively impacted Defendants' stated interests. In fact, Mr. Howell, Defendants' main witness, admitted that personalization was not a problem. *See* SOAF ¶ 39 (Q. "Is it your opinion that -- that voters became even more confused

105

and frustrated when the applications contained prefilled information?" A. "I don't think that the prefilled information, in and of itself, was what all of the concern was.").

Critically, Defendants marshal evidence that relies on the same conflating language, "inaccurate and duplicate applications," on several fronts.  First, Defendants claim—without citation to the record—that certain Kansas elections officials referenced "hundreds" of calls and visits "from voters expressing confusion, frustration, and anger about the inaccurate and duplicate pre-filled advance mail ballot applications they were receiving" (Mot. at 41 n.5), and that because county election officials were busy processing "inaccurate and duplicate applications," there was "chaos."  *Id.* at 42. [24]  Even with respect to these hearsay statements from voters, [25] Defendants provide no specific citations to calls from voters complaining about the *inaccurate personalization* of their applications.

Second, Defendants argue that they have an interest in preventing voter fraud, even if no such fraud has occurred in Kansas.  Defendants claim—again without citation to the record—that the surge of "inaccurate and duplicate applications" decreased the efficiency of county election officials, which in turn increased the opportunity for "mistakes to be made."  Mot. at 50.  But

---

[24]   Moreover, Defendants rely primarily on 2 out of 105 county election officials—Mr. Howell and Ms. Cox—but their experiences do not necessarily represent that there was "chaos" across the state. *See, e.g.*, SOAF ¶ 42.

[25]   Defendants argue these unspecified references are not inadmissible hearsay under Federal Rule of Evidence 803(3).  Without specific records cites, Plaintiff cannot meaningfully assess whether any of these "references" are in fact hearsay.  Even assuming *arguendo* that such "references" are admissible, only the portion of the statement that speaks to the declarant's state of mind would be admissible (*e.g.*, that a voter was confused), but the portion of the statement that speaks to *why* that voter was in such state of mind (*e.g.*, that the voter received a duplicate application) would be inadmissible as a statement of memory or belief.  *See McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1143 (10th Cir. 2006); *United States v. Joe*, 8 F.3d 1488, 1492-93 (10th Cir. 1993).  Without admissible evidence of why voters were supposedly upset, any hearsay admissible under Rule 803(3) would have marginal, if any, relevance to this action, and certainly would not be material.

106

Defendants make no attempt to tie the fact that applications are personalized to any risk of voter fraud. Following Defendants' logic, any activity that takes up an election official's time and attention can be criminalized on the basis of potential fraud. This argument is illogical and should be rejected.[26]

The only specific evidence that Defendants *do* cite concerning the alleged inaccuracy of personalized applications is Mr. Block's identification of "hundreds" of purported errors identified by their expert witness in a list of over 300,000 voters. *See* SOF ¶¶ 44-47. But even assuming that all issues raised by Mr. Block are genuine—and they are not—they relate to under 3% of all records on VPC's mailing list. *See* Pl.'s Mot. to Exclude; SOAF ¶ 34. Defendants also cite to data reflecting that VPC included erroneous middle initials or suffixes for 3% and 5% of its mailers, nationally. *See* SOF ¶¶ 38-39; *see also* SOAF ¶ 32. But Defendants do not present any evidence as to error rates in Kansas. In fact, Mr. Block admitted he did not know, and made no attempt to calculate, the error rate in VPC's mailing list. SOAF ¶¶ 35, 36. In any event, Defendants' own witnesses acknowledged that such errors are immaterial. For example, Mr. Block made no attempt to connect the purported errors he identified in the VPC's mailing list to any errors in applications actually received by election officials. *See* SOAF ¶ 37. Thus, he could not offer any opinion as to whether VPC mailers created more or less work for election officials. *See* SOAF ¶ 38. Additionally, Shawnee County Election Commissioner Andrew Howell admitted that if a voter crossed out a prefilled suffix, and the remaining information on the application was correct, it

---

[26] Indeed, Defendants' own witnesses testified that there was no evidence of fraud in the 2020 election cycle and that their offices ran the 2020 elections successfully. *See* SOAF ¶¶ 45, 46. Thus, uncontroverted evidence in the record militates *against* Defendants' arguments concerning potential voter fraud.

would be accepted.  *See* SOAF ¶ 40; *accord* ¶ 41.  Defendants therefore present sparing evidence that does not entitle them to summary judgment.[27]

Thus, the record reveals that Defendants' conflating language—"inaccurate and duplicate applications"—is a subterfuge; that is, the issues that Defendants and their witnesses complain of in fact concern duplicate applications and not inaccurate applications at all.  But VPC's sending of duplicate applications is entirely irrelevant to this action.  Even assuming *arguendo* that the State has a legitimate interest in reducing the number of duplicate applications sent and received, the Personalized Application Prohibition in no way limits the number of advance mail ballot applications a third party could send a voter.  *See* SOF ¶ 4.  Moreover, evidence in the record indicates that any increase in duplicate applications was caused by a number of factors in 2020, including the dramatic general increase in vote-by-mail amidst the COVID-19 pandemic.  *See, e.g.*, SOAF ¶¶ 43, 44.  Accordingly, whatever burden duplicate applications may cause the State, it is irrelevant—it has no tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable.  *See* FED. R. EVID. 401.

---

[27]  Defendants' legal arguments in support of summary judgment fare no better.  Defendants cite to two inapposite cases to show that their purported state interests justify the Personalized Application Prohibition.  Mot. at 44.  In *Raffensperger*, the court denied the plaintiffs' motion for a preliminary injunction of certain ballot restrictions, stating that "[t]he record show[ed] that the government designed the Prefilling Provision to address the concerns and confusion that arise when voters receive prefilled applications with incorrect identification information."  *VoteAmerica v. Raffensperger*, 2022 WL 2357395, at *14, *20 (N.D. Ga. June 30, 2022).  Here, after months of discovery, and with the burden on Defendants to show they are entitled to summary judgment, no record of why the government designed the Personalized Application Prohibition exists.  *Lichtenstein*, 489 F. Supp. 3d 742 (M.D. Tenn. 2020), is similarly off point.  This Court has already distinguished *Lichtenstein* from the case at hand.  *See VoteAmerica*, 576 F. Supp. 3d at 874-75 ("Plaintiffs correctly respond that *Lichtenstein* is not germane because their application packets include speech that communicates a pro-mail voting message.").  In any event, only one of the four interests listed in *Lichtenstein* is even remotely similar to the interests asserted by Defendants—decreasing the risk of voter confusion arising from incorrect addressing information.  And here, the law only addresses personalizing the *application itself* without addressing inaccurate information on the outer envelope.

108

Defendants also speculate that voters submitted multiple applications because they thought the prefilled applications had come from the county election office. Mot. at 41-42 (citing SOF ¶¶ 73-74, 79-80). But, like concerns about duplicate applications, a voter's confusion or frustration about whether VPC's mailers came from a third party or their county election official is irrelevant in this action. *See* Mot. at 42. The Personalized Application Prohibition does not contain any provisions that would affect how a third party identifies itself on its mailers.[28] The Personalized Application Prohibition is not "related" to state interests impacted by duplicate applications or confusion about the identity of the sender, because the Prohibition does nothing to prevent these issues.[29]

## CONCLUSION

For the foregoing reasons, Defendants have failed to establish that they are entitled to summary judgment for any of Plaintiff's three claims.

---

[28] In fact, VPC already clearly identifies itself in mailers to Kansas voters in multiple ways. *See* SOF ¶ 9.

[29] Defendants' arguments to the contrary rely on conclusory statements (*see, e.g.*, Mot. at 33 ("The Pre-Filled Application Prohibition is clearly related to each of the aforementioned legitimate state interests.")), and generalities about the 2020 election cycle, which was an extraordinary election cycle in many aspects unrelated to personalized applications. *See, e.g.*, *id.* (discussing the "confusion, frustration, anger and chaos in the 2020 General Election"). These assertions do not suffice to demonstrate that the Prohibition furthers any legitimate state interest.

109

DATED:  November 4, 2022

Respectfully Submitted,

By:     /s/ *Mark P. Johnson*

| | |
|---|---|
| Jonathan K. Youngwood, *Pro Hac Vice* | Mark P. Johnson, Kansas Bar #22289 |
| Meredith D. Karp, *Pro Hac Vice* | **Dentons US LLP** |
| Brooke Jarrett, *Pro Hac Vice* | 4520 Main Street, Suite 1100 |
| Nicole A. Palmadesso, *Pro Hac Vice* | Kansas City, Missouri 64105 |
| **Simpson Thacher & Bartlett LLP** | Telephone: 816-460-2400 |
| 425 Lexington Avenue | Facsimile: 816-531-7545 |
| New York, New York 10017 | E-mail: mark.johnson@dentons.com |
| Telephone: 212-455-2000 | |
| Facsimile: 212-455-2502 | Danielle Lang, *Pro Hac Vice* |
| E-mail: jyoungwood@stblaw.com | Alice C.C. Huling, *Pro Hac Vice* |
| E-mail: meredith.karp@stblaw.com | Hayden Johnson, *Pro Hac Vice* |
| E-mail: bonnie.jarrett@stblaw.com | Christopher Lapinig, *Pro Hac Vice* |
| E-mail: nicole.palmadesso@stblaw.com | **Campaign Legal Center** |
| | 1101 14th Street, NW, Suite 400 |
| *Attorneys for Plaintiffs* | Washington, DC 20005 |
| | Telephone: 202-736-2200 |
| | Facsimile: 202-736-2222 |
| | E-mail: dlang@campaignlegalcenter.org |
| | E-mail: ahuling@campaignlegalcenter.org |
| | E-mail: hjohnson@campaignlegalcenter.org |
| | E-mail: clapinig@campaignlegalcenter.org |
| | |
| | *Attorneys for Plaintiffs* |

110

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on this 4th day of November 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all Counsel of record.

*/s/ Mark P. Johnson*
Mark P. Johnson

111