Case No. 25-3138

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

**VOTEAMERICA and VOTER PARTICIPATION CENTER,**

*Plaintiffs-Appellees*

v.

**SCOTT SCHWAB, in his official capacity as Kansas Secretary of State; KRIS KOBACH, in his official capacity as Kansas Attorney General; and STEPHEN M. HOWE, in his official capacity as District Attorney of Johnson County**

*Defendants-Appellants*

## APPELLANTS' APPENDIX – VOLUME III

Appeal from the U.S. District Court for the District of Kansas
Honorable Kathryn H. Vratil, District Judge
District Court Case No. 2:21-CV-02253-KHV-GEB

Kris Kobach
  Attorney General
Anthony J. Powell
  Solicitor General
**Kansas Attorney General's Office**
120 SW 10th Ave., Room 200
Topeka, KS 66612-1597
Tel.: (785) 296-2215
Fax: (785) 291-3767
Email: anthony.powell@ag.ks.gov
Email: kris.kobach@ag.ks.gov

Bradley J. Schlozman
Scott R. Schillings
Garrett R. Roe
**HINKLE LAW FIRM LLC**
1617 N. Waterfront Parkway, Ste. 400
Wichita, KS 67206
Tel: (316) 267-2000
Fax: (316) 264-1518
Email: bschlozman@hinklaw.com
Email: sschillings@hinklaw.com
Email: groe@hinklaw.com

i

## TABLE OF CONTENTS – VOLUME III

<u>Document</u>                                                                 <u>Page(s)</u>

Order Declining to Rule on Parties' Summary Judgment Motions ........................... 461

Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for
Summary Judgment Regarding Counts I-III ................................................................. 469

Plaintiffs' Reply Memorandum in Support of Plaintiff's Motion for
Summary Judgment ..................................................................................................... 551

Minute Order Denying Parties' Summary Judgment Motions ................................ 593

Joint Revised Uncontroverted and Controverted Facts ............................................ 594

Order Deeming Case Submitted Without Oral Argument ........................................ 628

Initial Memorandum and Order Granting Judgment to Plaintiffs ............................ 630

Parties' Joint Proposed Remand Plan & Schedule .................................................... 672

Order Granting Parties' Joint Proposed Remand Plan & Schedule .......................... 677

Plaintiffs' Post-Remand Brief .................................................................................... 679

Defendants' Response to Plaintiffs' Post-Remand Brief ........................................... 723

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 21-2253-KHV** |
| SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; DEREK SCHMIDT, in his official capacity as Attorney General of the State of Kansas; and STEPHEN M. HOWE in his official capacity as District Attorney of Johnson County, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### ORDER

This matter is before the Court on <u>Defendants' Motion For Summary Judgment Regarding Counts I-III</u> (Doc. #141) and <u>Plaintiff's Motion For Summary Judgment</u> (Doc. #144), both filed October 14, 2022. Between briefs and exhibits, these cross-motions comprise more than 23,000 pages. The briefs and exhibits on plaintiff's <u>Daubert</u> motion add another 550 pages to the record. And briefing is still in progress.

This case is set for a bench trial on May 1, 2023. The Court cannot imagine a worse use of scarce judicial resources than to plough through this record on cross-motions for summary judgment, only to potentially repeat the process at trial. The problem is especially acute because the factual record in this case is replete with argument, immaterial objections and matters which do not fairly address the substance of the matters asserted. <u>See</u> D. Kan. Rule 56.1(e).

Having reviewed the record to date, the Court orders as follows:

1.      There being no need or reason for delay, trial is hereby advanced to March 13,

2023.  In anticipation of trial, counsel no later than December 1, 2022 shall confer in good faith and prepare a statement of all uncontroverted facts to which the parties can stipulate.  Counsel shall not refuse to stipulate to uncontroverted facts on grounds (e.g., lack of relevance or materiality, foundation, inadmissibility, inconsistency relative to other facts) that the Court is capable of addressing at trial.  Should counsel fail to participate in good faith in identifying uncontroverted facts, the Court will not hesitate to impose sanctions under Rule 11, Fed. R. Civ. P.

2.      Counsel no later than December 1, 2022 shall also file a joint statement of all facts to which they claim the record reveals a genuine issue of material fact.

3.      Counsel shall discuss whether in lieu of adjudicating this case on cross-motions for summary judgment, they stipulate that all issues may be submitted for trial on the written record generated by the pending motions for summary judgment and Daubert motion.  If so, counsel shall so advise the Court by written stipulation filed no later than December 1, 2022.  If counsel do not so stipulate, the Court will construe all pending motions as trial briefs and will consider them only for assistance in resolving the issues at trial on March 13, 2022.

4.      No later than December 1, 2022, counsel shall file unsealed unredacted copies of exhibits attached in support of all pending motions.  The Court will not consider any exhibits which contain redactions or are sealed.

**IT IS SO ORDERED**.

Dated this 15th day of November, 2022 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

-2-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| VOTEAMERICA and<br>VOTER PARTICIPATION CENTER,<br><br>*Plaintiffs,*<br><br>vs.<br><br>SCOTT SCHWAB, in his official capacity as<br>Secretary of State of the State of Kansas;<br>DEREK SCHMIDT, in his official capacity as<br>Attorney General of the State of Kansas; and<br>STEPHEN M. HOWE, in his official capacity as<br>District Attorney of Johnson County,<br><br>*Defendants.* | Case No. 2:21-cv-02253-KHV-GEB |

**DEFENDANTS' REPLY TO PLAINTIFF VOTER PARTICIPATION CENTER'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
<u>REGARDING COUNTS I-III</u>**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................... ii

**SUMMARY OF EXHIBITS CITED IN REPLY BRIEF** ..................................... iv

**INTRODUCTION** .................................................................................................. 1

**REPLY TO VPC'S RESPONSE TO STATEMENT OF UNCONTROVERTED FACTS** ... 3

      A.    *Reply to VPC's Response to Defendants' Statement of Uncontroverted Facts* ................................................................................................. 3

      B.    *Reply to VPC's Statement of Additional Uncontroverted Facts* ............... 37

**ARGUMENT** ....................................................................................................... 56

    I.    Pre-Filling an Advance Voting Ballot Application is *Conduct*, Not *Speech* ........ 56

    II.    The Case Law Does Not Support VPC's Legal Position .................................... 64

    III.    The Pre-Filled Application Prohibition Does Not Violate VPC's Freedom of Association Rights ........................................................................................ 68

    IV.    The Pre-Filled Application Prohibition Must Be Evaluated Under a Rational Basis, Not Strict Scrutiny Review Standard .......................................... 72

      A.    *The Pre-Filled Application Prohibition Does Not Target Core Political Speech* ................................................................................................. 72

      B.    *The Pre-Filled Application Prohibition is Content- and Viewpoint Neutral* ................................................................................................. 73

      C.    *The Pre-Filled Application Prohibition is Not Unconstitutionally Overbroad* ............................................................................................. 74

      D.    *Assuming the Pre-Filled Application Prohibition is Implicated, Anderson-Burdick Provides the Appropriate Standard of Review* ............................ 77

      E.    *The Pre-Filled Application Serves Legitimate State Interests* ................... 78

**CONCLUSION** ................................................................................................... 80

**CERTIFICATE OF SERVICE** .......................................................................... 82

i

## <u>**TABLE OF AUTHORITIES**</u>

Page(s)

<u>Cases</u>

*Am. Ass'n of People With Disabilities v. Herrera*, 580 F. Supp.2d 1195 (D.N.M. 2008)............ 59

*Am. Ass'n of People With Disabilities v. Herrera*, 690 F. Supp.2d 1183 (D.N.M. 2010)............ 59

*Armour v. City of Indianapolis, Ind.*, 566 U.S. 673 (2012) ...................................................... 72

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) .................................................. 80

*Buckley v. Am. Constit. Law Found., Inc.*, 525 U.S. 182 (1999) ..................................... 56, 57, 66

*Burdick v. Takushi*, 504 U.S. 428 (1992) .................................................................................... 77

*Callahan v. A.E.V., Inc.*, 182 F.3d 237 ....................................................................................... 76

*Campbell v. Buckley*, 203 F.3d 738 (10th Cir. 2000) ................................................................ 57

*Chandler v. City of Arvada*, 292 F.3d 1236 (10th Cir. 2002) .................................................... 66

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464 (2022) ......................... 73

*Fusaro v. Cogan*, 930 F.3d 241 (4th Cir. 2019) ........................................................................ 78

*Hamilton Cnty. Educ. Ass'n v. Hamilton Cnty. Bd. of Educ.*, 822 F.3d 831 (6th Cir. 2016) ....... 69

*Healy v. James*, 408 U.S. 169 (1972) ................................................................................... 70, 71

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995)....... 63

*Kraft Gen. Foods, Inc. v. BC-USA, Inc.*, 840 F. Supp. 344 (E.D. Pa. 1993) ............................... 76

*Kusper v. Pontikes*, 414 U.S. 51 (1973)..................................................................................... 69

*League of Women Voters of Fla. v. Cobb*, 447 F. Supp.2d 1314 (S.D. Fla. 2006)................. 72, 73

*League of Women Voters v. Hargett*, 400 F. Supp.3d 706 (M.D. Tenn. 2019) ........................... 61

*Lerman v. Bd. of Elections*, 232 F.3d 135 (2d Cir. 2000)........................................................... 57

*Lichtenstein v. Hargett*, 489 F. Supp.3d 742 (M.D. Tenn. 2020) .............................................. 61

*Lichtenstein v. Hargett*, __ F. Supp.3d _, 2021 WL 5826246, at *6
(M.D. Tenn. Dec. 7, 2021) ..................................................................................................... 61

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ....................................................... 78

*Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984)........... 74

*Meyer v. Grant*, 486 U.S. 414 (1988) ....................................................................... 56, 57, 66, 67

*Meyers v. E. Okla. Cnty. Tech. Ctr.*, 776 F.3d 1201 (10th Cir. 2015) ........................................ 64

*Morris Jewelers, Inc. v. Gen. Elec. Credit Corp.*, 714 F.2d 32 (5th Cir. 1983) ......................... 76

*NAACP v. Button*, 371 U.S. 415 (1963)..................................................................................... 70

ii

*NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022)...................................... 63, 64

*NetChoice, LLC v. Paxton*, 49 F.3d (5th Cir. 2022) ...................................................... 64

*Priorities USA v. Nessel*, 462 F. Supp.3d 792 (E.D. Mich. 2020)................................................. 64

*Priorities USA v. Nessel*, __ F. Supp.3d __, No. 2:19-cv-13341, 2022 WL 4272299, at *5 (E.D. Mich. Sept. 15, 2022) ................................................................................... 65, 66

*Project Vote v. Kelly*, 805 F. Supp.2d 152 (W.D. Pa. 2011) .................................................. 67, 68

*Riley v. National Fed. of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ......................................... 60

*Rumsfeld v. F. for Acad. and Institutional Rts., In*c., 547 U.S. 47 (2006) ........................ 60, 63, 77

*Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019)........................................................................ 78

*Sheldon v. Grimes*, 18 F. Supp.3d 854 (E.D. Ky. 2014)............................................................. 67

*SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 332 F. Supp.3d 446 (D. Mass. 2018).................... 76

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ........................................................................ 62

*Texas v. Johnson*, 491 U.S. 397 (1989) ...................................................................................... 63

*Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020) .................................................................. 77

*Univ. of Tex. v. Camenish*, 451 U.S. 390 (1981) ........................................................................ 56

*Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980) ........................... 58, 59

*VoteAmerica v. Raffensperger*, No. 1:21-cv-1390, 2022 WL 2357395 (N.D. Ga. June 30, 2022) ........................................................................... 56, 59, 64, 71

*VoteAmerica v. Schwab*, 576 F. Supp.3d 862 (D. Kan. 2021)..................................................... 61

*Voting for Am., Inc. v. Andrade*, 488 F. App'x 890 (5th Cir. 2012)............................................ 57

*Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) .............................................. 57, 61, 65

*Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008)..................................... 57, 66

<u>Statutes</u>

K.S.A. 25-1122(k)(2)....................................................................................... 41, 42, 48, 49

K.S.A.§§ 21-6602(a)(3), (b) ................................................................................. 50

<u>Rules</u>

Fed. R. Evid. 703(6)........................................................................................ 15

iii

## SUMMARY OF EXHIBITS CITED IN REPLY BRIEF

*(Exhibits marked with an \* are attached to this Reply Brief. All others are attached only to the Defendants' Memorandum in Support of their Motion for Summary Judgment (Dkt. 151))*

| | |
|---|---|
| A. | Andrew Howell Affidavit |
| B. | Jamie Shew Deposition |
| C. | Bryan Caskey Deposition |
| E. | VPC's advance voting ballot application mailing statistics for 2020 General Election |
| F. | Lionel Dripps Deposition |
| G. | Tom Lopach Deposition |
| L. | Kansas Voters to whom VPC sent advance voting ballot application in 2020 General Election |
| M. | Ken Block's Initial Declaration |
| N. | Ken Block's Supplemental Declaration |
| P. | Ex. V to Ken Block's Initial Declaration |
| Q. | Examples of CVI-pre-filled deficient advance voting ballot applications received from Shawnee County voters |
| S. | Andrew Howell Deposition |
| T. | Debbie Cox Deposition |
| U. | Debbie Cox Affidavit |
| Y. | Emails between VPC's Counsel and Other States' Election Officials |
| CC.\* | VPC's Resp. to Def. Schwab's First Req. for Produc. of Docs. |
| DD.\* | Letter from Scott Schillings to Meredith Karp (June 8, 2022) |
| EE.\* | Redacted Study on Pre-Filled Absentee Ballot Applications |
| FF.\* | Connie Schmidt Deposition Excerpts |
| HH.\* | Bryan Caskey Additional Deposition Excerpts |
| MM.\* | Eitan Hersh Deposition Excerpts |
| NN.\* | Jamie Shew Additional Deposition Excerpts |
| OO.\* | Lionel Dripps Additional Deposition Excerpts |
| PP.\* | Tom Lopach Additional Deposition Excerpts |

iv

QQ.*      Andrew Howell Additional Deposition Excerpts

RR.*      Debbie Cox Additional Deposition Excerpts

SS.*      Defendant Scott Schwab's First Request for Production of Documents to Plaintiff Voter Participation Center, No. 19

TT.*      Defendant Scott Schwab's Second Request for Production of Documents to Plaintiff Voter Participation Center

UU.*      Defendants' Subpoena of Andrew Howell

v

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VOTEAMERICA and
VOTER PARTICIPATION CENTER,

*Plaintiffs,*

vs.

Case No. 2:21-cv-02253-KHV-GEB

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
DEREK SCHMIDT, in his official capacity as
Attorney General of the State of Kansas; and
STEPHEN M. HOWE, in his official capacity as
District Attorney of Johnson County,

*Defendants.*

**DEFENDANTS' REPLY TO PLAINTIFF VOTER PARTICIPATION CENTER'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
REGARDING COUNTS I-III**

Defendants submit this Reply to Plaintiff Voter Participation Center's ("VPC") Opposition

to Defendants' Motion for Summary Judgment Regarding Counts I-III (Dkt. 155).  In support of

this Reply brief, Defendants respectfully state as follows:

**I. – INTRODUCTION**

The thrust of VPC's Opposition to Defendants' summary judgment motion is that the Court

should adhere to its ruling at the preliminary injunction phase of the case that VPC's pre-filling of

third-parties' advance voting ballot applications amounts to expressive conduct – core political

speech no less – and thus enjoys the highest level of protection under the First Amendment.

Discovery, however, has exposed substantial facts amply justifying the Pre-Filled Application

Prohibition.  Additionally, Defendants believe that the Court applied an improper legal standard

in its preliminary injunction order regarding VPC's constitutional attack on the statute, and we

1

urge the Court to revisit that ruling at summary judgment. While VPC continues to rely on a series of cases involving in-person voter registration activities, which are fundamentally distinct from the absentee/advance voting ballot applications at issue here, the case law addressing whether a third-party has a First Amendment right to pre-fill those applications and send them to individuals who did not request them or otherwise seek assistance tilts almost entirely in the direction of Defendants' legal position. Exclusively non-expressive conduct is involved in the activity now before the Court. And to the extent there is any speech at all, it is the speech of the voter, not VPC.

Even if the Court holds that pre-filling a third-party's advance voting ballot application is expressive conduct that implicates the First Amendment, the evidence marshalled in discovery underscores the problems that those pre-filled applications caused, not only in Kansas during the 2020 General Election, but also in other states across the country. VPC simply glosses over this evidence in its opposition brief. The omission is even more ironic given that VPC itself was concerned enough about the level of inaccuracies in the information it was using to pre-populate those applications that it stopped pre-filling them in its Kansas mailings and opted to send voters *blank* applications.

Moreover, no court – save this one at the preliminary injunction hearing – has found that the pre-filling of such applications constitutes *core political speech* triggering heightened scrutiny and narrow tailoring. VPC's frequently repeated assertion that pre-filled applications make its get-out-the-vote efforts more effective – a point for which they have produced no admissible evidence – does not change the requisite standard of review. While VPC seeks to bring its pre-filling of applications under the rubric of the First Amendment by characterizing such activity as "intertwined" with the other materials in its mailers to voters, the two activities are distinct and easily disaggregated. None of the messaging sought to be conveyed by VPC is lost in the process.

2

Impeding the State's ability to regulate in this area of election administration is foreclosed by governing precedent and will unreasonably hamstring legislators and election officials from fulfilling an essential role in ensuring the integrity and public confidence in our elections. For all these reasons, Defendants urge the Court to grant summary judgment to Defendants on Counts I-III.

## II. – REPLY TO VPC'S RESPONSE TO STATEMENT OF UNCONTROVERTED FACTS

### A. *Reply to VPC's Response to Defendants' Statement of Uncontroverted Facts*

As a preliminary matter, VPC's twelve "General Objections" to Defendants' Statement of Uncontroverted Facts, Br. at 4-6, is improper and should be rejected. If VPC has objections to any specific pieces of evidence or statements of fact, the proper response is to controvert those specific issues and cite to the record. *See* Local Rule 56.1,

VPC does not controvert SOF ¶¶ 1-13, 20-23, 25, 29-32, 34-36, 39, 42, 55, and 67. Defendants will confine their discussion to the specific statements of fact that VPC does controvert.

**Reply to SOF ¶ 14**

VPC controverts only the second sentence of SOF ¶ 14. VPCs' objection does not affect summary judgment. The second sentence of SOF ¶ 14 merely states that election officials send mail ballots to voters who properly submitted advance ballot applications beginning 20 days prior to the General Election. VPC does not controvert this factual statement and, regardless, the exact date on which such ballots are sent to voters is not material for purposes of summary judgment.

**Reply to SOF ¶ 15**

VPCs' quotation of Shawnee County Election Commissioner Andrew Howell's deposition testimony does not contradict SOF ¶ 15. VPCs' Response merely discusses the "cure" process for incomplete or inaccurate advance voting ballot applications. In those situations, election officials,

3

rather than issuing a provisional ballot, may elect to continue attempting to cure any problems with the application beyond the normal two-day deadline for sending the voter an advance ballot (so that a normal/non-provisional ballot can be sent to the voter) if there is sufficient time to contact the voter. This does not controvert SOF ¶ 15. Furthermore, VPCs' additional facts reinforce the added effort election officials undergo when an advance mail ballot application is inaccurate or incomplete.

**Reply to SOF ¶ 16**

VPC only controverts SOF ¶ 16 because it claims that there is nothing in the cited source about the "standards" or "criteria" a county uses to process an advance voting ballot application. But VPC does not controvert that, in the Shawnee County Election Office, the information on an advance voting ballot application must match the ELVIS system and that only clearly inadvertent mismatches will be overlooked. *See* Pls. Resp. to SOF ¶ 18. There is thus no sound basis for controverting this SOF. In any event, VPC's objection is immaterial for purposes of summary judgment.

**Reply to SOF ¶ 17**

It is not clear why VPC is objecting to SOF ¶ 17. Mr. Howell noted in his affidavit that, after receiving an advance voting ballot application, his office verifies all such information on the application against the information in ELVIS. Ex. A at ¶ 23. Moreover, K.A.R. 7-36-7(a)-(c) describes the information that must match between the application and ELVIS. There is thus no basis for controverting this SOF. In any event, VPC's objection is immaterial for purposes of summary judgment.

**Reply to SOF ¶ 18**

With respect to VPC's objection in (a), it is not clear why VPC is objecting.  Mr. Howell noted in his affidavit that, after receiving an advance voting ballot application, his office verifies all such information on the application against the information in ELVIS.  Ex. A at ¶ 23.  Moreover, K.A.R. 7-36-7(a)-(c) describes the information that must match between the application and ELVIS.  There is thus no basis for controverting this SOF.  And VPC's objection – to the extent there is one here – is immaterial for purposes of summary judgment.

With respect to VPC's objection in (b), VPC is not controverting SOF ¶ 18.  Defendants were providing examples of what mistakes a county election office may overlook in processing an advance ballot applications.  VPC merely provides an additional example of a clearly inadvertent mismatch mentioned by Mr. Shew.  This does not controvert SOF ¶ 18 in a material way.

**Reply to SOF ¶ 19**

VPC has not controverted SOF ¶ 19.  VPC has not cited anything in the record indicating that a county election official would send an advance voting ballot application to a voter who submitted an erroneous middle initial or suffix.  By entering the curative process, the office is *not* sending the voter an advance ballot.  And if the application deficiencies cannot be cured, the voter will be sent a *provisional* ballot.

**Reply to SOF ¶ 24**

VPCs' citations do not controvert SOF ¶ 24.  Mr. Caskey testified that the individuals and groups requesting the identities of voters who had submitted an advance voting ballot application wanted weekly updates of that information, so that is what the Secretary of State's Office provided.  Ex. C at 121:21-124:16.  He did not testify that *only* a weekly update was available as VPC claims.  Additionally, VPC misstates Mr. Shew's testimony.  Mr. Shew did not testify that the relevant

5

information was only available 20 days before the election; rather, he testified that the Douglas County Election Office began its nightly uploads of certain information 20 days prior to the election. VPC Ex. 2 at 102:16-103:25. However, Mr. Shew also testified that while there is a daily update 20 days before the election, "at any time before that, anybody requesting the daily records that exist on that date could obtain it from ELVIS." Ex. NN at 106:18-107:11. Regardless, these discrepancies between what VPC claims these officials testified and what the officials actually testified are not material to the summary judgment motion.

**Reply to SOF ¶ 26**

VPC's response is not supported by its citations and does not controvert SOF ¶ 26. Mr. Caskey testified that county election officials remove ineligible voters from the voter registration lists when they become aware of death or criminal conviction. VPC Ex. 3 at 83:3-91:9; 102:11-103:10. SOF ¶ 26 merely states that the information on a pre-filled advance voting ballot application may not match the information in ELVIS when the data used to pre-fill the application was from a voter registration list generated prior to information about the voter being updated in ELVIS. SOF ¶ 26. The point of SOF ¶ 26 is that, because the data in ELVIS is constantly updated, pre-filling an application with stale information can cause inaccurate pre-filled applications. SOF ¶ 26 should be deemed admitted.

**Reply to SOF ¶ 28**

VPC's disagreement with SOF ¶ 28 is not material. Messrs. Lopach and Dripps hold equivalent titles at both VPC and its sister organization, the Center for Voter Information ("CVI"). Ex. OO at 8:12-9:9; VPC Ex. 6 at 152:20-153:9. Moreover, both entities mailed prefilled advance voting applications to Kansans in 2020. Ex. PP at 69:15-70:21; 87:13-88:18. Additionally, VPC's

counsel explicitly represented that CVI was ultimately responsible for the mailings for both organizations during the 2020 General Election.  Ex. QQ at 108:17-25.

To the extent VPC argues these differences are somehow material, VPC had months to disclose the exact amounts of mailings by VPC vs. CVI and never did so.  Defendants requested all documents supporting VPC's "allegation that an estimated 69,577 Kansas voters requested advance mail ballots in the 2020 general election using applications provided by VPC."  Ex. SS. VPC responded by producing Exhibit E.  Defendants deposed VPC's 30(b)(6) witness, Mr. Lopach, about this exhibit.  Mr. Lopach testified that it was a chart of VPC's mailers.  Ex. G at 123:17-124:20; Ex. PP 108:7-109:10.  As VPC's 30(b)(6) witness, Defendants relied upon Mr. Lopach's testimony as it relates to the data in Exhibit E and VPC has not provided any updated information, outside of Mr. Dripps' speculation, that the numbers in Exhibit E represent anything other than that to which Mr. Lopach testified.  Given that this is VPC's own data, this Court should deem SOF ¶ 28 admitted.

### Reply to SOF ¶ 33

VPCs' objection is not material to summary judgment and does not controvert SOF ¶ 33. Furthermore, VPCs' implication that *only* Mr. Howell and Mr. Shew recognized VPC's mailers is not accurate.  Connie Schmidt posted an FAQ addressing voter confusion caused by VPC's mailers. Ex. FF at 297:4-298:8.  Ms. Cox also testified that she could identify VPC's mailers and that "[t]hose were the ones that [she] noticed that would have multiple applications sent from the same person."  Ex. RR at 143:25-144:22.

### Reply to SOF ¶ 37

Not only do VPC's citations not contravene SOF ¶ 37, but VPC misstates the testimony to try to create a disputed fact.  With respect to part (a) of VPC's objection, VPC does not appear to

controvert SOF ¶ 37.  With respect to part (b), VPC's response does not controvert SOF ¶ 37 and is not supported by the citations.  First, the use of the term "data vendors," as opposed to Catalist, is meaningless.  Catalist *is* a data vendor of VPC.  VPC Ex. 4 at 112:19-23.  Second, VPC's citation to Mr. Dripps' deposition does not support VPC's new claim that VPC does not "intentionally or routinely" use commercial data with state voter lists or that the use of commercial data was done so "mistakenly" by VPC's vendor.  *Nowhere* does Mr. Dripps' testimony state, and VPC's citation does not support, this new argument that Catalist "mistakenly" appended commercial data when "merging records."  While it may be that Catalist made a mistake in *how* it merged the data, which led to numerous inaccurate pre-filled applications being sent to Kansas voters, VPC's attempt to inject a dispute and new facts is impermissible and unsupported by the evidence they cite.

Additionally, it is untrue that "Mr. Dripps' testimony on this matter also refers to data used in states other than Kansas, and that he did not know *whether or* to what extent Catalist appended commercial data to the voter data in Kansas specifically."  VPC Resp. SOF ¶ 37 (emphasis added).  Mr. Dripps testified specifically that two of the five Kansas waves did *not* include pre-filled applications. Ex. F at 171:1-171:11.  When asked about "the number of advance ballot applications that were sent out in Waves A and B in the state of Kansas," he stated that while he did not know "specifically" what the error rate was in Kansas, he knew that nationally the error rate was 5% involving a middle name or initial and 3% involving a suffix.  Ex. F at 169:10-170:25.  In other words, he merely testified that he did not know whether the national error rate was precisely the same as the Kansas error rate, *not* that VPC's mailers to Kansas were not part of VPC's errors. Ex. F. at 169:17-170:25.  Accordingly, the Court should deem SOF ¶ 37 admitted.

8

**Reply to SOF ¶ 38**

Defendants' inverting of the percentages of the errors in pre-filled advance voting ballot applications was inadvertent and not material.

**Reply to SOF ¶ 40**

VPC's objection is once again immaterial to summary judgment.  VPC does not controvert that this list of voters was provided by VPC in discovery in response to Defendants' request for the same.  *See* Ex. TT.  The fact that some or most of the pre-filled applications were mailed by VPC's sister organization, CVI, is not material.  Ex. F at 177:9-177:22 (referring to CVI as "VPC's sister organization"); Compl. (Dkt. 1), ¶ 29.  What is undisputed is that the pre-filled applications themselves were included in mailers that came from either VPC or CVI and that included language in the cover letter telling voters that the materials were from CVI.  Ex. QQ at 105:24-107:25.

When testifying as VPC's 30(b)(6) witness, Mr. Lopach also did not testify that the 507,864 advance voting ballot applications that VPC sent out, identified in Exhibit E, consisted of both VPC and CVI mailers.  Ex. G at 123:17-124:6.  Furthermore, Mr. Dripps' testimony relied upon by VPC only states that he believed the numbers "could have been also VPC's sister organization, CVI," but that he did not "recall" whether that was true.  Ex. F at 177:9-177:15.  Ultimately, the distinction as to whether VPC or CVI mailed the pre-filled applications to voters is irrelevant for purposes of this case.

**Reply to SOF ¶ 41**

VPC does not controvert anything specific in SOF ¶ 41, and Defendants point the Court to ¶¶ 17, 24, 27-28 of Ex. M.

9

**Reply to SOF ¶ 43**

VPC concedes that Mr. Block testified that VPC failed to properly remove voters; VPC merely notes that Mr. Block did not testify that VPC did not remove "any" voters. This distinction is immaterial for purposes of summary judgment. The fact that VPC does not controvert that it failed to remove at least *some voters* from its list of Kansans to whom it mailed pre-filled advance voting ballot applications is sufficient for summary judgment.

Further, VPC's reliance on Mr. Hersh's 28-page rebuttal expert witness report, to which it cites only "generally," does not controvert SOF ¶ 43. Defendants *assume* that VPCs' citation to Paragraph 24 of Mr. Hersh's Declaration is the evidence that VPC believes controverts SOF ¶ 43. However, the quoted portion of Mr. Hersh's report is irrelevant to SOF ¶ 43. SOF ¶ 43 has nothing to do with estimating the accuracy of VPC's list based on some benchmark or reviewing the *entirety* of VPC's list to determine how many inaccurate mailings VPC sent, which is what Mr. Hersh discussed in Paragraph 24. Mr. Block was not "cherry-picking" data. SOF ¶ 43, and Mr. Block's Declaration, address the fact that VPC sent pre-filled applications to Kansans *after some of those Kansans had already been removed from the ELVIS voter list*. That statement does not require Mr. Block to find *every instance* that this occurred.

The data analyzed by Mr. Block shows that Mr. Lopach's testimony was not accurate as to VPC's operations. While Mr. Lopach testified that VPC removes voters from its database, Mr. Block identified numerous mailings by VPC that were sent to voters that had been removed from the Kansas voter rolls long before the date of the mailing. Ex. N at ¶¶ 9-10. Mr. Lopach's untrue statements cannot create a controverted fact.

Relatedly, VPCs' claim that Mr. Block "did not review any material that could prove" that VPC did not remove voters from its mailing list despite the voter having been previously removed

10

from the ELVIS system is simply false. As noted above, Kansas election officials confirmed, using lists provided by VPC and comparing that list to Kansas voter data, that VPC sent numerous mailings to voters who had already been removed from the Kansas voter rolls by the time VPC mailed the prefilled applications to them. Ex. M at ¶¶ 15-17. VPC just ignores those paragraphs.

The fact that Mr. Block used a February 2021 list is not relevant as it ignores Mr. Block's analysis and process. Rather than repeat why this is true, Defendants will simply point to their Response to VPC's Motion to Exclude Mr. Block's Report Testimony and Report (Dkt. 152, at 11-12). The same will be done with regard to VPC's objections to Mr. Block's qualifications. *Id.* at 7-9.

**Reply to SOF ¶ 44**

It is true that the specific reasons for each voter's removal from the Kansas registration list is not identified in Exhibit O, absent the voters with links to the voter's obituary. However, the specific reason why each voter was removed is not material for purposes of summary judgment. SOF ¶ 44 makes the point that VPC sent mailers to 385 Kansans that had already been removed from the ELVIS database *before* VPC sent voters its *initial* two mailers. In fact, VPC sent multiple mailers to many individuals who had already been removed from the Kansas voter registration rolls. Thus, regardless of the reason for the voter's removal, VPC was pre-filling advance voting ballot applications and mailing them to voters whose registrations had been cancelled. VPC does not controvert this fact.

Moreover, as discussed in Defendants' Response to VPC's Motion to Exclude Mr. Block's Report Testimony and Report (Dkt. 152), his testimony is admissible. And as an expert witness, he is entitled to rely on hearsay. In short, VPC has not properly controverted SOF ¶ 44.

11

**Reply SOF ¶ 45**

As discussed in Defendants' Response to VPC's Motion to Exclude Mr. Block's Report Testimony and Report (Dkt. 152), his testimony is admissible. And as an expert witness, he is entitled to rely on hearsay. VPC has thus not properly controverted SOF ¶ 45.

**Reply SOF ¶ 46**

VPC's objection to the term "hundreds" is not material. VPC concedes that approximately 341 voters were removed from the voter rolls by Kansas officials yet, nevertheless, received VPC mailings after having been removed. Ex. N. ¶¶ 10-13. Moreover, as discussed in Defendants' Response to VPC's Motion to Exclude Mr. Block's Report Testimony and Report (Dkt. 152), Mr. Block's testimony is admissible. And as an expert witness, he is entitled to rely on hearsay.

**Reply SOF ¶ 47**

VPC's evidence does not properly controvert Mr. Block's findings. While VPC avers that the fact that the same voter had separate registration numbers does not mean the two voters were not each sent mailers, it provides no evidence to disprove this fact and instead ignores the evidence suggesting otherwise that it produced in discovery. VPC cites Dr. Hersh's statement that it "was not clear" to him whether this occurred. Pls.' Ex. 5 at 14. But Ex. M ¶¶ 23-24 and Ex. P are derived from VPC's own list of voters whom *VPC represented to Defendants* had received mailers from VPC. *See* Ex. L. And Exhibit P itself shows the number of mailings VPC sent to each of the voters listed at the address. *See* Ex. P (column "gen_mailings").

Furthermore, the record shows that VPC sent applications to these addresses, as Mr. Block testified. For example, VPC's list of individuals to whom it mailed pre-filled applications includes two entries for Paula Marks one voter identification number and two addresses. Ex. L at VPC134-

00333, VPC134-01244. The same is true for Elizabeth Lopez. Ex. L at VPC134-00262, VPC134-03641.

VPC argues that Mr. Block's evidence does not state what Defendants assert. While SOF ¶ 47 did include one inadvertent misstatement (Mr. Block identified *21*, not *23*, pairs of voters), this minor error is immaterial. The other objections VPC makes are factually inaccurate. VPC argues that "five . . . of the twenty-three 'matched' pairs reflect" records for different people. While that is true, VPC ignores that its data vendor believed these individuals to be the same person with different addresses, which resulted in VPC sending inaccurately pre-filled applications to them. *See* Ex. P (Elizabeth Schultz, Danielle Morris, An Tran, Cameron Williams, Cheryl Simon).

VPC contends that thirteen pairs of individuals were not properly separated because they were not in Kansas' voter file. This obscures the larger point. The names were properly separated because one was in the voter file and *one was not*. Nevertheless, VPC sent pre-filled applications to voters who were not on the Kansas voter rolls for some inexplicable reason. *See* Ex. P (Salvador Correa, Tien Vo, Lindsay Vaughn, Sierra Taylor, Lily Julian, Margaret Admire, Luis Torres, Anna Robinson, Shaw Islam, Jorge Torres, Pablo Alba Guzman).

As for the individuals whose names are not listed in the voter file, VPC is proving Mr. Block's point. Kansas properly separated these individuals in the voter system – one person with that name and another person who did not have that name – but VPC nevertheless sent pre-filled applications to the person whose name did appear in the Kansas voter file.

### Reply to SOF ¶ 48

The fifteenth voter was removed on April 10, 2020. Thus, depending on the time of day a Kansas voter registration was requested in relation to when the voter was removed, the number of removed would either be fourteen or fifteen at the time the voter list was downloaded from ELVIS.

13

The trivial difference is also immaterial. Moreover, as discussed in Defendants' Response to VPC's Motion to Exclude Mr. Block's Report Testimony and Report (Dkt. 152), Mr. Block's testimony is admissible. And as an expert witness, he is entitled to rely on hearsay.

**Reply to SOF ¶ 49**

VPC's purported controverting of SOF ¶ 49 is immaterial and/or refuted by other evidence and admissions. First, VPCs' quibbling about the frequency of VPC's inaccurate applications is not material to summary judgment. Second, although ¶ 39 of Exhibit M may not detail all of the steps an election official must undertake upon receiving an inaccurate application, VPC has elsewhere admitted that election officials must undertake a cure process when an application has information that does not match the information in ELVIS. *See* Resp. to SOF ¶ 62; *see also* Ex. A ¶ 26; Ex. U ¶ 25.

Third, VPC's own expert acknowledges that VPC's use of obsolete records – meaning records that have become stale because the data changed in ELVIS – involve instances where "a registrant moves, dies, or has been removed from voter files." VPC Ex. 5, ¶ 28. According to Mr. Hersh, it is "unavoidable" that groups like VPC will use obsolete records to pre-fill applications and that the rates identified by Mr. Block are "ordinary." Thus, not only does Mr. Hersh not controvert Mr. Block's assertion, he *admits* that it is "unavoidable" that VPC will send inaccurate prefilled applications to Kansas voters.

Fourth, Mr. Hersh's claim that "VPC methods reduced the burden on election officials" is pure speculation. It is also contradicted by testimony from Kansas election officials. *See* SOF ¶¶ 50-56, 60-64; VPC Ex. 1 at 207:13-208:20. Fielding hundreds of calls from concerned voters is not a reduction on an election official's burden.

Finally, as to the claims of inadmissibility of Mr. Block's Exhibit VII, as an expert witness, he was entitled to rely on the information in forming his conclusions. Furthermore, even if it were inadmissible from Mr. Block, the document would be admissible as a business record of Mr. Howell. After all, the applications that comprise VPC Ex. 8 are advance voting ballot applications received by the Shawnee County Election office and produced in third-party discovery by Mr. Howell. Ex. QQ at 215:13-215:16. Notwithstanding VPC's claim to the contrary, Mr. Howell acknowledged producing these documents and testified that he was familiar with them. Ex. QQ at 217:9-220:10. Mr. Howell is also qualified to testify as to their authenticity. *See* Fed. R. Evid. 703(6). VPC is also incorrect that Mr. Howell did not recognize these documents.

**Reply to SOF ¶ 50**

VPC takes issue with the term "large," but its dispute with the term is based on attorney argument, not facts, and does not properly controvert SOF ¶ 50. VPC merely cherry-picks a few lines from Mr. Howell's deposition that do not contradict his affidavit while ignoring the other testimony in the deposition that is consistent with his affidavit. The testimony cited by VPC states that Mr. Howell "doesn't track" the reason his office must cure an advance ballot application and that he doesn't know precisely "how much time" his staff spent on only prefilled applications. Pls.' Ex. 1 at 253:24-254:11. But Mr. Howell also testified that he was "aware of [] problems processing advance mail ballot applications that are specific to VPC's prefilling of the applications" and it took "a great deal of staff time to deal" with them. Ex. QQ at 255:21-256:14. He further clarified that it was not only duplicates, but that "it takes a great deal of staff time to deal with" VPC's pre-filled applications. Ex. QQ at 256:15-256:21. Just because Mr. Howell did not "know the exact number" of applications, he testified that the "applications that took the most

15

time for staff to deal with inaccuracies and duplicates were the ones that came from the Center for Voter Information," consistent with his affidavit. Ex. QQ at 256:22-257:5.

The remainder of VPC's attempt to controvert SOF ¶ 50 is likewise grounded upon attorney speculation. VPC suggests that these applications did not create an additional burden because VPC believes that only 12 of them went through the cure process. There was no suggestion that these 12 represented the entire universe of problematic pre-filled applications from VPC/CVI. It was a *sample*. And VPC's admission that those 12 applications had to go through the cure process confirms that pre-filled applications did place additional burdens on the Shawnee County Election office, consistent with Mr. Howell's testimony. Ex. QQ at 252:24-253:18.

For all but two of the remaining applications, VPC again speculates as to what the documents reveal. For example, VPC suggests that perhaps the voter (as opposed to an election official) crossed out information before returning the application, but VPC provides no evidence to support the speculation. VPC also speculates the pre-filled application may have been accurate but intended for a different voter also residing at that address. Again, no evidence to support that speculation. Whatever happened to the applications, VPC's contention that pre-filled applications were not erroneously pre-populated because someone crossed-out and corrected the information before it reached the election office in no way undermines the fact that the information had been pre-filled inaccurately in the first place. *See, e.g.* Ex. Q at 12 (Jamie Huske), 14 (Tammy Guffey-Morgan), 18 (Megan Gilbert), 19 (Ashley Craig-which also includes an incorrect prefilled address), 20 (Jullie Whitney), 21 (Jill Paletta). (This is only a sample of Ex. Q).

**Reply to SOF ¶ 51**

With regard to VPC's hearsay argument/objection, Defendants point the Court to footnote 11 in the brief. As for VPC's argument that the term "numerous" is inaccurate, this misstates Mr.

Howell's testimony.  VPC cites to a question posed in his deposition about whether he had "received a prefilled ballot application that is not – it's not filled out, it just notes on it this person is deceased[,]" to which he responded that he "received a couple of those, at least."  VPC Ex. 1 at 199:6-199:13.  But his affidavit speaks to a broader category of individuals, not just the applications that he received that were "not filled out" and "notes . . . deceased."  Elsewhere in his deposition, he also confirmed that he had "received an advance mail ballot application with the information of a voter who is listed as deceased in ELVIS[.]"  VPC Ex. 1 at 198:9-13.  And he was not asked about phone calls regarding deceased individuals.  In any event, he produced more than "a couple" in discovery.  *See* Pls.' Ex. 8.

With respect to Exhibit R, VPC is correct that the first two exhibits do not have an indication of "deceased."  And it is true that one of those applications was not prefilled by VPC.  But those minor discrepancies are immaterial to summary judgment.

**Reply to SOF ¶ 52**

The phrase used in SOF ¶ 52 is neither vague nor ambiguous; it is referring to the "inaccurately pre-filled advance voting ballot applications" that voters received from VPC.  And the affidavit repeatedly identifies CVI (who mailed VPC's packets, including the applications) as the source of the mailers.  *See*, *e.g.*, Ex. A at ¶¶ 38-40, 42, 44.

The remainder of VPC's Response to SOF ¶ 52 is attorney argument.  VPC asks the Court to ignore the anger, confusion, and frustration caused by VPC's prefilled applications and instead focus on excessive duplicate applications, which was another, closely related problem caused by VPC's use of pre-filled applications.  VPC also asks the Court to assume that voters were angry because they believed that Shawnee County election officials had sent the inaccurately pre-filled applications and, had the voters realized that VPC sent the applications, the voters would not have

17

been angry, frustrated or confused. This argument seeks to deflect blame and does not controvert SOF ¶ 52 at all. It was the pre-filled applications themselves that was causing the emotions, not simply that voters believed the Shawnee County election office got their information wrong or that the office sent numerous applications. Had the applications not been pre-filled, the voters would not have been angry and confused about the inaccurate information in the first place. In any event, VPC's theory also confirms another reason voters were confused, i.e., voters thought that pre-filled applications came from the county election office, not from a third-party.

As for Mr. Howell's testimony, it does not controvert his affidavit. VPC cherry-picks one sentence from a 270-page deposition to misstate the testimony. Mr. Howell testified that the "difference" between earlier elections and the 2020 election that caused a drastic increase in duplicate applications was "[p]refilled applications by third parties that either had inaccuracies or duplicate entries." Ex. S at 269:2-13. Mr. Howell also testified that he was "aware of [] problems processing advance mail ballot applications that are specific to VPC's prefilling of the applications" and that it took "a great deal of staff time to deal" with them. Ex. QQ at 255:21-256:14. He further clarified that the problem was not only duplicates, but that "it takes a great deal of staff time to deal with" VPC's pre-filled applications. Ex. QQ at 256:15-256:21. Thus, just because Mr. Howell did not "know the exact number" of inaccurately pre-filled applications that his office had received, he clearly testified that the "applications that took the most time for staff to deal with inaccuracies and duplicates were the ones that came from the Center for Voter Information," consistent with his affidavit. Ex. QQ at 256:22-257:5. Finally, the information contained in his affidavit is not inadmissible hearsay. *See* footnote 11.

18

**Reply to SOF ¶ 53**

First, the information is not inadmissible hearsay. *See* footnote 11. Second, VPC does not controvert the statements contained in Mr. Howell's affidavit (Ex. A at ¶ 38) as it relates to voters' confusion, frustration and anger about having received CVI-prefilled applications with inaccurate information. Instead, VPC challenges three other sections (Ex. A at, ¶¶ 40-42), claiming that these paragraphs merely state that the voters were confused, frustrated, and angry only about the sender, not the "content" of the applications. This is a distinction without a difference. The voters would not have been angry and contacted the county election office had the applications sent by VPC been blank. The reason for the voters' confusion and anger stems from the pre-filled applications themselves.

**Reply to SOF ¶ 54**

Ms. Cox's testimony supports the SOF ¶ 54. She testified that the reason she placed an ad in the local papers was in response to voters asking about where the information used to pre-fill their advance voting ballot applications was coming from. She noted that she was receiving 20-30 calls a day regarding these applications, with each call averaging five minutes in length. Ex. T at 131:19-132:12. Furthermore, her affidavit (at ¶ 37) is referencing "overall confusion" caused by the pre-filled applications. That is not vague. The confusion is referencing the confusion voters reported experiencing from having pre-filled applications, as discussed in Ex. U at ¶¶ 32-36. These paragraphs, to which ¶ 37 of her affidavit refers, address concerns about inaccurate or duplicate applications, contrary to VPC's claim. VPC incorrectly claims that this was not the reason Ms. Cox took out these ads, but her affidavit indicates otherwise. VPC's own citation shows this to be true. VPC thus does not actually controvert SOF ¶ 54. And to the extent it does, any contravention is not material for purposes of summary judgment.

19

**Reply to SOF ¶ 56**

VPC is correct that Defendants inadvertently cited Ex. A rather than Ex. S.  But SOF ¶ 56 is relevant as an example of the burdens on election offices flowing from having to deal with pre-filled applications containing inaccurate information.

**Reply to SOF ¶ 57**

VPC claims that Mr. Caskey's deposition testimony regarding the calls he received from voters is inadmissible hearsay.  The information is not inadmissible hearsay.  *See* footnote 11.  In any event, VPC does not dispute that Mr. Caskey had these calls with voters and election officials regarding complaints over pre-filled advance voting ballot applications.  The exact details of the calls with Mr. Caskey are immaterial.  The point is that the use of the pre-filled applications caused election officials – including Mr. Caskey – to have to expend a significant amount of time dealing with voter complaints, which ultimately had an adverse impact on election administration.

**Reply to SOF ¶ 58**

VPC claims that Mr. Caskey's deposition testimony regarding the calls he received from voters is inadmissible hearsay.  The information is not inadmissible hearsay.  *See* footnote 11.

**Reply to SOF ¶ 59**

This SOF addresses information that the Legislature received related to voter confusion and workload on county election officials caused by advance mail ballot applications.  As such, it is relevant and material.

**Reply to SOF ¶ 60**

VPC addresses immaterial, collateral issues but does not actually controvert SOF ¶ 60.  As such, it should be deemed admitted.

20

**Reply to SOF ¶ 61**

VPC addresses immaterial, collateral issues but does not actually controvert SOF ¶ 61. As such, it should be deemed admitted.

**Reply to SOF ¶ 62**

Mr. Howell's testimony does not conflict with his affidavit. VPC's citation addresses Mr. Howell's reservation about guessing the average time it takes to cure an advance voting ballot application anytime the application is missing information. He testified that it depended upon how easily the information could be obtained, meaning curing "can happen anywhere from almost immediately to as far out as you could never catch the person, they don't live there, the address you sent the envelope to was incorrect so it never gets there . . . It can range the full gamut on both ends to never getting there, clear up to solving it within an hour." VPC Ex. 1 at 168:12-168:21. Mr. Howell's affidavit, on the other hand, is limited to the times where his office is "able to reach the voter" and "attempt to work with [the voter] to correct the discrepancy/omission." Ex. A at ¶ 26. Furthermore, elsewhere in his deposition, Mr. Howell stated that when going through the cure process with a voter, his office spends "an average of three to five minutes filling out an application if everything goes well, then we're going to spend 15 or 20 minutes, at an absolute minimum, just doing the basic amount of cure." Ex. QQ at 253:4-12. Mr. Howell also testified that if a provisional ballot had to be issued, it would take "another 25 to 30 minutes of staff time." *Id.* at 253:13-16. The other portions of Mr. Howell's testimony referenced by VPC are not pertinent to SOF ¶ 62 or material to this summary judgment motion.

**Reply to SOF ¶ 63**

VPC does not actually controvert SOF ¶ 63. As such, it should be deemed admitted.

21

**Reply to SOF ¶ 64**

SOF ¶ 64 is not "at odds" with Mr. Howell's deposition testimony. The deposition testimony cited by VPC consists of his description of the provisional ballot process. The election office must prepare and issue a provisional ballot when a voter's advance voting ballot application cannot be timely cured. *See* PTO-SF, ¶ xxxiv; VPC Ex. 1 186:11-187:12, 187:23-188:12. The fact that the Shawnee County Election Office continues to attempt to contact voters to cure applications – thereby permitting the provisional ballot to be counted if the deficiencies are cured – has nothing to do with SOF ¶ 64. SOF ¶ 64 does not even reference the two-day time period. VPC does not actually controvert Mr. Howell's testimony, but instead raises irrelevant facts which illustrate that inaccurate applications resulting in provisional ballots further increase the burden on election administration. Accordingly, SOF ¶ 64 should be deemed admitted.

**Reply to SOF ¶ 65**

Once again, VPC does not actually controvert SOF ¶ 65. Instead, it points to *other* canned responses in VPC's FAQs, none of which are material. The fact that its call center had other canned responses does not change the fact that VPC's FAQs contained canned responses to respond to voters who contacted VPC about problems with advance voting ballot applications. SOF ¶ 65 should be deemed admitted.

**Reply to SOF ¶ 66**

Rather than controverting SOF ¶ 66, VPC attempts to explain away the confusion that its pre-filled absentee ballot applications have caused in other states. And it often mischaracterizes the evidence in the process.

With respect to Ex. Y at 4-5, the emails show that VPC sent pre-filled applications out to voters who, upon receiving the applications, inaccurately completed a remaining unfilled portion.

22

While the voter may have selected the incorrect election, the county cited the pre-filling of the application related to the date of the election as being problematic. Indeed, the county explicitly noted that it was the pre-filling of the *election date* by VPC that prevented the county from being able to process the application for the "General or Special election" given the date pre-filled by VPC. Had VPC not pre-filled that date, there would not have been that specific question whether the county could process the application.

In Ex. Y at 10, VPC omits that the email states that the county "continue[s] to receive calls from voters with questions and suspicions of where the form originated and whether it is legitimate or fraudulent," opting instead to claim it was only about another problem VPC had with its mailing program related to return addresses.

In Ex. Y at 26, VPC omits that the County Commissioner was frustrated not merely with VPC's errors related to the return address, but the fact that "Virginia has been dealing with [VPC's] error after error for nearly a decade now" and that his request is that VPC "cease mailing anything to Virginia voters."

Ex. Y at 28-31, which VPC omits from its objection, addresses an issue that Kansas also experienced – specifically, VPC using old data and complaints by voters. By using old lists, VPC mails applications to individuals who have died or moved and potentially have not even lived at an address for years. The election commissioner also stated that VPC's "last mailing cost literally 100's of hours for [the] office."

Ex. Y at 32, also omitted by VPC, describes phone calls from concerned voters regarding CVI's communications that indicate individuals are either not registered or eligible for absentee ballots and that the forms they are receiving include "information on the request [that] is grossly inaccurate."

As for Ex. Y at 35, although VPC claims the email is limited to suggesting "instructions" for its mailers, the text of that email illustrates that the reason the clerk is asking for changes to the instructions is that the pre-filled applications her office was receiving were resulting in individuals not providing their required photo ID. VPC likewise characterizes Ex. Y at 38-39 as being limited to suggestions for "instructions." But VPC omits that one instruction stems from counties being "inundated with duplicate absentee ballot requests[.]" Ex. Y at 38. Another instruction stems from voters not providing complete information when they return a VPC pre-filled application because VPC's instructions were not compliant with state law. *Id.* at 39.

Finally, as to Ex. Y at 41-42, while VPC correctly notes that this email had to do with voter registration applications, the problems with those mailings are similar to what Kansas has experienced with advance voting ballot applications, namely VPC sending letters to individuals with the wrong names.

**Reply to SOF ¶ 68**

VPC has not properly controverted SOF ¶ 68. VPC does not controvert that 507,864 voters were sent application packets nor does it controvert that 112,597 voters used the VPC-provided envelopes to return applications. Instead, citing Mr. Dripps' testimony, VPC claims that some, not all, of those mailers and applications "could have" been CVI packets rather than VPC packets. VPC also relies upon Mr. Lopach's affidavit, purportedly identifying the approximate number of voters who "responded to advance mail ballot applications" in 2020.

This distinction is immaterial to summary judgment. This case involves a prohibition on pre-filling advance voting ballot applications *regardless of the entity that mails those applications*. And the distinction is particularly irrelevant when it relates to CVI and VPC. CVI is VPC's "sister organization," the entities share many, if not all, of the same officers. CVI was responsible for

24

mailing both VPC's and CVI's packets in the General Election of 2020, and both organizations sent pre-filled advance mail ballot applications. Ex. OO at 8:12-9:9; Ex. PP at 69:15-70:21, 87:13-88:18; VPC Ex. 6 at 152:20-153:9; Ex. QQ at 108:17-25. For purpose of SOF ¶ 68, what is material is that VPC admits that 507,864 mailings were sent to Kansans during the 2020 General Election by VPC *and* CVI. It is also material that VPC effectively admits that approximately 112,597 mailings from VPC *and* CVI were returned to Kansas county election offices in that election. The fact that some of the applications may have come from CVI is wholly immaterial.

Furthermore, the Court should not permit VPC to attempt to raise this issue at this late date. If VPC believed this distinction was material – and it is hard to see how it is – VPC had months to disclose the amount of applications sent only by VPC. Defendants requested all documents supporting VPC's "allegation that an estimated 69,577 Kansas voters requested advance mail ballots in the 2020 general election using applications provided by VPC." Ex. SS. VPC responded by providing Ex. E and Defendants deposed VPC's 30(b)(6) witness, Mr. Lopach, about this chart. Mr. Lopach indicated that document was a chart of VPC's mailers. Ex. G 123:17-124:20; Ex. PP at 108:7-109:10. Defendants relied on Mr. Lopach's 30(b)(6) testimony regarding the numbers in this chart, and VPC has not provided updated information, outside of Mr. Dripps' speculation as to what "could also" be included in the cited numbers, to further clarify these numbers. Defendants also requested information, including name, address, and number of advance mail ballot applications sent to Kansans, and VPC responded by providing a list of over 500,000 individuals. Ex. TT; Ex. L. This is VPC's own data.

As for VPC's claim that SOF ¶ 68 is immaterial and irrelevant, that is not the case. This SOF addresses the number of advance voting ballot applications that were prepared by VPC/CVI and returned by Kansas voters during the 2020 General Election. These numbers, combined with

other facts, reveal the potential scope of voter confusion and election administration inefficiencies caused by pre-filled applications.

### Reply to SOF ¶ 69

VPC seeks to controvert on the basis that the stated numbers "could also" include CVI applications numbers. For the reasons stated previously, this distinction, which only claims that these numbers "could also" include both CVI and VPC mailers, is not material for purposes of summary judgment. *See* Reply to SOF ¶ 68. And it is too late for VPC to attempt to insert this new fact for the reasons stated previously. *See* Reply to SOF ¶ 68.

### Reply to SOF ¶ 70

VPC raises the same objections to SOF ¶ 70 as it did to SOF ¶¶ 68-69. For the same reasons stated in reply to those SOFs, VPC's objections are not material to defeat summary judgment.

### Reply to SOF ¶ 71

VPC's Response to ¶ 71 does not controvert SOF ¶ 71 and raises non-responsive issues. SOF ¶ 71 focuses on the advance voting ballot applications and duplicates the Shawnee County Election Office received during the 2020 General Election. SOF ¶ 71 does not address prior years, the numbers that were pre-filled by VPC, or Mr. Howell's description at the preliminary injunction hearing of his experience in the 2020 Election. These additional statements do not controvert SOF ¶ 71 and should be stricken. If VPC wanted to add additional facts, the proper procedure was to include them separately as additional material facts, not insert non-responsive information into their Response to SOF ¶ 71. *See* D. Kan. Local Rule 56.1(b).

Furthermore, VPC's attempt to controvert the number of duplicate applications Shawnee County received in 2020 lacks credible evidence. VPC cites to Mr. Howell's *preliminary injunction* testimony, not his *deposition testimony*, in order to try to manufacture a controverted

26

fact. As this Court knows, evidence introduced at the preliminary injunction is often preliminary and the evidence, upon further development of the record, can change. In discovery, VPC subpoenaed Mr. Howell and demanded that he produce documents "sufficient to show," *inter alia*, the "number of advance mail voting applications received." Ex. UU, Deposition Notice of Andrew Howell, at 9. VPC also commanded Mr. Howell to testify about, *inter alia*, "[t]he volume of advance mail voting applications received from voters[.]" *Id.* at 16-17. At his deposition, Mr. Howell testified *repeatedly* that the number of duplicate applications his office received in the 2020 General Election was 4,217 applications, a number higher than the amount he identified at preliminary injunction and equal to the number identified in his Affidavit. Ex. S at 117:4-117:9; Ex. QQ at 252:11-252:23, 270:3-270:14; VPC Ex. 1 at 232:21-233:16. Mr. Howell also explained how he reached the number of 4,217 duplicate applications. Specifically, when his office originally determined the number, it "missed a box or two . . . [s]o in order to be accurate" Shawnee County Election Office staff went "back through all of [the applications], [to] try to do a hand analysis of the total number of duplicates, as well as an accounting of how many there were in each set of duplicates." VPC Ex. 1 at 232:21-233:8. Thus, Howell clearly explained why a discrepancy in duplicate numbers existed between the preliminary injunction testimony and his later deposition testimony and affidavit. VPC had the opportunity to explore that further at Mr. Howell's deposition but chose not to do so. SOF ¶ 72 should thus be deemed admitted.

Finally, while VPC mentions that the number of advance mail ballot applications in 2020 increased by approximately 270% as compared to the 2016 General Election and approximately 195% as compared to the 2018 General Election, the number of duplicate applications received by the Shawnee County Election Office in the 2020 General Election increased by ***35,040%*** as compared to the 2016 and 2018 general elections. *See* Ex. A at ¶¶ 15, 17.

27

**Reply to SOF ¶ 72**

VPC's Response to ¶ 72 does not controvert SOF ¶ 72 and raises non-responsive issues. SOF ¶ 72 focuses on the advance voting ballot applications and duplicates the Shawnee County Election Office received during the 2020 General Election. SOF ¶ 72 does not address prior years, the numbers that were pre-filled by VPC, or Mr. Howell's description at the preliminary injunction hearing of his experience in the 2020 Election. These additional statements do not controvert SOF ¶ 72 and should be stricken. If VPC wanted to add additional facts, the proper procedure was to include them separately as additional material facts, not insert non-responsive information into their Response to SOF ¶ 72. *See* D. Kan. Local Rule 56.1(b).

Furthermore, VPC's attempt to controvert the number of duplicate applications Shawnee County received in 2020 lacks credible evidence. VPC cites to Mr. Howell's *preliminary injunction* testimony, not his *deposition testimony*, in order to try to manufacture a controverted fact. As this Court knows, evidence introduced at the preliminary injunction is often preliminary and the evidence, upon further development of the record, can change. In discovery, VPC subpoenaed Mr. Howell and demanded that he produce documents "sufficient to show," *inter alia*, the "number of advance mail voting applications received." Ex. UU, Deposition Notice of Andrew Howell, at 9. VPC also commanded Mr. Howell to testify about, *inter alia*, "[t]he volume of advance mail voting applications received from voters[.]" *Id.* at 16-17. At his deposition, Mr. Howell testified *repeatedly* that the number of duplicate applications his office received in the 2020 General Election was 4,217 applications, a number higher than the amount he identified at preliminary injunction and equal to the number identified in his Affidavit. Ex. S at 117:4-117:9; Ex. QQ at 252:11-252:23, 270:3-270:14; VPC Ex. 1 at 232:21-233:16. Mr. Howell also explained how he reached the number of 4,217 duplicate applications. Specifically, when his office

28

originally determined the number, it "missed a box or two . . . [s]o in order to be accurate" Shawnee County Election Office staff went "back through all of [the applications], [to] try to do a hand analysis of the total number of duplicates, as well as an accounting of how many there were in each set of duplicates." VPC Ex. 1 at 232:21-233:8. Thus, Howell clearly explained why a discrepancy in duplicate numbers existed between the preliminary injunction testimony and his later deposition testimony and affidavit. VPC had the opportunity to explore that further at Mr. Howell's deposition but chose not to do so. SOF ¶ 72 should thus be deemed admitted.

Finally, while VPC mentions that the number of advance mail ballot applications in 2020 increased by approximately 270% as compared to the 2016 General Election and approximately 195% as compared to the 2018 General Election, the number of duplicate applications received by the Shawnee County Election Office in the 2020 General Election increased by **_35,040%_** as compared to the 2016 and 2018 general elections. *See* Ex. A at ¶¶ 15, 17.

**Reply to SOF ¶ 73**

VPC does not actually controvert anything stated in SOF ¶ 73. Instead, VPC simply adds facts that are nonresponsive and irrelevant. If VPC believed these additional facts were material – and they clearly are not – the proper procedure would have been to include such additional facts in an additional statement of material facts. SOF ¶ 73 should be deemed admitted. *See also* Reply to SOF ¶¶ 71-72 regarding comparisons between 2016, 2018 and 2020.

29

**Reply to SOF ¶ 74**

As an initial matter, the testimony regarding what county election officials heard from voters about advance voting ballot applications is not inadmissible hearsay. *See* footnote 11. And VPC does not actually controvert SOF ¶ 74 other than to quibble with quantification issues.

Moreover, contrary to VPC's cherry-picked statement from Mr. Howell's deposition transcript, the affidavit testimony of Ms. Cox and Mr. Howell, as well as other Howell testimony, underscores that voters were confused by the pre-filled advance voting ballot application that they had received in the mail, that voters believed the applications had originated from the election offices, and that voters believed they had to return the applications in order to vote. See Ex. A at ¶ 41; Ex. U at ¶ 19.

As for Mr. Howell's deposition testimony, on the page following VPC's cherry-picked quote, Mr. Howell discusses voters contacting the election office about inaccuracies on pre-filled applications and mistakenly thinking that they were sent by the election office. He also clarified his statement: "I guess, to say it another way, inaccuracies are their own issue and duplicates sent multiple times also create a lot of voter confusion and concern." VPC Ex. 1 at 245:24-246:16. For these reasons, SOF ¶ 74 should be deemed admitted as VPC has not properly controverted it.

**Reply to SOF ¶ 75**

SOF ¶ 75 is relevant and material because it addresses the numbers of advance voting ballot applications and duplicates that the Ford County Election Office received in the 2020 General Election. As discussed repeatedly, pre-filled applications were one of the drivers of the duplicate applications that county election offices received.

Furthermore, VPC does not actually controvert SOF ¶ 75. Instead, it attempts to add its own facts, which should have been included in an additional statement of material facts, not as

30

part of an argument for "context." Regardless, SOF ¶ 75 does not, and was not intended to, address only pre-filled applications sent by VPC/CVI. And if the Court finds VPC's "context" relevant – which it is not – then Defendants note that Ms. Cox testified that her office did *not* pre-fill the applications it sent to voters and that she prefers that applications not be pre-filled due to potential inaccuracies. Ex. RR at 107:16-108:7, 115:24-116:5.

Finally, while VPC mentions that Ford County had "a lot more voters" voting by mail in 2020 than in 2016 or 2018, the number of advance mail ballot applications received in Ford County in connection with the 2020 General Election increased by approximately ***53,800%*** as compared to the 2016 and 2018 general elections. *See* Ex. U at ¶ 16, 18.

### Reply to SOF ¶ 76

This statement is relevant and material because it addresses the numbers of duplicate advance voting ballot applications that the Ford County Election Office received in connection with the 2020 General Election. As discussed repeatedly, pre-filled applications were a major driver of the duplicate applications that election offices received.

VPC does not actually controvert SOF ¶ 76 but instead merely argues it is incomplete because it does not include irrelevant facts that Plaintiffs want included for context. Having not controverted anything in the statement, SOF ¶ 76 should be deemed admitted. And if the Court feels context is relevant, Defendants note that Ms. Cox testified that her office did *not* pre-fill the applications it sent to voters and that she prefers that applications not be pre-filled due to potential inaccuracies. Ex. RR at 107:16-108:7, 115:24-116:5.

Finally, while VPC mentions that Ford County had "a lot more voters" voting by mail in 2020 than in 2016 or 2018, the number of advance mail ballot applications received in Ford County

31

in connection with the 2020 General Election increased by approximately **_53,800%_** as compared to the 2016 and 2018 general elections. *See* Ex. U at ¶ 16, 18.

### Reply to SOF ¶ 77

VPC does not actually controvert SOF ¶ 77, but simply raises a baseless foundation objection in an attempt to dispute that the majority of pre-filled applications came from VPC/CVI. Mr. Howell and Ms. Cox are permitted to testify based on their personal knowledge, belief, and observations as to the source of the majority of the duplicate applications received by their offices. Both testified that they could identify VPC/CVI pre-filled applications by specific markings. Ex. A at ¶ 14, 16 ("The overwhelming majority of the duplicate applications [the Shawnee County Election Office] received had been partially pre-filled by CVI[.]"; Ex. U at ¶ 15. They were thus able to identify which applications were prefilled by VPC/CVI, and they can testify that they observed the quantity of those applications were, relative to other pre-filled applications, a majority of the duplicates. Accordingly, SOF ¶ 77 should be deemed admitted.

### Reply to SOF ¶ 78

The testimony regarding Mr. Caskey's conversations with county election officials is not inadmissible hearsay. *See* footnote 11. And VPC does not actually controvert SOF ¶ 78. VPC's suggestion that not all pre-filled applications came from VPC (or CVI) is irrelevant. VPC has asserted a facial and as applied challenge to the constitutionality of the Pre-Filled Application Prohibition. The statute prohibits anyone, not just VPC from pre-filling advance voting ballot applications. Whether the calls to which Mr. Caskey testifies specified VPC is not material. SOF ¶ 78 should be deemed admitted.

**Reply to SOF ¶ 79**

The statement is material and relevant to burdens on election officials. Furthermore, despite VPC's clarification, it does not actually controvert SOF ¶ 79 and its clarification is not material to summary judgment. VPC also cites no evidence to support any inference that other election officials do not process applications in the manner described.

**Reply to SOF ¶ 80**

This statement goes to the burdens of duplicate advance voting applications on election administration and is therefore relevant and material. Furthermore, despite VPC's clarification, it does not actually controvert SOF ¶ 80 and its clarification is not material to summary judgment. VPC also cites no evidence to support any inference that other election officials do not process applications in the manner described.

**Reply to SOF ¶ 81**

Nothing in VPC's response controverts anything in SOF ¶ 81. Instead, VPC injects legal argument about the processing of advance voting ballot applications that are not material. VPC also raises issues that SOF ¶ 81 does not address. And VPC incorrectly claims that SOF ¶ 81 does "not pertain" to VPC applications. While that is not relevant given the Pre-Filled Application Prohibition restricts *any* third-parties from pre-filling applications, Mr. Howell testified that the "overwhelming majority of the duplicate applications" that the Shawnee County Election Office received were the ones that had been partially pre-filled by VPC/CVI. Ex. A at ¶ 16. SOF ¶ 81 thus should be deemed admitted. *See also* Reply to SOF ¶¶ 71-72 regarding comparisons between 2016, 2018 and 2020.

**Reply to SOF ¶ 82**

SOF ¶ 82 addresses voter confusion and the burdens on election administrators caused by pre-filled applications. As such, it is relevant and material to summary judgment. It is also not inadmissible hearsay. *See* footnote 11.

VPC does not actually controvert this statement and admits that it accurately reflects the cited evidence. Instead, VPC merely argues that the statement "does not pertain" to VPC's applications. While this distinction is immaterial and is irrelevant to SOF ¶ 82, VPC also ignores that Mr. Howell testified that the "overwhelming majority" of pre-filled applications that the Shawnee County Election Office received came from VPC/CVI. Ex. A at ¶ 16.

**Reply to SOF ¶ 83**

This statement addresses voter confusion and burdens on election administration. It is therefore relevant and material to summary judgment. VPC does not actually controvert SOF ¶ 83, but instead includes other facts that it apparently would prefer to be included in SOF ¶ 83. This is improper. If VPC wants to include additional facts that it believes are material, they should have been added as part of its statement of additional material facts. Regardless, nothing in the facts that VPC adds as "context" for its response is material. SOF ¶ 83 merely addresses the voters who requested an advance ballot yet nevertheless voted in person on Election Day. Accordingly, SOF ¶ 83 should be deemed admitted. *See also* Reply to SOF ¶¶ 71-72 regarding comparisons between 2016, 2018 and 2020.

**Reply to SOF ¶ 84**

The statement goes to VPC's First Amendment claims, namely the purported message (or absence thereof) that voters receive from a pre-filled application as opposed to a blank application. It is relevant and material. And VPC has not actually controverted SOF ¶ 84 for numerous reasons.

34

First, VPC's cited evidence about a 2006 study is inadmissible hearsay and lacks a proper foundation. VPC did not designate an expert or submit competent and admissible evidence that pre-filled applications have higher rates of return than blank applications. Defendants explicitly requested during discovery any studies that VPC believed supported its belief that pre-filled advance voting ballot applications were more effective than blank applications. Ex. CC, #4, 15. Initially, VPC produced one "study" that does not even address pre-filled vs. blank applications. Ex. PP at 16:6-17:13. At his deposition, Mr. Lopach then identified a purported "study" conducted in 2006 by Dr. Mann with VPC's predecessor organization, Ex. PP at 17:15-20:13, and a second purported "study" by Dr. Green which, when finally disclosed, was merely an expert report in another case, dated March 21, 2022. Ex. PP at 27:3-27:18. Following the deposition, Defendants requested a copy of the 2006 study referenced by Mr. Lopach given that it was not previously produced. Ex. DD. In response, VPC produced a 111-page document, all but four pages of which were redacted. Ex. EE. The document stated that VPC's predecessor conducted a study in 2006 that "tested both the messages of its mailings and different combinations of mail and phone calls." Ex. EE at 92. The only unredacted portion of the alleged study's conclusion that was produced was a two-sentence statement stating that a "pre-populated form produces a higher response rate than a blank form." Ex. EE at 96. Defendants know nothing about how the study was conducted, the sample size, controls, or its reliability. In short, the study lacks any foundation, is inadmissible hearsay, and, without some expert witness to testify about it, VPC cannot rely on it.

Mr. Lopach also lacks the requisite personal knowledge to rely upon Dr. Mann's study. Indeed, Mr. Lopach testified that he did not know "the size of the sample or anything else" about the study. Ex. PP at 19:2-19:9. Mr. Lopach likewise testified that he is "not aware of any studies examining how the recipient of a vote-by-mail mailing that is pre-filled compared to one that is

35

not pre-filled [or] how the recipient reacts or responds to that mailing." Ex. PP at 27:19-28:13. To now imply that such studies exist in his Declaration amounts to a sham affidavit.

Citing to Mr. Lopach's deposition, VPC also claims that "Columbia University faculty" have allegedly evaluated and opined on this issue. But neither introduced this study into evidence nor designated an expert who could do so. In fact, when VPC provided this purported "study," months later, it turned out to be nothing more than an expert report by Dr. Green in another case, dated March 21, 2022. Ex. PP at 27:3-27:18. It is inadmissible hearsay and, given that it is dated after this lawsuit was commenced, VCP cannot possibly claim that the study served as a basis for sending pre-filled applications to voters in 2020 (or any time before then).

Because VPC has cited no admissible evidence to controvert SOF ¶ 84, it must be deemed admitted.

**Reply to SOF ¶ 85**

The statement goes to VPC's First Amendment claims, namely the purported message (or absence thereof) that voters receive from a pre-filled application as opposed to a blank application. It is relevant and material. And VPC has not actually controverted SOF ¶ 85. VPC does not, and could not, suggest that Mr. Lopach discerns a political message from a pre-filled advance voting ballot application. In any event, as detailed in the Argument section of this brief, any message that is contained in VPC's mailers comes from the cover letter, not the pre-filled application. And that is a legal issue.

**Reply to SOF ¶ 86**

This statement goes to VPC's freedom of association claim. It is relevant and material. VPC does not actually controvert SOF ¶ 86, but instead offers additional facts that supposedly add "context" to Mr. Lopach's testimony. But the "context" does not address the statement in SOF ¶

36

86, and Mr. Lopach's "belief" about VPC's "strongest encouragement" is irrelevant.  Indeed, Mr. Lopach's theory that pre-filling an application is a "message" is nothing more than an inadmissible legal conclusion.  SOF ¶ 86 should be deemed admitted.

**Reply to SOF ¶ 87**

This statement goes to VPC's First Amendment speech claims.  It is relevant and material. VPC does not actually controvert SOF ¶ 86.  Instead, it attempts to insert additional facts that it claims add "context."  But these additional facts do not address the statement in SOF ¶ 86.  VPC cites to a portion of Mr. Lopach's deposition that is both irrelevant and inadmissible.  It is irrelevant because the excerpted testimony addresses what the Pre-Filled Application Prohibition permits and does not permit.  Mr. Lopach's belief as to successful methods of voter encouragement does not address SOF ¶ 86.

The statement is also inadmissible because Mr. Lopach lacks any foundation from which to make the statement that VPC cites from his deposition.  The only basis for Mr. Lopach's theory as to successful methods of voter encouragement derive from inadmissible studies (*see* SOF ¶ 84 above) to which he could not testify when asked about in his deposition.  Indeed, with respect to the "study" he primarily cited to, he admitted he did not know the "size of the sample or anything else" about the study.  Ex. PP at 19:2-19:9.  Moreover, whether pre-filling an application conveys a message separate and apart from the cover letter is an inadmissible legal conclusion.

B.      *Reply to VPC's Statement of Additional Uncontroverted Facts*

1.      Plaintiff VPC's core mission is to promote voting among traditionally underserved groups, including young voters, voters of color, and unmarried women at rates commensurate with voters in other groups. See Stipulated Facts at § 2(a)(viii); Johnson Decl., Ex. 7 (Deposition of Lionel Dripps (Aug. 30, 2022) ("Dripps Tr.")) 111:25-112:9; *id.* at Ex. 6, (Lopach Tr.) 153:12-16,

37

96:14-17, 204:3-6; *id.* at Ex. 8 (September 8, 2021 Hearing on Plaintiffs' Motion for Preliminary Injunction ("9/8/2021 PI Tr.")) 50:9-20 (Thomas Lopach testimony); Lopach Decl. ¶ 7-11, 28.

**RESPONSE:  Uncontroverted but immaterial.**

2.     VPC believes that our country's democracy is better off when more eligible voters can participate and vote for the candidates of their choice and encouraging and assisting voters to participate in elections through mail voting is one of the best ways to ensure a robust democracy. Ex. 14 (Lopach Decl.) at ¶ 8, 10.

**RESPONSE:  Uncontroverted that Mr. Lopach states that this is VPC's belief in ¶ 8 of his Declaration.  However, it is immaterial because the Pre-Filled Application Prohibition does not prohibit anything stated in SOAF ¶ 2.**

3.     VPC advocates mail voting to expand engagement among its target voters who do not have the ability and availability to vote in person or the resources and know-how to navigate the mail voting application process. Ex. 14 (Lopach Decl.) at ¶ 10.

**RESPONSE:  Controverted in part, but immaterial.  The cited evidence merely refers to VPC's "belie[f] and support[]"that mail voting "expands participation opportunities[.]" The cited evidence also does not refer to individuals who do not "know how to navigate the mail voting application process."  Regardless, SOAF ¶ 3 is immaterial.  The Pre-Filled Application Prohibition does not restrict anyone from voting by mail, advocating for mail voting, or instructing on how to vote-by-mail.  Ex. G at 184:4-185:7.  The challenged provision only prohibits third-parties from pre-filling advance voting ballot applications.  *Id.***

4.     VPC primarily encourages these voters to register and to participate in the electoral process through direct mailings. *See* Stipulated Facts at §2(a)(ix); Johnson Decl., Ex. 6 (Lopach Tr.) 146:24-147:15; Lopach Decl. ¶¶ 7, 13.

38

**RESPONSE:  Uncontroverted but immaterial.  The only issue in this case is whether pre-filling an advance voting ballot application constitutes speech or expressive conduct and communicates a message that is constitutionally protected.  Whether pre-filling an official government form with someone else's information constitutes speech or expressive conduct is a legal question, not a fact.**

5.      VPC's core message is that advance mail voting is safe, secure, accessible, and beneficial. Ex. 14 (Lopach Decl.) at ¶ 9.

**6.      RESPONSE:  Uncontroverted but immaterial.  Mr. Lopach's Declaration does make this statement.  However, whether pre-filling a government form with someone else's information to request an advance ballot via mail constitutes speech or expressive conduct is a legal question, not a fact.  It is also immaterial and irrelevant because Mr. Lopach testified that, other than the restriction regarding the insertion of a voter's name and address on an advance voting ballot application, nothing in the Pre-Filled Application Prohibition restricts VPC from encouraging individuals to participate in the democratic process, instructing them how to obtain or vote an advance ballot, encouraging them to do so, or communicating any other message in the mailers sent to targeted voters.   Ex. G at 183:9-187:19.**

6.      VPC encourages registered Kansas [sic] to participate in this manner by mailing voters a package communication that advocates for mail voting and provides a personalized advance mail ballot application.  *See* Stipulated Facts at §2(a)(x); Johnson Decl., Ex. 7 (Dripps Tr.) 124:14-125:2; Lopach Decl. ¶¶ 12, 17-18, 21, 23-24.

**RESPONSE:  It is uncontroverted that VPC sends mailers to Kansas voters that include information advocating for mail voting and that at least some of those mailers include a pre-filled advance voting ballot application.  However, whether pre-filling an official State**

39

**form with someone else's information to request an advance ballot via mail constitutes speech or expressive conduct is a legal question, not a fact.**

7.      To personalize the applications it sends, VPC uses statewide voter registration files obtained via its data vendors and fills-in parts of the advance mail ballot applications with the voter's information as it appears in the state records. Ex. 6 (Lopach Tr.) 91:4-92:18; Ex. 14 (Lopach Decl.) ¶¶ 37-40.

**RESPONSE:  Controverted to the extent that SOAF ¶ 7 means that (i) VPC (and the vendors with which it contracts) only uses official State voter registration data in pre-filling the advance voting applications or (ii) all of the applications VPC sends to voters are pre-filled only with "the voter's information as it appears in the state records."  VPC Executive V.P. Lionel Dripps specifically testified that VPC does *not* pre-populate advance voting ballot applications simply with information drawn from the State voter file.  Ex. F at 171:24-172:17. Rather, VPC's vendor supplements the State file with commercially available data.  Ex. F at 173:13-174:1.  Moreover, the commercial data used to "supplement" the information from the State voter file included faulty data.  *Id.*  Thus, the pre-filled applications VPC sent to voters in connection with the 2020 General Election often did *not* match "the voter's information as it appears in the state records."  Because VPC, in pre-filling applications for use in the 2020 General Election, also used voter data that its vendor had obtained from the State *at least* 4-6 months before those applications were mailed to voters, the information on the pre-filled application often had changed and did not match the data by the time VPC sent its mailer to the voter.  Ex. M at ¶¶ 34-35.**

8.      The process for personalizing applications adds additional steps and cost to the application mailing process. Ex. 14 (Lopach Decl.) ¶ 21; Ex. 2 (Shew Tr.) 24:7-14.

40

**RESPONSE:  Uncontroverted but immaterial.**

9.      VPC's mailer communications sent to Kansas voters also included a letter encouraging the voter to request and cast an advance ballot with instructions on how to do so, or if they choose, to opt out of future VPC communications; a step-by-step guide and other assistance for how voters may submit the included application; and a postage-paid envelope addressed to the voter's county election office. Lopach Decl., Ex. A (2020 VPC mailer) at VPC000001-005.

**RESPONSE:  Uncontroverted.**

10.     The letter's opening paragraph specifically refers to "the enclosed advance voting application already filled out with [the voter's] name and address" and mentions the personalization in the closing "P.S." message: "We have already filled in your name and address on the enclosed form. Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope." Ex. 14 (Lopach Decl.) at Ex. A at VPC000002. The step-by-step guide was printed on the reverse side of the enclosed personalized advance ballot application. *Id.* at VPC000004.

**RESPONSE:  Uncontroverted.**

11.     The 2022 mailers contain the same basic components as VPC's prior mailer communications, including personalized advance mail ballot applications. Ex. 14 (Lopach Decl.) ¶ 17; *id.* at Ex. B at VPC000743-746 (2022 VPC mailer).

**RESPONSE:  Uncontroverted but immaterial.  The mailers that VPC sent in the most recent 2022 election – more than a year after the Kansas Legislature enacted K.S.A. 25-1122(k)(2), at least in part in response to VPC's activities in Kansas in 2020 – are irrelevant to this lawsuit.**

41

12.    VPC also sent a follow-up letter in September 2022 to remind voters that they have previously received a personalized advance mail ballot application and further encouraging the voter to return the application and vote by advance mail ballot. Id. at ¶ 52; Johnson Decl., Ex. 6 (Lopach Tr.) 30:3-10.

**RESPONSE:  Uncontroverted but immaterial.  The mailers that VPC sent in the most recent 2022 election – more than a year after the Kansas Legislature enacted K.S.A. 25-1122(k)(2), at least in part in response to VPC's activities in Kansas in 2020 – are irrelevant to this lawsuit.**

13.    VPC carefully designs this package of materials to convey to the recipient VPC's message that this particular Kansan should participate in the democratic process by mail voting, that voting by mail is easy, and that VPC's audience can act on this encouragement by returning the supplied advance mail ballot application that VPC has personalized. Ex. 14 (Lopach Decl.) ¶¶ 11, 17-18, 22, 28-29; Ex. 15 (9/8/2021 PI Tr.) 47:7-13.

**RESPONSE:  Uncontroverted but immaterial.  The only issue in this case is whether pre-filling an advance voting ballot application constitutes speech or expressive conduct and communicates a message that is constitutionally protected.**

14.    VPC believes that distributing personalized advance mail ballot applications as a part of its advance mail voting mailer conveys its viewpoint that voting by mail is convenient and a good option for the recipient to participate in democracy. Ex. 6 (Lopach Tr.) 149:11-13, 150:13-19, 151:14-16, 183:9-184:1, 185:21-186:3, 188:1-4; *id.* at Ex. 5 (Dripps Tr.) 192:5-13; *id.* at Ex. 15 (9/8/2021 PI Tr.) 44:24-45:7, 49:17-24 (Thomas Lopach testimony); Ex. 14 (Lopach Decl.) ¶¶ 9, 23-24, 66.

42

**RESPONSE: Uncontroverted that this is VPC's "belief," but VPC's subjective beliefs are immaterial in establishing this assertion as fact. VPC conceded that it does not know if voters receive any message from a pre-filled advanced ballot application. Ex. PP at 98:17-100:10; 151:18-152:2. Indeed, Mr. Lopach testified that he could not "speak to how an individual or group of people would respond to pre-filled vote-by-mail application versus a blank vote-by-mail application outside of the study we did in 2006 or other studies presented by academics or practitioners who have done similar work." (None of which were produced in this case). Ex. PP at 99:2-99:7. Mr. Lopach lacks the personal knowledge to support his claim that a pre-filled application "conveys" VPC's viewpoint to a voter. Whether pre-filling an official State form with someone else's information to request an advance ballot via mail constitutes speech or expressive conduct is a legal question, not a fact.**

15.    VPC believes that personalizing its applications increases voter engagement, which in turn allows VPC to build a broad associational base with potential voters in Kansas. Ex. 6 (Lopach Tr.) 167:22-168:15; Ex. 14 (Lopach Decl.) ¶¶ 21-22, 24, 28-30.

**RESPONSE: Controverted. First, VPC's belief is directly at odds with Mr. Lopach's testimony that immediately follows the pages cited by VPC. Mr. Lopach agreed that nothing "in the prohibition against partially-completed advance ballot applications [] prohibits VPC from associating, sending its mailers, to any individual Kansas voter[.]" VPC Ex. 6 at 169:2-8. Second, VPC has no admissible evidence on which to base its "belie[f] that personalizing its applications increases voter engagement, which in turn, [allegedly] allows VPC to build a broad associational base with potential voters in Kansas." *See* Reply to SOF ¶ 84, *supra*.**

**Third, Mr. Lopach has not been designated as an expert in the area of "increase[ing] voter engagement" or analyzing any effect that pre-filling a mail ballot application has on**

43

building "an associational base," whatever that is intended to mean. While he may be able to broadly state what VPC's *subjective* belief is in Paragraph 21 of his Declaration, which is immaterial to summary judgment and the resolution of this case, there is no admissible evidence to support the basis for such a belief. Indeed, Mr. Lopach admitted that the Pre-Filled Application Prohibition does not prevent VPC from associating with anyone. VPC Ex. 6 at 169:2-8.

The remaining cited paragraphs of Mr. Lopach's affidavit are immaterial, do not support SOAF ¶ 15, or are contrary to the sworn testimony. Paragraph 22 of Mr. Lopach's Declaration states that VPC includes a scannable barcode to track which voters returned the pre-paid envelope, which is undisputed by Defendants, but then makes numerous immaterial claims about what VPC believes the barcode on its envelopes may reveal about voters. Any message in VPC's mailers is conveyed through the cover letter, however, not the pre-filled application. The Pre-Filled Application Prohibition imposes no restriction on what messages VPC can communicate. Thus, to the extent VPC tests which messages in its mailers are more effective than others, that fact is entirely irrelevant to this lawsuit. Moreover, Mr. Lopach testified that VPC has not "done any testing to see whether or not the recipients of those ballot applications discern a different message from a partially-filled-out ballot application versus a blank advance ballot application." VPC Ex. 6 at 20:21-21:2.

16.    VPC considers providing young voters, voters of color, and unmarried women—who may have less access to printing and postage—with the necessary personalized applications is key to effectively advocating its message. Ex. 6 (Lopach Tr.) 185:25-186:3; Ex. 15 (9/8/2021 PI Tr.) 59:23-60:20; Lopach Decl. ¶¶ 10, 21, 23, 24.

**RESPONSE: Controverted.** While VPC may "consider" the pre-filling of advance voting ballot applications as "key" to the effectiveness of its message, there is no competent evidence in the record to support VPC's assertion that sending an unsolicited, *pre-filled* application is more effective at advocating its message than sending a blank application. VPC did not designate any expert or submit competent and admissible evidence that pre-filled applications have higher rates of return than blank applications. For the reasons stated in Reply to SOF ¶ 84 and Response to SOAF ¶ 15, the cited evidence is inadmissible.

Furthermore, nothing in the Pre-Filled Application Prohibition prevents VPC from performing the actions identified in Paragraphs 10, 21, or 23 of Mr. Lopach's Declaration, with the exception of pre-filling the application. Nor does the challenged provision prevent VPC from providing blank applications and communicating any message it wants to voters. In any event, whether pre-filling an official state form / application with someone else's information constitutes speech or expressive conduct is a legal question, not a fact.

17.    Doing so provides the voter simple access to an advance mail ballot application that is personalized with required information from the voter file. Ex. 14 (Lopach Decl.) ¶¶ 18, 21.

**RESPONSE: Controverted but immaterial.** It is uncontroverted that the pre-filled applications VPC provides to voters often contain certain information required in order to obtain an advance ballot. However, it is controverted, as Mr. Lopach suggests in ¶ 18 of his Declaration, that pre-filling applications "best ensures" their accuracy. VPC V.P. Lionel Dripps testified that VPC does *not* solely use information from the Kansas voter file to pre-fill applications; rather, its vendor (Catalist) merges commercially available data with information from the State's voter file. Ex. F at 173:14-174:1. Additionally, election officials in Kansas and VPC officials testified that VPC (and/or CVI) has pre-filled applications with

45

information that does not match the State's voter file (meaning it is not information required from the voter file), and Mr. Dripps testified that these inaccuracies caused VPC to briefly stop mailing pre-filled applications. **Ex. A, ¶¶ 11-12, 35, 38; F at 171:2-11; Ex. QQ at 256:22-257:5, 269:2-13; Ex. U, ¶¶ 30-34, 36.** That is why some Kansas election officials prefer that voters fill out their own information because the voter has access to the most accurate information. **Ex. A, ¶ 13.** In any event, whether pre-filling an official state form / application with someone else's information constitutes speech or expressive conduct is a legal question, not a fact.

18.    An estimated 69,000 Kansas voters submitted an advance mail voting application provided by VPC to their county election official in the 2020 general election. Ex. 14 (Lopach Decl.) ¶ 26.

**RESPONSE:  Uncontroverted but immaterial.  However, this statement conflicts with Mr. Lopach's 30(b)(6) testimony regarding 2020 responses.  Ex. G at 124:16-124:20 (claiming that VPC "had 112,000 respondents send 127,336 responses").**

19.    VPC is a data driven operation. VPC uses data to identify its target voters, tracks recipient responses to its communications and conducts randomized control trials to evaluate the effectiveness of its mailings.  Ex. 4 (Dripps Tr.) 77:24-79:17, 116:3-18; *id.* at Ex. 6 (Lopach Tr.) 14:15-20:13,  116:17-117:12, 154:25-157:15, 165:1-166:9, 170:7-174:9.

**RESPONSE:  It is uncontroverted that VPC "uses data to identify its target voters" and "tracks recipient responses to its communications" to the extent it is claiming that it tracks when the recipients of its mailings use its pre-paid, pre-addressed envelopes to send advance voting ballot applications to county election offices.  But Defendants controvert that VPC knows whether a voter perceives any purported message from a pre-filled advance**

46

voting ballot application.  *See* **Response to SOAF ¶ 15 above.  In any event, whether pre-filling an official state form / application with someone else's information constitutes speech or expressive conduct is a legal question, not a fact.**

20.    VPC engages experts in voting behavior and quantitative research, who support VPC's belief that personalizing applications is effective at conveying the organization's pro-advance mail voting message. Ex. 14 (Lopach Decl.) ¶ 16; Ex. 6 (Lopach Tr.) 13:15-16:10; Ex. 4 (Dripps Tr.) 159:20-160:16.

**RESPONSE:  Controverted.  VPC is improperly trying to admit expert testimony, apparently by Christopher B. Mann, via lay witness Lopach, to support its claim.  VPC did not designate or disclose any expert (i) "in voting behavior and quantitative research" or (ii) who could address the issue of whether "personalizing applications is effective at conveying the organization's pro-advance mail voting message."  *See* Response SOAF ¶ 15.  Moreover, any studies that VPC officials may have relied upon to assess the efficacy of its program are inadmissible hearsay.  In any event, whether pre-filling an official state form / application with someone else's information constitutes speech or expressive conduct is a legal question, not a fact.**

21.    VPC (then named "Women's Voices. Women Vote") conducted a study that evaluated the 2006 election cycle (the "2006 Study"), including VPC's evaluation of the effectiveness of personalizing advance mail voting applications. Ex. 6 (Lopach Tr.) at 17:15–18:7, 20:7–13.

**RESPONSE:  It is uncontroverted that Mr. Lopach claimed a "study" was conducted by this organization in 2006.  Everything beyond that is controverted.  VPC is impermissibly**

47

**attempting to introduce expert testimony evidence and a study without a qualified expert. None of these studies are admissible.** *See* **Reply to SOF ¶ 84 and Response to SOAF ¶ 15.**

22.    Mr. Lopach testified that the 2006 Study found that pre-filled "vote-by-mail applications had a higher rate of return than blank vote-by-mail applications." Ex. 6 (Lopach Tr.) at 18:24-19:6.

**RESPONSE:  Controverted.   While Mr. Lopach may have stated these words, he lacks the qualification or foundation to testify about the 2006 study.  He is not designated as expert and his description of what a study purportedly found is inadmissible hearsay.** *See* **Reply to SOF ¶ 84 and Response to SOAF ¶ 15.**

23.    The 2006 Study concluded that "a pre-populated form produced a higher response rate than a blank form." Ex. 17 (2006 Study, VPC000756) (excerpted) at VPC000851. Specifically, pre-populated forms had a response rate over 11% higher than un-populated forms. See *id.* at VPC000852.

**RESPONSE:  Controverted.  VPC has not produced this alleged "study" and cannot now introduce it into evidence at summary judgment.** *See* **Reply to SOF ¶ 84 and Response to SOAF ¶ 15.  In fact, VPC's Ex. 17, which it labels "excerpts," contains only three of the four partially un-redacted pages, omitting the rest of what was produced to Defendants.** *Compare* **Ex. DD** *with* **VPC Ex. 17.**

24.    The Personalized Application Prohibition bans any person who solicits by mail a registered voter to file an advance mail ballot application and includes an application for an advance voting ballot in such mailing from completing of any portion an application prior to mailing the application to a registered voter, such as a voter's name and address. PTO-SF ¶ xxii; H.B. 2332 § 3(k)(2) (codified at K.S.A. § 25-1122(k)(2))

48

**RESPONSE: VPC misquotes both the parties' Stipulation and the relevant statute.**

**PTO-SF ¶ xxiii, which partially K.S.A. § 25-1122(k)(2), states:**

> **Section 3(k)(2) of HB 2332 (codified at K.S.A. 25-1122(k)(2)) states that "The application for an advance voting ballot included in [a mail solicitation to a registered voter to file an advance voting ballot application] shall be the official application for advance ballot by mail provided by the secretary of state. No portion of such application shall be completed prior to mailing such application to the registered voter." This statute will be referred to as the "Personalized Application Prohibition."**

**To the extent more is required, it is uncontroverted that the challenged provision does not permit a person, who solicits by mail a registered voter to submit an application for an advance mail ballot, to pre-fill any portion of the advance voting ballot application included in such mailing, which would include the voter's name and address.**

25.    The Personalized Application Prohibition is not limited to only the inaccurate or fraudulent completion of any portion of an application. H.B. 2332 § 3(k)(2) (codified at K.S.A. 25-1122(k)(2)).

**RESPONSE: Uncontroverted but immaterial.**

26.    The Personalized Application Prohibition does not allow a person soliciting a registered voter to file an advance mail ballot application to mail that voter an application that has been completed with information from the Kansas voter rolls prior to mailing. *See id.*

**RESPONSE: Uncontroverted but immaterial. However, this statement represents a legal conclusion, not a fact.**

27. The Personalized Application Prohibition does not limit the number of advance mail ballot applications that may be mailed to a registered voter. *See id.*

**RESPONSE: Uncontroverted but immaterial.**

28.    The Personalized Application Prohibition does not require the sender of advance mail ballot applications to identify itself on such mailings. *See id.*

49

**RESPONSE: Uncontroverted but immaterial.**

29.     A violation of the Personalized Application Prohibition is a class C nonperson misdemeanor, which contains no scienter requirement and is punishable by up to one month in jail and/or fines. Id. § 3(k)(5); K.S.A.§§ 21-6602(a)(3), (b).

**RESPONSE: Whether the Pre-Filled Application Prohibition contains a "scienter requirement" is a legal (statutory construction) argument being made in a statement of facts. It is inappropriate for inclusion in the statement of facts.**

30.     VPC understands that the Personalized Application Prohibition would prevent it from its most effective means of conveying its pro-mail voting message. Ex. 14 (Lopach Decl.) ¶ 18 ("[p]ersonalizing the applications with pre-filled information drawn from states' voter registration files best ensures that VPC's message and assistance are both effective and accurate"), ¶¶ 55-66; Ex. 6 (Lopach Tr.) 150:13-19, 151:14-16, 185:21-186:3, 188:1-4; Id. at Ex. 15 (PI Hearing Tr.) 44:24-45:7, 49:17-24, 60:11-20 (Thomas Lopach testimony).

**RESPONSE: Controverted. While VPC may believe that pre-filling the advance voting ballot applications it sends to voters is the most effective means of conveying whatever message it wants to convey in its mailers, there is no competent evidence in the record to support it. *See* Response to SOAF ¶ 15. Moreover, whether pre-filling an official state form / application with someone else's information constitutes speech or expressive conduct is a legal question, not a fact.**

31.     VPC understands that the Personalized Application Prohibition would limit its associational activity with voters. Ex. 6 (Lopach Tr.) 190:10-12.

**RESPONSE: Controverted. This statement is directly contrary to the testimony of Mr. Lopach and is not supported by the citation. First, the citation VPC uses confirms that**

50

it is Mr. Lopach's belief that the Pre-Filled Application Prohibition "limits the success of our engagement with voters but it does not prohibit us from engaging." VPC Ex. 6 at 190:10-12. This vague statement is referring to Mr. Lopach's opinion as to the return rates pre-filled versus blank applications. Ex. PP 189:18-190:21. As discussed previously, however, VPC has no admissible evidence to support that theory. *See* Reply to SOF ¶ 84 and Response to SOAF ¶ 15. Second, almost immediately after the citation provided by VPC, Mr. Lopach confirms that "there is nothing in the personalized application prohibition that keeps [VPC] from associating with other persons or organizations to encourage the use of advanced mail voting[.]" Ex. G at 191:4-14.

32.    VPC Executive Vice President Lionel Dripps testified that VPC detected an error in the data it received from its data vendor whereby, nationally, roughly 5% of records had a middle name or initial and roughly 3% had a suffix that did not appear to match the voter file. Ex. 4 (Dripps Tr.) 167:24-168:9, 169:17-170:2.

**RESPONSE: Uncontroverted.**

33.    Mr. Dripps testified that he did not know whether these errors appeared in the Kansas data in line with the national numbers. Ex. 4 (Dripps Tr.) at 169:10-16, 170:11-25.

**RESPONSE: It is uncontroverted that Mr. Dripps did not know whether the national error rate was the same in Kansas as it was nationally. Thus, Mr. Dripps's testimony does not establish whether the Kansas error rate was higher or lower than the national error rate. However, Mr. Dripps did testify that VPC "had enough concern about the level of recipients of partially completed advance ballot applications and there being incorrect information either in the form of prefixes, suffixes, or middle initials" that VPC "sent out non-partially completed applications" in two waves. Ex. F at 171:2-11.**

51

34.    Plaintiff's expert witness Dr. Eitan Hersh, who analyzed the expert reports of Defendants' proffered expert witness Kenneth Block, concluded that even assuming that all issues raised by Mr. Block represent actually erroneous or obsolete registrants contacted by VPC's mailers, the alleged issues raised by Mr. Block relate to just under 3% of the records in the VPC database. See Ex. 5 (Hersh Rept.) ¶ 27.

**RESPONSE:  Controverted in part.  This statement lacks context.  As an initial matter, as reflected in SOF ¶ 40, VPC produced only a subset of the Kansas voters to whom it mailed advance voting ballot applications in the 2020 General Election.  Specifically, VPC produced a list containing only 312,918 of the approximately 507,864 total Kansas voters to whom it sent applications.  *See* Ex. L.  Mr. Block, therefore, only had a partial list of the individuals to whom VPC sent applications with which to conduct his analysis.  Had Mr. Block been provided the full list of voters, the number of errors may have been much greater.**

**Furthermore, even using the 3% figure referenced by Dr. Hersh, that would equate to 15,235 [0.03 x 507,864] erroneous applications.  That is a substantial number of erroneous applications for county election officials to have to deal with.  Dr. Hersh testified that such errors are unavoidable and that VPC simply made a cost-benefit calculation and determined that ensuring that only the latest data was used in pre-filling applications to voters was not worth the cost.  *See* Ex. MM at 147:20-148:18.**

**Finally, Dr. Hersh's testimony does not address the significant error rates on pre-filled applications that VPC itself (via Mr. Dripps) acknowledged.  *See* SOF ¶ 38.**

35.    Mr. Block testified that he did not endeavor to compare the total number of purportedly erroneous records in his declaration and exhibits to the total records on VPC's mailing list. See Ex. 7 (Block Tr.) 272:18-23.

**RESPONSE: Uncontroverted but immaterial.**

36.     Mr. Block testified that he did not know "what the error rates are in VPC's data." Ex. 7 (Block Tr.) 267:18-268:7.

**RESPONSE: Uncontroverted but immaterial.**

37.     Mr. Block testified that he does not know how many advance mail ballot applications that were submitted by voters and pre-filled by VPC were ultimately rejected by Kanas election officials. Ex. 7 (Block Tr.) 272:9-17.

**RESPONSE: Uncontroverted but immaterial.**

38.     Mr. Block testified that he does not know, and is not offering an opinion as to, whether applications sent in on VPC mailers created more or less work for election officials than applications sent in by other individuals or organizations. Ex. 7 (Block Tr.) 268:14-24.

**RESPONSE: Uncontroverted but immaterial.  Mr. Block was retained as an expert to analyze VPC's data and the accuracy (or inaccuracy) of that data as compared to the Kansas state voter file.  He was not retained to analyze the specific impact of VPC's activities on election administration in the State.**

39.     Mr. Howell testified that the personalization of applications did not cause voters to become more confused and frustrated. See Ex. 1 (Howell Tr.) 245:13-19 (Q. "Is it your opinion that - that voters became even more confused and frustrated when the applications contained prefilled information?" A. "I don't think that the prefilled information, in and of itself, was what all of the concern was.").

**RESPONSE: Controverted.  First, VPC's citation proves that this statement is not accurate.  Mr. Howell testified that he did not "think the pre-filled information, *in and of itself,* was what *all* of the concern was." (emphasis added).  Second, VPC ignores other**

53

**portions of Mr. Howell's deposition testimony where he confirms that voters were confused by pre-filled applications, particularly when they contained inaccurate information. Ex. QQ at 117:24-125:2; 255:21-257:5; Ex. A at ¶¶ 35-42. Other election officials also discussed confusion and frustration due to pre-filled applications. Ex. RR at 130:6-132:5; Ex. U at ¶ 37; Ex. HH at 150:13-152:15, 212:20-213:4, 237:11-245:20.**

40.    Mr. Howell testified that that if a voter crossed out a prefilled suffix, and the remaining information on the application was correct, it would probably be accepted. See Ex. 1 (Howell Tr.) 184:16–185:11; Ex. 9 (Ex. 7 to Howell Dep.) at 55.

**RESPONSE:  Uncontroverted but immaterial.**

41.    Ms. Schmidt testified that an application with a missing middle initial would still be processed so long as the remaining information on the application was correct. See Ex. 18 (Excerpts of the Deposition of Connie Schmidt (Sept. 16, 2022) ("Schmidt Tr.")) at 103:25-104:14.

**RESPONSE:  Uncontroverted but immaterial.  Defendants emphasize, however, that Ms. Schmidt was discussing a missing middle initial, not an incorrect middle initial.**

42.    Mr. Shew testified that he did not recall the Douglas County Elections Office receiving significantly more duplicate applications in 2020 compared to previous years and that, to the extent there was an increase, such an increase could be attributable to greater voter participation in the presidential election. See Ex. 2 (Shew Tr.) 74:3-19.

**RESPONSE:  Uncontroverted but immaterial.**

43.    Ms. Cox testified that the Ford County Clerk's office had "a lot more mail ballot voting than we had in the past" because of the "COVID-19 pandemic." See Ex. 16 (Cox. Tr.) 102:3-8.

54

**RESPONSE: Uncontroverted but immaterial. But VPC omits critical context. While VPC mentions that Ford County had "a lot more voters" voting by mail in 2020 than in 2016 or 2018, the number of advance mail ballot applications received in Ford County in connection with the 2020 General Election increased by approximately _53,800%_ as compared to the 2016 and 2018 General Elections. _See_ Ex. U at ¶ 16, 18.**

44.    Ms. Cox further testified, "I did mail out [advance mail ballot] applications because of the COVID -- which I don't normally do a mass mailing. I did mail out to every registered voter [advance mail ballot] applications for the primary and the general." See Ex. 16 (Cox. Tr.) 102:9-12.

**RESPONSE: Uncontroverted, but VPC omits important context. Indeed, Ms. Cox also testified that she mailed advance voting ballot applications to all registered voters before the 2018 General Election and that she intentionally did not, and does not, pre-fill any of those applications. VPC Ex. 16 at 102:12-13; Ex. RR at 115:24-116:5.**

45.    Ms. Schmidt testified that the Johnson County Election Office did not detect any instances of voter fraud in 2020. See Ex. 18 (Schmidt Tr.) 212:25-213:22.

**RESPONSE: Uncontroverted and immaterial.**

46.    Ms. Cox testified that the Ford County Clerk's Office ran the 2020 elections successfully and that post-election audits detected no evidence of voter fraud. See Ex. 16 (Cox. Tr.) 105:5-106:9.

**RESPONSE: Uncontroverted but immaterial. Moreover, post-election audits do not address possible voter fraud resulting from pre-filled advance voting ballot applications. A post-election audit merely verifies that "every ballot that was cast was accounted for and counted properly either by hand or by machine." Ex. HH at 283:14-283:21; Ex. RR at**

**105:19-106:9 (explaining that a post-election audit occurs by hand-counting the votes cast in 1% of the precincts and verifying that number matches the machine count); Ex. QQ at 40:24-41:15 (explaining that the audit occurs by verifying that a hand count of the votes match what was reported on election night and covers a minimal number of precincts). Fraud in applying for, obtaining, and casting a mail ballot would not be revealed by a post-election audit.**

## III. – ARGUMENT

I.      **Pre-Filling an Advance Voting Ballot Application is *Conduct*, Not *Speech***

VPC's opposition brief adamantly insists that VPC engages in core political speech when pre-filling the advance voting ballot applications which it sends to individuals along with the other materials in its get-out-the-vote mailings. Br. at 84-89. VPC glibly dismisses the recent decision in the Northern District of Georgia that rejected the identical claims asserted here against a virtually identical statute, *VoteAmerica v. Raffensperger*, No. 1:21-cv-1390, 2022 WL 2357395 (N.D. Ga. June 30, 2022), characterizing the case as "wrongly decided" and inconsistent with this Court's preliminary injunction ruling. Br. at 93. Reiterating this Court's prior ruling, the legal standard in which Defendants respectfully submit was mistaken with respect to the Pre-Filled Application Prohibition,[1] VPC maintains that its pre-population of third-parties' applications is "intertwined with [its] overall communication" and that pre-filling the applications "is itself [VPC's] added speech." Br. at 84. This contention does not stand up to scrutiny.

As it has done at every phase of the case, VPC cites *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.* 525 U.S. 182 (1999), as if those two cases were some sort of oracle for the key issues in this dispute. But those cases in no way support

---

[1] The Court's findings of facts and conclusions of law from the preliminary injunction hearing are not binding in subsequent phases of the case. *Univ. of Tex. v. Camenish*, 451 U.S. 390, 395 (1981).

56

the notion that pre-filling an unsolicited advance voting ballot application amounts to expressive conduct.

*Meyer* and *Buckley* involved statutes restricting who could participate in referendums and initiative-petitions.  The Supreme Court struck down, as violative of the First Amendment, requirements that circulators could not be paid, had to identify themselves, and had to report their compensation. *Meyer*, 486 U.S. at 420-23; *Buckley*, 525 U.S. at 192.  Those decisions (and follow-on cases like *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008)) made total sense because the *petitions themselves* communicate a message of legal change and thus represent the protected speech of the circulators.[2] *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 390 (5th Cir. 2013).  Indeed, "the very nature of a petition process requires association between the third-party circulator and the individuals agreeing to sign." *Id.* (citing *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 898 n.13 (5th Cir. 2012)).  The interactions are almost always direct, in-person, one-on-one conversations as well.  The restrictions on those activities, therefore, had the effect of limiting the ability of the circulators (and their sponsoring organizations) from disseminating their message.

By contrast, the Pre-Filled Application Prohibition at issue here does not prevent or limit any message from being conveyed.  SOF ¶ 87.  Moreover, the advance voting ballot application that VPC mails to voters is nothing more than an official state form that communicates no message (save, perhaps, the applicant's own message to election officials to send the applicant an advance ballot following submission).  Only the voter can choose to speak (or not) by returning (or not returning) the application.  In other words, to the extent there is any speech at all – and there is

---

[2] The same would be true of restrictions on candidate petitions to gain access to the ballot. *See, e.g., Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000); *Lerman v. Bd. of Elections*, 232 F.3d 135, 146 (2d Cir. 2000).

none – it would be the *applicant's* speech, not the party pre-filling the application on the applicant's behalf.

VPC's argument that the Pre-Filled Application Prohibition "directly dictates the content" of its "communications and eliminates VPC's core means of expressing its message through its activity" (Br. at 95) borders on the absurd. There is no question that the letter in VPC's mailers to targeted voters conveys a message that voting by mail is safe, secure, accessible, and beneficial. But that message comes from the *cover letter*, not the pre-filled application. The act of pre-filling the application is wholly distinct from the message that VPC communicates to voters about the vote-by-mail process and the benefits thereof in the cover letter.[3] The cover letter and the message contained therein are not affected at all by the Pre-Filled Application Prohibition. Pre-filling the application merely embodies *conduct*, not expression.

VPC responds to this point by contending that "the distribution of personalized applications is 'characteristically intertwined' with [its] pro-mail-voting communication." Br. at 85 (citing *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)). VPC has misread that case. In *Schaumburg*, a municipal ordinance prohibited charities from soliciting donations if they did not use at least 75% of their donations directly for charitable purposes. *Id.* at 622. The Court noted that "[s]oliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Id.* at 632. The Court

---

[3] It is nonsensical to argue that a registered voter who receives VPC's mailing and a blank advance voting ballot application would not understand VPC's intended message if the voter's name was not already pre-filled on the application. The name "John Smith" on an application conveys no additional message.

58

then held that the 75% limit was a direct and substantial limitation on constitutionally protected activity under the First Amendment because it effectively *barred* the fundraising operations of many charitable organizations. *Id.* at 635. More specifically, the Court observed:

> [There are] organizations whose primary purpose is not to provide money or services for the poor, the needy or other worthy objects of charity, but to gather and disseminate information about and advocate positions on matters of public concern. These organizations characteristically use paid solicitors who 'necessarily combine' the solicitation of financial support with the 'functions of information dissemination, discussion, and advocacy of public issues.' These organizations also pay other employees to obtain and process the necessary information and to arrive at and announce in suitable form the organizations' preferred positions on the issues of interest to them. Organizations of this kind, although they might pay only reasonable salaries, would necessarily spend more than 25 percent of their budgets on salaries and administrative expenses and would be completely barred from solicitation in the Village.

*Id.* (internal citations omitted).

Here, in contrast to *Schaumburg*, there is nothing inextricably linked or "characteristically intertwined" between the message communicated in VPC's cover letter and the pre-filled (versus blank) application that is included, along with a pre-addressed envelope, in the mailed package. Each can exist and be sent without the other. *See VoteAmerica*, 2022 WL 2357395, at *8 (rejecting argument that pre-filling an absentee ballot application represented expressive conduct on the basis of *Schaumburg*); *Am. Ass'n of People With Disabilities v. Herrera*, 580 F. Supp.2d 1195, 1228 (D.N.M. 2008) (rejecting same argument in the context of voter registration applications); *Am. Ass'n of People With Disabilities v. Herrera*, 690 F. Supp.2d 1183, 1213 (D.N.M. 2010) (same). The Pre-Filled Application Prohibition does not in any way restrict VPC from communicating its pro-mail-in voting message, explaining the process for obtaining an advance ballot, or even including an advance voting ballot application in its mailer. The only thing the statute does is

59

prohibit VPC from pre-filling the application in the absence of a request by the voter. *Schaumburg* thus provides no support for VPC's "intertwined" theory.[4]

VPC likewise gains no traction from *Riley v. National Federation of the Blind of N.C., Inc.*, 487 U.S. 781 (1988). VPC cites this case for the proposition that the pre-filled applications in its mailers cannot be disaggregated from the cover letter. Br. at 85-86. Like *Schaumburg*, *Riley* dealt with a restriction on how much professional fundraisers could charge as a percentage of the gross revenue they solicited on behalf of charitable organizations. *Riley*, 487 U.S. at 784-85. The statute at issue also required the fundraiser to disclose, *inter alia*, the average percentage of gross receipts that it turned over to the charity during the preceding year. *Id.* at 786. The Court invalidated the disclosure obligation on First Amendment grounds, concluding that it mandated speech that the speaker would not otherwise make. *Id.* at 795. The Court then declined the State's invitation to characterize the disclosure rules as commercial speech, which would be evaluated under a more lax standard, reasoning, "where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase." *Id.* at 796. But for the same reasons described above with *Schaumburg*, there is no parallel between the impediments in *Riley* and the Pre-Filled Application Prohibition in the case at bar. Under no reasonable construction of Kansas' law can it be said that restricting a party's

---

[4] VPC argues that, because it tells voters in its cover letter that it has pre-filled the advance voting ballot application included in their mailer, protected speech somehow flows therefrom. Br. at 85 n.13. Not so. The Supreme Court has held that where the expressive component of an individual's "actions is not created by the conduct itself but by the speech that accompanies it," that "explanatory speech is . . . strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection under" the First Amendment. *Rumsfeld v. F. for Acad. & Institutional Rts, Inc.*, 547 U.S. 47, 66 (2006) ("FAIR"). Were the rule otherwise, "a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

ability to pre-fill *another person's* advance voting ballot application impedes that party from communicating any message to the targeted voter.

For similar reasons, VPC's reliance on *League of Women Voters v. Hargett*, 400 F. Supp.3d 706 (M.D. Tenn. 2019), Br. at 86, also falls flat. As an initial matter, that case revolved around voter registration activities, which – as Defendants explained in their original motion, Dkt. 151 at 36-37 – are fundamentally different than absentee ballot applications. In addition, the "slicing and dicing" language that VPC quotes from that opinion is from the *dissent* in *Steen*. *Id.* at 720 (quoting *Steen*, 732 F.3d at 401). The *Steen majority*, on the other hand, properly found, consistent with Supreme Court precedent, that an apparently limitless variety of conduct cannot be labeled "speech" any time a person engaging in such conduct intends thereby to express an idea. *Id.* at 388-390.[5]

In fact, if VPC were correct that its unsolicited mailing of pre-filled advance voting ballot applications to voters was expressive conduct just because it was part of its overall message to voters about the virtues of mail voting, then no election regulation would be safe. Individuals would presumably have a First Amendment right to enter polling booths to urge voters to cast their ballot in a particular way. Or fill out the voter's advance ballot on his/her behalf. And any restrictions on handling completed advance ballots would likely be verboten. The First Amendment simply does not have the reach that VPC claims.

---

[5] VPC's (and this Court's) attempt to distinguish *Lichtenstein v. Hargett*, 489 F. Supp.3d 742 (M.D. Tenn. 2020), dissolves upon closer examination. In its preliminary injunction ruling, this Court suggested that *Lichtenstein* was not relevant to this case because, unlike in *Lichtenstein*, VPC's application packets include speech that communicates a pro-mail voting message. *VoteAmerica v. Schwab*, 576 F. Supp.3d 862, 875 (D. Kan. 2021). But the *Lichtenstein* court subsequently made clear in its order dismissing the case that the plaintiffs there, just like VPC here, sent voters a whole packet of "voter engagement materials" along with a blank absentee ballot application. *Lichtenstein v. Hargett*, __ F. Supp.3d __, 2021 WL 5826246, at *6 (M.D. Tenn. Dec. 7, 2021).

61

VPC next argues that its pre-filling of advance voting ballot applications is written speech because the pre-filling represents "words chosen by VPC – specific names from the voter rolls and the associated addresses – written on a page." Br. at 86. This theory would push the scope of the First Amendment far beyond the jurisprudence in this area. The notion that VPC's insertion of a voter's name and address (drawn from the State voter file) on an official state form, in the blank spaces where the voter's name and address are to be written, is "protected speech" is indefensible. While VPC contends that its pre-filling of an advance voting ballot application "amounts to the creation and dissemination of information" and thus enjoys constitutional sanctuary, Br. at 86, the information is nothing more than a voter's biographical information. It makes no sense to argue that VPC can cloak itself in First Amendment protection merely by sharing a voter's name and address with *that particular voter*.

VPC seeks haven in *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), but that case offers no refuge. *Sorrell* addressed whether data miners and pharmaceutical manufacturers had a right to access pharmacy records that reveal the prescribing practices of individual doctors. *Id.* at 557. The data was off limits due to State privacy laws, and the manufacturers wanted to use it for their business purposes. That is nothing at all like this case. Here, the data that VPC uses to pre-fill the applications it sends to voters is freely available to VPC (and everyone else). In fact, VPC uses that data to prepare both the cover letters – which fully include its message about the importance and ease of voting by mail – and the pre-addressed, pre-paid envelopes that it sends to voters. But there is no independent message created by printing the voter's name on the state form. To suggest, as VPC does, Br. at 88, that the State's official advance voting ballot application form allows for any type of discretionary messaging because it can be filled out with different voters' names is

62

beyond the pale. Under that logic, every piece of written text – no matter the context – is protected speech. That is a triumph of form over substance and is completely unreasonable.

VPC relatedly argues that pre-filling advanced voting ballot applications is also expressive conduct. Br. at 88-90. As Defendants have explained repeatedly, any message communicated to voters comes from the *cover letter* that VPC includes in its mailings. There is nothing inherently expressive about the pre-filled application. And the Supreme Court's decision in *FAIR* forecloses VPC's premise. The Court there held that, where the expressive component of an individual's "actions is not created by the conduct itself but by the speech that accompanies it," that "explanatory speech is . . . strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection under" the First Amendment. *FAIR*, 547 U.S. at 66. A ruling to the contrary would mean that "a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

VPC responds in part by contending that a speaker need not isolate a particular message apart from other types of expression in order for conduct to be expressive. Br. at 89. As long as a voter discerns *some sort of message*, VPC contends, expressive conduct is present. Although not a model of clarity, this argument contradicts *Texas v. Johnson*, 491 U.S. 397 (1989), which held that, "in deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," the Court asks "whether an intent to convey *a particularized message* was present, and whether the likelihood was great that *the message* would be understood by those who viewed it." *Id.* at 404 (emphasis added) (citation and internal alterations omitted).[6]

---

[6] In support of its "some sort of message" argument, VPC also cites *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1212 (11th Cir. 2022), a wholly irrelevant case in which internet and social media platform trade associations challenged a Florida statute restricting the ability of those platforms to control the content that is disseminated on their platforms. The Eleventh Circuit, citing *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995), held that a "private entity's decisions about whether, and to what extent, and in what manner[,] to disseminate third-party-created content to the

63

VPC also ignores the fact that its CEO, Mr. Lopach, expressly testified that he (and thus VPC, since he was its Rule 30(b)(6) witness) did not know if the recipient of a pre-filled application views a political message from whether or not the recipient's name is filled out on the application. SOF ¶ 85. He further testified that he could not speak to how an individual would respond to a pre-filled application versus a blank application. SOF ¶ 84. That VPC spent additional money to pre-fill applications with voters' names and addresses, a fact to which VPC attaches significance, Br. at 90, is immaterial regarding the existence of a message (or absence thereof) in the pre-filling of the application. In short, there is no competent or admissible evidence in the record about the effectiveness of the pre-filled applications, but even if there was, that would not move the needle in terms of discerning an *independent message* from the pre-populated application. The message is exclusively found in the accompanying cover letter.

## II.     The Case Law Does Not Support VPC's Legal Position

VPC's description of the allegedly "binding and persuasive" precedent supporting their position is both inaccurate and misleading. Br. at 91-94. VPC dismisses out-of-hand the one *on-point* case in which the Court rejected the identical arguments asserted here in a challenge to an identical statutes. Br. at 93 (citing *VoteAmerica*, 2022 WL 2357395, at *7-10). VPC simply characterizes the decision as "wrongly decided" and inconsistent with this Court's equally non-binding preliminary injunction ruling.

Another opinion that VPC cites (Br. at 92) – *Priorities USA v. Nessel*, 462 F. Supp.3d 792 (E.D. Mich. 2020) – was subsequently reversed by the district court, which determined that the

---

public are editorial judgments protected by the First Amendment." *NetChoice*, 34 F.4th at 1212. The Fifth Circuit reached a contrary result. *See NetChoice, LLC v. Paxton*, 49 F.3d 439 (5th Cir. 2022). Regardless, the Tenth Circuit has explicitly held, relying on *FAIR* and *Johnson*, that conduct falls within the safeguards of the First Amendment only if the speaker intended to convey a particularized message, the target of that message was likely to understand the particularized message, and the conduct was inherently expressive. *Meyers v. E. Okla. Cnty. Tech. Ctr.*, 776 F.3d 1201, 1207-08 (10th Cir. 2015).

legal analysis in the initial opinion was mistaken and that Michigan's restrictions on non-family/household members from soliciting or offering to help a voter return an absentee ballot application did *not* amount to expressive conduct under the First Amendment. *Priorities USA v. Nessel*, __ F. Supp.3d __, No. 2:19-cv-13341, 2022 WL 4272299, at *5 (E.D. Mich. Sept. 15, 2022). Ironically, now that the district court vacated the expressive conduct holding that VPC had found so critical, VPC partially retreats from the decision and suggests in a footnote that it was not so important after all. Br. at 92 n.16.[7]

As for the other cases VPC references, none come close to dictating (or even supporting) a holding in VPC's favor. Defendants discussed and distinguished, *supra*, the *League of Women Voters* and *American Association of People With Disabilities* cases. Neither opinion provides a foundation for VPC's farfetched legal theories. Defendants also explained in detail in their own motion for summary judgment and in response to VPC's motion for summary judgment why the other district court cases that VPC again references (and that the Court relied upon in issuing a preliminary injunction) have little to no relevance to the Pre-Filled Application Prohibition. Dkt. 151 at 27-31; Dkt. 155 at 52-55.

Defendants are at a loss as to why VPC thinks that *Steen* is helpful to it. Br. at 93. The voter registration activities that the State of Texas conceded involved speech all involved *in-person interactions* between voters and the voluntary deputy registrars who were empowered to receive and deliver voters' completed voter registration applications. *See Steen*, 732 F.3d at 385, 389. To

---

[7] VPC oddly attaches significance to a line in the latest *Nessel* opinion in which the court noted that "Plaintiffs may provide potential absentee voters with blank applications" and that "such conduct be a 'vehicle' to discuss the 'importance of voting, as well as the merits of candidates and ballot measures.'" *Nessel*, 2022 WL 4272299, at *5 (citation omitted). But in the case at bar, Kansas does not prohibit VPC from providing voters with blank advance voting ballot applications. And there is no conceivable way to read the *Nessel* opinion as suggesting that *pre-filling* an absentee ballot application is independent speech or expressive conduct.

65

the extent a party undertakes the same type of activities (to which Texas offered its concession) in the context of absentee ballot applications, Defendants would make a similar acknowledgment. None of those activities are precluded, however, by Kansas' Pre-Filled Application Prohibition.

The irrelevancy of VPC's case law support is particularly true of the petition circulator cases it cites. Br. at 92 (citing *Meyer*, 486 U.S. at 422-23; *Buckley*, 525 U.S. at 186; *Yes on Term Limits*, 550 F.3d at 1028; *Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002)). Defendants have repeatedly explained in this litigation, why the cases involving restrictions on initiative-petition circulators are a world apart from the legal issues at play here with advance voting ballot applications. The most recent *Nessel* case that VPC now largely seeks to disavow is just the latest court to reach this same conclusion. *Nessel*, 2022 WL 4272299, at *5-6.

Surrendering not a single inch, VPC, again citing *Meyer*, avers that it has a right to select the most effective means for communicating its message and that pre-filling advance voting ballot applications is necessary to that success. Br. at 95. But *Meyer* simply has no applicability here. Further, as Defendants highlighted in their response to VPC's summary judgment motion, Dkt. 155 (Response to VPC's SOF ¶ 24), there is no competent evidence in the record to support VPC's assertion that sending an unsolicited, *pre-filled* application is more effective at conveying its message than mailing a blank application. VPC did not designate any expert or submit competent and admissible evidence that pre-filled applications have higher rates of return than blank applications. VPC's evidence on this point is simply its own *ipse dixit* that must be ignored in the absence of any other admissible evidence.

In any event, *Steen*'s discussion of why this legal theory makes no sense is spot on, *see* Dkt. 151 at 26-27, and VPC makes almost no effort to explain otherwise. To understand why VPC

66

has badly misread *Meyer*, Defendants also direct the Court to *Project Vote v. Kelly*, 805 F. Supp.2d 152 (W.D. Pa. 2011), a case in which a non-profit organization conducting voter registration drives challenged on First Amendment free speech grounds a Pennsylvania law that prohibited persons from giving, soliciting, or accepting payments to obtain voter registrations if such payment is based on the number of voter registrations obtained. *Id.* at 158. Addressing an argument very much like the one VPC advances here, the court there explicated why *Meyer* cannot be construed so broadly:

> There is language in *Meyer* suggesting that the First Amendment protects the right of individuals "to select what they believe to be the most effective means" to convey their message. *Meyer,* 486 U.S. at 424. This language, however, must be read in context. The Colorado statute prohibiting the use of paid petition circulators had the "inevitable effect" of restricting "direct one-on-one communication," which the Supreme Court characterized as "the most effective, fundamental, and perhaps economical avenue of political discourse." *Id.* at 423-424. The reasoning employed in *Meyer* does not support the idea that Project Vote has an unqualified First Amendment right to choose the compensation system that it believes to be "the most effective way" to motivate its canvassers. The problem with the Colorado statute challenged in *Meyer* was that it completely foreclosed an entire "channel of communication." *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 398, n.1 (2000) (Stevens, J., concurring). It was that "channel of communication" (*i.e.,* "direct one-on-one communication") that was deemed to be "the most effective means" available to initiative proponents to express their message. *Meyer,* 486 U.S. at 424. Unlike the statute at issue in *Meyer,* [Pennsylvania's law] does not have the "inevitable effect" of preventing the Plaintiffs from engaging in "direct one-on-one communication." *Id.* at 423-424. After all, ACORN was able to collect roughly 40,000 voter-registration applications in Allegheny County during the 2008 election season. The record indicates that, throughout all of Pennsylvania, ACORN procured 127,156 voter-registration applications in 2008.

*Id.* at 179-80; *cf. Sheldon v. Grimes*, 18 F. Supp.3d 854, 859-60 (E.D. Ky. 2014) (*Meyer*'s use of the term "means" in explaining speaker's right to select "most effective means" of communicating its message is not limitless and must be construed in context).[8]

---

[8] In support of its argument regarding the alleged effectiveness of pre-filling advance voting ballot applications, VPC references a study that it neglected to produce in discovery except for a few un-redacted pages. Br. at 97 n.19. Given its decision not to turn over the full study, the foundation of which is unknown, VPC's attempted reliance on it at summary judgment is egregious. We know nothing at all about how the (clearly inadmissible) hearsay study was conducted or its reliability. Even so, the supposed conclusions of that study only reinforce why *Meyer* is inapplicable here. As the court in *Project Vote* noted, the concern

67

While VPC takes issue with Defendants' characterization of the "overwhelming majority" of case law supporting Defendants' legal position, it is difficult to locate *any* case law – other than the preliminary injunction ruling here – that supports VPC's position.  The Pre-Filled Application Prohibition does not preclude from VPC or any other entity from distributing advance voting ballot applications to voters, from assisting voters in person to complete the applications, from mailing pre-filled applications to voters who have requested them, or from communicating any message at all to voters.  No speech or expressive conduct whatsoever has been constrained.  VPC seeks to isolate this Court on an island in urging a summary judgment holding that merely pre-filling an application is itself expressive conduct.  Defendants urge the Court to avoid taking that path.

**III.     The Pre-Filled Application Prohibition Does Not Violate VPC's Freedom of Association Rights**

VPC next contends that the Pre-Filled Application Prohibition contravenes their freedom of association rights under the First Amendment.  Br. at 90-91, 100.  VPC advances this argument despite Mr. Lopach's concession that the statute does not inhibit VPC from banding together with other persons or organizations to engage potential voters and encourage the use of advance mail voting.  SOF ¶ 86.  Mr. Lopach's own recognition of the limited scope of the Kansas law begs the question how any constitutional violation will occur when VPC may continue to associate with Kansas voters and share its message about the ease and reliability of advance mail voting.  Indeed, this form of engagement is precisely what the First Amendment was designed to protect, and VPC

---

in *Meyer* was that the regulation on circulation petitioners cut off a whole "channel of communication" (direct one-on-one conversations between the circulators and their targets). *Project Vote*, 805 F. Supp.2d at 179-80.  If, as VPC represents, its own study showed that a pre-populated form produced a 4.0% return rate while an unpopulated form produced a 3.6% rate (VPC Ex. 17 at VPC000852) – a 0.4% difference – that would in no way serve as the basis for arguing that an entire channel of communication has been foreclosed by the Pre-Filled Application Prohibition.

agrees it may carry on with this type of speech regardless of the Pre-Filled Application Prohibition.[9]

VPC cites to *Kusper v. Pontikes*, 414 U.S. 51 (1973) (Br. at 100), but that case is of little help to it. Unlike the plaintiff in *Kusper*, who was deprived of the ability to vote for the political party of her choosing in a primary due to Illinois' 23-month waiting period before a voter could change political party affiliation, 414 U.S. at 58, Kansas' Pre-Filled Application Prohibition poses no "substantial restraint" or "significant encroachment" on VPC's ability to send its message to, and associate with, the State's voters. VPC does not and cannot argue that the challenged statute prohibits it from disseminating its materials or messages to anyone.

Furthermore, the deference given to an association in choosing how to associate with others is not without limits. *See e.g.*, *Hamilton Cnty. Educ. Ass'n v. Hamilton Cnty. Bd. of Educ.*, 822 F.3d 831, 841 (6th Cir. 2016) ("[W]e need not accept HCEA's claim of impairment when it has failed to demonstrate how the Board's letter either disrupts its ability to associate or substantially weakens its message by imposing restrictions on association."). This Court must still evaluate whether the Pre-Filled Application Prohibition significantly or substantially intrudes on VPC's ability to engage with Kansas voters and encourage them to vote by mail. In light of the parties' Stipulation (Dkt. 73) and Mr. Lopach's testimony, a reasonable factfinder cannot conclude that the challenged statute significantly intrudes on VPC's associational rights with Kansas voters.

Moreover, VPC's struggle to find common ground with Kansas voters by sending them pre-filled advance voting ballot applications as opposed to blank applications is a far cry from the

---

[9] Although no association is being restricted via the Pre-Filled Application Prohibition, it's not even clear that VPC is seeking to form any type of membership or association. All that VPC does is send pre-filled applications to certain persons and then track whether those individuals returned the application using a VPC-provided envelope. There is no ensuing membership or organization that is being, or attempted to be, formed.

69

associational issues addressed in *NAACP v. Button*, 371 U.S. 415 (1963), and *Healy v. James*, 408 U.S. 169 (1972). Try as it might, VPC simply cannot show that its members are similarly situated to the plaintiffs in *Button* and *Healy*.

In *Button*, members of the NAACP and its affiliated Virginia Conference were distributing forms to potential litigants, parents, and local school boards to engage designated staff attorneys of the NAACP and/or Virginia Conference for the purpose of pursuing civil rights litigation to achieve desegregation. *Button*, 371 U.S. at 421–23. Eventually, the Virginia legislature enacted a prohibition forbidding solicitation of legal business by a "runner" or "capper," which was defined to include an agent for the individual or organization which retains a lawyer in connection with an action to which it is not a party or has no pecuniary right or liability. *Id.* at 423–24. The Supreme Court ultimately found this prohibition violated the First Amendment because it impaired members of the NAACP and Virginia Conference from associating with potential litigants who shared a common interest in fighting discrimination and achieving desegregation. *Id.* at 443–44.

Contrary to the plaintiffs in *Button*, VPC's act of mailing pre-filled advance voting ballot applications does not further a common interest or goal shared by both VPC and Kansas voters. The recipients of VPC's mailers are not members of any particular organization and have no demonstrated interest in encouraging other Kansas voters to vote by advance mail ballot. Unlike the act of soliciting potential litigants to jointly fight against discrimination at issue in *Button*, there is no boomerang effect here. In other words, recipients of pre-filled advance voting applications do not subsequently join in a common endeavor with VPC. There is simply no associational component between VPC and its targeted voters that is hindered by the Pre-Filled Application Prohibition.

70

VPC's reliance on *Healy* is equally misplaced. In *Healy*, university students desired to form a local chapter of Students for a Democratic Society; however, the university's president denied the students' application for campus recognition. *Healy*, 408 U.S. at 172, 174–75. While the Supreme Court noted that the university's failure to afford official campus recognition to these students' chapter impaired their ability to associate with other university students, *id.* at 181–82, the case did not end there. The Supreme Court concluded that the record was insufficient to allow it to determine whether a constitutional violation had taken place. *Id.* at 185. The Supreme Court astutely recognized that there is a "line between permissible speech and impermissible conduct" when considering the constitutional right of association. *Id.* at 189. "Just as in the community at large, reasonable regulations with respect to the time, the place, and the manner in which student groups conduct their speech-related activities must be respected." *Id.* at 192–93. The Supreme Court reiterated the need to balance requirements that might limit certain conduct when such requirements do not impose an impermissible condition on associational rights. *Id.* at 193.

Here, VPC erroneously likens the act of mailing pre-filled applications to certain Kansas voters as protectable association similar to the *Healy* petitioners' act of obtaining official campus recognition to associate with like-minded students at meetings held on campus. The two scenarios share no commonalities and *Healy* adds nothing to VPC's position. The act of mailing pre-filled applications to Kansas voters with whom VPC shares no connection in no way implicates freedom of association. The recipient voters do not share a common goal or desire to associate with VPC. Instead, a recipient voter takes the pre-populated application and independently does with it as the voter chooses, in the voter's discretion, without consideration of VPC's or other Kansas voters' interests. There is simply no associational link between the two. *See VoteAmerica*, 2022 WL 2357395, at *10 ("The record here shows that Plaintiffs send application forms to strangers whose

71

information they obtain from the state's voter roll. While it is undisputed that Plaintiffs' overall program involves advocacy work, there is no evidence of the type of two-way engagement that characterizes cases like *Button*.").

## IV. The Pre-Filled Application Prohibition Must Be Evaluated Under a Rational Basis, Not Strict Scrutiny Review Standard

For all the reasons set forth in Parts I and II, *supra*, the Pre-Filled Application Prohibition regulates only non-expressive conduct. The First Amendment is not even implicated. As such, the statute must be evaluated under rational basis review. *See Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012). But even if some expressive conduct is incidentally touched by the statute, it is certainly not the kind of core political speech that triggers strict scrutiny, as VPC insists. Br. at 96-103. Defendants are not aware of a single case that supports the imposition of such a standard in the context of absentee ballot applications. Moreover, the only case applying such heightened scrutiny with regard to the distribution of *voter registration applications* – a process which, as Defendants have noted time and again, is very different from the distribution of *absentee ballot applications* – is *League of Women Voters v. Cobb*, 447 F. Supp.2d 1314 (S.D. Fla. 2006), an old, wrongly decided, outlier opinion that contradicts every federal district and circuit case over the last sixteen years. *See* Dkt. 151 at 28-29.

### A. The Pre-Filled Application Prohibition Does Not Target Core Political Speech

VPC claims that it mails unsolicited pre-filled advance voting ballot applications in order to encourage what it characterizes as "under-represented groups" to vote by mail and participate in the democratic process. Br. at 97. VPC contends that this activity is constitutionally protected core political speech because it advocates for a political controversial viewpoint in favor of voters trusting and using advance mail voting. And VPC avers that the Pre-Filled Application Prohibition "directly blocks VPC's most effective means of advocacy because it bans VPC from personalizing

its applications." *Id.* Defendants explained in detail both in their original motion, Dkt. 151 at 34-39, as well as Parts I and II, *supra*, why VPC's reasoning is both factually and legally indefensible, and Defendants expressly incorporate that analysis here.

> B.    *The Pre-Filled Application Prohibition Is Content- and Viewpoint Neutral*

VPC further argues that the Pre-Filled Application Prohibition is content- and viewpoint-discriminatory. Br. at 98-99. This argument runs contrary to the Supreme Court's recent teaching in *City of Austin v. Reagan National Advertising of Austin, LLC*, 142 S. Ct. 1464 (2022). That case involved a municipal code regulating signs that advertise things that are not located on the same premises as the sign, as well as signs that direct people to offsite locations. *Id.* at 1468. When the city denied permits to certain advertising companies that sought permits to digitize their off-premises billboards, the companies sued alleging violations of the Free Speech Clause of the First Amendment. *Id.* at 1470. On appeal, the Fifth Circuit concluded that "the fact that a government official has to read a sign's message to determine the sign's purpose is enough to render a regulation content based and subject to strict scrutiny." *Id.* (citations and internal alterations omitted). But the Supreme Court explicitly rejected that reasoning. It determined that a rule holding "that a regulation cannot be content neutral if it requires reading the sign at issue[] is too extreme an interpretation of this Court's precedent." Id. at 1471. Instead, the Court held, "the City's off-premises distinction requires an examination of speech only in service of drawing neutral, location-based lines" and is thus "agnostic as to content." *Id.* As a result, the Court found the City's distinction to be content neutral and not warranting the application of strict scrutiny. *Id.*

VPC responds that, in contrast to *City of Austin*, the Pre-Filled Application Prohibition is not agnostic as to content because it singles out personalized information on advance voting ballot applications. Br. at 99. That makes no sense; there is nothing content-based about the law. First,

the absence of any message at all in simply writing someone's name on a state form highlights the absurdity of this argument. Second, there is no conceivable counterpoint to be written on the form such that the State could be said to have engaged in viewpoint-based discrimination. Indeed, there is *nothing* else that could be written on the application. Nothing in the statute takes a position on mail voting. The fact that VPC spends additional funds to pre-fill applications by inserting certain voters' names and addresses on an official state form does not alter the First Amendment analysis. In short, VPC is trying to jam a square peg into a round hole here and it simply does not fit.

VPC's theory is also at odds with *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984), another lawsuit challenging a municipal ordinance dealing with signs on public property. The city regulation at issue barred the posting of signs on public property, but specifically exempted certain plaques "commemorating an historical, cultural, or artistic event, location, or personality" and the "painting of house numbers upon curbs." *Id.* at 791 n.1. To apply these exemptions, an official would need to look at, and often read, the object at issue to determine whether it fell into an exempted category. In spite of this inquiry, however, the Court upheld the regulation, underscoring that the "text of the ordinance is neutral . . . concerning any speaker's point of view" and thus did not trigger strict scrutiny. *Id.* at 804.

C.    *The Pre-Filled Application Prohibition is Not Unconstitutionally Overbroad*

The parties appear to be in agreement over the legal standards for evaluating an overbreadth cause of action, but VPC contends that the Pre-Filled Application Prohibition lacks any plainly legitimate sweep. Br. at 101-102. In light of the record developed in discovery, that is a rather audacious claim.

To begin with, VPC's own vice-president, Mr. Dripps, testified that, in the wake of its first two mailers to Kansas voters, VPC discovered that approximately 5% of the pre-filled applications

74

it sent to voters throughout the United States contained an erroneous middle initial (i.e., an initial that did not match the data in the State's voter registration files), and approximately another 3% of the pre-filled applications it sent to voters contained an erroneous suffix (i.e., a suffix that did not match the data in the State's voter registration files). SOF ¶ 38.[10] VPC was so concerned about these inaccuracies in the pre-filled applications (which were pre-populated with data that it had obtained from its vendor, Catalist), that it opted to send blank applications to Kansas voters in the third and fourth and waves. SOF ¶ 39. To criticize the State of Kansas for taking steps to address the very issue that VPC itself identified as a major problem is legally indefensible.

VPC nevertheless complains that the Pre-Filled Application Prohibition reaches too far because "over 90%" of its pre-populated applications did not contain inaccurate information. But in the 2020 General Election, VPC (through its sister organization, CVI) sent advance voting ballot applications to approximately 507,867 Kansas voters. SOF ¶ 40. That means more than *40,000* of the pre-filled applications sent to voters likely included incorrect information. And that does not even account for the thousands of other pre-filled ballots that VPC/CVI sent to voters who were not eligible to vote by virtue of having died, moved out of the State, or committed a felony. SOF ¶¶ 41-48.

When an inaccurate application is submitted to a county election office, officials there must then expend significant time reviewing the voter's registration records, contacting the voter, and attempting to allow the voter to cure the deficiency. SOF ¶¶ 17-19, 61-64. Plus, the inaccurate applications caused confusion and anger among many voters, who subsequently contacted county and state election officials to express their frustration. SOF ¶¶ 53-54, 57-58. The impact on both county election officials and voters alike from these inaccurate applications was thus undeniable.

---

[10] As VPC correctly pointed out in its Opposition Brief, Defendants inadvertently transposed the 5% and 3% figures in SOF ¶ 38 of their summary judgment motion.

While VPC argues that the problems flowing from the mailing of *duplicate* applications to voters is irrelevant to the State's legitimate interests in the Pre-Filled Application Prohibition, VPC overlooks the fact that many voters submitted duplicate applications because they were confused at having received a pre-filled application. Those voters believed that they were obligated to mail any such pre-filled applications to the county election office, even if they had previously submitted one or more applications already. SOF ¶ 74.[11] And Mr. Howell noted that the majority of the duplicate applications received by the Shawnee County Election Office had been pre-filled. SOF ¶ 77.

VPC suggests that Kansas, in adopting legislation to address these problems, was limited to prohibiting *inaccurate* pre-filled applications, and not pre-filled applications altogether. Br. at 102. This is nonsensical. It would be impossible, and a State is not required, to legislate with a scalpel of such fine precision in the electoral context. Such a restriction would effectively neuter the State from enacting prophylactic measures to mitigate the harms identified here.

---

[11] VPC contends that voters' statements to county election officials about the confusion such voters experienced at having received inaccurate and/or duplicate advance voting ballot applications from VPC (through CVI) would be inadmissible hearsay because the comments would relate to memory or belief. Br. at 106 n.25. Not so. Defendants are not offering these statements to prove that any particular voter received an inaccurate or duplicate application. Evidence of inaccurate and duplicate applications is available via the applications themselves, the testimony of county election officials, and VPC's own witness, Mr. Dripps. *See* SOF ¶¶ 38-39, 50-51, 56, 71-72, 75. The statements from Mssrs. Howell and Caskey, and Ms. Cox on this issue, *see* SOF ¶ 52-55, 57-58, are simply offered to prove (i) voters' state of mind upon receiving the CVI-pre-populated applications and (ii) the fact that state and county election officials fielded calls from hundreds of voters confused by the pre-filled applications. The relevant evidence is that election officials were forced to take these calls, and the calls consumed an enormous amount of their time. Whether any particular caller's pre-filled application was actually incorrect or duplicate is irrelevant, as is the identity of any particular caller material. *See Morris Jewelers, Inc. v. Gen. Elec. Credit Corp.*, 714 F.2d 32, 33-4 (5th Cir. 1983); *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 252 and n.11 (3d Cir. 1999) ("The relevance of their statements depends only on the fact that they were the plaintiffs' customers, not their particular identities."); *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 332 F. Supp.3d 446, 477 (D. Mass. 2018) (same); Kraft Gen. Foods, Inc. v. BC-USA, Inc., 840 F. Supp. 344, 347-48 (E.D. Pa. 1993) (admitting anecdotal evidence of customers' confusion under Rule 803(3)). For that matter, whether a particular caller was *actually* confused or not is beside the point; what matters is that election officials had to field many hundreds of calls from voters who professed confusion and frustration at the pre-filled applications they received in the mail.

Fortunately, the Court here need not explore the exact contours of the State's legislative authority because the Pre-Filled Application Prohibition targets only non-expressive conduct and there is thus no impact on VPC's First Amendment rights. But even if there is some impact on VPC's rights, it certainly cannot be characterized as substantial. To the contrary, it would pale in comparison to the State's clear and legitimate interests in preventing voter confusion, facilitating confidence in the election process and the officials who administer it, ensuring efficient and orderly administration of elections, and minimizing the potential for voter fraud. *Cf. Thompson v. DeWine*, 959 F.3d 804, 811 (6th Cir. 2020) (even intermediate scrutiny under *Anderson-Burdick* balancing does not require narrow tailoring).

> D. *Assuming the Pre-Filled Application Prohibition Is Implicated, Anderson-Burdick Provides the Appropriate Standard of Review*

Although Defendants maintain that the Pre-Filled Application Prohibition targets only non-expressive conduct and thus does not implicate the First Amendment, the Court, even if it disagrees with this position, still must apply a rational basis type of review in evaluating the constitutionality of the statute. In other words, to the extent any speech rights are triggered in connection with this election-related statute, the *Anderson-Burdick* standard would apply.

VPC avers, without case law support (save this Court's preliminary injunction ruling), that the challenged law here is directed at speech, not merely election mechanics, rendering *Anderson-Burdick* inapplicable. Br. at 103-04. As an initial matter, VPC cannot simply label any restriction with which it disagrees as addressing "speech" and thereby invite heightened scrutiny. The Court in *FAIR* made that abundantly clear. *FAIR*, 547 U.S. at 66. Moreover, *Burdick* itself involved free speech rights, yet the Supreme Court applied the balancing test that VPC now seeks to avoid. *See Burdick v. Takushi*, 504 U.S. 428, 437-38 (1992) ("petitioner submits that the write-in prohibition . . . conditions his electoral participation upon the waiver of his First Amendment right to remain

77

free from espousing positions that he does not support, and discriminates against him based on the content of the message he seeks to convey through his vote."); *see also Fusaro v. Cogan*, 930 F.3d 241, 257-64 (4th Cir. 2019) (law restricting access to list of State's registered voters to certain persons and prohibiting use of such list for purposes unrelated to electoral process reviewed under *Anderson-Burdick* standard); *Schmitt v. LaRose*, 933 F.3d 628, 639-42 (6th Cir. 2019) (challenge to county's refusal to certifiy ballot initiative as alleged prior restraint on speech reviewed under *Anderson-Burdick* balancing test). Regardless of how VPC attempts to mischaracterize it, the Pre-Filled Application Prohibition does nothing more than to restrict how an official state form can be pre-populated with biographical data for which which the form itself provides no discretion in completing. The notion that the law targets "pure speech" along the lines of Ohio's prohibition against all anonymous campaign literature in *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 345 (1995) is absurd. Other than the largely discredited *Cobb* decision cited above (which arose in the very different context of voter registration), there is no precedent (let alone binding precedent) to support VPC's insistence that the Court disregard *Anderson-Burdick* in its attack on the challenged Kansas law.

E.    *The Pre-Filled Application Serves Legitimate State Interests*

Short of ignoring the record altogether, it is difficult to explain how VPC can argue that the Pre-Filled Application Prohibition serves no legitimate state interests. Br. at 105-09. VPC suggests that any harms from its activities flow exclusively from its sending of duplicate advance voting ballot applications to voters and that Defendants have conflated inaccurate applications with duplicates. Br. at 105. That is simply not true. Shawnee County Election Commissioner Andrew Howell testified that incorrectly pre-filled applications caused significant burdens on his office, typically taking three to five times longer to process than accurately completed applications. Ex.

78

QQ at 252:24-253:23. He also described, and included numerous examples, of error-prone CVI-pre-filled applications that were submitted by voters to his office. SOF ¶¶ 50-51. And he discussed the adverse impact these erroneous applications had on election administration. SOF ¶¶ 52-53, 60-64. Ford County Clerk Deborah Cox likewise testified about inaccurate pre-filled applications that her office received, Ex. RR at 139:9-140:3, and the deleterious impact of the same on election administration. SOF ¶¶ 54-55. Defendants' expert witness Ken Block also discussed the large number of mailings sent to individuals whose voter registrations had been cancelled. SOF ¶¶ 41-48.

Moreover, the issue of duplicates is not irrelevant. As noted above, voters told county election officials that they often submitted duplicate applications because they believed that they were obligated to mail any and all pre-filled applications back to the county election office in order to receive an advance ballot, even if they had previously submitted one. SOF ¶ 74. The fact that Shawnee County received 4,217 duplicate applications (more than 15.4% of the total number of applications the office received during the 2020 General Election), and that Ford County received 274 duplicate applications (nearly 9% of the total applications the office received during the 2020 General Election), SOF ¶¶ 71-72, 75, underscores emphatically that the problem was not just a few confused voters. This is especially true when one compares the *exponentially* greater number of duplicates received in 2020 to the number received in prior elections. SOF ¶¶ 73, 76; Reply to Pls.' Resp. to SOF ¶¶ 71-73, 75-76, 81, 83. The difference cannot be explained by the pandemic or supposed issues with the Postal Service.

Nor does VPC anywhere acknowledge that the problems seen in Kansas were present in other states throughout the country as well. SOF ¶ 66. The Kansas Legislature painted on a canvas in which these disturbing colors were clearly present, and the law is clear that a State is entitled to

79

rely on harms elsewhere in enacting legislation designed to prevent such problems from rearing their head in that State. Dkt. 151 at 42-43. Moreover, the fact that Kansas has (at least apparently, so far as we know) avoided any systemic fraud from mail ballots – a problem that the Supreme Court has readily acknowledged, *see Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2348 (2021) – hardly means that this interest cannot be considered by the Court in evaluating the Pre-Filled Application Prohibition. Br. at 106-07.

In a related vein, VPC concedes the substantial overall error rate – nationally – on its pre-filled applications, Br. at 107, but claims that Defendants did not specifically tie these errors to Kansas. Such a theory cannot carry the day. There is no evidence that Kansas was immune from the high error rate afflicting VPC's mail ballot program. Indeed, VPC itself believed the problem was of such magnitude that it stopped pre-populating advance voting ballot applications in Kansas. Further, a State is not confined to addressing problems only within its own borders when adopting legislation targeted at facilitating election integrity.

## IV. – CONCLUSION

VPC proposes a legal standard that affords virtually no deference to the State in adopting election integrity measures designed to address and prevent the actual and potential problems that arise (and/or can arise) with pre-filled advance voting ballot applications. VPC also has blatantly misrepresented the record here and attempted to thrust evidentiary obligations on the State that are inconsistent with Supreme Court precedent. The State enjoys far more latitude in this context. For all these reasons stated herein, Defendants respectfully request that the Court grant their motion for summary judgment with regard to Counts I-III of the Plaintiffs' Complaint.

80

Respectfully Submitted,

By /s/ Bradley J. Schlozman
Bradley J. Schlozman (KS Bar #17621)
Scott R. Schillings (KS Bar #16150)
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, Kansas 67206
Telephone: (316) 267-2000
Facsimile: (316) 630-8466
Email: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com

*Attorneys for Defendants*

81

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November 2022, I electronically filed the foregoing Defendants' Reply to Plaintiff Voter Participation Center's Opposition to Defendants' Motion for Summary Judgment Regarding Counts I-III with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By /s/ Bradley J. Schlozman

82

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| VOTEAMERICA and<br>VOTER PARTICIPATION CENTER,<br><br>*Plaintiffs,*<br><br>vs.<br><br>SCOTT SCHWAB, in his official capacity as<br>Secretary of State of the State of Kansas; DEREK<br>SCHMIDT, in his official capacity as Attorney<br>General of the State of Kansas; and STEPHEN M.<br>HOWE, in his official capacity as District Attorney<br>of Johnson County,<br><br>*Defendants.* | C.A. NO. 2:21-cv-02253-KHV-GEB |

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

i

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ........................................................................................................................... 1

PLAINTIFF'S REPLY IN FURTHER SUPPORT OF ITS STATEMENT OF UNCONTROVERTED FACTS ........................................................................................................................................... 2

PLAINTIFF'S RESPONSE TO DEFENDANTS' ADDITIONAL MATERIAL FACTS ........................... 6

ARGUMENT ................................................................................................................................... 7

    I.    The First Amendment protects Plaintiff's distribution of personalized advance mail ballot applications. ................................................................................................................................ 7

        A.    Defendants' Efforts to Dictate and Disaggregate Plaintiff's Speech Should Fail. ........................ 8

        B.    Defendants misconstrue the expressive conduct analysis. ........................................................... 11

        C.    Defendants Misapprehend the Relevant Cases. .......................................................................... 14

    II.    The Personalized Application Prohibition is Subject to Strict Scrutiny. ...................................... 17

        A.    Strict Scrutiny Applies to the Restriction on Plaintiff's Speech. ................................................. 17

        B.    Anderson-Burdick Does Not Apply ............................................................................................ 23

        C.    Rational Basis Review Does Not Apply. ..................................................................................... 24

    III.    The Prohibition Cannot Survive Strict Scrutiny. ....................................................................... 25

        A.    The Court Should Reject Defendants' Mischaracterization of the Applicable Legal Standards. 25

        B.    The Record Contains No Evidence Demonstrating that the Prohibition Serves the Interests Defendants Claim It Does. ........................................................................................................... 27

        C.    Defendants' Purported Interests Do Not Withstand Scrutiny ...................................................... 29

CONCLUSION .............................................................................................................................. 33

Appellants' Appendix - Vol. III - 552

## TABLE OF AUTHORITIES

**Other Authorities**

*AADP v. Herrera,*
690 F. Supp. 2d 1183 (D.N.M. 2010). .................................................................................15

*AAPD v. Herrera*,
08-cv-702 (D.N.M. July 2, 2010).........................................................................................16

*AAPD v. Herrera*,
08-cv-702 (D.N.M. Sept. 16, 2009) .....................................................................................16

*AARA v. Clean Elections USA*,
No. 22-cv-01823, 2022 WL 15678694 (D. Ariz. Oct. 28, 2022)........................................13

*ACORN v. City of Tulsa*,
835 F.2d 735 (10th Cir. 1987)..............................................................................................13

*Alpha Energy Savers, Inc. v. Hansen*,
381 F.3d 917 (9th Cir. 2004)................................................................................................30

*Anderson v. Celebrezze*,
460 U.S. 780 (1983)..............................................................................................................27

*Ashcroft v. Am. C.L. Union*,
542 U.S. 656 (2004)..............................................................................................................27

*Bernbeck v. Moore,*
936 F. Supp. 1543 (D. Neb. 1996) .......................................................................................31

*Bethune-Hill v. Va. State Bd. of Elections*,
580 U.S. 178 (2017)..............................................................................................................27

*Bolger v. Youngs Drug Prod. Corp.*
463 U.S. 60 (1983)..........................................................................................................11, 30

*Brewer v. City of Albuquerque*,
18 F.4th 1205 (10th Cir. 2021) .........................................................................................1, 28

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021) .........................................................................................................25

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)..............................................................................................................23

*Buckley v. Am. Const. Law Found., Inc.*,
525 U.S. 182 (1999)........................................................................................................passim

*Burdick v. Takushi*,
504 U.S. 428 (1992)..............................................................................................................26

ii

*Burson v. Freeman,*
   504 U.S. 191 (1992) ................................................................................................ 20, 25, 26

*Cal. Democratic Party v. Jones,*
   530 U.S. 567 (2000) ......................................................................................................... 8

*Chandler v. City of Arvada,*
   292 F.3d 1236 (10th Cir. 2002) ................................................................................ 18, 32

*Citizens United v. FEC,*
   558 U.S. 310 (2010) ....................................................................................................... 15

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
   142 S. Ct. 1464 (2022) ................................................................................................... 19

*City of Dallas v. Stanglin,*
   490 U.S. 19, 22, 24 (1989) ............................................................................................. 22

*Clark v. Community for Creative Non–Violence,*
   468 U.S. 288 (1984) ................................................................................................. 12, 13

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of N.Y.,*
   447 U.S. 530 (1980) ....................................................................................................... 11

*Cressman v. Thompson,*
   798 F.3d 938 (10th Cir. 2015) .................................................................................. 12, 13

*DCCC v. Ziriax,*
   487 F. Supp. 3d 1207 (N.D. Okla. 2020) ...................................................................... 16

*Doe v. Reed,*
   561 U.S. 186 (2010) ......................................................................................... 19, 20, 21, 26

*Feldman v. Ariz. Sec'y of State,*
   843 F.3d 366 (9th Cir. 2016) ......................................................................................... 16

*Fish v. Schwab,*
   957 F.3d 1105 (10th Cir. 2020) ..................................................................................... 33

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
   515 U.S. 557 (1995) ............................................................................................. 7, 12, 13

*iMatter Utah v. Njord,*
   774 F.3d 1258 (10th Cir. 2014) ..................................................................................... 25

*In re Motor Fuel Temperature Sales Pracs. Litig.,*
   07-1840, 2012 WL 13050524 (D. Kan. Apr. 4, 2012) ..................................................... 7

*Knox v. Brnovich,*
   907 F.3d 1167 (9th Cir. 2018) ....................................................................................... 16

*Lamont v. Postmaster Gen. of U.S.*,
   381 U.S. 301 (1965) ................................................................................................................. 11

*League of Women Voters v. Browning*,
   575 F. Supp. 2d 1298 (S.D. Fla. 2008) ................................................................................... 16

*LWV of Mo. v. Missouri*,
   20AC-CC04333 (Cole Cty. Cir. Ct. Oct. 25, 2022) ............................................................... 14

*LWV of Tenn. v. Hargett*,
   400 F. Supp. 3d 706 (M.D. Tenn. 2019) ............................................................ 10, 14, 16, 23

*Martin v. City of Struthers*,
   319 U.S. 141 (1943) ................................................................................................................. 30

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
   138 S. Ct. 1719 (2018) ............................................................................................................ 12

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ........................................................................................................... 27, 32

*McIntyre v. Ohio Election Comm'n*,
   514 U.S. 334 (1995) ........................................................................................................... 10, 23

*McLaughlin v. City of Lowell*,
   140 F. Supp. 3d 177 (D. Mass. 2015) ..................................................................................... 28

*Meyer v. Grant*,
   No. 87-920 (U.S. Apr. 25, 1988) ..................................................................................... passim

*NAACP v. Button*,
   371 U.S. 415 (1963) ........................................................................................................... 21, 26

*Navajo Nation v. San Juan Cnty.*,
   929 F.3d 1270 (10th Cir. 2019) .............................................................................................. 26

*NetChoice, LLC v. Att'y Gen., Fla.*,
   34 F.4th 1196 (11th Cir. 2022) ......................................................................................... 12, 13

*New Georgia Project v. Raffensperger*,
   484 F. Supp. 3d 1265 (N.D. Ga. 2020) ................................................................................... 16

*New Mexico Youth Organized v. Herrera*,
   611 F.3d 669 (10th Cir. 2010) ................................................................................................ 22

*New York v. Biden*,
   No. 20-CV-2340 (EGS), 2022 WL 5241880 (D.D.C. Oct. 6, 2022) ....................................... 31

*Peck v. McCann*,
   43 F.4th 1116 (10th Cir. 2022) ............................................................................................... 27

iv

*Priorities USA v. Nessel*,
487 F. Supp. 3d 599 (E.D. Mich. 2020) ................................................................................. 15

*Priorities USA v. Nessel,*
No. 2:19-CV-13341, 2022 WL 4272299 (E.D. Mich. Sept. 15, 2022) ................................... 15

*Project Vote/Voting for Am., Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) ................................................................................................. 31

*Republican Party of Minn. v. White*,
536 U.S. 765 (2002) ............................................................................................................... 25

*Revo v. Disciplinary Bd. of the Supreme Ct. for N.M.*,
106 F.3d 929 (10th Cir. 1997) ............................................................................................... 11

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ............................................................................................................... 10

*Rowan v. U.S. Post Off. Dep't*,
397 U.S. 728 (1970) ............................................................................................................... 30

*Schneider v. New Jersey*,
308 U.S. 147 (1939) ................................................................................................................. 9

*SD Voice v. Noem*,
432 F. Supp. 3d 991 (D.S.D. 2020) ........................................................................................ 20

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ............................................................................................................... 21

*Spence v. Washington*,
418 U.S. 405 (1974) ....................................................................................................... 9, 12, 13

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) ............................................................................................................... 11

*Troster v. Pa. State Dep't of Corr.*,
65 F.3d 1086 (3d Cir. 1995) .................................................................................................. 12

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ............................................................................................................... 28

*U.S. West v. FCC,*
182 F.3d 1224 (10th Cir. 1999) ............................................................................................... 9

*United States v. Alvarez*,
567 U.S. 709 (2012) ............................................................................................................... 27

*United States v. Hernandez-Calvillo*,
39 F.4th 1297 (10th Cir. 2022) .............................................................................................. 22

Appellants' Appendix - Vol. III - 556

*Utah Republican Party v. Cox*,
  892 F.3d 1066 (10th Cir. 2018)................................................................................................... 26

*Vill. of Schaumburg v. Citizens for a Better Env't*,
  444 U.S. 620 (1980) ................................................................................................................... 10

*Virginia v. Hicks*,
  539 U.S. 113 (2003) ................................................................................................................... 23

*VoteAmerica v. Raffensperger,*
  1:21-cv-01390, 2022 WL 2357395 (N.D. Ga. June 30, 2022)................................................. 16

*VoteAmerica v. Schwab*,
  576 F. Supp. 3d 862 (D. Kan. 2021) ...................................................................................passim

*Voting for Am., Inc. v. Andrade*,
  488 F. App'x 890 (5th Cir. 2012) ............................................................................................. 22

*Voting for America v. Steen*,
  732 F.3d 382 (5th Cir. 2013 ..................................................................................................... 10

*Yes On Term Limits, Inc.. v. Savage*,
  550 F.3d 1023 (10th Cir. 2008)................................................................................... 18, 24, 33

## Statutes

52 U.S.C. § 21061 ............................................................................................................................. 21

K.S.A. § 25-1122(k)(1) ..................................................................................................................... 30

K.S.A. § 25-1122(k)(4) ..................................................................................................................... 21

## Other Authorities

Daniel E. Rauch, *Customized Speech and the First Amendment*, 35 Harv. J.L. & Tech. 405 (2022) .......... 9

**INTRODUCTION**

The parties agree that this case presents the Court with a narrow legal question: whether a ban on distributing personalized vote-by-mail applications, the Personalized Application Prohibition, violates the First Amendment.  This Court already held that Plaintiff Voter Participation Center's ("VPC") communications advocating for advance mail voting and assisting voters constitute speech and expressive conduct in an area "where the First Amendment has its fullest and most urgent application." *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 888 (D. Kan. 2021) (citation omitted).  The Court also ruled that the Prohibition on Plaintiff's protected communications fails constitutional scrutiny.  *Id.* at 889-93.  Discovery is now closed, and this question has been briefed exhaustively.  But the result remains clear: relevant precedent and the evidence demonstrate that Plaintiff's personalized communications are protected speech that the Prohibition unconstitutionally restricts.  While Defendants may prefer that civic organizations speak in a different manner, the First Amendment stands in the way of such government intrusion.

Defendants fail to produce any new evidence or legal argument that require this Court to depart from its prior analysis.  They opt instead for conflation and repetition.  Defendants conflate the facts concerning Kansans' receipt of personalized applications with receipt of multiple applications, as well as the precedent about political advocacy during the distribution of voting materials with inapposite cases about the collection and return of materials after that advocacy.  And they otherwise rehearse arguments this Court rejected.  Defendants take this approach because the record is devoid of evidence that the Personalized Application Prohibition advances the interests Defendants proffer.  Juxtaposed against the "paltry record evidence" of a real harm that it ameliorates, and the lack of tailoring to any harm, the Prohibition cannot satisfy the core First Amendment protections implicated here.  *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1226 (10th Cir. 2021).

1

### PLAINTIFF'S REPLY IN FURTHER SUPPORT OF ITS STATEMENT OF UNCONTROVERTED FACTS

The following 56 facts are uncontroverted or controverted only for purposes of minor immaterial corrections and a response from Plaintiff is not required: 1-13, 15-18, 20-22, 31-34, 36-47, 49-50, 52, 55-56, 59, 61-65, 67, 69-76.

In addition, though purportedly disputing the following 16 facts, Defendants merely raise immaterial facts and/or make legal arguments not appropriate for factual contentions such that Defendants' responses do not warrant replies from Plaintiff and do not present any actual facts in dispute: 14, 19, 23-24, 26-30, 48, 53-54, 57-58, 60, 66.

Finally, Defendants raise no genuine factual dispute with respect to the remaining 5 of Plaintiff's factual statements.  The statements, Defendants' responses, and Plaintiff's replies are set forth below.

**PLAINTIFF'S UNCONTROVERTED FACT ¶ 25:**

Doing so provides the voter simple access to an advance mail ballot application that is personalized with required information from the voter file.  Lopach Decl. ¶ 21.

**DEFENDANTS' RESPONSE TO ¶ 25:**

Controverted but immaterial. VPC V.P. Lionel Dripps testified that VPC does not solely use information from the Kansas voter file to pre-fill applications; rather, its vendor (Catalist) merges commercially available data with information from the State's voter file. Ex. F at 173:14-174:1.

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO ¶ 25:**

Plaintiff's factual statement is uncontroverted. Defendants' response does not controvert the fact that VPC endeavors to personalize the applications it sends to voters using voter information originating in the voter file that VPC obtains from the data vendor that VPC

2

pays for data management services. *See* Decl. of Mark P. Johnson In Supp. of Pl.'s Mot. Summ. J., (Oct. 14, 2022) ("Johnson Decl."), Ex. 6 (Lopach Tr.) at 33:2-35:3, 92:14-25, 93:20-96:8; *see also id.* at Ex. F (Dripps Tr.) 167:24–174:21.

**PLAINTIFF'S UNCONTROVERTED FACT ¶ 35:**

To personalize the applications it sends, VPC uses statewide voter registration files obtained via its data vendors and fills-in parts of the advance mail ballot applications with the voter's information as it appears in the state records. Johnson Decl., Ex. 6 (Lopach Tr.) 91:4-92:18; Lopach Decl. ¶¶ 37-40. VPC culls its lists to ensure that the information is accurate and current and that it is running its program as efficiently as possible. *See* Lopach Decl. ¶¶ 18, 39; Johnson Decl., Ex. 6 (Lopach Tr.) 33:2-35:3, 92:13-25, 93:20-96:8; *id.* at Ex. 7 (Dripps Tr.) 123:13-21, 147:16-20.

**DEFENDANTS' RESPONSE TO ¶ 35:**

Controverted. VPC Executive V.P. Lionel Dripps specifically testified that VPC does not pre-populate advance voting ballot applications simply with information drawn from the State voter file. Ex. F at 171:24-172:17. Rather, VPC's vendor supplements the State file with commercially available data. Ex. F at 173:13-174:1. Moreover, the commercial data used to "supplement" the information from the State voter file included faulty data. *Id.* Thus, the pre-filled applications VPC sent to voters in connection with the 2020 General Election often did not match "the voter's information as it appears in the state records." Because VPC, in pre-filling applications for use in the 2020 General Election, also used voter data that its vendor had obtained from the State at least 4-6 months before those applications were mailed to voters, the information on the pre-filled application often had changed and did not match the data by the time VPC sent its mailer to the voter. Ex. M at ¶¶ 34-35.

3

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO ¶ 35:**

Plaintiff's factual statement is uncontroverted.  Defendants' response does not controvert the fact that VPC endeavors to personalize the applications it sends to voters using voter information originating in the voter file that VPC obtains from the data vendor that VPC pays for data management services.  *See* Johnson Decl., Ex. 6 (Lopach Tr.) 33:2-35:3, 92:13-25, 93:20-96:8; *see also* Ex. F (Dripps Tr.) 167:24-174:2.

**PLAINTIFF'S UNCONTROVERTED FACT ¶ 51:**

It also presented new hurdles for voters who wanted to participate without jeopardizing the health of themselves or their loved ones.  *Id.* at Ex. 1 (Schmidt Tr.) 149:4–150:6.

**DEFENDANTS' RESPONSE TO ¶ 51:**

Controverted but immaterial.  The cited exhibit does not support the statement in ¶ 51, and it is speculation as to what voters in 2020 thought as they cast their ballots and selected the method for doing so.

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO ¶ 51:**

Plaintiff's factual statement is uncontroverted.  As Ms. Schmidt testified, that voters were "frightened" and "in their homes" due to COVID-19, and for that reason they requested advance mail ballots.  *See* Johnson Decl., Ex. 1 (Schmidt Tr.) 149:4-150:6, ECF No. 145-2.

**PLAINTIFF'S UNCONTROVERTED FACT ¶ 68:**

On March 17, 2021, the Kansas Secretary of State's Office submitted written testimony on HB 2332 that did not include any discussion of prefilled advance mail ballot applications.  Stipulated Facts at § 2(b)(x); *see also* Johnson Decl., Ex. 32 (KS SOS Tr. Ex. 17) *id.* at Ex. 17 (KS SOS Tr.) 295:21-297:7.

4

**DEFENDANTS' RESPONSE TO ¶ 68:**

Controverted. The document, which speaks for itself, references the fact that "mailings [from third parties] may not collect information required by federal or state law, resulting in incomplete mail ballot applications. For instance, state law requires a government issued identification number or a copy of a government issued ID with advance by mail ballot applications. In addition, a voter signature is required for those who wish to request an advance by mail ballot. If a voter does not provide that information, their application is incomplete." The document also explicitly identifies "the Center for Voter Information based out of Springfield, Missouri" as one of the entities mailing pre-filled advance voting ballot applications to Kansas voters.

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO ¶ 68:**

Plaintiff's factual statement is uncontroverted. Reference to "incomplete mail ballot applications," is not discussion of personalized applications.

**PLAINTIFF'S UNCONTROVERTED FACT ¶ 77:**

These rationales for the Personalized Application Prohibition are not a part of the Legislative Record for HB 2332. *See* Kansas House Bill 2332 (2021), Legislative Record, http://kslegislature.org/li/b2021_22/measures/hb2332/ (last accessed Oct. 14, 2022).

**DEFENDANTS' RESPONSE TO ¶ 77:**

Controverted and immaterial. First, as a matter of law, the Legislature was not required to memorialize its interests in adopting the legislation as part of any formal record. Second, Plaintiffs only cite to the bill page of the Kansas Legislature's website and thus have not shown that their citation is to the entire "Legislative Record." Second, at least one proponent did cite voter confusion, inaccurate applications, and other information that would address these categories. Testimony of John M. Toplikar in Support of H.B. 2332

5

(http://kslegislature.org/li/b2021_22/committees/ctte_h_electns_1/documents/testimony/20210218_18.pdf) (last visited Oct. 25, 2002).  Third, the Kansas County Clerks & Election Officials testified that they "appreciate[d] Representative Toplikar's intent under this bill and d[id] not disagree with what he [was] trying to accomplish." Testimony of Rick Piepho, Kansas County Clerks & Election Officials Elections Committee Chair, available at http://kslegislature.org/li/b2021_22/committees/ctte_h_electns_1/documents/testimony/20210218_15.pdf (last visited Oct. 25, 2022).  The Secretary's testimony likewise highlighted these issues. Ex. Z, Secretary of State Testimony.

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO ¶ 77:**

Plaintiff's factual statement is uncontroverted. Defendants misdescribe their citations to the legislative record.  Nothing in the cited documents have an articulated connection to personalized applications or "inaccurate information."  *See also, e.g.*, Supplemental Note on House Bill No. 2332, http://kslegislature.org/ li/b2021_22/ measures/documents/ supp_note_hb2332_03_0000.pdf ("In the House Committee hearing on the bill, Representative Toplikar testified as a proponent, stating the bill was introduced to address voter confusion and as a result of certain voters receiving multiple applications for advance voting ballots during the 2020 election cycle.").

**PLAINTIFF'S RESPONSE TO DEFENDANTS' ADDITIONAL MATERIAL FACTS**

Each of Defendants' 57 "Additional Material Facts" cites an identical or materially identical fact included in Defendants' Statement of Uncontroverted Facts in support of their Motion for Summary Judgment.  *See* Defs.' Mem. in Supp. Mot. for Summ. J. ("Defs.' Mot.") at 6-21, ECF No. 151.  Plaintiff incorporates its prior responses and objections.  *See* Pl.'s Opp'n to Defs' Mot. for Summ. J. ("Pl.'s Opp'n") at 14-75, ECF No. 156 (responding to Defendants' Statement of Uncontroverted Facts 17-18, 29-30, 32, 35, 37-87, renumbered in Defendants'

6

Statement of Additional Material Facts as 1-57).  Plaintiff also incorporates its general objections. *See id.* at 4-6.

## ARGUMENT

### I.     The First Amendment Protects Plaintiff's Distribution of Personalized Advance Mail Ballot Applications

As Plaintiff details in its Opening Brief[1] and its opposition to Defendants' cross-motion for summary judgment, VPC's distribution of personalized advance mail ballot applications is First Amendment-protected activity under at least four different approaches to the doctrine:  (1) Plaintiff's communications assisting and persuading Kansans to vote by mail represent a single package of speech in which the personalized application is an integral and intertwined part; (2) Plaintiff's personalization of the applications it distributes—identifying and disseminating the information of VPC's chosen audience—is itself speech; (3) VPC's distribution of personalized advance mail ballot applications is expressive conduct; and (4) VPC distributes its personalized applications as associational activity to promote engagement in the political process.[2]  *See* Pl.'s

---

[1] "Opening Brief" and "Pl.'s Summ. J. Br." refer to Plaintiff's Memorandum in Support of Its Motion for Summary Judgment.  *See* ECF No. 154.  "SOF" refers to Plaintiff's Statement of Uncontroverted Facts in Support of its Motion for Summary Judgment.  *See* ECF No. 154 at 2–17. "Opposition" and "Opp'n" refer to Defendants' Response to Plaintiff's Motion for Summary Judgment.  *See* ECF No. 155.

[2] Throughout their responses to Plaintiff's statement of facts, Defendants repeatedly do not dispute factual questions concerning VPC's speech because they state that First Amendment coverage of an activity is a legal question.  *See*, *e.g.*, Defs.' Resp. to SOF ¶ 23 (citing *In re Motor Fuel Temperature Sales Pracs. Litig.*, 07-1840, 2012 WL 13050524, at *2 (D. Kan. Apr. 4, 2012)). True enough, but in taking that approach, Defendants leave uncontested Plaintiff's material facts concerning the speech elements of its communications.  Because "the reaches of the First Amendment are ultimately defined by the facts it is held to embrace," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 567 (1995), Defendants' repeated concession of VPC's speech facts supports Plaintiff's motion for summary judgment.  Their citation to this Court's decision in *In re Motor Fuel*—a case with no bearing on free speech claims—is not to the contrary.

7

Summ. J. Br. at 19-24; Pl.'s Opp'n at 83-94.  Defendants' claim that VPC's distribution of personalized applications is non-expressive conduct fails for several reasons.

### A.      Defendants' Efforts to Dictate and Disaggregate Plaintiff's Speech Fail

Defendants contend that the State can direct how VPC should communicate its message—through means other than distributing personalized applications.  Opp'n at 45-46, 48-49, 61, 72-73.  That argument misconstrues the facts, is logically flawed, and violates binding precedent.

To begin, Defendants' focus on VPC's cover letter misstates the undisputed facts.  They claim, without support, that "[n]othing in the challenged statute impedes VPC from engaging in any of the messaging that it imparts through its cover letter" and the "cover letter, and the message contained therein . . . is wholly unaffected by the [Personalized] Application Prohibition."  *Id.* at 45.  But Defendants do not contest that VPC's cover letter explicitly says, for example: "I have sent you the enclosed advanced ballot by mail application already filled out with your name and address." SOF ¶ 34.  And they do not dispute that the entire point of VPC's cover letter and other instructional materials is to inform and persuade the recipient voter that opting to vote by mail is easily done *with the attached personalized application*.  *Id*.  The personalized application cannot be isolated from its context.

Moreover, the fact that VPC hypothetically could separately speak through a different cover letter or distributing a blank application does nothing to undermine the First Amendment protections covering its decision to distribute personalized applications.  The Supreme Court has "consistently refused to overlook an unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 581 (2000).  Indeed, it has "reject[ed] summarily" the argument that speech can be limited when other communicative channels remain available because of the longstanding maxim that "one is not to have the exercise of his liberty of expression in appropriate

8

places abridged on the plea that it may be exercised in some other place." *Spence v. Washington*, 418 U.S. 405, 411 n.4 (1974) (quoting *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939)).  If Defendants' contrary perception of the First Amendment were reality, then *Meyer* would have come out differently.  But the Supreme Court rejected exactly that type of argument.  *Meyer*, 486 U.S. at 424 (rejecting Colorado's attempt to argue the same and holding that the fact that a speaker remains "free to employ other means to disseminate their ideas" does not take their speech "outside the bounds of First Amendment protection").[3]

The Tenth Circuit reinforced the same rule in *U.S. West v. FCC*, a case concerning speech restrictions and facts analogous to this case.  182 F.3d 1224, 1228-30 (10th Cir. 1999).  The challenged law in *U.S. West* limited a speaker's ability to use recipient information in a database to transmit targeted direct mail.  *Id*.  The government claimed, like Defendants here, that restricting the method of "target[ing]" the speaker's message did "not prevent [the speaker] from communicating with its customers or limit anything that it might say to them."  *Id.* at 1232.  The court rejected this claim as "fundamentally flawed" because the "existence of alternative channels of communication . . . does not eliminate the fact that the [challenged laws] restrict speech."  *Id*.  The same is true of Plaintiff's use of specific voter information to target its pro-advance mail voting communications here, which further reinforces its communicative character.[4]  VPC's speech warrants even greater protection than the commercial speech in *U.S. West* because VPC's communications represent its core political speech taking a stance in the heated national debate about mail voting.  Such "advocacy of a politically controversial viewpoint" in favor of mail voting

---

[3] *See* Oral Argument Transcript at 19-21, *Meyer v. Grant*, No. 87-920 (U.S. Apr. 25, 1988), https://www.supremecourt.gov/pdfs/transcripts/1987/87-920_04-25-1988.pdf.

[4] *See, e.g.*, Daniel E. Rauch, *Customized Speech and the First Amendment*, 35 Harv. J.L. & Tech. 405 (2022) (collecting sources and concluding that "[d]octrinally, the First Amendment robustly protects Speech Customization").

9

is "the essence of First Amendment expression." *McIntyre v. Ohio Election Comm'n*, 514 U.S. 334, 347 (1995).

Defendants' slicing and dicing of Plaintiff's speech fails along similar lines. *See LWV of Tenn. v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (rejecting "slicing and dicing" speech in voter registration context).[5] Defendants attempt to "disaggregate[]" VPC's personalized "application . . . from the cover letter" and invent the rule that voters must discern VPC's message from the "application itself, separate and apart from the other materials and messaging in the mailer." Opp'n at 48-49. But precedent forecloses this notion. The Supreme Court has "refuse[d] to separate the component parts of" a communication "from the fully protected whole." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) (applying *Meyer*, among other cases). Defendants do not dispute VPC's facts that the personalized applications are "characteristically intertwined" with its entire package of speech. *Id.* (quoting *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)); *see also*, *e.g.*, SOF ¶¶ 23, 37. The legal significance of those facts is clear: the Court must view the speech as a whole and "cannot parcel out the speech" because "[s]uch an endeavor would be both artificial and impractical." *Riley*, 487 U.S. at 796.[6]

---

[5] Defendants emphasize that the *LWV of Tennessee* court cited the dissenting opinion in *Voting for America v. Steen*, 732 F.3d 382 (5th Cir. 2013), to condemn the "slicing and dicing" of protected speech. *See* Opp'n at 48, 53. But Defendants incorrectly suggest that the *Steen* majority—a nonbinding Fifth Circuit decision—somehow has greater bearing than the dissent, which is more persuasive. *See LWV of Tenn.*, 400 F. Supp. 3d at 720-71 & n.6. In any event, even the *Steen* majority supports Plaintiff's position here. 732 F.3d at 289-90 ("accept[ing]" that "'distributing' voter registration forms" and 'helping' voters to fill out their forms" are expressive, and finding that while the collection of completed voter registration forms is not speech, "[s]oliciting, urging, and persuading [a] citizen to vote are the canvasser's speech").

[6] Defendants concede that VPC's cover letter is protected speech, Opp'n at 45-46, and that VPC's distribution of generic advance mail ballot applications is First Amendment-protected activity. *Id.* at 43; *cf. id.* at 2. But the breadth of Defendants' arguments against personalization contradicts this concession. For example, Defendants' misplaced reliance on *Timmons v. Twin Cities Area*

10

Finally, Defendants differentiate between solicited and unsolicited speech, suggesting that the First Amendment protects the former over the latter. But the law makes no such distinction. The Supreme Court has long held—even specifically in the direct mail context—that speakers have a protected right to convey unsolicited speech.[7] Thus, solicited or not, Plaintiff's personalized advance mail ballot mailer communications represent protected First Amendment activity.

**B.      Defendants Misconstrue the Expressive Conduct Analysis**

The Court has already observed that Plaintiff's distribution of personalized applications "is inherently expressive conduct that the First Amendment embraces."  *VoteAmerica*, 576 F. Supp. 3d at 875.  Defendants do not dispute the developed facts that continue to support this conclusion: (1) VPC identifies a specific audience for its communications; (2) during the election, it sends the personalized application mailer to the selected recipient; (3) VPC's message is that mail voting is beneficial and convenient, and that the specific voter should use the personalized application to

---

*New Party*, 520 U.S. 351, 363 (1997), to say "state-created forms" cannot be part of speech would also mean that distributing a blank application is not First Amendment activity.  Opp'n at 46. Defendants' claim that the personalized applications are not speech because they purportedly do not convey a message "separate and apart" from the cover letter also contradicts the First Amendment interest Defendants concede VPC has in distributing a generic application.  *Id.* at 49. And Defendants explicitly ask the Court to rely on cases they believe support "that the distribution of advance ballot applications is not protected speech"—whether personalized or not.  *Id.* at 50. Defendants' concession that distributing applications is speech, while contradictorily pressing arguments against that concession, undermines their persuasiveness.

[7] *See, e.g.*, *Bolger v. Youngs Drug Prod. Corp.* 463 U.S. 60, 69 (1983) (ruling that "the mailing of unsolicited contraceptive advertisements" is protected speech that "not only implicates 'substantial individual and societal interests' in the free flow of commercial information, but also relates to activity which is protected from unwarranted state interference"); *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 532, 535 (1980) (a ban on the unsolicited "inclusion in monthly electric bills of inserts discussing controversial issues of public policy" was a "prohibition of discussion of controversial issues [that] strikes at the heart of the freedom to speak"); *see also Revo v. Disciplinary Bd. of the Supreme Ct. for N.M.*, 106 F.3d 929, 933 (10th Cir. 1997) ("the solicitation letters" of attorneys' services "are protected commercial speech"); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 305 (1965) ("[T]he use of the mails is almost as much a part of free speech as the right to use our tongues" (quotation omitted)).

11

participate; and (4) over 69,000 Kansans acted upon VPC's message to opt into mail voting.  SOF ¶¶ 20-26, 33-34, 37, 42.  These undisputed facts, viewed in the context of the election and the overall mailer package, establish that distributing personalized applications is "sufficiently imbued with elements of communication" to be expressive conduct.  *Cressman v. Thompson*, 798 F.3d 938,  954 (10th Cir. 2015).

Instead of contesting these facts, *see supra* note 2, Defendants urge that VPC must show both "an intent to convey a particularized message" and that VPC's audience must in fact subjectively "understand the… message."  Opp'n at 47.  Defendants' articulation of the applicable test is wrong.  First, as the Supreme Court clarified in *Hurley*, "a narrow, succinctly articulable message is not a condition of constitutional protection," and is not "confined to expressions conveying a 'particularized message' . . . ."  515 U.S. at 569 (quoting *Spence*, 418 U.S. at 411).  After *Hurley*, the particularized message "factors" considered in prior cases "are not necessarily prerequisites for First Amendment protection for" expressive conduct.  *Cressman*, 798 F.3d at 955.[8]  It is instead sufficient to show that the conduct is "intended to be communicative," as viewed "in context."  *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 294 (1984).  Second, Plaintiff is also under no obligation to show that voters subjectively understood a particular message.  Opp'n at 47-48.  For communicative conduct to "fall[] within the free speech guarantee

---

[8] There is widespread agreement that *Hurley* eschewed any particularized intended message prerequisite for expressive conduct.  *See, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1741 (2018) (Thomas, J., concurring) (observing that "a 'particularized message' is not required, or else the freedom of speech 'would never reach … unquestionably shielded'" conduct (quoting *Hurley*, 515 U.S. at 569)); *id.* at 1748 n.1 (Ginsburg, J., dissenting) ("[F]or conduct to constitute protected expression, the conduct must be reasonably understood by an observer to be communicative."); *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1212 (11th Cir. 2022); *Troster v. Pa. State Dep't of Corr.*, 65 F.3d 1086, 1090 & n.1 (3d Cir. 1995).  Because the Tenth Circuit in *Cressman* ultimately found that the plaintiff *could* articulate a particularized and specifically understood message, the court concluded that any difference between *Hurley* and *Johnson* was immaterial for purposes of resolving that case.  *Id.* at 956-60.

12

of the First Amendment," the test is simply whether the conduct is "*reasonably perceived* to convey *a message*." *ACORN v. City of Tulsa*, 835 F.2d 735, 742 (10th Cir. 1987) (emphases added). The analysis is objective and broad: whether the conduct could "reasonably be understood by" the hypothetical observer "to be communicative" of some message. *Clark*, 468 U.S. at 294; *see also NetChoice*, 34 F.4th at 1212 (assessing "whether the reasonable person would interpret [the conduct] as *some* sort of message, not whether an observer would necessarily infer a *specific* message" (citation omitted)). Thus, the rule is that "expressive conduct need not convey a specific message" and "[t]he critical question is whether a reasonable observer would interpret the conduct as conveying *some* sort of message." *AARA v. Clean Elections USA*, No. 22-cv-01823, 2022 WL 15678694, at *4 (D. Ariz. Oct. 28, 2022) (citing *Hurley*, 515 U.S. at 569).

Plaintiff's distribution of personalized advance mail ballot applications more than meets this standard.[9] VPC distributes personalized applications to communicate its pro-advanced mail voting views to Kansans. *See* SOF ¶¶ 23-27, 37. In fact, organizations would only do so if they supported mail voting. *See infra* Part II.A.2. A reasonable voter would also discern some sort of message from receiving VPC's personalized application, particularly when viewed in context of the election season and the rest of VPC's mailer package. *See Cressman*, 798 F.3d at 953 (emphasizing the "context-driven nature of the inquiry"); *accord Clark*, 468 U.S. at 294; *Spence*, 418 U.S. at 409. That over 69,000 voters did in fact understand and act upon VPC's application is instructive. *See* SOF ¶ 42. Defendants' arbitrary suggestion that this total is somehow not

---

[9] Indeed, the facts show that Plaintiff satisfies even Defendants' incorrect standard. *See* Pl.'s MSJ Opp'n at 89. Defendants emphasize Mr. Lopach's answer in response to leading and speculative questions that he did not know if voters receive "a *political message*" from VPC's communications. SOAF ¶ 55 (emphasis added). But this answer is far from Defendants' extrapolation that he testified voters do not "discern[] *any* message." Opp'n at 47. Regardless, Mr. Lopach's testimony and his sworn declaration elsewhere make clear that VPC does believe voters receive a message from these communications. *See* SOF ¶¶ 23-27, 37.

13

enough people to indicate voters got the message invents a rule based in neither law nor fact. Opp'n at 49.

### C.        Defendants Misapprehend the Relevant Cases

Defendants have little answer to the key binding decisions in, for example, *Meyer*, *Buckley*, *Chandler*, and *Yes on Term Limits*.  That precedent provides the proper framework for evaluating the scope of the First Amendment protections in this case and how the exacting scrutiny standard should be applied.  *See* Pl.'s Summ. J. Br. at 24-27.  The *Meyer-Buckley* framework is "not limited to the circulation of initiative petitions," and "[i]f anything" the issues here are even closer to the nucleus of protected core political speech because "a person's decision to sign up to vote is more central to shared political life than his decision to sign an initiative petition."  *LWV of Tenn.*, 400 F. Supp. 3d at 724; *see also id.* (noting that a person's decision to vote "inherently 'implicates political thought and expression'" (quoting *Buckley v. Am. Const. Law Found., Inc*., 525 U.S. 182, 195 (1999)).

Defendants attempt to dismiss the other persuasive cases that Plaintiffs cite—and this Court relied upon—as "outlier[s]" or representing the "minority view," Opp'n at 53, but that does not make it so.  Instead, numerous decisions support that the activity involved in *distributing* vote-by-mail or voter registration applications warrants First Amendment protection.  *See* Pl.'s Summ. J. Br. at 24.  For example, just recently in Missouri, a state trial court ruled that "[e]ngaging and assisting voters in registering to vote or applying to cast an absentee ballot is 'the type of interactive communication concerning political change that is appropriately described as "core political speech" . . . an area in which the importance of First Amendment protections is at its zenith.'" Reply Ex. 1, *LWV of Mo. v. Missouri*, 20AC-CC04333 (Cole Cty. Cir. Ct. Oct. 25, 2022) (quoting *Meyer*, 486 U.S. at 420-28).

14

Defendants' specific attempts to distinguish some of the pertinent persuasive authorities are also unfounded.  For example, Defendants diminish the *Priorities USA v. Nessel* litigation by noting that the district court there later denied the plaintiff's motion for a preliminary injunction. *Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 612 (E.D. Mich. 2020) ("*Nessel II*").  Defendants overlook that key differences in the *Nessel II* factual record and the court's misapplication of the exacting scrutiny standard there combine to explain the contrary result.  Notably, the *Nessel II* court reaffirmed its conclusion that the plaintiff's activities were protected core political speech. *Id.*  But the court focused on record evidence of impropriety in the collection and return of completed absentee ballot applications and ruled that the states' purported interests were "sufficiently" important and "sufficiently" related to the limitations in the statute.  *Id.* at 612-14.[10] Such evidence is not present in this case, and regardless is unrelated to Plaintiff's *distribution* of applications.[11]

Defendants' effort to minimize *AAPD v. Herrera* is also unavailing.  Defendants fail to develop their bare conclusion that the front end "voter registration activity" in *AAPD v. Herrera* is "materially different than assistance with absentee ballot applications."  Opp'n at 55.  Instead, the facts show that, like the speech in *AADP v. Herrera*, Plaintiff's distribution of personalized applications similarly represents "public endeavors to assist people [that] are intended to convey a

---

[10] In concluding that the state's interests justified the speech restriction, the court incorrectly employed a less stringent "exacting scrutiny" standard used only in the campaign finance disclosure context.  *Id.* at 614 (applying *Citizens United v. FEC*, 558 U.S. 310, 340 (2010)).  Tenth Circuit precedent here, however, requires strict scrutiny.  *See infra* Part II.A.

[11] Defendants' reference to the *Nessel* court's Rule 12(c) decision oversimplifies the court's reasoning.  Opp'n at 53.  Notably, the court distinguished cases such as *Meyer* and *LWV of Tennessee* because it found that the remaining challenged law "restricts only the possession of a completed ballot application" and imposes no "front-end restriction" on speech such as on distributing "applications to voters."  No. 2:19-CV-13341, 2022 WL 4272299, at *5-7 (E.D. Mich. Sept. 15, 2022) ("*Nessel III*").  The court's decision indicates that front-end activities "helping voters navigate the absentee application process" would be expressive.  *Id.* at *5.

15

message that voting is important, that the Plaintiffs believe in civic participation, and that the Plaintiffs are willing to expend the resources to broaden the electorate," 690 F. Supp. 2d 1183, 1215-16 (D.N.M. 2010), "communicates a message that democratic participation is important," *id.* at 1216; and "take[s] a position and express[es] a point of view in the ongoing debate whether to engage or to disengage from the political process," *id.*  The *AADP v. Herrera* court's reasoning supporting its holding that the First Amendment protected the plaintiffs' registration activities applies with equal force here.[12]

As discussed in Plaintiff's opposition to Defendants' motion, their "overwhelming majority" of contrary authority is a mirage as they nearly all concern form collection and return activity.  *See* Pl.'s Opp'n at 92-94.[13]  These are distinct from front-end advocacy activities, like VPC's distribution of personalized applications, which "bear[] directly on the expressive and associational aspects" of core of get-out-the-vote work that involves "both encouraging and facilitating" civic participation.  *LWV of Tenn.*, 400 F. Supp. 3d at 720; *see also* Pl.'s Opp'n at 92-93.  Thus, Defendants' "overwhelming majority" erodes to two non-binding cases that limit speech protections for distribution activities: *VoteAmerica v. Raffensperger* and *Lichtenstein v. Hargett*. The *Raffensperger* decision is unpersuasive because it takes the incorrect view—contrary to this

---

[12] Though Defendants emphasize that the *AAPD* court ultimately applied *Anderson-Burdick* balancing, it is notable that the *AAPD* plaintiffs accepted that *Anderson-Burdick* applied and did not separately develop the *Meyer-Buckley* strict scrutiny standard in their briefing.  *See, e.g.*, Pl.'s Summ. J. Br. at 16, *AAPD v. Herrera*, 08-cv-702 (D.N.M. July 2, 2010),ECF No. 120; Pl.'s Mot. to Dismiss Opp'n at 5, *AAPD v. Herrera*, 08-cv-702 (D.N.M. Sept. 16, 2009), ECF No. 81.

[13] *See, e.g.*, *DCCC v. Ziriax*, 487 F. Supp. 3d 1207, 1233 (N.D. Okla. 2020) (addressing restrictions on "returning an absentee voter's ballot"); *New Georgia Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1300 (N.D. Ga. 2020) ("collecting ballots does not qualify as expressive conduct"); *Knox v. Brnovich*, 907 F.3d 1167, 1182 (9th Cir. 2018) (rejecting "First Amendment rights of ballot collectors"); *Feldman v. Ariz. Sec'y of State*, 843 F.3d 366, 392 (9th Cir. 2016) ("consider[ing] whether ballot collection is expressive conduct"); *cf. League of Women Voters v. Browning*, 575 F. Supp. 2d 1298, 1319 (S.D. Fla. 2008) (assuming that collecting registrations is expressive).

16

Court's reasoning and Defendants' concession here—that nothing in VPC's application distribution is expressive.  1:21-cv-01390, 2022 WL 2357395, at \*7 (N.D. Ga. June 30, 2022). The decision also misreads precedent, addresses a record unlike the developed facts here, and at times follows internally contradictory reasoning, all of which reduce its persuasiveness.  *Id.* at \*8-12 (ruling, for example, that applications are not platforms for speech but deeming an application disclaimer is compelled speech).  *Lichtenstein* is likewise both distinguishable and unpersuasive for reasons this Court has already identified.  *See VoteAmerica*, 576 F. Supp. 3d at 874-75.

## II.      The Personalized Application Prohibition is Subject to Strict Scrutiny

Despite Defendants' repeated assertions that the Personalized Application Prohibition does not implicate the First Amendment, they fail to present any facts that contravene what this Court previously found—that the Personalized Application Prohibition "significantly inhibits communicati[on] with voters about proposed political change and eliminates voting advocacy by plaintiffs."  *Id.* at 888 (quotations omitted).  Rather, the record makes clear that the Personalized Application Prohibition infringes VPC's First Amendment rights, *see supra* Part I, warranting strict scrutiny and summary judgment for Plaintiff.  And even if lesser scrutiny under the unrelated *Anderson-Burdick* balancing standard applied, the undisputed facts still weigh in favor of guarding Plaintiff's speech against Defendants' nonexistent interests.

### A.      Strict Scrutiny Applies to the Restriction on Plaintiff's Speech

The undisputed facts demonstrate that the Personalized Application Prohibition (i) abridges Plaintiff's core political speech, (ii) is content-based discrimination, (iii) limits Plaintiff's associational activity, and (iv) is unconstitutionally overbroad.  For each of these independently sufficient reasons, the Prohibition is subject to strict scrutiny, not some lesser level of review.

17

1.       The Prohibition Abridges Plaintiff's Core Political Speech

Plaintiff's distribution of personalized applications is core political speech expressing VPC's pro-advance mail voting message to certain, carefully identified Kansas voters. *See supra* Part I.A; Pl.'s Summ. J. Br. at Part I; Pl.'s Opp'n at Part I.A. As such, it is subject to strict scrutiny. *Yes On Term Limits, Inc.. v. Savage*, 550 F.3d 1023,1028 (10th Cir. 2008).

Contrary to Defendants' argument, and as discussed *supra* Part I.A., the existence of other potential means of communication does not make the Prohibition's restriction on VPC "*de minimis*," Opp'n at 61. The Prohibition would instead "have the inevitable effect of reducing the total quantum of speech on [this] important public issue," *VoteAmerica*, 576 F. Supp. 3d at 888-89, and deprive Plaintiff of their First Amendment right to "select what [it] believe[s] to be the most effective means" of advocating its message, *Meyer*, 486 U.S. at 424; SOF ¶ 48.

Disregarding this, Defendants contend that VPC has failed to demonstrate the superior effectiveness of its personalized applications in expressing its pro-advance mail voting, asserting that VPC is consequently not entitled to heightened scrutiny. Opp'n at 57-58. The record does not support this contention. SOF ¶¶ 27-28. But equally important is that VPC is not required to empirically prove the effectiveness of its preferred method of conveying its message—nothing in the applicable and binding precedent imposes such a requirement. *See Meyer*, 486 U.S. at 424 (recognizing First Amendment protection for what plaintiff *believes* to be their most effective means of communication); *Chandler v. City of Arvada*, 292 F.3d 1236, 1244 (10th Cir. 2002) (same). The relevant consideration is VPC's belief—as it consistently attests—that mailing personalized applications is its most effective means of conveying to its intended recipients that

18

advance mail voting is convenient, safe, and beneficial and they should participate through this means.  SOF ¶¶26-28.[14]

Defendants attempt to distinguish this case from controlling precedent by claiming the restriction at issue here is different from restrictions in the petition circulator context.  Opp'n at 60-61.  But Defendants provide no meaningful distinction.  *Id.*  Citizen petitions, like advance ballot applications, are state-created forms that both have an effect in the political process and can be used by advocates to express their speech.  *Meyer*, 486 U.S. at 421; *Buckley*, 525 U.S. at 192.[15]

### 2.    The Prohibition Is Unconstitutional Content Discrimination

This Court previously found that the Personalized Application Prohibition "eliminates voting advocacy by plaintiffs . . . based on the content of their message."  *VoteAmerica*, 576 F. Supp. 3d at 888.  Defendants identify nothing in the record that would change that analysis.  *See* Opp'n at 58-60.  Instead, Defendants again attempt to analogize the Prohibition to the regulation of billboards at issue in *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464

---

[14] Based on *Steen*, Defendants contend that in personalizing applications VPC seeks to not only communicate "but also to succeed in their ultimate goal."  Opp'n at 49-50.  This misunderstands both *Steen* and Plaintiff's argument.  *See supra* Part I.B.  VPC is not advocating for a right to a successful program, but for its "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing."  *Meyer*, 486 U.S. at 424; *see* SOF ¶¶ 26, 28, 30.

[15] Defendants assert that the applications, being "official state forms with no room for any extraneous communications," cannot "serve a communicative purpose."  Opp'n. at 59.  This directly conflicts with *Doe v. Reed*, 561 U.S. 186 (2010), where the Court explicitly found a signature placed on an official state ballot petition form to have a communicative purpose.  561 U.S. at 195.  Defendants' attempt to distinguish *Doe* on the basis that advance ballot applications are distinguishable from petitions are unavailing.  *See* Opp'n at 60.  In *Doe*, the Supreme Court found that by its very inclusion on a ballot petition form, a "signature [] expresses the political view [of the signor] that the question should be considered 'by the whole electorate,'" and thereby constitutes "the expression of a political view implicat[ing] a First Amendment right."  *Doe*, 561 U.S. at 195.  Here, by personalizing the application it sends to a specific voter, VPC is similarly expressing its political view that the recipient whose name has been personalized on the application should complete and submit the application to request an advance mail ballot and participate in the upcoming election.  SOF ¶¶ 26, 37.  The speech at issue in these two contexts is analogous.

19

(2022).  As Plaintiff has previously described, that comparison is inapposite.  *See* Pl.'s Opp'n at 98-99.  The Prohibition is not "'absent a content-based purpose or justification,'" *see* Opp'n at 58 (quoting *City of Austin*, 142 S. Ct. at 1471), as claimed by Defendants, because it defines the regulated speech based on the category of document it covers (SOF ¶ 73) and bans the content VPC uses to convey its message: particular voters' names and addresses.  SOF ¶ 72.

Defendants also liken the Prohibition to the restriction in *Burson v. Freeman*, but that comparison is similarly unhelpful to their argument.  *Burson* concerns an electioneering prohibition near polling locations, which the Supreme Court found to be "a facially content-based restriction on political speech."  504 U.S. 191, 193, 197-98 (1992).  The Personalized Application Prohibition is a similar content-based restriction because "[w]hether individuals may exercise their free speech rights [] depends entirely on whether their speech is related to [the regulated content]." *Id.* at 197.[16]

The Prohibition is also content-discriminatory because it disfavors some speech based on viewpoint and speaker.  *See Reed*, 576 U.S. at 170 (explaining that viewpoint- and speaker-based discrimination are subsets of content-discriminatory laws that unconstitutionally "single[] out" certain speech).  VPC has taken sides in the ongoing national debate around mail voting, and whether it is a trustworthy method for voters to cast their ballots.  SOF ¶ 54.  By limiting communications in favor of mail voting while imposing no limitation on communications against it, the Personalized Application Prohibition is viewpoint discrimination.  *See SD Voice v. Noem*, 432 F. Supp. 3d 991, 996 (D.S.D. 2020); *see also* Pl.'s Summ. J. Br. at Part II.B.

---

[16] The Court ultimately held that the *Burson* restriction was one of the rare cases where a content-based speech restriction was sufficiently narrowly tailored to its compelling state interest of ensuring voters could cast their ballots free from intimidation and fraud.  504 U.S. at 210.  *See infra* at Part III.A.

Appellants' Appendix - Vol. III - 577

Finally, Defendants' Opposition Brief argues that the Prohibition is distinguishable from cases such as *Meyer* because it is not "dictating who can speak" or limiting "the number of voices who will convey the plaintiffs' message." Opp'n. at 60-61 (citations and internal alterations omitted). That is not the case. The Prohibition is instead also content-based discrimination because it explicitly permits the government to choose some speakers who can personalize applications but prohibit others. *See Reed*, 576 U.S. at 170. The law exempts from the Prohibition Kansas's designated Protection and Advocacy for Voting Accessibility (PAVA) non-profit under the Help America Vote Act, *see* 52 U.S.C. § 21061, allowing that civic organization to continue speaking through personalized applications. *See* K.S.A. § 25-1122(k)(4) (stating that "provisions of this subsection shall not apply to" the PAVA designee organization). But it bars civic organizations such as Plaintiff from speaking in the same manner. This is textbook content discrimination based on speaker that facially permits the state to select some categories of speakers to engage in communication but not others. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

### 3. The Prohibition Infringes on Plaintiff's Associational Rights

The Personalized Application Prohibition's limits on VPC's ability to associate for the purposes of assisting voters to request an advance mail voting application violates its First Amendment rights. *VoteAmerica*, 576 F. Supp. 3d at 876; *see also* Pl.'s Summ. J. Br. at 23-24; Pl.'s Opp'n at Part I.A.3. Nothing in the record supports Defendants' hyperbolic claim in response that "most of modern civilization would be immune from regulation" should the Court find for Plaintiff on this question. Opp'n. at 69.

Defendants' uncited assertion that a recipient's ability to ignore VPC's outreach somehow renders it not entitled to First Amendment protection is at odds with the relevant case law that protects activity initiating an association. *See NAACP v. Button*, 371 U.S. 415, 429 (1963). The

21

undisputed facts also show that VPC identifies a specific group of voters to target for its associations and does in fact continue its association with those voters by, for example, tracking who responds to its personalized applications and following up by sending further get-out-the-vote communications. *See* SOF ¶¶ 26, 27, 37. These circumstances are distinct from *City of Dallas v. Stanglin*, relied upon by Defendants, Opp'n at 69, where the asserted associational activity was open to "all who [were] willing to pay the admission fee." 490 U.S. 19, 22, 24 (1989).

Finally, Defendants cite language in *Voting for America v. Andrade* in a misguided attempt to differentiate the Prohibition from restrictions on petition circulation, the associational nature of which is undisputed. Opp'n at 69. This comparison is unhelpful, however, as *Andrade* considered restrictions on *collecting and returning* completed applications, which the Fifth Circuit itself "perceive[d] [as] significant[ly] distinct[]" from "activity that urges citizens to vote," such as the relevant activity here. *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890 898 (5th Cir. 2012).

### 4. The Prohibition is Unconstitutionally Overbroad

Defendants do not dispute that assessing overbreadth requires an examination of whether the law's plain text "chills a substantial amount of protected speech," *New Mexico Youth Organized v. Herrera*, 611 F.3d 669, 677 n.5 (10th Cir. 2010), in comparison to the law's "legitimate and illegitimate applications." *United States v. Hernandez-Calvillo*, 39 F.4th 1297, 1309 (10th Cir. 2022). Yet, they fail to describe any legitimate sweep of the Prohibition. *See* Opp'n at 70-73. To the extent Defendants insinuate a legitimate application of the law to prevent inaccurate applications, it is limited solely to inaccurately pre-filled advance mail ballot applications. *Id.* at 70-71. Despite this, the Prohibition on its face proscribes *all* personalization, regardless of its accuracy or source. *See* SOF ¶ 72. Moreover, the Prohibition punishes *all* personalization with the potential of criminal penalties that "may cause others not before the court

22

to refrain from constitutionally protected speech or expression." *Hernandez-Calvillo*, 39 F.4th at 1302 n.6.

As applied to Plaintiff, Defendants make much of any limited inaccuracies that may have occurred in personalized applications. Opp'n. at 70-71.[17] But the record indicates that the occurrence of any such inaccuracies was, at most, in the single digits of personalized applications sent to Kansas voters. Opp'n, Defendants' Statement of Additional Facts ("SOAF") ¶ 8. It is also undisputed that Plaintiff endeavors to base any personalization upon the state's own records. SOF ¶ 35. And, despite Defendants' continuous misrepresentation to the contrary, the record does not show that any personalization errors were a cause of administrative burden (as compared to receipt of duplicative applications). *See e.g.*, Pl.'s Statement of Additional Facts (ECF No. 156) at ¶¶ 39-42. Thus, Defendants can produce no evidence of errors for over 90% of the hundreds of thousands of personalized applications VPC mailed to Kansas voters, making plain that the Personalized Application Prohibition is unconstitutionally overbroad because it both "punishes a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep," *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)), and "by [its] broad sweep . . . burden[s] innocent associations." *Broadrick*, 413 U.S. at 612.

## B.     *Anderson-Burdick* Does Not Apply

Strict *Meyer-Buckley* scrutiny applies "to cases governing election-related speech rather than 'the mechanics of the electoral process.'" *LWV of Tenn.*, 400 F. Supp. 3d at 722 (quoting *McIntyre*, 514 U.S. at 345). And while Defendants characterize—without citation—the

---

[17] Once again Defendants list other permitted expressive conduct and speech unaddressed by the Prohibition in an effort to mitigate the severity of the Prohibition. Opp'n at 72-73. This is irrelevant, however, as the potential availability of some other forms of expression, which are entirely outside the applications of the law, has no bearing on the law's legitimate or illegitimate applications.

23

Prohibition as regulating "an essential part of the mechanics of the electoral process," Opp'n at 64, it in fact does not apply to voters' (or third parties') *submission* of advance mail ballot application and is not aimed at establishing the time, place, or manner of election administration. Rather, its specific limitation is on third parties "who solicit[] by mail a registered voter to file an application for an advance voting ballot," *i.e.*, those engaged in voting-related advocacy. SOF ¶ 73. The *Anderson-Burdick* framework is inapplicable here because the Personalized Application Prohibition infringes upon Plaintiff's "election-related speech and associations" and thereby "go[es] beyond the intersection between voting rights and election administration, and veer[s] into the area where the First Amendment has its fullest and most urgent application." *VoteAmerica*, 576 F. Supp. 3d at 888 (citations and quotations omitted).

Additionally, and as previously discussed, the Prohibition is unlawful content discrimination. *See supra* Part II.A.2; *see also* Pl.'s Summ. J. Br. at Part II.B; Pl.'s Opp'n at Part II.A.2. The *Anderson-Burdick* framework is therefore inapplicable as it only applies to content-neutral regulations. *VoteAmerica*, 576 F. Supp. 3d at 887; *see also* Pl.'s Opp'n at 103.

Even if considered under the *Anderson-Burdick* balancing approach, however, strict scrutiny still applies because the Personalized Application Prohibition "impacts speech in a way that is not minimal" but is severe. *VoteAmerica*, 576 F. Supp. 3d at 888. Indeed, burdens on core political speech are *per se* severe. *See Buckley*, 525 U.S. at 207 (Thomas, J., concurring); *Yes On Term Limits, Inc.*, 550 F.3d at 1028-29. The record establishes that the Prohibition would eliminate Plaintiff's most effective way of communicating its message, SOF ¶ 48, and Kansas's interest in prohibiting personalized applications is virtually nonexistent. *See infra* Part III; *see also* Pl.'s Summ. J. Br. at Part III; Pl.'s Opp'n at Part III.

**C.      Rational Basis Review Does Not Apply**

24

As has already been discussed at length, VPC's personalization of advance mail ballot applications is protected speech. *See supra* Part I.A; Pl.'s Summ. J. Br. at Part I; Pl.'s Opp'n at Part I.A. As such, rational basis review does not apply. *VoteAmerica*, 576 F. Supp. 3d at 889 ("Plaintiffs have shown a sufficiently heavy burden on First Amendment rights to justify a significantly more demanding standard of review than the 'rational basis' standard . . . .").

## III.   The Prohibition Cannot Survive Strict Scrutiny

Contrary to Defendants' arguments, the Personalized Application Prohibition falls far short of satisfying strict scrutiny or even lesser scrutiny under *Anderson-Burdick*'s sliding scale approach. Defendants fail to—and cannot—prove that the Prohibition is narrowly tailored to serve any compelling state interest, as strict scrutiny requires. *See Republican Party of Minn. v. White*, 536 U.S. 765, 774-75 (2002); *iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014) ("[W]hen a law infringes on the exercise of First Amendment rights, its proponent . . . bears the burden of establishing its constitutionality." (citation omitted)).

### A.   The Court Should Reject Defendants' Mischaracterization of the Applicable Legal Standards

As a threshold matter, the Court should reject Defendants' mistaken understanding of the analyses under strict scrutiny and the *Anderson-Burdick* framework. *See* Opp'n at 65, 68 (arguing that no narrow tailoring framework applies here). The cases Defendants invoke to support their view of the applicable analyses are inapposite. First, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021), has no bearing here. *See* Opp'n at 68 (arguing that the state's "entire system of voting" must be examined "when assessing the burden imposed by a challenged provision"). The *Brnovich* court's discussion that Defendants cite was in the context of § 2 of the Voting Rights Act of 1965, which applies a standard assessing racial discrimination in voting that is entirely distinct from the pertinent First Amendment analysis here. *See Brnovich*, 141 S. Ct. at 2330.

25

Second, Defendants' reliance on *Burson v. Freeman*, 504 U.S. 191 (1992), is likewise misplaced.  *See* Opp'n. at 60.  Instead *Burson* supports Plaintiff because the Court "agree[d] that distinguishing among types of speech requires that the statute be subjected to strict scrutiny."  504 U.S. at 207.  But the *Burson* Court noted the matter presented "the rare case in which we have held that a law survives strict scrutiny," and decided to reduce the level of scrutiny because the challenged law implicated a constitutional "compromise" where two fundamental rights—"the exercise of free speech rights" and "the right to cast a ballot in an election free from the taint of intimidation and fraud"—conflicted.  *Id.* at 211.  There is no analogous conflict of fundamental rights here.  If anything, the scrutiny should be more intensive for the restriction on Plaintiff's speech because VPC exercises its rights in order to reinforce and perpetuate the right to vote.

Thus, the legal standards are not as forgiving for the government as Defendants portray. Whether under strict scrutiny or *Anderson-Burdick*, Defendants must present legitimate, extant interests and show the challenged law is sufficiently tailored to those established interests. Restrictions on core political speech must survive the *Meyer-Buckley* standard that "is well-nigh insurmountable," *Meyer*, 486 U.S. at 425; content-discriminatory laws "are presumptively unconstitutional," *Reed*, 576 U.S. at 163; and the narrow "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms" concerning associational rights, *Button*, 371 U.S. at 438.

Also contrary to Defendants' arguments about *Anderson-Burdick*, tailoring is required because "the seriousness of the injury increases 'the rigorousness of [the] inquiry into the propriety' of the [state's] justifications." *Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270, 1283–84 (10th Cir. 2019) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).  For severe burdens on the plaintiff's rights, as is the case here, the law "must be 'narrowly tailored to serve a compelling state interest.'" *Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018)

26

(quoting *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)).  And even if an intermediate scrutiny standard applies, Defendants must still prove the Prohibition is sufficiently tailored.  The *Anderson* Court itself struck down a ballot access law as unconstitutional in part because "its coverage is both too broad and too narrow."  *Anderson v. Celebrezze*, 460 U.S. 780, 805 (1983).

Thus, under the correct First Amendment analysis here, the State must carry a "heavy burden of demonstrating that a [speech] restriction is 'the least restrictive means among available, effective alternatives.'"  *Peck v. McCann*, 43 F.4th 1116, 1135 (10th Cir. 2022) (quoting *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 665-66 (2004)); *accord United States v. Alvarez*, 567 U.S. 709, 729 (2012) (plurality) ("[W]hen the Government seeks to regulate protected speech, the restriction must be the 'least restrictive means among available, effective alternatives.'").  The State must show "that no alternative exists that is both 'less restrictive' than the existing law and would effectively achieve the state's compelling interest."  *Peck*, 43 F.4th at 1135.  In other words, "by demanding a close fit between ends and means, the [First Amendment] tailoring requirement prevents the government from too readily sacrific[ing] speech for efficiency."  *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citations and quotations omitted).

B. **The Record Contains No Evidence Demonstrating that the Prohibition Serves the Interests Defendants Claim It Does**

Defendants claim that the Prohibition reduces voter confusion, facilitates efficient election administration, enhances public confidence, and deters voter fraud.  Opp'n at 56. However, as discussed in Plaintiff's Opening Brief and opposition to Defendants' motion for summary judgment, the record contains insufficient admissible evidence to establish that the Prohibition serves any of these interests.  *See* Pl.'s Summ. J. Br. at 34-43; Pl.'s Opp'n  at 105-09.

As discussed in Plaintiff's opening brief, under strict scrutiny, courts must look to the "actual considerations that provided the essential basis for the [decision-making], not post hoc

27

justifications the legislature in theory could have used but in reality did not." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 179 (2017); *accord McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 190 (D. Mass. 2015) ("[A]fter-the-fact explanations cannot help a law survive strict scrutiny" under the First Amendment.").

Tellingly, the legislative history for the Personalized Application Prohibition makes no mention of any of the interests Defendants proffer. Indeed, the legislative record does not concern personalization at all. SOF ¶ 77. Given the legislature's silence on these interests, Defendants can offer little more than conclusory statements about the Prohibition's connection to their purported state interests. *See, e.g.*, Opp'n at 63 (asserting that the Prohibition "facilitates more efficient election administration," "minimizes voters' confusion," "enhances confidence in the electoral process," and "minimizes the possibility of voter fraud" without any citation to the record or even to legal authority). A restriction on speech and expressive conduct, "juxtaposed against [] paltry record evidence of real, non-speculative harms ameliorated by the" restriction—as is the case here—cannot survive strict scrutiny. *Brewer*, 18 F.4th at 1226. Put another way, Defendants have failed to demonstrate that the "recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality op.) (citations omitted).

Recognizing that nothing in the record mentions the personalization of applications, Defendants attempt to conflate two distinct issues—voters and elections officials' receipt of multiple advance mail ballot applications, on one hand, and the personalization of applications, on the other. *See* Opp'n at 57, 66, 67 (repeatedly invoking the phrase "inaccurate and duplicate applications"); *see also* Pls.' Opp'n at 105 (citing at least six instances in which Defendants deploy the same phrase). This is likely because the legislative history *does* mention voters' receipt of multiple advance mail ballot applications. *See e.g., supra*, Plaintiff's Reply to Defendants

28

Response to SOF ¶ 77. But the Personalized Application Prohibition does not concern this subject—nothing in the Prohibition prevents voters, for example, from receiving multiple successive applications. Defendants attempt to link the two issues in only one sentence of their opposition: "As Andrew Howell and Debbie Cox noted, many voters submitted duplicate applications to county election offices because, after receiving pre-filled applications, they believed that they were required to return them even if they had already submitted another one." Opp'n at 65. This statement omits why Defendants' witnesses say these voters thought they had to return the applications they had received—not because they were personalized, but rather purportedly because (a) they thought *a county election office* had mailed the applications (due to the return envelope, not the personalized information), *see* Opp'n Ex. S at 269:14-270:1 (testifying that Mr. Howell spoke with voters where the voters said *because the applications were sent "with a return envelope* from [Mr. Howell's] office, they thought they had to send in" (emphasis added)); or (b) they knew the application was from a third-party, but they may have thought they had to submit all applications they received, *see* Opp'n Ex. U ¶ 19 (stating that voters called "to ask whether they were required to submit the duplicate application"). *See also* Opp'n Ex. A ¶ 41 (stating that many voters told Mr. Howell that they thought his office was responsible for sending the applications and the voters believed they were required to return every application they received). Defendants cannot point to any evidence that voters were confused by applications *because they were personalized*. And, in all events, the undisputed evidence does not support such conflation between personalization and duplicates, and attempting to tie the distinct topics is insufficient to meet strict scrutiny or any lesser level of review.

## C.   Defendants' Purported Interests Do Not Withstand Scrutiny

Upon closer inspection, each interest Defendants offer in support of the Prohibition—(1) reducing voter confusion and enhancing public confidence in the electoral system, (2) facilitating

29

efficient election administration, and (3) deterring voter fraud—fails to withstand scrutiny.  *See* Opp'n at 56.  Each alleged interest is addressed below in turn.

*First,* especially given the lack of admissible evidence concerning purported voter confusion about personalized applications, *see* Pl.'s Opp'n at 106, the Prohibition cannot survive constitutional scrutiny on the ground that it minimizes voter confusion.   The Supreme Court has held that freedom of speech, which "embraces the right to distribute literature . . . and necessarily protects the right to receive it," "may not be withdrawn even if it creates the minor nuisance for a community."  *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943).  The Court has "never held that the government itself can shut off the flow of mailings to protect those recipients who might potentially be offended."  *Bolger*, 463 U.S. at 72.

Moreover, the Prohibition is not narrowly tailored to serve this interest because other less drastic means could be used to minimize voter confusion.  For example, VPC already includes in its mailers an option for recipients to unsubscribe, and Kansas could codify this requirement into law or add further regulations to facilitate individual Kansans to unsubscribe.[18]  *See, e.g.*, *Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728, 737 (1970) (upholding law permitting individuals to unsubscribe from commercial mailers in part because giving *individuals* the power to unsubscribe "avoid[s] possible constitutional questions that might arise from vesting the power to make any discretionary evaluation of the material in a governmental official").

*Second*, courts have repeatedly held that fundamental rights, such as the right to free speech, cannot be sacrificed for the sake of mere administrative convenience.  *See Buckley*, 525 U.S. at 192 (speech restrictions were not narrowly tailored to serve, *inter alia*, purported

---

[18]   VPC also clearly identifies itself in its mailers. SOF ¶ 9.  Such identification is now also required under HB 2332, and VPC does not challenge this requirement.  K.S.A. § 25-1122(k)(1).

Appellants' Appendix - Vol. III - 587

government interest of administrative efficiency); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 930 (9th Cir. 2004) (purported interest in promoting administrative efficiency did not outweigh free speech interests); *cf. Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (the right to vote "must not be sacrificed to administrative chicanery, oversights, or inefficiencies"). Any asserted "[a]dministrative convenience . . . is not usually enough to justify what is . . . a significant restriction of speech rights." *Bernbeck v. Moore*, 936 F. Supp. 1543, 1566 (D. Neb. 1996); *see also Riley*, 487 U.S. at 795 ("[W]e reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency").

The evidence also contradicts Defendants' argument that the Prohibition facilitates efficient election administration. Kansas county election officials indicated their support for the benefits of personalized applications, and at least one testified that, if not for budgetary constraints, his office would prefer to personalize applications sent to voters. SOF ¶ 30. At least one county did in fact personalize applications that it sent to voters, prefilling more information than VPC does, because staff believed doing so "makes it easier for the voter and reduces mistakes that [staff] then ha[s] to work harder to fix on the back end." SOF ¶¶ 31-32. And, county officials also testified that their offices were able to and did in fact process applications with minor errors or variations in names or addresses. *See* Pl.'s Opp'n at 107-08.

Moreover, Defendants attribute far too much of the purported difficulties in the 2020 election to Plaintiff's personalization of applications. The 2020 election was a challenge because numerous Kansans switched to voting by mail for the first time in the middle of a global pandemic, which was fraught with difficulties for both the election and the society in which it took place. *See, e.g.*, SOF ¶¶ 40-41, 50-52. This context matters when considering Defendants' stated interests, and further shows the weak tie between 2020 election complications and the discrete action of personalized applications. In addition, voters had other valid concerns about mail delays,

31

which contributed to the volume of applications sent and submitted. SOF ¶¶ 59-61; *see also New York v. Biden*, No. 20-CV-2340 (EGS), 2022 WL 5241880, at \*13 (D.D.C. Oct. 6, 2022) (discussing evidence of "nationwide delays" in election mail service in 2020 and permanently enjoining U.S. Postal Service's unlawful policy changes). But again, that volume of applications has nothing to do with VPC's personalization of advance mail voting applications—the prohibited activity here.

*Third*, Defendants fail to demonstrate that the Prohibition is connected to any documented problems of voter fraud. Under strict scrutiny, Defendants must demonstrate that the Prohibition is "vital to ensuring the integrity" of elections. *Chandler*, 292 F.3d at 1243. Here, Defendants fail to demonstrate any connection between the Prohibition and voter fraud. Indeed, Defendants do not—and cannot—offer evidence of *any* voter fraud, let alone any fraud connected with personalized advance mail ballot applications, especially when the advance mail voting process contains multiple safeguards against fraud. *See* SOF ¶¶ 64-66; *see also Buckley*, 525 U.S. at 210 (Thomas, J., concurring) (concluding that "the State has failed to satisfy its burden of demonstrating that fraud is a real, rather than a conjectural, problem").

Finally, Defendants attempt to cite communications from other states regarding VPC's mailer communications. Opp'n at 66. Defendants misapply the relevant factual contentions and extrapolate voter registration programs to vote-by-mail advocacy, though they otherwise attempt to distinguish the two programs. *Id.* at 54, 55, 59. Regardless, Defendants' attempts to focus on alleged conduct outside of Kansas fails to appreciate the applicable First Amendment standards, which requires a localized analysis of the government interests. In *Brewer*, for example, the Tenth Circuit required proof of "traffic safety problems *in Albuquerque*" to justify a speech restriction, not general issues in other jurisdiction that are "too generic or isolated" to bear on local issues. 18 F.4th at 1227-35 (emphasis added). Other courts have likewise required concrete and localized

32

support for the state interest to justify a speech restriction.  *See McCullen*, 573 U.S. at 490 (requiring concrete, case-specific evidence under strict scrutiny); *Yes On Term Limits*, 550 F.3d at 1029 (same).  Similar requirements apply under *Anderson-Burdick* because even if the proffered state interests are "legitimate in the abstract," the government must establish "concrete evidence that 'those interests make it necessary to burden the plaintiff's rights' in this case." *Fish v. Schwab*, 957 F.3d 1105, 1132 (10th Cir. 2020) (citing *Burdick*, 504 U.S. at 434).

In sum, Defendants' purported interests cannot sustain the Personalized Application Prohibition under strict scrutiny or even lesser scrutiny under *Anderson-Burdick*.

## CONCLUSION

For the foregoing reasons, and as further stated in Plaintiff's moving brief and opposition brief to Defendants' motion, the Court should grant summary judgment in favor of Plaintiff.

Date: November 18, 2022

Respectfully Submitted,

By:      /s/ Mark P. Johnson

Jonathan K. Youngwood, *Pro Hac Vice*
Meredith D. Karp, *Pro Hac Vice*
Brooke Jarrett, *Pro Hac Vice*
Nicole A. Palmadesso, *Pro Hac Vice*
**Simpson Thacher & Bartlett LLP**
425 Lexington Avenue
New York, New York 10017
Telephone: 212-455-2000
Facsimile: 212-455-2502
E-mail: jyoungwood@stblaw.com
E-mail: meredith.karp@stblaw.com
E-mail: bonnie.jarrett@stblaw.com
E-mail: nicole.palmadesso@stblaw.com

*Attorneys for Plaintiffs*

Mark P. Johnson, Kansas Bar #22289
**Dentons US LLP**
4520 Main Street, Suite 1100
Kansas City, Missouri 64105
Telephone: 816-460-2400
Facsimile: 816-531-7545
E-mail: mark.johnson@dentons.com

Danielle Lang, *Pro Hac Vice*
Alice C.C. Huling, *Pro Hac Vice*
Hayden Johnson, *Pro Hac Vice*
Christopher Lapinig, *Pro Hac Vice*
**Campaign Legal Center**
1101 14th Street, NW, Suite 400
Washington, DC 20005
Telephone: 202-736-2200
Facsimile: 202-736-2222
E-mail: dlang@campaignlegalcenter.org
E-mail: ahuling@campaignlegalcenter.org
E-mail: hjohnson@campaignlegalcenter.org

33

E-mail: clapinig@campaignlegalcenter.org

*Attorneys for Plaintiffs*

34

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on this 18th day of November 2022, a copy of the

foregoing document was emailed to:

> Bradley J. Schlozman (KS Bar #17621)
> Scott R. Schillings (Bar #16150)
> Hinkle Law Firm LLC
> 1617 North Waterfront Parkway, Suite 400
> Wichita, KS 67206
> Tel: (316) 267-2000
> Fax: (316) 630-8466
> bschlozman@hinklaw.com
> sschillings@hinklaw.com
>
>
> *Attorneys for Defendants*

*/s/Mark P. Johson*

Mark P. Johnson
*Attorney for Plaintiffs*

35

## CLERK'S COURTROOM MINUTE SHEET – CIVIL

VOTEAMERICA and
VOTER PARTICIPATION CENTER,

       Plaintiffs,

   v.                                   Case No:   21-cv-2253-KHV

SCOTT SCHWAB,
DEREK SCHMIDT, and
STEPHEN HOWE

       Defendants.

| **Appearing for Plaintiff(s):** | **Appearing for Defendant(s):** |
|---|---|
| Mark Johnson | Brad Schlozman |
| Jonathan Youngwood | Scott Schillings |
| Alice Huling | |
| Christopher Lapinig | |
| Nicole Palmadesso | |
| Danielle Lang | |
| Brooke Jarrett | |

| **JUDGE:** | Kathryn H. Vratil | **DATE:** | 1/24/2023 |
|---|---|---|---|
| **CLERK:** | Audra Harper | **TAPE/REPORTER:** | Nancy Wiss |

### MOTION HEARING

The parties appear by counsel.

Before the Court is Joint Motion to Remove from Trial Docket (Doc. #172), filed January 20, 2023. For reasons stated on the record, the Court OVERRULES the motion.

Defendant's Motion for Summary Judgment Regarding Counts I-III (Doc. #141) and Plaintiff's Motion for Summary Judgment (Doc. #144), both filed October 14, 2022, are hereby OVERRULED but will be considered as trial briefs in resolving the issues at trial on March 13, 2023. Disputed facts shall be considered as proposed findings. On this written record, the case is not in a proper position for disposition.

Plaintiff Voter Participation Center's Motion to Exclude the Testimony and Report of Kenneth J. Block (Doc. #148), filed October 15, 2022, is OVERRULED. The expert's analysis is necessary to assist the Court and his methodology is not seriously questioned. Any objections to his conclusions can be raised contemporaneously.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VOTEAMERICA and
VOTER PARTICIPATION CENTER,

   *Plaintiffs,*

vs.

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
DEREK SCHMIDT, in his official capacity as
Attorney General of the State of Kansas; and
STEPHEN M. HOWE, in his official capacity as
District Attorney of Johnson County,

   *Defendants.*

Case No. 2:21-cv-02253-KHV-GEB

## JOINT REVISED UNCONTROVERTED AND CONTROVERTED FACTS

The Parties respectfully submit the following stipulation of uncontroverted and controverted facts in response to and in accordance with the Court's November 15, 2022 Order (ECF No. 160), and in connection with the conference held with the Court on January 24, 2023, directing the Parties to confer in good faith and prepare a statement of all uncontroverted facts to which the parties can stipulate.

2

# TABLE OF CONTENTS

I.      REVISED UNCONTROVERTED FACTS....................................................................... 3

II.     REVISED CONTROVERTED FACTS ........................................................................... 28

## I.   REVISED UNCONTROVERTED FACTS

The following enumerated list of revised uncontroverted facts is integrated from and between Plaintiff's and Defendants' Statements of Facts (ECF Nos. 151 and 154) and Statements of Additional Facts (ECF Nos. 155 and 156) in Support of Plaintiff's and Defendants' Motions for Summary Judgment, respectively. These facts have been negotiated and agreed to by the Parties.

1.   Plaintiff Voter Participation Center is a 501(c)(3) non-profit, nonpartisan organization founded in 2003. *See* Pre-trial Order Stipulated Facts, ECF No. 140 ("PTO-SF") ¶ 2(a)(vii); PXM 6 (Deposition of Thomas Lopach (May 18, 2022) ("Lopach Tr.")) at 57:25-58:1, 58:24-59:4; PXO 14 (Declaration of Thomas Lopach in Support of Plaintiff Voter Participation Center's Motion to Dismiss (Oct. 13, 2022) ("Lopach Decl.")) ¶ 2.[1]

2.   Plaintiff VPC's core mission is to promote voting among traditionally underserved groups, including young voters, voters of color, and unmarried women at rates commensurate with voters in other groups. *See* PTO-SF ¶ 2(a)(viii); PXM 7 (Deposition of Lionel Dripps (Aug. 30, 2022) ("Dripps Tr.")) at 111:25-112:9; PXM 6, (Lopach Tr.) at 153:12-16, 96:14-17, 204:3-6; PXM 8 (Sept. 8, 2021 Hearing on Plaintiffs' Motion for Preliminary Injunction ("9/8/2021 PI Tr.")) at 50:9-20 (Thomas Lopach testimony); PXO 14 Lopach Decl. ¶¶ 7-11, 28.

3.   VPC believes that our country's democracy is better off when more eligible voters can participate and vote for the candidates of their choice and encouraging and assisting voters to participate in elections through mail voting is one of the best ways to ensure a robust democracy. PXO 14 (Lopach Decl.) ¶¶ 8, 10.

4.   VPC believes and supports that mail voting expands participation opportunities among its target voters, some of whom may not have the ability and availability to vote in person or the resources to navigate the mail voting application process. PXO 14 (Lopach Decl.) ¶ 10.

---

[1] References herein to "PXM" refer to Plaintiff's Exhibits Annexed to the Declaration of Mark P. Johnson in Support of Plaintiff Voter Participation Center's Motion for Summary Judgment, dated October 14, 2022.

References herein to "PXO" refer to Plaintiff's Exhibits Annexed to the Declaration of Mark P. Johnson in Support of Plaintiff Voter Participation Center's Opposition to Defendants' Motion for Summary Judgment, dated November 4, 2022.

5.      VPC primarily encourages these voters to register and to participate in the electoral process through direct mailings. *See* PTO-SF ¶ 2(a)(ix); PXM 6 (Lopach Tr.) at 146:24-147:15; PXO 14 (Lopach Decl.) ¶¶ 7, 13.

6.      VPC has stated that it considers providing young voters, voters of color, and unmarried women—who may have fewer resources for, and less access to, printing and postage— with the necessary personalized applications to be key to its effectively advocating its message. PXM 6 (Lopach Tr.) 185:25-186:3; PXM 8 (9/8/2021 PI Tr.) 59:23-60:20; Lopach Decl. ¶¶ 10, 21, 23, 28.

7.      Mr. Lopach testified that VPC believes sending personalized advance mail ballot applications "increases voter engagement, which [Mr. Lopach] think[s] would be a broad associational base with potential voters in Kansas." PXM 6 (Lopach Tr.) 167:22-168:15; *see also* PXM 14 (Lopach Decl.) ¶¶ 28-29.

8.      Mr. Lopach testified that, other than the restriction on inserting a voter's name and address on an advance voting ballot application, nothing in the Pre-Filled Application Prohibition restricts VPC from encouraging individuals to participate in the democratic process, instructing them how to obtain or vote an advance ballot, encouraging them to do so, or communicating any other message in the mailers sent to targeted voters.  DXM G at 183:9-187:19.[2]

9.      Mr. Lopach testified that "there is nothing in the personalized application prohibition that keeps [VPC] from associating with other persons or organizations to encourage the use of advanced mail voting[.]"  DXM G at 191:4-14.

10.     VPC understands that the Personalized Application Prohibition would limit its associational activity with voters. PXM 6 (Lopach Tr.) at 190:10-12.

11.     Douglas County Elections Director Jamie Shew testified that Douglas County sends advance mail ballot applications to registered voters, as do "state parties, both from the Democratic and Republican parties", "larger campaigns", "and larger organizations", and other "organized effort[s]" where Mr. Shew is unable to identify the sender.  PXM 3 (Deposition of Jameson Shew (Sept. 15, 2022) ("Shew Tr.")) at 22:23-24:6.  Kansas Secretary of State Elections Director Bryan Caskey testified that he was aware of VPC and the Democratic Congressional Campaign Committee sending advance mail ballot applications to Kansas voters.  PXM 8 (9/8/2021 PI Tr.) at 70:18-25 (Bryan Caskey testimony).

12.     VPC's message is that advance mail voting is safe, secure, accessible, and beneficial. PXO 14 (Lopach Decl.) ¶ 9.

---

[2] References herein to "DXM" refer to Defendants' Exhibits Annexed Their Motion for Summary Judgment, dated October 28, 2022.

13. VPC encourages registered Kansans to participate in this manner by mailing voters a package communication that advocates for mail voting and provides a personalized advance mail ballot application. *See* PTO-SF ¶ 2(a)(x); PXM 7 (Dripps Tr.) at 124:14-125:2; PXO 14 (Lopach Decl.) ¶¶ 12, 17-18, 21, 23-24.

14. Providing young voters, voters of color, and unmarried women with the necessary personalized applications provides the voter simple access to an advance mail ballot application that is personalized with required information. PXO 14 (Lopach Decl.) ¶¶ 18, 21.

15. VPC believes that distributing personalized advance mail ballot applications as a part of its advance mail voting mailer conveys its viewpoint that voting by mail is convenient and a good option for the recipient to participate in democracy. PXM 6 (Lopach Tr.) at 149:11-13, 150:13-19, 151:14-16, 183:9-184:1, 185:21-186:3, 188:1-4; PXM 7 (Dripps Tr.) at 192:5-13; PXM 8 (9/8/2021 PI Tr.) at 44:24-45:7, 49:17-24 (Thomas Lopach testimony); PXO 14 Lopach Decl. ¶¶ 9, 23-24, 66.

16. VPC is a data-driven operation. It tracks recipient responses to its communications and conducts randomized control trials to evaluate the effectiveness of its mailings. PXM 7 (Dripps Tr.) at 77:24-79:17, 116:3-18; PXM 6 (Lopach Tr.) at 14:15-20:13, 33:2-35:3, 112:13-24, 116:17-117:12, 155:1-157:15, 165:1-166:9, 170:7-174:9.

17. Mr. Lopach and Mr. Dripps both testified that VPC engages voting behavior and quantitative research professionals, including but not limited to Christopher B. Mann, an associate professor of political science at Skidmore College, to analyze the efficacy of every aspect of its direct mail programs. PXM 14 (Lopach Decl.) ¶ 16; PXM 6 (Lopach Tr.) at 13:15-16:10; PXM 7 (Dripps Tr.) at 159:20-160:16.

18. VPC believes that the Personalized Application Prohibition would prevent it from what it believes is its most effective means of conveying its pro-mail voting message, and as such would make VPC reconsider its resource allocation decision to convey its communications in Kansas if it cannot speak in this manner. (Lopach Decl.) ¶¶ 55-66; *see also id.* ¶ 18 ("[p]ersonalizing the applications with pre-filled information drawn from states' voter registration files best ensures that VPC's message and assistance are both effective and accurate"); PXM 6 (Lopach Tr.) at 150:14-19, 151:14-16, 185:21-186:3, 188:1-4; PXM 8 (PI Hearing Tr.) at 44:24-45:7, 49:17-24, 60:11-20 (Thomas Lopach testimony).

19. Defendant Kansas Secretary of State Scott Schwab does business in and is an elected official in the state of Kansas. *See* PTO-SF ¶ 2(a)(i).

20. Defendant Schwab is the Chief Election Officer for the State of Kansas. PTO-SF ¶ 2(a)(ii).

21. As the Chief Election Official for the State of Kansas, Defendant Schwab is responsible for overseeing all Kansas elections and administering the State's election laws and regulations. Defendant Schwab also issues guidance and instruction to county election officers on a range of election procedures and requirements. *See* PTO-SF ¶ 2(a)(iii) (citing K.S.A. 25-124).

22.    Kansas law permits Defendant Schwab to adopt rules and regulations related to advance voting, including the general form of advance voting ballots and applications for advance mail voting. K.S.A. 25-1131, 25-1121(a)-(b), 25-1122d(c); *see also* HB 2332, Session of 2021 (Kan.), §§ 3(k)(2), (m).

23.    Defendant Schwab, as Kansas's Secretary of State, is responsible for maintaining an online voter registration database.  52 U.S.C. § 21083(a)(1)(A).  All additions, deletions, and modifications of records in the database are performed by county election officials.  DXO HH (Deposition Excerpts of Bryan Caskey ("Caskey Tr. Excerpts") at 40:5-42:17.[3]

24.    The Kansas state voter registration database is known as the Election Voter Information System ("ELVIS").  *See* PTO-SF ¶ 2(a)(xi).

25.    Election officials in Kansas's 105 counties are responsible for maintaining the voter files for voters within their respective counties and ELVIS reflects the voter data maintained by those county officials.  *See* PTO-SF ¶ 2(a)(xii).

26.    When a voter registration application is received by the respective county election office, they input that voter's registration information into the state's central database by hand and thereby create a voter record in ELVIS.  PTO-SF ¶ 2(a)(xiii).

27.    ELVIS is a dynamic system that reflects in real-time changes that are made to individual voter files. County election officials input information on voters, including the voters' registration and advance mail ballot information.  PTO-SF ¶ 2(a)(xiv); DXM A (Andrew Howell Affidavit ("Howell Aff.")) ¶ 10; DXM C (Bryan Caskey Deposition "Caskey Tr.")) at 42:14-43:8.

28.    To vote by mail in Kansas a voter generally must complete an advance voting ballot application and return it to the county election office in the county in which the voter is registered to vote.  *See* PTO-SF ¶ 2(a)(xxx).  However, voters who are on the permanent advance voting list or who vote by mail pursuant to the Uniformed and Overseas Citizens Absentee Voting Act are not required to file an advance voting ballot application every time they wish to vote by mail.  See id. ¶ 2(a)(xxxiii).

29.    If an advance voting ballot application has been timely submitted to the county election office, an individual working in such office processes the application and, if the county accepts the application, the county will mail the voter an advance ballot packet. *See* PTO-SF ¶2(a)(xxxi).

30.    Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the General Election and the Tuesday of the week preceding such General Election.  PTO-SF ¶ 2(a)(xxxii); K.S.A. 25-1122(f)(2).

---

[3] References herein to "DXO" refer to Defendants' Exhibits Annexed to Their Response to Plaintiff's Motion for Summary Judgment, dated November 4, 2022.

31. Other than voters entitled to receive ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq.*, counties cannot transmit advance ballots to voters prior to the 20th day before the election for which an application has been received. K.S.A. 25-1123(a) and 25-1220.

32. With respect to advance voting ballot applications that are received by the county election office on or after the 20th day before the election, the county generally must process them within two business days of their receipt. K.S.A. 25-1123(a). PTO-SF ¶ 2(a)(xxxiii). If an advance voting ballot application is timely submitted to the county election office, an official in such office processes the application and, if the county accepts the application, the county will mail the voter an advance ballot packet. PTO-SF ¶ 2(a)(xxxi).

33. If a voter submits an inaccurate or incomplete application, adherence to the two-day policy is not always possible. Mr. Howell testified that Shawnee County officials will attempt to contact the voter and "cure" the application and still meet that deadline. DXO KK (Deposition Excepts of Andrew Howell ("Howell Tr. Excerpts")) at 188:13-189:22. But it is not always possible.

34. If an advance mail ballot application does not contain sufficient information, does not match the voter file, or if the information is illegible, or if there is a signature mismatch or missing signature, the election office confirms the validity of the application before accepting it. K.A.R. § 7-36-7 and 7-36-9; K.S.A. §§ 25-1122(e), 25-1124; PXM 1 (Deposition of Connie Schmidt (Sept. 16, 2022) ("Schmidt Tr.")) at 91:8-17, 93:9-13, 110:24-111:16; PXM 2 (Deposition of Deborah Jean Cox (Sept. 9, 2022) ("Cox Tr.")) at 52:14-53:6, 56:22-57:11, 72:6-16; PXM 3 (Shew Tr.) at 51:12-13; PXM 4 (Deposition of Andrew Howell (Sept. 14, 2022) ("Howell Tr.")) at 66:13-25, 77:12-78:17, 132:17-133:21, 138:5-11, 147:8-148:23; PXM 5 (30(b)(6) Deposition of the office of Kansas Secretary of State (May 24, 2022) ("KS SOS Tr.")) Ex. 9 to PXM 5 (Kansas Election Standards on Election Administration) at KS000167VA.

35. In such cases, county election offices must attempt to contact the voter to obtain the correct information and cure the application. PXM 1 (Schmidt Tr.) at 130:14-131:22; PXM 2 (Cox Tr.) at 69:12-21; PXM 3 (Shew Tr.) at 40:6-14.

36. If the voter cannot be contacted, or it would be impracticable to make contact before the election, the voter will be mailed a provisional ballot. K.A.R. § 7-36-7(f); PTO-SF ¶ 2(a)(xxxiv).

37. All of the information on an advance voting ballot application must precisely match the information in ELVIS in order for the county election office to process the application without having to contact the voter to cure mismatches or discrepancies. Only the most clearly inadvertent mismatches (e.g., minor misspelling of street name, such as omitting the letter "e" in "George" in the street "George Williams Way," or signing as "Jim" despite being registered as "James") will be overlooked. DXM A (Howell Aff.) ¶ 25; DXM B (Jamie Shew Deposition ("Shew Tr.")) at 35:6-40:5; 48:6-51:7.

38. Once an advance voting ballot application has been received and processed by the county election office, the fact and date of such processing is recorded in ELVIS. The office also documents in ELVIS the date on which it transmits the regular or provisional ballot to the voter. *See* PTO-SF ¶ 2(a)(xxxv).

39. County election offices also document in ELVIS whether (and when) a voter has returned an advance ballot that was transmitted to the voter. DXM A (Howell Aff.) ¶ 23; DXM C (Caskey Tr.) at 48:17-49:18.

40. During the deposition of former Johnson County Elections Director Connie Schmidt, she was asked "when your office receives advance mail voting applications, and one is typed and one is handwritten, is the any difference in the level or difficulty of processing those applications?" In response she testified "I think that would be obvious" explaining that "[s]ometimes handwriting can be hard to read." PXM 1 (Schmidt Tr.) at 85:6-14. When asked, County Elections Director Debbie Cox testified that she would normally agree "that at least in some ways, pre-filled application -- prefilled information increases the likelihood and the ease that [her] office can match information between the voter file and application." PXM 2 (Cox Tr.) at 150:9-14. Douglas County Elections Director Jamie Shew testified that if not for budgetary constraints, his office would prefer to personalize the applications sent to voters with their prefilled information. PXM 3 (Shew Tr.) at 24:15-20.

41. Connie Schmidt testified that "hard to read" handwriting does not generally "increase the amount of time for the application processing" due to other information on an application. DXO FF at 85:15-85:20.

42. Shawnee County Election Commissioner Andrew Howell testified "[p]enmanship was not usually an issue" in processing advance ballot applications and that he did not "find that to be a significant driver of errors" in applications submitted to his office. DXO KK at 270:22-271:12.

43. Mr. Howell, Ms. Cox, and Mr. Shew all noted that county election officials in their respective counties will not send an advance ballot to a voter who submitted an application with an erroneous middle initial or suffix. Such an application will instead enter the curative process. DXM A (Howell Aff.)¶¶ 11, 25; DXM U (Debbie Cox Affidavit ("Cox Aff.")) ¶¶ 12, 24; DXM B (Shew Tr.) at 48:25-50:7.

44. In 2020, Johnson County sent applications for the primary and general elections to all voters in the county, opting to expend additional resources to personalize the applications and in fact prefilled more information than VPC's communications by also adding the voter's date of birth. *See* PXM 1 (Schmidt Tr.) at 222:10-227:7, 234:23-236:20, 284:2-8; PXM 9 (Exhibit 32 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 32")) (Apr. 16, 2020 emails); PXM 10 (Exhibit 35 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 35")) (2020 prefilled Johnson County advance mail ballot application mailer); PXM 11 (Exhibit 38 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 38")) (same).

45. The process for personalizing applications adds additional steps and cost to the application mailing process. PXO 14 (Lopach Decl.) ¶ 21; PXM 2 (Cox Tr.) at 24:7-14.

46.   Staff in the Johnson County Elections Office decided to "pre-fill as much of the [voter's] information from their registrant record as possible," PXM 12 (Exhibit 31 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 31")) at 3 (Apr. 2, 2020 emails), believing that doing so "makes it easier for the voter and reduces mistakes that we then have to work harder to fix on the back end," PXM 9 (Schmidt Tr. Ex. 32) at 1 (Apr. 16, 2020 emails).

47.   VPC, together with its 501(c)(4) sister organization, the Center for Voter Information ("CVI"), mailed advance voting ballot application packets to approximately 507,864 Kansas voters in connection with the 2020 General Election.  DXM E (VPC's Advance Voting Ballot Application Mailing Statistics for 2020 General Election); DXM F (Dripps Tr.) at 175:6-176:24, 177:24 178:15; DXM G (Lopach Tr.) at 108:7-19, 123:17-124:6.

48.   VPC's mailer communications sent to Kansas voters also included a letter encouraging the voter to request and cast an advance ballot with instructions on how to do so, or if they choose, to opt out of future VPC communications; a step-by-step guide and other assistance for how voters may submit the included application; and a postage-paid envelope addressed to the voter's county election office. PXO 14 (Lopach Decl.) Ex. A at VPC000001-005 (2020 VPC mailer). PTO-SF ¶ 2(a)(xxxviii).  A sample of VPC's cover letter, pre-filled advance voting ballot application, and pre-addressed envelope that it sent in 2020 can be found at Defendants' Exhibit I.  *See* DXM I (Sample of VPC Cover Letter with Pre-Filled Ballot Application).

49.   The letter's opening paragraph specifically refers to "the enclosed advance voting application already filled out with [the voter's] name and address" and mentions the personalization in the closing "P.S." message: "We have already filled in your name and address on the enclosed form. Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope."  *See* PXO 14 (Lopach Decl.) Ex. A at VPC000002.  The step-by-step guide was printed on the reverse side of the enclosed personalized advance ballot application. PXO 14 (Lopach Decl.) Ex. A at VPC000004.

50.   A list of all registered voters in Kansas can be purchased from the Secretary of State's office for a $200 fee.  DXM C (Caskey Tr.) at 114:25-116:16; DXM D (Kansas Secretary of State's Office Voter Registration Data Request Form).  That list comes from ELVIS and represents a snapshot in time of the State's voter file as it appears on the date that the voter registration list is generated.  DXM C (Caskey Tr.) at 114:25-115:7.

51.   Any individual or organization similarly may obtain a list of all registered voters in Kansas who have submitted an advance voting ballot application that has been processed by a county election office (as of the date of the request).  This data can be purchased (or, in some counties, obtained for free) from either the Secretary of State's Office or a county election office.  DXM C (Caskey Tr.) at 118:13-119:17, 121:3-124:21; DXM B (Shew Tr.) at 102:23-103:24.25.

52.   VPC relied on a vendor, Catalist, LLC ("Catalist"), to provide the voter registration data for the Kansas voters whom VPC targeted with advance voting ballot application packets during the 2020 General Election.  DXM G (Lopach Tr.) at 92:14-93:4; DXM F (Dripps

Tr.) at 164:7-13; DXM H (Pls.' Resp. to Interrog. No. 16 in Defs.' Second Set of Interrogs.) at 3.

53.   VPC received Kansas active voter registration lists from Catalist on January 31, April 10, and September 15 of 2020.  PTO-SF ¶ 2(a)(xxxix).

54.   VPC CEO Lopach testified that he does not know how often Catalist requests an updated voter file from the Secretary of State's Office.  DXM G (Lopach Tr.) at 104:2-105:13.

55.   To personalize the applications it sends, VPC uses statewide voter registration files obtained via its data vendors and fills-in parts (the voter's name and address) of the advance mail ballot applications with the voter's information.  PXM 6 (Lopach Tr.) at 91:4-92:18; PXO 14 (Lopach Decl.)  ¶¶ 37-40. VPC attempts to cull its lists to ensure it is running its program as efficiently and accurately as possible. See PXO 14 (Lopach Decl.)  ¶¶ 18, 40; PXM 6 (Lopach Tr.) at 33:2-35:3, 92:13-25. Mr. Dripps testified that it is his recollection "that VPC understood there was an error with the data [VPC was] receiving from [its] data vendor [and] that until [VPC] could be confident that the information that [VPC] had was completely correct, [VPC] did not want to send prefilled advance ballot application mail with that information" and therefore it sent two waves of mailers with blank applications." PXM 7 (Dripps Tr.) at 168:3-9. Mr. Dripps further testified that it was his "recollection [] that VPC worked with [its] data vendors to obtain a list of voters that was exactly as the data vendor had received it from the various state election officials" so that it could resume sending prefilled applications. PXM 7 (Dripps Tr.) at 174:6-9.

56.   Mr. Howell, Ms. Cox, and Mr. Shew all noted that, due to the unique nature of VPC's pre-filled applications, they were easily able to identify them.  DXM A (Howell Aff.)  ¶ 14; DXM U (Cox Aff.) ¶ 15; DXM B (Shew Tr.) at 18:10-21:22.

57.   The advance voting ballot applications that were partially pre-filled or otherwise provided by VPC to Kansas voters in connection with the 2020 General Election (a) used a unique all-caps font (to the extent they were partially pre-filled), (b) contained a unique message – "It's as Easy as 1-2-3" on the back of the applications, (c) contained yellow highlighting on certain parts of the application, and (d) contained a code on the bottom margin of the application.  A sample is available at DXM J.  See DXM J (Same VPC pre-filled advance voting ballot application).

58.   Because ELVIS is a dynamic system, even if a third-party utilizes voter registration information obtained from ELVIS to partially pre-fill advance voting ballot applications, some information on the pre-populated application may not match the State's voter file database when a voter receives the pre-filled application if there is a lag time between the date the third-party acquires the ELVIS data and the date it mails out the pre-filled application to the voter.  DXM A (Howell Aff.) ¶ 9.

59.   Among the reasons that voter information in ELVIS may not match the information on a voter's pre-filled advance voting ballot application (completed by someone other than the voter) is that the data in ELVIS may have been updated (e.g., change of name, change of address, death, or ineligibility due to criminal conviction) since the date the voter file was

generated and used by a third-party to pre-fill an application (using the stale data).  DXM A (Howell Aff.) ¶ 10.

60.   VPC sent five "waves" of mailers to Kansas voters for the 2020 General Election.  The dates were as follows:

a.      Wave A: data uploaded on 7/6/2020, expected in homes on 8/17/2020;

b.      Wave B: data uploaded on 7/27/2020, expected in homes on 8/26/2020;

c.      Wave C: data uploaded on 8/10/2020, expected in homes on 9/8/2020;

d.      Wave D: data uploaded on 8/24/2020, expected in homes on 9/16/202; and

e.      Wave E: data uploaded on 8/24/2020, expected in homes on 9/28/2020.  *See* PTO-SF ¶ 2(a)(xl).

61.   Concerned about the accuracy of the voter data that it had received from Catalist, VPC opted to send blank advance voting ballot applications to Kansas voters in connection with Waves C and D.  DXM F (Dripps Tr.) at 171:1-23.

62.   VPC only included *pre-filled* advance voting ballot applications (along with the other materials in the mailers) with Waves A, B, and E. Waves C and D included *blank* advance voting ballot applications.  DXM F (Dripps Tr.) at 163:6-164:16.

63.   Although the information that Catalist (and, by extension, VPC) used to pre-fill advance voting ballot applications for voters was "based upon publicly available information" in ELVIS, Pls.' Resp. to Req. for Admis. No. 8, (attached as Ex. K), Catalist also merged commercial data with the official State voter file in preparing the voter data it sent to VPC for use in pre-filling those applications in two of the five waves of advance mail ballot applications sent by VPC.  DXM F (Dripps Tr.) at 171:24-174:1; DXM K (Pls.' Response to Defs.' RFA No. 8).

64.   VPC Executive Vice President Lionel Dripps testified that VPC detected an error in the data it received from its data vendor whereby, nationally, roughly 5% of records had a middle name or initial and roughly 3% had a suffix that did not appear to match the voter file. PXO 4 (Deposition of Lionel Dripps (Aug. 30, 2022) ("Dripps Tr.")) at 167:24-168:9, 169:17-170:2.

65.   Mr. Dripps testified that he did not know whether these errors appeared in the Kansas data in line with the national numbers. PXO 4 (Dripps Tr.) at 169:10-16, 170:11-25.

66.   In its discovery responses, Plaintiffs produced a subset of the Kansas voters to whom it, together with CVI, sent advance voting ballot applications in the 2020 General Election. (The list contained 312,918 of the approximately 507,864 voters to whom VPC and CVI had sent applications).  DXM L (Kansas Voters to Whom VPC Sent Advance Voting Ballot Application in 2020 General Election).

67.    Defendants' expert witness, Ken Block, analyzed DXM L and attested that he identified numerous errors/deficiencies in the information that VPC was using to pre-populate the advance voting ballot applications sent to Kansas voters.  DXM M (Ken Block's Initial Declaration).

68.    Because of the 4-6 week lead time between the date that VPC sent its data to its printer for pre-filling advance voting ballot applications and the date such applications arrived in voters' mailboxes, and based on the dates that VPC received updated Kansas voter files from Catalist, at best, VPC was using the Kansas voter file from April 10, 2020, to pre-populate the applications sent to Kansas voters in connection with the 2020 General Election.  DXM H (Pls.' Resp. to Interrog. No. 16 in Defs.' Second Set of Interrogs.) at 3; PTO-SF ¶ 2(a)(xl).

69.    Mr. Block attested that VPC did not remove from the database it used to pre-fill advance voting ballot applications certain Kansas voters whose voter registrations had been cancelled prior to mailing those individuals pre-filled advance voting ballot applications during the 2020 General Election.  DXM N (Ken Block's Supplemental Declaration ("Block Supp. Decl.")) ¶ 10.

70.    Mr. Block attested that in its first wave of mailings, which VPC sent to the printer on July 6, 2020, for delivery to voters on or about August 17, 2020, 385 Kansas voters to whom VPC sent pre-filled advance voting ballot applications had had their voter registrations cancelled prior to that date.  DXM N (Block Supp. Decl.) ¶ 9; DXM O (Exhibit XI to Ken Block's Supplemental Declaration ("Exhibit XI to Block Supp. Decl.")) (date of voters' cancelled registration is found in Column E).

71.    Mr. Block attested that in its mailings to Kansas voters for the 2020 General Election, VPC sent out:

- separate mailings to 176 of the 385 voters whose voter registrations had been cancelled (and thus been removed from the Kansas voter rolls) prior to the first VPC wave mailing;

- 4 separate mailings to 99 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing;

- 3 separate mailings to 39 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing; and

- 2 separate mailings to 11 voters who had been removed from the Kansas voter rolls prior to the first VPC wave mailing.

DXM N (Block Supp. Decl.) ¶ 9; DXM O (Exhibit XI to Block Supp. Decl.).

72.    Mr. Block attested that in the time between when VPC sent its mailers to the printer in connection with its first wave of mailings and its final wave of mailings for the 2020 General Election, approximately 341 Kansas voters had had their voter registration

cancelled yet still received a mailing from VPC due to its failure to remove such no-longer-registered voters.  DXM N (Block Supp. Decl.) ¶¶ 10-13.

73. Mr. Block attested that he identified pairs of matched records in which two different voters showed the same voter registration number, which he attested indicated that VPC had sent a pre-filled application for Voter #1 to Voter #2.  Mr. Block further attested that these individuals were properly separated in Kansas' own voter file to which VPC (and any other member of the public) had access.  DXM M (Ken Block's Initial Declaration) ¶¶ 23-24; DXM P (Exhibit V to Ken Block's Supplemental Declaration ("Exhibit V to Block Supp. Decl.")).

74. Mr. Block attested that Kansas election officials identified 15 voters to whom VPC sent advance voting ballot applications in connection with the 2020 General Election yet whose registration status had been cancelled in ELVIS on or prior to April 10, 2020 (meaning that their names would not have appeared on a list of voters by anyone requesting the statewide voter file as of that date).  DXM O (Exhibit XI to Block Supp. Decl.).

75. Mr. Block attested that VPC's use of stale voter registration data to pre-fill the advance voting ballot applications it sent to Kansas voters imposed an extra burden on county election officials.  DXM M (Ken Block's Initial Declaration) ¶ 39.

76. Mr. Block testified that he does not know, and is not offering an opinion as to, whether applications sent in on VPC mailers created more or less work for election officials than applications sent in by other individuals or organizations. PXO 7 (Block Tr.) at 268:14-24.

77. Mr. Block testified that he did not endeavor to compare the total number of purportedly erroneous records in his declaration and exhibits to the total records on VPC's mailing list. *See* PXO 7 (Deposition of Kenneth Block (Sept. 13, 2022) ("Block Tr.")) at 272:18-23.

78. Mr. Block testified that he did not know "what the error rates are in VPC's data." PXO 7 (Block Tr.) at 267:18-268:7.

79. Mr. Block testified that he does not know how many advance mail ballot applications that were submitted by voters and pre-filled by VPC were ultimately rejected by Kansas election officials. PXO 7 (Block Tr.) at 272:9-17.

80. Dr. Eitan Hersh, who analyzed the expert reports of Defendants' proffered expert witness Kenneth Block, testified that "it seems likely that the VPC methods *reduced* the burden on election officials." PXO 5 (Expert Rebuttal Decl. & Report of Dr. Eitan D. Hersh ("Hersh Rpt.")) ¶ 41 (emphasis in original).

81. During his deposition, Douglas County Elections Director Jamie Shew was asked what issues "will cause you to go into the curative process prior to sending that voter an advance ballot?"  Mr. Shew replied "Number one's probably they forgot to sign it. Number two is the signature doesn't match." DXM B (Shew Tr.) at 35:6-13.

82. When asked during his deposition whether a change to information from the voter file made by VPC's data vendor would create more work for the county election office, Dr. Hersh

replied that it "is a relative question, depends on what we're comparing it to. And as [he] say[s] in [his] report, Mr. Block provides no basis for comparing what VPC does and what [VPC's data vendor] does to any reasonable alternative."  PAX 1 (Deposition of Dr. Eitan Hersh (Sept. 6, 2022) ("Hersh Tr")) at 92:2-93:3.[4]

83.     During his deposition, Dr. Hersh stated, "all voter registration data, whether it's sourced from the state or whether it's sourced from a third party, contain obsolete records essentially the day that it is downloaded." PAX 1 (Hersh Tr.) at 104:22-25.

84.     At her deposition, Ms. Schmidt was asked "Are you aware of any data entry errors, like misspellings in the entry in the information in ELVIS, that would lead to a lack of finding a record" to which she replied, "I'm sure there's always data entry errors." PAX 2 (Deposition of Connie Schmidt (Sept. 16, 2022) ("Schmidt Tr.")) at 107:19-24.

85.     In his report, Dr. Hersh attested that "human errors are present in registration records," that "Kansas has obsolete and duplicate records in its system," and that "no list is perfectly accurate. People die and move and change their names all the time." PXO 5 (Hersh Rpt.) ¶¶ 11, 12, 14.

86.     In his report, Dr. Hersh attested that any errors in VPC's lists raised by Mr. Block "are nothing out of the ordinary, given population churn and the logistics of sending large mailers out to voters." PXO 5 (Hersh Rpt.).  Dr. Hersh further attested that attempts to eliminate routine error in mailing lists would be "extreme," "costly and labor intensive, and it would delay the eventual sending of the mailing." PXO 5 (Hersh Rpt.) ¶ 20.

87.     In his report, Dr. Hersh attested that in his opinion, "the VPC data are accurate compared to reasonable benchmarks." PXO 5 (Hersh Rpt.) ¶ 24.

88.     Dr. Eitan Hersh, who analyzed the expert reports of Defendants' proffered expert witness Kenneth Block, stated in his report that "Mr. Block's concerns related to just under 3% of the records in the VPC database" and "[e]ven if one were to stipulate that all the issues raised by Mr. Block . . . the total number of problems identified by Mr. Block is quite in line with [his] expectations." *See* PXO 5 (Hersh Rept.) ¶ 27.

89.     Mr. Block did not have the full list of individuals to whom CVI sent its own application mailers with which to conduct his analysis.  But given that VPC and CVI collectively mailed 507,864 pre-filled applications to Kansas voters in connection with the 2020 General Election, using the 3% figure referenced by Dr. Hersh, as a hypothetical, that would equate to 15,235 [0.03 x 507,864] total erroneous applications across both VPC and CVI's respective advance mail ballot programs.

---

[4] References herein to "PAX" refer to Plaintiff's Additional Exhibits Annexed to the Declaration of Alice Huling in Support of Plaintiff VPC's Additional Facts Included in Parties' Submission of Uncontroverted and Controverted Facts, dated December 8, 2022..

90.  Dr. Hersh testified that it "might be theoretically possible" to get "much more frequent" updates to the State's voter registration database without allowing for "months of lag time" between the date that the data is obtained and the date the mailer is sent. But such frequency "comes with [a] cost, and organizations [] have to make cost-benefit assessments." *See* DXO MM at 147:20-148:18.

91.  VPC now contracts with two data vendors so that it can use data from whichever vendor has the most up-to-date data at the moment a program's mailing list is being created in a given state. PXM 6 (Lopach Tr.) at 100:12-101:13; PXM 7 (Dripps Tr.) at 123:13-21, 147:16-20; PXO 14 (Lopach Decl.) ¶ 39.

92.  VPC carefully designs this package of materials to convey to the recipient VPC's message that this particular Kansan should participate in the democratic process by mail voting, that voting by mail is easy, and that VPC's audience can act on this encouragement by returning the supplied advance mail ballot application that VPC has personalized. PXO 14 (Lopach Decl.) ¶¶ 11, 17-18, 22, 28-29; PXM 8 (9/8/2021 PI Tr.) at 47:7-13.

93.  In 2018, VPC sent approximately 90,000 advance mail ballot application mailers to Kansas voters in a single wave of mailers. PXO 14 (Lopach Decl.) ¶ 35.

94.  Approximately 5,000 Kansans applied for an advance mail ballot in 2018 using a personalized application from VPC. PXO 14 (Lopach Decl.) ¶ 26.

95.  In 2020, VPC anticipated that the pandemic would result in many voters voting by mail for the first time. PXM 7 (Dripps Tr.) at 136:4-16; PXO 14 (Lopach Decl.) ¶ 33.

96.  VPC therefore increased the amount that it communicated with Kansas voters about advance mail voting in 2020 to five waves of mailers and sending nearly 1.2 million advance mail ballot application mailers to Kansas voters. PXO 14 (Lopach Decl.) ¶¶ 34-35.

97.  An estimated 112,000 Kansas voters used a VPC or CVI-provided pre-paid/pre-addressed envelope to mail their advance ballot application to their respective county election office in the 2020 general election. An estimated 69,000 of such Kansas voters mailed an advance voting ballot application provided by VPC. PXO 14 (Lopach Decl.) ¶ 26; DXM G (Lopach Tr.) at 124:16-124:20.

98.  For the 2022 election, VPC sent one wave of advance mail voting mailers. PXM 7 (Dripps Tr.) at 135:12-20; PXO 14 (Lopach Decl.) ¶¶ 47, 52.

99.  The 2022 mailers contain the same basic components as VPC's prior mailer communications, including a personalized advance mail ballot application. PXO 14 (Lopach Decl.) ¶ 17; PXO 14 (Lopach Decl.) Ex. B at VPC000743-746 (2022 VPC mailer).

100. VPC also sent a follow-up letter in September 2022 to remind voters that they had previously received a personalized advance mail ballot application and further encouraging the voter to return the application and vote by advance mail ballot. PXO 14 (Lopach Decl.) ¶ 52; PXM 6 (Lopach Tr.) at 30:3-10.

101.  Each year, VPC notifies the Kansas Director of Elections of its upcoming advance mail voting program and seeks feedback on the forms and instructions regarding advance mail voting that VPC plans to distribute. *See* PXM 15 (Exhibit 15 to 30(b)(6) Deposition of the office of Kansas Secretary of State (May 24, 2022) ("KS SOS Tr. Ex. 15")) at KS001922VA—2068VA (Apr. 19, 2018 email); PXM 16 (Exhibit 16 to 30(b)(6) Deposition of the office of Kansas Secretary of State (May 24, 2022) ("KS SOS Tr. Ex. 16")) at  VPC000048—50 (June 22, 2020 to July 1, 2020 email thread); PXM 18 (Exhibit 8 to Deposition of Lionel Dripps (Aug. 30, 2022) ("Dripps Tr. Ex. 8")) at VPC000706-09 (July 28, 2022 emails); PXM 19 (Exhibit 9 to Deposition of Lionel Dripps (Aug. 30, 2022) ("Dripps Tr. Ex. 9")) at VPC000712-16 (Aug. 25, 2022 emails).

102.  In the 2020 election cycle, the Kansas Director of Elections confirmed to VPC in writing that its advance mail voting application form and instructions complied with Kansas law and with the forms that the Secretary of State's office uses. PXM 16 (KS SOS Tr. Ex. 16) at VPC000048—50 (June 22, 2020 to July 1, 2020 email thread).

103.  The 2020 General Election in Kansas had record turnout (1,375,125 total votes cast, a 70.9% turnout rate) and a steep increase in advance mail voting (459,229 voted by mail compared with 152,267 votes cast by mail during the 2018 General Election and 173,457 votes cast by mail in the 2016 General Election).  This compared to 1,039,085 total votes cast in the 2018 General Election, which represented a 56.4% turnout rate with 152,267 votes cast by mail.  It also compared to 1,225,667 total votes cast in the 2016 General Election, which was a 67.4% turnout rate, with 173,457 votes having been cast by mail. *See* https://sos.ks.gov/elections/elections-statistics.html.  PTO-SF ¶ 2(a)(xxxvi).

104.  Conducting a high-turnout presidential election race held in the middle of a worldwide pandemic introduced many challenges for those tasked with administering it. *See* PXM 1 (Schmidt Tr.) at 155:7–156:20; PXM 2 (Cox Tr.) at 98:25-100:13; PXM 4 (Howell Tr.) at 49:2-25; PXM 3 (Shew Tr.) at 85:5-24.

105.  It also presented new hurdles for some voters who, as Ms. Schmidt testified, were "frightened" and "in their homes" due to COVID-19, and for that reason requested advance mail ballots. PXM 1 (Schmidt Tr.) at 149:4-150:6.

106.  A national debate has unfolded about the efficacy and security of mail voting as public figures both in Kansas and nationwide expressed their views on whether voters should or should not vote by mail. *See, e.g.*, PXM 20 (Bryan Lowry & Sarah Ritter, Despite Trump's attacks, Kansas voters request 2020 mail ballots at historic rate, THE KANSAS CITY STAR (May 29, 2020), https://www.kansascity.com/news/politics-government/article243052656.html).

107.  Many organizations, campaigns, and elections offices, including Plaintiff VPC as well as Kansas election officials, sought to encourage voters to vote by mail in the 2020 election. Compare PXO 14 (Lopach Decl.) at Ex. A (2020 VPC mailer) with PXM 21 (Exhibit 17 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 17")) (May 18, 2020 emails); *see also* PXM 1 (Schmidt Tr.) at 287:4-14.

108.    Several Kansas counties sent mailers regarding the advance mail voting process, including advance mail ballot applications, to their registered voters. *See, e.g.*, PXM 1 (Schmidt Tr.) at 82:25-83:2; PXM 2 (Cox Tr.) at 102:9-15; PXM 3 (Shew Tr.) at 21:23-22:2.

109.    The Johnson County election office opted to send advance mail ballot applications that were prepopulated with the voter's data on the application form. PXM 1 (Schmidt Tr.) at 227:2-236:20, 240:12-243:12; 285:12-286:19; *see also* PXM 12 (Schmidt Tr. Ex. 31) (Apr. 3, 2020 emails); PXM 9 (Schmidt Tr. Ex. 32) (Apr. 16, 2020 emails); PXM 10 (Schmidt Tr. Ex. 35); PXM 22 (Exhibit 36 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 36")); PXM 23 (Exhibit 37 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 37")); PXM 11 (Schmidt Tr. Ex. 38) (redacted examples of Johnson County prefilled mailers from May 2020).

110.    Johnson County election officials engaged in this and other outreach efforts because many Kansans were voting by advance mail ballot for the first time in 2020 and had questions about the process. *See, e.g.*, PXM 1 (Schmidt Tr.) at 241:2-4 ("Again, these are reminders because a lot of our voters, in 2020, during COVID, have never dealt with voting by mail before."), 297:25-298:8; PXM 24 (Exhibit 43 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 43")) (Johnson County FAQ and Face-book post); PXM 2 (Cox Tr.) at 91:18-24, 107:9-15, 146:3-147:19.

111.    When incomplete or inaccurate applications were submitted, county election officials attempted to help voters cure them regardless of whether the voter had used a blank form or a form pre-populated with personalized information.  PXM 1 (Schmidt Tr.) at 84:18-85:20, 86:22-87:5, 134:6-22, 135:25-136:13, 294:2-13; PXM 2 (Cox Tr.) at 67:9-68:1; 89:3-90:5; PXM 4 (Howell Tr.) at 245:13-246:16, 252:11-23, 254:3-11; PXM 17 (KS SOS Tr.) at 250:18-252:6.  Mr. Howell testified that in Shawnee County, "we don't spend time determining was it prefilled out or not and because we don't track it that way, it really isn't, to me, a question of was it prefilled or not. It's really a question of was it accurate, were there duplicates, was there some other issue that caused us to get off on the track of having to cure information that either wasn't correct or wasn't provided and then ended up going down to the provisional road for that voter."  PXM 4 (Howell Tr.) at 254:3-11.

112.    During the 2020 election cycle, many voters who had concerns about lost advance mail ballot applications or mail delays called their respective election office to inquire about the status of their application. PXM 1 (Schmidt Tr.) at 195:1-196:8, 293:13-18; *see also* PXM 2 (Cox Tr.) at 73:25-74:5, 100:14-101:1.

113.    Some voters re-submitted their applications, resulting in duplicative advance mail ballot applications being received in county election offices. PXM 1 (Schmidt Tr.) at 120:12-24; PXM 2 (Cox Tr.) at 100:14-101:1. PXM 1 (Schmidt Tr.) at 309:1-6 ("The bigger issue for us was apps coming from outside the State of Kansas to our voters, and multiple applications."), 288:3-12, 293:7-294:13, 308:8-11, 309:1-6; PXM 17 (KS SOS Tr.) at 150:13-19 (testifying to conversations about duplicate applications that election offices received in the 2020 election); PXM 2 (Cox Tr.) at 91:13-17; 100:19-101:1; PXM 3 (Shew Tr.) at 73:13-74:7.

114.   Other voters' concerns of mail delays were grounded in experience. *See, e.g.*, PXM 1 (Schmidt Tr.) at 195:1-197:21, 201:7-12, 211:24-212:8, 293:13-294:1; PXM 25 (Exhibit 25 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 25")) (July 22, 2020 Johnson County Election Office Facebook post); PXM 26 (Exhibit 26 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 26")) (July 24, 2020 emails); PXM 27 (Exhibit 27 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 27")) (Apr. 11, 2020 emails).

115.   When voters called their election offices about advance mail ballot applications received in the mail, officials instructed voters that the application forms were legitimate and that the voters could complete and submit those applications if they chose to do so. *See, e.g.*, PXM 1 (Schmidt Tr.) at 297:25-298:8; PXM 24 (Schmidt Tr. Ex. 43) (Johnson County FAQ and Facebook post).

116.   Voters who expressed a desire to not do so, election officials informed the voter that the applications could be discarded.  *See id.* PXM 1 (Schmidt Tr.) at 294:20-295:1; PXM 2 (Cox Tr.) at 139:20-140:3.

117.   The 2020 General Election nevertheless saw high turnout throughout Kansas and state and local Kansas election officials deemed it a successful election. PXM 17 (KS SOS Tr.) 274:5-22, 282:8-9; PXM 1 (Schmidt Tr.) at 167:10-168:11; PXM 28 (Exhibit 15 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 15")) (Aug. 5, 2020 letter); PXM 29 (Exhibit 23 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 23")) (Johnson County Board of Canvassers report); PXM 30 (Press Release, Kansas Att'y Gen., AG Derek Schmidt: Kansas asks U.S. Supreme Court to hear Texas election lawsuit (Dec. 9, 2020), https://ag.ks.gov/media-center/news-releases/2020/12/09/ag-derek-schmidt-kansas-asks-u.s.-supreme-court-to-hear-texas   election-lawsuit) (quoting Defendant Schmidt that "Kansas ran its elections honestly and by the rules…."); PXM 31 (Russel Falcon, Zero evidence of voter fraud in any state, including Kansas officials report to NYT, KSNT (Nov. 11, 2020), https://www.ksnt.com/news/kansas/zero-evidence-of-voter-fraud-in-any-state-including-kansas-officials-report-to-nyt) (quoting Defendant Schwab that "Kansas did not experience any widespread, systematic issues with voter fraud, intimidation, irregularities or voting problems. . . .").

118.   The advance mail voting process includes multiple safeguards against fraud, PXM 1 (Schmidt Tr.) at 64:3-20, 124:9-25, 212:25-216:9; PXM 2 (Cox Tr.) at 58:5-8; PXM 4 (Howell Tr.) at 42:9-23, 113:4-19, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. *See, e.g.*, K.S.A. § 25-2431.

119.   Kansas Secretary of State Elections Director Bryan Caskey testified that the 2020 post-election audits examined "ballots not, the source of ballots" and its "results were every ballot that was cast was accounted for and counted properly either by hand or by machine." When asked whether they "reveal[ed] any systemic fraud in Kansas elections in 2020" Mr. Caskey responded "They did not." PXM 17 (KS SOS Tr.) at 282:25-283:13.

120.   On February 10, 2021, the Kansas Legislature introduced HB 2332, which, among other things, restricted the distribution of advance ballot applications to potential Kansas voters. *See* PTO-SF ¶ 2(a)(xvii).

121.   On March 17, 2021, the Kansas Secretary of State's Office submitted written testimony on HB 2332 that mentioned "incomplete mail ballot applications" but did not include any discussion of prefilled advance mail ballot applications. PTO-SF ¶ 2(b)(x); PXM 32 (Exhibit 17 to 30(b)(6) Deposition of the office of Kansas Secretary of State (May 24, 2022) ("KS SOS Tr. Ex. 17")); *id*. PXM 17 (KS SOS Tr.) at 295:21-297:7.

122.   The Office's official position was "neutral." *Id.*

123.   The Legislature passed the legislation, as amended, by votes of 83-38 in the House and 27-11 in the Senate, but Governor Kelly vetoed the bill on April 23, 2021. PTO-SF ¶ 2(a)(xix)-(xxi).

124.   On May 3, 2021, the Legislature enacted HB 2332 over the Governor's veto. *See* PTO-SF ¶ 2(a)(xxi); PXM 33 (Exhibit 4 from the Deposition of Connie Schmidt ("Schmidt Tr. Ex. 4")) (Governor Kelly's veto letter).

125.   Plaintiffs challenged two of HB 2332's provisions, but only one—the Personalized Application Prohibition—is still at issue in this lawsuit. *See* PTO-SF ¶ 2(a)(xxviii).

126.   HB 2332's Personalized Application Prohibition bans any person or organization who solicits a registered voter by mail from mailing registered Kansas voters a personalized advance mail voting application that is prefilled with any information, such as a voter's name and address. *See* H.B. 2332 § 3(k)(2) (codified at K.S.A. § 25-1122(k)(2)) ("No portion of such [advance mail voting application] shall be completed prior to mailing such application to the registered voter.").

127.   Section 3(k)(2) of H.B. 2332 (codified at K.S.A. 25-1122(k)(2)) prohibits "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot and includes an application for an advance voting ballot in such mailing" from completing (i.e., pre-filling) any portion of such application prior to mailing such application to the registered voter.   PTO-SF ¶ 2(a)(xxii).   The prohibition applies even if the prefilled information is derived from the State's publicly available voter registration file.

128.   The Personalized Application Prohibition is not limited to only the inaccurate or fraudulent completion of any portion of an application. H.B. 2332 § 3(k)(2) (codified at K.S.A. 25-1122(k)(2)).

129.   K.S.A. 25-1122(k)(2) does not apply to persons who mail or cause to be mailed an application for an advance voting ballot with any portion completed to a registered voter where the portion of such application completed prior to mailing is completed at the request of the registered voter.   In other words, when a registered voter asks a person to mail or cause to be mailed an advance voting ballot application to such registered voter, and that person does so, that person does not "solicit[] by mail a registered voter to file an application for an advance voting ballot" as set forth in K.S.A. 25-1122(k)(1).   Stipulation, at 2-3, ECF No. 73.

130. Section 3(l)(1) of HB 2332 (codified at K.S.A. 25-1122(1)(1)) provides that "[n]o person shall mail or cause to be mailed an application for an advance voting ballot, unless such person is a resident of this state or is other-wise domiciled in this state."  This statute will be referred to as the "Out-of-State Distributor Ban."  PTO-SF ¶ 2(a)(xxiv).

131. At passage, both Sections 3(k)(2) and 3(l)(1) of HB 2332 were scheduled to go into effect on January 1, 2022.  PTO-SF ¶ 2(a)(xxv).

132. A violation of the Personalized Application Prohibition is a class C nonperson misdemeanor, which is punishable by up to one month in jail and/or fines. H.B. 2332 § 3(k)(5); K.S.A.§§ 21-6602(a)(3), (b).

133. HB 2332 carves out exceptions to the Personalized Application Prohibition by permitting a subset of state and county election officials to mail prefilled advance mail voting applications.  H.B. 2332 § 3(k)(4).

134. The Personalized Application Prohibition does not allow a person soliciting a registered voter to file an advance mail ballot application to mail that voter an application that has been completed with information from the Kansas voter rolls prior to mailing. *See id.*

135. The Personalized Application Prohibition does not limit the number of advance mail ballot applications that may be mailed to a registered voter. *See id.*

136. The Personalized Application Prohibition does not require the sender of advance mail ballot applications to identify itself on such mailings. *See id.*

137. In defense of the Personalized Application Prohibition, the State has asserted interests such as "[m]inimizing voter confusion" and disenfranchisement, "[p]reserving and enhancing voter confidence," and reducing the rejection of inaccurate applications, inefficiencies in election administration, and potential for voter fraud. PXM 34 (Defendant Schwab's Responses and Objections to Plaintiff's First Interrogatories) at 3-4.

138. These rationales for the Personalized Application Prohibition are not a part of the Legislative Record for HB 2332. *See* Kansas House Bill 2332 (2021), Legislative Record, http://kslegislature.org/li/b2021_22/measures/hb2332/ (last accessed Oct. 14, 2022).

139. Mr. Howell attested that the Shawnee County Election Office received a large number of advance voting ballot applications from voters that had been pre-filled by VPC and contained information that did not match the voters' information in ELVIS.  Mr. Howell attested that the mismatched information included erroneous addresses, last names, suffixes, and/or middle initials.  DXM A (Howell Tr.) ¶¶ 11, 35.

140. At his deposition, Mr. Howell was asked "how much time [his] staff spent curing applications that contained pre-filled information during the 2020 general election."  PXO 1 (Howell Tr.) at 253:24–254:11.  Mr. Howell testified that his office "doesn't spend time determining" whether an application in the cure process was "prefilled or not.  It's really of question of was it accurate, were there duplicates, was there some other issue . . . ."  *Id.*

141.   At Mr. Howell's deposition, when asked "Is it your opinion that -- that voters became even more confused and frustrated when the applications contained prefilled in-formation?" he testified "I don't think that the prefilled information, in and of itself, was what all of the concern was." *See* PXO 1 (Deposition of Andrew Howell (Sept. 14, 2022) ("Howell Tr.")) at 245:13-19.

142.   Mr. Howell attested in his affidavit that duplicate and inaccurately pre-filled advance voting ballot applications resulted in telephone calls, letters, e-mails, and in-office visits from voters regarding what they had received from VPC.  DXM A (Howell Aff.)  ¶¶ 12, 37, 40, 44; DXM S (Andrew Howell Deposition ("Howell Tr.")) at 117:24-125:2; Mr. Howell further testified that he spoke with hundreds of these voters.  DXM S (Howell Tr.) at 121:11-122:12.

143.   Mr. Howell attested that voters communicating with Mr. Howell regarding duplicate and/or pre-filled advance voting ballot applications often believed (erroneously) that the applications had been sent to them by the Shawnee County Election Office, and they expressed anger and frustration at the purported incompetency of the office.  Many of these voters voiced their incredulity that the office would send an application to the wrong address or use the wrong name in pre-filling the application when they had previously communicated such changes to the election office.  DXM A (Howell Aff.) ¶¶ 38, 40-42.

144.   Mr. Howell attested that the Shawnee County Election Office also received calls from voters who reported that advance voting ballot applications that had been pre-filled were sent to individuals who were deceased.  Mr. Howell attested that most of the applications sent alerting this office of the voter's death were sent to voters who had been removed from ELVIS prior to the date on which VPC mailed its pre-filled applications.  DXM A (Howell Aff.) ¶ 12.

145.   Mr. Howell testified that if a voter crossed out a prefilled suffix, and the remaining information on the application was correct, it would probably be accepted. *See* DXM A (Howell Aff.) ¶ at 184:16–185:11; PXO 9 (Exhibit 7 from the Deposition of Andrew Howell (Sept. 14, 2022) ("Howell Tr. Ex. 7")) at 55.

146.   Ms. Schmidt testified that an application with a missing middle initial would still be processed so long as the remaining information on the application was correct. *See* PXO 18 (Excerpts of the Deposition of Connie Schmidt (Sept. 16, 2022) ("Schmidt Tr.")) at 103:25-104:14.

147.   Mr. Shew testified that he did not recall the Douglas County Elections Office receiving significantly more duplicate applications in 2020 compared to previous years and that, to the extent there was an increase, such an increase could be attributable to greater voter participation in the presidential election. *See* PXO 2 (Deposition of Jameson Shew (Sept. 15, 2022) ("Shew Tr.")) at 74:3-19.

148.   Ms. Cox testified that the Ford County Clerk's office had "a lot more mail ballot voting than we had in the past" because of the "COVID-19 pandemic." *See* PXO 16 (Deposition of Deborah Jean Cox (Sept. 9, 2022) ("Cox Tr.")) at 102:3-8.

149. Ms. Cox further testified, "I did mail out [advance mail ballot] applications because of the COVID -- which I don't normally do a mass mailing. I did mail out to every registered voter [advance mail ballot] applications for the primary and the general." *See* PXO 16 (Cox Tr.) at 102:9-12.  None of these applications were pre-filled.

150. Ford County Election Clerk Deborah Cox attested that she heard from 20-30 voters per day about the advance voting ballot applications they were receiving from VPC (via CVI) in the lead-up to the 2020 General Election and that she sent an ad to three Ford County newspapers in an effort to remind voters that most pre filled applications had come from CVI and not the county election office.  DXM T (Debbie Cox Deposition ("Cox Tr.")) at 130:6-132:5; DXM U (Cox Aff.) ¶ 37.  The text of the ad can be found at DXM V.

151. Ms. Cox got the idea for the ad because a similar ad had been placed in the Beloit Call by Mitchell County Clerk Chris Treaster.  DXM T (Cox Tr.) at 130:6-17.

152. The Shawnee County Election Office sent out letters or emails to the voters who submitted advance voting ballot applications containing information that did not match the data in ELVIS.  DXM S (Howell Tr.) at 120:6-121:4.

153. Mr. Howell and Ms. Cox attested that, on average, it takes an experienced election official in their respective offices three to five minutes to process an accurate, non-duplicate advance voting ballot application.  DXM A (Howell Aff.) ¶ 24; DXM U (Cox Aff.) ¶ 23.

154. Mr. Howell and Ms. Cox attested that if the information on a voter's advance voting ballot application does not match the information in ELVIS, or if the application is missing information, the election office will attempt to contact the voter (via telephone, U.S. mail, and/or e-mail) to determine the reason for the discrepancy or to obtain the missing information.  This contact can require multiple attempts.  Their offices generally make at least three attempts to reach the voter, assuming it is practicable.  DXM A (Howell Aff.) ¶ 25; DXM U (Cox Aff.) ¶ 24.

155. Mr. Howell and Ms. Cox attested that if their county election office is able to reach the voter, it attempts to work with him/her to correct any discrepancies or omissions.  It may be necessary for the voter to submit a new advance voting ballot application or registration form.  The cumulative time to contact the voter and process the application in these situations averages in their respective offices around 15 minutes of staff time.  DXM A (Howell Aff.) ¶ 26; DXM U (Cox Aff.) ¶ 25.

156. Mr. Howell and Ms. Cox attested that if their election office is unable to reach the voter or it would be impracticable to do so, their office will prepare a provisional ballot, assuming it is able to discern that the applicant is a registered voter.  The cumulative time to complete this whole process regularly takes thirty minutes or more of staff time.  DXM A (Howell Aff.) ¶ 26; DXM U (Cox Aff.) ¶ 26.

157. Mr. Howell attested that if his election office must send a provisional ballot to a voter after being unable to reach him/her in order to address defects on his/her application, there is a greater likelihood that the voter will not correct those defects prior to the county canvassing

boards and thus will either not return the provisional ballot or will not have the ballot counted.  DXM A (Howell Aff.) ¶ 28.

158.   VPC provided in discovery a set of FAQs, which including the following two questions and answers to be used to respond to individuals who contacted VPC regarding materials they received by VPC:

**I got a form that has someone else's information on it why did that happen?**

Thank you for reaching out.  VPC is aware of this issue and is actively working to make sure it doesn't happen again.  This issue was limited in scope and only affected a very small percentage of individuals.  In the meantime, we are happy to send you a new vote-by-mail application with the correct information, or I can tell you the link you can use to print it from your state's SoS website and then fill it out and mail back in the envelope we sent you.

**How did it happen?  How are you making sure it won't happen again?**

The mistake was due to a printer error and they have taken responsibility for their mistake and have already added additional quality control measures, like installing an additional camera to monitor printing, and retraining printer staff, to prevent this type of situation in the future.

DXM X (VPC Call Center FAQs).

159.   VPC received complaints from election officials in states other than Kansas about the inaccurate absentee ballot application mailers or voter registration mailers that VPC or CVI was sending to voters in those states during the 2020 election cycle.  DXM Y (e-mails between VPC outside counsel Jennifer Carrier and other state election officials).

160.   A majority of the correspondence attached as DXM Y does not discuss inaccurately prefilled advance mail ballot applications.

161.   Kansas Elections Director Bryan Caskey received many calls from county election officials who complained that their offices were receiving pre-filled advance voting ballot applications in which the information on the form did not match the data in ELVIS.  DXM C (Caskey Tr.) at 150:13-152:15.  In response to these calls, Mr. Caskey regularly discussed the problem with county election officials during his weekly telephone conferences with them.  He also spoke personally with election officials in at least 60 of the State's 105 counties on the subject.  DXM C (Caskey Tr.) at 212:20 213:11, 237:11-240:5.

162.   Mr. Caskey also spoke with many voters who expressed their anger, confusion, and frustration over the pre-filled advance voting ballot applications that they were receiving from third-parties such as VPC.  DXM C (Caskey Tr.) at 209:15-210:9, 240:6-242:7.

163.   The Kansas Secretary of State's Office submitted written testimony to both the House and Senate Committees on Federal and State Affairs in February 2021 regarding the State's

experience with advance voting ballot applications mailed to voters by third-parties in the 2020 General Election. Among other things, the testimony advised the Legislature that, "[l]eading up to the 2020 general election, state and county election officials were inundated with calls from confused voters who submitted an advance by mail ballot application but continued to receive unsolicited advance ballot applications from third parties. This created a substantial workload increase for local election offices who had to process thousands of duplicate forms at a time when county election officials were preparing for a high turnout, statewide election, in the middle of a pandemic." DXM Z (Written Testimony from Kansas Secretary of State's Office to Kansas Legislature).

164. The Kansas voters whom VPC targeted with mailings in the 2020 General Election received between one and five advance voting ballot applications from VPC. DXM L (Kansas Voters to Whom VPC Sent Advance Voting Ballot Application in 2020 General Election); DXM G (Lopach Tr.) at 206:9-207:14, 209:3-210:22.

165. Of the approximately 507,864 Kansas voters to whom VPC or CVI sent at least one (and as many as five) advance voting ballot applications in connection with the 2020 General Election, at least 112,597 of those individuals used a VPC- or CVI-provided pre-paid/pre-addressed envelope to mail their completed application back to their respective county election offices. DXM E (VPC's Advance Voting Ballot Application Mailing Statistics for 2020 General Election); DXM F (Dripps Tr.) at 177:24 179:20; DXM G (Lopach Tr.) at 123:17-124:20.

166. The 112,597 Kansas voters who used a VPC or CVI-provided pre-paid/pre-addressed envelope to mail their completed applications back to their respective county election offices sent in 127,336 applications using the VPC or CVI-provided envelopes. In other words, approximately 14,739 duplicate applications were sent to county election offices by Kansas voters using a VPC- or CVI-provided envelope. DXM E (VPC's Advance Voting Ballot Application Mailing Statistics for 2020 General Election); DXM F (Dripps Tr.) at 178:16-182:3; DXM G (Lopach Tr.) at 124:16-125:18.

167. Of the 112,597 Kansas voters who used a VPC- or CVI-provided pre-paid/pre-addressed envelope to send in a completed advance voting ballot application to their county election office, only 111,199 voters ultimately received an advance ballot. In other words, 1,398 voters who returned an advance voting ballot application in a VPC- or CVI-provided envelope never submitted a successful application such that they could receive an advance ballot in connection with the 2020 General Election. DXM E (VPC's Advance Voting Ballot Application Mailing Statistics for 2020 General Election); DXM F (Dripps Tr.) at 182:20-184:1; DXM G (Lopach Tr.) at 128:3-25.

168. In the 2020 General Election, the Shawnee County Election Office received and processed 23,156 advance voting ballot applications. That is, it sent regular or provisional advance ballots to 23,156 voters after having received advance voting ballot applications from these voters. In addition, it received 4,217 duplicate applications (i.e., applications from voters who had already submitted an application and to whom the office had already mailed a regular or provisional advance ballot). More than 15.4% of the total advance voting ballot

applications that the office received, therefore, were duplicates.  DXM A (Howell Aff.) ¶ 15.

169.   Mr. Howell attested in his affidavit that of the 4,217 duplicate applications the Shawnee County Election Office received for the 2020 General Election: 3,676 were sets of two (i.e., voters sent in two applications); 407 were sets of three (i.e., voters sent in three applications); 99 were sets of four; 27 were sets of five; 6 were sets of six; 1 was a set of seven, and 1 was a set of nine.  DXM A (Howell Aff.) ¶ 18.  The number of duplicate applications received by the Shawnee County Election Office in the 2020 General Election increased by 35,040% as compared to the 2016 and 2018 general elections. *See* DXM (Howell Aff.) A ¶¶ 15, 17.

170.   The Shawnee County Election Office received very few (no more than a dozen) duplicate applications in connection with either the 2016 General Election (during which it received 7,394 total applications) or the 2018 General Election (during which it received 9,272 total applications).  DXM A (Howell Aff.) ¶ 17.

171.   Mr. Howell and Ms. Cox attested that voters told county election officials in their offices that they were confused by the pre-filled advance voting ballot applications that they had received during the 2020 General Election and some voters believed (erroneously) that the applications had originated from the election office.  Mr. Howell and Ms. Cox attested that these voters told election officials in Shawnee and Ford Counties that they thought they were required to complete and mail back the pre-filled applications to the county election office even if they had already submitted another application.  DXM A (Howell Aff.) ¶ 41; DXM S (Howell Tr.) at 269:14-270:1; DXM U (Cox Aff.) ¶ 19.

172.   In the 2020 General Election, the Ford County Election Office received and processed 3,040 advance voting ballot applications.  That is, it sent regular or provisional advance ballots to 3,040 voters after having received advance voting ballot applications from these voters.  In addition, it received 274 duplicate applications (i.e., applications from voters who had already submitted an application and to whom the office had already mailed a regular or provisional advance ballot).  Nearly 9% of the advance voting ballot applications that the office received, therefore, were duplicates.  DXM U (Cox Aff.) ¶ 16.

173.   The Ford County Election Office received only a handful (no more than five) duplicate applications in connection with either the 2016 General Election or the 2018 General Election.  DXM U (Cox Aff.) ¶ 18.  The number of duplicate advance mail ballot applications received in Ford County in connection with the 2020 General Election increased by approximately 53,800% as compared to the 2016 and 2018 general elections. *See* DXM U (Cox Aff.)  ¶¶ 16, 18.

174.   Although Kansas election officials did not attempt to quantify how many duplicate advance voting ballot applications in the 2020 General Election involved VPC-pre-populated applications, Mr. Howell and Ms. Cox attested that they believed the majority of duplicate applications their offices received to have been pre-filled by VPC.  DXM A (Howell Aff.) ¶ 16; DXM U (Cox Aff.) ¶ 17.

175. Kansas Elections Director Bryan Caskey also had "dozens if not hundreds of conversations" with county election officials regarding the "flood" of duplicate advance voting ballot applications that were being submitted by voters to such offices.  DXM C (Caskey Tr.) at 150:13-19.

176. Mr. Howell and Ms. Cox attested that when a voter submits duplicate advance voting ballot applications to the Shawnee and Ford County election office, respectively, in connection with a single election, the offices must conduct the same review and verifications of each application upon receipt.  One step in this process is to determine if the voter had previously submitted another application and was previously sent a regular or provisional advance ballot.  If there are any differences between the original application and the new/duplicate application (e.g., different name or mailing address), the offices will attempt to contact the voter to determine the reason for the discrepancy.  DXM A (Howell Aff.) ¶ 29; DXM U (Cox Aff.) ¶ 27.

177. Mr. Howell and Ms. Cox attested in their respective affidavits that after receiving a duplicate application, their election offices cannot assume that the initially submitted application was correct.  Depending on the situation, the offices may need to send a provisional ballot to the voter.  For this reason, the review of a duplicate application usually takes their offices more staff time than the review of the initially submitted application.  If their offices do not have to contact the voter, the review of the duplicate application generally takes 7-10 minutes.  If the offices does have to contact the voter, the review of the duplicate application can take from 15-30 minutes (and occasionally more) of total staff time.  DXM A (Howell Aff.) ¶ 30; DXM U (Cox Aff.) ¶ 28.

178. The number of advance mail ballot applications the Shawnee County Election Office received during the 2020 general election increased by approximately 270 percent as compared to the 2016 general election, and approximately 195 percent as compared to the 2018 general election.  Compare DXM A (Howell Aff.) ¶ 15 (stating that the Shawnee County Election Office received and 'processed' 23,156 plus an additional 4,217, totaling 27,373 applications received) with DXM A (Howell Aff.) ¶ 17 (stating the Shawnee County Election Office received 7,394 applications in 2016 and 9,272 applications in 2018).  The Shawnee County Election Office typically assigns 6-7 staff members to handle the processing of advance voting ballot applications.  Nearly double that number had to be assigned to the task for the 2020 General Election.  Mr. Howell attested in his affidavit that the most significant time burden and strain on staff came from having to contact thousands of voters who had submitted inaccurate or duplicate applications.  At one point, Mr. Howell had to assign almost 30 staff members just to review and process applications in order to ensure that the office could process applications within the time imposed by State law.  DXM A (Howell Aff.) ¶ 33.

179. Mr. Howell attested in his affidavit that prior to Election Day in November 2020, the Shawnee County Election Office responded to many confused voters who had returned pre-filled advance voting ballot applications but who insisted that they did not actually intend to request and vote an advance ballot and that these voters told election officials that they thought they were required to return the application.  Mr. Howell further attested that

election officials in his office expended substantial time and resources responding to those voters.  DXM A (Howell Aff.) ¶ 47.

180.   Approximately 718 voters in the 2020 General Election voted on Election Day in Shawnee County (usually by provisional ballot) after having submitted an advance voting ballot application and having received an advance ballot.  In the 2016 General Election, just 141 voters voted on Election Day (usually by provisional ballot) after having mailed in an advance voting ballot application and having received an advance ballot.  DXM A (Howell Aff.) ¶ 47.

181.   VPC's Rule 30(b)(6) witness, Mr. Lopach, testified that he cannot "speak to how an individual or a group of people would respond to a pre-filled vote-by-mail application versus a blank vote-by-mail application."  DXM G (Lopach Tr.) at 98:17-99:20.

182.   During Mr. Lopach's deposition he was asked "And so you don't know if the person receiving [the pre-filled advance mail ballot application] sees any political message in the fact that their name and address are filled out for them on the advance ballot application?"  Mr. Lopach answered "I don't know if the recipient views a political message in whether or not their name is filled out on" the application.  DXM G (Lopach Tr.) at 99:22-100:10.

183.   Ms. Schmidt testified that the Johnson County Election Office did not detect any instances of voter fraud in 2020. *See* PXO 18 (Schmidt Tr.) at 212:25-213:22.

184.   Ms. Cox testified that the Ford County Clerk's Office ran the 2020 elections successfully and that post-election audits detected no evidence of voter fraud. *See* PXO 16 (Cox Tr.) at 105:5-106:9.

185.   On June 2, 2021, Plaintiffs commenced this lawsuit, alleging that the enforcement of K.S.A. 25-1122(k)(2) and 25-1122(l)(1) violated their First and Fourteenth Amendment rights and breached the Constitution's Dormant Commerce Clause.  With regard to the First and Fourteenth Amendment claims, Plaintiffs alleged that the statutes violated their freedom of speech (Count I) and freedom of association (Count II) and were unconstitutionally overbroad (Count III).  Compl. at 22-33, ECF No. 1.

186.   In a Memorandum & Order on November 19, 2021 (and a nunc pro tunc Order on December 15, 2021), the Court preliminarily enjoined enforcement of Sections 3(k)(2) and 3(l)(1) of HB 2332.  ECF Nos. 50, 61.

187.   Defendants, via a Stipulation with Plaintiffs that the Court entered on February 25, 2022, agreed to a permanent injunction against the enforcement of the Out-of-State Distributor Ban as violative of Plaintiffs' First and Fourteenth Amendment rights.  Those claims have thus been fully resolved and are no longer part of this litigation (other than Plaintiffs' request for their attorney fees as prevailing parties).  PTO-SF ¶ 2(a)(xxvii).  The only claims remaining in dispute pertain to the Pre-Filled Application Prohibition.  PTO-SF ¶ 2(a)(xxviii).

188.   The Pre-Filled Application Prohibition does not cover Plaintiff VoteAmerica's conduct because VoteAmerica only mails pre-populated advance voting ballot applications to voters who have specifically requested them via its interactive website.  As a result, VoteAmerica has not participated in any discovery in this case.  PTO-SF ¶ 2(a)(xxix).

## II.   REVISED CONTROVERTED FACTS

The following enumerated list of revised controverted facts is integrated from Plaintiff's and Defendants' Statements of Facts and Statements of Additional Facts in Support of Plaintiff's and Defendants' Motions for Summary Judgment, respectively.

**PLAINTIFFS' FACT IN DISPUTE 1**: VPC also personalizes its applications with pre-filled information which Mr. Lopach testified that VPC believes makes the application processing easier for election officials. PXO 14 (Lopach Decl.) ¶ 60.

> DEFENDANTS' RESPONSE:  Controverted.  It is uncontroverted that VPC pre-fills advance mail ballot applications, but it is controverted that doing so makes it "easier for election officials" to process.
>
> Mr. Lopach is not qualified to testify as to what is "easier for election officials to process[.]"  He has never worked in an election office so this statement is entirely speculative and without foundation.  DXO JJ at 125:20-126:8.  In fact, he admitted that he has to defer to county election officials regarding what is entailed in processing applications.  *Id.*
>
> The evidence also shows that pre-filled applications are often *not* easier for election officials to process.  Shawnee County's Election Office, for example, received numerous pre-filled advance voting ballot applications from voters with information that did not match the State's voter file and/or applications from (or on behalf of) individuals who had died or whose registrations had otherwise been cancelled.  DXM A at ¶¶ 11-12, 35; DXM Q (examples of inaccurate applications); DXM R (examples of applications of previously

canceled voters).  These inaccurate pre-filled applications "overwhelmed" the Shawnee County Election Office with telephone calls, letters, e-mails, and in-office visits from voters who were confused, angry, and frustrated at what they had received from VPC. DXM A at ¶¶ 12, 37, 40, 44; DXO KK at 117:24-125:2.  Shawnee County Election Commissioner Andrew Howell personally spoke with hundreds of angry, frustrated, and confused voters about their pre-filled applications.  DXO KK at 121:11-122:12.

Other election officials experienced similar calls from confused, angry, and frustrated voters.  DXO LL at 130:6-132:5; DXM U at ¶ 37; DXO HH at 150:13-152:15, 209:15-210:9, 212:20-213:1, 237:11-245:20.  Indeed, the problems caused by VPC's pre-filled applications are not unique to Kansas as other states have had similar issues.  DXM Y (e-mails between VPC outside counsel Jennifer Carrier and other state election officials).

PLAINTIFFS' REPLY: Defendants' response does not dispute that it is VPC's belief that pre-filled applications make the application processing easier for election officials.  *See also supra* Part I Stipulated Facts 46, 79.

**PLAINTIFFS' FACT IN DISPUTE 2**: Mr. Lopach testified that VPC (then named "Women's Voices. Women Vote") conducted a study that he understood to evaluate the 2006 election cycle (the "2006 Study"), including VPC's evaluation of the effectiveness of personalizing advance mail voting applications.  PXM 6 (Lopach Tr.) at 17:15–18:7, 20:7–13.

DEFENDANTS' RESPONSE: Defendants explicitly requested during discovery any studies that VPC believed supported its belief that pre-filled advance voting ballot applications were more effective than blank applications.  DXO CC, Nos. 4, 15.  Initially, VPC produced one "study" that does not address pre-filled vs. blank applications.  DXO

JJ at 16:6-17:13.  At his deposition, Mr. Lopach then identified a purported "study" conducted in 2006 by Dr. Mann with VPC's predecessor organization, DXO JJ at 17:15-20:13, and a second purported "study" by Dr. Green which, when finally disclosed, was merely an expert report in another case, dated March 21, 2022.  DXO JJ at 27:3-27:18. Following the deposition, Defendants requested a copy of the 2006 study referenced by Mr. Lopach given that it was not previously produced due to the timeframe of the requested documents.  DXO DD.  In response, VPC produced a 111-page document, all but four pages of which was redacted.  DXO EE.  The document stated that VPC's predecessor conducted a study in 2006 that "tested both the messages of its mailings and different combinations of mail and phone calls."  *Id.* at 92.  The only unredacted portion of the alleged study that was produced was a two-sentence conclusion stating that a "pre-populated form produces a higher response rate than a blank form."  *Id.* at 96.  The study is inadmissible hearsay and, without some expert witness to testify about it, VPC cannot rely on it in support of its motion.

Mr. Lopach also lacks the requisite personal knowledge to rely upon Dr. Mann's study.  Indeed, Mr. Lopach testified that he did not know "the size of the sample or anything else" about the study.  DXO JJ at 19:2-19:9.  Mr. Lopach likewise testified that he is "not aware of any studies examining how the recipient of a vote-by-mail mailing that is pre-filled compared to one that is not pre-filled [or] how the recipient reacts or responds to that mailing."  DXO JJ at 27:19-28:13.  To now imply that such studies exist in his Declaration amounts to a sham affidavit.  *See Burns v. Bd. of Cnty. Comm'rs*, 330 F.3d 1275, 1281-82 (10th Cir. 2003).

PLAINTIFFS' REPLY: Defendants' response fails to dispute the study's ultimate findings or VPC's belief that pre-filled applications are its most effective means of communicating its pro-advance mail voting.

**PLAINTIFFS' FACT IN DISPUTE 3**: Mr. Lopach testified that he understood the 2006 Study to find that pre-filled "vote-by-mail applications had a higher rate of return than blank vote-by-mail applications." PXM 6 (Lopach Tr.) at 18:24-19:6.

DEFENDANTS' RESPONSE: *See* response to Plaintiffs' Fact in Dispute 2.

PLAINTIFFS' REPLY: *See* reply to Plaintiffs' Fact in Dispute 2.

**PLAINTIFFS' FACT IN DISPUTE 4**: The 2006 Study states that "a pre-populated form produces a higher response rate than a blank form." DXO EE (2006 Study) at VPC000851. Specifically, the 2006 Study states that pre-populated forms had a response rate over 11% higher than un-populated forms. *See id.* at VPC000852.

DEFENDANTS' RESPONSE: *See* response to Plaintiffs' Fact in Dispute 2.

PLAINTIFFS' REPLY: *See* reply to Plaintiffs' Fact in Dispute 2.

**DEFENDANTS FACT IN DISPUTE 1**: DXM Q consists of examples of inaccurate applications received by Shawnee County.

PLAINTIFFS' RESPONSE: Of these fifty-one applications, only twelve appear to have entered the cure process, DXM Q at 1–9, (4 applications), 37–39 (2 applications), 48-53 (6 applications); and another two do not request a mail ballot, but rather indicate that the voter does not wish to vote by mail, id. at pp. 35, 36.  The remaining thirty-seven applications

appear to have been personalized by VPC, but the voter crossed out some personalized information and wrote-in their information.  During his deposition, Mr. Howell was shown an application personalized by VPC, including a suffix.  PXO 9 (Howell Tr. Ex. 7) at 55 (excerpted).  The voter submitted the application to Shawnee County with the suffix crossed out.  PXO 9 (Howell Tr. Ex. 7) at 55.  Looking at this exhibit, Mr. Howell admitted that if a voter crosses out a piece of pre-filled information, as long as the information that is not scratched out is correct and matches the system, the application would be accepted.  PXO 1 (Howell Tr.) at 184:16–185:11.

Plaintiff further disputes that all fifty-one applications in Defendants' Exhibit Q contain examples of personalized information filled in by VPC that is "inaccurate."  For example, some voters crossed out and replaced the first name and middle initial.  *See, e.g.*, DXM Q Q at 15, 16, 17.  It is possible that VPC intended to send these applications to different recipients at the same address, and that the crossed-out information did in fact match the intended recipient's information in ELVIS.

DEFENDANTS' REPLY: The critical point is that these voters received pre-filled applications from VPC or CVI that contained inaccurate information.  The fact that a voter may have corrected the erroneous information in certain instances did not eliminate the frustration, anger, and confusion that voters felt at having received applications that were inaccurate (and, if uncorrected by the voter or during the cure process), would have potentially prevented the voter from casting a valid ballot.  In addition, the fact that some diligent election officials (and some diligent voters) were able to identify the mistakes of VPC/CVI and correct the inaccurate pre-filled applications and thereby ensure that the voter received an advance ballot hardly

excuses the actions of VPC/CVI nor does it minimize the additional administrative

burden that such actions imposed on election officials.

Date: February 2, 2023

Respectfully Submitted,

By: /s/ *Mark P. Johnson*                     By: /s/ *Bradley J. Schlozman*
Mark P. Johnson (KS Bar #22289)          Bradley J. Schlozman (KS Bar #17621)
DENTONS US LLP                           Scott R. Schillings (KS Bar #16150)
4520 Main Street, Suite 1100             HINKLE LAW FIRM LLC
Kansas City, MO 64105                    1617 North Waterfront Parkway, Suite 400
Tel: (816) 460-2400                      Wichita, Kansas 67206
Fax: (816) 531-7545                      Telephone: (316) 267-2000
mark.johnson@dentons.com                 Facsimile: (316) 630-8466
                                         bschlozman@hinklaw.com
Danielle M. Lang (*pro hac vice*)        sschillings@hinklaw.com
Alice C.C. Huling (*pro hac vice*)
Hayden Johnson (*pro hac vice*)          *Attorneys for Defendants*
Christopher Lapinig (*pro hac vice*)
CAMPAIGN LEGAL CENTER
1101 14th Street, NW, St. 400
Washington, D.C. 20005
Tel: (202) 736-2200
dlang@campaignlegalcenter.org
ahuling@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org
clapinig@campaiginlegalcenter.org

Jonathan K. Youngwood (*pro hac vice*)
Meredith D. Karp (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Nicole A. Palmadesso (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
bonnie.jarrett@stblaw.com
nicole.palmadesso@stblaw.com

*Attorneys for Plaintiffs*

34

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on this 2nd day of February 2023, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all Counsel of record.

*/s/ Bradley J. Schlozman*

| | |
|---|---|
| **From:** | KSD_CMECF@ksd.uscourts.gov |
| **To:** | ksd_nef@ksd.uscourts.gov |
| **Subject:** | Activity in Case 2:21-cv-02253-KHV VoteAmerica v. Schwab et al Order |
| **Date:** | Thursday, February 16, 2023 4:22:51 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### DISTRICT OF KANSAS

## Notice of Electronic Filing

The following transaction was entered on 2/16/2023 at 4:22 PM CST and filed on 2/16/2023
**Case Name:**       VoteAmerica v. Schwab et al
**Case Number:**     2:21-cv-02253-KHV
**Filer:**
**Document Number:** 179(No document attached)

**Docket Text:**
**ORDER - The dates when the Court is available for oral argument apparently do not work for counsel. As the result, the case is hereby deemed submitted without oral argument. Signed by District Judge Kathryn H. Vratil on 2/16/2023. (This is a TEXT ENTRY ONLY. There is no pdf document associated with this entry.)(alh)**

**2:21-cv-02253-KHV Notice has been electronically mailed to:**

Mark P. Johnson       mark.johnson@dentons.com, docket.general.lit.kcm@dentons.com

Scott R. Schillings     sschillings@hinklaw.com, aayesh@hinklaw.com

Bradley Joseph Schlozman      bschlozman@hinklaw.com, jheppler@hinklaw.com, thansen@hinklaw.com

Aseem Mulji     amulji@campaignlegalcenter.org

Meredith D. Karp     meredith.karp@stblaw.com

Hayden Johnson     hjohnson@campaignlegalcenter.org

Jonathan K. Youngwood     jyoungwood@stblaw.com, managingclerk@stblaw.com

Alice Huling     ahuling@campaignlegalcenter.org

Brooke Jarrett     bonnie.jarrett@stblaw.com

Danielle M. Lang     dlang@campaignlegalcenter.org

Christopher Lapinig     clapinig@campaignlegalcenter.org

Nicole A. Palmadesso     nicole.palmadesso@stblaw.com

Allison Walter     awalter@campaignlegalcenter.org

**2:21-cv-02253-KHV Notice has been delivered by other means to:**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

VOTEAMERICA and VOTER    )
PARTICIPATION CENTER,    )
              )
    **Plaintiffs,**    )
              )   **CIVIL ACTION**
**v.**                 )
              )   **No. 21-2253-KHV**
**SCOTT SCHWAB, in his official capacity as** )
**Secretary of State of the State of Kansas;** )
**KRIS KOBACH, in his official capacity as** )
**Attorney General of the State of Kansas; and** )
**STEPHEN M. HOWE in his official capacity** )
**as District Attorney of Johnson County,** )
              )
    **Defendants.**    )
_____)

## MEMORANDUM AND ORDER

Voter Participation Center ("VPC") brings suit for declaratory and injunctive relief against Scott Schwab in his official capacity as Kansas Secretary of State, Kris Kobach in his official capacity as Kansas Attorney General and Stephen M. Howe in his official capacity as District Attorney of Johnson County.   Plaintiff alleges that the Personalized Application Prohibition in Section 3(k)(2) of HB2332 (codified as K.S.A. § 25–1122(k)(2)) violates its First and Fourteenth Amendment rights, U.S. Const. amends. I and XIV.[1]   The parties have submitted the matter for a bench trial.[2]   After careful consideration, based on largely stipulated facts, the Court makes the following findings of fact and conclusions of law, as required by

---

[1]  The Personalized Application Prohibition does not cover plaintiff VoteAmerica's conduct because VoteAmerica mails personalized advance mail ballot applications only to voters who have specifically requested them on its interactive website.

[2]  The parties stipulated that their briefs on cross-motions for summary judgment would serve as trial briefs.

Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## **Findings Of Fact**

Based on the stipulations of the parties, the Court makes the following findings of fact:

Personalized Application Prohibition

On February 10, 2021, the Kansas Legislature introduced HB 2332, which restricted the distribution of advance mail ballot applications to potential Kansas voters. On May 3, 2021, over the veto of Governor Laura Kelly, the Legislature enacted HB 2332. Plaintiff challenged two of HB 2332's provisions. Only one—the Personalized Application Prohibition—is still at issue in this lawsuit.

The Personalized Application Prohibition prohibits any person or organization (1) who solicits a registered voter by mail (2) from mailing to a registered Kansas voter a personalized advance mail ballot application (3) that is pre-filled with any information, such as the voter's name or address. K.S.A. § 25-1122(k)(2). A violation is a class C nonperson misdemeanor, which is punishable by up to one month in jail and/or fines. HB 2332 carves out exceptions by permitting a subset of state and county election officials to mail pre-filled advance mail ballot applications. H.B. 2332 § 3(k)(4).

The state argues that the Personalized Application Prohibition is necessary to (1) minimize voter confusion and disenfranchisement, (2) preserve and enhance voter confidence and (3) reduce the rejection of inaccurate applications and inefficiencies in the election administration, and reduce potential voter fraud. Exhibit 34 (Doc #145-37) at 3-4. These rationales are not a part of the Legislative Record for HB 2332.

In February of 2021, the Office of the Kansas Secretary of State submitted written

-2-

testimony to both the House and Senate Committees on Federal and State Affairs regarding the

state's 2020 general election. Among other things, the testimony advised the legislature as

follows:

> Leading up to the 2020 general election, state and county election officials were inundated with calls from confused voters who submitted an advance by mail ballot application but continued to receive unsolicited advance ballot applications from third parties. This created a substantial workload increase for local election offices who had to process thousands of duplicate forms at a time when county election officials were preparing for a high turnout, statewide election, in the middle of a pandemic.

Exhibit Z (Doc. #151-26). On March 17, 2021, the Kansas Secretary of State submitted written

testimony on HB 2332 which mentioned "incomplete mail ballot applications" but did not

discuss pre-filled applications. Exhibit 32 (Doc. #145-31) at 3.

Voting In Kansas

Schwab is the Chief Election Officer for Kansas. As such, he oversees all Kansas

elections and administers the state's election laws and regulations. Schwab also issues guidance

and instruction to county election officers on election procedures and requirements. Kansas law

permits Schwab to adopt rules and regulations related to advance voting, including the general

form of advance voting ballots and applications for advance mail voting. K.S.A. §§ 25-1131, 25-

1121(a)-(b), 25-1122d(c); see also HB 2332, Session of 2021 (Kan.), §§ 3(k)(2), (m).

The Kansas state voter registration database is known as the Election Voter Information

System ("ELVIS"). Schwab is responsible for maintaining an online voter registration database.

52 U.S.C. § 21083(a)(1)(A). County election officials in all 105 counties in Kansas perform all

additions, deletions and modifications of records in the database, and ELVIS reflects the voter

data maintained by those county officials. When a county election office receives a voter

-3-

registration application, election officials put that voter's registration information into the state's central database and thereby create a voter record in ELVIS.  ELVIS reflects real-time changes that officials make to individual voter files.

To vote by mail in Kansas, a voter generally must complete an advance ballot application and return it to the county election office where the voter is registered.  Voters on the permanent advance voting list or who vote by mail pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 et seq., need not file advance ballot applications to vote by mail.  The advance mail voting process includes multiple safeguards against fraud, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. See, e.g., K.S.A. § 25-2431.

If  a voter timely submits an advance voting ballot application, a county election official processes the application, and if the county accepts the application, mails the voter an advance ballot packet.[3]  If a voter submits an inaccurate or incomplete application, county election officials must contact the voter and "cure" the application.  If officials cannot contact the voter, the office will mail the voter a provisional ballot.

For the county election office to process an application without having to contact the voter to cure a mismatch or discrepancy, an advance voting ballot application must precisely

---

[3]     Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the General Election and the Tuesday of the week preceding such General Election.  K.S.A. § 25-1122(f)(2).  Other than voters entitled to receive ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, counties cannot transmit advance ballots to voters before the 20th day before the election for which an application has been received.  K.S.A. §§ 25-1123(a), 25-1220.  For advance voting ballot applications received by the county election office on or after the 20th day before the election, the county generally must process them within two business days of their receipt.  K.S.A. § 25-1123(a).

-4-

match the information in ELVIS; officials may only overlook clear inadvertent mismatches (e.g., minor misspelling of a street name such as omitting the letter "e" or signing as "Jim" despite being registered as "James").  Once the county election office processes an advance ballot application, it documents in ELVIS the date it processed the application and transmitted the regular or provisional ballot to the voter.  County election offices also document in ELVIS whether (and when) a voter has returned an advance ballot.

<u>Voter Participation Center</u>

Plaintiff's core mission is to promote voting among traditionally underserved groups—including young voters, voters of color and unmarried women—at rates commensurate with voters in other groups.  Plaintiff believes that when more eligible voters participate in elections, it benefits democracy in the United States and that encouraging and assisting voters to participate in elections through mail voting ensures a robust democracy.  Plaintiff believes that mail voting expands participation opportunities among its target voters—some of whom may not have the ability to vote in person or the resources to navigate the mail voting application process.

Plaintiff primarily uses direct mailings to encourage these voters to register and participate in the electoral process.  VPC President and Chief Executive Officer Thomas Lopach testified that plaintiff believes sending personalized advance mail ballot applications "increases voter engagement," which Lopach thinks would be a broad associational base with potential voters in Kansas.  <u>Exhibit 7</u> (Doc. #147-5) at 167:22–168:15.[4]  Plaintiff considers that providing

---

[4]      To support its belief that sending personalized applications increases voter engagement, plaintiff relies on a 2006 election cycle study which, among other things, evaluated the effectiveness of personalizing advance mail ballot applications.  Defendants argue that the study is inadmissible hearsay.  The Court finds that plaintiff may not rely on the study to prove
(continued . . .)

-5-

underserved groups the necessary personalized advance mail voting applications is key to effectively advocating its message.

Plaintiff encourages registered Kansans to participate in this manner by mailing voters a communication package that advocates for mail voting and provides a personalized advance mail ballot application.  Through these communications, plaintiff communicates its message that advance mail voting is safe, secure, accessible and beneficial.  Providing personalized applications to young voters, voters of color and unmarried women provides them simple access to advance mail ballot applications.  Plaintiff tracks recipient responses to its communications and conducts randomized control trials to evaluate the effectiveness of its mailings.

Lopach and VPC Executive Vice President Lionel Dripps testified that plaintiff engages voting behavior and quantitative research professionals, including but not limited to Christopher B. Mann, associate professor of political science at Skidmore College, to analyze the efficacy of its direct mail programs.  Plaintiff believes that the personalized applications are the most effective means of conveying its pro-mail voting message, and if the Prohibition stands, plaintiff must reconsider its communications with Kansas voters.

2020 Elections In Kansas

For the 2020 General Election, plaintiff and its 501(c)(4) sister organization, the Center for Voter Information ("CVI"), sent advance mail ballot application packets to approximately 507,864 Kansas voters.  Plaintiff's communications included a letter that (1) encouraged each voter to request and cast an advance ballot and provided instructions on how to do so,

---

the true effectiveness of the personalized applications.  This finding does not, however, dispute plaintiff's evidence of its *belief* that personalizing the applications increases engagement.

-6-

(2) detailed how to opt out of future VPC communications and (3) provided a step-by-step guide on how to submit the included application.  The packet also included a postage-paid envelope addressed to the voter's county election office.  The letter's opening paragraph specifically referred to "the enclosed advance voting application already filled out with [the voter's] name and address" and mentioned the personalization in the closing "P.S." message: "We have already filled in your name and address on the enclosed form.  Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope." Exhibit A (Doc. #145-34) at 3.  On the reverse side of the enclosed personalized advance ballot application, plaintiff also printed a step-by-step guide.

To personalize the applications, plaintiff uses statewide voter registration files obtained from data vendors and fills in parts of the advance mail ballot applications with voter information (the voter's name and address).  Plaintiff relied on a vendor, Catalist, LLC, to provide the voter registration data for the Kansas voters whom plaintiff targeted with advance voting ballot application packets. [5]  For a $200 fee, the Secretary of State's office will provide a list of all registered voters in Kansas.  That list comes from ELVIS and presents a snapshot of the state's voter file as it appears on the date when the office generates the registration list.  On January 31, April 10 and September 15, 2020, Catalist sent Kansas active voter registration lists to plaintiff.  Plaintiff's CEO Lopach testified that he does not know how often Catalist requests updated voter files from the Secretary of State's office.

Plaintiff attempts to cull its lists to ensure efficiency and accuracy.  Because ELVIS is a

---

[5]     It is not clear exactly which voters plaintiff targets.  Plaintiff at least targets some underrepresented voters who may not have the ability and availability to vote in person or the resources to navigate the mail voting application process.

-7-

dynamic system, if a third party relies on voter registration information obtained from ELVIS, some information on the pre-filled application may not match the state's voter file database when the voter receives it. This happens when an official has updated ELVIS (e.g., noting a change of name, change of address, death or ineligibility due to criminal conviction) after the Secretary of State's office generates the voter file which the third party has requested (using the stale data).

VPC Executive Vice President Dripps testified that *nationally*, plaintiff detected that roughly five per cent of the data vendor records had an incorrect middle name or initial and roughly three per cent had a suffix that did not match the voter file. Dripps testified that he did not know whether the errors in Kansas data matched the national numbers.

Defendants' expert witness, Ken Block, analyzed a subset of the advance ballot applications that plaintiff sent to Kansas voters in the 2020 General Election. This subset contained 312,918 of the approximately 507,864 applications that plaintiff sent. Block identified errors in the information that plaintiff used to pre-populate the applications. Block attested that during the 2020 General Election, plaintiff's data contained information on 385 Kansas voters whose registrations had been cancelled. Of those 385 Kansans, plaintiff sent (1) five separate mailings to 176 of the Kansans; (2) four separate mailings to 99 of the Kansans; (3) three separate mailings to 39 of the Kansans; and (4) two separate mailings to 11 of the Kansans. Exhibit N (Doc. #151-14) at 3-4. Block also attested that he identified 23 pairs of matched records in which two different voters showed the same voter registration number, which purportedly indicates that plaintiff had sent a pre-filled application for Voter #1 to Voter #2. Block further attested that Kansas' own voter file properly separated these individuals. Block did not address whether recipients actually returned these erroneous advance mail ballot

-8-

applications, or purport to demonstrate that any erroneously pre-filled application came to the attention of election officials or negatively impacted the 2020 election process. Block nonetheless attested that plaintiff's use of stale voter registration data to pre-fill the advance mail ballot applications imposed an extra burden on county election officials.

Dr. Eitan Hersh, who analyzed Block's reports, testified that actually "it seems likely that the [plaintiff's] methods *reduced* the burden on election officials." Exhibit 5 (Doc. #156-6) ¶ 41 (emphasis in original). During his deposition, Dr. Hersh stated, "all voter registration data, whether it's sourced from the state or whether it's sourced from a third party, contain obsolete records essentially the day that it is downloaded." Exhibit 1 (Doc. #167-1) at 104:22–25. Connie Schmidt, Johnson County Elections Director, testified that she is "sure there are always data entry errors" in ELVIS. Exhibit 2 (Doc. #167-2) at 107:19–24.

In his report, Dr. Hersh attested that any errors in plaintiff's lists raised by Block "are nothing out of the ordinary, given population churn and the logistics of sending large mailers out to voters." Exhibit 5 (Doc. #156-6) ¶ 16. Dr. Hersh further attested that attempts to eliminate routine error in mailing lists would be "extreme," "costly and labor intensive, and it would delay the eventual sending of the mailing." Id. ¶ 20. Dr. Hersh concluded that "Block's concerns relate to just under 3% of the records in" plaintiff's database and "[e]ven if one were to stipulate that all the issues raised by" Block existed, "the total number of problems identified by [him] is quite in line with [Dr. Hersch's] expectations." Id. ¶ 27.

Plaintiff now contracts with two data vendors to ensure it has the most accurate data when creating mailing lists. Each year, plaintiff notifies the Kansas Director of Elections of its upcoming advance mail voting program and seeks feedback on the forms and instructions that

-9-

plaintiff plans to distribute.  In the 2020 general election, an estimated 112,000 Kansas voters used a VPC- or CVI-provided pre-paid/pre-addressed envelope to mail an advance ballot application to their county election office.  An estimated 69,000 of such Kansas voters mailed an advance voting ballot application provided by plaintiff.  In 2020, county election offices received approximately 14,739 duplicate applications from Kansas voters using VPC- or CVI-provided envelopes.[6]

The 2020 general election in Kansas had record turnout (1,375,125 votes cast, a 70.9% turnout rate) and a steep increase in advance mail voting (459,229 voted by mail, 3.2% of total votes).   This compared to 1,039,085 total votes cast in the 2018 general election, which represented a 56.4% turnout rate with 152,267 votes cast by mail, and 1,225,667 total votes cast in the 2016 general election, which was a 67.4% turnout rate with 173,457 votes cast by mail.

Conducting a high-turnout presidential election race in the middle of a worldwide pandemic introduced many challenges for election administrators.  It also presented new hurdles for some voters due to COVID-19.   In the 2020 primary and general elections, many organizations, campaigns and elections offices, including plaintiff and Kansas election officials, encouraged voters to vote by mail.  Several Kansas counties sent communications to their registered voters regarding the advance mail voting process, including advance mail ballot applications.

Many voters with concerns about lost applications or mail delays called their respective election offices to inquire about the status of their applications.  Some voters re-submitted their

---

[6]     It is not clear how many Kansas voters, if any, submitted duplicate VPC- or CVI-provided applications before the 2020 general election.

-10-

applications. Election Commissioner Andrew Howell attested that in Shawnee County, duplicate and inaccurately pre-filled advance mail ballot applications resulted in telephone calls, letters, e-mails and in-office visits from voters. Howell testified, however, that he does not believe voters were necessarily confused and frustrated because they received pre-filled applications. Rather, he believes that voters erroneously assumed that the county had mailed the pre-filled ballot applications and were frustrated at the purported incompetency of his election office. The Shawnee County Election Office received 4,217 duplicate applications in 2020, as compared to the dozen or fewer that it received in the 2016 and 2018 general elections.

Howell and Ford County Election Clerk Deborah Cox attested that after receiving a duplicate application, their election offices cannot assume that the initially submitted application was correct. Depending on the situation, the offices may need to send a provisional ballot to the voter. For this reason, reviewing a duplicate application usually takes staff more time than the review of the initially submitted application. If the office does not need to contact the voter, staff can review the duplicate application in about seven to 10 minutes. If the office must contact the voter, staff can review the duplicate application in about 15 to 30 minutes (occasionally longer).

Cox testified that she would normally agree that at least in some ways, "pre-filled information increased the likelihood and the ease that [her] office can match information between the voter file and application." Exhibit 2 (Doc. #145-3) at 150:9–14. Douglas County Elections Director Jamie Shew testified that if not for budgetary constraints, his office would actually prefer to pre-fill the applications sent to voters. In 2020, for the primary and general elections, Johnson County mailed applications to all voters—opting to expend additional resources to personalize the applications and it actually pre-filled more information than

-11-

plaintiff.   Staff in the Johnson County Election Office chose to pre-fill as much of the voter's information as possible.   Exhibit 12 (Doc. #145-11) at 4.   The Office reasoned that doing so "makes it easier for the voter and reduces mistakes that [officials] then have to work harder to fix on the backend."   Exhibit 9 (Doc. #145-8) at 2.

Bryan Caskey, Kansas Secretary of State Elections Director, testified that the 2020 post-election audits revealed that every cast ballot was accounted for and counted properly either by hand or by machine.   When asked whether the audits revealed "any systemic fraud in Kansas elections in 2020," Caskey responded, "They did not."   Exhibit 17 (Doc. #146-16) at 282:25–283:13.

Procedural History

On June 2, 2021, plaintiff filed this suit, alleging that the enforcement of K.S.A. §§ 25-1122(k)(2) and 25-1122(l)(1) violated its First and Fourteenth Amendment rights and breached the Constitution's Dormant Commerce Clause.   On November 19, 2021 (and a nunc pro tunc Order on December 15, 2021), the Court preliminarily enjoined enforcement of Sections 3(k)(2) and 3(l)(1) of HB 2332.   Through a stipulation with plaintiff that the Court entered on February 25, 2022, defendants agreed to a permanent injunction against the enforcement of the Out-of-State Distributor Ban as violative of plaintiff's First and Fourteenth Amendment rights.

The only claims remaining in dispute pertain to the Personalized Application Prohibition. Plaintiff alleges that the statutes violate its freedom of speech (Count I) and freedom of association (Count II) and are unconstitutionally overbroad (Count III).

**Conclusions of Law**

Count I alleges that sending personalized mail ballot applications constitutes expressive

-12-

conduct, and Count II alleges that plaintiff's mailings constitute protected association.  Count III

asserts that the Personalized Application Prohibition is unconstitutionally overbroad, facially and

as applied to plaintiff, because it needlessly regulates a substantial amount of protected

expression and associations and impermissibly chills plaintiff's speech.  Defendants argue that

plaintiff's activity is non-expressive conduct, not speech or association, and that the Personalized

Application Prohibition is not unconstitutionally overbroad.

## I.      Counts I and II

The First Amendment, made applicable to the states by the Fourteenth Amendment,

provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const.

amend. I.   The party invoking the First Amendment's protections must prove that it applies.

Clark v. Cmty. for Creative Non–Violence, 468 U.S. 288, 293 n.5 (1984).  The First Amendment

protects several categories of speech and expression, and the Supreme Court's decisions in this

area have created a "rough hierarchy" of available protections.  R.A.V. v. City of St. Paul, 505

U.S. 377, 422 (1992).  "Core political speech occupies the highest, most protected position" in

the hierarchy, while obscenity and fighting words receive the least protection.  See id.  Other

categories of speech rank somewhere between these poles.  See id.

### A.      Whether the Prohibition Implicates Plaintiff's First Amendment Rights

Defendants assert that the Personalized Application Prohibition regulates non-expressive

conduct and does not implicate plaintiff's First Amendment rights.  Therefore, under defendants'

theory, the Personalized Application Prohibition need only be rationally related to a legitimate

state interest.  If plaintiff establishes that the Personalized Application Prohibition infringes upon

its protected speech, conduct or association, however, the prohibition must withstand some form

-13-

of heightened scrutiny.  Accordingly, the Court will first address whether the Prohibition restricts

plaintiff's expressive conduct and association.

### i.       Expressive Conduct (Count I)

The First Amendment "literally forbids the abridgement only of speech," but its

protection is not limited to just spoken or written words.  Texas v. Johnson, 491 U.S. 397, 404

(1989).  Conduct that is "sufficiently imbued with elements of communication"—known as

"inherently expressive" conduct—falls within the scope of the First and Fourteenth

Amendments.  Id.; see also Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 66

(2006).  The test to determine whether conduct is sufficiently communicative to warrant First

Amendment protection was originally articulated in two seminal free-speech cases, Spence v.

Washington, 418 U.S. 405 (1974), and Texas v. Johnson, 491 U.S. 397 (1989).  Summarizing

these cases in Cressman v. Thompson, 719 F.3d 1139 (10th Cir. 2013) ("Cressman I"), the Tenth

Circuit found that the Spence-Johnson test requires "(1) an intent to convey a particularized

message, and (2) a great likelihood that the message would be understood by those who viewed

the symbolic act or display."  Id. at 1149.[7]  Under this test, courts must analyze plaintiff's

---

[7]       The Tenth Circuit has questioned the viability of the Spence-Johnson test.
Cressman I, 719 F.3d at 1149.  In Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos.,
515 U.S. 557 (1995), the Supreme Court revisited the Spence-Johnson test and "suggested the
Spence-Johnson factors are not necessarily prerequisites for First Amendment protection for
symbolic speech."  Cressman I, 719 F.3d at 1149.  After Hurley, the circuit courts took
"divergent approaches" to reconciling the three cases.  Cressman v. Thompson, 798 F.3d 938,
955 (10th Cir. 2015) ("Cressman II").  The Second Circuit, for example, has "interpreted Hurley
to leave intact the Supreme Court's test for expressive conduct in Texas v. Johnson."  Church of
Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 n.6 (2d Cir. 2004) (citation
omitted); see also Voting for Am., Inc. v. Steen, 732 F.3d 382, 388 (5th Cir. 2013) (same).  The
Third Circuit, on the other hand, has held that Hurley "eliminated the 'particularized message'
aspect of the Spence-Johnson test."  Tenafly Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144,
(continued . . .)

-14-

conduct "with the factual context and environment in which it was undertaken."   Spence, 418

U.S. at 410; see also Clark, 468 U.S. at 294 (expressive conduct examined "in context").

Plaintiff argues that (1) it "personalizes the applications to express a specific pro-advance

mail voting message to a specific voter recipient whose information [it] conveys on its

communications" and (2) "tens of thousands of Kansans did in fact receive and act on [its]

specific message by completing and submitting an application that [it] sent."   Plaintiff Voter

Participating Center's Opposition To Defendants' Motion For Summary Judgment (Doc. #156)

filed November 4, 2022 at 89.   Defendants do not deny that plaintiff intends to communicate a

particularized message but argue that (1) plaintiff communicates its messages "through the

contents of a cover letter that [it] sends with the application, not through the application itself"

and (2) nothing in the Personalized Application Prohibition impedes plaintiff from distributing

the cover letter.   Defendants' Memorandum In Support Of Motion For Summary Judgment

Regarding Counts I-III (Doc. #151) filed October 28, 2022 at 23.[8]   Defendants assert that

---

160 (3d Cir. 2002).  "Other circuits fall somewhere in the middle."  Cressman II, 798 F.3d at 956
(citing Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 388 (6th Cir. 2005) (claimants must
show conduct conveys particularized message, but message need not be narrow or succinctly
articulable), and Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1270 (11th Cir. 2004)
(looking to whether "reasonable person would interpret [a display] as some sort of message, not
whether an observer would necessarily infer a specific message")).  Ultimately, the Tenth Circuit
has not defined a post-Hurley test but has "observed that Hurley suggests that a Spence-Johnson
'particularized message' standard may *at times* be *too high a bar* for First Amendment
protection."  Id. (quoting Cressman I, 719 F.3d at 1150) (emphasis in original).

Plaintiff argues that Hurley eschewed any particularized message prerequisite for
expressive conduct.  Although plaintiff may be correct, the Court need not reach this issue
because plaintiff's conduct satisfies even the more stringent particularized message standard
under Spence-Johnson.

[8]       As explained below, the Court doubts that "the First Amendment would
countenance slicing and dicing" plaintiff's actions for constitutional purposes.  League of
(continued . . .)

plaintiff has not established that any recipient of the personalized application discerns any particular message.

Viewed in context, a recipient is highly likely to understand that the personalized ballot application communicates plaintiff's pro-advance mail voting message. Defendants' argument that only the cover letter communicates plaintiff's message is not convincing. An organization with a neutral or negative opinion toward advance mail voting would not expend its resources to personalize mail ballot applications for specific voters. A recipient would readily understand that through the personalized mail ballot application, plaintiff is communicating that advance mail voting is safe, secure and accessible. Plaintiff presented evidence that in the 2020 general election, approximately 69,000 recipients submitted advance voting ballot applications which it provided, which strongly suggests that Kansans not only understood plaintiff's pro-advance mail voting message but also acted on its encouragement. Plaintiff has established that through mailing personalized advance mail ballot applications to select voters in Kansas, it intends to communicate a pro-advance mail voting message and that recipients understand that message.

Relying on Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47 (2006) ("FAIR"), defendants assert that plaintiff's decision to include an explanatory cover letter in its mailing packet demonstrates that a recipient would not understand plaintiff's alleged message through the personalized mail ballot application alone. In FAIR, a group of law schools sought to restrict military recruiting on their campuses because they objected to the

_____

Women Voters v. Hargett, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (quoting Steen, 732 F.3d at 401 (Davis, J. dissenting)) (quotation marks omitted). This issue does not affect the Court's analysis here, however, because it concludes that the personalized mail ballot applications constitute protected speech.

-16-

government's policy on homosexuals in the miliary.  Id. at 52.  Accordingly, the group

challenged the Solomon Amendment—which withheld federal funds from schools that denied

equal access to military recruiters—arguing that forcing them to choose between enforcing their

nondiscrimination policy against military recruiters and continuing to receive federal funds

violated their First Amendment rights.  Id.  The Supreme Court concluded that "the conduct

regulated by the Solomon Amendment is not inherently expressive."  Id. at 66.  The Court

explained as follows:

> Prior to the adoption of the Solomon Amendment's equal access requirement, law schools "expressed" their disagreement with the military by treating military recruiters differently from other recruiters. But these actions were expressive only because the law schools accompanied their conduct with speech explaining it. For example, the point of requiring military interviews to be conducted on the undergraduate campus is not "overwhelmingly apparent." . . . An observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else.

Id. (quoting Johnson, 491 U.S. at 406).

Plaintiff correctly responds that its personalized mail ballot applications are readily

distinguishable from the conduct in FAIR.  Unlike in FAIR, it is overwhelmingly apparent to

someone who receives plaintiff's application that plaintiff is expressing a pro-advance mail

voting message.  Again, only an organization which intends to convey such a message would

expend its resources to personalize and distribute advance mail ballot applications.  Defendants'

argument that the Personalized Application Prohibition merely regulates names and addresses on

paper and that a recipient would not think anything of the personalized application oversimplifies

plaintiff's claim and defies common sense.

Defendants further argue that in its order on defendants' motion to dismiss, the Court

-17-

improperly distinguished <u>Lichtenstein v. Hargett</u>, 489 F. Supp. 3d 742 (M.D. Tenn. 2020). Defendants again assert that by mailing application packets and distributing personalized mail ballot applications, plaintiff is not engaging in speech or expressive conduct. <u>Lichtenstein</u> involved First Amendment challenges to a Tennessee statute which prohibited anyone except election officials from distributing absentee ballot applications. <u>Id.</u> at 748. The district court held that the law did not prohibit spoken or written expression and therefore did not restrict expressive conduct. <u>Id.</u> at 773.

In its previous order, the Court concluded that <u>Lichtenstein</u> is not germane because plaintiff's application packets include speech that communicates a pro-mail voting message. <u>Memorandum And Order</u> (Doc. #50) filed November 19, 2021 at 12. Defendant argues that "there is no basis for this factual distinction" and that the court in <u>Lichtenstein</u> subsequently clarified that plaintiffs there—like plaintiff here—included other "voter engagement materials" with the applications. <u>Defendants' Memorandum In Support Of Motion For Summary Judgment Regarding Counts I-III</u> (Doc. #151) at 38; <u>Lichtenstein v. Hargett</u>, No. 3:20-cv-00736, 2021 WL 5826246, at *6 (M.D. Tenn. Dec. 7, 2021). Defendants' arguments miss the point. By personalizing the mail ballot applications, plaintiff engages in expressive conduct which is distinguishable from distributing blank absentee ballot applications. Moreover, as explained below, the Court rejects defendants' invitation to disaggregate the application and plaintiff's other voter engagement materials. In the final analysis, <u>Lichtenstein</u> is not persuasive or binding.

The Court finds that mailing the personalized applications is inherently expressive conduct that the First Amendment embraces. <u>See</u> <u>League of Women Voters of Fla. v. Cobb</u>, 447 F. Supp. 2d 1314 (S.D. Fla. 2006); <u>see also</u> <u>Democracy N.C. v. N.C. State Bd. of Elections</u>, 476

-18-

F. Supp. 3d 158 (M.D. N.C. 2020).[9]

### ii.      Association (Count II)

In Count II, plaintiff asserts that the Personalized Application Prohibition infringes upon its First Amendment right of association.  Specifically, plaintiff argues that the Personalized Application Prohibition interferes with its associational rights by (1) "limiting its ability to associate with Kansans to persuade them to vote by mail and assist them in requesting an advance mail ballot" and (2) foreclosing plaintiff "from using the assistance it offers its intended population of underrepresented voters to gain a foothold for future electoral engagement with those voters."   Plaintiffs' Memorandum In Support Of Their Motion For Summary Judgment  (Doc. #145) filed April 14, 2022 at 30.  Defendants argue that because plaintiff's communications are unilateral acts which a recipient may ignore, the Personalized Application Prohibition does not impact plaintiff's right to associate.

The right to associate to advance beliefs and ideas is at the heart of the First Amendment. NAACP v. Button, 371 U.S. 415, 430 (1963).  An organization's attempt to broaden the base of public participation in and support for its activities is conduct "undeniably central to the exercise

---

[9]      Defendants attempt to distinguish Cobb by arguing that voter registration drives are materially different from advance mail ballot applications.  Defendants seemingly argue that because advance voting ballot applications are more directly connected to the act of voting than registration drives, Cobb is not instructive.  As plaintiff correctly responds, even if defendants' argument is correct, this speaks to state rationales for the Personalized Application Prohibition— not the expressive nature of plaintiff's conduct.

Defendants also argue that Democracy North Carolina is distinguishable from this case because "nothing in Kansas law prevents a third-party from assisting a voter in completing an advance mail ballot application."   Defendants' Memorandum In Support Of Motion For Summary Judgment Regarding Counts I-III (Doc. #151) at 37.  In the same step, however, defendants concede that the Personalized Application Prohibition *does* bar third parties from assisting voters by personalizing and distributing unsolicited applications.  Id.  The Court is not persuaded by defendants' hollow attempt to distinguish Democracy North Carolina.

-19-

of the right of association." Am. Ass'n of People with Disabilities v. Herrera, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) (quoting Tashjian v. Republican Party of Conn., 479 U.S. 208, 214–15 (1986)), on reconsideration in part, No. CIV-08-0702 JB/WDS, 2010 WL 3834049 (D.N.M. July 28, 2010).  Public endeavors which "assist people with voter registration are intended to convey a message that voting is important," and public endeavors which expend resources "to broaden the electorate to include allegedly under-served communities" qualify as expressive conduct which implicates the First Amendment freedom of association.  Democracy N.C., 476 F. Supp. 3d at 223 (quoting Am. Ass'n of People with Disabilities, 690 F. Supp. 2d at 1215–16).

In Button, the Supreme Court emphasized that the state "cannot foreclose the exercise of constitutional rights by mere labels."  371 U.S. at 429.  The Court continued that plaintiff's conduct was a protected "form of political expression" because it was "a means for achieving the lawful objectives of equality of treatment by all government" for Black communities in the United States.  Id.  The Court emphasized that "in order to find constitutional protection for th[is] kind of cooperative, organizational activity," it "need not . . . subsume such activity under a narrow, literal conception of free of speech, petition or assembly."  Id. at 430.

Plaintiff argues that as in Button, the Prohibition abridges its ability "to engage in association for the advancement of beliefs and ideas" to "persuade [its audience] to action."  Id. at 430, 437.  Plaintiff uses personalized mail ballot applications as its chosen "means for achieving" its desired result: persuading its audience to request a mail ballot and assisting them in such process.  Id. at 429.  Plaintiff relies on the perceived effectiveness of its personalized communications, and the ease with which voters can act on its persuasion, to build relationships and increase advance mail voting in Kansas.  On this record, plaintiff has established that its

-20-

personalized mail ballot applications attempt to broaden the base of public participation in and support for its activities.  Plaintiff expends resources to (1) convey a message that voting is important, (2) assist potential voters to vote by advance mail and (3) broaden electorate participation to include underserved communities who may not have the ability and availability to vote in person or the resources to navigate the mail voting application process.  Plaintiff's associational actions implicate First Amendment protections.

Defendants argue that unlike the recipients of plaintiff's communications in <u>Button</u>—who responded to the NAACP's communications by joining its litigation efforts—the recipient of a personalized mail ballot application does not subsequently join plaintiff in a common endeavor. Defendants liken plaintiff's activity to that in <u>City of Dallas v. Stanglin</u>, 490 U.S. 19 (1989), and <u>Voting for America v. Andrade</u>, 488 F. App'x 890 (5th Cir. 2012).  Plaintiff responds that its association is distinct from <u>Stanglin</u>, where the asserted associational activity was open to "all who [were] willing to pay the admission fee."  490 U.S. at 24.  Similarly, plaintiff asserts that <u>Andrade</u> is not instructive because <u>Andrade</u> addressed restrictions on collecting and returning completed ballot applications, which the Fifth Circuit "perceive[d] [as] significant[ly] distinct[]" from "activity that urges citizens to vote."  488 F. App'x at 898.

Plaintiff here identifies a specific group of voters to target for its associations and continues to associate with these voters by, for example, tracking responses to its personalized applications and sending further get-out-the-vote communications.  In the 2020 general election, 69,000 voters joined plaintiff's common endeavor by requesting advance mail ballots.  Plaintiff includes unsubscribe information to ensure that it only associates with voters who are engaged in its advocacy and want to associate with its cause.  Unlike <u>Stanglin</u> and <u>Andrade</u>, plaintiff's

-21-

activity is directed at specific voters—underrepresented members of the electorate—and clearly urges them to vote.  The Court is not persuaded by defendants' attempt to distinguish Button and finds that the Personalized Application Prohibition implicates plaintiff's First Amendment right to freedom of association.

### B.        What Level of Scrutiny Applies

Because the Prohibition infringes upon plaintiff's First Amendment rights of speech and association, the Court must decide what level of scrutiny applies: strict scrutiny or the Anderson-Burdick balancing test.  See Chandler v. City of Arvada, Colo., 292 F.3d 1236, 1241 (10th Cir. 2002); Citizens for Responsible Gov't State Pol. Action Comm. v.  Davidson, 236 F.3d 1174, 1196 (10th Cir. 2000).  Plaintiff argues that strict scrutiny applies because the Personalized Application Prohibition restricts core political speech.  Defendants argue that because the Prohibition does not regulate core political speech, the more flexible Anderson-Burdick balancing test applies.

Strict scrutiny applies to restrictions on core First Amendment activities.  See Yes On Term Limits, Inc. v. Savage, 550 F.3d 1023, 1028–29 (10th Cir. 2008).  Under strict scrutiny, a state must assert a significant and compelling government interest that is sufficiently narrowly tailored to serve that interest.  See Perry Educ. Ass'n. v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45 (1983); see also Dias v. City & Cnty. of Denver, 567 F.3d 1169, 1181 (10th Cir. 2009) ("If a legislative enactment burdens a fundamental right, the infringement must be narrowly tailored to serve a compelling government interest.").

The Supreme Court has stated, however, that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order,

-22-

rather than chaos, is to accompany the democratic process." Storer v. Brown, 415 U.S. 724, 730 (1974); see Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) ("States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election-and-campaign-related disorder."). The Supreme Court has noted that state voting laws, whether they govern "the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affect—at least to some degree—the individual's right to vote and his right to associate with others for political ends." Burdick v. Takushi, 504 U.S. 428, 433 (1992) (quoting Anderson v. Celebrezze, 460 U.S. 780, 788 (1983)).

Accordingly, First Amendment challenges to "election code provisions governing the voting process itself" require a specialized inquiry beyond a simple "'litmus-paper test' that will separate valid from invalid restrictions." McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 345 (1995) (citation omitted). In such cases, the Supreme Court has "pursued an analytical process," balancing the relative interests of the state and an individual's right to vote and evaluating the extent to which the state's interests necessitated the contested restrictions. Id. (citation omitted).

The Supreme Court has applied the Anderson-Burdick framework to cases governing the "mechanics of the electoral process" rather than election-related speech. McIntyre, 514 U.S. at 345; see also Lerman v. Bd. of Elections in City of New York, 232 F.3d 135, 146 (2d Cir. 2000) ("Restrictions on core political speech so plainly impose a severe burden that application of strict scrutiny clearly will be necessary.") (citing Buckley v. Am. Const. L. Found. Inc., 525 U.S. 182, 208 (1999) (Thomas, J., concurring)).

Although the Tenth Circuit has applied the Anderson-Burdick framework when deciding

-23-

the "constitutionality of a content-neutral regulation of the voting process," it acknowledges that

courts must apply strict scrutiny "where the government restricts the overall quantum of speech

available to the election or voting process." Campbell v. Buckley, 203 F.3d 738, 745 (10th Cir.

2000). Other courts have noted that some laws which govern elections, particularly election-

related speech and associations, go beyond the intersection between voting rights and election

administration, and veer into the area where the First Amendment "has its fullest and most urgent

application." Tenn. State Conf. of NAACP v. Hargett, 420 F. Supp. 3d 683, 701 (M.D. Tenn.

2019) (quoting Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 223 (1989)).

Likening its challenge to those raised in Meyer v. Grant, 486 U.S. 414 (1988), and

Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182 (1999), plaintiff argues

that the Personalized Application Prohibition regulates its core political speech and association

and therefore the Court must apply strict scrutiny. In Meyer, the Supreme Court struck down a

Colorado ban on the use of paid petition circulators. 486 U.S. at 428. In Buckley, the Supreme

Court struck down three additional Colorado restrictions on petition circulators: "(1) the

requirement that initiative-petition circulators be registered voters; (2) the requirement that they

wear an identification badge bearing the circulator's name; and (3) the requirement that

proponents of an initiative report the names and addresses of all paid circulators and the amount

paid to each circulator." 525 U.S. at 186 (citations omitted). The Supreme Court reasoned that

the regulation of such activities concerned "a limitation on political expression subject to

exacting scrutiny." Meyer, 486 U.S. at 420 (citation omitted). Rejecting the state's argument

that collecting signatures could be easily separated from the regulation of speech, the Court

explained that the "circulation of an initiative petition of necessity involves both the expression

-24-

of a desire for political change and a discussion of the merits of the proposed change." Id. at 421. "[T]o guard against undue hindrances to political conversations and the exchange of ideas," the First Amendment "requires us to be vigilant" when states regulate such activities. Buckley, 525 U.S. at 192. Ultimately, the Court held that the prohibitions were unconstitutional because they "significantly inhibit[ed] communication with voters about proposed political change, and [were] not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify those restrictions." Id.

Plaintiff first argues that because defendants concede that its cover letter is core political speech, the Court should apply strict scrutiny to both the cover letter and the personalized mail ballot application because they are "characteristically intertwined." See Vill. of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632 (1980). The Supreme Court has held that where "the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase." Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 796 (1988). The Court reasoned that such "an endeavor would be both artificial and impractical." Id. In Village of Schaumburg, for example, the Supreme Court held as follows:

> Prior authorities, therefore, clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests— communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation *is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues*, and for the reality that without solicitation the flow of such information and advocacy would likely cease. Canvassers in such contexts are necessarily more than solicitors for money.

-25-

444 U.S. at 632 (emphasis added).

Plaintiff argues that "the entire point of [its] mailer is to convey a message that voting by mail is easy and provide direct assistance and the seamless means for how voters can engage in this manner."   Plaintiff Voter Participating Center's Opposition To Defendants' Motion For Summary Judgment (Doc. #156) at 85.   Accordingly, although the application itself communicates plaintiff's message, plaintiff includes the cover letter, and other instructional materials, to inform and persuade the recipient that opting to vote by mail is easily done *with the attached personalized application*.   Defendants argue that the cover letter would be "wholly unaffected" by the Personalized Application Prohibition.   Defendants' Memorandum In Support Of Motion For Summary Judgment Regarding Counts I-III (Doc. #151) filed October 28, 2022 at 30.   The record, however, does not support defendants' contention.   Plaintiff's cover letter explicitly states, for example: "I have sent you the enclosed advance ballot by mail application already filled out with your name and address."   Exhibit I (Doc. #151-9) at 2.

Defendants further argue that unlike in Village of Schaumburg, the Personalized Application Prohibition does not effectively bar plaintiff's conduct.   Instead, defendants assert that even if the Personalized Application Prohibition regulates plaintiff's speech, it is a "*de minimus*" regulation.   The Supreme Court has, however, "consistently refused to overlook an unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired."   Cal. Democratic Party v. Jones, 530 U.S. 567, 581 (2000).   Plaintiff has established that the personalized mail ballot application is "characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues."   Village of

-26-

Schaumburg, 444 U.S. at 632.  Defendants have provided no evidence to the contrary.  For constitutional purposes, the First Amendment does not countenance slicing and dicing plaintiff's actions.  Steen, 732 F.3d at 401 (Davis, J. dissenting).

The Court therefore rejects defendants' invitation to disaggregate the application from the cover letter, which conflicts with the Supreme Court's refusal "to separate component parts of" a communication "from the fully protected whole."  Riley, 487 U.S. at 796; see also League of Women Voters, 400 F. Supp. 3d at 720.  Because defendants concede that the cover letter, is protected core political speech, the Court applies strict scrutiny. [10]

Even if the Court were to find that it must independently analyze the personalized mail ballot application, the record supports plaintiff's contention that as in Meyer and Buckley, sending personalized applications constitutes "interactive communication concerning political change."  Meyer, 486 U.S. at 422.  Plaintiff tracks the effectiveness of its communications and from experiences believes that personalizing applications is the most effective way to convey its pro-advance mail voting message.  The Personalized Application Prohibition significantly inhibits communication with voters about proposed political change because it effectively eliminates the program which plaintiff believes most effectively delivers its message.

---

[10]     Although decided under Kansas rather than federal law, the Court notes that the Kansas Court of Appeals recently considered the constitutionality of a ballot collection restriction.  See League of Women Voters of Kan. v. Schwab, 525 P.3d 803 (Kan. Ct. App. 2023).  It held that under Kansas law, the restriction must withstand strict scrutiny because such scrutiny applies to any infringement of a fundamental right, regardless of the degree of infringement.  Id. at 824.  The court also emphasized that "other courts have been skeptical of an analytic approach that would separate an advocacy for voting from the collection of ballots or applications themselves" because "[t]his approach allows the government to indirectly burden protected activity."  Id. at 830.  Finally, the court concluded that the ballot collection limitation statute infringes upon the free speech rights of the ballot collector.  Id. at 831.

-27-

Ultimately, the Personalized Application Prohibition would reduce the total quantum of speech on this important public issue and deprive plaintiff of its First Amendment right to "select what [it] believe[s] to be the most effective means" of advocating its message, Meyer, 486 U.S. at 424; see also Chandler, 292 F.3d at 1244 (recognizing First Amendment protection for what plaintiff "believes" to be its most effective means of communication).

Defendants' argument that plaintiff remains free to communicate its pro-advance mail voting message through its cover letter misses the point. That plaintiff remains free to employ other speech to disseminate its ideas does not take plaintiff's speech outside the bounds of First Amendment protection. See Meyer, 486 U.S. at 424.

Relying on Voting for America v. Steen, 732 F.3d 382 (5th Cir. 2013), defendants argue that plaintiff's "novel theory would render virtually every feature of a state's electoral regulatory scheme vulnerable to constitutional attack just because such law might stand in the way of an advocacy organization's effort to maximize the success of its operations." Defendants' Response To Plaintiffs' Motion For Summary Judgment (Doc. #155) at 50. Plaintiff correctly responds, however, that it is not advocating for the right to a successful program but for its right to advocate its cause through the means it believes to be most effective. See Meyer, 486 U.S. at 424.

Defendants further argue that ballot applications are merely official state forms, not core political speech. Relying on Doe v. Reed, 561 U.S. 186 (2010), plaintiff responds that by personalizing the applications to a specific voter, it expresses its political view that the recipient whose name has been personalized on the application should complete and submit the application to request an advance mail ballot and participate in the upcoming election. In Reed,

-28-

the Supreme Court found that by its very inclusion on a ballot petition form, a signature "expresses the political view [of the signor] that the question should be considered by the whole electorate" and thereby constitutes "the expression of a political view" implicating a First Amendment right.  Id. at 195 (quotation marks and citation omitted).  Similarly, plaintiff here expresses its political view that the recipient of the personalized mail ballot application should vote by advance mail, and the state—having chosen to tap the energy and the legitimizing power of the democratic process—must accord the participants in that process the First Amendment rights that attach to their roles.  Id.

Finally, defendants argue that unlike the cases which address petition restrictions, the Personalized Application Prohibition "does not restrict anyone from communicating with anyone else and about anything."  Defendants' Response To Plaintiffs' Motion For Summary Judgment (Doc. #155) at 69.  Defendants oversimply the issue.  Like Meyer and Buckley, this case involves more than names and addresses on mail ballot applications or some other matter of election administration regulation.  It involves the "direct regulation of communication and political association, among private parties, advocating for a particular change," namely an increase in advance mail voting for underrepresented voters.  Hargett, 420 F. Supp. 3d at 704.  Like citizen petition circulators, plaintiff uses state-created forms—advance mail ballot applications—to have an effect in the political process and express its political message that voting by mail is a safe alternative, especially for underrepresented and underserved populations.  The Personalized Application Prohibition restricts "the overall quantum of speech available to the election or voting process" and must survive strict scrutiny.  Campbell, 203 F.3d at 745.

Even if the Court were to find that the Personalized Application Prohibition constitutes a

-29-

content-neutral regulation of the voting process, it must apply the Anderson-Burdick balancing framework to determine the appropriate level of scrutiny.  This approach would not necessarily change the analysis or the outcome of this case.  When the challenged law is "minimally burdensome" on the exercise of constitutional rights, Anderson-Burdick requires a "less-searching examination close to rational basis" review.  Ohio Democratic Party v. Husted, 834 F.3d 620, 627 (6th Cir. 2016) (citing Burdick, 504 U.S. at 434).  Regulations "imposing severe burdens" on plaintiff's rights, however, "must be narrowly tailored and advance a compelling state interest."  Campbell, 203 F.3d at 743 (quoting Timmons, 520 U.S. at 358).

In American Constitutional Law Foundation, Inc. v. Meyer, for example, the Tenth Circuit considered the constitutionality of a provision which provided, in part, that "[n]o petition for any ballot issue shall be of any effect unless filed with the secretary of state within six months from the date that the title, submission clause, and summary have been fixed and determined."  120 F.3d 1092, 1098 (10th Cir. 1997).  The Court of Appeals concluded that the six-month deadline was "not a significant burden on the ability of organized proponents to place a measure on a ballot" because "by planning and proper preparation of the ballot, title proponents enjoy ample time to circulate petitions."  Id. at 1099.  Accordingly, it only considered whether the state's purported interest were "sufficiently weighty to justify the limitation imposed on" plaintiffs' rights.

On the other hand, the Tenth Circuit applied strict scrutiny to the requirement that each petition circulator wear a personal identification badge.  Id. at 1101.  It rejected the state's invitation to avoid exacting scrutiny because the "First Amendment affords the broadest protection to political expression in order to assure the unfettered interchange of ideas for the

-30-

bringing about of political and social changes desired by the people." Id. at 1101–02 (quoting Buckley, 424 U.S. at 14 (quotation marks omitted)). It therefore concluded that the badge requirement chilled petition circulation. Id. at 1102.

Here, even if the Court applied the Anderson-Burdick balancing framework to determine the appropriate level of scrutiny, strict scrutiny would apply. Planning and proper preparation could not remedy plaintiff's loss: its ability to advocate its pro-advance mail voting message to underrepresented voters through the means it believes to be the most effective. The Personalized Application Prohibition criminalizes what plaintiff believes to be the most effective means of speech and association. Plaintiff has established that the Personalized Application Prohibition significantly burdens its speech and association, and as discussed below, defendants have failed to provide much, if any, factual basis to justify that burden. Because the First Amendment affords the broadest protection to political expression like plaintiff's conduct, the Personalized Application Prohibition must survive strict scrutiny even under the Anderson-Burdick framework.

### C.    Strict Scrutiny

To survive strict scrutiny, defendants must show that the Personalized Application Prohibition is narrowly tailored to serve a compelling state interest. See Yes On Term Limits, 550 F.3d at 1028 (citing Republican Party of Minn. v. White, 536 U.S. 765, 774–75 (2002)). Defendants assert the following justifications for the Personalized Application Prohibition: (1) enhancement of public confidence in the integrity of the electoral process and avoiding fraud, (2) avoidance of voter confusion and (3) facilitation of orderly and efficient election administration. Defendants' Response To Plaintiff's Motion For Summary Judgment (Doc.

-31-

#155) at 56.

### i.      Public Confidence and Avoiding Fraud

Defendants argue that the Personalized Application Prohibition is narrowly tailored to achieve its interest in avoiding potential fraud.  Preventing voter fraud and preserving election integrity are important state interests.  See Timmons, 520 U.S. at 364 ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials.").  The Supreme Court has observed that the courts do not "require elaborate, empirical verification of the weightiness" of the state's asserted justifications.  Id. at 364.  "Indeed, the Supreme Court has upheld what is likely a more burdensome regulation, requiring photo identification issued by the government in order to vote in person, even in the face of a record devoid of any evidence of voter fraud occurring in Indiana in its history."  Democracy N.C., 476 F. Supp. 3d at 207 (citing Crawford, 553 U.S. at 194–96).

To start, although preventing voter fraud is a potentially compelling state interest, defendants have presented no evidence of voter fraud effectuated through advance mail voting or otherwise.  Defendants have presented no evidence of a single instance in which a voter received duplicate mail ballots, and they have presented that every cast ballot was accounted for.  Kansas officials publicly declared that the 2020 election was successful, without widespread, systematic issues of voter fraud, intimidation, irregularities or voting problems.

As the Court noted in its order granting plaintiff's motion for preliminary injunction, defendants' argument has superficial appeal but boils down to an issue of administrative efficiency.  The real issue seems to be that the process of preventing duplicate ballots takes more time than the process of dealing with requests for initial ballots.  See Defendants' Memorandum

-32-

<u>In Support Of Motion For Summary Judgment Regarding Counts I-III</u> (Doc. #151) at 50 ("While Kansas appears to have avoided any systemic fraud in its recent elections, the surge of inaccurate and duplicate pre-filled advance voting ballot applications in 2020 taxed the ability of overburdened county election offices to timely and efficiently process such applications, which also necessarily increased the opportunity for mistakes to be made both in connection with advance voting ballot applications and election administration in general.").

Even if Kansas had a problem with election fraud, the Personalized Application Prohibition is not narrowly tailored to prevent such fraud. Defendants argue that a surge of "inaccurate and duplicate" advance mail ballot applications decreased the efficiency of county election officials, which in turn increased the "opportunity" for mistakes. Even in a historically unprecedented election, they cite no evidence of a single mistake. <u>Id.</u> Given the overall surge in advance mail ballot applications, the Court does not doubt that some county election offices felt put upon or overburdened. In the 2020 elections, many organizations, campaigns, election offices and even Kansas election officials were encouraging voters to vote by mail. Kansas voters got the message: compared to 2018, three times as many of them voted by mail. Because of the highly contested nature of the election, in addition to the pandemic, many voters were concerned that their mail ballots would not be received and counted, and requested duplicate ballots for peace of mind. Defendants have not demonstrated that in this context, any "surge" of "inaccurate and duplicate" advance mail ballot requests was fairly attributable to activity which the Personalized Application Prohibition seeks to prohibit. In fact, the record suggests that on balance, such activity is more helpful than harmful to overburdened elections officials.

Again, defendants have not presented any evidence of voter fraud effectuated on account

-33-

of personalized advance ballot applications or any other reason, or even a single instance in which a voter received or cast duplicate mail ballots. The advance mail voting process includes multiple safeguards against fraud, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. See, e.g., K.S.A. § 25-2431. These safeguards are extremely effective in preventing fraud in Kansas. Plaintiff persuasively observes that following defendants' logic, "any activity that takes up an election official's time and attention can be criminalized on the basis of potential fraud." Plaintiff Voter Participating Center's Opposition To Defendants' Motion For Summary Judgment (Doc. #156) filed November 4, 2022 at 114.

Even if pre-filled or duplicate applications raised fraud concerns in Kansas, the Personalized Application Prohibition does nothing to address this alleged issue. It does not limit the number of advance mail ballot applications a third party may send to a voter or the number of ballot applications a voter may submit. Moreover, even accepting Block's identification of "hundreds" of purported errors in plaintiff's mailing list, these errors relate to under *three per cent* of plaintiff's records in a general election year that was sui generis, and the record contains no evidence that these errors had any impact on election processes. Block could not connect the alleged errors in plaintiff's mailing list with errors in applications received by election officials.

Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve any alleged interest in preventing voter fraud.

### ii.    Voter Confusion

Defendants argue that the Personalized Application Prohibition prevents voter confusion because it eliminates the opportunity for mistakes in pre-filled applications and reduces any mistaken belief that the applications originated from election officials. Specifically,

-34-

defendants assert that some voters were confused about inaccurately pre-filled and duplicate applications and that this confusion caused disorder, which endangered the integrity of the election. The state's interest in minimizing voter confusion is connected to its broader legitimate interest in protecting election integrity. Fish v. Kobach, 189 F. Supp. 3d 1107, 1148 (D. Kan. 2016); see also Burson v. Freeman, 504 U.S. 191, 199 (1992) (state has "compelling interest in protecting voters from confusion and undue influence").

Although protecting voters from confusion is a compelling interest, the Personalized Application Prohibition is not narrowly tailored to serve that interest. Howell attested that duplicate and inaccurately pre-filled advance mail ballot applications resulted in telephone calls, letters, e-mails and in-office visits from voters. Howell does not believe that voters were confused or frustrated because the applications which they received were pre-filled. Rather, he believes that voters erroneously assumed that the county had mailed the duplicate ballot applications and were frustrated by the purported incompetency of his election office.

Given the record turnout and COVID-19, some voter confusion was perhaps inevitable. Even assuming that receiving duplicate advance ballot applications confused some voters, defendants presented no evidence on how criminalizing the mailing of personalized mail ballot applications would prevent confusion as to the source of the pre-filled advance mail ballot. Furthermore, it is not clear that the state has a compelling interest in protecting the reputations of election officials for administrative efficiency. Even so, defendants have not established that the Personalized Application Prohibition is narrowly tailored to protect their reputational interests. Johnson County officials distributed pre-filled ballot applications because they believed doing so "makes it easier for the voter and reduces mistakes that [officials] then have to work harder to fix

-35-

on the backend," Exhibit 9 (Doc. #145-8) at 2, so it appears that the real problem is not pre-filled applications but duplicate applications—which the Personalized Application Prohibition does not attempt to regulate. Defendants presented minimal evidence of voter confusion and frustration and have not established that the pre-filled applications caused the alleged confusion.

On this record, defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve its alleged interest in preventing voter confusion regarding the source of unsolicited pre-filled applications, or any other electoral issues.

### iii.    Orderly And Efficient Election Administration

Finally, defendants argue that the Personalized Application Prohibition is necessary to facilitate orderly and efficient administration of elections. Preserving the integrity and administration of the electoral process is a compelling state interest. Fish, 957 F.3d at 1133.

Defendants submitted evidence that if a voter submits an inaccurate or incomplete application, county election officials must contact the voter and "cure" the application. If officials cannot contact the voter, the office will mail a provisional ballot to the voter. Howell and Cox attested that reviewing a duplicate application usually takes more staff time than review of the initially submitted application. Again, the real issue here seems to be duplicate applications, which the Personalized Application Prohibition does not address. Moreover, even if receiving such duplicates hinders efficient election administration, defendants have not established that in the context of an unprecedented election during a global pandemic, any "surge" of inaccurate and duplicate applications was fairly attributable to activity which the Personalized Application Prohibition seeks to prohibit.

In fact, the record suggests that on balance, personalizing advance mail ballot

-36-

applications actually facilitates orderly and efficient election administration.  Cox testified that normally she agrees that at least in some ways, pre-filled information increases the likelihood and the ease with which her office can match information between voter files and applications. Shew testified that if not for budgetary constraints, his office would prefer to personalize applications sent to voters with pre-filled information.  Even more, in the 2020 primary and general elections, Johnson County mailed applications to all voters—expending additional resources to personalize applications and actually pre-filling more information than plaintiff. Staff in the Johnson County Election Office chose to pre-fill as much of the voter's information as possible because doing so makes it easier for voters and reduces mistakes that officials have to fix on the back end.

On this record, defendants' contention that the Personalized Application Prohibition is narrowly tailored to facilitate orderly and efficient election administration is not persuasive.  The prohibition does nothing to address duplicate application concerns, and defendants have not established that pre-filling advance mail ballot applications hinders election administration.

Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve the state's alleged interests in the enhancement of public confidence in the integrity of the electoral process and avoiding fraud, the avoidance of voter confusion or the facilitation of orderly and efficient election administration.   The Personalized Application Prohibition cannot withstand strict scrutiny and is therefore an unconstitutional infringement on plaintiff's First Amendment rights to speech and association.

## II.    Count III

Count III asserts that the Personalized Application Prohibition is unconstitutionally

-37-

overbroad because it needlessly regulates a substantial amount of protected expression and associations and impermissibly chills plaintiff's speech.  Plaintiff brings both as-applied and facial overbreadth challenges.

Facial challenges and as-applied challenges can overlap conceptually.  See Reed, 561 U.S. at 194.  Where the "claim and the relief that would follow . . . reach beyond the particular circumstances of the[] plaintiffs," "they must satisfy th[e] standards for a facial challenge to the extent of that reach."  Id.; see also United States v. Sup. Ct. of N.M., 839 F.3d 888, 913 (10th Cir. 2016) (same).  In Reed, for example, the Supreme Court held that because plaintiffs sought "an injunction barring the secretary of state from making referendum petitions available to the public," not just an injunction barring the public disclosure of the referendum petition involving them, plaintiffs must satisfy the "standards for a facial challenge to the extent of that reach."  561 U.S. at 194.  Here, plaintiff's claim for relief reaches beyond its particular circumstances, and the Court therefore analyzes plaintiff's claims under the heightened facial challenge standard.  Id.

A statute is "facially overbroad if it criminalizes 'a *substantial amount* of protected speech.'"  United States v. Hernandez-Cavillo, 39 F.4th 1297, 1309 (10th Cir. 2022) (quoting United States v. Williams, 553 U.S. 285, 292 (2008) (emphasis added)).  That is, "a substantial number of instances must exist in which [the Personalized Application Prohibition] cannot be applied constitutionally."  Id. (quoting N.Y. State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 14 (1988)).  That number must be substantial "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."  Williams, 553 U.S. at 292.  Accordingly, the Court must compare the Personalized Application Prohibition's "legitimate and illegitimate applications."  Harmon v. City of Norman, 981 F.3d 1141, 1153 (10th Cir. 2020) (citation

-38-

omitted).  The Court may invalidate the Personalized Application Prohibition as overbroad "only if this comparison reveals 'a realistic danger that [it] . . . will significantly compromise recognized First Amendment protections'" of parties not before the Court.  Hernandez-Cavillo, 39 F.4th at 1309 (quoting N.Y. State Club Ass'n, 487 U.S. at 11).  The Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be substantial" in both absolute and relative terms.  Williams, 553 U.S. at 292.  "Application of the overbreadth doctrine . . . is, manifestly, strong medicine" which courts employ "sparingly and only as a last resort." Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973).

Defendants assert that the Personalized Application Prohibition has three legitimate purposes: eliminating voter fraud, preventing voter confusion and preserving limited resources to maintain orderly administration of the electoral process.  See Defendants' Memorandum In Support Of Motion For Summary Judgment Regarding Counts I-III (Doc. #151) at 55.  Plaintiff argues that the Personalized Application Prohibition is facially overbroad because it punishes all advance mail ballot application personalization with the potential of criminal penalties.

The record reflects that the Personalized Application Prohibition criminalizes a substantial amount of protected speech and that any legitimate applications are hypothetical or rare.  Defendants offer little support for the claim that inaccurately personalized mail ballot applications are a significant problem and no evidence that fraudulent applications are a problem in Kansas.  Even more, "other statutes independently—and more narrowly—proscribe" the creation or submission of fraudulent advance mail ballot applications.  Hernandez-Cavillo, 39 F.4th at 1309; see e.g., K.S.A. § 25-2431.  "The availability of these alternative prosecutorial tools dilutes the force" of the Personalized Application Prohibition's legitimate application.  Id.

-39-

at 1310.  Further, defendants have presented minimal evidence of voter confusion and frustration and have not established that the pre-filled applications caused the alleged confusion.  The record also suggests that on balance, personalizing advance mail ballot applications is more helpful than harmful to overburdened elections officials.

On the other hand, the illegitimate applications are far broader.  The Personalized Application Prohibition criminalizes *all* personalization, which "may cause others not before the court to refrain from constitutionally protected speech or expression."  Hernandez-Cavillo, 39 F.4th at 1302 n.6.  The Personalized Application Prohibition does not include a scienter requirement, which creates "a real danger that the statute will chill First Amendment expression."  Id. at 1300.  Further, the Personalized Application Prohibition excludes only a subset of state and county election officials, who are permitted to mail pre-filled advance mail ballot applications.  H.B. 2332 § 3(k)(4); cf. United States v. Stevens, 559 U.S. 460, 477–78 (2010) (federal statute criminalizing animal-cruelty depictions unconstitutionally overbroad even though it excluded speech having "serious religious, political, scientific, educational, journalistic, historical, or artistic value" (quoting 18 U.S.C. § 48 (2010))).

Ultimately, the comparison of the Personalized Application Prohibition's legitimate and illegitimate applications is one-sided.  Because other statutes proscribe voter fraud, the Personalized Application Prohibition would not deprive the government of "a critical enforcement tool or leave wide swaths of criminal conduct unpunished."  Hernandez-Cavillo, 39 F.4th at 1313; see also Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 609 (1967) ("The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." (citation omitted)); cf. Younger v. Harris, 401 U.S. 37, 51

-40-

(1971) ("[I]t is well settled that [a] statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so."). Defendants have also failed to establish that inaccurately pre-filled applications caused voter confusion or that the Personalized Application Prohibition facilitates orderly election administration.

By proscribing all advance mail ballot application personalization, the Personalized Application prohibition criminalizes a substantial amount of protected speech and association. Even if a person drew directly from ELVIS to instantaneously personalize and deliver an application, the Personalized Application Prohibition prohibits that practice.  Simply put, regardless of source or timing, the Personalized Application Prohibition would prohibit all personalization—meaning that "many of [the Personalized Application Prohibition's] potential applications involve protected speech."   Hernandez-Cavillo, 39 F.4th at 1311.   The Court therefore finds that facially, the Personalized Application Prohibition is unconstitutionally overbroad.

**IT IS THEREFORE ORDERED** that the Clerk of the Court enter judgment in favor of plaintiff.   Because the second sentence of K.S.A. § 25-1122(k)(2) restricts plaintiff's core political speech and association and it cannot withstand strict scrutiny, it is an unconstitutional infringement on plaintiff's First Amendment rights to speech and association.  Because plaintiff has established that the second sentence of K.S.A. § 25-1122(k)(2) criminalizes a substantial amount of protected speech, the prohibition is also unconstitutionally overbroad.  Defendants are enjoined from enforcing the second sentence of K.S.A. § 25-1122(k)(2).

Dated this 4th day of May, 2023 at Kansas City, Kansas.

-41-

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VOTEAMERICA and
VOTER PARTICIPATION CENTER,

   *Plaintiffs,*

v.

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas; KRIS
KOBACH, in his official capacity as Attorney
General of the State of Kansas; and STEPHEN
M. HOWE, in his official capacity as District
Attorney of Johnson County,

   *Defendants.*

C.A. 2:21-cv-02253-KHV-GEB

**JOINT PROPOSED REMMAND PLAN AND SCHEDULE AND
JOINT MOTION FOR AN ORDER HOLDING IN ABEYANCE PROCEEDINGS
<u>REGARDING ATTORNEYS' FEES AND EXPENSES</u>**

The parties, by and through undersigned counsel, hereby jointly propose the following

plan and schedule for further proceedings in accordance with the Court's December 9, 2024 Order

(Doc. 195). The parties have conferred and agree that no further discovery is necessary and

propose to submit the remaining issues in this matter for resolution to the Court on the basis of

supplemental written submissions and, should it be helpful to the Court, oral argument. Due to

the upcoming holidays, pre-planned trips out of the country and other case commitments, the

parties propose the following supplemental briefing schedule:

- Plaintiffs' Opening Brief: January 31, 2025 (30-page limit, excluding exhibits)

- Defendants' Response:  March 14, 2025 (30-page limit, excluding exhibits)

- Plaintiffs' Reply:   April 4, 2025 (15-page limit, excluding exhibits)

In addition, and pursuant to pursuant to Fed. R. Civ. P. 54(d) and D. Kan. Rule 6.1, hereby jointly move for the entry of an order holding in abeyance proceedings regarding the award of attorneys' fees and costs in this action until 45 days after issuance of a final judgment in this action. In support of this motion, the parties state:

1.     The parties have consulted on this motion, and the motion is being filed jointly.

2.     Pursuant to Fed. R. Civ. P. 54(d), a claim for attorneys' fees and related expenses must be filed no later than 14 days after the entry of judgment "[u]nless . . . a court order provides otherwise."

3.     On May 31, 2022, this Court entered an Order sustaining the Consent Motion Regarding Attorneys' Fees and Expenses (*see* Doc. 97), ordering that, "Proceedings regarding the award of attorneys' fees and related expenses in this action are held in abeyance until 45 days after issuance of a final judgment in this action." (Doc. 102.)

4.     On May 23, 2023, this Court entered an Order granting the Joint Motion for an Order Holding in Abeyance Proceedings Regarding Attorneys' Fees and Expenses, ordering that, "all fees and related expense issues shall be held in abeyance until 45 days after the final resolution of all appeals filed in relation to this action have been exhausted, including any petition for a writ of certiorari in the U.S. Supreme Court or decision by the U.S. Supreme Court." (Doc. 186.)

5.     On November 11, 2024, the Tenth Circuit reversed this Court's judgment and remanded the case to this Court for further proceedings. (*See* Doc. 194.)

6.     The final amount of Plaintiffs' fees request will depend on the result of and time expended on further proceedings before this Court and potentially any subsequent appeals. As a result, the parties believe that the interests of justice, as well as interests of judicial economy, will be served by holding all fees issues in abeyance until after issuance of a final judgment in this

action including the final resolution of all appeals filed in relation to this action.

7.      Therefore, the parties respectfully request that this Court enter an order holding all fees issues in abeyance until 45 days after the after issuance of a final judgment in this action including the final resolution of any appeal, including any petition for a writ for certiorari in the U.S. Supreme Court, filed in relation to this action.

WHEREFORE, the parties respectfully request that this Court enter an order holding in abeyance proceedings regarding the award of attorneys' fees and related expenses in this action until 45 days after the issuance of a final judgment in this action including the final resolution of any appeal, including any petition for a writ for certiorari in the U.S. Supreme Court or decision by the U.S. Supreme Court, filed in relation to this action.

Dated this 15th day of December, 2024.

Respectfully Submitted,

| | |
|---|---|
| Bradley J. Schlozman (KS Bar #17621) | Mark P. Johnson, Kansas Bar #22289 |
| Scott R. Schillings (Bar # 16150) | **Dentons US LLP** |
| **HINKLE LAW FIRM LLC** | 4520 Main Street, Suite 1100 |
| 1617 North Waterfront Parkway | Kansas City, MO 64105 |
| Suite 400 | Telephone: 816-460-2400 |
| Wichita, KS 67206 | Facsimile: 816-531-7545 |
| Tel.: (316) 267-2000 | E-mail: mark.johnson@dentons.com |
| Fax: (316) 630-8466 | |
| E-mail: bschlozman@hinklaw.com | Danielle Lang, *Pro Hac Vice* |
| E-mail: sschillings@hinklaw.com | Alice Huling, *Pro Hac Vice* |
| | **Campaign Legal Center** |
| *Attorneys for Defendants* | 1101 14th Street, NW, Suite 400 |
| | Washington, DC 20005 |
| | Telephone: 202-736-2200 |
| | Facsimile: 202-736-2222 |
| | E-mail: dlang@campaignlegalcenter.org |

3

Jonathan K. Youngwood, *Pro Hac Vice*
Meredith D. Karp, *Pro Hac Vice*
Brooke Jarrett, *Pro Hac Vice*
Nicole A. Palmadesso, *Pro Hac Vice*
**Simpson Thacher & Bartlett LLP**
425 Lexington Avenue
New York, NY 10017
Telephone: 212-455-2000
Facsimile: 212-455-2502
E-mail: jyoungwood@stblaw.com
E-mail: meredith.karp@stblaw.com
E-mail: bonnie.jarrett@stblaw.com
E-mail: nicole.palmadesso@stblaw.com

*Attorneys for Plaintiffs*

4

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on this 15th day of December, 2024, I electronically filed the foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

_/s/ Bradley J. Schlozman_
Bradley J. Schlozman

## Bhakta, Sajani J.

| | |
|---|---|
| **From:** | KSD_CMECF@ksd.uscourts.gov |
| **Sent:** | Monday, December 16, 2024 9:28 AM |
| **To:** | ksd_nef@ksd.uscourts.gov |
| **Subject:** | Activity in Case 2:21-cv-02253-KHV VoteAmerica v. Schwab et al Order |

**EXTERNAL**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### DISTRICT OF KANSAS

## Notice of Electronic Filing

The following transaction was entered on 12/16/2024 at 9:28 AM CST and filed on 12/16/2024
**Case Name:**       VoteAmerica v. Schwab et al
**Case Number:**    2:21-cv-02253-KHV
**Filer:**
**Document Number:** 198(No document attached)

**Docket Text:**
**ORDER: The parties' [197] Joint Proposed Remand Plan And Schedule And Joint Motion For An Order Holding In Abeyance Proceedings Regarding Attorneys' Fees And Expenses filed December 15, 2024 is SUSTAINED. The parties shall submit written submissions on the remaining issues in this matter for resolution by the Court as follows: (1) On or before January 31, 2025, plaintiffs shall file an opening brief limited to 30 pages, excluding exhibits; (2) On or before March 14, 2025, defendants shall file a response brief limited to 30 pages, excluding exhibits; and (3) On or before April 4, 2025, plaintiffs may file a reply brief limited to 15 pages, excluding exhibits. All proceedings regarding the award of attorneys' fees and costs in this action shall be held in abeyance until 45 days after issuance of a final judgment in this action, including the final resolution of any appeal, including any petition for a writ for certiorari in the U.S. Supreme Court or decision by the U.S. Supreme Court, filed in relation to this action. The status conference scheduled for 12/17/2024 at 1:00 PM is CANCELLED. Signed by District Judge Kathryn H. Vratil on 12/15/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jsh)**

**2:21-cv-02253-KHV Notice has been electronically mailed to:**

Mark P. Johnson     mark.johnson@dentons.com, docket.general.lit.kcm@dentons.com

Scott R. Schillings     sschillings@hinklaw.com, aayesh@hinklaw.com

Bradley Joseph Schlozman     bschlozman@hinklaw.com, jheppler@hinklaw.com, sbhakta@hinklaw.com, thansen@hinklaw.com

Aseem Mulji     amulji@campaignlegalcenter.org

Meredith D. Karp     meredith.karp@stblaw.com

Jonathan K. Youngwood     jyoungwood@stblaw.com, managingclerk@stblaw.com

Alice Huling     ahuling@campaignlegalcenter.org

Brooke Jarrett     bonnie.jarrett@stblaw.com

Danielle M. Lang     dlang@campaignlegalcenter.org

Christopher Lapinig     clapinig@campaignlegalcenter.org

Nicole A. Palmadesso     nicole.palmadesso@stblaw.com

**2:21-cv-02253-KHV Notice has been delivered by other means to:**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

VOTEAMERICA and VOTER
PARTICIPATION CENTER,

          Plaintiffs,

    v.

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
KRIS KOBACH, in his official capacity as
Attorney General of the State of Kansas;
STEPHEN M. HOWE, in his official capacity
as District Attorney of Johnson County,

          Defendants.

Civil Action No. 2:21-CV-2253

**PLAINTIFFS' OPENING BRIEF**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ........................................................................................................... 2

      A.  Relevant Facts ................................................................................................. 2

      B.  Procedural History ......................................................................................... 5

ARGUMENT ................................................................................................................ 6

   I.  The Personalized Application Prohibition Is Subject To—And Cannot Survive—Strict Scrutiny Because It Was Enacted For An Improper Purpose ........................................... 8

  II.  The Personalized Application Prohibition Cannot Survive Intermediate Scrutiny .......... 11

      A.  The Personalized Application Prohibition Is Not Narrowly Tailored To Prevent Voter Fraud ..................................................................................... 13

      B.  The Personalized Application Prohibition Is Not Narrowly Tailored To Prevent Voter Confusion ............................................................................. 15

      C.  The Personalized Application Prohibition Is Not Narrowly Tailored To Promote Orderly And Efficient Election Administration .......................................... 18

      D.  The Personalized Application Prohibition Does Not Leave Open Ample Alternative Channels Of Communication ................................................ 20

CONCLUSION............................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**

*Animal Legal Def. Fund v. Kelly*,
  9 F.4th 1219 (10th Cir. 2021) ............................................................................... 8

*Bl(a)ck Tea Soc'y v. City of Boston*,
  378 F.3d 8 (1st Cir. 2004) ................................................................................... 12

*Brewer v. City of Albuquerque*,
  18 F.4th 1205 (10th Cir. 2021) ..................................................................... passim

*Citizens for Peace in Space v. City of Colorado Springs*,
  477 F.3d 1212 (10th Cir. 2007) ........................................................................... 12

*City of Austin v. Reagan National Advertising of Austin, LLC*,
  596 U.S. 61 (2022) ............................................................................................ 6, 8

*Cutting v. City of Portland*,
  802 F.3d 79 (1st Cir. 2015) ................................................................................. 20

*Doe v. City of Albuquerque*,
  667 F.3d 1111 (10th Cir. 2012) ..................................................................... passim

*Edenfield v. Fane*,
  507 U.S. 761 (1993) ............................................................................................ 12

*McCraw v. City of Oklahoma City*,
  973 F.3d 1057 (10th Cir. 2020) ....................................................... 15, 16, 19, 20

*McCullen v. Coakley*,
  573 U.S. 464 (2014) (Scalia, J., concurring in judgment) ............................. passim

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015) ......................................................................................... 8, 11

*Rideout v. Gardner*,
  838 F.3d 65 (1st Cir. 2016) ............................................................................ 13, 14

*Santa Fe Indep. Sch. Dist. v. Doe*,
  530 U.S. 290 (2000) ............................................................................................ 13

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622 (1994) ........................................................................... 12, 13, 16, 18

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000)........................................................................................................ 11

*VoteAmerica v. Schwab*,
    121 F.4th 822 (10th Cir. 2024) ............................................................................... passim

*VoteAmerica v. Schwab*,
    671 F. Supp. 3d 1230 (D. Kan. 2023)...................................................................... passim

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989).................................................................................................. 8, 11, 12

**Statutes**

Kan. Stat. Ann. § 25-1122(k)(1)-(2), (*l*)(1) (2022) ........................................................ 3, 8, 9, 17

Kan. Stat. Ann. § 25-1122(*l*)(1) ...................................................................................... 10

## PRELIMINARY STATEMENT

Plaintiff Voter Participation Center ("VPC") and other civic organizations encourage Kansas voters to vote by mail by sending certain registered voters an advance mail ballot application that is personalized with the voter's information. Kansas House Bill 2332 included, among other restrictions on pro-mail-voting communications, a provision that criminalized prefilling any portion of an application mailed to a voter if the mailer solicits the voter to submit the advance mail ballot application (the "Personalized Application Prohibition" or the "Prohibition"). This Court preliminarily, and then permanently, enjoined enforcement of the Personalized Application Prohibition. *See generally VoteAmerica v. Schwab*, 671 F. Supp. 3d 1230 (D. Kan. 2023) [hereinafter *VoteAmerica I*]. Defendants appealed.

The Tenth Circuit held that "VPC's mailing of the prefilled mail-ballot applications constitutes speech entitled to First Amendment protection." *VoteAmerica v. Schwab*, 121 F.4th 822, 838 (10th Cir. 2024) [hereinafter (*VoteAmerica II*)]. Two narrow questions remain before this Court on remand: (1) did Kansas enact the Personalized Application Prohibition for an impermissible purpose or justification that warrants strict scrutiny review and (2) can the Prohibition survive the appropriate level of First Amendment scrutiny?

The record demonstrates that the Personalized Application Prohibition was enacted to target organizations encouraging Kansans to vote by mail—especially VPC—such that strict scrutiny is the appropriate level of review. However, even if this Court were to apply intermediate scrutiny, the outcome is the same: Defendants fail to carry their burden that the Personalized Application Provision is sufficiently tailored to their stated interests. The Court should enter judgment in favor of Plaintiffs.

## BACKGROUND[1]

### A.    Relevant Facts

Plaintiff VPC's core mission is to promote voting among and expand participation opportunities for traditionally underserved groups (including young voters, voters of color and unmarried women) which VPC believes in turn ensures a more robust democracy. *VoteAmerica I* at 1236. VPC primarily uses direct mailings to communicate with these voters and, based on its tracking of responses and randomized control trials, considers utilizing personalized advance mail ballot applications key to effectively advocating its message. *Id.* at 1236–37. In Kansas, VPC encourages registered voters to vote by mail by sending them a mailer that includes an advanced mail ballot application personalized with the voter's name and address. *Id.* at 1237.

During the 2020 General Election, VPC, together with its 501(c)(4) sister organization the Center for Voter Information ("CVI"), mailed personalized advance voting ballot application packets to Kansas voters. *Id.* Many other organizations, campaigns, and election offices likewise encouraged Kansas voters to vote by mail in the 2020 election, including by sending advance mail ballot applications. *Id.* at 1239. CVI and Kansas Democratic Paty also sent partially prefilled advance mail ballot applications to Kansas voters in 2020. *See* Declaration of Mark Johnson (Jan. 31, 2025) ("Johnson Decl."), Ex. 1 (Prelim. Inj. Hr'g Ex. 4 (VPC mailer)); Ex. 2 (Prelim Inj. Hr'g Ex. C (CVI mailer)); Ex. 3 (Prelim Inj. Hr'g Ex. D (Kansas Democratic Party mailer)).[2]

---

[1]   This Court made findings of fact pursuant to Rule 52(a)(1) during the bench trial on Plaintiff's claims. *VoteAmerica I* at 1234–40. The Tenth Circuit's opinion did not disturb these findings. *See VoteAmerica II* at 834 (stating that the "opinion addresses only legal issues arising from the dispute"). The parties agreed that no further discovery was necessary. *See* ECF No. 197 at 1. Plaintiff accordingly incorporates this Court's findings by reference and summarizes facts relevant to the remaining issues on remand.

[2]   This Court admitted these exhibits during the preliminary injunction hearing. *See* ECF No. 43 (Clerk's Courtroom Min. Sheet for Evidentiary Mot. Hr'g (Sept. 8, 2021)); ECF No. 45 (Tr. of Prelim. Inj. Hr'g before the Hon. Kathryn H. Vratil (Sept. 8, 2021)) at 2. For the

In the wake of 2020 election and record mail voting participation in Kansas, the Kansas Legislature enacted HB 2332 over Governor Kelly's veto, including section (*l*)(1) that barred any person from mailing or causing to be mailed "an application for an advance voting ballot, unless person is a resident of this state or is otherwise domiciled in this state" (the "Out-of-State Distributor Ban" or the "Ban") and section (k)(2), the Personalized Application Prohibition prohibiting "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot" and includes an "application" from "complet[ing]" "any portion of such application . . . prior to mailing such application to the registered voter." *See VoteAmerica I* at 1235, 1239; Kan. Stat. Ann. § 25-1122(k)(1)-(2), (*l*)(1) (2022); ECF No. 176 (Joint Revised Uncontroverted Facts) ¶¶ 127, 130.

In these proceedings, Defendants have argued that the Personalized Application Prohibition is necessary to reduce potential voter fraud, minimize voter confusion, enhance voter confidence, and reduce inefficiencies in election administration. *See VoteAmerica I* at 1235. None of these rationales are part of the Legislative Record for HB 2332, nor did the written testimony submitted by the Office of the Kansas Secretary of State to the House and Senate Committees on Federal and State Affairs regarding the 2020 election discuss prefilled applications. *Id.*

But the Legislative Record does reflect a desire to target and stifle the speech of third-party organizations that encourage Kansas voters to vote by mail, including specifically Plaintiff VPC. The Kansas Secretary of State's written testimony advised the legislature that "[l]eading up to the 2020 general election, . . . [voters] continued to receive unsolicited advance ballot applications from third parties." *Id*. Defendants' witnesses' testimony similarly focused on third parties,

Court's convenience, Plaintiff has included the preliminary injunction exhibits as exhibits to this brief.

including VPC in particular. For example, Kansas Elections Director Bryan Caskey testified that he was aware of only two organizations that were sending advance mail ballot applications to Kansas voters: VPC and the Democratic Congressional Campaign Committee. ECF No. 176 ¶ 11 (citing Prelim. Inj. Hr'g Tr. at 70:18-25 (Caskey testifying that he was "aware of two organizations" that were the source of duplicate advance mail ballot applications: "One is the Voter Participation Center . . . and the other was the DCCC, the Democratic Congressional Campaign Committee. Those are the two entities that I'm aware of")). In addition, Shawnee County Election Commissioner Andrew Howell and Ford County Election Clerk Deborah Cox attested to issues in their respective counties arising from duplicate applications, *see VoteAmerica I* at 1239–40, and their belief that the majority of duplicate applications their offices received had been prefilled by VPC, even though they did not attempt to quantify how many duplicate applications they received involved VPC-pre-populated applications. ECF No. 176 ¶ 174. Cox also attested that "she heard from 20-30 voters per day about the advance ballot applications they were receiving from VPC (via CVI)." *Id.* ¶ 150.

The record also demonstrates a lack of tailoring between Kansas's post-hoc rationales for HB 2232 and its provisions. Despite the testimony on duplicate applications, "[t]he [P]rohibition does nothing to address duplicate application concerns." *See VoteAmerica I* at 1254. With respect to voter fraud, Caskey testified that the 2020 post-election audits did not reveal "any systemic fraud," and that "every cast ballot was accounted for and counted properly." *Id.* at 1240. As to voter confusion, Howell attested that voters contacted his office about duplicate and inaccurately prefilled advance mail ballot applications they had received but does not believe these voters were necessarily confused and frustrated because they received prefilled applications. *See id.* at 1239. With respect to efficient election administration, Plaintiffs' expert witness Dr. Eitan Hersh

concluded that it seemed likely that VPC's methods of prefilling applications reduced the burden on election officials. *Id.* at 1238. Cox testified that in some ways, prefilled information increased the likelihood and ease that her office can match information between the voter file and the application. *Id.* at 1240. Douglas County Elections Director Jamie Shew testified that his office would prefer to prefill applications sent to voters. *Id.* And in 2020, Johnson County mailed applications to voters that were prefilled with as much of the voter's information as possible to "make[] it easier for the voter [to complete the application] and reduce[] mistakes that [officials] then have to work harder to fix on the backend." *Id.* In sum, there is no evidence of a coherent justification for the Personalized Application Prohibition.

### B.    Procedural History

Plaintiffs filed suit alleging that the Personalized Application Prohibition and the Out-of-State Distributor Ban violated their First Amendment rights to free speech and association and were unconstitutionally overbroad, and the Out-of-State Distributor Ban violated the Dormant Commerce Clause. Plaintiffs moved for a preliminary injunction. After a live evidentiary hearing with witnesses and oral argument, this Court granted a preliminary injunction against the enforcement of both provisions. Defendants did not appeal and subsequently stipulated to a permanent injunction against the enforcement of the Out-of-State Distributor Ban and declaratory judgment that the Ban violates the First and Fourteenth Amendment, both facially and as applied to Plaintiffs. *See VoteAmerica I* at 1240; ECF No. 176 ¶¶ 185–87.

Following discovery, the parties cross-moved for summary judgment and, following conferences with this Court, stipulated to joint uncontroverted facts and that their briefs would serve as trial briefs for a bench trial. *See VoteAmerica I* at 1234. This Court held that the Personalized Application Prohibition was unconstitutional as to its abridgement of VPC's speech and associational First Amendment rights as well as its overbreadth. *See id.* at 1256. The Court

held that the Personalized Application Prohibition failed strict scrutiny as to each of the State's purported interests. *See id.* at 1254. The State presented "no" or "minimal evidence" of each purported harm and failed to establish that prefilled applications caused the alleged harms or that the Prohibition would serve the stated interests. *See generally id.* at 1251–54. The Court found that "the record suggests that on balance, personalizing advance mail ballot applications actually facilitates orderly and efficient election administration." *Id.* at 1254. The Court entered judgment for Plaintiffs on all counts. Defendants appealed. *See VoteAmerica II* at 827.

On appeal, the Tenth Circuit reversed the judgment on Plaintiffs' associational and overbreadth claims and remanded Plaintiffs' free speech claim. *See id.* at 854. The Tenth Circuit held that VPC's mailing of prefilling applications was protected speech that, absent evidence of improper purpose, should be subject to intermediate scrutiny. *See id.* at 838, 851. Therefore, on remand, the Tenth Circuit invited the parties to provide more focused briefing and evidence regarding whether the Prohibition was enacted for an improper purpose or justification: if so, the Court should apply strict scrutiny; if not, the Court should apply the intermediate scrutiny standard from *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61, 76 (2022). *See id.* at 851–52. The Court sustained the parties' agreement to submit written submissions on the remaining issues in this matter. *See* ECF No. 198.

## ARGUMENT

Under either strict or intermediate scrutiny, Defendants bear the burden of establishing that the Personalized Application Prohibition is constitutional. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012). They have failed to present evidence that soliciting voters to vote by mail by sending voters prefilled advance mail ballot applications causes any impediment to Defendants' stated interests, let alone that the Prohibition would alleviate these harms. This plainly insufficient tailoring is not only fatal to their defense, but also suggests that motivations

other than their stated interests motivated the enactment of HB 2332. Given the circumstances surrounding the passage of this bill and the evidence offered by Defendants, the only rational purpose of the Personalized Application Prohibition was to target and suppress speech by third parties like VPC that express a pro-vote-by-mail message. The Tenth Circuit specifically left the door open for this Court to consider whether the Prohibition was motivated by an improper purpose and, if so, to apply strict scrutiny. *See VoteAmerica II* at 851–52. It was, and this Court should apply strict scrutiny.

But even if this Court were to apply intermediate scrutiny, Defendants cannot carry their burden. In fact, many of the conclusions reached by the Court during the original bench trial apply with equal force when applying intermediate scrutiny because the Personalized Application Prohibition is so poorly tailored to Defendants' stated interests. *See VoteAmerica I* at 1252 ("Even if pre-filled or duplicate applications raised fraud concerns in Kansas, the Personalized Application Prohibition does nothing to address this alleged issue."); *id*. at 1253 ("[D]efendants presented no evidence on how criminalizing the mailing of personalized mail ballot applications would prevent confusion as to the source of the pre-filled advance mail ballot" and "[D]efendants have not established that the Personalized Application Prohibition is narrowly tailored to protect their reputational interests . . . [because] it appears that the real problem is not pre-filled applications but duplicate applications—which the Personalized Application Prohibition does not attempt to regulate."); *id*. at 1254 ("The prohibition does nothing to address duplicate application concerns, and defendants have not established that pre-filling advance mail ballot applications hinders election administration.").

Accordingly, this Court should enter judgment for Plaintiffs and permanently enjoin the Personalized Application Prohibition.

## I.    The Personalized Application Prohibition Is Subject To—And Cannot Survive—Strict Scrutiny Because It Was Enacted For An Improper Purpose

On remand, the Court must consider whether "there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction." *City of Austin*, 596 U.S. at 76; *see VoteAmerica II* at 851. Laws that are facially content neutral may nevertheless be subject to strict scrutiny where they were adopted by the government "because of disagreement with the message [the speech] conveys." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Both the text of the statute and the legislative history may point toward such an impermissible purpose. *See Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021).

Here, the Personalized Application Prohibition functionally restricts only speech advocating for voting by mail, because only those communications would include a personalized advance mail ballot application. The restriction's practical impact of suppressing only communications encouraging registered voters to vote by mail is no coincidence; and the record suggests that this is the exact impermissible purpose for which HB 2332 was enacted.[3]

*First*, as this Court has found, and as explained below, *see infra* Sections II.A–C, there is no connection between Defendants' stated interests and the Personalized Application Prohibition. *See VoteAmerica I* at 1251–54. As the Court has observed, prefilling does not increase the risk of voter fraud, voter confusion,[2] or inefficient election administration; and it does nothing to prevent

---

[3]    In fact, the Personalized Application Prohibition applies specifically to speech "solict[ing] . . . a registered voter to file an application for an advance voting ballot." K.S.A. § 25-1122(k)(1)-(2); *see Reed*, 576 U.S. at 163–64 (holding that laws that "defin[e] regulated speech by its function or purpose . . . are subject to strict scrutiny").

[2]    With respect to voters' purported "confusion as to the source of the pre-filled advance mail ballot," *see VoteAmerica I* at 1253, in 2020, VPC, CVI, and the Kansas Democratic Party proactively included a clear statement in their cover letters that the mailers were paid for

organizations from sending multiple applications to voters. *Id*. A statute does not become "'justified without reference to the content of the regulated speech' simply because the statute itself and those defending it in court say that it is," especially where "[e]very objective indication shows that the provision's primary purpose is to restrict speech that [advances a certain viewpoint]." *See McCullen v. Coakley*, 573 U.S. 464, 502 (2014) (Scalia, J., concurring in judgment). Here, the only plausible explanation for the Personalized Application Prohibition supported by objective evidence is Defendants' desire to restrict the pro-vote-by-mail message conveyed by organizations that solicit Kansans to vote by mail.

There is a glaring disconnect between the actual issue Kansas elections officials confronted in the 2020 election—receipt of duplicate advanced mail ballot applications—and what the Personalized Application Prohibition forbids—soliciting voters to vote by mail by mailing them prefilled applications. As this Court has already found, the only election-administration concern that Defendants have demonstrated is the receipt of duplicate applications by election officials. *See VoteAmerica I* at 1254. Yet the Personalized Application Prohibition does not address duplicate applications; in fact, under the Prohibition, a person or organization is free to send as many applications to recipients as it wishes, so long as they are not prefilled. *See id.*

*Second*, while there is no rational relationship between the one problem Defendants have demonstrated (duplicate applications) and their purported solution (banning prefilled applications), the broader context of HB 2332 provides insight into their actual motivations. The Personalized Application Prohibition was part of a broader effort to restrict the distribution of advance mail

---

by a third-party organization. *See* Johnson Decl. Ex. 1 (VPC) at 3; Ex. 2 (CVI) at 2; Ex. 3 (Kansas Democratic Party) at 2. Moreover, HB 2332 now requires similar disclosures about the sender and the fact that they are not associated with the government. *See* K.S.A. § 25-1122 (k)(1)(A)–(D).

ballot applications: the legislation also passed the Out-of-State Distributor Ban, which proscribed any non-Kansas resident from "mail[ing] or caus[ing] to be mailed an application for an advance voting ballot," ECF No. 176 ¶130; K.S.A. § 25-1122(*l*)(1). Like the Prohibition, the Ban only applied to those encouraging voters to submit an advance mail ballot application. While the Out-of-State Distributor Ban is now permanently enjoined, its inclusion along with the Personalized Application Prohibition suggests that HB 2322 was aimed at limiting the flow of pro-vote-by-mail communications to Kansas voters, especially by third-party groups like Plaintiff VPC.

*Third*, there is evidence that pro-vote-by-mail groups were specifically singled out. Kansas Elections Director Bryan Caskey—who ultimately served as the 30(b)(6) witness for the office of the Kansas Secretary of State—testified that he was only aware of two organizations who sent applications that allegedly had caused duplicates: Plaintiff VPC and the Democratic Congressional Campaign Committee. *See* ECF No. 176 ¶ 11 (citing Prelim. Inj. Hr'g Tr. at 70:18-25). Election officials Howell and Cox attested to issues in their respective counties arising from duplicate applications that had been prefilled by VPC. *See VoteAmerica I* at 1239–40; ECF No. 176 ¶¶ 150, 174. But VPC takes proactive steps to avoid duplicate submissions, such as including a clear statement at the top of its cover letters that accompany personalized applications: "If you've already submitted a request for a ballot by mail for the 2020 General Election, there is no need to submit another request." *See* Johnson Decl. Ex. 1 (VPC) at 3.

Ultimately, the evidence in the record of groups that prefill applications and would be affected by the Personalized Application Prohibition are VPC, its sister organization CVI, and the Kansas Democratic Party, each of which sent mailers with personalized applications to encourage recipients to vote by mail. However, while Defendants identified these three organizations as causing duplicate submissions, all three organizations include clear statements on their mailers to

*discourage* voters from submitting duplicates. *See id*; Johnson Decl. Ex. 2 (CVI) at 2; Ex. 3 (Kansas Democratic Party) at 2 ("If you have already requested a ballot by mail, verify your status at KSVotes.org.")). This, too, suggests that these groups were not targeted because their mailers allegedly caused confusion or other issues, but because they encourage voters to vote by mail.

In sum, the record demonstrates that Kansas enacted the Personalized Application Prohibition for the improper purpose of restricting communications "because of disagreement with the message [they] convey[]," such that strict scrutiny applies. *See Ward,* 491 U.S. 781 at 791 (1989); *see Reed*, 576 U.S. at 164; *see also VoteAmerica II* at 852.

To survive strict scrutiny, Defendants must prove that the Personalized Application Prohibition is narrowly tailored to serve a compelling state interest. *See Reed*, 576 U.S. at 171. This Court has already determined that Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve the State's alleged interests in "preventing voter fraud," "preventing voter confusion regarding the source of unsolicited prefilled applications, or any other electoral issues," or "facilitat[ing] orderly and efficient election administration." *See VoteAmerica I* at 1251–54. The record has not changed with regard to those purported interests, so this Court's prior reasoning applies with equal force on remand: "The Personalized Application Prohibition cannot withstand strict scrutiny and is therefore an unconstitutional infringement on plaintiff's First Amendment rights to speech and association." *Id.* at 1254.

## II.    The Personalized Application Prohibition Cannot Survive Intermediate Scrutiny

Even if the Court were to conclude there is no evidence of an improper purpose or justification for the Personalized Application Prohibition such that intermediate scrutiny applies, Defendants would still fail to carry their burden. Because the Tenth Circuit has held that the Prohibition restricts speech, "the Government bears the burden of proving the constitutionality of its actions." *Doe*, 667 F.3d at 1131 (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803,

816 (2000)). Under intermediate scrutiny, to establish that the Personalized Application Prohibition is constitutional, Defendants must show it "is narrowly tailored to achieving significant government interests, and that the [Prohibition] leaves open ample alternative channels of communication." *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1220 (10th Cir. 2021). Defendants cannot carry that burden for the same reasons that they failed to carry their burden under strict scrutiny: the Prohibition is not narrowly tailored to Defendants' stated interests. The Personalized Application Prohibition is therefore an unconstitutional restriction of protected speech. The Court should enter judgment in favor of Plaintiffs and permanently enjoin enforcement of the Prohibition.

Intermediate scrutiny "demand[s] a close fit between ends and means." *McCullen v. Coakley*, 573 U.S. at 486. First, the government "must demonstrate that the recited harms are real, not merely conjectural." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664, (1994). "It is not enough that the [State] justify its restrictions based broadly" on general interests, as opposed to "the harms that a particular set of [restrictions] are designed to forfend." *See Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1221 (10th Cir. 2007) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 13 (1st Cir. 2004)). The government must demonstrate "that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664. "Absent such proof, a restriction 'may not be sustained if it provides only ineffective or remote support for the government's purpose.'" *Citizens for Peace in Space*, 477 F.3d at 1220 (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)).

Then, the government must demonstrate that the restriction does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799 (1989). "[T]he government must demonstrate that alternative measures that burden

substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495.

Moreover, if the government fails to carry its burden that the restriction is narrowly tailored to serve its identified significant government interests, the Court "need not consider whether the [restriction] leaves open ample alternative channels of communication." *Brewer*, 18 F.4th at 1257.

### A.    The Personalized Application Prohibition Is Not Narrowly Tailored To Prevent Voter Fraud

Defendants have failed to prove that the Personalized Application Prohibition is narrowly tailored to prevent voter fraud. To determine whether the government's stated harms are "real," courts begin with "an examination of the circumstances surrounding [the Prohibition]'s enactment." *Doe*, 667 F.3d at 1132 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315, (2000); *Turner*, 512 U.S. at 664). Here, preventing voter fraud is not "part of the Legislative Record for HB 2332." *VoteAmerica I* at 1235. As this Court found, "Defendants have presented no evidence of a single instance in which a voter received duplicate mail ballots, and they have presented that every cast ballot was accounted for." *Id.* at 1251.

Defendants' argument that "the fact that Kansas has avoided any major voter fraud from advance ballots is irrelevant" is unavailing under intermediate scrutiny, *VoteAmerica II* Dkt. No. 23-3100 (Aplt. Br.) at 54; they must show that the Personalized Application Prohibition alleviates a real harm in a "direct and material way." *See Turner*, 512 U.S. at 664. Even in the context of elections and interests that are "unquestionably 'compelling in the abstract,'" "intermediate scrutiny is not satisfied by the assertion of abstract interests." *See Rideout v. Gardner*, 838 F.3d 65, 72 (1st Cir. 2016).

For example, in *Rideout*, New Hampshire prohibited photographing marked ballots and publicizing such photos to prevent potential vote buying and voter coercion. *See id.* at 67–68.

While the First Circuit acknowledged that these interests were compelling in the abstract, it found that in reality, the State could not "identify a single complaint of vote buying or intimidation related to a voter's publishing a photograph of a marked ballot" since small cameras and digital photography have been ubiquitous. *See id.* at 72–73. Similarly, here, "defendants have not presented any evidence of voter fraud effectuated on account of personalized advance ballot applications or any other reason, or even a single instance in which a voter received or cast duplicate mail ballots." *VoteAmerica I* at 1252. "The government's burden is not met when a State offers no evidence or anecdotes in support its restriction." *Rideout*, 838 F.3d at 73 (emphasis original) (internal quotations and citations omitted).

In addition, as this Court has held, "[e]ven if prefilled or duplicate applications raised fraud concerns in Kansas, the Personalized Application Prohibition does nothing to address this alleged issue" because the Prohibition "does not limit the number of applications a third party may send to a voter or the number of ballot applications a voter may submit." *VoteAmerica I* at 1252. To the extent Defendants rely on their expert witness's identification of purported inaccuracies in the applications VPC prefilled, "the record contains no evidence that these errors had any impact on election processes," and their expert witness "could not connect the alleged errors in plaintiff's mailing list with errors in applications received by election officials." *Id.* at 1252–53. The Court's reasoning during the bench trial yields the same result under intermediate scrutiny: "Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve any alleged interest in preventing voter fraud." *Id.*; *see Brewer*, 18 F.4th at 1220.

Moreover, Defendants have not "demonstrate[d] that alternative measures that burden substantially less speech"—such as Kansas's existing safeguards against fraud, *see VoteAmerica I* at 1236, or forbidding only inaccurately prefilling applications—"would fail to achieve the

government's interests." *See McCullen*, 573 U.S. at 495. Thus, Defendants' interest in preventing voter fraud does not justify the Personalized Application Prohibition under intermediate scrutiny.

**B.     The Personalized Application Prohibition Is Not Narrowly Tailored To Prevent Voter Confusion**

Defendants assert that the Personalized Application Prohibition is justified by their interest in avoiding voter confusion about duplicate and inaccurately prefilled advance mail ballot applications. Again, avoiding voter confusion is not part of the legislative record. *See VoteAmerica I* at 1235; *see also Doe*, 667 F.3d at 1132. In any event, Defendants' "minimal" anecdotal evidence of purported voter confusion does not demonstrate a "real" harm; and even if it did, Defendants have not established that the Personalized Application Prohibition would alleviate any confusion. *See VoteAmerica I* at 1253.

Defendants rely entirely on second-hand, anecdotal evidence that voters were confused. *See id.* at 1239, 1253 (describing Election Commissioner Andrew Howell's "belief" about why voters were frustrated); *see also* ECF No. 176 ¶¶ 141-44, 150, 162, 171, 179. Defendants did not proffer any objective evidence of voter confusion, nor did they establish that voters were confused because applications were prefilled. The Court found that Howell believed that voters were frustrated because they thought county election officers were sending duplicate applications, not because the applications were prefilled. *VoteAmerica I* at 1253. Accordingly, the Court concluded that "Defendants presented minimal evidence of voter confusion and frustration." *Id.*

Under intermediate scrutiny, the Tenth Circuit has rejected similar attempts to establish that the "recited harms are real" using unsupported anecdotal evidence. *See McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1071–72 (10th Cir. 2020). In *McCraw*, Oklahoma City prohibited individuals from sitting or standing on certain road medians to protect pedestrians from traffic and avoid distracting drivers. *See id.* at 1061–62, 1071. The City sought to rely on the testimony of a

police investigator that he had seen "a couple hundred" vehicles on medians. *See id.* at 1072. The Tenth Circuit rejected this anecdotal evidence as establishing that accidents involving pedestrians on medians were an "actual issue, as opposed to a hypothetical concern" because the police investigator "could neither identify any data, reports, or other evidence to support [his] estimate, nor describe any involvement of pedestrians in these anecdotes." *See id.* Similarly, here, Defendants have not marshaled any objective evidence of voter confusion, nor have they established that any confusion was caused by the prefilled information on advance mail ballot applications. Defendants have not carried their burden under intermediate scrutiny to show that their recited harm of voter confusion caused by prefilled applications is "real."

Defendants have also failed to establish that the Personalized Application Prohibition "will in fact alleviate" voter confusion "in a direct and material way." *See Turner*, 512 U.S. at 664. This Court previously concluded that "[e]ven assuming that receiving duplicate advance ballot applications confused some voters, defendants presented no evidence on how criminalizing the mailing of personalized mail ballot applications would prevent confusion as to the source of the prefilled advance mail ballot." *VoteAmerica I* at 1253. The Court reasoned that because some county election officials distributed prefilled applications, "it appears that the real problem is not prefilled applications but duplicate applications—which the Personalized Application Prohibition does not attempt to regulate." *Id.*

The Court's reasoning applies with equal force on remand. The Tenth Circuit has rejected similar attempts by the government to rely on "anecdotes" that are "too generic" to support the restriction at issue, or "where the nexus between the [harm] described and the conduct that the [restriction] proscribes is simply too tenuous to bolster the conclusion that the [government] narrowly tailored the [restriction]." *See Brewer*, 18 F.4th at 1237. For example, in *Brewer*, the

Tenth Circuit concluded that the government failed to demonstrate narrow tailoring under intermediate scrutiny where it supported a restriction of pedestrians on medians or in travel lanes based on "City Councilors' and their constituents' own observations and experiences," testimony about general traffic safety issues, "vague, second-hand accounts," and "good common sense.' *See id.*

As in *Brewer*, "in many respects, the situations described by the anecdotes are largely divorced from the central thrust of the [restriction]"—here, to ameliorate the purported harms caused by prefilled advance mail ballot applications. *See id.* Defendants' "anecdotal evidence simply misses the mark," and while general observations about voter confusion (such as the number of duplicate applications) may be "relevant factors in an overarching policymaking process," "they have little bearing, in *this* case, on the question of whether the [restriction] is narrowly tailored to achieving significant government interests that are real and not speculative." *See id.* at 1238 (emphasis original). Accordingly, under intermediate scrutiny, Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve their alleged interest in preventing voter confusion regarding the source of unsolicited prefilled applications, or any other electoral issues.

Moreover, Defendants have failed to explain why less restrictive alternatives would fail to serve these interests. *See McCullen*, 573 U.S. at 495. HB 2332 requires disclosures about the sender of an unsolicited advance mail ballot (which Plaintiffs do not challenge), including a clear statement that "This is not a government mailing." *See* K.S.A. § 25-1122(k)(1)(A)–(D). Defendants have not demonstrated how the Personalized Application Prohibition avoids voter confusion about the sender of a prefilled application at all, much less why the required disclosures or other less restrictive measures included in the same bill would fail to serve this interest.

**C.    The Personalized Application Prohibition Is Not Narrowly Tailored To Promote Orderly And Efficient Election Administration**

Defendants assert that the Personalized Application Prohibition is justified by the State's interest in promoting orderly and efficient election administration. Like Defendants' stated interests in preventing voter fraud and voter confusion, promoting orderly and efficient election administration is not part of the legislative record. *See VoteAmerica I* at 1235; *see also Doe*, 667 F.3d at 1132. In any event, Defendants have failed to establish that prefilling hinders orderly election administration, or that the Prohibition "will in fact alleviate these harms in a direct and material way." *See Turner*, 512 U.S. at 664.

Defendants submitted evidence about the cure process for inaccurate or incomplete applications. *See VoteAmerica I* at 1236, 1254. However, Defendants "could not connect the alleged errors in plaintiff's mailing list with errors in applications received by election officials" that required curing, *id.* at 1252–53, and have not offered any evidence that personalizing advance mail ballot applications causes voters to submit incomplete applications. Defendants also submitted evidence about the process election officials undertake when they receive a duplicate application and the number of duplicate applications election officials received. *See id.* at 1239–40. However, while Defendants assert that there was a "surge" of "inaccurate and duplicate" advance mail ballot request, this Court previously concluded that "Defendants have not demonstrated that in this context, any 'surge' . . . was fairly attributable to activity which the Personalized Application Prohibition seeks to prohibit." *Id.* at 1252; *see id.* at 1254. Accordingly, the Personalized Application Prohibition would not "alleviate these harms." Again, these factual findings were not disturbed by the Tenth Circuit's opinion and apply on remand.

Moreover, this Court previously found that "on balance, personalizing advance mail ballot applications actually facilitates orderly and efficient election administration." *Id.* at 1254. The

Tenth Circuit has similarly credited evidence that the prohibited conduct actually serves the stated interests when applying intermediate scrutiny. *See, e.g.*, *McCraw*, 973 F.3d at 1072 (crediting plaintiffs' "evidence that they feel <u>safer</u> on medians than on sidewalks," as well as evidence of a "safety zone" on medians and the fact that most pedestrian fatalities occur "mid-block" and "not on medians" (emphasis original)).

Here, as in *McCraw*, VPC has both proffered evidence of its well-founded belief that mailing personalized applications increases voter engagement and identified evidence that election officials—including Defendants' witnesses—believe that prefilling makes it easier for election officials to carry out their duties. *See VoteAmerica I* at 1236–37 (citing testimony of VPC President and CEO Thomas Lopach), 1240 (citing testimony of Defendants' witness Ford County Election Clerk Deborah Cox and Plaintiffs' witness Douglas County Elections Director Jamie Shew). In addition, Johnson County mailed applications to voters in 2020 that prefilled more information than VPC. *Id.* at 1254. And Plaintiffs' expert witness Dr. Eitan Hersh opined that "it seems likely that the [plaintiff's] methods reduced the burden on election officials." *Id.* at 1238. In light of this evidence, Defendants have "not met [their] burden to demonstrate that its interest is based on a concrete, non-speculative harm." *See McCraw*, 973 F.3d at 1073. Based on this record and reasoning, the Court's conclusion that "defendants have not established that prefilling advance mail ballot applications hinders election administration" applies with equal force when applying intermediate scrutiny. *See VoteAmerica I* at 1254.

Lastly, Defendants have failed to demonstrate that they considered less burdensome alternatives that would promote orderly and efficient election administration. "The real issue here seems to be duplicate applications, which the Personalized Application Prohibition does not

address." *See id.* And Defendants have proffered neither evidence nor argument that they considered any alternatives that would alleviate issues caused by duplicate applications.

### D.     The Personalized Application Prohibition Does Not Leave Open Ample Alternative Channels Of Communication

Defendants have failed to carry their burden that the Personalized Application Prohibition is narrowly tailored to any of their three asserted interests such that the Court "need not consider whether the [restriction] leaves open ample alternative channels of communication." *Brewer*, 18 F.4th at 1257; *see McCullen*, 573 U.S. at 496 n.9; *see also Cutting v. City of Portland*, 802 F.3d 79, 88 (1st Cir. 2015) ("[T]he fact that there are other places where plaintiffs may engage in their expressive activity 'misses the point' of the narrow tailoring inquiry.").

In any event, Defendants have failed to make a showing that there are ample alternative channels for Plaintiff's speech, and that those channels are adequate. *See McCraw*, 973 F.3d at 1078. Defendants ignore "practical recognition of the facts giving rise to the [Prohibition]" that advocates like VPC may not be able to justify or afford engaging in a less effective mailing campaign with exclusively blank applications, which in turn limits their "ability to reach [their] intended audience[s]." *See id.* Accordingly, the Personalized Application Prohibition cannot survive intermediate scrutiny.

## CONCLUSION

For the foregoing reasons, Defendants have failed to carry their burden that the Personalized Application Prohibition can survive intermediate scrutiny, much less strict scrutiny. This Court should enter judgment in favor of Plaintiffs and permanently enjoin the enforcement of the Prohibition.

Date: January 31, 2025

By:    */s/ Mark P. Johnson*
       Mark P. Johnson

Danielle M. Lang (*pro hac vice*)
Alice C.C. Huling (*pro hac vice*)
Katherine Hamilton (*pro hac vice*)
**CAMPAIGN LEGAL CENTER**
1101 14th Street, NW, St. 400
Washington, D.C. 20005
(202) 736-2200
DLang@campaignlegalcenter.org
AHuling@campaignlegalcenter.org
KHamilton@campaignlegalcenter.org

Mark P. Johnson KS Bar #22289, D. Kan. #22289
**DENTONS US LLP**
4520 Main Street, Suite 1100
Kansas City, MO 64105
816/460-2400
816/531-7545 (fax)
mark.johnson@dentons.com

Jonathan K. Youngwood (*pro hac vice*)
Meredith D. Karp (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Nicole A. Palmadesso (*pro hac vice*)
**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
bonnie.jarrett@stblaw.com
nicole.palmadesso@stblaw.com

*Attorneys for Plaintiffs*

21

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on this 31st day of January 2025, a copy of Plaintiffs'

Opening Brief has been served upon other counsel of record via electronic mail only, to the

following:

Bradley J. Schlozman (KS Bar #17621)
Scott R. Schillings (Bar # 16150)
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, KS 67206
Tel.: (316) 267-2000
Fax: (316) 630-8466
E-mail: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com

*Attorneys for Defendants*

                                    */s/ Mark P. Johnson*
                                    Mark P. Johnson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER,<br><br>        Plaintiffs,<br><br>v.<br><br>SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; KRIS KOBACH, in his official capacity as Attorney General of the State of Kansas; STEPHEN M. HOWE, in his official capacity as District Attorney of Johnson County,<br><br>        Defendants. | Civil Action No. 2:21-CV-2253 |

## DECLARATION OF MARK P. JOHNSON
## IN SUPPORT OF PLAINTIFFS' OPENING BRIEF

I, Mark P. Johnson, make this declaration pursuant to K.S.A. § 60-256(e)(1) and hereby state as follows:

1.      I am a partner at the law firm of Dentons US LLP, counsel for Plaintiff Voter Participation Center. I respectfully submit this declaration in support of Plaintiffs' Opening Brief regarding the remaining issues in this matter for resolution.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a Voter Participation Center Sample Mailer, admitted by this Court as Exhibit 4 during the September 8, 2021 preliminary injunction hearing in this matter. *See* ECF 43-2 at 1, ECF 45 at 2, 41:7-18, 51:5-9.

3.      Attached hereto as Exhibit 2 is a true and correct copy of an example advance mail ballot application and accompanying letter from Center for Voter Information, admitted by

this Court as Exhibit C during the September 8, 2021 preliminary injunction hearing in this

matter. *See* ECF 43-3 at 1, ECF 45 at 2, 93:7-9, 104:11-16

4.      Attached hereto as Exhibit 3 is a true and correct copy of a sample advance mail

ballot application and accompanying letter from Kansas Democratic Party, admitted by this

Court as Exhibit D during the September 8, 2021 preliminary injunction hearing in this matter.

*See* ECF 43-3 at 1, ECF 45 at 2, 86:10-19, 87:7-10.

5.      I declare under penalty of perjury under the laws of the United States and the

State of Kansas that the foregoing is true and correct.


Executed this 31st day of January, 2025 in Kansas City, Missouri.

By:    _____

Mark P. Johnson

# EXHIBIT 1

## to Johnson Declaration

Case 2:21-cv-02253-KHV-GEB   Document 25-4   Filed 07/08/21   Page 1 of 6
Case 2:21-cv-02253-KHV   Document 200-2   Filed 01/31/23   Page 2 of 7
Appellate Case: 25-3138   Document: 24-3   Date Filed: 11/07/2025   Page: 250

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

VOTEAMERICA and VOTER
PARTICIPATION CENTER,

              Plaintiffs,

    v.

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
DEREK SCHMIDT, in his official capacity
as Attorney General of the State of Kansas;
STEPHEN M. HOWE, in his official capacity
as District Attorney of Johnson County,

              Defendants.

Civil Action No. 2:21-CV-2253

# Exhibit 2.A
## Voter Participation Center Sample Mailer

Case 2:21-cv-02253-KHV-GEB   Document 25-4   Filed 07/08/21   Page 2 of 6
Case 2:21-cv-02253-KHV-GEB   Document 200-2   Filed 01/31/25   Page 3 of 7

Appellate Case: 25-3138     Document: 24-3     Date Filed: 11/07/2025     Page: 251

V2002    KSR KSAS02435G8

**The Center for Voter Information**

4319 South National #315
Springfield MO, 65810

© 2016-2020 The Center for Voter Information.
All Rights Reserved.

VOTE AT HOME BALLOT REQUEST FORM
DO NOT DISCARD

ELECTRONIC SERVICE REQUESTED

NONPROFIT
U.S. POSTAGE
**PAID**
PERMIT #2227
LANSDALE, PA

32150000011
Jane A. Smith
123 Main Street
Anytown, KS   12345-6789

KSR
V2003

# Center For Voter
## Information

> If you've already submitted a request for a ballot by mail for the 2020 General Election, there is no need to submit another request.

Dear Jane,

**County election officials in Kansas encourage voters to use mail ballots in upcoming elections.** I have sent you the enclosed advance voting application already filled out with your name and address.

**Voting by mail is EASY.** Just sign, date, and complete the application. Drop it in the mail and you will receive a ballot from your county election office which you can complete and return without ever leaving your home. No waiting in line.

**Voting by mail keeps you healthy and safe.** The best way to protect yourself, your family, and your whole community during this time is to vote by mail.

You can even research the candidates as you vote.

**Your privacy is protected.** If you use the enclosed envelope with **pre-paid postage,** your application will be delivered directly to your county election office.

You can check your ballot status at: **myvoteinfo.voteks.org/voterview.**

Sincerely,

*Lionel Dripps*

Lionel Dripps
*Center for Voter Information*

---

### HOW DO YOU COMPARE WITH OTHERS?*

| Your Participation | Average of All Voters |
|---|---|

**Your voting score is:**
below average

---

P.S. We have already filled in your name and address on the enclosed form. **Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope.** Thank you.

*Data obtained from publicly available state voter files.

If you wish to be removed from our mailing list, email this code: KSAS0243568 to unsubscribe@centerforvoterinformation.org

This mailing has been paid for by the Center for Voter Information (CVI). CVI is a non-government, nonprofit, 501(c)(4) organization. **(866)-377-7396** www.centerforvoterinformation.org. CVI is not affiliated with state or local election officials. © 2016-2020 The Center for Voter Information. All Rights Reserved.

32150000011



VKS01
V2002

Office of the Kansas Secretary of State

# Application for Advance Ballot by Mail
DOWNLOAD THIS FORM AT WWW.SOS.KS.GOV


FORM AV1M

## 1. Affirmation

Affirmation of an Elector of the County of ____SEWARD____ and State of Kansas Desiring to Vote an Advance Voting Ballot
State of _____, County of _____, ss: (where application is completed)

## 2. Voter Identification Requirements

I understand that my current and valid Kansas driver's license number or Kansas nondriver's identification card number must be provided in order to receive a ballot.

Current Kansas driver's license number or nondriver's identification card number: _____

If I do not have a current and valid Kansas driver's license number or Kansas nondriver's identification card number, I must provide a copy of one of the following forms of photo identification with this application in order to receive a ballot.

- Driver's license issued by Kansas or another state
- Nondriver's ID card issued by Kansas or another state
- U.S. passport
- Concealed carry of handgun license issued by Kansas or another state
- Employee badge or ID document issued by a government office

- U.S. military ID
- Student ID card issued by an accredited Kansas postsecondary educational institution
- Public assistance ID card issued by a government office
- ID card issued by an Indian tribe

## 3. Personal Information   Please print.

SMITH
Last Name

JANE
First Name

A
M.I.

_____
Date of Birth (MM/DD/YY)

123 MAIN STREET
Residential Address

ANYTOWN
City

KS
State

12345
Zip Code

Political Party (To be filled in only when requesting a primary election ballot): ☐ Democratic ☐ Republican

## 4. Address to Mail Ballot (if different from residential address)

_____
Mailing Address

_____
City

_____
State

_____
Zip Code

**Note:** The ballot may be mailed only to the voter's residential or mailing address as indicated on the county voter registration list, to the voter's temporary residential address, or to a medical care facility where the voter resides. These restrictions do not apply to a voter who has an illness, disability or who lacks proficiency in the English language. Ballots cannot be mailed until 20 days before the election.

## 5. Voter Signature   Note: False statement on this affirmation is a severity level 9, nonperson felony.

I do solemnly affirm under penalty of perjury that I am a qualified elector residing at the address listed above, or I am authorized to sign for the above named voter who has a disability preventing the voter from signing an application. I am entitled to vote an advance voting ballot and I have not voted and will not otherwise vote at the election to be held on ____11/03/2020____ (date).

**Required** ▶

_____
Signature of Voter

_____
Date (MM/DD/YY)

_____
Phone Number

FOR OFFICE USE ONLY  Date App. Rec'd. _____  Ballot Mailed _____  Transmitted by _____

Prepared by the Office of the Secretary of State, 1st Floor, Memorial Hall, 120 S.W. 10th Avenue, Topeka, KS 66612-1594.
KSA 25-1122d(a). Rev 6/1/20 tc

32150000011 KSAS0243568 KSR

SEWARD

Appellate Case: 25-3138   Document: 24-3   Date Filed: 11/07/2025   Page: 254

Case 2:21-cv-02253-KHV-GEB   Document 25-4   Filed 07/08/21   Page 6 of 6
Case 2:21-cv-02253-KHV   Document 200-2   Filed 01/31/25   Page 7 of 7
Appellate Case: 25-3138   Document: 24-3   Date Filed: 11/07/2025   Page: 255

Jane A. Smith
123 Main Street
Anytown, KS 12345-6789

**NO POSTAGE NECESSARY.**
**POSTAGE HAS BEEN PAID.**

FIRST-CLASS MAIL
U.S. POSTAGE
PAID
VPC
IMB-POSTAGE

SEWARD COUNTY CLERK
515 N Washington Ave Ste 100
Liberal, KS 67901-3496

# EXHIBIT 2

## to Johnson Declaration

**The Center for Voter Information**

4319 South National #315

Springfield MO, 65810

© 2016-2020 The Center for Voter Information.
All Rights Reserved.

<table>
<tr><td>VOTE AT HOME BALLOT REQUEST FORM<br>DO NOT DISCARD</td><td>ELECTRONIC SERVICE REQUESTED</td><td>NONPROFIT<br>U.S. POSTAGE<br>**PAID**<br>PERMIT #2227<br>LANSDALE, PA</td></tr>
</table>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*ECRWSH\*\*C-043

32150193642

th Village Pkwy

Topeka, KS 66609-1

South Village Pkwy
Topeka, KS 66609-1873

NO POSTAGE NECESSARY.
POSTAGE HAS BEEN PAID.

FIRST-CLASS MAIL
U.S. POSTAGE
PAID
VPC
IMB-POSTAGE

SHAWNEE COUNTY ELECTION COMMISSIONER

3420 SW Van Buren St

Topeka, KS 66611-2228

KSR
V2003

## Center For Voter Information

| |
|---|
| If you've already submitted a request for a ballot by mail for the 2020 General Election, there is no need to submit another request. |

Dear

**County election officials in Kansas encourage voters to use mail ballots in upcoming elections.** I have sent you the enclosed advance voting application already filled out with your name and address.

**Voting by mail is EASY.** Just sign, date, and complete the application. Drop it in the mail and you will receive a ballot from your county election office which you can complete and return without ever leaving your home. No waiting in line.

**Voting by mail keeps you healthy and safe.** The best way to protect yourself, your family, and your whole community during this time is to vote by mail.

You can even research the candidates as you vote.

**Your privacy is protected.** If you use the enclosed envelope with **pre-paid postage**, your application will be delivered directly to your county election office.

You can check your ballot status at: **myvoteinfo.voteks.org/voterview.**

Sincerely,

*Lionel Dripps*

Lionel Dripps
*Center for Voter Information*



**HOW DO YOU COMPARE WITH OTHERS?** *

Your Participation    Average of All Voters

**Your voting score is:**
above average

P.S. We have already filled in your name and address on the enclosed form. **Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope.** Thank you.

*Data obtained from publicly available state voter files.

If you wish to be removed from our mailing list, email this code: KSAS0125263 to unsubscribe@centerforvoterinformation.org

This mailing has been paid for by the Center for Voter Information (CVI). CVI is a non-government, nonprofit, 501(c)(4) organization. **(866)-377-7396** www.centerforvoterinformation.org. CVI is not affiliated with state or local election officials.
© 2016-2020 The Center for Voter Information. All Rights Reserved.

32150193642

VKS01
V2002

# IT'S AS EASY AS 1-2-3

You're a voter, and for you, voting by mail is simple. Here's how it works:

**STEP 1:** You complete, sign, and mail the form on the reverse of this sheet.

**STEP 2:** Your county election office sends you an advance ballot by mail.

**STEP 3:** You fill out the ballot and return it to your county election office–by mail.

## SEE REVERSE FOR YOUR APPLICATION TO VOTE-BY-MAIL

For questions, please call your county election office. You can find their phone number at
**https://www.sos.ks.gov/elections/county_election_officers.aspx**

VKS01
V2002

Office of the Kansas Secretary of State
## Application for Advance Ballot by Mail
DOWNLOAD THIS FORM AT WWW.SOS.KS.GOV


FORM
AV1M

### 1. Affirmation

Affirmation of an Elector of the County of _____ SHAWNEE _____ and State of Kansas Desiring to Vote an Advance Voting Ballot
State of _____, County of _____, ss: (where application is completed)

### 2. Voter Identification Requirements

I understand that my current and valid Kansas driver's license number or Kansas nondriver's identification card number must be provided in order to receive a ballot.

Current Kansas driver's license number or nondriver's identification card number: _____

If I do not have a current and valid Kansas driver's license number or Kansas nondriver's identification card number, I must provide a copy of one of the following forms of photo identification with this application in order to receive a ballot.

- Driver's license issued by Kansas or another state
- Nondriver's ID card issued by Kansas or another state
- U.S. passport
- Concealed carry of handgun license issued by Kansas or another state
- Employee badge or ID document issued by a government office

- U.S. military ID
- Student ID card issued by an accredited Kansas postsecondary educational institution
- Public assistance ID card issued by a government office
- ID card issued by an Indian tribe

### 3. Personal Information   Please print.

| Last Name | First Name | M.I. | L | Date of Birth (MM/DD/YY) |
| --- | --- | --- | --- | --- |

E SOUTH VILLAGE PKWY      TOPEKA        .KS      66609
Residential Address        City          State    Zip Code

Political Party (To be filled in only when requesting a primary election ballot): ☐ Democratic ☐ Republican

### 4. Address to Mail Ballot (if different from residential address)

| Mailing Address | City | State | Zip Code |
| --- | --- | --- | --- |

Note: The ballot may be mailed only to the voter's residential or mailing address as indicated on the county voter registration list, to the voter's temporary residential address, or to a medical care facility where the voter resides. These restrictions do not apply to a voter who has an illness, disability or who lacks proficiency in the English language. Ballots cannot be mailed until 20 days before the election.

### 5. Voter Signature   Note: False statement on this affirmation is a severity level 9, nonperson felony.

I do solemnly affirm under penalty of perjury that I am a qualified elector residing at the address listed above, or I am authorized to sign for the above named voter who has a disability preventing the voter from signing an application. I am entitled to vote an advance voting ballot and I have not voted and will not otherwise vote at the election to be held on _____ 11/03/2020 _____ (date).

**Required** ▶

| Signature of Voter | Date (MM/DD/YY) | Phone Number |
| --- | --- | --- |

FOR OFFICE USE ONLY  Date App. Rec'd. _____  Ballot Mailed _____  Transmitted by _____

Prepared by the Office of the Secretary of State, 1st Floor, Memorial Hall, 120 S.W. 10th Avenue, Topeka, KS 66612-1594.
KSA 25-1122d(a). Rev 6/1/20 tc

Appellants' Appendix - Vol. III - 718

32150193642 KSAS0125263 KSR

SHAWNEE

# EXHIBIT 3

## to Johnson Declaration

Kansas Democratic Party
P.O. Box 1914
Topeka, KS 66601

NONPROFIT ORG
U.S. Postage
PAID
Topeka, KS
PERMIT 127

000017 0807

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*ECRWSH\*\*C092

156339

or Current Resident
NE Lime St
Topeka, KS  66616-

**Open Immediately: Your official Kansas postage-paid ballot request form is enclosed.**

156339

FIRST-CLASS MAIL
U.S. POSTAGE
PAID
DS
IMB-POSTAGE

000017

Shawnee County Elections Officer
3420 SW Van Buren St
Topeka KS 66611

156339

BOL20007 RET

# KANSAS VOTER ALERT

## ALL REGISTERED VOTERS ARE ELIGIBLE TO VOTE BY MAIL. RETURN YOUR POSTAGE-PAID BALLOT REQUEST TODAY!

**As a Kansas voter, you're eligible to request a ballot by mail.** Voting by mail is easy, convenient, safe, and secure.

> **Easy To Do:** By mailing the enclosed form in the enclosed return envelope, you'll get your ballot for the 2020 General Election mailed to you.

> **Convenient:** You can cast your vote for President, U.S. Senate, Congress, and other candidates without having to leave your home.

> **Safe And Secure:** Your personal information and your vote will always be secret.

If you have already requested a ballot by mail, verify your status at **KSVotes.org**.

Requesting your ballot using the enclosed form is as **easy as 1-2-3**:

**1. Finish filling out the enclosed request form.**
We've started filling out this form for you, but you'll need to fill in a few more blanks.

> ➤ **Verify all the pre-filled information is accurate.** You can correct your information directly on the form, or you can request your ballot at KSVotes.org.

> ➤ **Fill out the state and county where you are currently located.** This may be different than the county where you are registered to vote.

> ➤ **Add your Kansas driver's license number.** If you don't have a Kansas driver's license, follow the instructions listed on the form.

> ➤ **Sign, date, and add a phone number** at the bottom of the form.

**2. Fold your completed request form and place it in the enclosed envelope.**
If your envelope is missing, you can use any stamped envelope addressed to your local county elections official. You can find your county election official's address at **kansasdems.org/vote**.

**3. Drop the envelope in the mail—no stamp needed!**
Your ballot will arrive a few weeks before the election.

Voters with a current Kansas driver's license or Kansas non-driver identification card can also request a ballot by mail online at www.KSVotes.org.

Paid for by the Kansas Democratic Party, kansasdems.org. Not authorized by any candidate or candidate's committee.

BOL20007 LTR

156339

Office of the Kansas Secretary of State
# Application for Advance Ballot by Mail
DOWNLOAD THIS FORM AT WWW.SOS.KS.GOV



FORM
AV1M

## 1. Affirmation

Affirmation of an Elector of the County of _____ Shawnee _____ and State of Kansas Desiring to Vote an Advance Voting Ballot
State of _____, County of _____, ss: (where application is completed)

## 2. Voter Identification Requirements

I understand that my current and valid Kansas driver's license number or Kansas nondriver's identification card number must be provided in order to receive a ballot.

Current Kansas driver's license number or nondriver's identification card number: _____

If I do not have a current and valid Kansas driver's license number or Kansas nondriver's identification card number, I must provide a copy of one of the following forms of photo identification with this application in order to receive a ballot.

- Driver's license issued by Kansas or another state
- Nondriver's ID card issued by Kansas or another state
- U.S. passport
- Concealed carry of handgun license issued by Kansas or another state
- Employee badge or ID document issued by a government office

- U.S. military ID
- Student ID card issued by an accredited Kansas postsecondary educational institution
- Public assistance ID card issued by a government office
- ID card issued by an Indian tribe

## 3. Personal Information   Please print.

| | | J | 09/ |
|---|---|---|---|
| Last Name | First Name | M.I. | Date of Birth (MM/DD/YY) |

| Lime St | Topeka | KS | 66616 |
|---|---|---|---|
| Residential Address | City | State | Zip Code |

Political Party (To be filled in only when requesting a primary election ballot): ☐ Democratic ☐ Republican

## 4. Address to Mail Ballot (if different from residential address)

| NE Lime St | Topeka | KS | 66616 |
|---|---|---|---|
| Mailing Address | City | State | Zip Code |

Note: The ballot may be mailed only to the voter's residential or mailing address as indicated on the county voter registration list, to the voter's temporary residential address, or to a medical care facility where the voter resides. These restrictions do not apply to a voter who has an illness, disability or who lacks proficiency in the English language. Ballots cannot be mailed until 20 days before the election.

## 5. Voter Signature   Note: False statement on this affirmation is a severity level 9, nonperson felony.

I do solemnly affirm under penalty of perjury that I am a qualified elector residing at the address listed above, or I am authorized to sign for the above named voter who has a disability preventing the voter from signing an application. I am entitled to vote an advance voting ballot and I have not voted and will not otherwise vote at the election to be held on November 3, 2020 _____ (date).

Required
_____  _____  _____
Signature of Voter          Date (MM/DD/YY)              Phone Number

Voter ID Number: _____

FOR OFFICE USE ONLY Date App. Rec'd _____ Ballot Mailed _____ Transmitted by _____

Prepared by the Office of the Secretary of State, 1st Floor, Memorial Hall, 120 S.W. 10th Avenue, Topeka, KS 66612-1594.
KSA 25-1122d(a). Rev 6/1/20 tc

BOL20007 FORM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VOTEAMERICA and
VOTER PARTICIPATION CENTER,

    *Plaintiffs,*

vs.

    Case No. 2:21-cv-02253-KHV-GEB

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas; KRIS
KOBACH, in his official capacity as Attorney
General of the State of Kansas; and STEPHEN
M. HOWE, in his official capacity as District
Attorney of Johnson County,

    *Defendants.*

## DEFENDANTS' RESPONSE TO PLAINTIFF VPC'S BRIEF FOLLOWING REMAND

Defendants submit this Response to Plaintiff Voter Participation Center's ("VPC") Brief Following Remand from the Tenth Circuit Court of Appeals (ECF No. 200) ("Pl.'s Br."). *See VoteAmerica v. Schwab*, 121 F.4th 822 (10th Cir. 2024). For the reasons set forth below, the challenged statute prohibiting the mailing of unsolicited, pre-filled advance ballot applications ("Pre-Filled Application Prohibition" or "Prohibition"), K.S.A. 25-1122(k)(1)-(2), does not violate Plaintiffs' First Amendment free speech rights. Defendants, therefore, respectfully request that the Court enter judgment in their favor.

### I. – FACTUAL BACKGROUND

This case revolves around the process for advance voting by mail in Kansas, the problems and complications that can and have arisen therefrom, the State's authority to address those issues through appropriate legislation, and the proper deference that the Court owes to the State when evaluating constitutional challenges to such election integrity measures.

The Tenth Circuit, in addition to ordering the dismissal of VPC's freedom of association and overbreadth claims, rejected the application of strict scrutiny to VPC's free speech cause of action. The court of appeals held that, unless "the purpose or justification for the Prohibition was to suppress speech favoring mail voting" – which, as described below, is emphatically not present here – the Prohibition need only survive intermediate scrutiny. *VoteAmerica*, 121 F.4th at 851. Moreover, the case law governing First Amendment attacks on election integrity statutes in non-public fora, as an advance ballot application surely must be characterized, militates substantial deference to the State's interests. Few cases have *ever* invalidated statutes in this context, and the pending lawsuit presents no basis for an exception.

### A.  Advance Voting By Mail in Kansas

Kansas has long been at the forefront of absentee voting and has consistently had one of the most generous allowances in the country for citizens to cast their ballot by mail. The State first permitted members of the military to vote outside of their precinct during the Civil War.[1] In the following decades, it added categories of individuals who could vote absentee, including railroad employees (1901), the sick or physically disabled (1953), persons absent from the county during the entirety of Election Day (1967), voters with permanent physical disabilities or illnesses (1984), and finally, no excuse absentee mail voting for all (1995).[2] In fact, the law that permitted railroad employees to vote by mail was the first such law in the country,[3] and Kansas' adoption of no-

---

[1] Kan. Legis. Rsch. Dep't, *Kansas Voter Registration and Voting Law Changes since 1995-August 1, 2023*, p. 5 (Aug. 1, 2023) (citing 1868 Ch. 36 of the General Statutes, § 45; K.S.A. 25-1201 *et seq.*), *https://www.kslegresearch.org/KLRD-web/Publications/ElectionsEthics/memo_genl_shelley_voting_registration_law_changes_2023update.pdf*

[2] *Id.* (citations omitted).

[3] Smithsonian Nat'l Postal Museum, *Voting by Mail: Civil War to Covid-19, History 1861-2022* (recognizing that Kansas was the first state to permit mail voting but limited such voting to railroad employees), *https://postalmuseum.si.edu/exhibition/voting-by-mail-exhibition/history-1861-2022*.

excuse mail voting was one of the first such laws in America.[4] Kansas was one of only approximately 15 states to offer no-excuse absentee voting by mail in 1996.[5]

This flexibility continues to the current day. All registered voters in Kansas are eligible to vote by mail in advance of Election Day. To do so, a voter must simply timely submit an advance ballot application to the county election office in which the individual is registered. ECF No. 176 (Stipulated Facts), ¶ 28. In order to preserve the integrity of the process and protect against any potential fraud, all information on the application must precisely match the data in the State's voter registration database ("ELVIS") before the applicant will be issued an advance ballot. *Id.* at ¶¶ 24, 37. If the information does not match or is missing required data (unless the mismatch is clearly inadvertent, e.g., a misspelled street name, omitting the letter "e" in George, or signing as "Jim" despite being registered as "James"), then a ballot will not be promptly issued. *Id.* at ¶¶ 34-35. Instead, county election officials must then undertake a time-consuming process to contact the voter and allow him/her an opportunity to cure any deficiencies. *Id.* If the voter cannot be reached, or it would be impracticable to do so given the proximity of the election, a more labor-intensive provisional ballot may be issued, depending on the defect. *Id.* at ¶¶ 36, 43.

This cure process can be protracted and time consuming. Although it takes an experienced election official, on average, roughly three to five minutes to process an accurate advance ballot application, *id.* at ¶ 153, an average of fifteen minutes of staff time is typically necessary if the cure process must be utilized. *Id.* at ¶¶ 154-155. If a voter cannot be contacted and must instead be sent a provisional ballot, the process ordinarily consumes thirty minutes or more of staff time.

---

[4] The Center for Election Innovation and Research, *The Expansion of Voting Before Election Day, 2000-2024* (July 2024), *https://electioninnovation.org/research/expansion-voting-before-election-day/*.

[5] N. Cemenska, *Report on the 1972-2008 Early and Absentee Voting Dataset*, Absentee Voting Laws (Dec. 14, 2009), https://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2009/NonPrecinctLaws197220081pdf.pdf.

*Id.* at 156. Review of duplicate applications, meanwhile, generally takes seven to ten minutes of staff time to process if the voter does not need to be contacted, but can take fifteen to thirty minutes or more if officials must communicate directly with the voter. *Id.* at ¶¶ 176-177.

### B. *VPC's Ballot Application Activities in Kansas*

Plaintiff VPC, along with its sister organization, Center for Voter Information ("CVI"), mailed partially pre-filled advance ballot applications (in which the registrant's name, address, county, and election date were pre-populated) to targeted individuals in connection with the 2020 General Election. ECF No. 200, Exs. 1-2.[6] VPC relied on a vendor (Catalist) to provide the data used to pre-fill the forms. ECF No. 176, ¶ 52. Although the information Catalist sent to VPC was based upon publicly available information in ELVIS, Catalist also merged commercial data into the mix, meaning the information VPC received did not always track ELVIS data. *Id.* at ¶ 63. Because of the significant lag time between data gathering and the printing and mailing of the pre-filled applications, the information used to pre-populate the forms was also often stale. *Id.* at ¶¶ 53, 68. This resulted in substantial quality control issues with VPC's mailings.

Prior to the November 2020 election, VPC and CVI mailed between one and five advance ballot application packets to nearly 508,000 Kansas voters. *Id.* at ¶¶ 47, 165. This occurred over five "waves" of mailings. *Id.* at ¶ 60. A large number of these pre-filled applications contained erroneous information. VPC's internal data revealed that nationally,[7] approximately 5% of its pre-filled applications contained an erroneous middle name or initial and about 3% had a mismatched suffix. *Id.* at ¶ 64. This would translate to more than *40,600* inaccurate applications in Kansas,

---

[6] VPC accompanied its pre-filled applications with a cover letter touting the purported virtues of voting early by mail. The Tenth Circuit made clear, however, that the pre-filled application must be entirely disaggregated from the cover letter in evaluating Plaintiffs' First Amendment claim. *VoteAmerica*, 121 F.4th at 834-36.

[7] In addition to Kansas, VPC undertook similar activity in seventeen other states.

assuming a similar error rate. Although VPC did not know whether Kansas' error rates exactly tracked its national error rate, it never argued that the rates did not track. And VPC was sufficiently concerned itself about the accuracy of the data it received from Catalist that it stopped pre-filling applications and instead sent blank applications in the third and fourth Kansas waves. *Id.* at ¶¶ 61-62, 65.

In discovery, VPC provided only a subset of its Kansas mailing list (just under 313,000 of the voters to whom it sent at least one advance ballot application), but Defendants' expert, Ken Block, identified an array of errors in the names and addresses that VPC used to pre-fill the applications, as well as highlighting almost 400 mailings to voters whose registrations had been cancelled. *Id.* at ¶¶ 67-74. He also discovered that, *at best*, VPC used a Kansas voter file from April 2020 to pre-fill the applications it sent to voters for the November 2020 Election. *Id.* at ¶¶ 53, 68. Given that ELVIS is a dynamic system and updated in real time, *id.* at ¶58, VPC thus often used stale / inaccurate information. Even Plaintiffs' expert, Dr. Eitan Hersh, acknowledged that at least 3% of VPC's Kansas voter database were inaccurate, suggesting that VPC and CVI sent at least 15,236 erroneous applications to Kansas voters in connection with the 2020 General Election. *Id.* at ¶ 88. Dr. Hersh observed that VPC could have achieved greater accuracy, but that VPC's cost-benefit assessment led it to refrain from taking any such measures. *Id.* at ¶ 90.

Then there were the duplicate applications. Shawnee County Election Commissioner Andrew Howell, for example, not only described receiving a substantial number of pre-filled applications containing information that did not match applicants' data in ELVIS (e.g., wrong address, last name, middle initial, or suffix), *id.* at ¶ 139, but he also noted that the county received 4,217 duplicate applications, a staggering figure representing more than 15.4% of the total advance applications received. *Id.* at ¶¶ 168-169. Ford County Clerk Debbie Cox testified similarly. Her

5

office received 274 duplicates, nearly 9% of the 3,040 total applications. *Id.* at ¶ 172. These figures bore no resemblance to the 2020 proportional increase in mail voting, considering that Shawnee County had never received more than a *dozen* duplicates in any prior election, and Ford County had never received more than *five*. *Id.* at ¶¶ 169-170, 173. Election Director Bryan Caskey testified that other county election officials throughout the State shared their own similar experiences with him. *Id.* at ¶¶ 161-162.

Howell recounted that these inaccurate and duplicate applications resulted in calls, letters, e-mails, and in-office visits from voters expressing anger, confusion, and frustration at what they had received from VPC. *Id.* at ¶¶ 142-144. While VPC seeks to dismiss the significance of the duplicate applications since Kansas does not prohibit duplicate mailings, Howell and Cox both noted that many voters explained that they had only submitted duplicate applications because they *believed they were obligated to mail any and all pre-filled applications back to the county election office*, even if they had previously submitted one, and even if they had no desire to vote by mail. *Id.* at ¶¶ 143, 171, 179. VPC responds that its mailers contained a statement advising voters that they need not submit the latest pre-filled application if they had already submitted one, Pls.' Br. at 10, but the avalanche of duplicate applications returned to county election offices underscored that voters clearly did not get the message and that VPC's disclaimer proved wholly ineffective.

These inaccurate and duplicate applications had a deleterious impact on efficient election administration. Election officials described the extra time they had to spend processing every application and going through the elaborate curative process for voters submitting erroneous and duplicate applications. *Id.* at ¶¶ 153-157, 176-178. Cox recalled the situation got so bad in Ford County that she took out an ad in the local paper to inform voters that she had nothing to do with VPC's mailings. *Id.* at ¶¶ 150-151, 679. VPC itself received enough complaints about its pre-filled

6

applications that it created an FAQ for staff to use in responding to voters in which voters were to be told that VPC was "aware" that it was mailing forms with "Someone else's information" and that voters should use the Secretary of State's website to obtain a *blank application* instead. *Id.* at ¶ 158. Officials in other states complained to VPC about its inaccuracies as well. *Id.* at ¶ 159.[8] Although existing safeguards fortunately prevented systemic fraud from occurring in Kansas, VPC's activities made election administration far more difficult for the State's election officials.

### C. *Kansas Legislature's Reaction to Problems with Pre-Filled Applications in 2020*

In response to the events of the 2020 election, the Kansas legislature in its 2021 session adopted the Pre-Filled Application Prohibition, now codified at K.S.A. 25-1122(k)(2). The statute makes it a misdemeanor for any person to solicit, by mail, a registered voter to file an advance ballot application if the mailing includes an application that has been partially or fully completed prior to the mailing. The legislature employed a scalpel rather than a sledgehammer. It could have banned mail voting altogether (as many states do), prohibited the distribution of mail ballot applications by anyone other than county election officials (as Tennessee does via a statute that the Sixth Circuit recently upheld against a First Amendment challenge, *see Lichtenstein v. Hargett*, 84 F.4th 575 (6th Cir. 2023)), restricted the provision of *any assistance* of voters (even in person) with their advance ballot applications (as states like Minnesota do, *see* Minn. Stat. Ann. § 203B.03, Subd. 1(a)(7)), or imposed an array of other possible restrictions on the process. Instead, the legislature opted to target what it perceived to be one of the primary sources of voter confusion, and impediment to efficient election administration: the mailing of unsolicited, pre-filled applications.

---

[8] Georgia adopted a bill (S.B. 202) very similar to Kansas' Prohibition on March 25, 2021, several months before Kansas' legislature enacted the law at issue here. *See* Ga. Code Ann. § 21-2-381(a)(1)(C)(ii). Georgia's law was also passed in response to significant voter complaints about the inaccurately pre-filled absentee vote applications they received from VPC in connection with the 2020 General Election, which are recounted in *VoteAmerica v. Raffensperger*, 696 F.Supp.3d 1217, 1226 (N.D. Ga. 2023).

## II. – ARGUMENT

### A. The Prohibition is not subject to strict scrutiny

Seeking to avail itself of the tiny window crack left open by the Tenth Circuit, VPC argues as a preliminary matter that the Prohibition must be subjected to strict scrutiny because the purpose or justification of its passage was to suppress speech favoring mail voting. VPC theorizes that "the only rational purpose of the . . . Prohibition was to target and suppress speech by third parties like VPC that express a pro-vote-by-mail message." Pls.' Br. at 7; *see also id.* at 8-11. This position is indefensible. Its acceptance would require a disregard of not only the stipulated facts in this case, but also Kansas' long and consistent role as a leader in promoting mail voting.

As noted in Part I.A. above, Kansas has been, and remains today, one of the most flexible states in the union in terms of its solicitude of mail voting. No excuse is necessary in order to vote early via the mail. And the process could hardly be easier, as VPC's own mailers explicitly acknowledge. The notion that Kansas' adoption of measures designed to address at least part of the problems that occurred in connection with the 2020 General Election (both in this State and elsewhere) meant that it had suddenly reversed many decades of consistent policy and exhibited impermissible animus towards voting by mail defies common sense. Nor is the Prohibition being challenged here restrictive of VPC's ability to communicate its message. Indeed, the Tenth Circuit held that any threat to free speech posed by the Prohibition is "small." *VoteAmerica,* 121 F.4th at 850. The Court explained:

> Although VPC cannot, without invitation, complete answers to the questions on the mail-ballot application seeking noncontroversial demographic information to satisfy legal requirements, it can provide that information to the voter in multiple alternative ways, including, for instance, on a sheet with that information attached to the form. We are not sufficiently imaginative to see how the Prohibition could "effectively drive [any] ideas or viewpoints from the marketplace." *Davenport [v. Wash. Educ. Ass'n*], 551 U.S. [177,] 188 [2007].

8

*Id.* at 850.  The Court then added:

> [T]he history of regulations (instructions) governing the filling out of noncontroversial information on government forms provides substantial comfort that such regulation is fully compatible with a lively market in controversial ideas.  We think the likelihood that the Prohibition's restrictions on what can be done with a government form would impair the free marketplace of ideas is even less than the potential impairment from the somewhat analogous context of content restrictions on the use of government property constituting a nonpublic forum.

*Id.* at 851 (internal citations and alterations omitted). This analogy is particularly instructive given that regulations on *non-public fora*—which an official advance mail ballot application form is, *at most*—typically survive judicial scrutiny. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 799-800 (1985) (speech restrictions may be imposed on non-public fora as long as they are reasonable and do not constitute viewpoint discrimination); *United States v. Kokinda*, 497 U.S. 720, 727 (1990) (postal sidewalk is a nonpublic forum and thus can be reasonably regulated by the government).

As for VPC's contention that the Prohibition is undergirded by an improper justification because it constrains only views that advocate in favor of mail voting, the facts and common sense suggest otherwise. VPC seems to believe that a pre-filled application is only consistent with a pro-vote-by-mail message, and thus any restrictions on the pre-filling necessarily must trigger strict scrutiny. But even if VPC's insertion of a voter's name and address on an advance mail ballot application represents speech, there is no conceivable counterpoint to be written on the form.  The application contains only discrete data fields. There is *nothing* else that *could* be written on it. It is simply a government form. As the Tenth Circuit noted, "to state the obvious, the use of forms by the government inherently requires some content restrictions. One would be hard-pressed to name an official form that is not accompanied by a set of instructions on how to complete it—instructions which not uncommonly exceed the length of the form itself." *VoteAmerica,* 121 F.4th at 850-51.

9

"In particular, instructions governing the time, place, and manner in which someone can fill out for another person a government form seeking noncontroversial information do not on their face suggest hostility to any idea or point of view." *Id.* at 851.

In its briefing before the Court of Appeals, VPC posited that an anti-vote-by-mail group could send an adulterated application with bolded letters urging voters not to vote by mail. But in that scenario, the form being used as background would no longer represent a valid application; it would effectively function as a cover letter articulating a specific message. Plus, if the *destruction* of an application is necessary to communicate a counter-message, then the form does not lend itself to multiple viewpoints. The bottom line is that Kansas is indifferent to any message that VPC seeks to communicate. There is no improper purpose or justification behind the Prohibition. The State is merely trying to minimize voter confusion, facilitate efficiency in election administration, and foster confidence in, and protect the integrity of, the electoral process.

VPC claims that the legislative record of the now-challenged statute reflects an improper hostility to organizations that encourage voters to vote by mail. Pls.' Br. at 3-4, 10. This represents a mischaracterization of the legislature's actions. No entity was singled out based on its viewpoints. The only reason the legislative debate over HB 2332 included references to the activities of third-parties was because the problems the bill was attempting to address—e.g., voter confusion and frustration, inefficient election administration, and diminished confidence in the integrity of the electoral process—were *caused by* the referenced third-parties' erroneous pre-filling and duplicate mailings of advance ballot applications. That certainly does not suggest any unconstitutional discrimination.[9] Moreover, given the unprecedented torrent of duplicate applications, it is rather

---

[9] VPC's references to the testimony of certain state and county election officials *in this lawsuit* as a basis for suggesting that *the legislature* improperly targeted organizations like itself when adopting HB 2332 *back in 2021*, Pls.' Br. at 10, makes no sense and further underscores the lack of merit in its theory.

10

rich for VPC to attempt to trumpet its supposed efforts to avoid this scenario by including what was indisputably a completely ineffective statement on its cover letters advising voters that they need not send in duplicate applications.  In any event, the Tenth Circuit rejected Plaintiffs' argument that the Prohibition's speaker distinctions invite strict scrutiny.  *VoteAmerica*, 121 F.4th at 848.

Having fallen short on its direct assault, VPC next attempts to mount an indirect attack to get to strict scrutiny by claiming that the legislature must have had nefarious motives in adopting the Prohibition because the State's asserted interests in the law are not served by the statute. Even if true—which it emphatically is not—VPC's argument is predicated on a "logical fallacy of the inverse," also known as the denial of the antecedent (i.e., the failure of the means does not prove an improper motive). *See NLRB v. Noel Canning*, 573 U.S. 513, 589 (2014) (Scalia, J. concurring) (discussing the fallacy); *Ace Fire Underwriters Ins. Co. v. Romero*, 831 F.3d 1285, 1291 n.7 (10th Cir. 2016) (same). In other words, even if the State's interests were not served by the statute, that would in no way constitute evidence of any improper motive justifying the application of strict scrutiny. VPC's fallacious theory is ultimately beside the point, however, because, as detailed in Part II.B. below, the Prohibition *does* closely serve Kansas' interests.

VPC also avers that another provision in HB 2332—the statutory prohibition against non-Kansas residents mailing advance ballot applications to Kansas voters, (what VPC characterizes as the Out-of-State Distributor Ban, codified at K.S.A. 25-1122(*l*)(1)), which has been permanently enjoined by stipulation—is evidence that the bill "was aimed at limiting the flow of pro-vote-by-mail communications to Kansas voters." Pls.' Br. at 10. But that statute is no longer at issue in the case, and the Court cannot analyze the constitutionality of these provisions under a "one bad apple spoils the whole barrel" methodology. The Court must assess each statute on its own merits, even

if enacted alongside other allegedly unconstitutional provisions. *See United States v. O'Brien*, 391

U.S. 367, 383 (1968) ("It is a familiar principle of constitutional law that this Court will not strike

down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."). As

anyone even remotely familiar with the legislative process knows well, different provisions in an

omnibus bill are frequently proposed, amended, and adopted by a divergent cast of legislators and

committees. Legislative text is added and deleted in committee and on the floor of each house. The

notion that every line in a bill reflects the universal consensus or motivation of each member voting

in favor of final passage is simply untrue. The long and arduous path that HB 2332 took to passage

shows this bill is no exception. *See* https://kslegislature.gov/li_2022/b2021_22/measures/hb2332/.

In sum, there is a paucity of evidence that the Prohibition was adopted by the legislature

for the purpose, or with the justification, of suppressing speech favoring mail voting. There is thus

no basis for subjecting the statute to strict scrutiny. It must instead must be analyzed under inter-

mediate scrutiny, as described in the Tenth Circuit's *VoteAmerica* opinion.

**B.  The Prohibition survives intermediate scrutiny review**

The Tenth Circuit explained that, in evaluating VPC's First Amendment free speech claim

under intermediate scrutiny, the Court must assess whether the Prohibition's "restriction on speech

or expression" are "narrowly tailored to serve a significant governmental interest." *VoteAmerica*,

121 F.4th at 851 (quoting *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76

(2022)). The Prohibition clearly passes that test.

1.  *Any restrictions on speech in the context of advance mail ballot applications occur, at most, in a non-public forum where regulatory latitude is much greater*

In describing the "narrowly tailoring" requirement, VPC suggests that it is a one-size-fits-

all inquiry. It is not. VPC primarily focuses on *Brewer v. City of Albuquerque*, 18 F.4th 1205 (10th

Cir. 2021); *McCraw v. City of Oklahoma City*, 973 F.3d 1057 (10th Cir. 2020); and *Citizens for*

12

*Peace in Space v. City of Colorado Springs*, 477 F.3d 1212 (10th Cir. 2007). Each of those cases, however, involved significant restrictions—virtual *complete bans*—on speech in *traditional public fora*, "which occupy a special position in terms of First Amendment protection, have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Brewer*, 18 F.4th at 1219 (quotations omitted). "In these traditional public fora, the government's right to limit expressive activity is sharply circumscribed." *Id.* at 1220 (quotations omitted). The ground surrounding a highway entrance (*Brewer*), public median (*McCraw*), and hotel perimeter (*Citizens for Peace in Space*) are classic examples of traditional public fora where constraints (let alone bans) on protesting, panhandling, or distributing literature have a high likelihood of limiting ideas or viewpoints from the marketplace.[10] The Tenth Circuit heavily emphasized the public forum context in those cases. *See id.* at 1222-23 n.14 (describing a more flexible narrow tailoring test in commercial speech than in public fora, the former being much more analogous to the Prohibition at issue here).

The same is true of the other cases VPC cites on this issue, each of which involved a broad and sweeping limitation on speech in traditional public fora. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 476-77 (2014) (street and sidewalk outside abortion clinic are traditional public fora; "government's ability to restrict speech in such location is very limited"); *Rideout v. Gardner*, 838 F.3d 65 (1st Cir. 2016) (prohibition against posting ballot-selfies on the internet—the *ultimate traditional public forum*—held not to be narrowly tailored under intermediate scrutiny).

---

[10] Notably, the speech restrictions in *Citizens for Peace in Space* (a total ban on protestors) were still ultimately upheld as valid time/place/manner limits, even though the court was required to impose the more robust intermediate scrutiny test applicable to traditional public fora. 477 F.3d at 1221-26. So, too, was a First Amendment free speech claim rejected, applying intermediate scrutiny, against a city ordinance prohibiting loitering in a traffic median. *See Evans v. Sandy City*, 944 F.3d 847, 854-60 (10th Cir. 2019).

By contrast, in a *non-public forum*, the government has much greater latitude to impose restrictions "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806 (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983)). "The Government's decision to restrict access to a nonpublic forum need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation. In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Id.* at 808.

Moreover, "[n]ot every instrumentality used for communication . . . is a traditional public forum or a public forum by designation." *Id.* at 803. That is why, for example, the Supreme Court characterized advertising space on city buses as a non-public forum and upheld restrictions therein. *Id.* at 803-04 (citing *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974)). It is also why the Supreme Court in *Cornelius* rejected a First Amendment challenge to the government's restrictions on which entities could participate in the annual Combined Federal Campaign charity drive. *Id.* at 811-12. The Court reasoned that the necessity for regulation in this campaign reflected that the government did not intend to create an arena for open-ended expression, and it was appropriately labeled a non-public forum. *Id.* at 804-06. The underlying rationale is that the scope of the First Amendment typically turns on "the nature of the property" and the "disruption that might be caused by the speaker's activities." *Id.* at 800.

An official government form like Kansas' advance mail ballot application that is used as a critical component of the voting process is *not* properly characterized as a traditional public forum. There may be information communicated meriting First Amendment protection, *VoteAmerica*, 121 F.4th at 838, but the form itself is, *at most*, a non-public forum. *See id.* at 850-51 (describing how

14

this type of government form inherently needs content restrictions). Indeed, the Tenth Circuit held that "the likelihood that the Prohibition's restrictions on what can be done with a government form would impair the free marketplace of ideas is *even less* than the potential impairment from the somewhat analogous context of content restrictions on the use of government property constituting a *nonpublic forum.*" (emphasis added); *cf. Doe v. Reed*, 561 U.S. 186, 196 (2010) (exacting scrutiny test used for determining if disclosure mandate unreasonably burdened speech requires that the "strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."). To subject any regulations/instructions imposed by Kansas on this form to the same level of scrutiny applied in connection with a public gathering space or other traditional public forum is illogical.

This analysis is fully consistent with, and even compelled by, *Vidal v. Elster*, 602 U.S. 286 (2024), which the Tenth Circuit relied upon in rejecting a strict scrutiny standard in this case. *See VoteAmerica*, 121 F.4th at 848-49. Just as is the case with viewpoint-neutral trademark restrictions, there is a long history of federal courts deferring to states' electoral regulations. The Judiciary has consistently recognized that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). *Vidal* instructs courts to look at that history when evaluating the scope and impact of the First Amendment on the regulation at issue.[11] *Vidal*, 602 U.S. at 300. Despite acknowledging that a content-based, viewpoint neutral speech restriction was involved in the trademark dispute,

---

[11] To be sure, as the Tenth Circuit also noted, *Vidal* indicated that a historical practice of regulation is not required for a viewpoint-neutral regulation to pass constitutional muster under the First Amendment. *VoteAmerica*, 121 F.4th at 849. This point is reinforced, the Tenth Circuit observed, by *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177 (2007).

15

the Supreme Court held that the absence of a public forum, combined with the lack of a government intent to create a designated forum for speech simply by providing for the federal registration of trademarks, counseled in favor of a standard more akin to reasonableness as would exist in a non-public forum. *Id.* at 309; *see also Burson v. Freeman*, 504 U.S. 191, 214-16 (1992) (Scalia, J. concurring) (content-based, viewpoint-neutral restrictions on speech around polling place are not subject to any heightened scrutiny because they regulate a non-public forum).

The same is true of advanced mail ballot applications.  Far from intending to establish any designated forum for speech, the official application form — accompanied by detailed instructions and governed by a comprehensive election code — simply functions as a critical component of the actual voting process. In fact, exercising their broad authority to regulate elections under U.S. Const. Art. 1, § 4, states have created a plethora of laws governing voter registration and ballot casting, which rely on a variety of government forms.  *See, e.g., Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) (collecting cases regarding laws subject to the Elections Clause). These forms, which necessarily restrict speech under the Tenth Circuit's interpretation, have long co-existed with the First Amendment, and the Prohibition should be viewed in a similar light.

In sum, the State enjoys substantial flexibility to regulate in this arena. Whether an advance mail ballot application is branded a non-public forum or simply a mechanism at the far end of the continuum where government regulation of speech is at its peak (i.e., the immediate proximity of a non-public forum), the limits on state authority that VPC advocates here from traditional public fora precedent are inapplicable. The proper test is reasonableness.

2.   *The Prohibition meets any intermediate scrutiny test*

Even if the Court applies the intermediate scrutiny test for speech restrictions in a public forum, however, the Prohibition still survives unscathed. With public fora, the narrow tailoring

16

component of intermediate scrutiny requires the court to "look to the amount of the speech covered by the [regulation] and whether there is an appropriate balance between the affected speech and the governmental interests that the [regulation] purports to serve." *Brewer*, 18 F.4th at 1224 (quoting *Evans v. Sandy City*, 944 F.3d 847, 856 (10th Cir. 2019)). The fit need not be perfect. There is no mandate that the challenged regulation "be the least restrictive or least intrusive means of serving the government's interests." *Id.* (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)); *accord Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). "Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation without burdening *substantially more* speech than is necessary to further the government's legitimate interests." *Brewer*, 18 F.4th at 1225 (citations and internal alterations omitted). "In other words, restrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Id.* "The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Evans*, 944 F.3d at 856-57 (cleaned up).

3.  *The Prohibition is narrowly tailored to meet Kansas' significant interests*

Defendants have identified numerous compelling reasons that supported the enactment of the Prohibition, including the avoidance of voter confusion, facilitation of orderly and efficient election administration, enhancement of public confidence in the integrity of the electoral process, and deterrence of voter fraud. All are well-recognized and indisputably legitimate interests in the context of election administration. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021) (combatting fraud is a "strong and entirely legitimate" reason for enacting voting laws);

17

*Doe v. Reed*, 561 U.S. 186, 197-98 (2010) ("State's interest in preserving the integrity of the electoral process is undoubtedly important . . . [and it] extends more generally to promoting transparency and accountability in the electoral process."); *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (State has "compelling interest in protecting voters from confusion and undue influence."); *Burdick*, 504 U.S. at 438 ("We have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls."); *Marchioro v. Chaney*, 442 U.S. 191, 196 (1979) ("The State's interest in ensuring that [its electoral] process is conducted in a fair and orderly fashion is unquestionably legitimate."); *DSCC v. Pate*, 950 N.W.2d 1, 5-7 (Iowa 2020) (rejecting constitutional challenge to statute that prohibited third-parties from pre-populating voters' absentee ballots).

VPC does not take issue with the *general* importance of any of these interests. Instead, it argues that these interests were not set forth in the legislative record when HB 2332 was enacted, that the State failed to marshal evidence of the harms that led to the Prohibition's passage, and that the Prohibition is not a proper fit for such harms in any event. None of those contentions has merit.

As a threshold matter, the fact that the legislature did not create a comprehensive record of all its rationale for adopting the Prohibition is irrelevant. The legislature was under no obligation to "show its work" when enacting the statute. "[B]ecause a government has such a compelling interest in securing the right to vote freely and effectively, this Court never has held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question." *Burson*, 504 U.S. at 208-09 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986)); *see also Minority Television Project, Inc. v. FCC*, 736 F.3d 1192, 1198-99 (9th Cir. 2013) (in conducting intermediate scrutiny review as part of First Amendment free speech challenge, court looks to evidence developed in the litigation and is not

18

restricted to legislative history); *id.* at 1199 ("As a matter of course, in multiple First Amendment cases, the [Supreme] Court has looked beyond the record before Congress at the time of enactment.") (citing *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 666 (1994)). And the stipulated factual record contains ample evidence to support the State's interests.

a.    The Prohibition minimizes voter confusion

VPC maintains that Defendants offered only "minimal" evidence of voter confusion, which was anecdotal in nature and did not constitute "real" harm. Pl.'s Br. at 15-17. VPC further claims that the Prohibition would not alleviate such harm in any event. False, all the way around.

The parties *stipulated* that election officials were inundated with calls from confused and angry voters who had received inaccurately pre-filled applications. ECF No. 176, ¶¶ 142-144, 161-162. Andrew Howell in Shawnee County described voters venting frustration at having received applications that contained the wrong name and address, particularly when those voters had previously communicated changes to the election office.  Id. at ¶ 143. Ford County alone received 20-30 phone calls *per day* and placed newspaper ads to alert voters that the county had not mailed out any pre-filled applications. *Id.* at ¶ 150. The parties also *stipulated* that, as attested by election officials, many voters were so confused by pre-filled applications that they believed they were required to complete and mail back any pre-filled application even if they had already submitted one. *Id.* at ¶¶ 171, 179.[12] This led to an explosion of duplicate applications, which imposed significant burdens on election officials. *Id.* at ¶¶ 152, 168-170, 172-174. To suggest that Defendants

---

[12] This testimony was *not* hearsay.  The election officials' statements were offered to demonstrate voters' *state of mind* after receiving the VPC materials, which is not hearsay.  Fed. R. Evid. 803(3); *United States v. Smalls*, 605 F.3d 765, 785 n.18 (10th Cir. 2010).  Testimony about a third-party's confusion in particular is either not hearsay or falls within the hearsay exception under Rule 803(3). *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 589 (6th Cir. 2015) (witness' testimony about telephone call with declarant in which declarant expressed confusion about the status of order was not hearsay); *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 132-33 (3d Cir. 2004) (bank tellers' testimony about customers' out-of-court statements regarding customers' confusion was not hearsay).

offered no evidence of voter confusion is nonsense.

VPC now engages in a *post-hoc* attack on these stipulated facts by attempting to minimize them as useless anecdotes. But the election officials' testimony regarding their interactions with voters—and the confusion, anger, and frustration of those voters arising out of the unsolicited, pre-filled advance ballot applications they had received in the mail—*is* objective evidence of such confusion. Indeed, the Tenth Circuit has held that "the government is permitted to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even based solely on history, consensus, and simple common sense, and it need not proffer either empirical data accompanied by a surfeit of background information or a double-blind empirical study or a linear regression analysis to bear its First Amendment burden." *Brewer*, 18 F.4th at 1243-44 (internal alteration and quotations omitted); *see also Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 989-93 (10th Cir. 2020) (noting that "the government is not limited in the evidence it may use to meet its burden" of justifying a regulation of speech, and discussing district court record, including post-ordinance evidence, to determine if burden had been sustained). It is not clear what VPC thinks is required, but to impose the kind of evidentiary burden it seems to be proposing would hamstring election officials and represent a major intrusion on state sovereignty and the separation of powers.

VPC's suggestion that the evidence presented fails to show that the "harms are real" falls flat as well. In contrast to the safety concerns in *McCraw v. City of Oklahoma City*, 973 F.3d 1057 (10th Cir. 2020), on which VPC rests this argument, an election statute targeting voter confusion requires no extensive studies. Defendants had no obligation to secure affidavits from thousands of voters or to present evidence of voter confusion from every county in the State. Defendants pro-duced competent (and stipulated) evidence from state and county election officials who interacted

20

with voters on a daily basis.  Moreover, as the Supreme Court has explained, "[t]o require States to prove actual voter confusion . . . as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight, rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights."  *Munro*, 479 U.S. at 195-96.

As for VPC's contention that the Prohibition would not alleviate the recited harms, this claim ignores the record. Voter confusion in the 2020 General Election was not confined to the widespread dissemination of duplicate applications. VPC *stipulated* that 5% of its pre-filled applications contained an incorrect middle name or initial and 3% contained an erroneous suffix. ECF No. 176, ¶ 64. Considering that VPC and CVI mailed applications to nearly 508,000 Kansas voters during in that election, that would equate to more than *40,000* erroneous applications. Even the 3% error rate acknowledged by VPC's expert translates to more than 15,000 incorrect applications. *Id.* at ¶¶ 88-89. While VPC did not know for certain if the error rates for Kansas matched its overall national error rates, *id.* at ¶ 65, it was clearly concerned about the erroneous data on the applications because, on its own initiative, it stopped pre-filling the applications and instead sent out blank applications to Kansas voters for two of its five mailers. *Id.* at ¶¶ 61-62. VPC even created an FAQ for its call center to tell voters complaining about the erroneous applications that they should seek a new, blank one from the Secretary of State's website. *Id.* at ¶ 158. And this was in addition to the pre-filled applications it sent to the wrong individuals or to persons who had died or moved out of the State, a problem created by VPC's poor quality control issues and the significant delay

between the time of printing and date of mailing. *Id.* at ¶¶ 68-74.

Nor was the pre-filled application predicament limited to Kansas. VPC's activities wreaked havoc in many other states, evidenced by the written complaints regarding inaccurate applications that VPC received from officials in those jurisdictions. *Id.* at ¶ 159. The media widely covered these problems, highlighting the bipartisan frustration with VPC and CVI, and describing how their mailers "contained mistakes and confused voters at a time when states are racing to expand vote by mail." Joshua Eaton et al., "*A Nonprofit with Ties to Democrats Is Sending Out Millions of Ballot Applications. Election Officials Wish It Would Stop*," Pro Publica, Oct. 23, 2020.[13] Kansas had every right to take other states' issues into consideration.

Clearly, then, the problem was not simply with duplicate applications, and the Prohibition properly targeted a major source of the voter confusion. But the issue of duplicates *was* relevant. Indeed, as discussed above, voters told election officials that they often submitted duplicate pre-filled applications because they thought they were required to mail back any pre-filled application even if they had already submitted one.[14] The voters were plainly confused, and the legislature was not rendered impotent to respond to this mess just because VPC included an obviously ineffective disclaimer on its applications. In any event, the fact that Kansas also had problems with duplicate applications, which are not prohibited, does not diminish the State's interests in the Prohibition.

---

[13] https://www.propublica.org/article/a-nonprofit-with-ties-to-democrats-is-sending-out-millions-of-ballot-applications-election-officials-wish-it-would-stop; Ryan McCarthy, "*Pro Publica Responds to the Center for Voter Information*," Pro Publica, Oct. 30, 2020, available at https://www.propublica.org/article/propublicaresponds-to-the-center-for-voter-information.

[14] The stipulated testimony of Shawnee County Election Commissioner Andrew Howell was also mischaracterized during the earlier proceedings. The court stated, "Howell does not believe that voters were confused or frustrated because the applications which they received were pre-filled. Rather, he believes that voters erroneously assumed that the county had mailed the duplicate ballot applications and were frustrated by the purported incompetency of his election office." *VoteAmerica v. Schwab*, 671 F.Supp.3d 1230, 1239 (D. Kan. 2023). What Howell actually testified to, however, was simply that he did not "think that the pre-filled information, *in and of itself*, was what *all of the concern was*." ECF No. 176, ¶ 141 (emphasis added). All he meant was that it was *both* the errors on the pre-filled applications and the duplicate mailings that triggered such negative emotions from voters.

States are not required to "choose between attacking every aspect of a problem or not attacking the problem at all." *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982).

VPC additionally insists that the Prohibition is not narrowly tailored because the State had less restrictive (and unspecified) alternatives available to combat the problem. Not true. Bearing in mind that Kansas was not obligated to select the least restrictive means to rectify its concerns, and that there was an array of more restrictive measures the State could have undertaken, *see* Part I.C. above, the legislature clearly endeavored to maintain its solicitude of mail voting and limit the intrusion on any speech rights while still addressing the problem that had occurred in 2020.

Precluding entities from sending more than one pre-filled application to any single voter, for example, would be ineffective given that there are multiple organizations and parties engaging in this activity. Nor would requiring that all applications be pre-filled exclusively with data directly from ELVIS have much utility. Not only would such a mandate be impossible to police, but ELVIS is a dynamic database that updates in real time as election officials input new/updated information from voters. *Id.* at ¶¶ 58-59. When data is downloaded, it reflects a snapshot of the system at the time of download. *Id.* at ¶ 50. As a result, data can become outdated almost immediately after it is downloaded. When there is a long delay between the download and the printing of a pre-filled application—as there was with VPC—the likelihood of a mismatch grows substantially. *Id.* at ¶ 59. The notion that the State could enforce a time limit on the printing/mailing lag time is folly. Plus, the volume of ELVIS data updates hits a peak as the Election Day registration deadline looms because that is the time when most individuals tend to focus on their voter registration information and ensuring that any changes to their profile (e.g., address and name) are current. Given that this is also the time when most pre-filled applications are sent to voters, it means that errors will not be avoided by a restriction on the source of the pre-filled data.

Ironically, in a separate federal lawsuit in Georgia challenging a law virtually identical to the Prohibition at issue here, VPC explicitly stated that "the challenged provisions of S.B. 202 [the Georgia law] are fundamentally more restrictive than the provision of Kansas law considered by the Tenth Circuit that infringed on Plaintiffs' speech, here limiting significantly more of Plaintiffs' speech. S.B. 202 limits the number of people to whom Plaintiffs can speak, categories of people to whom Plaintiffs can speak (newly registered voters), when Plaintiffs can speak, and even how Plaintiffs speak to voters." *VoteAmerica v. Raffensperger*, Case No. 1:21-cv-1390 (N.D. Ga.), Doc. No. 259, at 4.

It is also worth noting that, outside situations where there is a complete ban on speech in a traditional public forum, speech regulations regularly survive intermediate scrutiny review. *See, e.g.*, *Davenport v. Wash. Educ. Ass'n.*, 551 U.S. 177 (2007) (upholding, under intermediate scrutiny review, a content-based, viewpoint-neutral prohibition against public-sector unions from using agency fees deducted from non-member employees' wages to influence election without first securing affirmative consent of the employee); *Reagan Nat'l Advertising of Austin, Inc. v. City of Austin*, 64 F.4th 287 (5th Cir. 2023) (on remand from Supreme Court, in case cited by Tenth Circuit as a basis for invoking intermediate scrutiny here, court held that city's ban on digitizing off-premises billboards was sufficiently narrowly tailored to satisfy intermediate scrutiny test); *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1249-52 (10th Cir. 2023) (state law requiring permits for paid billboard message, but no such requirement for unpaid messages, did not violate First Amendment based on intermediate scrutiny review); *Aptive Env't,* 959 F.3d at 989-93 (applying intermediate scrutiny to ordinance imposing curfew on door-to-door solicitations, and concluding that the provision did not infringe on the sellers' First Amendment free speech rights). In fact, even where was a total ban on speech in a traditional public forum, the

24

Tenth Circuit has deemed such laws consistent with the First Amendment on multiple occasions. *See* footnote 10 at page 13 above (citing *Citizens for Peace*, 477 F.3d at 1221-26, and *Evans*, 944 F.3d at 854-60).

> b. <u>The Prohibition facilitates orderly and efficient election administration, and enhances public confidence in the integrity of the electoral process</u>

VPC also disputes that the Prohibition is justified by Kansas' interest in promoting orderly and efficient election administration. Pl.'s Br. at 18-20. This interest is closely tied to the State's interest in enhancing public confidence in the integrity of the electoral process, which is a critical interest in and of itself and which VPC does not address in its brief on remand. Regardless, the State's interests are sound and borne out by the record.

Defendants offered an abundancy of evidence of the extensive amount of extra time it took county election officials to process the inaccurate and duplicate advance ballot applications, and the elaborate and highly time-consuming cure process that such officials had to take each time they confronted such a non-compliant application. ECF No. 176, ¶¶ 33-36, 111, 139-144, 150, 152-157, 161, 163, 175-180. The Tenth Circuit specifically took notice of these stipulated facts. *See VoteAmerica*, 121 F.4th at 827-28 and 829-31.

In response, VPC mostly parrots back the district court's prior opinion, which was decided, the Tenth Circuit held, under an insufficiently deferential standard of review. While not expressly contesting there was a surge in inaccurate and duplicate applications in the 2020 General Election, VPC faults Defendants for "not connect[ing] the alleged errors in plaintiff's mailing list with errors in applications received by election officials" that required curing. Pl.'s Br. at 18 (citing *VoteAmerica*, 671 F.Supp.3d at 1252-53). But just from the partial subset of Kansas recipients of VPC/CVI pre-filled applications that VPC produced in discovery, the analyses of both Defendants' expert and VPC's expert indicated there was at least 15,000 (and likely more than 40,600) voters

who received erroneously pre-filled applications. Particularly in the context of electoral regulations, it is unreasonable and inconsistent with case law to force the State to identify the origin of every inaccurate submission before it can adopt prophylactic legislation. *See Frank v. Lee,* 84 F.4th 1119, 1140 (10th Cir. 2023) (even in case governed by strict scrutiny, states must be afforded a degree of deference when enacting laws that protect against voter confusion and ensure smooth election administration). VPC is essentially making a "little harm, no foul" argument, namely, that because only a subset of the tens of thousands of inaccurate applications it mailed out were returned to election offices, the State has no legitimate interest in preventing voter confusion, efficient election administration, and enhancing public confidence in elections through the Prohibition. Not only does that contention ignore the communications from voters expressing confusion, anger, and frustration with the pre-filled applications (as to both inaccuracies and duplicates), but it would effectively mean that Kansas would have to wait for even *greater* harm to its election processes before it could act, something the Supreme Court has said states need not do. *Munro*, 479 U.S. at 195. Whatever merit VPC's contention might have in a strict scrutiny analysis (not much, Defendants believe), it has no place under intermediate scrutiny review.

No doubt, not all erroneously pre-filled applications were submitted to county election offices. But the ones that *were* submitted—and the stipulated record reflects there were many—heavily taxed the time and resources of election officials. Any suggestion that the Prohibition will not facilitate more efficient election administration in the processing of mail votes blinks at reality. In addition, the diminished public confidence in the integrity of the electoral process resulting from many thousands of inaccurate applications floating throughout the State is itself sufficient to justify Kansas' legislative response. And as noted in Part II.B.3.a above, the pre-filled applications triggered many duplicate applications as well because of large numbers of voters thinking that they

26

had to return each and every pre-filled application in order to vote. This, too, caused havoc that the Prohibition will help prevent from recurring.

VPC emphasizes the evidence it offered from its executives and county election officials who believed that pre-filling applications can make processing them easier.  It is true that, as with many election-related provisions, there is some divergence of opinion as to the benefits and drawbacks of pre-filling advance ballot applications. While some election officials see mostly problems, others think that pre-filling is advantageous on the whole. But it is not the role of the federal judiciary—and certainly not the role of third-party organizations or county officials—to second-guess a state legislature's policy decisions.  *See Daunt v. Benson*, 999 F.3d 299, 329-31 (6th Cir. 2021) (Readler, J., concurring) (describing separation of powers concerns when election regulations are stricken). This is especially true under the far more deferential review that the Tenth Circuit ordered the district court to apply on remand. That voters might have utilized mail-in voting in 2020 in greater numbers due to the pandemic hardly undermines the State's right to adopt preventive measures like the Prohibition that are designed to minimize the harms from activities of third-parties like VPC.

In sum, Kansas has adequately proven that the Prohibition serves its legitimate interests in promoting orderly and efficient election administration, and enhancing the public's confidence in the integrity of the electoral process.

c.  Voter Fraud

VPC next argues that the Prohibition is not narrowly tailored to the State's interest in avoiding voter fraud. Pl.'s Br. at 13-15. VPC claims that, because Kansas has not had a history of systemic fraud affecting the outcome of its elections, the State is precluded from adopting the kind of prophylactic election integrity laws issue in this case. That is not how the law works in this area.

27

It is well settled that states are not required to sustain injury to their electoral system and processes before enacting preventative measures. See *Munro*, 479 U.S. at 195-96. Furthermore, to focus myopically on confirmed cases of fraud that have been both detected and successfully prosecuted greatly undervalues the prophylactic effect of election integrity laws like the Prohibition. The utility of this law is in no way undermined by a small number of fraud cases (either historically or contemporaneously). After all, not only is voter fraud extremely hard to detect, but prosecutors have discretion as to what cases to charge and may well have other priorities.

The flaw in VPC's argument is also underscored by Judge Easterbrook's opinion for the Seventh Circuit in *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014). In that case, a group of voters and advocacy organizations challenged a Wisconsin statute requiring photo ID in order to vote. The plaintiffs argued, through testimony from a political science professor, that Wisconsin did not have any history of impersonation fraud, the only sort of harm that a photo ID would avoid. *Id.* at 749-50. The court explained, however, that "whether a photo ID requirement promotes public confidence in the electoral system is a 'legislative fact'—a proposition about the state of the world, as opposed to a proposition about these litigants or about a single state." *Id.* at 750. In other words, "[p[hoto ID laws promote confidence, or they don't; there is no way they could promote confidence in Indiana (as *Crawford* concluded) and not in Indiana. This means that they are valid in every state . . . or they are valid in no state." *Id.* The same is true here. The Prohibition's restriction on the pre-filling of advance ballot applications makes it more difficult for nefarious actors to secure an advance ballot by using the data already partially pre-populated. While the history of such fraud is thankfully rare, no such history is required. And the extremely minimal burden on VPC's rights from the Prohibition (as the Tenth Circuit explicitly found) reinforces the narrow tailoring conclusion from this state interest.

28

4.  *The Prohibition leaves open ample channels for communication*

Having established that the Prohibition is narrowly tailored, the remaining question is whether it leaves open ample channels for communication. Clearly, it does, as the Tenth Circuit expressly acknowledged in its opinion. Reflecting on the statute's limited reach of only precluding the mailing of unsolicited prefilled applications, the Tenth Circuit observed:

> The Kansas Prohibition is a far cry from "restrict[ing] access to" an entire "fundamental ... avenue of political discourse," as in *Meyer* [*v. Grant*], 486 U.S. [414,] 424 [1988]. VPC may continue using the mails to send unsolicited letters to Kansas voters advocating for mail voting and may even include a separate sheet with all the information VPC previously placed on prefilled applications along with a blank application and instructions for using it. The mailing of prefilled applications is hardly a "fundamental" method of communication or one that "is the essence of First Amendment expression," like the distribution of political leaflets or the one-on-one discussions accompanying the circulation of petitions. *McCullen*, 573 U.S. at 488–89 (internal quotation marks omitted). In short, despite the Prohibition, VPC remains free to choose what avenue of communication it will use to advocate for mail voting, including the use of unsolicited mailers.

*VoteAmerica*, 121 F.4th at 845. Individuals and entities are free to communicate any message they want with an advance ballot application and they are fully permitted to express such views through any medium outside of mailing a pre-filled, unsolicited application. There is no credible argument that the Prohibition fails to leave ample channels open for VPC to communicate its ideas. VPC's reference to the complete ban on speech in a traditional public forum in *McCraw* to suggest the absence of alternative communication options, *see* Pl.'s Br. at 20, rings hollow.

## III. – CONCLUSION

In conclusion, the Prohibition was carefully crafted to address the specific harms Kansas elections experienced from unsolicited, pre-filled advance ballot applications during the 2020 General election.  In doing so, Kansas has not restricted anyone from conveying any message they wish, as long as an unsolicited advance ballot application remains blank. The statute is narrowly tailored, leaves more than sufficient avenues for groups like VPC to communicate their chosen

messages, and satisfies the intermediate scrutiny test. Accordingly, the Court should reject VPC's

free speech challenge to the Prohibition and grant judgment to Defendants.

Respectfully Submitted,

By /s/ Bradley J. Schlozman
Bradley J. Schlozman (KS Bar #17621)
Scott R. Schillings (KS Bar #16150)
Garrett R. Roe (KS Bar #26867)
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, Kansas 67206
Telephone: (316) 267-2000
Facsimile: (316) 630-8466
Email: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com
E-mail: groe@hinklaw.com

*Attorneys for Defendants*

30

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 14th day of March 2025, I electronically filed the foregoing Defendants' Response to Plaintiffs' Brief Following Remand with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By /s/ Bradley J. Schlozman

31